No. 25-5129

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

RINNAI AMERICA CORPORATION et al.,

*Plaintiffs–Appellants*,

v.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,

*Defendant–Appellee*,

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE et al.,

*Intervenor–Defendants–Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:24-cv-10482-PA-PD
Hon. Percy Anderson, District Judge

PLAINTIFFS–APPELLANTS' OPENING BRIEF

Sarah O. Jorgensen
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1201 W. Peachtree St., Suite 2300
Atlanta, GA 30309

Brian C. Baran
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006

Courtland L. Reichman
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
(650) 623-1401
creichman@reichmanjorgensen.com

*Counsel for Appellants Rinnai America Corp., Noritz America Corp.,
National Association of Home Builders, California Manufacturers &
Technology Association, California Restaurant Association, California
Hotel & Lodging Association, California Apartment Association, and
Plumbing-Heating-Cooling Contractors of California*

*(Additional parties and counsel listed on inside cover)*

John J. Davis, Jr.
Luke Dowling
MCCRACKEN, STEMERMAN &
  HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
(415) 597-7200
jjdavis@msh.law

*Counsel for Appellant California
State Pipe Trades Council*

Angelo I. Amador
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
(202) 331-5913
aamador@restaurant.org

*Counsel for Appellant Restaurant
Law Center*

Matthew P. Gelfand
CALIFORNIANS FOR
  HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, CA 90020
(213) 739-8206
matt@caforhomes.org

*Counsel for Appellant Californians
for Homeownership, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Appellate Rule 26.1(a), Plaintiffs–Appellants state as follows:

Rinnai America Corporation is a corporation with its headquarters in Peachtree City, Georgia. Rinnai America Corporation is a wholly owned subsidiary of Rinnai Corporation (Nagoya, Japan) (ticker: RINIF).

Noritz America Corporation is a corporation with its headquarters in Fountain Valley, California. It is a wholly owned subsidiary of Noritz USA Corporation, which is a wholly owned subsidiary of Noritz Corporation (Japan) (ticker: 5943.T).

National Association of Home Builders is a nonprofit corporation organized under Nevada law, with its principal office in Washington, D.C. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

California State Pipe Trades Council is an unincorporated labor organization chartered by the United Association of Journeymen and Apprentices of the United States and Canada, AFL-CIO, CLC ("UA") and headquartered in Sacramento, California. It is an affiliate of the UA. No publicly held corporation holds any interest in the UA or its affiliates.

California Manufacturers & Technology Association is a nonprofit organization organized under California law and headquartered in Sacramento, California. It does not have a parent corporation, and no publicly held corporation owns more than 10 percent of its stock.

California Restaurant Association is a nonprofit mutual benefit corporation organized under California law and headquartered in Sacramento, California. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

Restaurant Law Center is a nonprofit, tax-exempt organization incorporated and headquartered in Washington, D.C. It is affiliated with the National Restaurant Association. It has no parent corporation, and no publicly held company owns more than 10 percent of its stock.

Californians for Homeownership, Inc. is a California public benefit corporation and a 501(c)(3) public charity headquartered in Sacramento, California. It is functionally controlled by the California Association of Realtors through the right to appoint directors. No publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

California Hotel & Lodging Association is a 501(c)(6) nonprofit corporation organized under California law and headquartered in Sacramento, California. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

California Apartment Association is a 501(c)(6) nonprofit corporation organized under California law and headquartered in Sacramento, California. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ................................................. 3

ISSUE PRESENTED ......................................................................... 4

RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS ..... 4

STATEMENT OF THE CASE ........................................................... 5

    A. Legal background ........................................................................ 5

        1. In the Energy Policy and Conservation Act, Congress preempts state and local regulations concerning the energy use of covered appliances. ............................................. 5

        2. This Court holds in *California Restaurant Ass'n* that EPCA preempts effective bans on gas appliances. ................... 8

    B. Factual and procedural background ........................................ 11

        1. The District effectively bans gas appliances by amending its Rule 1146.2 to impose a zero-$NO_x$ emissions standard. .......... 11

        2. Facing irreparable harm, Plaintiffs bring this suit to enforce EPCA and this Court's precedent. ............................. 15

        3. Echoing the dissent from denial of rehearing en banc in *California Restaurant Ass'n*, the district court attempts to distinguish that controlling precedent. ................................. 18

SUMMARY OF ARGUMENT ......................................................... 22

STANDARD OF REVIEW ............................................................... 26

ARGUMENT ..................................................................................... 26

I. This Court's Precedent Establishes That EPCA Preempts the District's Effective Ban on Covered Gas Appliances. ........................ 27

    A. *California Restaurant Ass'n* squarely controls this case. ............ 27

    B. Under this Court's reading of EPCA's plain text, the zero-$NO_x$ rule is a regulation concerning the energy use of covered appliances. ............................................................................. 35

C. This Court's analysis of EPCA's structure and purpose
confirms that the zero-$NO_x$ rule is preempted. ............................ 37

    1. The statutory structure and context demonstrate that the
District's ban on gas appliances falls well within the
preempted territory. ................................................................ 38

    2. Allowing the District to ban gas appliances would gut the
preemption provision and create the very patchwork of
standards Congress sought to prevent. .................................. 40

D. The district court's carveout for emissions regulations is
contrary to the text and this Court's precedent. ......................... 45

    1. EPCA has no implied exception for emissions regulations
that concern energy use. ......................................................... 45

    2. Finding the District's zero-$NO_x$ rule preempted will not
eviscerate local air quality regulation. ................................. 48

II. The Clean Air Act Has No Bearing Here. ......................................... 51

CONCLUSION ........................................................................................ 54

STATEMENT OF RELATED CASES .................................................... 55

CIRCUIT RULE 25-5(f) CERTIFICATION ........................................... 55

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Inst. v.*
  *Energy Res. Conservation & Dev. Comm'n,*
  410 F.3d 492 (9th Cir. 2005)................................5-6, 20-21, 41

*Am. Apparel & Footwear Ass'n v. Baden,*
  107 F.4th 934 (9th Cir. 2024) ........................................... 26

*Am. Trucking Ass'ns v. City of Los Angeles,*
  569 U.S. 641 (2013)................................................... 28, 44

*Arizona v. United States,*
  567 U.S. 387 (2012)........................................................ 26

*Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.,*
  622 F.3d 1094 (9th Cir. 2010)....................................... 49, 53

*Ass'n of Contracting Plumbers of N.Y. v. City of New York,*
  2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), *appeal filed,*
  No. 25-977 (2d Cir. Apr. 18, 2025)..................................... 20

*Barapind v. Enomoto,*
  400 F.3d 744 (9th Cir. 2005) (en banc)............................ 27, 29

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council,*
  683 F.3d 1144 (9th Cir. 2012).............................................. 41

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019)...................................................... 29

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.,*
  519 U.S. 316 (1997)........................................................ 49

*California Restaurant Ass'n v. City of Berkeley,*
  89 F.4th 1094 (9th Cir. 2024) .................................... *passim*

*Dan's City Used Cars, Inc. v. Pelkey,*
  569 U.S. 251 (2013)........................................................ 49

v

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ................................................................ 44

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) (en banc) ............................... 27

*Lamar, Archer & Cofrin, LLP v. Appling*,
138 S. Ct. 1752 (2018) ........................................................... 36

*Marshall Naify Revocable Tr. v. United States*,
672 F.3d 620 (9th Cir. 2012) ........................................... 27, 29

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ............................................................... 48

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ......................................................... 36, 51

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ............................................................... 51

*Obduskey v. McCarthy & Holthus LLP*,
139 S. Ct. 1029 (2019) ........................................................... 46

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ................................................ 5, 26-27, 45, 48

*Pulsifer v. United States*,
144 S. Ct. 718 (2024) ............................................................. 38

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) ......................................................... 37-38, 48

*Sturgeon v. Frost*,
577 U.S. 424 (2016) ............................................................... 27

*Ysleta Del Sur Pueblo v. Texas*,
142 S. Ct. 1929 (2022) ........................................................... 40

**Constitutional Provisions**

U.S. Const. art.VI, cl.2 ..................................................... 4, 26

## Statutes

28 U.S.C. §1291 ............................................................................. 3

28 U.S.C. §1331 ............................................................................. 3

28 U.S.C. §2107(a) ........................................................................ 3

Energy Policy and Conservation Act of 1975,
    42 U.S.C. §§6201-6422 ....................................................... *passim*

   §6201 .................................................................................... 41

   §6291 ...................................................................................... 7

   §6291(3) ............................................................................... 35

   §6291(4) ............................................................................... 35

   §6292 ............................................................................... 7, 50

   §6292(a)(4) .......................................................................... 36

   §6292(a)(11) ........................................................................ 36

   §6295(o)(4) ..................................................................... 41, 43

   §6295(q)(1) .......................................................................... 43

   §6295(q)(1)(A) ..................................................................... 42

   §6295(q)(1)(B) ..................................................................... 42

   §6297 .................................................................................... 46

   §6297(a) ............................................................................... 21

   §6297(a)(2)(A) ................................................................. 35, 45

   §6297(c) ........................................................................ *passim*

   §6297(c)(1)-(9) .................................................................... 46

   §6297(c)(2) ............................................................................. 7

   §6297(c)(3) ....................................................................... 7, 46

§6297(d) ....................................................................... 7, 10, 24, 39-40, 46

§6297(d)(1) ......................................................................................... 39

§6297(d)(1)(A)-(B) ............................................................................... 8

§6297(d)(3) ........................................................................ 8, 10, 39, 42-43

§6297(d)(4) ............................................................................. 6, 8, 42-43

§6297(e) ............................................................................................ 46

§6297(f) .................................................................................... 9, 29, 46

§6297(f)(3) ................................................................................. *passim*

§6297(f)(3)(A) ...................................................................................... 7

§6297(f)(3)(C) ................................................................................. 7, 41

§6297(f)(3)(F) ...................................................................................... 7

§6311(4) .............................................................................................. 8

§6311(7) .............................................................................................. 8

§6313 ................................................................................................... 7

§6313(a)(4)-(5) .................................................................................. 36

§6316(b)(2)(A) .................................................................................... 8

42 U.S.C. §7410(a)(2)(E)(i) .................................................................. 52

Cal. Health & Safety Code §40410 ....................................................... 11

Cal. Health & Safety Code §40412 ....................................................... 11

Cal. Health & Safety Code §40700 ....................................................... 11

Cal. Health & Safety Code §40701(b) ................................................... 11

Energy Policy Act of 1992,
Pub. L. No. 102-486, §123(h)(3), 106 Stat. 2776, 2830 ......................... 6

Energy Policy Act of 2005,
Pub. L. No. 109-58, §135(d), 119 Stat. 594, 634 .................................. 7

National Appliance Energy Conservation Act of 1987,
Pub. L. No. 100-12, §7, 101 Stat. 103, 117-22 ....................................... 6

**Rules**

9th Cir. R. 28-2.7 ...................................................................... 4

Fed. R. App. P. 4(a)(1)(A) ........................................................ 3

Fed. R. Civ. P. 62(d) ................................................................ 16

S. Coast AQMD R. 1121 ........................................................ 12

    Rule 1121(a) ..................................................................... 12

    Rule 1121(b)(14) .............................................................. 12

S. Coast AQMD R. 1146.2 ...................................... *passim*

    Rule 1146.2(b) .................................................................. 12

    Rule 1146.2(c)(1) ............................................................. 12

    Rule 1146.2(c)(18) ........................................................... 12

    Rule 1146.2(c)(24)-(25) ................................................... 14

    Rule 1146.2(c)(28) .......................................................12-13

    Rule 1146.2(c)(29) ........................................................... 13

    Rule 1146.2(c)(30) ........................................................... 12

    Rule 1146.2(c)(31) ........................................................... 12

    Rule 1146.2(d)(1) ............................................................. 13

    Rule 1146.2(d)(2) ....................................................13-14, 31

    Rule 1146.2(d)(3) ............................................................. 14

    Rule 1146.2(e)(1) ............................................................. 14

Rule 1146.2(j)(9) ............................................................... 14

Rule 1146.2(k)(1)(B) ......................................................... 12

Rule 1146.2(k)(4)-(5) ........................................................ 14

## Other Authorities

Brief for the United States as Amicus Curiae Supporting
    Appellants, *Ass'n of Contracting Plumbers of N.Y. v. City of*
    *New York*, No. 25-977 (2d Cir. Aug. 7, 2025), Dkt.26.1 ...................... 11

California Restaurant Ass'n's Opposition to Motion to Dismiss
    First Amended Complaint, *Cal. Rest. Ass'n v. City of*
    *Berkeley*, 547 F. Supp. 3d 878 (N.D. Cal. 2021), Dkt.52 ................... 50

H.R. Rep. No. 94-340 (1975) ...................................................... 41

H.R. Rep. No. 100-11 (1987) ...................................................... 43

S. Rep. No. 94-516 (1975) (Conf. Rep.) ................................... 41

S. Rep. No. 100-6 (1987) ............................................................6-7, 41-42

## INTRODUCTION

This case presents essentially the same question of federal preemption this Court resolved last year in *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§6201-6422, expressly preempts state and local "regulation[s] concerning" certain appliances' "energy use." 42 U.S.C. §6297(c). Banning an appliance from using any energy—and thus setting its maximum energy use to zero—concerns that appliance's energy use and is therefore preempted. When Berkeley tried taking "a more circuitous route to" a ban on gas appliances by instead banning gas piping, this Court held that its ban was nonetheless preempted. *Cal. Rest.*, 89 F.4th at 1098. Berkeley could not do indirectly what it could not do directly.

The decision below flatly contradicts that precedent. This case arose when, within months of this Court's decision, the South Coast Air Quality Management District tried a slightly different route to the same preempted destination. Instead of cutting gas appliances off from the energy supply, the District prevented them from using any energy by banning emissions of nitrogen oxides ($NO_x$), an inevitable byproduct of combustion. The District's zero-$NO_x$ rule is legally indistinguishable from Berkeley's; both "effectively eliminate[] the 'use' of an energy source" (and thus set appliances' maximum energy use to zero), *Cal.*

1

*Rest.*, 89 F.4th at 1102, and so both are "regulation[s] concerning" covered appliances' "energy use," §6297(c).

Yet the district court allowed the District's ban to stand. Despite finding that the District's zero-$NO_x$ rule bans gas appliances, the court below concluded that it is not preempted because it "concerns the pollution appliances emit, and not how much energy an appliance uses." ER-13, ER-16-17. Swap in "piping within buildings" for "pollution appliances emit," and Berkeley could have said the same. At every turn, the district court failed to give fair import to this Court's reasoning and holding in *California Restaurant Ass'n* and instead attempted to confine that decision to its facts. That is not how to apply binding precedent.

The district court rattled off one purported distinction after the next, but to no avail. Everything it came up with was either equally true of Berkeley's ban or an argument unsuccessfully advanced in *California Restaurant Ass'n*. The reality is that the cases are on all fours.

That left the district court to write in an exception to EPCA preemption for emissions regulations. But that flouts the basic rules of statutory interpretation. Congress already wrote in all the exceptions it wanted, and the district court's new exception is nowhere to be found.

If allowed to stand, the district court's approach would upend the statutory scheme—and this Court's decision—by making EPCA trivially easy to evade. The District's zero-$NO_x$ rule would be a blueprint for any other state or local government that wants to do what this Court held

EPCA prohibits: ban gas appliances. Berkeley itself could reinstate its ban by recasting it as an emissions regulation; instead of banning the piping, just ban combustion. That would drive a truck through this Court's decision. And it would as good as erase EPCA's preemption provision, leading to exactly the result Congress crafted it to prevent: a patchwork of state and local regulations that undercuts consumer choice and burdens manufacturers' decisions regarding production and sales of appliances on a national scale. Last time around, this Court understood that Berkeley's ban would do just that. This case is no different.

All in all, the District's zero-$NO_x$ rule is indistinguishable from Berkeley's ban, and so it is preempted for the same reasons. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Plaintiffs' federal preemption claim under 28 U.S.C. §1331. It entered final judgment on July 18, 2025, ER-18-19, then amended its opinion and entered an amended judgment on July 22, 2025. ER-6-7. Plaintiffs timely appealed on August 8, 2025. ER-236-39; *see* 28 U.S.C. §2107(a); Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUE PRESENTED

Is the South Coast Air Quality Management District's effective ban on certain gas appliances—implemented by capping their emissions of $NO_x$, an inevitable byproduct of combustion, at zero—preempted by EPCA, as this Court held for Berkeley's ban on gas piping in *California Restaurant Ass'n*?

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

Article VI, clause 2 of the United States Constitution provides in pertinent part:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art.VI, cl.2.

EPCA's express preemption provision for consumer products states in pertinent part:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product … .

42 U.S.C. §6297(c).[1]

Other pertinent statutes and regulations are reproduced in the addendum to this brief. 9th Cir. R. 28-2.7.

---

[1] All further statutory references are to Title 42 of the U.S. Code unless otherwise noted.

## STATEMENT OF THE CASE

### A. Legal background

#### 1. In the Energy Policy and Conservation Act, Congress preempts state and local regulations concerning the energy use of covered appliances.

Responding to the early 1970s oil crisis, Congress enacted the Energy Policy and Conservation Act of 1975 to create a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016). To that end, EPCA both encouraged domestic supply and promoted energy conservation. One component of Congress's national policy is EPCA's regulation of many appliances' energy efficiency and energy use.

EPCA's appliance provisions originally focused on labeling, on the theory that well-informed consumers would choose more efficient appliances. *Air Conditioning*, 410 F.3d at 498-99. But over time, Congress shifted toward mandating federal standards while limiting state and local governments' role. *Id.* at 499. In 1978, Congress amended EPCA to require the Department of Energy to prescribe federal standards, while also strengthening preemption. *Id.* The Department

refused, instead "initiat[ing] a general policy of granting petitions from States requesting waivers from preemption." *Id.* (attribution omitted).

So Congress amended EPCA again in 1987, prescribing standards for many common household appliances and adopting the preemption provision at issue here. *Air Conditioning*, 410 F.3d at 499-500; *see* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, §7, 101 Stat. 103, 117-22. The Department's abdication of its standard-setting responsibility and its freewheeling waiver policy had created "a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Congress thus expanded preemption and restricted waivers, including by barring waivers "likely to result in the unavailability in the State of a product type or of products of a particular performance class." *Id.* at 2; §6297(d)(4).

The preemption provision for consumer products now reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [§6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product … .

§6297(c) (emphasis added).[2] Many common household and commercial

---

2 The current version of §6297(c) reflects a handful of minor amendments Congress has made since 1987, none of which are relevant here. *See, e.g.*, Energy Policy Act of 1992, Pub. L. No. 102-486, §123(h)(3),

appliances are "covered products" under EPCA, including furnaces, boilers, water heaters, stoves, ovens, dishwashers, dryers, and pool heaters. *See* §§6291, 6292, 6313; *Cal. Rest.*, 89 F.4th at 1101.

The preemption provision lists several narrow exceptions. As relevant here, it exempts regulations that are in a building code for new construction that satisfies certain criteria, §6297(c)(3), (f)(3), or for which the Department of Energy waives preemption, §6297(c)(2), (d).

To qualify for the building code exception, a building code must satisfy a series of strict requirements. §6297(f)(3). The thrust of these requirements is that the code must set a general energy conservation objective, allow builders the freedom to choose a mix of products to meet that objective, and treat products evenhandedly without requiring them to exceed federal standards. *See, e.g.*, §6297(f)(3)(A), (C), (F); *see also* S. Rep. No. 100-6, at 10-11 (explaining that Congress meant to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met").

As for the waiver exception, Congress carefully cabined the Department's ability to waive preemption. A regulation that "provides for any energy conservation standard or other requirement" is eligible for a waiver only if it is "needed to meet unusual and compelling State or

---

106 Stat. 2776, 2830 (adding "water use"); Energy Policy Act of 2005, Pub. L. No. 109-58, §135(d), 119 Stat. 594, 634 (exempting certain enumerated California regulations).

local energy or water interests," §6297(d)(1)(A)-(B).  Even then, waivers are prohibited when the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," §6297(d)(3), or is "likely to result in the unavailability" of types or classes of appliances that were generally available before the regulation, §6297(d)(4).[3]

### 2. This Court holds in *California Restaurant Ass'n* that EPCA preempts effective bans on gas appliances.

When Berkeley effectively banned gas appliances by "prohibit[ing] natural gas *piping* in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless," a unanimous panel of this Court held that §6297(c)'s plain text preempted that ban.  *Cal. Rest. Ass'n*, 89 F.4th at 1098.

This Court recognized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings."  *Cal. Rest.*, 89 F.4th at 1107.  It did not matter that Berkeley took a "more circuitous route to the same result" by prohibiting the piping necessary to use those appliances.  *Id.* at 1098.

---

[3] A separate preemption provision governs industrial equipment.  *See* §6316(b)(2)(A) (preempting "any State or local regulation concerning the energy efficiency or energy use of a product for which" there is a federal standard); *see also* §6311(4), (7) (defining "energy" and "energy use" in essentially the same way as the consumer provision).  Because the district court determined that the consumer and industrial provisions work the same way in relevant part, this brief will focus on the consumer provisions for simplicity.  *See* ER-10 n.5.

8

After all, it is well established that "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Id.* at 1107. "And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* at 1103. Likewise, it was no excuse that Berkeley's ban in effect "lower[ed] the quantity of energy consumed to zero," as opposed to some nonzero number; rather, "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." *Id.* at 1102 (cleaned up).

The Court began by grounding its holding in the text of §6297(c). It set out "to determine what constitutes a 'regulation concerning the … energy use' of a covered product." *Cal. Rest.*, 89 F.4th at 1101 (alteration in original). To do so, it considered the statutory definitions and undefined terms' plain meaning. It concluded that, "putting the[] terms together, EPCA preempts regulations, including 'building code requirements,' §6297(f), that relate to the quantity of natural gas directly consumed by certain consumer appliances at the place where those products are used." *Cal. Rest.*, 89 F.4th at 1101 (cleaned up). The Court explained that "rather than limit[ing] preemption to facial regulations of" covered appliances—as the district court there had thought—"Congress expressly expanded EPCA's reach to regulations that 'concern'"

9

those appliances. *Id.* at 1103 (alteration incorporated) (quoting §6297(c)); *see id.* at 1098 (noting the district court's view that preemption was limited "to ordinances that facially or directly regulate covered appliances").

This Court further explained how statutory context and structure confirm the broad scope of preemption under §6297(c). To start, the Court explained that §6297(f)(3)'s building code exception confirms that §6297(c) extends "at least" to building code requirements—and thus cannot be limited to design requirements that operate on the manufacturer's factory floor. *Cal. Rest.*, 89 F.4th at 1101-02.

Continuing to the waiver provision, this Court concluded that §6297(d) "likewise shows the extensive scope of the preemption clause." *Cal. Rest.*, 89 F.4th at 1103-04. By prohibiting the Department from waiving preemption if a regulation "will significantly burden manufacturing, marketing, distribution, sale, or servicing" of products, §6297(d)(3), the waiver provision requires the federal government to "consider the complete lifecycle of an appliance." *Cal. Rest.*, 89 F.4th at 1103-04. The Court reasoned that "[s]uch a provision would make little sense if the scope of EPCA's preemption end[ed] with the design or manufacture of the product." *Id.* at 1104. The Court therefore declined to read §6297(c) as limiting preemption to regulations that affect design choices on the factory floor. *Id.* at 1103-04.

This Court likewise rejected what was then the federal government's view that only "energy conservation standards" or their equivalent were

10

preempted. *Cal. Rest.*, 89 F.4th at 1105. The Court explained that among other problems, that interpretation would require giving different statutory terms the same meaning—including when those different terms were used together in the same sentence. *See id.*[4]

Ultimately, the Court concluded that confining preemption to the equivalent of energy conservation standards or to regulations affecting appliances on the factory floor would "engraft[] a limiting component onto the statute," an approach the Supreme Court has rejected. *Cal. Rest.*, 89 F.4th at 1106-07 (cleaned up) (collecting cases). The Court therefore held that Berkeley's gas piping ban was preempted. *Id.* at 1098-99, 1107.

The Court declined to reconsider the issue en banc. *Cal. Rest.*, 89 F.4th at 1098.

## B. Factual and procedural background

### 1. The District effectively bans gas appliances by amending its Rule 1146.2 to impose a zero-NO$_x$ emissions standard.

The South Coast Air Quality Management District is a public entity under California law that has responsibility for air quality in the South Coast Air Basin, which includes parts of the Counties of Los Angeles, Orange, Riverside, and San Bernardino. Cal. Health & Safety Code §§40410, 40412, 40700, 40701(b).

---

[4] In light of this Court's analysis, the government reconsidered its position and has told the Second Circuit that it now agrees with this Court's interpretation. Brief for the United States as Amicus Curiae Supporting Appellants at 1-2 & n.1, *Ass'n of Contracting Plumbers of N.Y. v. City of New York*, No. 25-977 (2d Cir. Aug. 7, 2025), Dkt.26.1.

The District's Rule 1146.2, titled "Emissions of Oxides of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters," has long limited certain gas appliances' emissions of nitrogen oxides ($NO_x$). S. Coast AQMD R. 1146.2; *see* ER-83. And gas appliances meeting those limits have long been sold in the District. ER-83-85; *see* ER-39-47 ¶¶6, 9, 12, 15.

Within months of this Court's decision in *California Restaurant Ass'n*, the District amended Rule 1146.2 to impose zero-$NO_x$ emission limits on the gas appliances within the rule's scope. ER-37 ¶2; *see* ER-214-35. Because $NO_x$ is an inevitable byproduct of combustion, no gas appliance can operate without producing some $NO_x$. ER-37 ¶3. As a result, the District's new zero-$NO_x$ limits effectively ban all gas appliances subject to the rule. ER-13.

As amended, Rule 1146.2 applies to "manufacturers, distributors, retailers, Resellers, Installers, owners, and operators of Units fired with, or designed to be fired with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000 British Thermal Units (Btu) per hour." Rule 1146.2(b). A "Unit" is defined as "any Boiler, Water Heater, or Process Heater," except gas tank water heaters addressed by Rule 1121. Rule 1146.2(c)(28), (c)(30), (k)(1)(B); *see* Rule 1146.2(c)(1), (18), (31) (definitions); S. Coast AQMD R. 1121(a), (b)(14). These appliances include all gas tankless water heaters, larger commercial tank water heaters, boilers used to heat residential and commercial

buildings, and pool and spa heaters used in homes, gyms, apartment complexes, and hotels. ER-83-85. By the District's own count, Rule 1146.2 applies to more than a million units. ER-39 ¶5.

Rule 1146.2 sets schedules for the rollout of zero-$NO_x$ limits depending on the type of gas appliance and whether it is in a new or existing building. Rule 1146.2(d)(1)-(2). The first zero-$NO_x$ limits for appliances in new buildings will take effect January 1, 2026. Rule 1146.2(d)(2) tbls.2-3. Those limits cover gas tankless water heaters and most "Type 1 Units" (those with a rated heat input capacity less than or equal to 400,000 Btu/hr). *Id.*; *see* Rule 1146.2(c)(28) (defining "Type 1 Unit"). These Phase I limits will be applied to existing buildings in 2029. Rule 1146.2(d)(2) tbl.3.

The second phase of appliances subject to zero-$NO_x$ limits are pool heaters and most "Type 2 Units" (those with a rated heat input capacity greater than 400,000 Btu/hr). Rule 1146.2(d)(2) tbls.2-3; *see* Rule 1146.2(c)(29) (defining "Type 2 Unit"). The Phase II limits take effect in 2028 for new buildings and 2031 for existing buildings. Rule 1146.2(d)(2) tbl.3. The third phase covers Type 1 and Type 2 High Temperature Units and takes effect in 2029 for new buildings and 2033 for existing buildings. Rule 1146.2(d)(2) tbls.2-3.

Once a zero-$NO_x$ limit takes effect, Rule 1146.2(d)(2) provides that "[n]o person shall manufacture, supply, sell, offer for sale, or Install, for use in the" District, any appliance exceeding that limit. Rule 1146.2(d)(2).

13

The rule also mandates the scheduled replacement of existing gas appliances with zero-$NO_x$ alternatives once the appliances are 15 or 25 years old, depending on the type of appliance. Rule 1146.2(d)(3); *see* Rule 1146.2(d)(2) tbl.2 (listing maximum unit ages); Rule 1146.2(e)(1) (unit age calculation). This means, for example, that a hotel spa heater that was installed new in 2020 must be replaced with an electric alternative by 2035, regardless whether such a replacement is necessary or even practical.

Although the rule exempts "Residential Structure[s]" and some "Small Business[es]" from the scheduled replacements, those who qualify for the exemption must still comply with the zero-$NO_x$ limits whenever they choose (or are forced by a breakdown) to replace their appliances. Rule 1146.2(k)(4)-(5); *see* Rule 1146.2(c)(24)-(25) (definitions); S. Coast AQMD R. 102 (limiting "Small Business[es]" to those with no more than ten employees and no more than $500,000 in gross annual receipts); *see also* Rule 1146.2(j)(9) (recordkeeping and reporting requirements for the small business exemption).

The District's Final Staff Report reflects the District's understanding that its rule effectively bans gas appliances and requires replacement with electric appliances. That is the premise of its cost-effectiveness analysis. ER-91 (considering the increased installation costs for heat pumps relative to gas appliances); ER-92 (comparing "[h]eat pump pool heaters" with "natural gas-fired pool heaters"). In particular, the report

14

"considered the cost impacts of transitions from conventional combustion heating that uses natural gas to zero-emission technologies that use electricity." ER-93 ("Estimating Fuel Switching Cost"); ER-94 (determining utility costs for an "existing" gas unit compared to "the electric unit which will be replacing" it). The District's Final Socioeconomic Impact Assessment likewise acknowledges that the rule will force a "transition[] from natural gas to zero-emission water heating technologies that use electricity." ER-106.

In sum, Rule 1146.2's zero-$NO_x$ limit effectively bans the sale or installation of regulated gas appliances, including by forcing retrofits of gas appliances with electric appliances in existing buildings. The upshot is that gas appliances that ordinary homeowners, renters, and businesses rely on to meet basic needs like taking a hot shower, heating an office, or keeping a hotel pool usable year-round must all be replaced with electric appliances.

## 2. Facing irreparable harm, Plaintiffs bring this suit to enforce EPCA and this Court's precedent.

Plaintiffs are manufacturers and sellers of gas appliances, trade associations, affordable housing groups, and labor union groups that collectively represent or employ thousands of residents, business owners, employers, and employees who live or work in the District. Plaintiffs' and their members' livelihoods rely on the availability of natural gas appliances and systems. ER-39-67 ¶¶6-39; *see* ER-109-76. The District's

zero-NO$_x$ rule is already harming Plaintiffs and their members, and once the first phase's effective date arrives on January 1, 2026, those injuries will be exacerbated. ER-36-67 ¶¶6-39.[5] Banning gas appliances will affect not just sales and installation of those appliances, but also related pipefitting and plumbing work, manufacturing processes, new building construction, and housing availability and affordability. *Id.* Plaintiffs and their members will lose sales and revenues, customers and goodwill, market position and reputation, certain lines of business, job opportunities, work hours, or the ability to pursue their chosen professions, and they will suffer business disruptions and reorganizations, compliance burdens, and a diminished workforce. *Id.*

For example, Rinnai America Corp. and Noritz America Corp. are leading sellers of gas tankless water heaters, and they have established market reputations and relationships with distributors and contractors in the District on that basis. ER-39-49 ¶¶6-18; ER-110-11 ¶¶2, 6 (Rinnai); ER-114-15 ¶¶2, 5 (Noritz). By outlawing their leading products, the rule will affect their sales and revenues, impact their distribution networks, undermine established relationships with customers and contractors, damage their goodwill and market share, force layoffs, and

---

[5] Plaintiffs moved in the district court under Civil Rule 62(d) to enjoin the zero-NO$_x$ limits as to EPCA-covered appliances pending appeal. As of this brief's filing, the motion is fully briefed, and a hearing is set for September 29, 2025. ER-260-61 (Dkts.85-90).

require costly changes to manufacturing and distribution facilities. ER-39-49 ¶¶6-18; ER-111-12 ¶¶4-8 (Rinnai); ER-114-16 ¶¶3-8 (Noritz).

Union members who provide plumbing and pipefitting services throughout the District will also be harmed by the District's rule. Banning gas appliances means forgoing the plumbing work related to installing, servicing, and repairing them, which in turn means lost work hours and wages, lost job opportunities, and harm to hiring and training programs. ER-51-53 ¶¶22-23. Similarly, members of the Plumbing-Heating-Cooling Contractors of California will be harmed by the loss of gas-related work; one family-owned plumbing company attests that 60% or more of its revenues come from selling and installing gas appliances. ER-66-67 ¶¶38-39; ER-173-76.

The hotel industry in the District, with many older structures, faces major renovations, which will impose substantial costs and cause disruptions like removing rooms from service or reducing amenities. ER-64-66 ¶¶36-37. Likewise, owners and operators of commercial properties, including landlords and restaurants, will be harmed by the rule's forced retrofits, which may require new transformers, electric panel upgrades, reconfiguration, venting or condensate management, and other equipment investments, as well as relocation of tenants or disruption of business operations. ER-55-57 ¶¶27-28; ER-61-64 ¶¶33-35. Similarly, manufacturing and industrial facilities face increased costs and

17

disruptions to their business operations as a result of the rule. *See* ER-53-55 ¶¶24-26; ER-128.

And homebuilders, homeowners, landlords, and renters will be harmed by the increased cost of and compliance burdens on building, renting, maintaining, and selling housing units. ER-50-51 ¶¶19-21, ER-57-64 ¶¶29-35. That will erode the affordability and availability of housing in the District. ER-57-61 ¶¶29-32.

To put a stop to the irreparable harms caused by the District's preempted zero-$NO_x$ rule, Plaintiffs brought this suit for declaratory and injunctive relief. ER-181-213. The district court allowed three environmental groups to intervene as defendants, subject to conditions preventing them from expanding the scope of the dispute. ER-177-80.

### 3. Echoing the dissent from denial of rehearing en banc in *California Restaurant Ass'n*, the district court attempts to distinguish that controlling precedent.

Both sides sought summary judgment on the same dispositive legal issue: whether EPCA preempts the District's zero-$NO_x$ rule. ER-8.

**a.** The district court granted summary judgment for the District. ER-17. The court determined that "by prohibiting $NO_x$ emissions," the challenged rule "effectively bans the use of covered gas fueled boilers and water heaters." ER-13. But the court agreed with the District that "unlike the building code provision at issue in" *California Restaurant Ass'n*, the zero-$NO_x$ rule "concerns the pollution appliances emit, and not

18

how much energy an appliance uses, and is therefore outside the scope of the *CRA* holding." *Id.*

According to the district court, this Court held that Berkeley's ban on gas piping was preempted "because the building code required appliances to use a quantity of 'zero' natural gas." ER-14. The district court emphasized the *California Restaurant Ass'n* opinion's characterization of its holding as "very narrow" and suggested that the opinion was "expressly limited" to building codes. ER-15 (attribution omitted).

The district court took that to mean that "the basis for" this Court's decision "was that the Berkeley building code imposed a complete physical impediment to the use of gas for covered appliances in buildings" where gas service was otherwise available. ER-15. "In other words," by banning the piping needed to connect appliances to otherwise-available gas, the ordinance "concerned the energy use of covered appliances within the meaning of" §6297(c) "by setting that use at zero." *Id.* (cleaned up).

Based on its narrow reading of this Court's precedent, the district court concluded that the zero-$NO_x$ rule presents "a very different situation" from Berkeley's ban on gas piping. ER-15-16. How so? Because, the court said, the zero-$NO_x$ rule "is not a building code"; "says nothing about the quantity of gas an appliance may use"; does not "depend on an appliance's efficiency or energy use"; and "does not create inconsistent state efficiency standards, require that consumers use appliances with higher state efficiency standards, or force manufacturers

19

to meet standards different than those set by the" Department of Energy. *Id.* Instead, it "addresses the pollution appliances emit" and is intended to "address air pollution issues and the health risks associated with the combustion of natural gas." *Id.*

Although the district court cited no support for these attempted distinctions, they all are either equally true of Berkeley's ban or represent arguments asserted unsuccessfully in *California Restaurant Ass'n. See* 89 F.4th at 1125-26 (Friedland, J., dissenting from the denial of rehearing en banc); *infra* pp.32-34 (table mapping every purported distinction to *California Restaurant Ass'n*).[6]

Next, despite acknowledging that this Court "has consistently held that in cases involving an express preemption clause, there is no presumption against preemption," ER-12, the district court relied in part on its concern that finding the District's rule preempted "would upset the historic and recognized powers of states and local governments to set emissions standards and implement other regulations designed to protect the health and safety of their citizens," ER-16. And it cited this Court's *Air Conditioning* decision for the proposition that EPCA's legislative

---

[6] The district court was well aware of the *California Restaurant Ass'n* dissent from denial; it twice cited it as authority for EPCA's history. ER-13-14. And when summarizing EPCA's requirements, the district court relied on a Southern District of New York decision expressly disagreeing with *California Restaurant Ass'n. Id.*; *see Ass'n of Contracting Plumbers of N.Y. v. City of New York*, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025), *appeal filed*, No. 25-977 (2d Cir. Apr. 18, 2025).

history "supports a narrow interpretation of" the neighboring preemption provision in §6297(a). ER-16 (quoting *Air Conditioning*, 410 F.3d at 500). That decision relied on the since-rejected presumption against preemption. *See Air Conditioning*, 410 F.3d at 497 ("Beginning with the presumption that Congress did not intend to supplant state law, we must narrowly interpret §6297(a) … .").

Drawing on its concern with upsetting historic powers, the district court concluded that "there is no reason to believe that Congress ever intended" for EPCA to "preempt emission regulations designed to combat air pollution." ER-16. Unlike building codes, the court reasoned, EPCA "fails to mention air pollution regulations," so it must not have meant to preempt them. *See id.* Aside from the text's ostensible silence, the court also relied on its view of EPCA's legislative history as "focus[ing] on establishing national standards for energy efficiency and not on upsetting state and local governments' longstanding practice of regulating appliance emissions." *Id.* (citing *Air Conditioning*, 410 F.3d at 500).

In sum, given its cabined view of *California Restaurant Ass'n*, the district court thought neither this Court's decision nor EPCA applies to emissions regulations meant to achieve compliance "with federal air pollution standards." ER-16-17. For that reason, it concluded that the zero-NO$_x$ rule "does not concern the energy use of appliances" and thus is not preempted. *Id.*

Finally, the district court dropped a footnote asserting that because it distinguished *California Restaurant Ass'n*, it "need not reconcile" that binding precedent with an out-of-Circuit district court decision expressly disagreeing with this Court's decision. ER-17 n.9.

**b.** The district court first issued its opinion and entered final judgment on July 18, 2025, ER-18-30, but then issued an amended opinion, ER-8-17, and entered an amended final judgment for the District on July 22, 2025, ER-6-7. Plaintiffs timely appealed. ER-236-39.[7]

## SUMMARY OF ARGUMENT

**I.** This Court's decision in *California Restaurant Ass'n* is directly on point and disposes of this case. Its holding and reasoning confirm that EPCA expressly preempts the District's effective ban on gas appliances. The district court's contrary conclusion is irreconcilable with controlling precedent and the statute's plain text.

**A.** This case does not arrive on a blank slate. *California Restaurant Ass'n* held that EPCA preempts Berkeley's legally indistinguishable ordinance effectively banning gas appliances. Given the district court's correct conclusion that the District's zero-$NO_x$ rule effectively bans EPCA-covered gas appliances by banning an inevitable byproduct of combustion, there was nothing left for it to do but apply this Court's

---

[7] Plaintiffs' motion for an injunction pending appeal is awaiting resolution in the district court as of this brief's filing. *Supra* note 5. Plaintiffs' motion to expedite the appeal is pending in this Court. Dkt.8.1.

binding decision and hold that the rule is preempted. Instead, the district court tried and failed to distinguish this case.

The district court's insistence that *California Restaurant Ass'n* has no bearing on anything other than building codes targeting the physical infrastructure needed to fuel gas appliances mistakes the decision's facts for its reasoning. That this Court took care to decide only the question presented does not erase or make any less binding the reasoning that got it there.

The district court's scattershot list of purported distinctions only underscores that *California Restaurant Ass'n* is indistinguishable. Every last one is either equally true of Berkeley's ban, an unsuccessful argument advanced in *California Restaurant Ass'n*, or both. The district court's argument bears closer resemblance to the dissent from denial of rehearing en banc than to the unanimous panel opinion.

**B.** EPCA's plain text preempts the District's rule. Because the zero-$NO_x$ rule effectively sets covered gas appliances' maximum permissible energy use to zero—and thus regulates the quantity of energy they use— it is a "State regulation" concerning covered products' "energy use," and it is therefore preempted. This Court already recognized the broad scope of preemption under §6297(c). The District's ban on gas appliances' inevitable emissions, and thus on gas combustion, concerns covered appliances' energy use for the same reason Berkeley's ban on gas piping did: It necessarily regulates how much energy gas appliances consume

23

by preventing them from using any energy. That the District moved one step down the energy chain whereas Berkeley moved one step up makes no difference.

**C.** This Court's analysis of EPCA's structure and purpose reinforce the point. The building code exception, §6297(f)(3), confirms that preemption extends beyond the factory floor; it is not limited to energy conservation standards or to design or manufacturing requirements. And the constraints Congress imposed on the Department of Energy's waiver authority, §6297(d), reflect the very concerns the District's zero-$NO_x$ rule implicates: Congress wanted to preserve consumer choice and avoid the significant burdens on the national supply chain that a regulatory patchwork would present.

What's more, allowing state and local appliance bans as long as they take the form of emissions regulations would upend Congress's carefully calibrated statutory scheme. The district court's approach would make EPCA's preemption provision—and this Court's decision in *California Restaurant Ass'n*—trivially easy to evade, leading to the regulatory patchwork Congress sought to prevent. Consider Berkeley's ban: All Berkeley would have needed to do to evade preemption is ban gas combustion (or its emissions) instead of banning gas piping.

**D.** Finding no exception for emissions regulations in the statute Congress wrote, the district court opted to add one of its own, claiming support from Congress's purported silence. But Congress was crystal

24

clear that it was preempting all state and local laws, regulations, and requirements concerning covered products' energy efficiency or energy use, subject to a detailed list of exceptions. That emissions regulations are not on the list is dispositive evidence that Congress did not create any such exception—not, as the district court thought, evidence of an unwritten exception.

The district court's reliance on a narrow view of the legislative history and on a concern with intruding on traditional state powers fares no better. EPCA's statutory objectives, as demonstrated both by its text and history, are not limited to energy efficiency standards or the equivalent; this Court already rejected that view. And reading the preemption provision narrowly to protect traditional police powers resurrects the overruled presumption against preemption.

Enforcing the statute Congress wrote in this case will not cast a cloud over ordinary local air quality regulation—not even over the preexisting version of Rule 1146.2, which limited gas appliances' $NO_x$ emissions rather than banning them altogether. Incidental impacts do not trigger preemption. Categorical bans do.

**II.** Contrary to the district court's suggestion and the District's argument below, the Clean Air Act has no role to play in this case. EPCA does not exempt regulations motivated by Clean Air Act compliance from preemption. Nor does anything in the Clean Air Act authorize state and local governments to combat air pollution by violating other federal

25

statutes. To the contrary, states must provide assurances that their air quality regulations are not prohibited by federal law before the EPA may approve regulations for inclusion in state implementation plans.

This Court should hold that EPCA preempts the District's zero-$NO_x$ rule and reverse.

## STANDARD OF REVIEW

This Court reviews de novo whether federal law preempts a state or local law. *Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024). The issue on appeal was ruled on in the district court's amended summary judgment order. ER-8-17.

## ARGUMENT

Under the Supremacy Clause, federal law is "the supreme Law of the Land" and is binding on the states and their political subdivisions, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art.VI, cl.2. "Under this principle, Congress has the power to pre-empt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). One way Congress can do so is "by enacting a statute containing an express preemption provision." *Id.*

Just like any other question of statutory interpretation, express preemption is analyzed by beginning with the text—and ending there when the text is unambiguous. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see also Cal. Rest.*, 89 F.4th at 1101. That is because the statute's plain meaning "necessarily contains the best

evidence of Congress's preemptive intent." *Franklin Cal.*, 579 U.S. at 125 (attribution omitted). Courts "do not invoke any presumption against preemption" when interpreting express preemption provisions. *Id.*; *accord Cal. Rest.*, 89 F.4th at 1101. Of course, like any other statutory text, preemption provisions must be read in context. *Cal. Rest.*, 89 F.4th at 1101; *see also, e.g.*, *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016).

This Court's published decisions are "binding authority" that "must be followed unless and until overruled by a body competent to do so." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (attribution omitted). That includes a panel's reasoning, not just its bottom line. *E.g.*, *Marshall Naify Revocable Tr. v. United States*, 672 F.3d 620, 627 (9th Cir. 2012) ("[W]e treat reasoning central to a panel's decision as binding later panels." (attribution omitted)); *see also* *Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam) (panel's discussion of an issue "presented for review" is binding "regardless of whether it was in some technical sense 'necessary' to [the Court's] disposition of the case").

# I. This Court's Precedent Establishes That EPCA Preempts the District's Effective Ban on Covered Gas Appliances.

## A. *California Restaurant Ass'n* squarely controls this case.

1. This Court as good as resolved this case in *California Restaurant Ass'n*. Under a straightforward application of that case's holding and reasoning, the District's zero-$NO_x$ rule is preempted for the same reason

Berkeley's was. From §6297(c)'s standpoint, there is no daylight between the two regulations. The District's zero-$NO_x$ rule does nothing more than "shift[] the[] regulatory focus" from the piping needed to fuel gas appliances to the emissions those appliances inevitably produce, providing another "indirect but wholly effective means" to the same preempted end: banning covered appliances. *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (rejecting an attempt to end-run a preemption provision); *see also Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases).

As this Court recognized, "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest.*, 89 F.4th at 1107. Just as Berkeley could not "evade preemption by merely moving up one step in the energy chain and banning natural gas piping within those buildings," *id.*, the District cannot evade preemption by moving down one step and banning gas emissions. Banning an inevitable byproduct of covered gas appliances' energy consumption "'concerns' the energy use of those products as much as a direct ban on the products themselves." *See id.* at 1103.

**2.** To be sure, this Court decided only the case before it, and that case was about whether "EPCA prevents Berkeley from prohibiting new-building owners from extending fuel gas piping within their buildings from the point of delivery at the gas meter by way of a building code."

28

*See Cal. Rest.*, 89 F.4th at 1106 (cleaned up). In particular, the Court emphasized that the case was not about "regulating the local distribution of gas" or whether local governments have "any obligation to maintain or expand the availability of a utility's delivery of gas to meters." *Id.* at 1105-06 (rejecting the argument that finding Berkeley's ban preempted "would impliedly repeal the Natural Gas Act").

But this Court's adherence to the judicial role in deciding only the dispute before it provides no excuse for the district court's attempt to confine *California Restaurant Ass'n* to its facts, ignoring the underlying reasoning. *Contra* ER-14-16; *see supra* pp.19-20. That is not how binding precedent works. "[J]ust as binding as this [Court's] holding is the reasoning underlying it." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1126 (2019); *accord Marshall Naify*, 672 F.3d at 627; *Barapind*, 400 F.3d at 750-51. The thorough analysis of §6297(c)'s text and context that led to the Court's specific holding about Berkeley's regulation cannot just be ignored. *See Cal. Rest.*, 89 F.4th at 1100-07 (explaining §6297(c)'s breadth and rejecting multiple narrower readings). Yet ignore it is what the district court did.

Take the district court's insistence that *California Restaurant Ass'n* was limited to building codes. ER-15. Not so. This Court said §6297(f)'s building code exception was "[o]f critical importance" because it refuted the view that preemption is limited to "direct or facial regulations of covered products" or to "regulations that impose standards on the design

29

and manufacture of appliances." *See Cal. Rest.*, 89 F.4th at 1100-01. The point was that preemption extends "to at least include building codes," not that preemption is confined to building codes. *Id.* at 1101.

In the end, though, the district court's own characterization of this Court's holding proves Plaintiffs' point. The district court acknowledged that Berkeley's ordinance "'concerned the energy use' of covered appliances" because, "by banning the installation of piping to transport gas to an appliance where gas was otherwise available," it "set[] that use at zero." ER-15. That is what the zero-$NO_x$ rule does too. The district court found that the District's rule effectively bans gas appliances by banning the combustion necessary to use them, ER-13—which, just like banning the piping, "set[s]" the appliances' maximum energy "use at zero," ER-15.

True, the district court called Berkeley's gas piping ban "a complete physical impediment" to using gas. ER-15. But the court made no attempt to explain why that would make any difference. It does not. Whether the ban is on piping or emissions, the result is the same: Both regulations categorically "prohibit[] consumers from using natural gas-powered appliances," and so both "necessarily regulat[e] the quantity of energy directly consumed by the appliances at point of use." *Cal. Rest.*, 89 F.4th at 1102 (cleaned up). Besides, it is not at all clear how "banning the installation of piping" is any more "physical," ER-15, than banning the installation of the appliance itself, as the District's rule does, *see*

Rule 1146.2(d)(2) ("No person shall manufacture, supply, sell, offer for sale, or Install" a noncompliant appliance.).

3. The district court's attempts to distinguish *California Restaurant Ass'n* confirm that the decision controls here. The district court spent just six rapid-fire sentences explaining why it thought this case presents "a very different situation":

> The [District's] Rule is not a building code, and it does not prohibit or regulate the quantity of natural gas used by appliances. The Rule addresses the pollution appliances emit and not their energy use. It says nothing about the quantity of gas an appliance may use. Nor does its application depend on an appliance's efficiency or energy use. To the contrary, the Rule regulates appliances' $NO_x$ emissions in order to address air pollution issues and the health risks associated with the combustion of natural gas. The Rule does not implicate any of the issues the EPCA was intended to address—it does not create inconsistent state efficiency standards, require that consumers use appliances with higher efficiency standards, or force manufacturers to meet standards different than those set by the [Department of Energy].

ER-15-16.

None of that even begins to distinguish the District's ban from Berkeley's. As the table below illustrates, every purported distinction is an argument considered and rejected by the *California Restaurant Ass'n* panel, an argument unsuccessfully advanced in the dissent from denial of rehearing en banc, or was equally true of Berkeley's ban.

**Table 1**

| District Court's Asserted Distinction (ER-15-16) | *California Restaurant Ass'n* |
|---|---|
| Rule 1146.2 "is not a building code." | Berkeley's ban was part of its health and safety code, *see* Berkeley, Cal. Mun. Code §12.80 (repealed), not its building code, *id.* tit.19.  What mattered was its effect, not its formal classification. *Cal. Rest.*, 89 F.4th at 1098-99. |
| The zero-NO$_x$ rule "does not prohibit or regulate the quantity of natural gas used by appliances. … It says nothing about the quantity of gas an appliance may use." | "Berkeley's main contention is that its Ordinance doesn't regulate 'energy use' because it bans natural gas rather than prescribes an affirmative 'quantity of energy.'"  89 F.4th at 1102. |
| "The Rule addresses the pollution appliances emit and not their energy use." | "[A]n ordinance that effectively eliminates the 'use' of an energy source" is a "regulation on 'energy use.'"  89 F.4th at 1102. |
| "Nor does its application depend on an appliance's efficiency or energy use." | "Berkeley did not adopt its ordinance to require consumers to use appliances with higher efficiency standards … .  Indeed, some gas appliances are more efficient than electric appliances, so the ordinance may have the indirect effect of *increasing* energy consumption … ."  89 F.4th at 1126 (dissent). |

32

| **District Court's Asserted Distinction (ER-15-16)** | *California Restaurant Ass'n* |
|---|---|
| "[T]he Rule regulates appliances' $NO_x$ emissions in order to address air pollution issues and the health risks associated with the combustion of natural gas." | "The ordinance was intended to slow climate change and reduce public safety hazards and health risks associated with the combustion of natural gas."  89 F.4th at 1126 (dissent). |
| "The Rule does not implicate any of the issues the EPCA was intended to address—it does not create inconsistent state efficiency standards, require that consumers use appliances with higher efficiency standards, or force manufacturers to meet standards different than those set by the DOE." | Berkeley's ban did not "require consumers to use appliances with higher efficiency standards than those prescribed by DOE" or require manufacturers "to change the design of their natural gas products to meet" such standards. 89 F.4th at 1126 (dissent).<br><br>Berkeley's ban, "[b]y its own terms, … 'shall in no way be construed as requiring the use or installation of any specific appliance or system as a condition of approval.'" *Id.* at 1099 (panel opinion) (alteration incorporated) (quoting Berkeley, Cal. Mun. Code §12.80.020(C)). |
| "[T]here is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emission regulations designed to combat air pollution." | "And as a textual matter, EPCA preemption is not limited to facial regulations of consumer products as the district court held. …  Put simply, by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses."  89 F.4th at 1103. |

At bottom, the district court seemed to think that, unlike the zero-$NO_x$ rule, Berkeley's ban expressly regulated "the quantity of gas an appliance may use." ER-15-16. That was, after all, what the District told it. ER-71 (describing Berkeley's ban as "explicitly regulating the quantity of gas that appliances could use"); ER-33 ("Berkeley's ordinance directly regulated appliances' 'energy use,' or the quantity of gas consumed, setting the allowable amount at zero."). But that is just not true. The whole point of the case as it came to this Court was that Berkeley's ban did not do so; it did not even explicitly regulate appliances, let alone say anything about the quantity of gas they could use. *Cal. Rest.*, 89 F.4th at 1098-99, 1102. Instead, Berkeley banned the piping needed to hook the appliances up to the gas supply. *Id.* That was why the district court in *California Restaurant Ass'n* had upheld Berkeley's ban: It "d[id] not facially regulate or mandate any particular type of product or appliance," and its impact on covered products was "at best indirect." 89 F.4th at 1099 (cleaned up) (emphasis omitted). And on appeal, "Berkeley's main contention [was] that its Ordinance doesn't regulate 'energy use' because it bans natural gas rather than prescribes an affirmative 'quantity of energy.'" *Id.* at 1102. This Court rejected that argument, and it rejected the district court's interpretation of EPCA as "divorced from the statute's text." *Id.* at 1103.

Berkeley's ban was preempted not because it expressly set gas appliances' maximum energy use to zero, but because it effectively did so

by banning gas piping beyond the meter and thus "prevent[ing] a building occupant from using available gas to run a covered appliance." *Cal. Rest.*, 89 F.4th at 1106-07. That is exactly what the zero-NO$_x$ rule does—just at a different "step in the energy chain," *id.* at 1107.

***

This Court's decision in *California Restaurant Ass'n* controls this case. Nothing in the district court's hodgepodge of rejected arguments and dissenting views succeeds in distinguishing the zero-NO$_x$ rule. Because the district court failed to heed controlling precedent, this Court should reverse.

### B. Under this Court's reading of EPCA's plain text, the zero-NO$_x$ rule is a regulation concerning the energy use of covered appliances.

Under the plain text of EPCA's preemption provision, the zero-NO$_x$ rule is a local regulation concerning the energy use of covered appliances. To see how the District's rule, like Berkeley's ban, fits within the scope of preemption, take the statutory terms step by step. *See Cal. Rest.*, 89 F.4th at 1101. The District's zero-NO$_x$ rule is a "State regulation." §6297(a)(2)(A) (defining "State regulation" to include "a law, regulation, or other requirement of a State or its political subdivisions"). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." §6291(4). "[E]nergy" includes "fossil fuels," such as natural gas. §6291(3). And "covered products" include water heaters,

35

boilers, and pool heaters, among many other common appliances. §6292(a)(4), (11); §6313(a)(4)-(5).

But perhaps the most important statutory term is "concerning," which carries a well-established meaning in preemption provisions. As this Court explained, "by using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Cal. Rest.*, 89 F.4th at 1103; *see also Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) ("'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'") (cleaned up); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (describing "relating to" as "broad," "deliberately expansive" language, "conspicuous for its breadth"). Congress could have preempted regulation "of" appliances' energy use, but instead it preempted regulation "concerning" appliances' energy use. *See, e.g., Lamar*, 138 S. Ct. at 1761 (contrasting Congress's broad term "statement respecting" with the narrower "statement of").

"[P]utting these terms together, EPCA preempts regulations … that relate to the quantity of natural gas directly consumed by certain consumer appliances at the place where those products are used." *Cal. Rest.*, 89 F.4th at 1101 (cleaned up).

The District's zero-NO$_x$ rule fits comfortably within this preemptive scope: It concerns the quantity of natural gas directly consumed by covered products because, by banning gas appliances that emit an

36

inevitable byproduct of combustion ($NO_x$), it effectively prohibits gas appliances from consuming any gas. Said another way, the District's zero-$NO_x$ rule effectively limits covered gas appliances' maximum energy use to zero. *See Cal. Rest.*, 89 F.4th at 1102 ("[A] building code regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'"); *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (holding that at the least, laws with "a significant impact related to Congress' deregulatory and pre-emption-related objectives" are preempted by a "related to" provision (cleaned up)).

The district court's finding that the challenged rule, "by prohibiting $NO_x$ emissions, effectively bans the use of covered gas fueled boilers and water heaters," ER-13, should thus have been the end of this case. Just as a ban on gas piping "necessarily regulates" how much energy gas appliances consume by preventing them from using any energy, *Cal. Rest.*, 89 F.4th at 1102, so too does a ban on gas appliances' inevitable emissions.

## C. This Court's analysis of EPCA's structure and purpose confirms that the zero-$NO_x$ rule is preempted.

Were there any doubt that the District's zero-$NO_x$ rule is preempted, this Court's analysis of the statutory context extinguishes it. The rule is just as incompatible with the statutory structure and purpose as was Berkeley's ban. This Court explained why EPCA's broad preemptive

37

scope extends beyond "energy conservation standards" or technical energy measurements, and it rejected narrower readings of §6297(c) advanced in support of Berkeley's ban as incompatible with EPCA's text and structure. *Cal. Rest.*, 89 F.4th at 1100-07.

> **1. The statutory structure and context demonstrate that the District's ban on gas appliances falls well within the preempted territory.**

**a.** When, as in EPCA, Congress "explicitly lists a set of exceptions" to preemption, those exceptions help determine the intended scope of preemption. *Rowe*, 552 U.S. at 374. As this Court explained in *California Restaurant Ass'n*, the building code and waiver exceptions are particularly helpful on that score.

First, this Court held that §6297(f)(3)'s exception for certain building codes "demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products," contradicting Berkeley's view that preemption is limited to "regulations that impose standards on the design and manufacture of appliances." *Cal. Rest.*, 89 F.4th at 1100-02. Congress would have had no reason to define exactly which building code regulations were exempt from preemption unless some building code regulations were preempted in the first place. *See Pulsifer v. United States*, 144 S. Ct. 718, 731-32 (2024) ("When a statutory construction … renders an entire subparagraph meaningless, … the canon against surplusage applies with special force." (cleaned up)). So this Court concluded that preemption under §6297(c) "extends beyond" direct,

product-specific regulations to "at least" reach building codes. *Cal. Rest.*, 89 F.4th at 1101. But contrary to the district court's suggestion below, this Court nowhere said that preemption only reached building codes. *Id.*

Second, this Court explained that §6297(d)'s "waiver provision likewise shows the extensive scope of the preemption clause." *Cal. Rest.*, 89 F.4th at 1103. Congress allowed the Department to waive preemption in certain circumstances, §6297(d)(1), but prohibited waivers when the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," §6297(d)(3). The provision's focus on "the complete lifecycle of an appliance" would, as this Court put it, "make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product." *Cal. Rest.*, 89 F.4th at 1104.

**b.** Next, this Court rejected an interpretation limiting preemption to "regulations that are the equivalent of 'energy conservation standards.'" *Cal. Rest.*, 89 F.4th at 1104-05. That view would have conflated the defined terms "energy use," "energy efficiency," and "energy conservation standards." *Id.* at 1105. Indeed, it hinged on giving different phrases— "energy conservation standard" and "regulation concerning … energy use"—the same meaning even though Congress used them together in the very sentence at issue. §6297(c). An "energy conservation standard" for a covered product triggers preemption, while "regulation concerning … energy use" describes what is preempted. *Id.*; *see also*

39

*Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (courts usually presume that "differences in language like this convey differences in meaning" (attribution omitted)).

Congress easily could have used "energy conservation standard" or "building code" to define what is preempted, but it did not. *Cal. Rest.*, 89 F.4th at 1105 ("[W]e presume that Congress means what it says, and we can't simply reconfigure the statute to fit the Government's needs.").

**c.** The Court's structural and contextual reasons for finding Berkeley's ban preempted underscore that the District's zero-$NO_x$ rule fits comfortably within §6297(c)'s broad preemptive scope. This is not a close case. Just like Berkeley's gas ban, the District's zero-$NO_x$ rule is a regulation concerning energy use because it prevents covered gas appliances from using any energy. *Cal. Rest.*, 89 F.4th at 1102.

### 2. Allowing the District to ban gas appliances would gut the preemption provision and create the very patchwork of standards Congress sought to prevent.

Allowing localities to ban gas appliances as long as they do so through the mechanism of emissions regulations would undermine EPCA's goals of national uniformity and create the very patchwork of standards Congress sought to prevent. *See Cal. Rest.*, 89 F.4th at 1103-04. As this Court observed, "no doubt Berkeley's ban, if adopted by States and localities throughout the country, would 'significantly burden' the 'sale' of covered products 'on a national basis.'" *Id.* at 1104 (quoting §6297(d)). So too here.

40

a. Taken as a whole, EPCA is a sweeping national energy policy that includes a policy regarding appliances. *See, e.g.*, §6201 (listing purposes). Its impetus was rising fuel prices and energy security concerns with dependency on imported oil. *Air Conditioning*, 410 F.3d at 498. The resulting policy was deliberately neutral as to the type of fuel; Congress chose to encourage diverse energy sources and rely on neutral energy consumption and conservation objectives. *See* S. Rep. No. 94-516, at 116-18 (1975) (Conf. Rep.); H.R. Rep. No. 94-340, at 1, 10-11, 316 (1975); *see also Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1153 (9th Cir. 2012) (regulations cannot discriminate among or favor "particular products or methods" (citing §6297(f)(3)(C)).

Later, Congress expanded the federal role to include creating uniform standards for appliance manufacturers to help achieve the nation's energy independence goals. *E.g.*, S. Rep. No. 100-6, at 4. In doing so, Congress struck a careful balance. Rather than sacrificing consumer choice for maximum conservation, Congress paid attention to consumers throughout the statute and chose, for example, to prohibit standards that would "result in the unavailability in the United States in any covered product type (or class) of performance characteristics, such as size or capacity." *Id.* at 8-9; *see* §6295(o)(4) (prohibiting amendments to standards that would make product features or characteristics

unavailable); §6297(d)(4) (prohibiting waivers for regulations that would make appliances unavailable).[8]

As the statute reflects, Congress decided to reduce the energy use of the kinds of appliances already on the market without taking choices away from consumers. Manufacturers would have one uniform set of standards to follow, and consumers nationwide would have access to the same types of products. As this Court concluded, "Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Cal. Rest.*, 89 F.4th at 1103.

Congress also recognized that regulations in populous states (like California) might carry national weight, S. Rep. No. 100-6, at 4, and therefore prohibited any attempt by state and local governments to supplant its policy. *See* §6297(d)(3).

To protect its national policy, Congress took care to prevent a "patchwork" of state and local regulations under which appliances would be legal in some places but not others. S. Rep. No. 100-6, at 4; *accord*

---

[8] *See also* §6295(q)(1)(A) (requiring different standards for products that use "different kind[s] of energy"); §6295(q)(1)(B) (requiring a different standard wherever "justified" by "a capacity or other performance-related feature" that other products in the same type or class do not share). The legislative history provides an example that sheds light on the attention paid to consumers and appliance availability: EPCA, "upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." S. Rep. No. 100-6, at 8-9.

H.R. Rep. No. 100-11, at 24 (1987). A patchwork of bans on appliances would be just as disruptive as a patchwork of different standards. Both make appliances unavailable for consumers in some areas but not others. And both impose burdens on manufacturers to adjust their design, production, and marketing strategies based on what they can and cannot sell in each jurisdiction. After all, a patchwork of energy conservation standards can be expressed as a patchwork of bans; appliances are banned wherever they do not meet state or local standards.

All in all, the District's zero-NO$_x$ rule interferes with Congress's carefully crafted approach in exactly the same way Berkeley's ban did: It burdens manufacturers' decisions regarding design, production, distribution, sales, and servicing; deprives builders and consumers of choice of appliances; and leads to a patchwork approach in which certain appliances that meet federal standards are unavailable in certain areas. *See, e.g.*, §6295(o)(4), (q)(1); §6297(d)(3)-(4), (f)(3).

**b.** The district court's approach would gut EPCA's preemption provision by making it trivially easy to evade. The crux of the district court's position is that EPCA has nothing to say about emissions regulations—even where those regulations ban particular covered appliances. That is a blueprint for every city and state that wants to ban gas-fired appliances. Can't ban them outright? *Cal. Rest.*, 89 F.4th at 1107. Can't ban them by banning the necessary piping? *Id.* No problem; just couch the same ban as an emissions regulation, and hey presto, no

preemption. Berkeley could ban gas appliances tomorrow. That is the trouble with relying on a distinction without a difference.

This Court already explained that EPCA is not so easy to evade: "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases for the proposition that preemption cannot be avoided by shifting the regulatory focus). To the contrary, Congress had every reason to expect that it would not "make[] any difference" for preemption purposes if a state were to "select[] an indirect but wholly effective means" of achieving a prohibited purpose. *Am. Trucking*, 569 U.S. at 652 (collecting cases rejecting states' attempts to end-run preemption provisions); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-55 (2004) (rejecting an interpretation that "would undo Congress's carefully calibrated regulatory scheme").

If Congress's choices in §6297(c) and this Court's recent decision in *California Restaurant Ass'n* are to be respected, then the District cannot be allowed to end-run preemption by framing its appliance ban as an emissions standard. Regardless of the framing, the effect of the zero-$NO_x$ rule is to ban gas appliances, or said differently, to set the maximum energy use for covered gas appliances to zero. *Cal. Rest.*, 89 F.4th at 1102. "Slice it or dice it any which way," the District crossed the same line Berkeley did. *Am. Trucking*, 569 U.S. at 652.

### D. The district court's carveout for emissions regulations is contrary to the text and this Court's precedent.

#### 1. EPCA has no implied exception for emissions regulations that concern energy use.

Beyond its unsuccessful attempt to distinguish *California Restaurant Ass'n*, the district court also contended that EPCA contains an unwritten exception for "emission regulations designed to combat air pollution." ER-16. According to the court, "there is no reason to believe that Congress ever intended or even contemplated that" EPCA would preempt those regulations, so they must be exempt. *Id.* The court reasoned that while it "specifically preempts building codes," EPCA "fails to mention air pollution regulations" even though the Clean Air Act "had been in place for many years at the time the EPCA was enacted and amended." *Id.* That fundamentally misunderstands the statute.

In reality, there is ample "reason to believe" Congress intended to preempt emissions regulations—and any other regulations—when they concern covered appliances' energy use. ER-16. The "best evidence" of what Congress meant to preempt is the "plain wording of" the statute it wrote. *Franklin Cal.*, 579 U.S. at 125. Here, Congress "broadly preempt[ed] any state regulation concerning" covered products' "energy efficiency" or "energy use," subject to carefully defined exceptions. *Cal. Rest.*, 89 F.4th at 1105. And its definition of "State regulation" could hardly be more capacious; the term captures any "law, regulation, or other requirement of a State or its political subdivisions." §6297(a)(2)(A).

45

Congress chose to limit preemption not by the type of regulation, but by whether it "concern[s]" the preempted subject matter. §6297(c). And to that general rule, it added specific exceptions. *See* §6297(c)(1)-(9), (d)-(f). None of those exceptions is for emissions regulations.

Section 6297's silence on emissions regulations means precisely the opposite of what the district court thought it did. As the district court noted, Congress was well aware of the Clean Air Act and states' role in its regulatory scheme when it amended EPCA's preemption provision in 1987. ER-16. So if Congress had wanted to include an exception for state and local emissions standards, it "could have"—and presumably would have—"said so." *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1038 (2019). It did not. Courts must "presume that Congress means what it says" and cannot "reconfigure the statute to fit the [District's] needs" by writing in a new exception. *Cal. Rest.*, 89 F.4th at 1105.

The reason EPCA mentions building codes but not emissions regulations, then, is because Congress chose to include an exception for certain building codes but not for emissions regulations. *See* §6297(f)(3). The district court's assertion that "EPCA specifically preempts building codes" is not correct. ER-16. Section 6297 mentions building codes only to explain when they are not preempted. §6297(c)(3), (f)(3). The exception for building codes of course confirms that they are generally within §6297(c)'s reach. *See supra* pp.38-39. But the language that preempts them in the first place—"State regulation concerning ... energy

46

use," §6297(c)—says no more about building codes than it does about emissions regulations. Congress neither went out of its way to target emissions regulations nor immunized them from preemption when they intrude on the preempted subject matter.

The district court's appeal to legislative history fares no better. The court suggested that EPCA is focused "on establishing national standards for energy efficiency" and therefore has nothing to say about emissions regulations. ER-16. But as discussed, EPCA's purpose is not so narrow. Not just the legislative history but also the text demonstrates that Congress was concerned with impacts on manufacturers and the supply chain, consumer choice, and nationwide availability of appliances. *Supra* pp.41-44. And as this Court has already held, preemption under §6297(c) is not limited to energy conservation standards and their equivalents. *Cal. Rest.*, 89 F.4th at 1103-05.

The district court's justification for its unwritten exception for emissions regulations boils down to a presumption against preemption. *See* ER-16-17 (expressing concern with upsetting "historic and recognized powers of states and local governments to set emissions standards"); *supra* pp.20-21. But as the court elsewhere acknowledged, ER-12, this Court has repeatedly recognized that the Supreme Court overruled any such presumption for express preemption provisions. *Cal. Rest.*, 89 F.4th at 1101; *see also id.* at 1099 (recounting—and ultimately rejecting—the district court's conclusion "that EPCA must be 'interpreted in a limited

47

manner,' so that the Act doesn't 'sweep into areas that are historically the province of state and local regulation'" (attribution omitted)). The district court's concern parallels the justification for the now-overruled presumption. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (cleaned up)), *abrogated in relevant part by Franklin Cal.*, 579 U.S. 115.

In short, the District cannot avoid preemption merely by framing its ban as an emissions regulation or otherwise invoking traditional police powers or health and safety purposes. "Despite the importance of [those] objective[s]," EPCA does not "create[] an exception on that basis." *Rowe*, 552 U.S. at 373-74.

## 2. Finding the District's zero-NO$_x$ rule preempted will not eviscerate local air quality regulation.

Finally, preempting the District's effective ban on gas appliances would not invalidate ordinary air quality regulations that have long coexisted with EPCA. *Contra* ER-16 (suggesting that Plaintiffs' interpretation "would upset" local authority to establish emissions standards and health and safety regulations).

This Court has already recognized that EPCA's preemption provision is broad but not unlimited. *Cal. Rest.*, 89 F.4th at 1103. Congress's intent as understood through the statute it wrote is the limiting principle for

48

§6297(c), just as it is for similarly broad preemption provisions throughout the U.S. Code. *See, e.g.*, *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997) ("[T]o determine whether a state law has the forbidden connection [with ERISA plans], we look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." (cleaned up)); *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 263-64 (2013) (considering congressional purpose, as evidenced by the text).

Preventing the District from banning appliances does not jeopardize its ability to impose emissions standards, just as Rule 1146.2 had done for decades before the District converted it into a ban. As Judge Baker explained in his *California Restaurant Ass'n* concurrence, EPCA is "unlikely" to preempt regulations that only "incidentally impact" covered products' gas consumption, such as "state and local taxes" or a decision not to extend a utility distribution system. 89 F.4th at 1117 (Baker, J., concurring); *see also Dan's City*, 569 U.S. at 264 (regulations with only a tangential effect on the preempted subject matter are ordinarily not preempted); *Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 n.2 (9th Cir. 2010) (rejecting the argument that preemption would eviscerate local regulations and noting that "the District greatly overstate[d] its case" by claiming that all regulations that "happened to affect railroads" would be preempted).

49

If ordinary limits on $NO_x$ emissions like those already in place in the District have any effect on appliances' energy use, that effect is likely incidental. The California Restaurant Association acknowledged as much in the Berkeley litigation. *See* California Restaurant Ass'n's Opposition to Motion to Dismiss First Amended Complaint at 16-17, *Cal. Rest. Ass'n v. City of Berkeley*, 547 F. Supp. 3d 878 (N.D. Cal. 2021) (No. 4:19-cv-07668-YGR), Dkt.52.

The zero-$NO_x$ rule's impact, by contrast, is anything but incidental. It does exactly what Berkeley's piping prohibition did: ban gas appliances in a roundabout way. The rule's effect and purpose is to categorically prohibit gas appliances, ER-13, preventing them from using any energy. *See Cal. Rest.*, 89 F.4th at 1102 (panel opinion) ("an ordinance that effectively eliminates the 'use' of an energy source" is preempted). Indeed, the District admits that its rule "targets appliances." ER-76. In that sense, it strikes even more directly at the preempted subject matter than did Berkeley's ban on piping. While EPCA has nothing to say about gas distribution by utilities, it "has everything to say about" regulation of appliances' energy use, *Cal. Rest.*, 89 F.4th at 1119 (Baker, J., concurring). That is the preemption provision's core focus. *See* §6297(c) (preempting regulations "concerning the … energy use … of [a] covered [consumer] product"); *see also* §6292 (listing covered products).

Like Berkeley's ban, the zero-$NO_x$ rule prohibits the use of gas appliances in buildings where gas service is otherwise available. *Cal.*

*Rest.*, 89 F.4th at 1119 (Baker, J., concurring). The District just took Berkeley's "manipulation of building codes for new construction to regulate the natural gas consumption of covered products when gas service is otherwise available," *id.*, and manipulated emissions regulations instead. That "cuts to the heart of what Congress sought to prevent" just as much as Berkeley's ban. *Id.*

As in *California Restaurant Ass'n*, this Court need not and should not decide today what will happen in cases about other regulations that are not yet and may never be before it. Broad preemption provisions like EPCA's are ill suited to bright-line rules. *Morales*, 504 U.S. at 390. That future cases may present tricky line-drawing problems is no reason to refuse to recognize that the District's zero-$NO_x$ rule—like Berkeley's gas ban—lies well within the borders of what EPCA preempts. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) (opinion of Roberts, C.J.) ("It is enough for today that wherever that line may be, this statute is surely beyond it."). And because Circuit precedent squarely controls, this Court need not break any new ground here.

## II. The Clean Air Act Has No Bearing Here.

The Clean Air Act cannot override EPCA preemption. Without directly addressing the role of the Clean Air Act, the district court seemed to assume that the existence of a separate federal–state regulatory scheme for air pollution indicated that Congress did not intend for EPCA to preempt emissions regulations. *See* ER-16-17. To the contrary,

nothing in the Clean Air Act gives the District immunity from preemption under or from compliance with other federal statutes.

Quite the opposite. Before the EPA can approve an amendment to a state implementation plan, the Clean Air Act requires the state to provide assurances that its air quality regulation "is not prohibited by any provision of Federal or State law." §7410(a)(2)(E)(i).[9] It follows that the Act does not authorize, let alone require, states to violate other federal laws in pursuit of air quality objectives. The District's regulations are therefore not immune from challenges under EPCA's preemption provision or any other federal statute.

Nor does it matter that the District's air quality regulations are part of a cooperative federal–state regulatory scheme. *Contra* ER-72-74, ER-77-78 (District's brief). The District's general "directive" under the Clean Air Act to "achieve federal air quality standards," ER-77, does not come with a specific federal directive to regulate appliance emissions, let alone to effectively ban gas appliances in violation of EPCA. Congress did not excuse air quality rules motivated by the Clean Air Act from EPCA's preemption provision, no matter how necessary or helpful to achieving

---

[9] Section 7410(a)(2)(E)(i) requires that each state implementation plan provide "necessary assurances that the State" (or, where applicable, the local government or regional agency) "will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof)."

federal air quality standards the District believes them to be, ER-77-78. *See Am. R.Rs.*, 622 F.3d at 1096-98 (finding the District's emissions regulations preempted under the Interstate Commerce Commission Termination Act, and stating that it was "irrelevant" to the preemption analysis under that statute "that the Clean Air Act reserves certain regulatory authority to the states and localities").

Because EPCA preempts all regulations concerning the energy use of covered appliances unless its express exceptions apply, EPCA "preempts the District's rules here." *Am. R.Rs.*, 622 F.3d at 1098.

## CONCLUSION

For these reasons, this Court should reverse.

Dated: September 22, 2025

Respectfully submitted,

*/s/ Courtland L. Reichman*

Sarah O. Jorgensen
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 W. Peachtree St., Suite 2300
Atlanta, GA 30309

Courtland L. Reichman
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94605
(650) 623-1401
creichman@reichmanjorgensen.com

Brian C. Baran
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K St. NW, Suite 800
Washington, DC 20006

*Counsel for Appellants Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California*

John J. Davis, Jr.
Luke Dowling
MCCRACKEN, STEMERMAN &
  HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
(415) 597-7200
jjdavis@msh.law

*Counsel for Appellant California State Pipe Trades Council*

Angelo I. Amador
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
(202) 331-5913
aamador@restaurant.org

*Counsel for Appellant Restaurant Law Center*

Matthew P. Gelfand
CALIFORNIANS FOR
  HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, CA 90020
(213) 739-8206
matt@caforhomes.org

*Counsel for Appellant Californians for Homeownership, Inc.*

54

## STATEMENT OF RELATED CASES

Under Circuit Rule 28-2.6, Plaintiffs certify that they are not aware of any other related cases pending in this Court.

Dated: September 22, 2025          */s/ Courtland L. Reichman*
Courtland L. Reichman

## CIRCUIT RULE 25-5(f) CERTIFICATION

I certify under Circuit Rule 25-5(f) that all parties on whose behalf this brief is submitted concur in its content.

Dated: September 22, 2025          */s/ Courtland L. Reichman*
Courtland L. Reichman

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-5129

I am the attorney or self-represented party.

**This brief contains** | 12,257 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [                    ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Courtland L. Reichman | **Date** | Sept. 22, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

**ADDENDUM**

FEDERAL STATUTES ...............................................................2

  42 U.S.C. §6291 ....................................................................2

  42 U.S.C. §6292 ....................................................................3

  42 U.S.C. §6293 ....................................................................5

  42 U.S.C. §6295 ....................................................................6

  42 U.S.C. §6297 ..................................................................10

  42 U.S.C. §6311 ..................................................................22

  42 U.S.C. §6316 ..................................................................25

  42 U.S.C. §7410 ..................................................................32

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT RULES... 34

  Rule 1146.2 ........................................................................34

# FEDERAL STATUTES

## 42 U.S.C. §6291

### §6291. Definitions

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of title 49) of a type—

(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

(B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

Add.2

(6) The term "energy conservation standard" means—

(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

[…]

(8) The term "measure of energy consumption" means energy use, energy efficiency, estimated annual operating cost, or other measure of energy consumption.

(9) The term "class of covered products" means a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary).

[…]

### 42 U.S.C. §6292

### §6292. Coverage

### (a) In general

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—

(A) any type designed to be used without doors; and

**Add.3**

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

**Add.4**

**(b) Special classification of consumer product**

(1) The Secretary may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

42 U.S.C. §6293

**§6293. Test procedures**

[...]

**(b) Amended and new procedures**

[...]

(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating

**Add.5**

cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

[...]

**42 U.S.C. §6295**

**§6295. Energy conservation standards**

[...]

**(*l*) Standards for other covered products**

(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (20) of section 6292(a) of this title if the requirements of subsections (*o*) and (p) are met and the Secretary determines that—

(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

(D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

[...]

[...]

**Add.6**

**(*o*) Criteria for prescribing new or amended standards**

(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

(2)(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

(B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

**Add.7**

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy

**Add.8**

or, in the case of showerheads, faucets, water closets, or urinals, water, or that the establishment of such standard is not technologically feasible or economically justified.

For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

[...]

[...]

## (q) Special rule for certain types or classes of products

(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—

   (A) consume a different kind of energy from that consumed by other covered products within such type (or class); or

   (B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which

**Add.9**

applies (or will apply) to other products within such type (or class).

In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

[...]

## 42 U.S.C. §6297

## §6297. Effect on other law

### (a) Preemption of testing and labeling requirements

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term

**Add.10**

shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

**(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product**

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal

standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

**(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product**

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for

**Add.13**

installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)(A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

(8)(A) is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

(A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

(i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

(ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

**(d) Waiver of Federal preemption**

(1)(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered

product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in

addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

Add.18

**(e) Exception for certain State procurement standards**

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

**(f) Exception for certain building code requirements**

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

(A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

**Add.19**

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

## (g) No warranty

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

(Pub. L. 94–163, title III, §327, Dec. 22, 1975, 89 Stat. 926; Pub. L. 95–619, title IV, §424, Nov. 9, 1978, 92 Stat. 3263; Pub. L. 100–12, §7, Mar. 17, 1987, 101 Stat. 117; Pub. L. 100–357, §2(f), June 28, 1988, 102 Stat.

674; Pub. L. 102–486, title I, §123(h), Oct. 24, 1992, 106 Stat. 2829; Pub. L. 109–58, title I, §135(d), Aug. 8, 2005, 119 Stat. 634; Pub. L. 110–140, title III, §§321(d), 324(f), Dec. 19, 2007, 121 Stat. 1585, 1594; Pub. L. 112–210, §10(a)(9), Dec. 18, 2012, 126 Stat. 1524.)

## 42 U.S.C. §6311

## §6311. Definitions

For purposes of this part—

(1) The term "covered equipment" means one of the following types of industrial equipment:

(A) Electric motors and pumps.

(B) Small commercial package air conditioning and heating equipment.

(C) Large commercial package air conditioning and heating equipment.

(D) Very large commercial package air conditioning and heating equipment.

(E) Commercial refrigerators, freezers, and refrigerator-freezers.

(F) Automatic commercial ice makers.

(G) Walk-in coolers and walk-in freezers.

(H) Commercial clothes washers.

(I) Packaged terminal air-conditioners and packaged terminal heat pumps.

(J) Warm air furnaces and packaged boilers.

(K) Storage water heaters, instantaneous water heaters, and unfired hot water storage tanks.

(L) Any other type of industrial equipment which the Secretary classifies as covered equipment under section 6312(b) of this title.

(2)(A) The term "industrial equipment" means any article of equipment referred to in subparagraph (B) of a type—

(i) which in operation consumes, or is designed to consume, energy;

(ii) which, to any significant extent, is distributed in commerce for industrial or commercial use; and

(iii) which is not a "covered product" as defined in section 6291(a)(2) of this title, other than a component of a covered product with respect to which there is in effect a determination under section 6312(c) of this title;

without regard to whether such article is in fact distributed in commerce for industrial or commercial use.

(B) The types of equipment referred to in this subparagraph (in addition to electric motors and pumps, commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, packaged terminal air-conditioners, packaged terminal heat pumps, warm air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks) are as follows:

(i) compressors;

(ii) fans;

(iii) blowers;

(iv) refrigeration equipment;

(v) electric lights and lighting power supply circuits;

(vi) electrolytic equipment;

(vii) electric arc equipment;

**Add.23**

(viii) steam boilers;

(ix) ovens;

(x) kilns;

(xi) evaporators;

(xii) dryers; and

(xiii) other motors.

(3) The term "energy efficiency" means the ratio of the useful output of services from an article of industrial equipment to the energy use by such article, determined in accordance with test procedures under section 6314 of this title.

(4) The term "energy use" means the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314 of this title.

[…]

(7) The terms "energy", "manufacture", "import", "importation", "consumer product", "distribute in commerce", "distribution in commerce", and "commerce" have the same meaning as is given such terms in section 6291 of this title.

[…]

(18) The term "energy conservation standard" means—

(A) a performance standard that prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a product; or

(B) a design requirement for a product.

[…]

Add.24

## 42 U.S.C. §6316

### §6316. Administration, penalties, enforcement, and preemption

(a) The provisions of section 6296(a), (b), and (d) of this title, the provisions of subsections (l) through (s) of section 6295 of this title, and section [1] 6297 through 6306 of this title shall apply with respect to this part (other than the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title) to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of this part—

(1) references to sections 6293, 6294, and 6295 of this title shall be considered as references to sections 6314, 6315, and 6313 of this title, respectively;

(2) references to "this part" shall be treated as referring to part A-1;

(3) the term "equipment" shall be substituted for the term "product";

(4) the term "Secretary" shall be substituted for "Commission" each place it appears (other than in section 6303(c) of title);

(5) section 6297(a) of this title shall be applied, in the case of electric motors, as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 1992;

(6) section 6297(b)(1) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if the National Appliance Energy Conservation Amendments of 1988 were the Energy Policy Act of 1992;

(7) section 6297(b)(4) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if paragraph (5) of section 6295(g) of this title were section 6313 of this title;

(8) notwithstanding any other provision of law, a regulation or other requirement adopted by a State or subdivision of a State contained in a State or local building code for new construction concerning the

---

[1] So in original. Probably should be "sections".

energy efficiency or energy use of an electric motor covered under this part is not superseded by the standards for such electric motor established or prescribed under section 6313(b) of this title if such regulation or requirement is identical to the standards established or prescribed under such section;

(9) in the case of commercial clothes washers, section 6297(b)(1) of this title shall be applied as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 2005; and

(10) section 6297 of this title shall apply with respect to the equipment described in section 6311(1)(L) of this title beginning on the date on which a final rule establishing an energy conservation standard is issued by the Secretary, except that any State or local standard prescribed or enacted for the equipment before the date on which the final rule is issued shall not be preempted until the energy conservation standard established by the Secretary for the equipment takes effect.

(b)(1) The provisions of section 6295(p)(4) of this title, section 6296(a), (b), and (d) of this title, section 6297(a) of this title, and sections 6298 through 6306 of this title shall apply with respect to the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of such equipment, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)(A) A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section.

(B) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction if—

(i) the standard in the building code does not require that the energy efficiency of such product exceed the applicable

minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1; and

(ii) the standard in the building code does not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1.

(C) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede the standards established by the State of California set forth in Table C-6, California Code of Regulations, Title 24, Part 2, Chapter 2-53, for water-source heat pumps below 135,000 Btu per hour (cooling capacity) that become effective on January 1, 1993.

(D) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a State regulation which has been granted a waiver by the Secretary. The Secretary may grant a waiver pursuant to the terms, conditions, criteria, procedures, and other requirements specified in section 6297(d) of this title.

(c) With respect to any electric motor to which standards are applicable under section 6313(b) of this title, the Secretary shall require manufacturers to certify, through an independent testing or certification program nationally recognized in the United States, that such motor meets the applicable standard.

(d)(1) Except as provided in paragraphs (2) and (3), section 6297 of this title shall apply with respect to very large commercial package air conditioning and heating equipment to the same extent and in the same manner as section 6297 of this title applies under part A on August 8, 2005.

(2) Any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(a)(9) of this title take effect on January 1, 2010.

(e)(1)(A) Subsections (a), (b), and (d) of section 6296 of this title, subsections (m) through (s) of section 6295 of this title, and sections 6298 through 6306 of this title shall apply with respect to commercial

refrigerators, freezers, and refrigerator-freezers to the same extent and in the same manner as those provisions apply under part A.

(B) In applying those provisions to commercial refrigerators, freezers, and refrigerator-freezers, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under paragraphs (2) and (3) of section 6313(c) of this title to the same extent and in the same manner as those provisions apply under part A on August 8, 2005, except that any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under paragraphs (2) and (3) of section 6313(c) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under section 6313(c)(4) of this title to the same extent and in the same manner as the provisions apply under part A on the date of publication of the final rule by the Secretary, except that any State or local standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(4)(A) If the Secretary does not issue a final rule for a specific type of commercial refrigerator, freezer, or refrigerator-freezer within the time frame specified in section 6313(c)(5) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to that specific type of refrigerator, freezer, or refrigerator-freezer for the period beginning on the date that is 2 years after the scheduled date for a final rule and ending on the date on which the Secretary publishes a

final rule covering the specific type of refrigerator, freezer, or refrigerator-freezer.

(B) Any State or local standard issued before the date of publication of the final rule shall not be preempted until the final rule takes effect.

(5)(A) In the case of any commercial refrigerator, freezer, or refrigerator-freezer to which standards are applicable under paragraphs (2) and (3) of section 6313(c) of this title, the Secretary shall require manufacturers to certify, through an independent, nationally recognized testing or certification program, that the commercial refrigerator, freezer, or refrigerator-freezer meets the applicable standard.

(B) The Secretary shall, to the maximum extent practicable, encourage the establishment of at least 2 independent testing and certification programs.

(C) As part of certification, information on equipment energy use and interior volume shall be made available to the Secretary.

(f)(1)(A)(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(1) of this title to the same extent and in the same manner as the section applies under part A on August 8, 2005.

(ii) Any State standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(d)(1) of this title take effect.

(B) In applying section 6297 of this title to the equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(2)(A)(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(2) of this title to the same extent and in the same manner as the section applies under part A on the date of publication of the final rule by the Secretary.

**Add.29**

(ii) Any State standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards established under section 6313(d)(2) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)(A) If the Secretary does not issue a final rule for a specific type of automatic commercial ice maker within the time frame specified in section 6313(d) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of automatic commercial ice maker for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of automatic commercial ice maker.

(B) Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

(4)(A) The Secretary shall monitor whether manufacturers are reducing harvest rates below tested values for the purpose of bringing non-complying equipment into compliance.

(B) If the Secretary finds that there has been a substantial amount of manipulation with respect to harvest rates under subparagraph (A), the Secretary shall take steps to minimize the manipulation, such as requiring harvest rates to be within 5 percent of tested values.

(g)(1)(A) If the Secretary does not issue a final rule for commercial clothes washers within the timeframe specified in section 6313(e)(2) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to commercial clothes washers for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering commercial clothes washers.

(B) Any State or local standard issued before the date on which the Secretary publishes a final rule shall not be preempted until

**Add.30**

the standards established under section 6313(e)(2) of this title take effect.

(2) The Secretary shall undertake an educational program to inform owners of laundromats, multifamily housing, and other sites where commercial clothes washers are located about the new standard, including impacts on washer purchase costs and options for recovering those costs through coin collection.

(h) WALK-IN COOLERS AND WALK-IN FREEZERS.—

(1) COVERED TYPES.—

(A) RELATIONSHIP TO OTHER LAW.—

(i) IN GENERAL.—Except as otherwise provided in this subsection, section 6297 of this title shall apply to walk-in coolers and walk-in freezers for which standards have been established under paragraphs (1), (2), and (3) of section 6313(f) of this title to the same extent and in the same manner as the section applies under part A on December 19, 2007.

(ii) STATE STANDARDS.—Any State standard prescribed before December 19, 2007, shall not be preempted until the standards established under paragraphs (1) and (2) of section 6313(f) of this title take effect.

(B) ADMINISTRATION.—In applying section 6297 of this title to equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(2) FINAL RULE NOT TIMELY.—

(A) IN GENERAL.—If the Secretary does not issue a final rule for a specific type of walk-in cooler or walk-in freezer within the timeframe established under paragraph (4) or (5) of section 6313(f) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of walk-in cooler or walk-in freezer during the period—

(i) beginning on the day after the scheduled date for a final rule; and

(ii) ending on the date on which the Secretary publishes a final rule covering the specific type of walk-in cooler or walk-in freezer.

(B) STATE STANDARDS.—Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

(3) CALIFORNIA.—Any standard issued in the State of California before January 1, 2011, under title 20 of the California Code of Regulations, that refers to walk-in coolers and walk-in freezers, for which standards have been established under paragraphs (1), (2), and (3) of section 6313(f) of this title, shall not be preempted until the standards established under section 6313(f)(4) of this title take effect.

## 42 U.S.C. §7410

## §7410. State implementation plans for national primary and secondary ambient air quality standards

## (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each

air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

[...]

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

[...]

**Add.33**

(Adopted January 9, 1998)(Amended January 7, 2005)(Amended May 5, 2006)
(Amended December 7, 2018)(Amended June 7, 2024)

**RULE 1146.2.**     **EMISSIONS OF OXIDES OF NITROGEN FROM LARGE WATER HEATERS AND SMALL BOILERS AND PROCESS HEATERS**

(a)     Purpose

The purpose of this rule is to reduce Oxides of Nitrogen (NOx) emissions from Water Heaters, Boilers, and Process Heaters fired with, or designed to be fired with, natural gas as defined in this rule.

(b)     Applicability

The provisions of this rule are applicable to manufacturers, distributors, retailers, Resellers, Installers, owners, and operators of Units fired with, or designed to be fired with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000 British Thermal Units (Btu) per hour.

(c)     Definitions

    (1)     BOILER means any equipment that is fired with, or is designed to be fired with, natural gas, used to produce steam or to heat water, and that is not used exclusively to produce electricity for sale. Boiler does not include any waste heat recovery boiler that is used to recover sensible heat from the exhaust of a combustion turbine or any unfired waste heat recovery boiler that is used to recover sensible heat from the exhaust of any combustion equipment.

    (2)     CERTIFIED RETROFIT KIT means any burner and ancillary controls or blowers that have been demonstrated to comply with the provisions of this rule, on a retrofit basis, on a particular model of Unit.

    (3)     COMPLIANCE PORTAL means the dedicated webpage on the South Coast AQMD website for submitting reports, notifications, or any documents to comply with South Coast AQMD rule(s).

    (4)     EXISTING BUILDING means a building that is not a New Building as defined in this rule. Existing Building includes any structures on the property including, but not limited to, sheds, detached garages, pools, and spas.

**Rule 1146.2 (Cont.)** **(Amended June 7, 2024)**

(c)  (5)  FORMER RECLAIM FACILITY means a facility, or any of its successors, that was in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX, that has received a final determination notification, and is no longer in the RECLAIM program.

(6)  HEAT INPUT means the chemical heat released due to assumed complete combustion of fuel to a Unit, using the higher heating value of the fuel. This does not include the sensible heat of incoming combustion air.

(7)  HEAT OUTPUT means the enthalpy of the working fluid output of the Unit.

(8)  HIGH TEMPERATURE UNIT means any Unit that is designed and used to produce steam or to heat water above 180 degrees Fahrenheit.

(9)  INDEPENDENT TESTING LABORATORY means a testing laboratory that meets the requirements of Rule 304 – Equipment, Materials, And Ambient Air Analyses, subdivision (k) and is approved by the Executive Officer to conduct certification testing under the Protocol: Nitrogen Oxides Emissions Compliance Testing for Natural Gas-Fired Water Heaters and Small Boilers (Protocol).

(10)  INSTALL means the action of an Installer to place a Unit in a position ready for use.

(11)  INSTALLER means a person who Installs a Unit and is required to obtain a license issued by the Department of Consumer Affairs Contractors State License Board for a classification related to buildings and appliances.

(12)  INSTANTANEOUS WATER HEATER means a tankless Water Heater with a Rated Heat Input Capacity less than or equal to 2,000,000 Btu per hour that heats water only on-demand when it flows through a heat exchanger, which is a device used to transfer heat between two or more mediums of different temperatures.

(13)  MOBILE HOME means a prefabricated structure on a permanently attached chassis.

(14)  NEW BUILDING means a building that is newly constructed or a building with a major alteration which changes the occupancy classification of a building, which means a change in the formal designation of the primary purpose of the building pursuant to 2022 Title 24 California Building Code Part 2 Chapter 3 for occupancy classification and use, and that does not have a Unit installed prior to the applicable Table 3 compliance dates. New

Building comprises any structures on the property including, but not limited to sheds, detached garages, pools, and spas.

(c)    (15)    OXIDES OF NITROGEN (NOx) EMISSIONS means the sum of nitric oxide and nitrogen dioxide emitted, calculated, and expressed as nitrogen dioxide.

        (16)    PARTS PER MILLION BY VOLUME (ppmv) means, for the purpose of this rule, Parts Per Million by Volume of a pollutant at a three percent oxygen correction on a dry basis at Standard Conditions.

        (17)    POOL HEATER means a Water Heater designed and used to heat a pool, hot tub, or spa.

        (18)    PROCESS HEATER means any equipment that is fired with, or is designed to be fired with, natural gas and which transfers heat from combustion gases to water or process streams. A Process Heater does not include any kiln or oven used for annealing, drying, curing, baking, cooking, calcining, or vitrifying; or any unfired waste heat recovery heater that is used to recover sensible heat from the exhaust of any combustion equipment.

        (19)    PROTOCOL means the South Coast AQMD Protocol to ensure standardization of compliance certification test procedures, titled: Nitrogen Oxides Emissions Compliance Testing for Natural Gas-Fired Water Heaters and Small Boilers.

        (20)    RECLAIM FACILITY means a facility, or any of its successors, that was in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX.

        (21)    RATED HEAT INPUT CAPACITY means the gross Heat Input of the combustion device, as supported by required documentation.

        (22)    RECREATIONAL VEHICLE means any vehicle used for recreational purposes designed to include a Water Heater and licensed to be driven or moved on the highways of California.

        (23)    RESELLER means anyone who sells either retail, wholesale, or on an individual basis any Unit.

        (24)    RESIDENTIAL STRUCTURE means any structure which is designed exclusively as a dwelling for not more than four families, and where such equipment is used by the owner or occupant of such a dwelling. Residential Structures includes any structures on the property including, but not limited to, sheds, detached garages, pools, and spas.

Rule 1146.2 (Cont.)                                    (Amended June 7, 2024)

(c)    (25)    SMALL BUSINESS is as defined by Rule 102 – Definition of Terms (Rule 102).

       (26)    STANDARD CONDITIONS are as defined by Rule 102.

       (27)    THERM means 100,000 Btu.

       (28)    TYPE 1 UNIT means any Unit with a Rated Heat Input Capacity less than or equal to 400,000 Btu per hour, excluding Water Heaters subject to the limits of Rule 1121 – Control of Nitrogen Oxides from Residential Type, Natural Gas-fired Water Heaters (Rule 1121).

       (29)    TYPE 2 UNIT means any Unit with a Rated Heat Input Capacity greater than 400,000 Btu per hour up to and including 2,000,000 Btu per hour.

       (30)    UNIT means any Boiler, Water Heater, or Process Heater as defined in this rule.

       (31)    WATER HEATER means any equipment that is fired with, or designed to be fired with, natural gas and that is used solely to heat water for use external to the equipment.

(d)    Requirements

       (1)    Prior to the applicable Table 3 compliance dates, no person shall manufacture, supply, sell, offer for sale, or Install, for use within the South Coast AQMD, any Unit unless the Unit is certified pursuant to subdivision (f) not to exceed the applicable Table 1 emission limits.

Table 1 – Emission Limits

| Equipment Category | NOx Emission Limit* | Carbon Monoxide (CO) Emission Limit* |
|---|---|---|
| Type 1 Units, excluding Pool Heaters | 14 ng/J or 20 ppmv | N/A** |
| Type 1 Pool Heaters | 40 ng/J or 55 ppmv | N/A** |
| Type 2 Units | 14 ng/J or 20 ppmv | 400 ppmv |

\*    Nanograms per Joule (ng/J) of NOx (calculated as $NO_2$) of Heat Output or the specified ppmv of NOx or CO corrected at 3 percent volume stack gas oxygen ($O_2$) on a dry basis.

\*\*   Type 1 Units are not subject to a CO limit in Rule 1146.2 but may be subject to CO limits by other South Coast AQMD rules.

       (2)    No person shall manufacture, supply, sell, offer for sale, or Install, for use in the South Coast AQMD, any Unit, unless such Unit complies with the

applicable Table 2 emission limits by the applicable Table 3 compliance dates.

Table 2 – Zero-Emission Limits, Compliance Schedule, and Unit Age

| Equipment Category | NOx and CO Emission Limits (ppmv) | Compliance Schedule | Unit Age (years) |
|---|---|---|---|
| Type 1 Unit* | 0 | Phase I | 15 |
| Instantaneous Water Heater ≤ 200,000 Btu/hr | 0 | | 25 |
| Instantaneous Water Heater > 200,000 Btu/hr | 0 | Phase II | 25 |
| Type 1 Pool Heater | 0 | | 15 |
| Type 2 Unit** | 0 | | 25 |
| Type 1 High Temperature Unit | 0 | Phase III | 25 |
| Type 2 High Temperature Unit | 0 | | 25 |

\*     Referring to a Type 1 Unit that is not a High Temperature Unit, Pool Heater, or Instantaneous Water Heater.
\*\*    Referring to a Type 2 Unit that is not a High Temperature Unit or Instantaneous Water Heater.

Table 3 – Compliance Dates for Zero-Emission Limits

| Phase | Building Type | Compliance Date |
|---|---|---|
| Phase I | New Buildings | January 1, 2026 |
| | Existing Buildings | January 1, 2029 |
| Phase II | New Buildings | January 1, 2028 |
| | Existing Buildings | January 1, 2031 |
| Phase III | New Buildings | January 1, 2029 |
| | Existing Buildings | January 1, 2033 |

**Rule 1146.2 (Cont.)**                                             **(Amended June 7, 2024)**

(d)     (3)     On and after the Table 3 compliance dates, an owner or operator of a Unit shall not operate a Unit which exceeds Table 2 emission limits once the Unit age determined pursuant to subdivision (e) is greater than or equal to the applicable Table 2 Unit age.

          (4)     The owner or operator of a Unit may modify a Unit and demonstrate it meets the emission limits in subdivision (d) by:

                   (A)     Modifying the Unit with a Certified Retrofit Kit; or

                   (B)     Causing an Independent Testing Laboratory to conduct a source test according to the South Coast AQMD Source Test Method 100.1 - Instrumental Analyzer Procedures for Continuous Gaseous Emission Sampling.

          (5)     An owner or operator of a Unit that modifies or replaces a burner in the Unit shall comply with the following applicable emission limits:

                   (A)     Table 1 emission limits if the modification or replacement occurs:

                           (i)     Prior to the applicable Table 3 compliance dates; or

                           (ii)     Before the Unit reaches its Table 2 Unit age; or

                   (B)     Table 2 emission limits if the modification or replacement occurs:

                           (i)     On and after the applicable Table 3 compliance dates; and

                           (ii)     When the Unit has reached its Table 2 Unit age.

          (6)     Except for units at a RECLAIM or former RECLAIM facility, an owner or operator shall not operate any Type 2 Unit manufactured prior to January 1, 2000, in the South Coast AQMD which does not meet the NOx emission limit of 30 ppmv, or 0.037 pound NOx per million Btu of heat input, and the CO emission limit of 400 ppmv.

(d)     (7)     An owner or operator of a Unit that elects to comply with the exemption in:

                (A)     Paragraph (k)(2) shall not operate a Unit that exceeds the applicable Table 1 emission limits on and after 180 days of failing to demonstrate compliance with paragraph (k)(2) pursuant to paragraph (g)(2);

                (B)     Paragraph (k)(3) shall not operate a Unit that exceeds the applicable Table 2 emission limits on and after 180 days of failing to demonstrate compliance with paragraph (k)(3) pursuant to paragraph (g)(2); or

                (C)     Paragraph (k)(5) shall not operate a Unit that does not comply with paragraph (d)(3) on and after 180 days of failing to meet the definition of a Small Business.

(e)     Unit Age

     (1)     For all Unit age determinations in this rule, an owner or operator of a Unit shall determine the Unit age as follows:

                (A)     Unit age shall be based on the original date of manufacture determined by:

                      (i)     Invoice from purchase of Unit provided by manufacturer;

                      (ii)     Original Unit manufacturer's identification or rating plate permanently affixed to the Unit; or

                      (iii)     Any other method of determining Unit age that can be substantiated through written information as approved by the Executive Officer.

                (B)     The Unit shall be deemed at the end of its Unit age as of January 1, 2025, for any Unit where the Unit age cannot be determined pursuant to subparagraph (e)(1)(A).

(f)     Certification

     (1)     The manufacturer shall obtain confirmation from an Independent Testing Laboratory prior to applying for certification for a natural gas Unit that each Unit model or retrofit kit complies with the Table 1 emission limits when fired with natural gas. This confirmation shall be based upon emission source tests of a randomly selected Unit of each model, and the Protocol shall be adhered to during the confirmation testing of all Units subject to this rule.

(f)    (2)    When applying for Unit(s) certification, the manufacturer shall submit to the Executive Officer the following:

         (A)    A statement that the model is in compliance with subdivision (d). The statement shall be signed and dated, and shall attest to the accuracy of all statements;

         (B)    General Information including:

             (i)    Name and address of manufacturer;

             (ii)    Brand name; and

             (iii)    Model number, as it appears on the Unit rating plate;

         (C)    A description of each model being certified; and

         (D)    A source test report verifying compliance with the emission limits in subdivision (d) for each model to be certified. The source test report shall be prepared by the confirming Independent Testing Laboratory and shall contain all of the elements identified in the Protocol for each Unit tested.

   (3)    When applying for Unit certification, the manufacturer shall submit the items identified in paragraph (f)(2) no more than 180 days after the date of the source test identified in subparagraph (f)(2)(D).

   (4)    The Executive Officer shall certify a Unit model which complies with the provisions of subdivision (d) and of paragraphs (f)(1), (f)(2), and (f)(3).

(g)    Demonstration of Compliance with Emission Limits

   (1)    The owner or operator of a Unit shall demonstrate compliance pursuant to subparagraph (d)(4)(B) by maintaining a copy of the South Coast AQMD approved source test report and making it available to the Executive Officer upon request. The source test report shall, at a minimum, include:

         (A)    The applicable NOx and CO emissions of the Unit;

         (B)    The South Coast AQMD approved test method and Independent Testing Laboratory that conducted the source test;

         (C)    The model and serial numbers of the Unit; and

         (D)    The Rated Heat Input Capacity of the Unit.

   (2)    The owner or operator of a Unit electing to comply with the exemptions in paragraph (k)(2) or (k)(3) shall:

         (A)    Demonstrate compliance with the annual Therm limit for each calendar year, determined using one of the following methods:

(g)    (2)    (A)    (i)    Fuel usage recorded by a non-resettable totalizing fuel meter, corrected to Standard Conditions;

(ii)    Fuel usage calculated by multiplying the number of hours recorded by a non-resettable totalizing time meter and the Rated Heat Input Capacity of the Unit, as calculated using Equation 1 (Eq. 1):

Fuel Usage (Therms) = H × R × 1,000,000 (Btu per MMBtu) ÷ 100,000 (Btu per Therm)                    (Eq. 1)

Where:

H = Number of Hours Recorded

R = Rated Heat Input Capacity of the Unit (MMBtu/hr); or

(iii)    Monthly fuel billing statement or equivalent documentation;

(B)    Calibrate the non-resettable totalizing fuel meter or non-resettable time meter according to the manufacturer's recommendation; and

(C)    Use the higher heating value of 1,050 million Btu per million standard cubic feet for converting natural gas measured in volume to Therm.

(h)    Identification of Compliant Units

(1)    Newly Manufactured Units

The manufacturer shall display the model number of the Unit complying with subdivision (d) on the shipping carton and permanent rating plate. The manufacturer shall also display the certification status on the shipping carton and on the Unit.

(2)    Certified Retrofit Kits

The manufacturer shall display the model number of the retrofit kit and manufacturer and model of applicable Units on the shipping carton and in a plainly visible portion of the retrofit kit.

(i)    Alternative Compliance Options

(1)    Alternative Compliance Option for Utility Upgrades

If an owner or operator of a Unit required to meet the Table 2 emission limits will encounter delays beyond the reasonable control of the owner or operator to meet the applicable compliance dates in Table 3 or paragraph (d)(3) because a utility upgrade is required and the applicable utility

**Rule 1146.2 (Cont.)**                        **(Amended June 7, 2024)**

company is unable to provide the necessary power to operate the Unit as demonstrated with documents specified in paragraph (j)(6), the owner or operator of a Unit shall:

(i)     (1)     (A)     Notify the Executive Officer through the Compliance Portal:

                 (i)     At least 90 days prior to the Unit's applicable compliance date in Table 3 or paragraph (d)(3) to request an extension of no more than 24 months from the applicable compliance date; or

                 (ii)     If utility upgrades are needed to operate a Unit that is replacing a Unit that failed and is no longer operational, no later than 30 days after the date the Unit became non-operational to request an extension of no more than 24 months from the date of Unit failure;

         (B)     Obtain a letter from the Executive Officer through the Compliance Portal approving or disapproving the extension:

                 (i)     Prior to the Unit's compliance date; or

                 (ii)     No later than 90 days after the date the notification was submitted pursuant to clause (i)(1)(A)(ii) for a Unit failure;

         (C)     If the utility upgrades will not be completed within the 24-month extension approved pursuant to subparagraph (i)(1)(B), the owner or operator may:

                 (i)     Request an additional extension of no more than 24 months through the Compliance Portal at least 90 days prior to the end of the initial 24-month extension; and

                 (ii)     Obtain a letter from the Executive Officer through the Compliance Portal prior to the end of the initial extension approving or disapproving the extension;

         (D)     If the utility upgrades will not be completed within the additional 24-month extension approved pursuant to subparagraph (i)(1)(C), the owner or operator may:

                 (i)     Request a further extension of no more than 12 months through the Compliance Portal at least 90 days prior to the end of the additional 24-month extension; and

(i)    (1)    (D)    (ii)    Obtain a letter from the Executive Officer through the Compliance Portal prior to the end of the additional 24-month extension approving or disapproving the extension;

    (E)    Provide a progress report to the Executive Officer through the Compliance Portal every six months after the start of the initial extension approved pursuant to subparagraph (i)(1)(B) and for the applicable extension period(s) approved pursuant to subparagraphs (i)(1)(C) and (i)(1)(D), which includes, but is not limited to:

    (i)    The status of the utility upgrade;

    (ii)    The estimated date the utility provider will complete the utility upgrade; and

    (iii)    Documentation which justifies the update to estimated date for completion;

    (F)    Provide a follow-up notification to the Executive Officer through the Compliance Portal no later than 72 hours after the Unit complying with the Table 2 emission limits has been installed;

    (G)    Maintain records pursuant to paragraph (j)(6);

    (H)    For a Unit that is non-operational during the extension(s) approved pursuant to subparagraphs (i)(1)(B), (i)(1)(C), and (i)(1)(D), the owner or operator may elect to operate a temporary Unit during the extension, provided:

    (i)    The temporary Unit complies with Table 1 emission limits;

    (ii)    No later than 72 hours after the date the temporary Unit was installed, the owner or operator notifies the Executive Officer through the Compliance Portal; and

    (iii)    No later than 72 hours after the date the temporary Unit was disconnected, the owner or operator notifies the Executive Officer through the Compliance Portal.

(2)    Alternative Compliance Option for Multiple Units

An owner or operator of five or more Units that are required to meet the Table 2 emission limits within two consecutive calendar years pursuant to paragraph (d)(3) may elect to submit an alternative compliance plan requesting alternative compliance date(s), provided the owner or operator:

(i)    (2)    (A)    Submit the alternative compliance plan at least one year prior to the earliest compliance due date, with a filing fee payment pursuant to Rule 306 – Plan Fees (Rule 306);

(B)    Specify compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(i)    Three or at least 30 percent of the Units by the latest applicable compliance date;

(ii)    At least 30 percent of the Units one year after the latest applicable compliance date; and

(iii)    The remaining Units two years after the latest applicable compliance date;

(C)    In lieu of subparagraph (i)(2)(B), if an owner or operator of five or more Units electing to comply by submitting an alternative compliance plan in subparagraph (i)(2)(A) will encounter delays beyond the reasonable control of the owner or operator to meet the applicable compliance dates because a utility upgrade is required and the applicable utility company is unable to provide the necessary power to operate the Units, as demonstrated with documents specified in paragraph (j)(6), the owner or operator of the Units may elect to:

(i)    Include a request for an extension of no more than 24 months from the earliest compliance due date of the Units included in the alternative compliance plan submitted pursuant to subparagraph (i)(2)(A); and specify alternative compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(A)    Three or at least 50 percent of the Units no later than 24 months after end of the approved extension in clause (i)(2)(C)(i); and

(B)    The remaining Unit(s) no later than 36 months after the end of the approved extension(s) in clause (i)(2)(C)(i);

(ii)    If the utility upgrades will not be completed within the initial 24-month extension period provided in clause (i)(2)(C)(i), the owner or operator may request a second extension of no

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

more than 24 months by submitting a revised alternative compliance plan at least 180 days prior to the end of the first 24-month extension, with a filing fee payment pursuant to Rule 306 and Executive Officer approval or disapproval; and specify alternative compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(i)    (2)    (C)    (ii)    (A)    Three or at least 50 percent of the Units no later than 24 months after end of the approved extension in clause (i)(2)(C)(ii); and

(B)    The remaining Unit(s) no later than 36 months after the end of the approved extension in clause (i)(2)(C)(ii);

(iii)    If the utility upgrades will not be completed within the second 24-month extension period provided in clause (i)(2)(C)(ii), the owner or operator may request a third extension of no more than 12 months by submitting a revised alternative compliance plan at least 180 days prior to the end of the second 24-month extension, with a filing fee payment pursuant to Rule 306 and Executive Officer approval or disapproval; and specify alternative compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(A)    Three or at least 50 percent of the Units no later than 24 months after the end of the approved extension in clause (i)(2)(C)(iii); and

(B)    The remaining Unit(s) no later than 36 months after the end of the approved extension in clause (i)(2)(C)(iii);

(iv)    Include the documentation listed in paragraph (j)(6) with the application for any alternative compliance plan or revised alternative compliance plan;

(v)    Provide a progress report to the Executive Officer through the Compliance Portal every six months after the start of the initial extension approved pursuant to clause (i)(2)(C)(i) for

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

|       |     |     |     | the applicable extension period(s) approved pursuant to clauses (i)(2)(C)(ii) or (i)(2)(C)(iii), which includes, but is not limited to: |

(i)    (2)    (C)    (v)    (A)    The status of the utility upgrade;

(B)    The estimated date the utility provider will complete the utility upgrade; and

(C)    Documentation which justifies the update to estimated date for completion;

(D)    Obtain written approval from the Executive Officer, as specified in paragraph (i)(3):

(i)    Prior to the earliest compliance due date of all Units included in the alternative compliance plan; and

(ii)    If an additional extension(s) was requested pursuant to clauses (i)(2)(C)(ii) and/or (i)(2)(C)(iii), prior to the end of the previously approved extension.

(3)    Approval of Alternative Compliance Option for Multiple Units

The Executive Officer shall review the request for alternative compliance date submitted pursuant to paragraph (i)(2) and provide written approval or disapproval based on whether the following criteria are met:

(A)    The owner or operator demonstrated they are operating five or more Units that are required to be replaced based on Unit age pursuant to paragraph (d)(3) to meet Table 2 emission limits within two calendar years;

(B)    The request was submitted at least one year prior to the earliest applicable compliance due date; and

(C)    The proposed alternative compliance date meets the criteria specified in subparagraph (i)(2)(B) and subparagraph (i)(2)(C), if applicable.

(4)    Alternative Compliance Option for Emergency Replacements

If a Unit requires a short-term replacement due to sudden Unit failure after the applicable Table 3 compliance date and an electrical upgrade is required to increase the power supply capacity to operate a Unit that complies with Table 2 emission limits, excluding Units utilizing alternative compliance options specified in paragraphs (i)(1), (i)(6), and (i)(7):

(i)  (4)  (A) For Units used in buildings that are not Residential Structures, the owner or operator of the Unit may elect to Install and operate a temporary Unit that complies with Table 1 emission limits for up to six months prior to installing a Unit that complies with Table 2 emission limits provided the owner or operator of the Unit:

      (i) Report the date the existing Unit failed and the date the temporary Unit was installed through the Compliance Portal no later than 72 hours after the date the temporary Unit was installed;

      (ii) Report the date the temporary Unit was disconnected through the Compliance Portal no later than 72 hours after the date the temporary Unit was disconnected; and

      (iii) Report the date the Unit complying with Table 2 emission limits was installed through the Compliance Portal no later than 72 hours after the date the new Unit was installed;

    (B) For Units sold for use in Residential Structures, a manufacturer, distributor, retailer, or Installer may elect to offer a Unit for rent that complies with Table 1 emission limits for up to six months prior to installing a Unit that complies with Table 2 emission limits provided the manufacturer, distributor, retailer, or Installer report the date the temporary Unit was rented through the Compliance Portal no later than 72 hours after the date the temporary Unit was rented.

  (5) Alternative Compliance Option for Mobile Homes

    An owner or operator of an Instantaneous Water Heater manufactured prior to June 7, 2024 that is installed in a Mobile Home may elect to Install an Instantaneous Water Heater with Rated Heat Input Capacity of less than or equal to 200,000 Btu/hr that complies with the Table 1 emission limits before January 1, 2033, in lieu of the applicable compliance date in Table 3 or paragraph (d)(3), provided the labeling requirement in paragraph (j)(2) is met. On and after January 1, 2033, any Instantaneous Water Heater with Rated Heat Input Capacity of less than or equal to 200,000 Btu/hr manufactured, supplied, sold, offered for sale, or installed for use in a mobile home must meet the Table 2 emission limits upon replacement.

(i)     (6)     Alternative Compliance Option for Units at a Property Under Lease

An owner or operator of a Unit in a property under lease shall be provided an extension of no more than 24 months from the applicable compliance date to comply with the Table 2 emission limits, if the installation is delayed beyond the reasonable control of the owner or operator of the Unit, excluding Units utilizing the alternative compliance options specified in paragraphs (i)(1), (i)(2), and (i)(7), provided the owner or operator of the Unit:

(A)     Occupies the property under a lease as a tenant before and after the applicable compliance date in Table 3 or paragraph (d)(3);

(B)     Reports the date the existing Unit is required to be replaced to comply with the Table 2 emission limits to the Executive Officer through the Compliance Portal no later than 90 days prior to the applicable compliance date in Table 3 or paragraph (d)(3);

(C)     If a Unit is non-operational during the extension specified in paragraph (i)(6), the owner or operator may elect to operate a temporary Unit during the extension, provided:

(i)     The temporary Unit complies with Table 1 emission limits;

(ii)     No later than 72 hours after the date the temporary Unit was installed, the owner or operator notifies the Executive Officer through the Compliance Portal; and

(iii)     No later than 72 hours after the date the temporary Unit was disconnected, the owner or operator notifies the Executive Officer through the Compliance Portal;

(D)     Report the date the new Unit was installed to comply with the Table 2 emission limits to the Executive Officer through the Compliance Portal no later than 72 hours after the date the new Unit was installed; and

(E)     Maintain records pursuant to paragraph (j)(7).

(7)     Alternative Compliance Option for Construction

An owner or operator of a Unit shall be provided an extension of no more than 18 months from the applicable compliance date to comply with the Table 2 emission limits if the installation is delayed because construction is required to expand the space designed to house or relocate the Unit, and associated equipment necessary for operating the Unit, excluding Units

**Rule 1146.2 (Cont.)**               **(Amended June 7, 2024)**

utilizing the alternative compliance options specified in paragraphs (i)(1), (i)(2), (i)(5), and (i)(6), provided the owner or operator of a Unit:

(i)     (7)     (A)     Reports the date the existing Unit is required to be replaced to comply with the Table 2 emission limits to the Executive Officer through the Compliance Portal no later than 90 days prior to the applicable compliance date in Table 3 or paragraph (d)(3);

                 (B)     If a Unit is non-operational during the extension specified in paragraph (i)(7), the owner or operator may elect to operate a temporary Unit during the extension, provided:

                         (i)     The temporary Unit complies with Table 1 emission limits;

                         (ii)     No later than 72 hours after the date the temporary Unit was installed, the owner or operator notifies the Executive Officer through the Compliance Portal; and

                         (iii)     No later than 72 hours after the date the temporary Unit was disconnected, the owner or operator notifies the Executive Officer through the Compliance Portal;

                 (C)     Report the date the new Unit was installed to comply with the Table 2 emission limits through the Compliance Portal no later than 72 hours after the date the new Unit was installed; and

                 (D)     Maintain records pursuant to paragraph (j)(8).

           (8)     An owner or operator of a Unit electing to use any of the alternative compliance options in this subdivision that fails to comply with the applicable requirements of the alternative compliance options must comply with the applicable requirements in paragraph (d)(2), (d)(3), or subparagraph (d)(5)(B).

(j)     Labeling, Reporting, and Recordkeeping Requirements

          (1)     Pursuant to the labeling schedule in Table 4, any Unit that is supplied or offered for sale for use within the South Coast AQMD prior to the applicable Table 3 compliance dates that complies with the Table 1 emission limits, but not the Table 2 emission limits, shall prominently display the statement "If Installed in South Coast AQMD: For Installation and Use in Existing Buildings Only."

**Rule 1146.2 (Cont.)**                          **(Amended June 7, 2024)**

Table 4 – Labeling Schedule

| Unit's Compliance Schedule | Labeling Requirements | |
|---|---|---|
| | Start Date | End Date |
| Phase I | January 1, 2026 | January 1, 2029 |
| Phase II | January 1, 2028 | January 1, 2031 |
| Phase III | January 1, 2029 | January 1, 2033 |

(j)     (2)     Effective January 1, 2029, to January 1, 2033, an Instantaneous Water Heater with Rated Heat Input Capacity of less than or equal to 200,000 Btu/hr supplied or offered for sale for use in a Mobile Home within the South Coast AQMD and complying with the alternative compliance date in paragraph (i)(5) shall prominently display the statement "If Installed in South Coast AQMD: For Installation and Use in Mobile Homes Only."

(3)     Annual Reporting Requirement

Effective on and after the Table 3 compliance dates for Existing Buildings, manufacturers of natural gas-fired Unit(s) shall submit a report by March 1st of the following calendar year to the Executive Officer through the Compliance Portal. The report shall include:

(A)     Name of the product manufacturer;

(B)     List of product model(s);

(C)     Number of Units and Rated Heat Input Capacity of each model that was sold into or within the South Coast AQMD; and

(D)     The applicable equipment category in Table 2.

(4)     General Recordkeeping Requirements

The owner or operator of a Unit shall maintain on-site, or provide upon the Executive Officer's request, the following records:

(A)     A copy of the manufacturer's and/or distributor's written instructions;

(B)     A record of the maintenance activity for a period of not less than three years;

(C)     A copy of a government-issued document that grants permission to an individual or organization to initiate a construction project which determines the eligibility of New Building or Existing Building for the compliance of the rule; and

(j)    (4)    (D)    A record demonstrating annual fuel usage pursuant to subparagraph (g)(2)(D) for a period of not less than three years, if the owner or operator of a Unit is electing to comply with the exemptions in paragraph (k)(2) or (k)(3).

       (5)    Rated Heat Input Capacity Documentation

              The owner or operator of a Unit shall maintain on-site, or provide upon the Executive Officer's request, a copy of all documents identifying the Unit's Rated Heat Input Capacity including:

              (A)    Manufacturer's or distributor's manual or invoice; and

              (B)    Maintain documentation of the Rated Heat Input Capacity for a Unit modified pursuant to paragraph (d)(5), signed by the licensed person modifying the Unit, including:

                     (i)     Description of all Unit modifications;

                     (ii)    Dates the Unit was modified; and

                     (ii)    Calculation of Rated Heat Input Capacity.

       (6)    Recordkeeping for Alternative Compliance Option for Utility Upgrades

              An owner or operator of a Unit that elects to comply with paragraph (i)(1) or subparagraph (i)(2)(C) shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after the end date of the approved extension(s), that demonstrate the utility provider's progress on providing the necessary power, including but not limited to an official document signed by the responsible party of the utility company that services the facility that includes:

              (A)    An explanation of the utility upgrades required by the utility company;

              (B)    Communications with the utility provider when the utility upgrade was requested;

              (C)    Estimated date the utility provider will complete the utility upgrades;

              (D)    Any additional information to substantiate that an additional time is necessary; and

              (E)    Documentation which demonstrates that the delays are outside of the reasonable control of the owner or operator.

**Rule 1146.2 (Cont.)**          **(Amended June 7, 2024)**

(j)    (7)    Recordkeeping for Alternative Compliance Option for Units at a Property Under Lease

An owner or operator that elects to comply with paragraph (i)(6) shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after reporting through the Compliance Portal pursuant to subparagraph (i)(6)(B), including but not limited to:

(A)    A legally binding contract that explains the terms and duration of the lease under which the owner or operator of the Unit is a tenant renting the property from a landlord; and

(B)    Documentation which demonstrates that the delays are beyond the reasonable control of the owner or operator of the Unit.

(8)    Recordkeeping for Alternative Compliance Option for Construction

An owner or operator that elects to comply with paragraph (i)(7) shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after reporting through the Compliance Portal pursuant to subparagraph (i)(7)(A), including but not limited to:

(A)    Images that show:

(i)    Construction activity;

(ii)    Expansion of the space for the Unit or new location where the Unit will be housed; and

(iii)    Associated equipment by the construction; and

(B)    Documentation which demonstrates the construction, which could be a construction permit or contract.

(9)    Small Business Registration

An owner or operator of a Unit electing to comply with the exemption in paragraph (k)(5) shall register their facility as a Small Business through the Compliance Portal at least 90 days prior to the Unit reaching the Unit age specified in Table 2. The owner or operator of the Unit shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after registering through the Compliance Portal, to demonstrate:

(A)    Business legal owner and contact information;

(B)    Number of current employees;

(C)    The total gross annual receipts; and

(D)    If the business is a not-for-profit training center.

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

(j)  (10)  The owner or operator of a Unit required to submit information through the Compliance Portal in paragraph (i)(1), (i)(4), (i)(6), (i)(7), (j)(3), or (j)(9) shall provide the required information by calling 1-800-CUT-SMOG® (800-288-7664) if:

(A)  The Compliance Portal is not available;

(B)  The functions within the Compliance Portal do not allow the owner or operator of a Unit to enter the necessary information; or

(C)  The owner or operator of a Unit does not have access to the Compliance Portal.

(k)  Exemptions

(1)  The provisions of this rule shall not apply to:

(A)  Units used in Recreational Vehicles;

(B)  Units subject to a NOx emission limit in Rule 1121; and

(C)  Units subject to a NOx emission limit in Rule 1179.1 – Emission Reductions From Combustion Equipment at Publicly Owned Treatment Works Facilities.

(2)  Until the applicable Table 3 compliance dates, the Table 1 emission limits shall not apply to Type 2 Units manufactured prior to January 1, 2000 that are demonstrated to use less than 9,000 Therms during every calendar year.

(3)  The provisions of paragraphs (d)(2) and (d)(3) and subparagraph (d)(5)(B) shall not apply to the following Units installed prior to June 7, 2024 that meet Table 1 emission limits:

(A)  Units with a rated heat input capacity greater than 1,000,000 Btu per hour, but less than or equal to 2,000,000 Btu per hour that are demonstrated to use less than 3,000 Therms during every calendar year; or

(B)  Units with a rated heat input capacity greater than 400,000 Btu per hour, but less than or equal to 1,000,000 Btu per hour that demonstrate to use less than 2,000 Therms during every calendar year.

(4)  The provisions of paragraphs (d)(3), (d)(4), (d)(5), (d)(6), and (d)(7), and the recordkeeping and reporting provisions in paragraphs (j)(4) through (j)(9) shall not apply to Units installed or used in Residential Structures.

**Rule 1146.2 (Cont.)**                    **(Amended June 7, 2024)**

(k)    (5)    The provisions of paragraph (d)(3) shall not apply to a Unit installed in a Small Business, provided that the owner or operator of the Unit complies with paragraph (j)(9).

(6)    Certification requirements specified in paragraphs (f)(1) through (f)(4) shall not apply to Units complying with Table 2 emission limits.