No. 25-5129

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RINNAI AMERICA CORPORATION et al.,

*Plaintiffs–Appellants*,

v.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,

*Defendant–Appellee*,

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE et al.,

*Intervenor–Defendants–Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:24-cv-10482-PA-PD
Hon. Percy Anderson, District Judge

## PLAINTIFFS–APPELLANTS' EXCERPTS OF RECORD

Sarah O. Jorgensen
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1201 W. Peachtree St., Suite 2300
Atlanta, GA 30309

Brian C. Baran
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006

Courtland L. Reichman
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
(650) 623-1401
creichman@reichmanjorgensen.com

*Counsel for Appellants Rinnai America Corp., Noritz America Corp.,
National Association of Home Builders, California Manufacturers &
Technology Association, California Restaurant Association, California
Hotel & Lodging Association, California Apartment Association, and
Plumbing-Heating-Cooling Contractors of California*

*(Additional parties and counsel listed on inside cover)*

John J. Davis, Jr.
Luke Dowling
MCCRACKEN, STEMERMAN &
  HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
(415) 597-7200
jjdavis@msh.law

*Counsel for Appellant California
State Pipe Trades Council*

Angelo I. Amador
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
(202) 331-5913
aamador@restaurant.org

*Counsel for Appellant Restaurant
Law Center*

Matthew P. Gelfand
CALIFORNIANS FOR
  HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, CA 90020
(213) 739-8206
matt@caforhomes.org

*Counsel for Appellant Californians
for Homeownership, Inc.*

## TABLE OF CONTENTS

| Dkt. | Description | Date | ER |
|------|-------------|------|-----|
| 82 | Amended Judgment | 07/22/2025 | 6 |
| 81 | Amended Summary Judgment Order | 07/22/2025 | 8 |
| 80 | Judgment | 07/18/2025 | 18 |
| 79 | Summary Judgment Order | 07/18/2025 | 20 |
| 73 | Defendant's Reply in Support of Cross-Motion for Summary Judgment (excerpt) | 06/16/2025 | 31 |
| 67 | Plaintiffs' Local Rule 56-3 Response to Defendant's Statement of Genuine Disputes of Material Fact and Local Rule 56-2 Statement of Genuine Disputes of Material Fact (excerpt) | 06/02/2025 | 34 |
| 53 | Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (excerpts) | 05/12/2025 | 68 |
| 50-4 | Exhibit 2, Attachments G-H to Plaintiffs' Motion for Summary Judgment: District's Final Staff Report and Final Socioeconomic Impact Assessment for Proposed Amended Rule 1146.2 (excerpts) | 04/14/2025 | 79 |
| 50-6 | Declaration of Frank Windsor in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 109 |
| 50-7 | Declaration of Jay Hassel in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 113 |
| 50-8 | Declaration of Thomas J. Ward in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 117 |

| Dkt. | Description | Date | ER |
|---|---|---|---|
| 50-9 | Declaration of Mike Hartley in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 120 |
| 50-10 | Declaration of Joe Raymond in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 123 |
| 50-11 | Declaration of Lance Hastings in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 127 |
| 50-12 | Declaration of Jot Condie in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 130 |
| 50-13 | Declaration of Angelo Amador in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 133 |
| 50-14 | Declaration of Matt P. Gelfand in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 136 |
| 50-15 | Declaration of Thomas K. Bannon in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 142 |
| 50-16 | Declaration of Brian Abernathy in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 149 |
| 50-17 | Declaration of Jessica Bohn in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 157 |
| 50-18 | Declaration of Blake Boyd in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 161 |
| 50-19 | Declaration of Lynn Mohrfeld in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 165 |

| Dkt. | Description | Date | ER |
|------|-------------|------|-----|
| 50-20 | Declaration of Whitney Squire in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 169 |
| 50-21 | Declaration of Mike Prencavage Jr. in Support of Plaintiffs' Motion for Summary Judgment | 04/14/2025 | 173 |
| 35 | Order Granting Motion to Intervene | 02/26/2025 | 177 |
| 12 | Amended Complaint for Declaratory and Injunctive Relief | 12/17/2024 | 181 |
| 1-1 | Exhibit 1 to Complaint: District's Amended Rule 1146.2 | 12/05/2024 | 214 |
| 83 | Notice of Appeal | 08/08/2025 | 236 |
| | District Court Docket Sheet | | 243 |

(6 of 261), Page 6 of 261    Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 6 of 261
Case 2:24-cv-10482-PA-PD    Document 82    Filed 07/22/25    Page 1 of 2    Page ID
#:2310

**JS-6**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al., | No.  CV 24-10482 PA (PDx) |
| Plaintiff, | AMENDED JUDGMENT |
| v. | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
| Defendant, | |
| and | |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, AND INDUSTRIOUS LABS, | |
| Defendant-Intervenors. | |

In accordance with the Court's July 22, 2025 Amended Minute Order granting the Cross-Motion for Summary Judgment filed by defendant South Coast Air Quality Management District ("Defendant"), IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1.    Defendant is entitled to summary judgment on the claim for declaratory relief filed by plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center,

1  Californians for Homeownership, Inc., California Hotel & Lodging Association, and

2  California Apartment Association;

3           2.      Plaintiffs shall take nothing and Defendant shall have its costs of suit; and

4           3.      The Clerk is ordered to enter this Amended Judgment.

5  DATED: July 22, 2025

6

7           _____

8                                           Percy Anderson
                                      United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(8 of 261), Page 8 of 261    Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 8 of 261
Case 2:24-cv-10482-PA-PD    Document 81    Filed 07/22/25    Page 1 of 10    Page ID
#:2300

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 22, 2025 |
|---|---|---|---|

| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. |
|---|---|

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE |
|---|---|

| Kamilla Sali-Suleyman | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**      IN CHAMBERS — COURT ORDER

Before the Court is a Motion for Summary Judgment filed by plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association, and California Apartment Association ("Plaintiffs") (Docket No. 50) and a Cross-Motion for Summary Judgment filed by defendant South Coast Air Quality Management District ("SCAQMD" or "District" or "Defendant"). (Docket No. 58.) The parties seek summary judgment on the same issue: whether the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, preempts the SCAQMD's rule regulating nitrogen oxide emissions for certain categories of natural gas appliances. Both motions are fully briefed. (Docket Nos. 50, 53-61, 63, 66, 67-75.) In addition, intervening defendants, People's Collective for Environmental Justice, Sierra Club, and Industrious Labs ("Intervening Defendants") have filed an Opposition to Plaintiff's Motion and a Joinder in Defendant's Cross-Motion for Summary Judgment and Reply. (Docket Nos. 62, 63, 76.) Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument and vacates the hearing on the matter.

## I.    **Factual and Procedural Background**

In this action, Plaintiffs, manufacturers of gas appliances, affordable housing groups, labor union associations, and associations of manufacturers, builders, commercial and residential building owners, hotel owners and operators, and restaurant chefs and owners, seek declaratory and injunctive relief against enforcement of SCAQMD's Rule 1146.2 ("Rule") imposing a zero-nitrogen oxide emission standard on certain categories of natural gas appliances.[1]  (First Amended Complaint ("FAC") ¶ 1.)  Plaintiffs allege that implementation of this Rule will

---

[1]      The Rule specifically applies to large water heaters and small boilers and process heaters fired with, or designed to be fired with, natural gas.  Rule 1146.2(a).

(9 of 261), Page 9 of 261    Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 9 of 261
Case 2:24-cv-10482-PA-PD    Document 81    Filed 07/22/25    Page 2 of 10    Page ID
#:2301

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | | Date | July 22, 2025 |
|---|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | | |

effectively prohibit the manufacture, sale, purchase, and installation of natural gas appliances after certain dates, and that this "de facto ban" on certain gas appliances should be invalidated under the EPCA's preemption clause. (Id.)

On December 17, 2024, Plaintiffs filed a First Amended Complaint and Defendant filed its Answer on January 24, 2025. (Docket Nos. 12, 23.) On February 26, 2025, the Court granted the Intervening Defendants' Motion to Intervene. (Docket No. 35.) The Intervening Defendants filed an Answer to the First Amended Complaint on March 4, 2025. (Docket No. 43.)

A.      **SCAQMD and Rule 1146.2**

The SCAQMD is the air pollution control agency for all of Orange County and the urban portions of Los Angeles, Riverside and San Bernardino counties. South Coast Air Quality Mgmt. Dist., About SCAQMD, S. COAST AQMD (last visited July 8, 2025), https://www.aqmd.gov/aq-spec/aboutscaqmd. The California state legislature created the SCAQMD in 1976 in order to address "the most critical air pollution problem in the nation" that is "detrimental to the public peace, health, safety and welfare of the people of the state." Cal. Stat. ch. 324, § 5, at 893.

The District has worked for many years to reduce emissions of air pollutants in the South Coast Air Basin ("Basin") in order to bring the Basin into compliance with federal air pollution standards.[2] (Defendants' Consolidated Additional Material Facts and Statement of Uncontroverted Facts, Docket No. 60, ("AMF") 42-44.) Despite its efforts, the Basin continues to suffer from poor air quality and has failed to meet federal standards. (AMF 41, 42.) In order to achieve its goals, the District has regulated appliance emissions of nitrous oxides ("NOx") – a leading cause of pollutants and smog in the Basin – since its inception. (AMF 48-52.)[3]

---

[2]      The amendments to the Clean Air Act ("CAA") were passed in 1970 as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." Union Electric Co. v. Environmental Protection Agency, 427 U.S. 246, 256 (1976). "The Amendments place the primary responsibility for formulating pollution control strategies on the States, but nonetheless subject the States to strict minimum compliance requirements." Id. at 256-57. The CAA thus relies on states to reduce pollutant emissions in order to meet national air quality standards. See also 42 U.S.C. § 7410.

[3]      NOx are toxic and highly reactive gases that threaten the environment and also pose significant safety risks to human health. (AMF 41.)

(10 of 261), Page 10 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 10 of 261
Case 2:24-cv-10482-PA-PD    Document 81    Filed 07/22/25    Page 3 of 10    Page ID
#:2302

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 22, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

To further reduce emissions of NOx, the District developed an Air Quality Management Plan ("Plan").[4] (AMF 45.) The Plan called for reductions of NOx emissions from appliances by requiring zero-emission commercial water heaters. (AMF 63.) In order to implement the Plan, the District amended an existing rule to expand the scope of equipment subject to NOx limits and also to reduce the emission limits to zero. (AMF 58-62.) The final rule, Rule 1146.2 was amended following public hearing on June 7, 2024. (AMF 65.) As amended, the Rule prohibits the manufacture, sale, supply, offer for sale, or installation for use in the District, of large water heaters and small boilers and process heaters that emit more than zero NOx based on a schedule of staggered compliance dates. (Rule 1146.2(b), (d)(2); AMF 70.) The Rule's zero-NOx standard is designed to bring the Basin into compliance with the federal ozone air quality standard. (AMF 84; Docket No. 50-2, Ex. 2.)

**B.    The Energy Policy and Conservation Act**

The EPCA regulates the energy efficiency of consumer products including air conditioners, water heaters, furnaces, washers and dryers, and stoves. See 42 U.S.C. §§ 6292, 6295. It authorizes the Department of Energy ("DOE") to promulgate energy conservation standards for certain appliances or "covered products." 42 U.S.C. § 6295(a). The EPCA expressly preempts state and local regulations "concerning energy efficiency" and "energy use" of the products for which the EPCA sets its own energy efficiency standards:

> . . .[O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product . . . .

42 U.S.C. § 6297(c).[5] The term "covered product" includes certain consumer and commercial appliances, including the heaters and boilers subject to Rule 1146.2. 42 U.S.C. §§ 6291(2),

---

[4]    The District's Plan and its subsequent revisions serve as the federally required state implementation plan to meet applicable federal and state air quality standards. (Intervening Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at p. 14.)

[5]    The EPCA also preempts state and local regulations concerning the energy efficiency or energy use of certain larger sized commercial or industrial appliances. See 42 U.S.C. §§ 6316(b)(2)(A); 6311, 6313, and 6291(3). Because the two preemption provisions operate in the same manner, and for ease of reference, the Court's ruling refers only to the EPCA sections pertaining to consumer appliances.

(11 of 261), Page 11 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 11 of 261
Case 2:24-cv-10482-PA-PD    Document 81    Filed 07/22/25    Page 4 of 10    Page ID
#:2303

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | | Date | July 22, 2025 |
|---|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | | |

6292. There are limited exceptions to preemption under the EPCA, including building code regulations for new construction that meet certain requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3).

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may move "for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Id. (emphasis added). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party must affirmatively show the absence of such evidence in the record, either by deposition testimony, the inadequacy of documentary evidence, or by any other form of admissible evidence. See id. at 322. The moving party has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. See id. at 325.

As required on a motion for summary judgment, the facts are construed "in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the nonmoving party's allegation that factual disputes persist between the parties will not automatically defeat an otherwise properly supported motion for summary judgment. See Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510, 91 L. Ed.2d 202. A "mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" Fazio v. City & County of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at 249, 252, 106 S. Ct. at 2514, 91 L. Ed. 2d 202).

### B.    Preemption

The Supremacy Clause establishes that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any state to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law. . . .There is no doubt that Congress may

ER-11

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### AMENDED CIVIL MINUTES - GENERAL

| Case No. | CV 24-10482 PA (PDx) | Date | July 22, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

withdraw specified powers from the States by enacting a statute containing an express preemption provision." Arizona v. United States, 567 U.S. 387, 399 (2012). Prior to 2016, in express preemption cases, the Supreme Court made clear that preemption was a matter of statutory interpretation, and that courts must ascertain Congress' purpose in determining whether a state statute should give way to a federal one. Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992). Moreover, if the statute contained an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The Supreme Court also applied another canon of statutory construction known as a "presumption against preemption," which instructs that federal law should not be read to supersede states' historic police powers "unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). However, in Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Tr., the Supreme Court, in considering whether an express preemption provision barred Puerto Rico from enacting its own municipal bankruptcy scheme, stated that because the federal Bankruptcy Code "contains an express pre-emption clause, we do not invoke any presumption against preemption." 579 U.S.115, 125 (2016) (cleaned up).

Following the Supreme Court's decision in Franklin Cal. Tax-Free Tr., the Ninth Circuit has consistently held that in cases involving an express preemption clause, there is no presumption against preemption. See Hollins v. Walmart, Inc., 67 F.4th 1011, 1016 (9th Cir. 2023) ("'[W]e do not invoke any presumption against pre-emption' where, as here, 'the statute contains an express pre-emption clause.'" (quoting Franklin Cal. Tax-Free Tr.)); Nat'l R.R. Passenger Corp. v. Su, 41 F.4th 1147, 1153 n.1 (9th Cir. 2022) ("because the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption" (quoting Franklin Cal. Tax-Free Tr.)); R.J. Reynolds Tobacco Co. v. County of Los Angeles, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (quoted in CRA); Webb v. Trader Joe's Co., 999 F.3d 1196, 1201 (9th Cir. 2021) ("Where the intent of a statutory provision that speaks expressly to the question of preemption is at issue, we do not invoke any presumption against pre-emption." (citation and quotation marks omitted)); Connell v. Lima Corp., 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting Franklin Cal. Tax-Free Tr.); In re Bard IVC Filters Prods. Liab. Litig., 969 F.3d 1067, 1073 (9th Cir. 2020) ("When a federal law contains an express preemption clause, we focus on the plain wording of the clause." (citation and quotation marks omitted)); Atay v. County of Maui, 842 F.3d 688, 699 (9th Cir. 2016) (quoted in Webb).

## III.   Analysis

Both Motions for Summary Judgment raise the same issue: whether the SCAQMD's zero NOx emissions standard for certain appliances fueled by natural gas – Rule 1146.2 – is

(13 of 261), Page 13 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 13 of 261
Case 2:24-cv-10482-PA-PD   Document 81   Filed 07/22/25   Page 6 of 10   Page ID
#:2305

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | | Date | July 22, 2025 |
|---|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | | |

preempted by the EPCA.[6/]  The Court agrees with Plaintiffs that the Rule, by prohibiting NOx emissions, effectively bans the use of covered gas fueled boilers and water heaters.  Plaintiffs argue that this conclusion should end the Court's inquiry because under the Ninth Circuit's holding in Cal. Rest. Ass'n v. City of Berkeley, 89 F.4th 1094 (9th Cir. 2024) ("CRA"), the EPCA's preemption clause necessarily applies.  However, SCAQMD argues that unlike the building code provision at issue in CRA, the Rule concerns the pollution appliances emit, and not how much energy an appliance uses, and is therefore outside the scope of the CRA holding.  For the reasons discussed below, the Court agrees with SCAQMD and concludes that the EPCA's preemption clause does not apply to Rule 1146.2.

A.      **EPCA Preemption Clause**

Congress initially enacted EPCA in 1975 to "reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs."  Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n, 410 F.3d 492, 498-99 (9th Cir. 2005).  At that time, the EPCA required manufacturers to label appliances with measures of energy efficiency and use in order to help consumers make informed purchasing decisions.  Id. at 499.  "A few years later, Congress took the EPCA a step further, establishing a nationwide conservation program for consumer appliances."  CRA, 89 F.4th at 1120 (Friedland, J., dissenting from denial of rehearing en banc).  The new act required the DOE to prescribe minimum energy efficiency standards for thirteen covered products.  Air Conditioning & Refrigeration Inst., 410 F.3d at 499.

The DOE largely failed to prescribe such standards and permitted states to establish their own standards resulting in a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing of appliances."  S. Rep No. 100-6, at 4 (1987).  Thus, in 1987 Congress, in cooperation with manufacturer trade associations and the National Resources

---

[6/]      The parties raise a number of evidentiary objections to each other's Statements of Uncontroverted Facts.  (See Docket Nos. 59, 73, 74.)  Plaintiffs also object to Defendant's Request for Judicial Notice of certain state and local rules concerning appliance NOx emissions (Docket No. 61, Exhs. A-P) and of an Opposition to a Motion to Dismiss filed by Plaintiff in Cal. Rest. Ass'n v. City of Berkeley, Case No. CV 19-7668 YGR (N.D. Cal. 2021) (Ex. Q).  (Docket No. 70.)  However, none of the evidence presented in the Request for Judicial Notice or the parties' uncontroverted facts is material to the legal issue before the Court.  Accordingly, because the Court has not relied on any evidence to which an evidentiary objection is asserted, the Court denies the Request for Judicial Notice and overrules all of the parties' objections as moot.  See Am. Guard Servs., Inc. v. First Mercury Ins. Co., No. CV 15-9259 PA (PJWx), 2017 WL 6039975, at n. 5 (C.D. Cal. Apr. 14, 2017), aff'd, 741 F. App'x 407 (9th Cir. 2018).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 22, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

Defense Council, adopted a uniform set of national federal energy efficiency standards designed to ease the burden on manufacturers while promoting energy conservation.  Id.; CRA, 89 F.4th at 1120 (Friedland, J.).  As amended, the EPCA now requires that covered products meet prescribed energy conservation standards, and that prior to distribution, a manufacturer perform certain test procedures, certify that the product meets the applicable standard, and label the product with information regarding its energy efficiency and energy use.  Association of Contracting Plumbers of City of New York, Inc. v. City of New York, 23-CV-11292 (RA), 2025 WL 843619, at *4 (S.D.N.Y. March 18, 2025) (appeal pending, Second Circuit Case No. 25-977).

At that same time, Congress amended the EPCA's preemption clause to "counteract the systems of separate state appliance standards."  Air Conditioning & Refrigeration Inst., 410 F.3d at 499-500.  The EPCA preemption provision turns on whether a state law or local ordinance directly or indirectly regulates the "energy efficiency" or "energy use" of a covered product.  42 U.S.C. § 6297(c); CRA, 89 F.4th at 1102.  The EPCA defines the term energy efficiency as "the ratio of the useful output of services from a consumer product to the energy use of such product" and the term energy use as "the quantity of energy directly consumed by a consumer product at point of use." 42 U.S.C. §§ 6291(4)-(5).

With respect to the application of  EPCA's express preemption clause, the CRA court reaffirmed that after Franklin, district courts should look to the "text, structure and context" of the ECPA because "the plain wording of the clause . . . necessarily contains the best evidence of Congress' pre-emptive intent."  CRA, 89 F.4th at 1101 (quoting Franklin Cal. Tax-Free Tr.)  Referring specifically the EPCA, the CRA court also stated that "we apply this textual analysis 'without any presumption thumb on the scale' for or against preemption."  89 F.4th at 1101 (quoting R.J. Reynolds Tobacco Co.).   Focusing on the plain wording of the presumption clause, the relevant inquiry is thus whether the Rule at issue in this case concerns energy use within the meaning of the EPCA.

**B.      EPCA Preemption Under California Restaurant Association v. City of Berkeley**

In CRA, the Ninth Circuit analyzed the "text, structure and context" of the EPCA preemption clause to determine whether it applied to a City of Berkeley building code ordinance that prohibited the installation of natural gas piping within newly constructed buildings.  The CRA court interpreted "point of use" to mean a place where something is used, and based on that interpretation found that the "EPCA is concerned with the end-user's ability to use installed covered products at their intended final destinations."  89 F. 4th at 1101-02.  The CRA court concluded that because the building code required appliances to use a quantity of "zero" natural gas, it was preempted.  Id.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### AMENDED CIVIL MINUTES - GENERAL

| Case No. | CV 24-10482 PA (PDx) | | Date | July 22, 2025 |
|---|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | | |

In so holding, the CRA court noted that although the "EPCA's preemption provision is broad, it is not unlimited," Id. at 1103, and expressly limited its holding as follows:

> For instance, our holding here has nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used. We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available.

Id. at 1103 (emphasis added). Moreover, the court itself characterized its opinion as "a narrow opinion about Berkeley's building codes," its decision as "limited," and its holding as "very narrow." Id. at 1106. "We only hold that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings 'from the point of delivery at the gas meter' by way of a building code." Id. The CRA court concluded by stating that "Berkeley cannot bypass EPCA's preemption of building codes that directly ban covered products by instead simply prohibiting the piping that transports natural gas from the utility's meter to the appliance." Id. at 1107.[7]

Thus, the basis for the CRA court's limited holding – and the Ninth Circuit's primary concern – was that the Berkeley building code imposed a complete physical impediment to the use of gas for covered appliances in buildings where the gas lines were already there. In other words, by banning the installation of piping to transport gas to an appliance where gas was otherwise available, the building code "concerned the energy use" of covered appliances within the meaning of the EPCA by setting that use at zero. Id.

### C. The EPCA Does Not Preempt Rule 1146.2

Here, we have a very different situation to that addressed by the Ninth Circuit in CRA. The SCAQMD Rule is not a building code, and it does not prohibit or regulate the quantity of natural gas used by appliances. The Rule addresses the pollution appliances emit and not their

---

[7]    The CRA court's emphasis on the fact that the challenged ordinance was a building code appears to be based directly on the text of the EPCA itself. See CRA, 89 F.4th at 1119 (Baker, J., concurring) ("the Berkeley Ordinance cuts to the heart of what Congress sought to prevent – state and local manipulation of building codes for new construction to regulate the natural gas consumption of covered products when gas service is otherwise available. . . ."). The EPCA preemption provision specifically applies to "State or local building code[s] for new construction concerning the . . . energy use of . . . covered products]," and preempts those building codes unless they comply with various specified conditions. Id. §§ 6297(f)(3) & (f)(3)(A)-(G).

ER-15

(16 of 261), Page 16 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 16 of 261
Case 2:24-cv-10482-PA-PD   Document 81   Filed 07/22/25   Page 9 of 10   Page ID
#:2308

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 22, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

energy use. It says nothing about the quantity of gas an appliance may use. Nor does its application depend on an appliance's efficiency or energy use. To the contrary, the Rule regulates appliances' NOx emissions in order to address air pollution issues and the health risks associated with the combustion of natural gas. The Rule does not implicate any of the issues the EPCA was intended to address – it does not create inconsistent state efficiency standards, require that consumers use appliances with higher efficiency standards, or force manufacturers to meet standards different than those set by the DOE.

Plaintiffs argue that now that the Rule has reduced the NOx emissions limit to zero – and no gas fueled appliance can comply – the Rule is subject to EPCA preemption. (Motion at pp. 11-12.) The District contends – and the Court agrees – that if taken to its logical conclusion, this interpretation would upset the historic and recognized powers of states and local governments to set emissions standards and implement other regulations designed to protect the health and safety of their citizens. (Cross-Motion at pp. 21-22; Reply at p. 8) (citing examples of other emission standards requiring zero or near zero NOx emissions and state and local provisions that effectively prohibit the use of covered gas appliances in certain buildings).

The Court also agrees with SCAQMD that there is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emission regulations designed to combat air pollution. (Cross-Motion at p. 23.) Indeed, while the EPCA specifically preempts building codes concerning energy use unless certain exemptions are met, it fails to mention air pollution regulations, despite the fact that the CAA had been in place for many years at the time the EPCA was enacted and amended. (Cross-Motion at pp. 10-12, 26-27.) Moreover, the EPCA's legislative history confirms its focus on establishing national standards for energy efficiency and not on upsetting states and local governments' longstanding practice of regulating appliance emissions to achieve air pollution goals.[8] See Air Conditioning & Refrigeration Inst., 410 F.3d at 500 ("In sum, the legislative history of the relevant Acts supports a narrow interpretation of the preemption provision. . . [and] . . .demonstrates that Congress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements."); see also S. Rep. No. 94-516, at 173 (1975); H.R. Rep. No. 94-700, at 116-17 (1975); H.R. Rep. No. 100-11, at 23-24 (1987).)

Based on the foregoing, the Court concludes that CRA's narrow holding – expressly limited to building codes that concern an appliance's actual energy use – does not reach the state regulation of toxic emissions from appliances in order to comply with federal air pollution

---

[8]    California has regulated ozone pollution in Los Angeles since the mid-twentieth century and the District has regulated NOx emissions from boilers and water heaters since the end of the twentieth century. (Intervening Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at p. 29.)

ER-16

(17 of 261), Page 17 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 17 of 261
Case 2:24-cv-10482-PA-PD    Document 81    Filed 07/22/25    Page 10 of 10    Page ID
#:2309

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**AMENDED CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 22, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

standards.  Simply stated, the SCAQMD Rule does not concern the energy use of appliances under the EPCA and is not preempted.[9]

### Conclusion

For all of the foregoing reasons, the Court grants Defendant's Cross-Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment, Declaratory Relief and Permanent Injunction.  A Judgment consistent with this order will be filed concurrently.

IT IS SO ORDERED.

---

[9]    In Association of Contracting Plumbers, the district court disagreed with CRA's interpretation of the phrase "point of use," concluding that the EPCA's history and structure support a definition of energy use as a "predetermined fixed value that measures the characteristics of a covered product as manufactured."  2025 WL 843619 at *4-5.  The district court then found that the local ordinance at issue – regulating appliances' carbon dioxide emissions – did not relate to or concern the subject matter of the EPCA because it did not focus on the performance standards of covered products.  Rather, the ordinance regulated the type of fuel a covered product may use in certain new residential buildings, regardless of the product's energy efficiency or use.  Id. at * 6.  However, the Court need not reconcile these two cases because it concludes that under CRA, the SCAQMD Rule concerns appliance emissions and not energy use.

**ER-17**

**JS-6**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al., | No.  CV 24-10482 PA (PDx) |
| Plaintiff, | JUDGMENT |
| v. | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
| Defendant, | |
| and | |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, AND INDUSTRIOUS LABS, | |
| Defendant-Intervenors. | |

In accordance with the Court's July 18, 2025 Minute Order granting the Cross-Motion for Summary Judgment filed by defendant South Coast Air Quality Management District ("Defendant"), IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1.     Defendant is entitled to summary judgment on the claim for declaratory relief filed by plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association, and California Apartment Association;

(19 of 261), Page 19 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 19 of 261
Case 2:24-cv-10482-PA-PD   Document 80   Filed 07/18/25   Page 2 of 2   Page ID
#:2299

2.      Plaintiffs shall take nothing and Defendant shall have its costs of suit; and

3.      The Clerk is ordered to enter this Judgment.

DATED: July 18, 2025

_____
Percy Anderson
United States District Judge

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

Present: The Honorable    PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**        IN CHAMBERS — COURT ORDER

Before the Court is a Motion for Summary Judgment filed by plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association, and California Apartment Association ("Plaintiffs") (Docket No. 50) and a Cross-Motion for Summary Judgment filed by defendant South Coast Air Quality Management District ("SCAQMD" or "District" or "Defendant"). (Docket No. 58.) The parties seek summary judgment on the same issue: whether the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, preempts the SCAQMD's rule regulating nitrogen oxide emissions from certain categories of natural gas appliances. Both motions are fully briefed. (Docket Nos. 50, 53-61, 63, 66, 67-75.) In addition, intervening defendants, People's Collective for Environmental Justice, Sierra Club, and Industrious Labs ("Intervening Defendants") have filed an Opposition to Plaintiff's Motion and a Joinder in Defendant's Cross-Motion for Summary Judgment and Reply. (Docket Nos. 62, 63, 76.) Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument and vacates the hearing on the matter.

## I.    Factual and Procedural Background

In this action, Plaintiffs, manufacturers of gas appliances, affordable housing groups, labor union associations, and associations of manufacturers, builders, commercial and residential building owners, hotel owners and operators, and restaurant chefs and owners, seek declaratory and injunctive relief against enforcement of SCAQMD's Rule 1146.2 ("Rule") imposing a zero-nitrogen oxide emission standard on certain categories of natural gas appliances.[1] (First

---

[1]    The Rule specifically applies to large water heaters and small boilers and process heaters fired with, or designed to be fired with, natural gas. Rule 1146.2(a).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

Amended Complaint ("FAC") ¶ 1.)  Plaintiffs allege that implementation of this Rule will effectively prohibit the manufacture, sale, purchase, and installation of natural gas appliances after certain dates, and that this "de facto ban" on certain gas appliances should be invalidated under the EPCA's preemption clause.  (Id.)

On December 17, 2024, Plaintiffs filed a First Amended Complaint and Defendant filed its Answer on January 24, 2025.  (Docket Nos. 12, 23.)  On February 26, 2025, the Court granted the Intervening Defendants' Motion to Intervene.  (Docket No. 35.)  The Intervening Defendants filed an Answer to the First Amended Complaint on March 4, 2025.  (Docket No.  43.)

## A.    SCAQMD and Rule 1146.2

The SCAQMD is the air pollution control agency for all of Orange County and the urban portions of Los Angeles, Riverside and San Bernardino counties.  South Coast Air Quality Mgmt. Dist., About SCAQMD, S. COAST AQMD (last visited July 8, 2025), https://www.aqmd.gov/aq-spec/aboutscaqmd.  The California state legislature created the SCAQMD in 1976 in order to address "the most critical air pollution problem in the nation" that is "detrimental to the public peace, health, safety and welfare of the people of the state."  Cal. Stat. ch. 324,§ 5, at 893.

The District has worked for many years to reduce emissions of air pollutants in the South Coast Air Basin ("Basin") in order to bring the Basin into compliance with federal air pollution standards.[2]  (Defendants' Consolidated Additional Material Facts and Statement of Uncontroverted Facts, Docket No. 60, ("AMF") 42-44.)  Despite its efforts, the Basin continues to suffer from poor air quality and has failed to meet federal standards.  (AMF 41, 42.)  In order to achieve its goals, the District has regulated appliance emissions of nitrous oxides (NOx) – a leading cause of pollutants and smog in the Basin – since its inception.  (AMF 48-52.)[3]

---

[2]    The amendments to the Clean Air Act ("CAA") were passed in 1970 as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution."  Union Electric Co. v. Environmental Protection Agency, 427 U.S. 246, 256 (1976).  "The Amendments place the primary responsibility for formulating pollution control strategies on the States, but nonetheless subject the States to strict minimum compliance requirements."  Id. at 256-57.  The CAA thus relies on states to reduce pollutant emissions in order to meet national air quality standards.  See also 42 U.S.C. § 7410.

[3]    NOx are toxic and highly reactive gases that threaten the environment and also pose significant safety risks to human health.  (AMF 41.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

To further reduce emissions of NOx, the District developed an Air Quality Management Plan ("Plan").[4/] (AMF 45.) The Plan called for reductions of NOx emissions from appliances by requiring zero-emission commercial water heaters. (AMF 63.) In order to implement the Plan, the District amended an existing rule to expand the scope of equipment subject to NOx limits and also to reduce the emission limits to zero. (AMF 58-62.) The final rule, Rule 1146.2 was amended following public hearing on June 7, 2024. (AMF 65.) As amended, the Rule prohibits the manufacture, sale, supply, offer for sale, or installation for use in the District, of large water heaters and small boilers and process heaters that emit more than zero NOx based on a schedule of staggered compliance dates. (Rule 1146.2(b), (d)(2); AMF 70.) The Rule's zero-NOx standard is designed to bring the Basin into compliance with the federal ozone air quality standard. (AMF 84; Docket No. 50-2, Ex. 2.)

## B.     The Energy Policy and Conservation Act

The EPCA regulates the energy efficiency of consumer products including air conditioners, water heaters, furnaces, washers and dryers, and stoves. See 42 U.S.C. §§ 6292, 6295. It authorizes the Department of Energy ("DOE") to promulgate energy conservation standards for certain appliances or "covered products." 42 U.S.C. § 6295(a). The EPCA expressly preempts state and local regulations "concerning energy efficiency" and "energy use" of the products for which the EPCA sets its own energy efficiency standards:

> . . .[O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product . . . .

42 U.S.C. § 6297(c). The term "covered product" includes certain consumer and commercial appliances, including the heaters and boilers subject to Rule 1146.2. 42 U.S.C. §§ 6291(2),

---

[4/]     The District's Plan and its subsequent revisions serve as the federally required state implementation plan to meet applicable federal and state air quality standards. (Defendant Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment at p. 14.)

**CIVIL MINUTES - GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

6292.[5/]  There are limited exceptions to preemption under the EPCA, including building code regulations for new construction that meet certain requirements.  42 U.S.C. §§ 6297(c)(3), (f)(3).

## II.  <u>Legal Standard</u>

### A.    **Summary Judgment**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party may move "for summary judgment, identifying each claim or <u>defense—or the part of each claim or defense</u>—on which summary judgment is sought."  <u>Id.</u> (emphasis added).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The moving party must affirmatively show the absence of such evidence in the record, either by deposition testimony, the inadequacy of documentary evidence, or by any other form of admissible evidence.  <u>See id.</u> at 322.  The moving party has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial.  <u>See id.</u> at 325.

As required on a motion for summary judgment, the facts are construed "in the light most favorable to the party opposing the motion."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, the nonmoving party's allegation that factual disputes persist between the parties will not automatically defeat an otherwise properly supported motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510, 91 L. Ed.2d 202.  A "mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  <u>Fazio v. City</u>

---

[5/]    The EPCA also preempts state and local regulations concerning the energy efficiency or energy use of certain larger sized commercial or industrial appliances.  <u>See</u> 42 U.S.C. §§ 6316(b)(2)(A); 6311, 6313, and 6291(3).  Because the two preemption provisions operate in the same manner, and for ease of reference, the Court's ruling refers only to the EPCA sections pertaining to consumer appliances.

**ER-23**

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

& County of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at 249, 252, 106 S. Ct. at 2514, 91 L. Ed. 2d 202).

### B.    Preemption

The Supremacy Clause establishes that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any state to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law. . . .There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." Id. Prior to 2016, in express preemption cases, the Supreme Court made clear that preemption was a matter of statutory interpretation, and that courts must ascertain Congress' purpose in determining whether a state statute should give way to a federal one. Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992). Moreover, if the statute contained an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The Supreme Court also applied another canon of statutory construction known as a "presumption against preemption," which instructs that federal law should not be read to supersede states' historic police powers "unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). However, in Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Tr., the Supreme Court, in considering whether an express preemption provision barred Puerto Rico from enacting its own municipal bankruptcy scheme, stated that because the federal Bankruptcy Code "contains an express pre-emption clause, we do not invoke any presumption against preemption." 579 U.S.115, 125 (2016) (cleaned up).

Following the Supreme Court's decision in Franklin Cal. Tax-Free Tr., the Ninth Circuit has consistently held that in cases involving an express preemption clause, there is no presumption against preemption. See Hollins v. Walmart, Inc., 67 F.4th 1011, 1016 (9th Cir. 2023) ("'[W]e do not invoke any presumption against pre-emption' where, as here, 'the statute contains an express pre-emption clause.'" (quoting Franklin Cal. Tax-Free Tr.)); Nat'l R.R. Passenger Corp. v. Su, 41 F.4th 1147, 1153 n.1 (9th Cir. 2022) ("because the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption" (quoting Franklin Cal. Tax-Free Tr.)); R.J. Reynolds Tobacco Co. v. County of Los Angeles, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (quoted in CRA); Webb v. Trader Joe's Co., 999 F.3d 1196, 1201 (9th Cir. 2021) ("Where the intent of a statutory provision that speaks expressly to the question of preemption is at issue, we do not invoke any presumption against pre-emption." (citation and

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

quotation marks omitted)); <u>Connell v. Lima Corp.</u>, 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting <u>Franklin Cal. Tax-Free Tr.</u>); <u>In re Bard IVC Filters Prods. Liab. Litig.</u>, 969 F.3d 1067, 1073 (9th Cir. 2020) ("When a federal law contains an express preemption clause, we focus on the plain wording of the clause." (citation and quotation marks omitted)); <u>Atay v. County of Maui,</u> 842 F.3d 688, 699 (9th Cir. 2016) (quoted in <u>Webb</u>).

## III.    Analysis

Both Motions for Summary Judgment raise the same issue:  whether the SCAQMD's zero NOx emissions standard for certain appliances fueled by natural gas – Rule 1146.2 – is preempted by the EPCA.[6]  The Court agrees with Plaintiffs that the Rule, by prohibiting NOx emissions, effectively bans the use of covered gas fueled boilers and water heaters.  Plaintiffs argue that this conclusion should end the Court's inquiry because under the Ninth Circuit's holding in <u>Cal. Rest. Ass'n v. City of Berkeley</u>, 89 F.4th 1094 (9th Cir. 2024) ("<u>CRA</u>"), the EPCA's preemption clause necessarily applies.  However, SCAQMD argues that unlike the building code provision at issue in <u>CRA</u>, the Rule concerns the pollution appliances emit, and not how much energy an appliance uses, and is therefore outside the scope of the <u>CRA</u> holding.  For the reasons discussed below, the Court agrees with SCAQMD and concludes that the EPCA's preemption clause does not apply to Rule 1146.2. ion for P

### A.    EPCA Preemption Clause

---

[6]    The parties raise a number of evidentiary objections to each other's Statements of Uncontroverted Facts.  (<u>See</u> Docket Nos. 59, 73, 74.)  Plaintiffs also object to Defendant's Request for Judicial Notice of certain state and local rules concerning appliance NOx emissions (Docket No. 61, Exhs. A-P) and of an Opposition to a Motion to Dismiss filed by Plaintiff in <u>Cal. Rest. Ass'n v. City of Berkeley</u>, Case No. CV 19-7668 YGR (N.D. Cal. 2021) (Ex. Q). (Docket No. 70.)  However, none of the evidence presented in the Request for Judicial Notice or the parties' uncontroverted facts is material to the legal issue before the Court.  Accordingly, because the Court has not relied on any evidence to which an evidentiary objection is asserted, the Court denies the Request for Judicial Notice and overrules all of the parties' objections as moot.  <u>See</u> <u>Am. Guard Servs., Inc. v. First Mercury Ins. Co.</u>, No. CV 15-9259 PA (PJWx), 2017 WL 6039975, at n. 5 (C.D. Cal. Apr. 14, 2017), aff'd, 741 F. App'x 407 (9th Cir. 2018).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

Congress initially enacted EPCA in 1975 to "reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n, 410 F.3d 492, 498-99 (9th Cir. 2005). At that time, the EPCA required manufacturers to label appliances with measures of energy efficiency and use in order to help consumers make informed purchasing decisions. Id. at 499. "A few years later, Congress took the EPCA a step further, establishing a nationwide conservation program for consumer appliances." CRA, 89 F.4th at 1120 (Friedland, J., dissenting from denial of rehearing en banc). The new act required the DOE to prescribe minimum energy efficiency standards for thirteen covered products. Air Conditioning & Refrigeration Inst., 410 F.3d at 499.

The DOE largely failed to prescribe such standards and permitted states to establish their own standards resulting in a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing of appliances." S. Rep No. 100-6, at 4 (1987). Thus, in 1987 Congress, in cooperation with manufacturer trade associations and the National Resources Defense Council, adopted a uniform set of national federal energy efficiency standards designed to ease the burden on manufacturers while promoting energy conservation. Id.; CRA, 89 F.4th at 1120 (Friedland, J.). As amended, the EPCA now requires that covered products meet prescribed energy conservation standards, and that prior to distribution, a manufacturer perform certain test procedures, certify that the product meets the applicable standard, and label the product with information regarding its energy efficiency and energy use. Association of Contracting Plumbers of City of New York, Inc. v. City of New York, 23-CV-11292 (RA), 2025 WL 843619, at *4 (S.D.N.Y. March 18, 2025) (appeal pending, Second Circuit Case No. 25-977).

At that same time, Congress amended the EPCA's preemption clause to "counteract the systems of separate state appliance standards." Air Conditioning & Refrigeration Inst., 410 F.3d at 499-500. The EPCA preemption provision turns on whether a state law or local ordinance directly or indirectly regulates the "energy efficiency" or "energy use" of a covered product. 42 U.S.C. § 6297(c); CRA, 89 F.4th at 1102. The EPCA defines the term energy efficiency as "the ratio of the useful output of services from a consumer product to the energy use of such product" and the term energy use as "the quantity of energy directly consumed by a consumer product at point of use." 42 U.S.C. §§ 6291(4)-(5).

With respect to the application of EPCA's express preemption clause, the CRA court reaffirmed that after Franklin, district courts should look to the "text, structure and context" of the ECPA because "the plain wording of the clause . . . necessarily contains the best evidence of Congress' pre-emptive intent." CRA, 89 F.4th at 1101 (quoting Franklin Cal. Tax-Free Tr.)

Case 2:24-cv-10482-PA-PD   Document 79   Filed 07/18/25   Page 8 of 11   Page ID #:2294

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

Referring specifically the EPCA, the CRA court also stated that "we apply this textual analysis 'without any presumption thumb on the scale' for or against preemption." 89 F.4th at 1101 (quoting R.J. Reynolds Tobacco Co.). Focusing on the plain wording of the presumption clause, the relevant inquiry is thus whether the Rule at issue in this case concerns energy use within the meaning of the EPCA.

**B.      EPCA Preemption Under California Restaurant Association v. City of Berkeley**

In CRA, the Ninth Circuit analyzed the "text, structure and context" of the EPCA preemption clause to determine whether it applied to a City of Berkeley building code ordinance that prohibited the installation of natural gas piping within newly constructed buildings. The CRA court interpreted "point of use" to mean a place where something is used, and based on that interpretation found that the "EPCA is concerned with the end-user's ability to use installed covered products at their intended final destinations." 89 F. 4th at 1101-02. The CRA court concluded that because the building code required appliances to use a quantity of "zero" natural gas, it was preempted. Id.

In so holding, the CRA court noted that although the "EPCA's preemption provision is broad, it is not unlimited," Id. at 1103, and expressly limited its holding as follows:

> For instance, our holding here has nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used. We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available.

Id. at 1103 (emphasis added). Moreover, the court itself characterized its opinion as "a narrow opinion about Berkeley's building codes," its decision as "limited," and its holding as "very narrow." Id. at 1106. "We only hold that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings 'from the point of delivery at the gas meter' by way of a building code." Id. The CRA court concluded by stating that "Berkeley cannot bypass EPCA's preemption of building codes that directly ban covered

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

products by instead simply prohibiting the piping that transports natural gas from the utility's meter to the appliance." Id. at 1107.[7]

Thus, the basis for the CRA court's limited holding – and the Ninth Circuit's primary concern – was that the Berkeley building code imposed a complete physical impediment to the use of gas for covered appliances in buildings where the gas lines were already there. In other words, by banning the installation of piping to transport gas to an appliance[where gas was otherwise available, the building code "concerned the energy use" of covered appliances within the meaning of the EPCA by setting that use at zero. Id.

## C.  The EPCA Does Not Preempt Rule 1146.2

Here, we have a very different situation to that addressed by the Ninth Circuit in CRA. The SCAQMD Rule is not a building code, and it does prohibit or regulate the quantity of natural gas used by appliances. The Rule addresses the pollution appliances emit and not their energy use. It says nothing about the quantity of gas an appliance may use. Nor does its application depend on an appliance's efficiency or energy use. To the contrary, the Rule regulates appliances' NOx emissions in order to address air pollution issues and the health risks associated with the combustion of natural gas. The Rule does not implicate any of the issues the EPCA was intended to address – it does not create an inconsistent state efficiency standard, require that consumers use appliances with a higher efficiency standard or force manufacturers to meet standards different than those set by the DOE.

Plaintiffs argue that now that the Rule has reduced the NOx emissions limit to zero – and no gas fueled appliance can comply – the Rule is subject to EPCA preemption. (Motion at pp. 11-12.) The District contends – and the Court agrees – that if taken to its logical conclusion, this interpretation would upset the historic and recognized powers of states and local governments to set emissions standards and implement other regulations designed to protect the health and safety

---

[7]      The CRA court's emphasis on the fact that the challenged ordinance was a building code appears to be based directly on the text of the EPCA itself. See CRA, 89 F.4th at 1119 (Baker, J., concurring) ("the Berkeley Ordinance cuts to the heart of what Congress sought to prevent – state and local manipulation of building codes for new construction to regulate the natural gas consumption of covered products when gas service is otherwise available. . . ."). The EPCA preemption provision specifically applies to "State or local building code[s] for new construction concerning the . . . energy use of . . . covered products]," and preempts those building codes unless they comply with various specified conditions. Id. §§ 6297(f)(3) & (f)(3)(A)-(G).

(29 of 261), Page 29 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 29 of 261
Case 2:24-cv-10482-PA-PD    Document 79    Filed 07/18/25    Page 10 of 11    Page ID
#:2296

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

of their citizens.  (Cross-Motion at pp. 21-22; Reply at p. 8) (citing examples of other emission standards requiring zero or near zero NOx emissions and state and local provisions that effectively prohibit the use of covered gas appliances in certain buildings).

The Court also agrees with SCAQMD that there is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emission regulations designed to combat air pollution.  (Cross-Motion at p. 23.)  Indeed, while the EPCA specifically preempts building codes concerning energy use unless certain exemptions are met, it fails to mention air pollution regulations, despite the fact that the CAA had been in place for many years at the time the EPCA was enacted and amended.  (Cross-Motion at pp. 10-12, 26-27).  Moreover, the EPCA's legislative history confirms its focus on establishing national standards for energy efficiency and not on upsetting states and local governments' longstanding practice of regulating appliance emissions to achieve air pollution goals.[8]  See Air Conditioning & Refrigeration Inst., 410 F.3d at 500 ("In sum, the legislative history of the relevant Acts supports a narrow interpretation of the preemption provision. . . [and] . . .demonstrates that Congress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements."); see also S. Rep. No. 94-516, at 173 (1975); H.R. Rep. No. 94-700, at 116-17 (1975); H.R. Rep. No. 100-11, at 23-24 (1987).)

Based on the foregoing, the Court concludes that CRA's narrow holding – expressly limited to building codes that concern an appliance's actual energy use – does not reach the state regulation of toxic emissions from appliances in order to comply with federal air pollution standards.  Simply stated, the SCAQMD Rule does not concern the energy use of appliances under the EPCA and is not preempted.[9]

---

[8]    California has regulated ozone pollution in Los Angeles since the mid-twentieth century and the District has regulated NOx emissions from boilers and water heaters since the end of the twentieth century.  (Defendant-Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment at p. 29.)

[9]    In Association of Contracting Plumbers, the district court disagreed with CRA's interpretation of the phrase "point of use," concluding that the EPCA's history and structure support a definition of energy use as a "predetermined fixed value that measures the characteristics of a covered product as manufactured."  2025 WL 843619 at *4-5.  The district court then found that the local ordinance at issue – regulating appliances' carbon dioxide emissions – did not relate to or concern the subject matter of the EPCA because it did not focus on the performance standards of covered products.  Rather, the ordinance regulated the type of fuel a covered product may use in certain new residential buildings, regardless of the product's

(30 of 261), Page 30 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 30 of 261
Case 2:24-cv-10482-PA-PD    Document 79    Filed 07/18/25    Page 11 of 11    Page ID
#:2297

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | July 18, 2025 |
|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District, et al. | | |

**<u>Conclusion</u>**

For all of the foregoing reasons, the Court grants Defendant's Cross-Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment, Declaratory Relief and Permanent Injunction.  A Judgment consistent with this order will be filed concurrently.

IT IS SO ORDERED.

---

energy efficiency or use.  <u>Id.</u> at * 6.  However, the Court need not reconcile these two cases because it concludes that under <u>CRA</u> the SCAQMD Rule concerns appliance emissions and not energy use.

1   MATTHEW D. ZINN (CA Bar No. 214587)
    Zinn@smwlaw.com
2   LAUREN M. TARPEY (CA Bar No. 321775)
    Ltarpey@smwlaw.com
3   RYAN K. GALLAGHER (CA Bar No. 344349)
    Rgallagher@smwlaw.com
4   SHUTE, MIHALY & WEINBERGER LLP
    396 Hayes Street
5   San Francisco, California 94102
    Telephone:   (415) 552-7272
6   Facsimile:   (415) 552-5816

7   Attorneys for Defendant South Coast Air Qual-
    ity Management District
8
    (additional counsel on following page)
9

10              UNITED STATES DISTRICT COURT

11      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13   RINNAI AMERICA CORP., et al,          Case No. 2:24-cv-10482 PA (PDx)

14            Plaintiffs,                   **DEFENDANT'S REPLY IN
                                            SUPPORT OF CROSS-MOTION**
15        v.                                **FOR SUMMARY JUDGMENT**

16
17   SOUTH COAST AIR QUALITY               Date:        July 14, 2025
     MANAGEMENT DISTRICT,                   Time:        1:30 p.m.
18                                          Courtroom:   9A
19            Defendant.
                                            The Hon. Percy Anderson
20   and
                                            Trial Date:   September 30, 2025
21   PEOPLE'S COLLECTIVE FOR
22   ENVIRONMENTAL JUSTICE,
     SIERRA CLUB, and INDUSTRIOUS
23   LABS,
24
              Defendant-Intervenors.
25
26
27
28

DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

(32 of 261), Page 32 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 32 of 261
Case 2:24-cv-10482-PA-PD    Document 73    Filed 06/16/25    Page 3 of 17    Page ID
#:2164

1

# TABLE OF CONTENTS

2

3 TABLE OF AUTHORITIES ................................................................................ 4

4 INTRODUCTION ............................................................................................... 6

5 ARGUMENT ....................................................................................................... 7

6     I.    Contrary to Plaintiffs' assertion, the Rule does not regulate energy use
        and therefore falls outside EPCA's preemptive scope as interpreted by
7         *CRA* ............................................................................................................. 7

8         A.    Plaintiffs err in arguing that *CRA* held that EPCA preempts any
                regulation that effectively prevents the use of a gas appliance.
9                 But even if it had, the Rule is not such a regulation. ............................ 7

10         B.    Despite Plaintiffs' contention that the Rule inevitably affects
                appliances' energy use, any such effect is merely incidental. .............. 9

11

12         C.    EPCA cannot supplant the District's obligations to attain the
                federal air quality standards under the Clean Air Act. ...................... 12

13     II.    Plaintiffs attempt to rewrite their facial challenge and ignore the
        Rule's technology-forcing nature. ................................................................ 14

14

15         A.    Because Plaintiffs concede that process heaters are not covered
                products, their facial challenge fails. .................................................. 14

16         B.    Plaintiffs misunderstand both fuel cell technology and the
                Rule's anticipation of further technological advancements ............... 16

17 CONCLUSION .................................................................................................. 17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)
**ER-32**

# INTRODUCTION

EPCA preempts state regulations concerning the quantity of energy that appliances use. The District's Rule 1146.2 concerns something else: the pollution that appliances emit. It does not set requirements for how much natural gas an appliance can consume.

Plaintiffs contend the District's Rule is the "mirror image" of Berkeley's ordinance invalidated in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) ("*CRA*"). That symmetry is a mirage. Berkeley's ordinance directly regulated appliances' "energy use," or the quantity of gas consumed, setting the allowable amount at zero. By contrast, the Rule targets appliances' nitrogen oxide emissions, as the District has done since the 1970s. Any effect on their use of gas is purely incidental, which the *CRA* court recognized as outside its expressly "narrow" holding.

*CRA* concluded that EPCA would not preempt other regulations with merely incidental impacts on energy use—such as state regulation of utilities' gas distribution or imposition of carbon taxes—on which the statute is silent. EPCA is similarly silent about appliance emission standards, which are analogous to taxes on carbon emissions. Indeed, Congress created a distinct regulatory program with extensive mandates for state and local governments to adopt such pollution regulation to achieve federal air quality standards.

Plaintiffs have failed to explain how or at what point legitimate emission standards are transformed into preempted regulations that "concern[ ] energy use." Any standard may be unachievable by some gas appliances. And contrary to Plaintiffs' claim, *CRA* does not prohibit all regulations that in effect prevent use of gas appliances; it is narrowly focused on regulations of the quantity of energy appliances may use.

Even if this Court found that *CRA*'s "narrow" holding includes appliance emission standards, the Rule is not invalid in all applications. EPCA does not cover process heaters that the Rule regulates. The Ninth Circuit rejected a facial challenge for virtually identical reasons in *American Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024). Plaintiffs also cannot explain away gas fuel cell technology that could comply with the Rule, and they ignore that the Rule allows time for technological innovation.

(34 of 261), Page 34 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 34 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 1 of 68   Page ID
#:2013

1  Courtland L. Reichman (SBN: 268873)
    creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN: 325939)
    bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
    100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
5  Tel.: (650) 623-1401; Fax: (650) 560-3501

6  *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
7  *America Corp., National Association of Home Builders,*
    *California Manufacturers & Technology Association,*
8  *California Restaurant Association, California Hotel &*
    *Lodging Association, California Apartment Association,*
9  *and Plumbing-Heating-Cooling Contractors of California*

10  ADDITIONAL COUNSEL ON FOLLOWING PAGE

11

12       **UNITED STATES DISTRICT COURT**
        **CENTRAL DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| RINNAI AMERICA CORP., et al. | Civil No. 2:24-cv-10482 PA(PDx) |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' L.R. 56-3 RESPONSE TO DEFENDANTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT (Nos. 1-39); AND** |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
| Defendant, | **PLAINTIFFS' L.R. 56-2 STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT (Nos. 40-99)** |
| And | |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS, | Date: July 14, 2025 |
| Defendant-Intervenors. | Time: 1:30 p.m.<br>Courtroom: 9A |
| | Honorable Percy Anderson<br>United States District Judge |

(35 of 261), Page 35 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 35 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 2 of 68   Page ID
#:2014

ADDITIONAL COUNSEL

Sarah O. Jorgensen (*pro hac vice*)
sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN
&FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403
Fax: (650) 560-3501

Sean M. Kneafsey (SBN 180863)
skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200
Fax: 213-892-1208
*Attorneys for Plaintiffs Rinnai America
Corp., Noritz America Corp., National
Association of Home Builders, California
Manufacturers & Technology Association,
California Restaurant Association,
California Hotel & Lodging Association,
California Apartment Association, and
Plumbing-Heating-Cooling Contractors of
California*


John J. Davis, Jr. (SBN 65594)
jjdavis@msh.law
MCCRACKEN, STEMERMAN & HOLSBERRY
LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200
Fax: (415) 597-7201
*Attorneys for Plaintiff California State
Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP,
INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206
Fax: (213) 480-7724
*Attorney for Plaintiff Californians for
Homeownership, Inc.*


Angelo I. Amador (*pro hac vice*)
aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913
Fax: (202) 331-2429
*Attorney for Plaintiff Restaurant Law
Center*

(36 of 261), Page 36 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 36 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 3 of 68    Page ID
#:2015

1    Pursuant to Local Rule 56 and section II.A.3 of the Court's Civil Trial

2    Scheduling Order, Dkt. 42, Plaintiffs, both in support of Plaintiffs' Motion for

3    Summary Judgment (Dkt. 50) and in opposition to Defendants' Cross-Motion for

4    Summary Judgment (Dkts. 53, 63), submit the following combined: (1) L.R. 56-3

5    Response to Defendants' Statement of Genuine Disputes of Material Fact (Dkt. 57);

6    and (2) L.R. 56-2 Statement of Genuine Disputes of Material Fact in response to

7    Defendants' Consolidated Additional Material Facts and Statement of

8    Uncontroverted Facts (Dkt. 60).

9  **I.    Plaintiffs' L.R. 56-3 Responses to Defendants' Statement of Genuine**

10           **Disputes of Material Fact (Dkt. 57).**

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| 1.   In *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), the Ninth Circuit held that the federal Energy Policy and Conservation Act, 42 U.S.C. §§ 6201-6422, preempted Berkeley, California's ordinance banning gas piping because it effectively prohibited covered appliances from using gas as an energy source.<br><br>*Evidence*: *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). | 1.   Disputed.<br><br><u>Plaintiffs' Evidence</u>: *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).<br><br><u>Basis for Dispute</u>: Plaintiffs purport to recite the holding of a Ninth Circuit decision, *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Legal analysis and holdings are not matters of fact and Defendants dispute the entirety of Plaintiffs' first statement on this basis. The text of the *California Restaurant Association* decision speaks for itself. |
| 1.   **Plaintiffs' Reply**:<br><br>       SUF 1 states the holding of the Ninth Circuit's precedential decision, which issued before the District amended Rule 1146.2.  The fact of what the Ninth Circuit held is relevant to the validity of the District's rule. | |

1

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| 2. In June 2024, Defendant South Coast Air Quality Management District ("District") adopted amended Rule 1146.2, titled "Emissions of Oxides of Nitrogen [$NO_x$] from Large Water Heaters and Small Boilers and Process Heaters," which imposes "zero-$NO_x$" emission limits for natural gas appliances within the rule's scope.<br><br>*Evidence*: Declaration of Brian Baran, Ex. 1 (amended S. Coast AQMD R. 1146.2) ("Baran Decl."). | 2. Undisputed. |
| 3. $NO_x$ is an inevitable byproduct of combustion. No gas appliance can operate via combustion without producing some $NO_x$.<br><br>*Evidence*: Subcomm. on Nitrogen Oxides, Nat'l Acad. of Scis., EPA-600/1-77-013, Nitrogen Oxides 1-1 (1977), https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000XWPA.TXT. | 3. Undisputed. |
| 4. The District's Final Staff Report for amended Rule 1146.2 acknowledges that its "zero-$NO_x$ rule" effectively bans the gas appliances in its scope and requires their replacement with electric appliances.<br><br>*Evidence*: Baran Decl., Ex. 2 (S. Coast AQMD Final Staff Report) at attach. G, 2-8, 2-11, 2-14, 2-15, 2-16, 2-17; *id.* at attach. H, ES-2. | 4. Disputed.<br><br>Plaintiffs' Evidence: Baran Decl., Ex. 2 (S. Coast AQMD Final Staff Report) at attach. G, 2-8, 2-11, 2-14, 2-15, 2-16, 2-17; *id.* at attach. H, ES-2.<br><br>Basis for Dispute: The District's Final Staff Report for amended Rule 1146.2 neither states that the Rule "effectively bans the gas appliances in [the Rule's] scope" nor states that the Rule "requires their replacement with electric appliances." Instead, the Staff Report states that "Rule 1146.2 is technology and fuel neutral and is focused on achieving the maximum NOx emission reductions possible." Dkt. 50-2, Ex. 2 at |

(38 of 261), Page 38 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 38 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 5 of 68    Page ID
#:2017

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | 095 (Final Staff Report at p. 2-7). The Staff Report also states that natural gas "fuel cell technology has the potential to replace existing units to meet the zero-emission limits." *Id.* at 099 (Final Staff Report at p. 2-11). The text of the Final Staff Report speaks for itself. |

4.  **Plaintiffs' Reply**:

First, that the District does not expressly use those words does not establish that the Staff Report does not "acknowledge" that the rule is an effective ban on gas appliances.

Second, the rule is not "fuel neutral" or "technology neutral": It applies to "equipment *fired with, or designed to be fired with, natural gas*." Rule 1146.2(c)(1), (c)(18), (c)(31) (defining "boiler," "process heater," and "water heater," respectively) (emphasis added); *id.*, subd. (b) ("The provisions of this rule are applicable to … Units fired with, or designed to be fired with, natural gas"). Defendants also admit that fuel cells produce "negligible," i.e., not zero, $NO_x$. Dkt. 53 at 28; *see also* Dkt. 50-4[1] at 99 (fuel cells produce "some $NO_x$ emissions"). Therefore, Defendants' assertion that "fuel cell technology" would "meet the zero-emission limits" of Rule 1146.2 is not well taken.

Third, the statements on fuel cell technology are speculative and relate to possible future developments; and fuel cell technology is not a product covered by EPCA or by the Rule, because it is not "fired with . . . natural gas."

And, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), gas appliances used in conjunction with fuel cells cannot comply with the District's zero-$NO_x$ emission standard. Fuel cells, which do not operate on combustion, convert gas to hydrogen in an electrochemical process that generates electricity and waste heat at the same time. The fuel cell-generated electricity powers electric appliances. The fuel cell's waste energy can be recycled into a conventional heating system, but does not replace that appliance. In other words, fuel cells act as generators, by providing electricity and waste heat for use other appliances, but fuel cells are <u>not themselves</u> products covered by EPCA or subject to the District's rule. Krause Decl. ¶ 16, citing Dkt. 50-4 at 96-99, 120; Dkt. 50-4 at 99 n.11, citing Department of Energy, Multi-Year Research, Development, and Demonstration Plan, https://www.energy.gov/sites/default/files/2017/05/f34/fcto_myrdd_fuel_cells.pdf; Krause Decl., Ex. 1.

---

[1] Defendants refer to Dkt. 50-4 (Final Staff Report) at times as Dkt. 50-2, Ex. 2.

(39 of 261), Page 39 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 39 of 261
Case 2:24-cv-10482-PA-PD Document 67 Filed 06/02/25 Page 6 of 68 Page ID
#:2018

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| For these reasons, SUF 4 is not subject to genuine or reasonable dispute. ||
| 5.     According to the District, Rule 1146.2 applies to more than one million units. Baran Decl., Ex. 2 (S. Coast AQMD Final Staff Report) at attach. G, 2-8, 2-11, 2-14, 2-15, 2-16, 2-17; *id.* at attach. H, ES-2.<br><br>*Evidence*: Baran Decl., Ex. 2 at 29. | 5.     Undisputed. |
| 6.     Plaintiff Rinnai America Corp. ("Rinnai") sells roughly 35% of gas tankless water heaters in the U.S., with roughly $14 million of sales in the District.  Rinnai also sells commercial hybrid tank/tankless water heaters, residential and commercial condensing tankless boilers, residential condensing combination water heaters/boilers, and electric heat pump water heaters in the District.<br><br>*Evidence*: Declaration of Frank Windsor ¶ 2 ("Windsor Decl."). | 6.     Undisputed. |
| 7.     Rinnai is experiencing, or will imminently experience, harm in the form of economic injuries, lost sales, and altered business practices because of the District's zero-NO$_x$ rule.<br><br>*Evidence*:  Windsor Decl. ¶ 4. | 7.     Disputed/Objection.<br><br>Plaintiffs' Evidence: Windsor Decl. ¶ 4.<br><br>Basis for Dispute: Defendants dispute that the Rule is currently causing any harm. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement asserting that the Rule will cause future harm because it is speculative, particularly because Rinnai also sells electric heat pump water heaters. Windsor Decl. ¶ 2. |

4

**ER-39**

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | <u>Objection</u>: Lacks foundation or personal knowledge; speculative; improper legal argument |

7.    **Plaintiffs' Reply**:

Defendants do not dispute that Plaintiff Rinnai is a tankless water heater manufacturer with roughly $14 million in sales in the District and that Rinnai will lose sales of gas tankless water heaters. Nor do they dispute that Rinnai is a member of Plaintiff National Association of Home Builders (representing the residential building construction industry) ("NAHB") and Plaintiff California Manufacturers & Technology Association (representing community manufacturing businesses) ("CMTA"). SUF 6, 20, 25; Windsor Decl. ¶ 3; Ward Decl. ¶ 3; Hastings Decl. ¶ 2.

As Rinnai's President, Mr. Windsor possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge within the affected markets and with respect to Rinnai's business to testify to the current harms to Rinnai's interests from the homebuilding industry's changed practices in anticipation of Rule 1146.2's impending gas appliance ban.  SUF 6, 8; Windsor, Decl. ¶¶ 1-3.

As to impending harm to Rinnai, Defendants do not contest the fact that Rinnai will lose sales of tankless water heaters in the District.  The assertion that Rinnai will not be harmed because it also sells electric heat pump water heaters is speculative; a lost sale of a gas appliance from Rinnai does not mean that Rinnai will be the company to sell an electric heat pump.  In addition, being forced to incur the compliance costs and business disruptions—including modifications to manufacturing, sales, distribution, and servicing—flowing from an unconstitutional regulation is irreparable harm.  Windsor Decl. ¶¶ 6-11; Dkt. 50-1 at 20-23.

This is not legal argument.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 7 is a material fact that is not subject to genuine or reasonable dispute.

| 8.    Already in the homebuilding market, where gas heaters and boilers have traditionally been installed in up to 80% of new construction, the industry is moving to electric heat | 8.    Disputed in part/Objection. <br><br> <u>Plaintiffs' Evidence</u>: Windsor Decl. ¶ 5. <br><br> <u>Basis for Dispute</u>: There is no evidence that anticipation of the District's zero- |

(41 of 261), Page 41 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 41 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 8 of 68   Page ID
#:2020

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| pumps, in anticipation of the District's zero-$NO_x$ rule. *Evidence*: Windsor Decl. ¶ 5. | $NO_x$ rule is the reason that the industry is moving to electric heat pumps. As set forth in the concurrently filed Objections, Defendants further dispute the fact on the basis that the declarant lacks personal knowledge and is not competent to testify as to whether or why the industry is moving to electric heat pumps.<br><br>Objection: Lacks foundation or personal knowledge; speculative; irrelevant |

8. **Plaintiffs' Reply**:

Defendants do not dispute that Rinnai is a tankless water heater manufacturer with roughly $14 million in sales in the District; or that Rinnai is a member of Plaintiff NAHB and Plaintiff CMTA. SUF 6, 20, 25; Windsor Decl. ¶ 3; Ward Decl. ¶ 3; Hastings Decl. ¶ 2.

As Rinnai's President, Mr. Windsor possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge within the affected markets and with respect to Rinnai's business to testify to the current harms to Rinnai's interests from the homebuilding industry's changed practices in anticipation of Rule 1146.2's impending gas appliance ban. *See* Reply at SUF 6, 8; Windsor, Decl. ¶¶ 1-3.

This is relevant to Plaintiffs' harm. It is not speculative because it reflects current and ongoing changes in the industry.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 8 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 9. After the rule's relevant effective dates, Rinnai's wholesale distributors and sales personnel will no longer be able to sell, offer for sale, or install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; installation contractors in Rinnai's service contract networks will no longer be able to install gas water | 9. Disputed/Objection.<br><br>Plaintiffs' Evidence: Windsor Decl. ¶ 6.<br><br>Basis for Dispute: The Rule does not prohibit the sale, offer for sale, or installation of gas water heaters or boilers so long as those appliances achieve the zero-$NO_x$ emissions |

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; and the hiring of gas appliance servicing contractors through Rinnai's service contract networks will increasingly diminish as existing gas appliances are replaced with electric appliances.<br><br>*Evidence*: Windsor Decl. ¶ 6. | standard. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>Plaintiffs' assertion that Rinnai's service contract networks will diminish as gas appliances are replaced with electric is speculative.<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative |

9.   **Plaintiffs' Reply**:

   Given that gas-fired water heaters or boilers cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard and are prohibited. *See* Reply at SUF 4.

   Second, the scope of Mr. Windsor's responsibilities, experience, and knowledge as Rinnai's President give him the knowledge and experience to speak to Rinnai's service contractor networks. SUF 6; Windsor Decl. ¶¶ 1-3.

   *See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

   For these reasons, SUF 9 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 10.   Because of the size of the California market for the banned products, the business disruption to Plaintiff Rinnai caused by the zero-$NO_x$ rule is, or will be, significant.<br><br>*Evidence*: Windsor Decl. ¶ 7. | 10.   Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Windsor Decl. ¶ 7.<br><br><u>Basis for Dispute</u>: The Rule does not "ban[]" gas products; it places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>The Rule will not affect the California market at large; it is limited to the District's jurisdiction.<br><br>Whether Rinnai will experience a significant business disruption caused by the Rule is speculative, particularly since Rinnai also asserts that it sells electric |

(43 of 261), Page 43 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 43 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 10 of 68   Page ID
#:2022

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | heat pump water heaters. Windsor Decl. ¶ 2.<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative; irrelevant |

10. **Plaintiffs' Reply**:

Given that gas-fired water heaters or boilers cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard and are banned. *See* Reply at SUF 4, 7-9.

This fact is relevant to Plaintiffs' harm. The scope of Mr. Windsor's responsibilities, experience, and knowledge as Rinnai's President give him the knowledge and experience to speak to the California market and Rinnai's harm, including the scale of the impact on Rinnai with $14 million in sales in the District alone. SUF 6; Windsor Decl., ¶¶ 1-3.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 10 is a material fact that is not subject to genuine or reasonable dispute.

| Plaintiffs' Uncontroverted Facts | Defendants' Response |
|---|---|
| 11.   These consequences of the zero-$NO_x$ rule will also affect Rinnai's long-term investment, manufacturing, marketing, and distribution plans. If Rinnai continues to sell to the California market, this would be limited to electric heat pump water heaters. Because of the size and configuration of electric heat pump water heater appliances, Rinnai would have to secure significantly larger storage facilities, and its transportation and distribution costs would increase. Rinnai's wholesale distributors would also incur these increased storage, transportation, and distribution costs.<br><br>*Evidence*: Windsor Decl. ¶ 8. | 11.   Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Windsor Decl. ¶ 8.<br><br><u>Basis for Dispute</u>: The Rule does not limit manufacturers to selling only electric appliances; it allows appliances to use any fuel as long as they achieve the zero-NOx emissions standard. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>Windsor's statements about the long-term consequences of the Rule on Rinnai and its wholesale distributors are speculative.<br><br>The Rule will not affect the California market at large; it is limited to the District's jurisdiction. |

(44 of 261), Page 44 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 44 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 11 of 68   Page ID
#:2023

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | <u>Objection</u>: Lacks foundation or personal knowledge; speculative; inadmissible hearsay |

| | |
|---|---|
| **11. Plaintiffs' Reply**:<br><br>Given that gas-fired water heaters or boilers cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard and are banned. The rule is not fuel-neutral, but instead bans only appliances "fired with, or designed to be fired with, natural gas." *See* Reply at SUF 4.<br><br>The scope of Mr. Windsor's responsibilities, experience, and knowledge as Rinnai's President give him the knowledge and experience to speak to Rinnai's wholesale distribution model. SUF 6; Windsor Decl. ¶¶ 1-3.<br><br>*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.<br><br>For these reasons, SUF 11 is a material fact that is not subject to genuine or reasonable dispute. | |

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| 12. Plaintiff Noritz America Corp. ("Noritz") sells roughly 10% of gas tankless water heaters in the U.S., with roughly $35 million in sales in California, a majority of which are made to customers in the District. Noritz's product line incorporates condensing and non-condensing instantaneous water heaters and condensing combination gas boilers, and Noritz has recently sold a small number of integrated hybrid electric heat pump water heaters.<br><br>*Evidence*: Declaration of Jay Hassell ¶2 ("Hassel Decl."). | 12. Undisputed. |
| 13. Noritz is experiencing, or will imminently experience, harm in the form of economic injuries, lost sales, and altered business practices because of the District's zero-$NO_x$ rule. | 13. Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Hassel Decl. ¶ 3.<br><br><u>Basis for Dispute</u>: Defendants dispute that the Rule is currently causing any |

(45 of 261), Page 45 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 45 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 12 of 68   Page ID
#:2024

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| *Evidence*: Hassel Decl. ¶ 3. | harm. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)). Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative. <u>Objection</u>: Lacks foundation or personal knowledge; speculative; improper legal argument |

13. **Plaintiffs' Reply**:

 Defendants do not dispute that Plaintiff Noritz is a tankless water heater manufacturer with roughly $35 million in sales in California, a majority of which are made to customers in the District.  SUF 12.

 As Noritz's President, Mr. Hassel possesses the requisite particularized vocational responsibilities, experience, and knowledge within the affected markets and with respect to Noritz's business to testify to the harms to Noritz's interests now and in anticipation of Rule 1146.2's impending gas appliance ban.  SUF 14; Hassel Decl. ¶¶ 1-2.

 As to impending harm to Noritz's business interests, Defendants' assertion is not well taken, because they do not dispute that it will bar sales of Noritz's products.  And being forced to incur compliance costs and business disruptions to sales, distribution, and servicing flowing from an unconstitutional regulation is irreparable harm.  Hassel Decl. ¶¶ 3-8; Dkt. 50-1 at 20-23.

 *See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

 For these reasons, SUF 13 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 14. Already in the homebuilding market, where gas heaters and boilers have traditionally been installed in up to 80% of new construction, the industry is moving to electric heat pumps, in anticipation of the District's zero-$NO_x$ rule. *Evidence*: Hassel Decl. ¶ 4. | 14. Disputed/Objection. <u>Plaintiffs' Evidence</u>: Hassel Decl. ¶ 4. <u>Basis for Dispute</u>: There is no evidence that anticipation of the District's zero-NOx rule is the reason that the industry is moving to electric heat pumps. As set forth in the concurrently filed Objections, Defendants further dispute |

(46 of 261), Page 46 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 46 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 13 of 68   Page ID
#:2025

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | the fact on the basis that the declarant lacks personal knowledge and is not competent to testify as to whether or why the industry is moving to electric heat pumps.<br><br>Objection: Lacks foundation or personal knowledge; speculative |

14. **Plaintiffs' Reply**:

   Please see Plaintiff's Reply at SUF 13.

   As Noritz's President, Mr. Hassel possesses the requisite particularized vocational responsibilities, experience, and knowledge within the affected markets and with respect to Noritz's business to testify to the harms to Noritz's interests from the homebuilding industry's changed practices in anticipation of Rule 1146.2's impending gas appliance ban.

   *See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

   For these reasons, SUF 14 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 15.   After the rule's relevant effective dates, Noritz's wholesale distributors and sales personnel will no longer be able to sell, offer for sale, or install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; installation contractors in Noritz's service contract networks will no longer be able to install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; and the hiring of gas appliance servicing contractors through Noritz's service contract networks will increasingly diminish as existing gas appliances are replaced with electric appliances.<br><br>*Evidence*: Hassel Decl. ¶ 5. | 15.   Disputed/Objection.<br><br>Plaintiffs' Evidence: Hassel Decl. ¶ 5.<br><br>Basis for Dispute: The Rule does not prohibit the sale, offer for sale, or installation of gas water heaters or boilers so long as those appliances achieve the zero-NOx emissions standard. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>Plaintiffs' assertion that Rinnai's [sic] service contract networks will diminish as gas appliances are replaced with electric is speculative.<br><br>Objection: Lacks foundation or personal knowledge; speculative |

(47 of 261), Page 47 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 47 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 14 of 68   Page ID
#:2026

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|

**15.  Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances.  *See* Reply at SUF 4.

Second, the scope of Mr. Hassel's responsibilities, experience, and knowledge as Noritz's President qualifies him to speak to Noritz's service contractor networks.  SUF 12; Hassell Decl. ¶¶ 1-2.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 15 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 16.   Because of the size of the California market for the banned products, the business disruption to Plaintiff Noritz caused by the zero-$NO_x$ rule is, or will be, significant.<br><br>*Evidence*: Hassel Decl. ¶ 6. | 16.  Disputed/Objection.<br><br>Plaintiffs' Evidence: Hassel Decl. ¶ 6.<br><br>Basis for Dispute: The Rule does not "ban[]" gas products; it places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>The Rule will not affect the California market at large; it is limited to the District's jurisdiction.<br><br>Whether Noritz will experience a significant business disruption caused by the Rule is speculative.<br><br>Objection: Lacks foundation or personal knowledge; speculative; improper legal argument |

**16.  Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances.  *See* Plaintiffs' Reply at SUF 4.

(48 of 261), Page 48 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 48 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 15 of 68    Page ID
#:2027

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|

Given the District's sheer size and economic significance to the state (in Noritz's case, the majority of its $35 million in sales in California are to customers in the District, SUF 12), Defendants' second assertion is not well taken.

Third, please see Plaintiffs' replies in support of SUF 12-15.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 16 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 17.  Further, Noritz has its headquarters in California and may be forced to consider leaving the state if its primary business is not allowed to be conducted in the largest existing market for its products.  Noritz, headquartered in the very District banning its gas products, must consider closing its facilities and eliminating or moving its approximately 120 employees out of the District or out of California altogether.<br><br>*Evidence*: Hassel Decl. ¶ 7. | 17.  Disputed/Objection.<br><br>Plaintiffs' Evidence:  Hassel Decl. ¶ 7.<br><br>Basis for Dispute: Defendants dispute the statement on the basis that the Rule does not "ban[]" gas products; it places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>The Rule will not affect the California market at large; it is limited to the District's jurisdiction.<br><br>Whether Noritz may consider leaving the state is speculative.<br><br>Objection: Lacks foundation or personal knowledge; speculative; irrelevant |

**17.  Plaintiffs' Reply:**

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances.  *See* Plaintiffs' Reply at SUF 4.

Given the District's sheer size and economic significance to the state (in Noritz's case, the majority of its $35 million in sales in California are to customers in the District, SUF 12), Defendants' second assertion is not well taken.

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| Third, Mr. Hassel's responsibilities, experience, and knowledge of Noritz's business operations and plans, in his capacity as Noritz's President, sufficiently equips him to testify thereto.  SUF 12; Hassel Decl. ¶¶ 1-2.<br><br>*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.<br><br>For these reasons, SUF 17 is a material fact that is not subject to genuine or reasonable dispute. | |
| 18.  These consequences of the zero-$NO_x$ rule will also affect Noritz's long-term investment, marketing, and distribution plans.  If Noritz continues to manufacture appliances for the California market, this would be limited to integrated hybrid electric heat pump water heaters.  Because of the size and configuration of electric heat pump water heater appliances, Noritz would have to secure significantly larger storage facilities, and their transportation and distribution costs would increase.  Noritz's wholesale distributors would also incur these increased storage, transportation, and distribution costs.<br><br>*Evidence*: Hassel Decl. ¶ 8. | 18.  Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Hassel Decl. ¶ 8.<br><br><u>Basis for Dispute</u>: The Rule does not limit manufacturers to selling only electric appliances; it allows appliances to use any fuel type as long as those appliances achieve the zero-NOx emissions standard. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>Whether Noritz will experience a significant business disruption caused by the Rule is speculative.<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative; hearsay |

18.  **Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances.  And Rule 1146.2 is not "fuel neutral" because it applies to appliances "fired with, or designed to be fired with, natural gas."  *See* Plaintiffs' Reply at SUF 4.

Second, please see Plaintiff's replies in support of SUF 11-17.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 18 is a material fact that is not subject to genuine or reasonable dispute.

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
| --- | --- |
| 19.  Plaintiff National Association of Homebuilders ("NAHB") represents the U.S. single- and multi-family residential building construction industry. NAHB aims to protect and provide housing opportunities for the public while promoting its members' business interests. *Evidence*: Declaration of Thomas J. Ward, ¶¶ 2-4 ("Ward Decl."). | 19.  Undisputed. |
| 20.  NAHB's members include Plaintiff Rinnai. *Evidence*: Ward Decl. ¶ 3; Windsor Decl. ¶ 3. | 20.  Undisputed. |
| 21.  Plaintiff NAHB's members doing business in the District are suffering, or imminently will suffer, harm to their revenues and business operations and compliance risks and burdens as a result of the District's zero-$NO_x$ rule.  For example, members will be forced to replace certain gas equipment with electric equipment, requiring intrusive and expensive remodeling to incorporate electrical service. *Evidence*: Ward Decl. ¶¶ 5-6. | 21.  Disputed/Objection. Plaintiffs' Evidence: Ward Decl. ¶¶ 5-6. Basis for Dispute: Defendants dispute that the Rule requires replacing gas equipment with electric equipment; the Rule does not prohibit the installation of gas water heaters or boilers so long as those appliances achieve the zero-NOx emissions standard. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)). Defendants dispute that the Rule is currently causing any harm. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)). Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative. The Rule does not regulate residential tank water heaters under 75 kBtu/hr. Dkt. 50-2, Ex. |

(51 of 261), Page 51 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 51 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 18 of 68   Page ID
#:2030

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | 2 at 029 (R. 1146.2 Governing Board Packet).<br><br>Objection: Lacks foundation or personal knowledge; speculative; inadmissible hearsay |

21.  **Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances.  And Rule 1146.2 is not "fuel neutral" because it applies to appliances "fired with, or designed to be fired with, natural gas."  *See* Plaintiffs' Reply at SUF 4.  That Rule 1146.2 does not cover residential tank water heaters does not change the character of the rule as a ban.

Second, Defendants do not dispute Plaintiff NAHB represents the U.S. single- and multi-family residential building construction industry, including members doing business in the District (including Plaintiff Rinnai).  SUF 19, 20. As NAHB's Vice President of Legal Advocacy, Mr. Ward possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge within the affected industries and with respect to NAHB members' affected businesses to testify to the current and anticipated harms to NAHB's members from industry changes due to Rule 1146.2.  Ward Decl. ¶¶ 1-6; SUF 6-11.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 21 is a material fact that is not subject to genuine or reasonable dispute.

| 22.  Plaintiff California State Pipe Trades Council ("Council") is a statewide labor organization comprised of District Councils and Local Unions representing 38,000 plumbers, pipefitters, steamfitters, welders, refrigeration fitters, HVAC technicians, and sprinkler fitters throughout California.  The Council's affiliates include Pipe Trades District Council No. 16, which includes thirteen Local Unions representing more than 10,000 Union members who | 22.  Undisputed. |

(52 of 261), Page 52 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 52 of 261
Case 2:24-cv-10482-PA-PD Document 67 Filed 06/02/25 Page 19 of 68 Page ID
#:2031

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| work throughout the District installing sophisticated piping systems, including natural-gas piping and gas-fired equipment, in every setting. Local 364 represents approximately 800 plumbers, pipefitters, steamfitters, welders, refrigeration fitters, and HVAC technicians working in Riverside and San Bernadino counties. Plaintiff Council and Local 364 are chartered affiliates of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO CLC.<br><br>*Evidence*: Declaration of Mike Hartley ¶¶ 2-3 ("Hartley Decl."); Declaration of Joe Raymond ¶¶ 1-2 ("Raymod Decl."). | |
| 23.    The District's zero-$NO_x$ rule is causing and will cause substantial harm to Plaintiff Council, District Council 16, its Local Union affiliates, and the workers they represent. Union plumbers and pipefitters have already lost work and wages, because residential construction projects traditionally built with natural gas service for gas-fired heating and appliances are now being designed and built without gas service or appliances, and often without gas infrastructure at all, in preparation for compliance with the zero-$NO_x$ rule. With the gas plumbing work reduced or eliminated from many building projects, the projects will involve substantially less plumbing work and will employ fewer plumbers, costing many members their jobs, reducing the need for their services, resulting in lower hours worked and wages earned, and impairing training programs. These | 23.    Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Hartley Decl. ¶ 5; Raymond Decl. ¶¶ 6-8.<br><br><u>Basis for Dispute</u>: The Rule does not require that buildings be built without gas infrastructure, appliances, or service. It places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)). As set forth in the concurrently filed Objections, Defendants further dispute the fact on the basis that the declarants lack personal knowledge and are not competent to testify as to whether or why the industry is moving to non-gas appliances and infrastructure.<br><br>There is no evidence that anticipation of the District's zero-NOx rule is the reason that projects are built without gas infrastructure, appliances, or service. |

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| harms will only be exacerbated once the zero-$NO_x$ rule goes into effect.<br><br>*Evidence*: Hartley Decl. ¶ 5; Raymond Decl. ¶¶ 6-8. | Objection: Lacks foundation or personal knowledge; speculative; inadmissible hearsay |

23. **Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances. *See* Plaintiffs' Reply at SUF 4.

Defendants concede in their dispute statement that projects are being built without gas infrastructure, appliances, or service. Dkt. 57 at AMF 23. And Defendants do not dispute that Plaintiff California State Pipe Trades Council ("Council") and its affiliates represent 10,000 Union Members who are trained to install and work on sophisticated natural-gas piping and gas-fired equipment in every setting throughout the District. SUF 22.

Mr. Harley (as the Council's Executive Director) and Mr. Raymond (as Local Union No. 364's Business Manager) possess the requisite particularized vocational and associational responsibilities, experience, and knowledge to testify to the demonstrable current and anticipated harms to Union Members' interests from industry changes due to Rule 1146.2. Hartley Decl. ¶¶ 2-5; Raymond Decl. ¶¶ 1-8.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 23 is a material fact that is not subject to genuine or reasonable dispute.

| | |
|---|---|
| 24.   Plaintiff California Manufacturers & Technology Association ("CMTA") works to improve and enhance a strong and competitive business climate for California's 30,000 manufacturing, processing, and technology-based companies and their employees.<br><br>*Evidence*: Declaration of Lance Hastings ¶ 2 ("Hastings Decl."). | 24.   Undisputed. |

(54 of 261), Page 54 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 54 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 21 of 68    Page ID
#:2033

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| 25.  CMTA's members include Plaintiff Rinnai.<br><br>*Evidence*: Hastings Decl. ¶ 2; Windsor Decl. ¶ 3. | 25.  Undisputed. |
| 26.  The zero-$NO_x$ rule is causing current and imminent harm to CMTA's members in the District, one or more of whom are suffering, or are imminently facing, increased costs, disruption to business, and compliance burdens or costs, as well as harm to their profits and operations.  These negative effects are occurring or will occur on a significant scale due to the size of the California market for the banned products.<br><br>*Evidence*: Hastings Decl. ¶ 3. | 26.  Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Hastings Decl. ¶ 3.<br><br><u>Basis for Dispute</u>: The Rule does not "ban[]" gas products; it places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>Defendants dispute that the Rule is currently causing any harm. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement asserting that the Rule will cause future harm because it is speculative. Whether Rinnai will experience a significant business disruption caused by the Rule is speculative, particularly since CMTA member Rinnai also asserts that it sells electric heat pump water heaters. Windsor Decl. ¶ 2.<br><br>The Rule will not affect the California market at large; it is limited to the District's jurisdiction.<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative; inadmissible hearsay |
| 26.  **Plaintiffs' Reply**:<br><br>    First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the | |

(55 of 261), Page 55 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 55 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 22 of 68   Page ID
#:2034

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|

District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances. *See* Plaintiffs' Reply at SUF 4.

Second, Defendants do not dispute Plaintiff CTMA represents California's 30,000 manufacturing, processing, and technology-based companies and their employees, including members doing business in the District (including Plaintiff Rinnai). SUF 24, 25. As CMTA's President and CEO, Mr. Hastings possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge within the affected industries and with respect to CMTA members' affected businesses to testify to the current and anticipated harms to CMTA's members from industry changes due to Rule 1146.2. Hastings Decl. ¶¶ 1-3; SUF 6-11. 25.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 26 is a material fact that is not subject to genuine or reasonable dispute.

| 27.   Plaintiff California Restaurant Association ("CRA") serves the California restaurant industry, providing support, resources, and advocacy for members while promoting networking and industry growth. CRA has over 18,000 members, including those who own or operate restaurants or work as chefs in the District. All CRA members in good standing are also members of Plaintiff Restaurant Law Center ("RLC"), an independent public policy organization supporting the food-service industry across the U.S.<br><br>*Evidence*: Declaration of Jot Condie ¶¶ 2-3 ("Condie Decl."); Declaration of Angelo Amador ¶¶ 2-3 ("Amador Decl."). | 27.   Undisputed. |
| 28.   One or more of CRA and RLC's members doing business in the District are suffering, or will imminently suffer, harm to their revenues, business operations, and compliance risks and burdens as a | 28.   Disputed/Objection.<br><br>Plaintiffs' Evidence: Condie Decl. ¶¶ 4-5; Amador Decl. ¶¶ 4-5. |

20

**ER-55**

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| result of the zero-$NO_x$ rule. Under the District's rule, members who want to open a restaurant in a new building may pay higher costs to own, lease, or operate a building for which the regulated appliances must be electric. The rule may also result in more buildings being all-electric, removing the option for restaurants to use gas for any appliances, including stoves and ovens. Members will also be denied the use of gas appliances subject to the rule in existing restaurants due to scheduled electric replacements or forced electric retrofits, which are expensive and disruptive to business operations. This imposition of significant costs and disruption on members who own or lease buildings will in turn affect chefs who work in these restaurants.<br><br>*Evidence*: Condie Decl. ¶¶ 4-5; Amador Decl. ¶¶ 4-5. | <u>Basis for Dispute</u>: The Rule does not require buildings to be built all-electric.<br><br>The Rule does not regulate stoves or ovens. Dkt. 50-2, Ex. 1 at 007 (Rule 1146.2(c)(30)) (defining "unit").<br><br>Defendants dispute that the Rule is currently causing any harm. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative.<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative; inadmissible hearsay; improper legal conclusion |

28. **Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances. *See* Plaintiffs' Reply at SUF 4.

Second, Defendants do not dispute that Plaintiffs California Restaurant Association ("CRA") and Restaurant Law Center ("RLC") represent, serve, and support the U.S. food and California restaurant industries, including members doing business in the District. SUF 27. Mr. Condie (as CRA's President and CEO) and Mr. Amador (as RLC's Executive Director), possess the requisite particularized vocational and associational responsibilities, experience, and knowledge to testify to the current and anticipated harms to CRA and RLC's members from industry changes due to Rule 1146.2. Condie Decl. ¶¶ 1-5; Amador Decl. ¶¶ 1-4.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

(57 of 261), Page 57 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 57 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 24 of 68   Page ID
#:2036

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| For these reasons, SUF 28 is a material fact that is not subject to genuine or reasonable dispute. | |
| 29.   Plaintiff Californians for Homeownership, Inc. ("Californians") is a nonprofit public benefit corporation whose mission is to address California's housing crisis through litigation in support of the production of housing affordable to families at all income levels.  It was formed in response to a call from the California legislature for increased nonprofit public interest litigation against local agencies whose actions exacerbate the housing crisis.<br><br>*Evidence*: Declaration of Matthew P. Gelfand ¶¶ 2-3 ("Gelfand Decl."). | 29.  Undisputed. |
| 30.   Californians' purpose includes representing the interests of future residents of residential units, who are and will be harmed by the District's zero-NO$_x$ rule. For some potential new housing developments, the added expense for compliant appliances will cause the developments to no longer "pencil out" (attain financial feasibility given market rents or sales prices), meaning they will not be built or will be built with fewer units, thereby increasing competition for fewer existing units, which will in turn result in increases in rents and sales prices. To the extent that new development remains financially feasible, those units' rents and sales prices will increase, because the developers will pass along the increased appliance costs to the eventual renters or buyers.<br><br>*Evidence*: Gelfand Decl. ¶¶ 2-6. | 30.   Disputed in part/Objection.<br><br>Plaintiffs' Evidence: Gelfand Decl. ¶¶ 2-6.<br><br>Basis for Dispute: Defendants do not dispute the nature of Californians' purpose. Defendants dispute that the Rule is currently causing any harm to future residents. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement alleging that the Rule will cause future harm to future housing residents because it is speculative. The Rule does not regulate residential tank water heaters under 75 kBtu/hr. Dkt. 50-2, Ex. 2 at 029 (R. 1146.2 Governing Board Packet).<br><br>Given incentive programs associated with the Rule to help cover the incremental cost of new zero-emission |

(58 of 261), Page 58 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 58 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 25 of 68    Page ID
#:2037

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| | equipment, the nature of any increased cost is speculative. Dkt. 50-2, Ex. 2 at 123 (Staff Report). |
| | <u>Objection</u>: Lacks foundation or personal knowledge; speculative |

30.  **Plaintiffs' Reply**:

Defendants do not dispute that Plaintiff Californians for Homeownership, Inc. ("Californians") was formed in response to a call from the California legislature for increased nonprofit public interest litigation against local agencies whose actions exacerbate the housing crisis; that Californians' mission is to address California's housing crisis through litigation in support of the production of housing affordable to families at all income levels; or that Californians' purpose includes representing the interests of future residents of residential units and current low- and moderate-income homeowners and tenants.  SUF 29, 30, 31.

The assertion regarding incentive programs is speculative (to the extent it presumes program continuity, implementation and availability and constituent eligibility) and implicitly concedes the expectation of increased costs for future residents.  Defendants improperly rely on hearsay statements in the Staff Report for the truth of the matter asserted.

As Californians' Counsel, Mr. Gelfand possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge with respect to affected markets and Californians' constituent housing needs, concerns, and financial constraints to testify to the current and anticipated harms to constituents' interests from market and practice changes due to Rule 1146.2.  SUF 29, 30, 31; Gelfand Decl. ¶¶ 1-10.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 30 is a material fact that is not subject to genuine or reasonable dispute.

| 31.  Californians' purpose also includes representing the interests of current low- and moderate-income homeowners and tenants, who are and will be harmed by the District's zero-NO$_x$ rule.  Homeowners will face increased total costs of ownership associated with replacing appliances, and those seeking to add much-needed | 31.  Disputed in part/Objection. <br><br> <u>Plaintiffs' Evidence</u>: Gelfand Decl. ¶¶ 7-10. <br><br> <u>Basis for Dispute</u>: Defendants do not dispute the nature of Californians' purpose. Defendants dispute that the Rule is currently causing any harm to |

(59 of 261), Page 59 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 59 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 26 of 68   Page ID
#:2038

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| capacity to an existing home, such as through an addition or the construction of an accessory dwelling unit, will face increased appliance costs. Some lower-income homeowners will not be able to bear such increased costs. When landlords face costly appliance replacement expenses, they will pass these along to their tenants to the extent permitted by law.<br><br>*Evidence*: Gelfand Decl. ¶¶ 7-10. | homeowners and tenants. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement alleging that the Rule will cause future harm to homeowners because it is speculative.<br><br>The Rule provides additional time to comply if needed for utility upgrades or expanding space. Dkt. 50-2, Ex. 1 at 012-014, 019-020 (Rule 1146.2(i)(1), (7)).<br><br>Given incentive programs associated with the Rule to help cover the incremental cost of new zero-emission equipment, the nature of any increased cost is speculative. Dkt. 50-2, Ex. 2 at 123 (Staff Report).<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative |

31. **Plaintiffs' Reply**:

    Please see Plaintiffs' Reply at SUF 30.

    The statement mischaracterizes the Rule, which speaks for itself. The rule requires an application for an extension, which is subject to restrictions and burdensome recordkeeping and reporting requirements. This burdensome application for an extension is itself unconstitutional. And it does not ultimately avoid compliance with the rule's effective ban, but only delays it.

    The assertion regarding incentive programs is speculative (to the extent it presumes constituent eligibility; and particularly as to programs that have yet to be implemented) and implicitly concedes the expectation of increased costs for future residents. Defendants improperly rely on hearsay statements in the Staff Report for the truth of the matter asserted.

    *See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| For these reasons, SUF 31 is a material fact that is not subject to genuine or reasonable dispute. | |
| 32.  Californians' purpose is also to support the California Association of REALTORS ("C.A.R."), a voluntary trade association whose membership includes about 200,000 persons licensed by the State of California as real estate brokers and salespersons, who are and will be harmed by the zero-$NO_x$ rule.  By reducing new development and the financial viability of for-sale development and conversions, the rule limits residential transactions. Concerns about the future need for costly appliance replacement will disrupt some real estate transactions when buyers refuse to remove contingencies or attempt not to close on a transaction.  In addition, many of C.A.R.'s members own and operate multifamily residential properties and, under the District's rule, unnecessarily will bear increased costs and experience disruptions associated with the forced replacement of appliances.<br><br>*Evidence*: Gelfand Decl. ¶¶ 11-15. | 32.   Disputed in part/Objection.<br><br>Plaintiffs' Evidence: Gelfand Decl. ¶¶ 11-15.<br><br>Basis for Dispute: Defendants do not dispute the nature of Californians' purpose. Defendants dispute that the Rule is currently causing any harm to homeowners and tenants. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement alleging that the Rule will cause future harm to brokers because it is speculative.<br><br>Defendants dispute that the Rule reduces new development and the financial viability of development and conversions.<br><br>Given incentive programs associated with the Rule to help cover the incremental cost of new zero-emission equipment, the nature of any increased cost is speculative. Dkt. 50-2, Ex. 2 at 123 (Staff Report).<br><br>Objection: Lacks foundation or personal knowledge; speculative |

25

**ER-60**

(61 of 261), Page 61 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 61 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 28 of 68    Page ID
#:2040

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| **32.  Plaintiffs' Reply**:<br><br>Please see Plaintiffs' Reply at SUF 30-31.<br><br>Defendants do not dispute Californians' purpose is also to support the California Association of REALTORS ("C.A.R."). As Californians' Counsel, Mr. Gelfand possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge with respect to affected markets and C.A.R. members' interests and circumstances to testify to the current and anticipated harms from market and practice changes due to Rule 1146.2.  SUF 29, 30, 31; Gelfand Decl. ¶¶ 11-15.<br><br>The assertion regarding incentive programs is speculative (to the extent it presumes constituent eligibility; and particularly as to programs that have yet to be implemented) and implicitly concedes the expectation of increased costs for future residents.  Defendants improperly rely on hearsay statements in the Staff Report for the truth of the matter asserted.<br><br>*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.<br><br>For these reasons, SUF 32 is a material fact that is not subject to genuine or reasonable dispute. | |
| 33.    Plaintiff California Apartment Association ("CAA") is the largest state-wide rental housing trade association in the U.S., representing more than 50,000 property owners and housing operators responsible for nearly 2 million rental housing units in California, including about 1,460 members within the District, all of whom are subject to strict business, employment, and housing legal standards under local and state law and regulation.<br><br>*Evidence*: Declaration of Thomas K. Bannon ¶¶ 2, 7-11 ("Bannon Decl."). | 33.  Undisputed. |
| 34.    The District's zero-NO$_x$ rule is causing, and will imminently cause, CAA members operating in the District to suffer harm to revenues, | 34.  Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Bannon Decl. ¶¶ 3, 12. |

(62 of 261), Page 62 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 62 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 29 of 68   Page ID
#:2041

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| altered business practices, and increased compliance risks and burdens.<br><br>*Evidence*: Bannon Decl. ¶¶ 3, 12. | <u>Basis for Dispute</u>: Defendants dispute that the Rule is currently causing any harm to CAA members. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative.<br><br>The Rule provides additional time to comply under certain circumstances. Dkt. 50-2, Ex. 1 at 012-020 (Rule 1146.2(i)).<br><br><u>Objection</u>: Lacks foundation or personal knowledge; speculative |

34. **Plaintiffs' Reply**:

Defendant do not dispute Plaintiff California Apartment Association ("CAA") represents 1,460 property owners and housing operators responsible for rental housing units in the District, all of whom are subject to strict business, employment, and housing legal standards under local and state law and regulation. SUF 33.

The statement mischaracterizes the Rule, which speaks for itself. The rule generally requires an application for extensions, which are subject to restrictions and burdensome recordkeeping and reporting requirements. This burdensome application for an extension is itself unconstitutional. And it does not ultimately avoid compliance with the rule's effective ban, but only delays it.

As CAA's CEO, Mr. Bannon possesses the requisite particularized vocational and associational responsibilities, experience, and knowledge with respect to affected markets and CAA members' businesses to testify to the current and anticipated harms to members' interests due to Rule 1146.2. Bannon Decl. ¶¶ 1-12.

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 34 is a material fact that is not subject to genuine or reasonable dispute.

(63 of 261), Page 63 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 63 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 30 of 68   Page ID
#:2042

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| 35.   The rule forces Plaintiff CAA's members to replace gas appliances with electric appliances— and many members will be required to make scheduled replacements. Forced replacements cause serious disruption, and may require new transformers, electric panel upgrades, reconfigurations, supporting infrastructure, engineering, myriad ancillary equipment investments, and venting or condensate management, as well as potential tenant relocations while compliance is achieved.  Many properties in the District were built decades ago, which not only drastically increases the costs, difficulties, and disruption to tenants associated with forced retrofitting, but also results in the very real possibility that achieving compliance will not be possible or will entail appreciable loss of tenant living space, parking space, and amenities. Even when there appear to be viable solutions, due to local agencies' capacity and resource constraints, there is no guarantee members can secure necessary agency input and permissions in time to conduct required work before the individual compliance deadlines under the rule— and ensuring such compliance is burdensome and costly in and of itself.

*Evidence*: Bannon Decl. ¶¶ 2-12; Declaration of Brian Abernathy ¶¶ 2-13, Ex. A; Declaration of Jessica Bohn ¶¶ 2-7; Declaration of Blake Boyd ¶¶ 2-10. | 35.   Disputed/Objection.

<u>Plaintiffs' Evidence</u>: Bannon Decl. ¶¶ 2-12; Declaration of Brian Abernathy, ¶¶ 2-13, Ex. A; Declaration of Jessica Bohn ¶¶ 2-7; Declaration of Blake Boyd ¶¶ 2-10.

<u>Basis for Dispute</u>: The Rule does not force members to replace gas appliances with electric appliances. It places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).

Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative.

Defendants dispute that the Rule will result in compliance burdens. The Rule provides additional time to comply under certain circumstances. Dkt. 50-2, Ex. 1 at 012-020 (Rule 1146.2(i)).

<u>Objection</u>: Lacks foundation or personal knowledge; speculative |

35.   **Plaintiffs' Reply**:

First, given that gas-fired appliances cannot combust fuel without emitting NO$_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the

(64 of 261), Page 64 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 64 of 261
Case 2:24-cv-10482-PA-PD   Document 67   Filed 06/02/25   Page 31 of 68   Page ID
#:2043

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| District's zero-NO$_x$ emission standard, which functions as a ban on the regulated appliances.  *See* Plaintiffs' Reply at SUF 4.  The Rule therefore does force members to replace the regulated gas appliances with electric appliances. The statement mischaracterizes the Rule, which speaks for itself.  The rule generally requires an application for an extension, which is subject to restrictions and burdensome recordkeeping and reporting requirements.  This burdensome application for an extension is itself unconstitutional.  And it does not ultimately avoid compliance with the rule's effective ban, but only delays it. Please see Plaintiffs' Reply at SUF 34. In addition, Defendants do not dispute that: (1) Mr. Abernathy is the owner of SGV Management, LLC, a CAA member and 30-year family business that manages 800 rental units in the District, many of which are serviced by tankless natural gas-powered water heaters and gas boilers and gas water heater tanks, that that does not qualify as a "Small Business" under Rule 1146.2 (SUF 34; Abernathy Decl. ¶¶ 1-5); (2) Ms. Bohn is a CAA member and is responsible for operations and compliance at a rental property in the District that is serviced by a natural gas-powered spa heater and is under a family ownership that does not qualify as a "Small Business" under Rule 1146.2 (SUF 34; Bohn Decl. ¶¶ 1-3); or (3) Mr. Boyd is a CAA member and the sole member of his rental property management companies, which are located in the District and are serviced by tankless natural gas-powered water (SUF 34; Boyd Decl. ¶¶ 1-3). In these capacities, Messrs. Abernathy and Boyd and Ms. Bohn possess the requisite vocational responsibilities, experience, and knowledge with respect to their own businesses and their affected markets to testify to the current and anticipated harms to their business interests due to Rule 1146.2 *See* Plaintiffs' Responses to Defendants' Evidentiary Objections. For these reasons, SUF 35 is a material fact that is not subject to genuine or reasonable dispute. | |
| 36.    Plaintiff California Hotel & Lodging Association ("CHLA") is the U.S.'s largest state lodging industry association, representing over 5,000 owners and operators and over $150 billion in annual state-wide travel-related spending.  The hospitality industry is a diverse cross-section of the state, including independent owner-operators, family businesspeople, first- and second- | 36.    Undisputed. |

29

(65 of 261), Page 65 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 65 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 32 of 68    Page ID
#:2044

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| generation immigrant entrepreneurs, large-scale operators, and more.<br><br>*Evidence*: Declaration of Lynn Mohrfeld ¶ 2 ("Mohrfeld Decl."). | |
| 37.    Plaintiff CHLA has one or more members in the District that are suffering or will imminently suffer harm to their revenues and operations because of the zero-NO$_x$ rule.  Due to the size and use cases of the regulated equipment, essential parts of hotel operations will be affected, and it may be necessary to reduce or cancel guest stays to provide space and time to retrofit electric panel upgrades, install new transformers, reconfigure spaces, obtain and install new supporting infrastructure and appliances, manage venting or condensation, implement other ancillary modifications, and demolish existing infrastructure.  In the District, hotels dating to the 1920s are still in operation, and were constructed with materials and structural plans that never contemplated such significant modifications, such that retrofitting may not be readily feasible. In currently depreciated markets, this could force complete overhaul or abandonment of existing structures.<br><br>*Evidence*: Mohrfeld Decl. ¶¶ 3-6. | 37.   Disputed/Objection.<br><br>Plaintiffs' Evidence: Mohrfeld Decl. ¶¶ 3-6.<br><br>Basis for Dispute: Defendants dispute that the Rule is currently causing any harm to CHLA members. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)).<br><br>Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative.<br><br>Objection: Lacks foundation or personal knowledge; speculative |
| 37.  **Plaintiffs' Reply**:<br><br>        Defendants do not dispute that Plaintiff California Hotel & Lodging Association ("CHLA") represents the interests of more than 5,000 hotel owners and operators in California's hospitality industry, including members doing business in the District.  SUF 36.  As CHLA's President and CEO, Mr. Mohrfeld possess the requisite vocational and associational responsibilities, experience, and knowledge with respect to affected markets and CHLA members' businesses to | |

30

(66 of 261), Page 66 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 66 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 33 of 68    Page ID
#:2045

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| testify to the current and anticipated harms to members' interests due to Rule 1146.2. Mohrfeld Decl. ¶¶ 1-6.<br><br>*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.<br><br>For these reasons, SUF 37 is a material fact that is not subject to genuine or reasonable dispute. | |
| 38. Plaintiff Plumbing-Heating-Cooling Contractors of California ("CAPHCC") is a state chapter of the Plumbing-Heating-Cooling Contractors Association, which was founded by plumbing craftsmen and is the nation's oldest trade association. The California chapter, Plaintiff CAPHCC, was founded in 1900, and for the past 125 years has been dedicated to the advancement and education of the plumbing and HVACR industry for the health, safety, and comfort of society and the protection of the environment.<br><br>*Evidence*: Declaration of Whitney Squire ¶¶ 2-3 ("Squire Decl."). | 38. Undisputed. |
| 39. One or more of Plaintiff CAPHCC's members conducting business in the District are experiencing or will imminently experience harm to their business revenues, operations, and planning due to the District's zero-$NO_x$ rule. The rule will significantly decrease plumbing business revenue associated with the banned gas appliances, and will eventually eliminate the service and repair side of such business. This will impact business decisions on what equipment to buy and how many employees to hire or train; require significant capital expense to train technicians for alternative non-gas products; and increase appliance and | 39. Disputed/Objection.<br><br><u>Plaintiffs' Evidence</u>: Squire Decl. ¶¶ 4-6; Declaration of Mike Prencavage Jr. ¶ 2, Ex. A.<br><br><u>Basis for Dispute</u>: The Rule does not "ban[]" gas products; it places emissions limitations on certain categories of appliances. Dkt. 50-2, Ex. 1 at 007-08 (Rule 1146.2(d)(2)).<br><br>Defendants dispute that the Rule is currently causing any harm. The Rule's earliest compliance deadline is January 1, 2026. Dkt. 50-2, Ex. 1 at 007-008 (Rule 1146.2(d)(2), (Table 3)). |

(67 of 261), Page 67 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 67 of 261
Case 2:24-cv-10482-PA-PD    Document 67    Filed 06/02/25    Page 34 of 68    Page ID
#:2046

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response |
|---|---|
| installation costs for customers while taking away customer choice—putting customers in difficult positions and perhaps causing delay in making needed appliance replacements.<br><br>*Evidence*: Squire Decl. ¶¶ 4-6; Declaration of Mike Prencavage Jr. ¶ 2, Ex. A. | Defendants dispute the statement alleging that the Rule will cause future harm because it is speculative.<br><br><u>Objection</u>: Lacks foundation; speculative; inadmissible hearsay; irrelevant |

39. **Plaintiffs' Reply**:

Given that gas-fired appliances cannot combust fuel without emitting $NO_x$ (SUF 3, which Defendants do not dispute), they cannot comply with the District's zero-$NO_x$ emission standard, which functions as a ban on the regulated appliances. *See* Plaintiffs' Reply at SUF 4.

Defendants do not dispute that Plaintiff Plumbing-Heating-Cooling Contractors of California ("CAPHCC") represents the interests of plumbing and HVACR industry members doing business in the District. SUF 38. As CAPHCC's CEO, Ms. Squire possesses the requisite vocational and associational responsibilities, experience, and knowledge with respect to the affected industries and CAPHCC member business to testify to the current and anticipated harms to members' interests from changed industry practices and circumstances due to Rule 1146.2. Squire Decl. ¶¶ 1-6.

Nor do Defendants dispute that Mr. Prencavage is a CAPHCC member and the owner of a plumbing business operating in the District. Prencavage Decl. ¶ 1; *id*., Ex. A. Mr. Prencavage possesses the requisite vocational responsibilities, experience, and knowledge with respect to his industry and his business to testify to the current and anticipated harms to his business from industry changes due to Rule 1146.2. *Id.*

*See* Plaintiffs' Responses to Defendants' Evidentiary Objections.

For these reasons, SUF 38 is a material fact that is not subject to genuine or reasonable dispute.

1 | MATTHEW D. ZINN (CA Bar No. 214587)
Zinn@smwlaw.com
2 | LAUREN M. TARPEY (CA Bar No. 321775)
Ltarpey@smwlaw.com
3 | RYAN K. GALLAGHER (CA Bar No. 344349)
Rgallagher@smwlaw.com
4 | SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
5 | San Francisco, California 94102
Telephone:  (415) 552-7272
6 | Facsimile:  (415) 552-5816

7 | Attorneys for Defendant South Coast Air
Quality Management District
8
| (additional counsel on following page)
9

10 | **UNITED STATES DISTRICT COURT**

11 | **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13 | RINNAI AMERICA CORP., et al,

| Case No. 2:24-cv-10482 PA (PDx)

14 |         Plaintiffs,

15 |                                    | **DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR**
16 |     v.                             | **SUMMARY JUDGMENT**

17 | SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT,               | Date:        July 14, 2025
18 |                                    | Time:        1:30 p.m.
                                       | Courtroom:   9A
19 |         Defendant.

20 | and                                | The Hon. Percy Anderson

21 |                                    | Trial Date:    September 30, 2025
PEOPLE'S COLLECTIVE FOR
22 | ENVIRONMENTAL JUSTICE,
SIERRA CLUB, and INDUSTRIOUS
23 | LABS,

24 |         Defendant-Intervenors.

25

26

27

28

---

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

**ER-68**

(69 of 261), Page 69 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 69 of 261
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 3 of 31    Page ID
#:1496

1

# TABLE OF CONTENTS

2

TABLE OF AUTHORITIES .......................................................................... 5

3

INTRODUCTION .................................................................................... 9

4

BACKGROUND ..................................................................................... 10

5

    I.    Regulation of air pollution under state and federal law ............... 10

6

        A.    The cooperative-federalism structure of air pollution control ........... 10

7

        B.    The District's ozone predicament ...................................... 12

8

    II.    The District's long history of regulating appliance emissions..................... 13

9

    III.    The challenged amendments to Rule 1146.2 ................................. 14

10

        A.    Public review and District approval of the Rule.............................. 14

11

        B.    The Rule's requirements ........................................ 15

12

    IV.    Plaintiffs challenge the Rule ....................................... 17

13

SUMMARY JUDGMENT STANDARD .......................................... 17

14

ARGUMENT ........................................................................ 17

15

    I.    Plaintiffs' facial challenge must fail because they cannot show that the
Rule is invalid in every application.................................. 18

16

    II.    The Rule does not regulate the energy use of covered appliances; it
regulates their emissions. *California Restaurant Association* did not
involve such a program. ........................................ 19

19

        A.    Unlike the Berkeley ordinance in *CRA*, the Rule does not
regulate the quantity of natural gas used by appliances. ................. 20

20

        B.    EPCA specifically covers building codes. It says nothing about
air pollution regulation, which instead is subject to the
exhaustive regime established by the Clean Air Act. ...................... 22

22

            1.    EPCA is silent about state pollution control regulation. .......... 22

23

            2.    Congress spoke directly to state air pollution regulation
in the Clean Air Act and called on states to regulate
emissions from stationary sources like appliances to
achieve federal air quality standards. ...................... 24

26

        C.    EPCA does not preempt regulations that only incidentally affect
energy use. .................................................... 25

27

        D.    EPCA's legislative history shows that Congress was focused on
energy efficiency and consumption, not appliance emissions............ 26

3

(70 of 261), Page 70 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 70 of 261
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 4 of 31    Page ID
#:1497

E.    The District reserves its right to argue on appeal that *CRA* was
wrongly decided. ....................................................................................... 27

III.    Even if *CRA* applied to the Rule, Plaintiffs could not satisfy the facial
challenge standard because they cannot show the Rule is preempted as
to all regulated categories of appliances. ......................................................... 28

A.    The Rule does not preclude the use of natural gas appliances in
every application. ..................................................................................... 28

B.    The Rule regulates some appliances not subject to federal
standards and thus not subject to preemption under EPCA. ................. 29

IV.    Plaintiffs are not entitled to judgment or relief. ........................................... 31

CONCLUSION ......................................................................................................... 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

## INTRODUCTION

The Los Angeles region suffers from some of the worst air quality in the nation. For decades, the South Coast Air Quality Management District has worked to reduce emissions of air pollutants in the South Coast Air Basin, which includes portions of Los Angeles, Orange, Riverside and San Bernadino Counties. It has made substantial progress through innovative and effective regulations but faces a daunting path forward. To tackle the Basin's "extreme" nonattainment of federal air quality standards for ozone—also known as smog—the District must reduce emissions of one of its precursor pollutants, nitrogen oxide ("NOx"), by a staggering 67 percent. So the District took a logical step: it further tightened longstanding emission standards for appliances that collectively generate tons of NOx pollution each day.

Plaintiffs ask this Court to invalidate Rule 1146.2 as preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6291 *et seq*. Plaintiffs' argument is based on a misreading of the Ninth Circuit's "very narrow" decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) ("*CRA*"). But this case is nothing like *CRA*. There, a building code ordinance prohibited natural gas infrastructure in new buildings, explicitly regulating the quantity of gas that appliances could use. Here, by contrast, the District regulates only the NOx emissions that appliances release. The Rule says nothing about how much gas an appliance can use; it addresses only what comes out the other side.

Plaintiffs' facial challenge fails for multiple reasons. First, EPCA preempts only regulations that "concern[ ] energy use." 42 U.S.C. § 6297(c). A zero-NOx emission standard no more concerns energy use than the District's previous 20 parts per million standard, which Plaintiffs concede is not preempted. The Ninth Circuit took pains to emphasize the "very narrow" scope of its *CRA* holding, precisely to avoid threatening emissions regulations like those at issue here. Indeed, earlier in that case, Plaintiff California Restaurant Association assured the trial court that "regulations of nitrogen oxide emissions. . . do not 'concern energy use'" and thus are not preempted by EPCA.

9

(72 of 261), Page 72 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 72 of 261
Case 2:24-cv-10482-PA-PD   Document 53   Filed 05/12/25   Page 10 of 31   Page ID
#:1503

1    Second, the District adopted the Rule in a legal context completely different from

2  that of the Berkeley ordinance. The Rule implements Congress's mandate in the Clean Air

3  Act ("CAA") that states and local air districts adopt all measures to reduce emissions as

4  necessary to attain air quality standards set by the United States Environmental Protection

5  Agency ("EPA"). The CAA's cooperative federalism scheme explicitly reserves to states

6  the "primary responsibility" for controlling air pollution from stationary sources. Congress

7  would not have silently preempted in one statute the very pollution controls it demanded

8  in another.

9    Third, even if *CRA* applied, Plaintiffs' facial challenge would still fail because under

10  the stringent standard applicable to such claims, they cannot show the Rule is invalid in *all*

11  applications. The Rule regulates "process heaters" that are not subject to federal standards

12  and thus cannot be preempted. The Rule also allows for compliance through non-combus-

13  tion natural gas technologies, such as fuel cells, that have the potential to operate with zero

14  NOx emissions.

15    The District, like ten other California air districts and at least four other states, has

16  regulated appliance emissions for decades—a testament to states' essential role in protect-

17  ing public health through air pollution control. If Plaintiffs prevail, they would not just

18  invalidate this Rule; they would jeopardize numerous state and local air pollution regula-

19  tions that have never before been thought to implicate federal energy efficiency law.

20    This Court should reject Plaintiffs' attempt to expand EPCA preemption into a field

21  that both common sense and Congress recognize as distinct. It should therefore deny their

22  motion for summary judgment.

### BACKGROUND

23

24  **I.    Regulation of air pollution under state and federal law**

25    **A.    The cooperative-federalism structure of air pollution control**

26    In the 1960s, the federal government began to address the problem of air pollution.

27  *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63 (1975). Congress then established the

28  modern federal air pollution control program in the Clean Air Act of 1970, Pub. L. No. 91-

10

(73 of 261), Page 73 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 73 of 261
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 11 of 31    Page ID
#:1504

1   604, 84 Stat. 1676 (1970), with major amendments in 1977, Pub. L. No. 95-95, 91 Stat.
2   685 (1977), and 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990) (collectively "CAA").

3       As "[e]nvironmental regulation traditionally has been a matter of state authority,"
4   *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000), "Congress itself contem-
5   plated that the states would retain leading roles in regulating air quality when it passed the
6   Clean Air Act," *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir.
7   2011). Indeed, Congress concluded that "air pollution control at its source is the *primary*
8   *responsibility* of States and local governments." 42 U.S.C. § 7401(a)(3) (emphasis added).

9       Under the CAA's "cooperative federalism regime," *Comm. for a Better Arvin v.*
10  *EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015), EPA must set national ambient air quality stand-
11  ards for "criteria" pollutants: six specified pollutants known to endanger public health and
12  welfare. 42 U.S.C. § 7408(a)(1); 40 C.F.R. Part 50. States must then develop State Imple-
13  mentation Plans detailing the measures to reduce pollutant emissions to bring regions such
14  as the Basin into attainment of the national standards by statutory deadlines. 42 U.S.C. §
15  7410.

16      The CAA thus explicitly relies on states exercising their police powers to enact laws
17  to protect and govern their citizens. This police power encompasses "the power to protect
18  the health of citizens in the state," including "air pollution prevention." *Exxon Mobil*, 217
19  F.3d at 1255. Indeed, "[l]egislation designed to free from pollution the very air that people
20  breathe clearly falls within the exercise of even the most traditional concept of . . . the
21  police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960).

22      California's longstanding efforts to control air pollution have made it a global leader
23  in cleaning the air. *See* Cal. Health & Safety Code ("HSC") § 42321(a). In response to the
24  Basin's notorious smog, in 1947 the California Legislature authorized the Los Angeles
25  County Air Pollution Control District, the first air pollution regulatory agency in the nation
26  and predecessor to the District. 1947 Cal. Stat. ch. 632. When it created the District in
27  1976, the Legislature recognized that the Basin had "the most critical air pollution problem
28  in the nation." 1976 Cal. Stat. ch. 324, § 5 at 893.

11

California law grants the District "the primary responsibility for control of air pollution from all sources[,] other than vehicular sources," in the Basin. *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th Cir. 2005) (quoting HSC §§ 39002, 40000). To allow the District to fulfill this responsibility, the Legislature delegated to the District broad authority to adopt and enforce rules to reduce pollutant emissions to attain state and federal air quality standards. HSC §§ 40001, 40440, 40702, 40716. It also required the District to develop a plan to attain those standards for the Basin, *id.* § 40460(a), and adopt regulations to implement the plan, *id.* § 40001(a). The District thus has primary responsibility for ensuring that the Basin attains the federal air quality standards.

Reflecting the states' primary role in air pollution control, the CAA gives states "virtually absolute power in allocating emission limitations so long as the national standards are met." *Union Elec. Co. v. EPA*, 427 U.S. 246, 267 (1976). Thus, except for specific mobile emission sources not at issue here, the CAA directs that "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416; *see also id.* § 7543(a), (e) (narrowly preempting state regulation of vehicle emissions).

### B.    The District's ozone predicament

Ozone is a criteria pollutant for which the EPA sets national ambient standards. *See* 42 U.S.C. § 7408(a); 40 C.F.R. Part 50. Ozone forms in the atmosphere from a reaction of NOx with volatile organic compounds in the presence of sunlight. Defendant's Additional Material Facts ("AMF") 40. NOx are toxic, reactive gases that also directly endanger human health and the environment. AMF 41.

For decades the District has worked to bring the Basin into compliance with federal standards. However, the Basin continues to suffer from some of the worst air quality in the nation. AMF 42. In fact, the Basin is in "extreme" nonattainment for several federal ozone standards and has the highest ozone levels nationwide. *Id.*

12

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

(75 of 261), Page 75 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 75 of 261
Case 2:24-cv-10482-PA-PD   Document 53   Filed 05/12/25   Page 22 of 31   Page ID
#:1515

1   caps NOx emissions at 55 ppm. AMF 89. These regulations are not qualitatively different

2   from Rule 1146.2; they are simply less stringent. And a year before the District adopted

3   the Rule, the Bay Area Air Quality Management District adopted its own zero-NOx emis-

4   sion standards for appliances. AMF 90. Holding that EPCA preempts Rule 1146.2 would

5   jeopardize all of these regulations.

6   In trial court briefing in the *CRA* case, the California Restaurant Association ("the

7   Association") conceded that EPCA would not preempt these NOx emission limits. The

8   Association, which is also a plaintiff in this case, reassured the court that finding Berkeley's

9   building code to be preempted would not affect "all sorts of ordinary local regulations" of

10  covered products. AMF 91 (Cal. Rest. Ass'n Opp. to Mot. to Dismiss First Amend. Compl.,

11  *Cal. Rest. Ass'n v. City of Berkeley*, Case No. 4:19-cv-07668-YGR (N.D. Cal. 2021). The

12  Association stated that "regulations of nitrogen oxide emissions" were not at risk because

13  "[t]he express preemption clause in the EPCA does not bar *all* local regulations that affect

14  EPCA-covered appliances. It bars only local regulations that 'concern[] energy use.' Local

15  regulations . . . limiting the emissions of nitro[gen] oxide may affect EPCA-covered appli-

16  ances, but they do not 'concern energy use.'"[6] *Id.* The Association was correct the first

17  time.

18  **B.    EPCA specifically covers building codes. It says nothing about air
19         pollution regulation, which instead is subject to the exhaustive regime
         established by the Clean Air Act.**

20         **1.    EPCA is silent about state pollution control regulation.**

21  Plaintiffs ignore another key distinction between this case and *CRA*: EPCA *explicitly*

22  covers building codes regulating energy efficiency. *E.g.*, 89 F.4th at 1101 ("We conclude

23  only that EPCA applies to building codes and that Berkeley's ordinance falls with[in] the

24  Act's preemptive scope."). The court emphasized that, while EPCA preempts regulation

25  concerning appliances' energy use, it includes a limited exemption for such regulations in

26

27  ───────────────

28  [6] The District anticipates Plaintiffs will argue that this concession was limited to non-zero
    NOx standards. As explained above, however, EPCA's text does not support that theory,
    and it is foreclosed by *CRA* itself. *See supra.*

───────────────
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

(76 of 261), Page 76 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 76 of 261
Case 2:24-cv-10482-PA-PD   Document 53   Filed 05/12/25   Page 23 of 31   Page ID
#:1516

1  qualifying state or local building codes. 42 U.S.C. § 6297(f). Although Berkeley's ordi-

2  nance did not qualify for the exemption, this exemption was "of critical importance" to the

3  court's analysis because it shows that EPCA generally preempts building codes concerning

4  energy use. 89 F.4th at 1101.

5      Judge Baker's concurrence reiterated that the decision turned on Congress's express

6  inclusion of building codes. He observed that whereas EPCA "has everything to say about

7  'State or local building code[s]," the statute has "little, if anything, to say" about regulating

8  a utility's distribution of natural gas, for example. *Id.* at 1119 (Baker, J., concurring). As a

9  result, while EPCA would preempt non-exempt building codes, it likely would not preempt

10 regulation of a utility's distribution of natural gas. *Id.* at 1117-18. As Judge Baker recog-

11 nized, EPCA's silence about local regulations that only incidentally impact the energy use

12 of covered appliances means they are not preempted.

13     The same is true of the District's regulation of appliances' NOx emissions. In con-

14 trast to EPCA's in-depth treatment of building codes, it says nothing about regulation of

15 air pollution from appliances. And unlike Berkeley's ordinance, the Rule targets appli-

16 ances, not construction standards for new buildings.

17     There is no reason to believe Congress intended EPCA to preempt emission regula-

18 tions like the Rule. The Ninth Circuit emphasized that "the breadth of EPCA's preemption

19 provision 'does not mean the sky is the limit.'" *Id.* at 1103 (quoting *Dan's City Used Cars,*

20 *Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). Indeed, "applying the 'relate to' provision [in

21 preemption provisions] according to its terms was a project doomed to failure, since, as

22 many a curbstone philosopher has observed, everything is related to everything else." *Id.*

23 at 1117 (Baker, J., concurring) (quoting *Cal. Div. of Labor Stds. Enf't v. Dillingham Con-*

24 *str., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)).[7] Judge Baker concluded

25 that a pollution control policy with some similarities to an emission standard—a carbon

26

27

28 [7] In *CRA*, the Ninth Circuit interpreted the phrases "relate to" and "concerning" inter-
changeably. 89 F.4th at 1103.

23

1  tax—would not be preempted. "[A]s far as EPCA is concerned, states and local govern-

2  ments are likely free to impose carbon taxes designed to discourage such [natural gas] con-

3  sumption." *Id*. Concluding that Congress intended to preempt air districts' air pollution

4  regulations would sweep far beyond the *CRA* court's holding.

### 2. Congress spoke directly to state air pollution regulation in the Clean Air Act and called on states to regulate emissions from stationary sources like appliances to achieve federal air quality standards.

7      Pollution control regulation is not merely absent from EPCA; it is instead the subject

8  of a distinct and detailed federal program that expressly and uniquely relies on state regu-

9  lation to achieve federal legislative goals. Unlike Berkeley, the District is implementing

10  Congress's directive in the federal CAA to achieve the federal air quality standards. The

11  CAA directs EPA to set national air quality standards for six pollutants, including ozone.

12  Background § I.A, *supra*. The CAA and California law task the District with adopting all

13  measures necessary to attain the federal air quality standards within the Basin by EPA's

14  deadlines. *See* 42 U.S.C. § 7410(a); HSC §§ 40001(a), 40460. If the District fails to adopt

15  or enforce strategies that achieve the national air quality standards, it risks federal

16  enforcement actions and severe sanctions, including the loss of federal transportation

17  funding and restrictions on new development. *See* 42 U.S.C. §§ 7410(k)(5), 7413, 7509(b).

18      When the District began developing the Rule amendments in 2023, the Basin was

19  not in attainment of multiple federal standards for ozone. The District could not possibly

20  attain those standards by relying on the regulations in effect at the time. AMF 42

21  (describing the Basin's "extreme" nonattainment). Indeed, the District calculated that it

22  would need to reduce NOx emissions by at least an additional 67 percent relative to

23  baseline conditions in 2037 to meet the federal ozone standards. AMF 44. To achieve this

24  staggering reduction, the District concluded that the *only* "viable pathway" would be to

25  negate NOx emissions from "*all* stationary sources of pollutants, large and small, where

26  feasible." AMF 46 (emphasis added). Fossil-fuel-burning appliances are a significant

27  source of pollution in the Basin; they collectively account for 20 percent of all emissions

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:24-cv-10482 PA (PDx)

(78 of 261), Page 78 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 78 of 261
Case 2:24-cv-10482-PA-PD   Document 53   Filed 05/12/25   Page 25 of 31   Page ID
#:1518

1    from stationary sources regulated by the District. AMF 49. Thus, as it has many times

2    before (*see* Background § II., *supra*), the District amended an existing rule to further reduce

3    the NOx emissions from appliances. In doing so, it expressly found that no other regulatory

4    approach could achieve the Basin's air quality objectives. AMF 66. In sum, the CAA and

5    its ambient air quality mandates left the District no choice but to adopt the challenged Rule.

6         Despite the critical role the CAA played in the District's adoption of the Rule,

7    Plaintiffs never once mention it. They do not acknowledge its demanding air quality

8    standards or the District's legal obligation to meet them. But the District, unlike Plaintiffs,

9    is not at liberty to ignore the CAA. Faced with persistent nonattainment and the threat of

10   federal sanctions, the District took the needed steps to improve air quality by reducing

11   ozone emissions at the source. The resulting Rule is not an end-run around EPCA's national

12   standards. It is the CAA's cooperative federalism working as intended.

### C.    EPCA does not preempt regulations that only incidentally affect energy use.

13

14        At most, the Rule is one of a "a host of state and local regulations that incidentally

15   impact" the quantity of natural gas consumed by covered products, but do not regulate the

16   quantity of natural gas appliances use. *CRA,* 89 F.4th at 1117 (Baker, J., concurring) (quot-

17   ing 42 U.S.C. § 6291(4)). EPCA does not prohibit such regulations. *Id.* at 1103.

18        Courts have refused to find that the incidental effects of emission regulation on

19   energy use trigger EPCA's analogous preemption provision for vehicle fuel economy

20   standards. Similar to the preemption provisions at issue here, section 32919(a) of EPCA

21   forbids states from "adopt[ing] or enforc[ing] a law or regulation related to fuel economy

22   standards or average fuel economy standards" for those automobiles for which the federal

23   government has set a national standard. 49 U.S.C. § 32919(a).

24        In *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.Supp.2d 295

25   (D. Vt. 2007) ("*Green Mountain*"), the court held that EPCA did not preempt Vermont

26   regulations limiting greenhouse gas ("GHG") emissions from new vehicles "as part of a

27   comprehensive strategy to reduce" statewide GHG emissions. *Id.* at 339, 351-54. It held

28

**ATTACHMENT G**

```
┌─────────────────────────────────────────────────────────────┐
│                                                             │
│          SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT         │
│                                                             │
└─────────────────────────────────────────────────────────────┘
```

**Final Staff Report**

**Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters**

June 2024

**Deputy Executive Officer**
Planning, Rule Development, and Implementation
Sarah L. Rees, Ph.D.

**Assistant Deputy Executive Officer**
Planning, Rule Development, and Implementation
Michael Krause

**Planning and Rules Manager**
Planning, Rule Development, and Implementation
Heather Farr

| | |
|---|---|
| Authors: | Emily Yen – Assistant Air Quality Specialist |
| Contributors: | Peter Campbell – Air Quality Specialist |
| | Jennifer Vinh – Air Quality Specialist |
| | Farzaneh Khalaj, Ph.D. – Air Quality Specialist |
| | Daniel Penoyer – Air Quality Specialist |
| | Dana Maxie – AQ Engineer II |
| | Chwen-Jy Chang – AQ Engineer II |
| | Mark VonDerAu – AQ Analysis & Compliance Supervisor |
| | Bradley McClung – Program Supervisor |
| | Susan Tsai – Supervising Air Quality Engineer |
| | Angela Shibata – Senior AQ Engineering Manager |
| | David Ono – Senior AQ Engineering Manager |
| | David De Boer – Senior Enforcement Manager |
| | Jillian Wong, Ph.D. – Assistant Deputy Executive Officer |
| | Jason Aspell – Deputy Executive Officer |
| | Victor Yip – Assistant Deputy Executive Officer |
| | Terrence Mann – Deputy Executive Officer |
| Reviewed By: | Yanrong Zhu – Program Supervisor |
| | Kevin Ni – Program Supervisor |
| | Xian-Liang (Tony) Tian, Ph.D. – Program Supervisor |
| | Ruby Laity – Principal Deputy District Counsel |
| | Josephine Lee – Senior Deputy District Counsel |
| | Barbara Radlein – Planning and Rules Manager |

**Exhibit 2–Page 076**
**ER-79**

(80 of 261), Page 80 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 80 of 261
Case 2:24-cv-10482-PA Document 104-2 Filed 04/24/24 Page 52 of 53 Page ID #:1126

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................... ES-1

CHAPTER 1: BACKGROUND ............................................................................. 1-1

    INTRODUCTION ............................................................................................ 1-1
    REGULATORY BACKGROUND .................................................................. 1-1
    2022 AIR QUALITY MANAGEMENT PLAN ............................................... 1-3
    AFFECTED INDUSTRIES ............................................................................. 1-3
    PUBLIC PROCESS ........................................................................................ 1-3

CHAPTER 2: BARCT ASSESSMENT ................................................................. 2-1

    INTRODUCTION OF BARCT ASSESSMENT ............................................. 2-1
    EQUIPMENT CATEGORIES ........................................................................ 2-1
    BARCT ASSESSMENT ................................................................................. 2-2
    COST-EFFECTIVENESS AND INCREMENTAL COST-EFFECTIVENESS .................. 2-11
    ADDITIONAL BENEFITS AND CHALLENGES ........................................ 2-27

CHAPTER 3: SUMMARY OF PROPOSALS ....................................................... 3-1

    INTRODUCTION ............................................................................................ 3-1
    PROPOSED AMENDED RULE STRUCTURE ............................................. 3-1
    PROPOSED AMENDED RULE 1146.2 ........................................................ 3-1

CHAPTER 4: IMPACT ASSESSMENT ............................................................... 4-1

    INTRODUCTION ............................................................................................ 4-1
    EMISSIONS INVENTORY AND EMISSION REDUCTIONS ........................... 4-1
    COST-EFFECTIVENESS ............................................................................... 4-4
    SOCIOECONOMIC IMPACT ASSESSMENT ............................................. 4-6
    CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA) ANALYSIS SUMMARY .. 4-6
    DRAFT FINDINGS UNDER HEALTH AND SAFETY CODE SECTION 40727 ............... 4-6
    COMPARATIVE ANALYSIS ........................................................................ 4-7

APPENDIX A: DETAILED CEQA ANALYSIS .................................................... A-1

APPENDIX B: RESPONSES TO COMMENTS ................................................... B-1

Exhibit 2–Page 078
ER-80

(81 of 261), Page 81 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 81 of 261
Case 2:24-cv-10482-PA Document 64-12/Filed 04/Page554 Page55 Page ID #:1128
ID #:1128

# EXECUTIVE SUMMARY

South Coast AQMD Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters (Rule 1146.2), regulates oxides of nitrogen (NOx) emissions from natural gas-fired large water heaters, small boilers, and process heaters that have a rated heat input capacity of less than or equal to two million British thermal units (Btu) per hour. This rule does not regulate residential gas-fired tank type water heaters rated ~~at~~ less than 75,000 Btu/hr heat input, which are regulated under Rule 1121 – Control of Nitrogen Oxides from Residential-Type, Natural Gas-Fired Water Heaters (Rule 1121); however, instantaneous water heaters and pool heaters used in residential structures are regulated by Rule 1146.2 due to the higher Btu ratings of those type of units. The provisions of Rule 1146.2 are applicable to manufacturers, distributors, retailers, installers, refurbishers, and operators.

Rule 1146.2 was initially adopted in January 1998. A Best Available Retrofit Control Technology (BARCT) assessment was conducted for the 2006 amendment where the NOx emission limits were lowered from 30 parts per million by volume (ppmv) to 20 ppmv, except for pool heaters, which remained at 55 ppmv. The rule was last amended in 2018 to remove the exemption for facilities in the REgional CLean Air Incentives Market (RECLAIM) and to require applicable new installations in RECLAIM facilities to meet the 20 ppmv NOx emission limits.

Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters (PAR 1146.2), seeks further NOx emission reductions and implements the 2022 Air Quality Management Plan (AQMP) Control Measure C-CMB-01 - Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Commercial Water Heating (Control Measure C-CMB-01).

For PAR 1146.2, staff conducted a comprehensive BARCT assessment which included an analysis of the technical feasibility and cost-effectiveness of zero-emission NOx technologies. PAR 1146.2 proposes to divide the applicable large water heaters, small boilers, and process heaters into different categories and require zero-emission (0 ppmv) limits for new installations based on future effective dates ~~depending on the commercial availability of zero-emission technologies~~. The zero-emission compliance dates are further differentiated for units installed in new or existing buildings. The future effective dates will allow time for the technology to mature, with longer timelines provided for the technologies that are not widely commercially available at this time. PAR 1146.2 also proposes zero-emission limits for existing units that will reach the end of unit age after the zero-emission compliance dates, with an exemption for units used for residential structures and small businesses and provides alternative compliance options and a low-use exemption to address challenges transitioning to zero-emission technologies. In addition, PAR 1146.2 clarifies and updates rule language, restructures the rule, and removes obsolete language.

PAR 1146.2 will affect approximately 1,070,000 units in the South Coast AQMD. Staff estimates that upon full implementation, PAR 1146.2 will reduce NOx emissions by 5.6 tons per day (tpd). The public process for PAR 1146.2 consisted of five working group meetings, a public workshop, a public consultation, and multiple meetings with industry stakeholders and technology vendors to obtain feedback.

Exhibit 2–Page 080
ER-81

(82 of 261), Page 82 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 82 of 261
Case 2:24-cv-10482-PA Document 1 Filed 12/05/24 Page 555 of 856 Page ID Page 104
ID #:1129

# CHAPTER 1: BACKGROUND

**INTRODUCTION**

**REGULATORY BACKGROUND**

**2022 AIR QUALITY MANAGEMENT PLAN**

**AFFECTED INDUSTRIES**

~~**AFFECTED EQUIPMENT**~~

**PUBLIC PROCESS**

Exhibit 2–Page 081
ER-82

(83 of 261), Page 83 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 83 of 261
Case 2:24-cv-10482-PA Document 41-1 Filed 04/14/25 Page 557 of 300 Page #1,0.2
ID #:1130

## INTRODUCTION

Rule 1146.2 limits NOx and carbon monoxide (CO) emissions from natural gas-fired large water heaters, small boilers, and process heaters that have a rated heat input capacity less than or equal to two million Btu per hour (MMBtu/hr). The rule was initially adopted in January 1998, and beginning on January 1, 2000, the provisions of the rule were applicable to manufacturers, distributors, retailers, refurbishers, installers, and operators of new units. Beginning July 1, 2002, the provisions of the rule were also applicable to operators of existing Type 2 units.

In Rule 1146.2, units are split into two categories based on rated heat input capacity: Type 1 units for units rated ~~at~~ less than or equal to 400,000 Btu per hour (kBtu/hr) and Type 2 units for units rated ~~at~~ greater than 400 kBtu/hr and less than or equal to 2 MMBtu/hr. Rule 1146.2 does not regulate residential gas-fired tank type water heaters rated less than 75,000 Btu/hr heat input, which are regulated under South Coast AQMD Rule 1121. However, instantaneous water heaters, also known as tankless water heaters, and pool heaters used in residential structures are regulated by Rule 1146.2 due to the higher Btu ratings of those type of units. Units used in recreational vehicles are exempt from the requirements of Rule 1146.2.

## REGULATORY BACKGROUND

Rule 1146.2 was initially adopted in 1998 and has been amended three times: in 2005, 2006, and 2018. The table below summarizes the current NOx and CO emission limits required in Rule 1146.2.

### Table 1-1. Current Rule 1146.2 NOx and CO Emission Limits

| Equipment Category | NOx Emission Limit* | CO Emission Limit* |
|---|---|---|
| **Type 1 Units, excluding Pool Heaters** | 14 ng/J or 20 ppmv | N/A** |
| **Type 1 Pool Heaters** | 40 ng/J or 55 ppmv | N/A** |
| **Type 2 Units** | 14 ng/J or 20 ppmv | 400 ppmv |

\*    Nanograms per Joule (ng/J) of NOx (calculated as $NO_2$) of heat output or the specified ppmv of NOx or CO at three percent oxygen ($O_2$) correction, on a dry basis

\*\*  Type 1 units are not subject to a CO limit by Rule 1146.2 but may be subject to CO limits by other South Coast AQMD rules.

South Coast AQMD developed the Rule 1146.2 Certification Program in 1998 which requires manufacturers to submit documentation for new unit models, including source test reports, to South Coast AQMD to demonstrate compliance with Rule 1146.2 emission limits.

Rule 1146.2, as adopted in January 1998, required new Type 2 water heaters or boilers to meet an emission limit of 30 ppmv of NOx or 0.037 pound NOx per million Btu of heat input and 400 ppmv of CO. New Type 1 units were required to meet a NOx emission limit of 55 ppmv of NOx or 40 ng/J of heat output. Compliance dates for the emission limits were based on the date of unit manufacture. Following rule adoption, staff prepared three implementation studies as required by

Exhibit 2–Page 082
ER-83

(84 of 261), Page 84 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 84 of 261
Case 2:24-cv-10482-PA Document 1-4 Filed 04/04/24 Page 557 Page 58 of 3000 Page
ID #:1131

the rule. A working group comprised of manufacturers, end-users, utilities, and other interested parties was convened to provide input and guidance to staff during each of the three implementation studies. The purpose of the third and final implementation study, Phase III Implementation Study, was to evaluate the requirement for retrofit of units greater than 400 kBtu/hr and less than or equal to 1 MMBtu/hr (smaller Type 2 units). The findings of the Phase III Implementation Study were presented at the July 2004 Governing Board meeting. The Phase III Implementation Study recommended modifying retrofit requirements and evaluating whether lower NOx emission limits were feasible for new equipment.

Based on the findings of the Phase III Implementation Study, Rule 1146.2 was amended on January 7, 2005, to require existing in-use equipment to comply with the emission limit once the unit reached 15 years of unit age, and to address technical and cost issues for the retrofit of existing units. The rule was amended to require smaller Type 2 units up to 1 MMBtu/hr manufactured prior to January 1, 2000 with unit age over 15 years to be retrofitted to meet 30 ppmv NOx limit and 400 ppmv CO limit; and require larger Type 2 units up to 2 MMBtu/hr manufactured on and after 1992 with unit age over 15 years to be retrofitted to meet 30 ppmv NOx limit and 400 ppmv CO limit. Lower emission limits for new equipment were not considered for the January 7, 2005, rule amendment because additional time was needed to evaluate low NOx technologies and their cost-effectiveness.

Rule 1146.2 was amended again in May 2006 to establish lower NOx emission limits for new equipment. Staff noted that the technology to reduce NOx emissions was available, that many of the new Rule 1146.2 boilers and heaters sold met the proposed 20 ppmv limit, and that the proposed amended rule allowed manufacturers four to six years to design equipment which would meet the proposed limit. New manufactured units rated greater than 400 kBtu/hr were required to meet a NOx emission limit of 20 ppmv effective January 1, 2010, and new manufactured units rated less than or equal to 400 kBtu/hr, with the exception for pool heaters, had to meet a 20 ppmv (less than 14 ng/J heat output) NOx limit effective January 1, 2012. The NOx limit for pool heaters rated less than or equal to 400 kBtu/hr remained at 55 ppmv (or 40 ng/J heat output) because it was deemed not cost-effective for this category to meet a 20 ppmv NOx limit at the time of the rulemaking, primarily due to the small number of hours these units operate each year.

Rule 1146.2 was amended in 2018 along with Rule 1146 – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam Generators, and Process Heaters, and Rule 1146.1 – Emissions of Oxides of Nitrogen from Small Industrial, Institutional, and Commercial Boilers, Steam Generators, and Process Heaters. The 2018 rule amendments were to create landing rules in anticipation of the sunset of the RECLAIM program when facilities would be transitioned to a command-and-control regulatory structure. The amendment for Rule 1146.2 extended the applicability to the RECLAIM facilities and required the RECLAIM facilities to meet applicable NOx emission limits by December 31, 2023, for new installations. The 2018 amendment also committed staff to conduct a BARCT technology assessment by January 2022 to determine if a more stringent BARCT requirement should be applied to existing Type 2 units operated in RECLAIM facilities. About 80 RECLAIM facilities have been identified to operate one or more Rule 1146.2 units.

A technology assessment for Rule 1146.2 was completed by January 1, 2022, determining that the NOx emission limits should be lowered in order to satisfy BARCT requirements. Staff evaluated water heaters and boilers rated less than or equal to 2 MMBtu/hr in both non-RECLAIM and RECLAIM facilities and reviewed certification test reports submitted in recent years to understand

the actual emission levels of certified models and the potential for achieving NOx emission reductions. Staff reviewed 137 source tests conducted since 2017 for units required to be certified at 20 ppmv for NOx emissions and found that 39 units (28 percent of units) had NOx concentrations less than 12 ppmv and 21 units (15 percent of units) had NOx concentrations less than 10 ppmv. As part of the 2021 technology assessment, staff met with stakeholders seeking their input and conducted a working group meeting on December 16, 2021. Staff recommended a future rule amendment and BARCT assessment to evaluate the potential for further NOx emission reductions.

## 2022 AIR QUALITY MANAGEMENT PLAN

The 2022 Air Quality Management Plan (AQMP) adopted on December 2, 2022, set forth a path for improving air quality and meeting federal air pollution standards by striving for zero-emission technologies across all sectors. The 2022 AQMP included Control Measure C-CMB-01, which seeks further NOx emission reductions from commercial building water heating sources subject to Rule 1146.2. Control Measure C-CMB-01 proposed an emission reduction of NOx by 70 to 75 percent by 2037. The control strategy focused on a combination of long-term regulation and short-term incentives with a focus on replacing existing water heaters with new zero-emission units. The incentive approach would achieve additional emission reduction, encouraging use and further technology development of zero-emission water heating for existing buildings. PAR 1146.2 will implement the 2022 AQMP Control Measure C-CMB-01.

## AFFECTED INDUSTRIES

Rule 1146.2 is applicable to manufacturers, distributors, refurbishers, retailers, resellers, installers, and operators of natural gas-fired large water heaters, small boilers, and process heaters less than or equal to 2 MMBtu/hr. The affected industries include water heater and boiler manufacturing and supply industries, professional installers, and facilities and residents that operate these types of water heaters and boilers. Nearly all industries will be affected by PAR 1146.2. Staff estimated a total of 1,070,000 units in the South Coast AQMD are regulated by PAR 1146.2.

## PUBLIC PROCESS

PAR 1146.2 was developed through a public process that began in the second quarter of 2023 and included a series of working group meetings, individual stakeholder meetings, and site visits to affected facilities. South Coast AQMD staff held five working group meetings on April 26, 2023, June 7, 2023, August 30, 2023, October 19, 2023, and December 13, 2023. The working group is composed of representatives from manufacturers, trade organizations, permit stakeholders, businesses, environmental groups, public agencies, consultants, and other interested parties. The purpose of the working group meetings was to present and discuss staff's BARCT assessment and the development of the proposed amendments and NOx limits for PAR 1146.2. Staff presented initial preliminary draft rule language at the working group meeting on December 13, 2023. A public workshop was held on February 7, 2024, and a public consultation was held on February 23, 2024. Staff presented PAR 1146.2 to the Stationary Source Committee on March 15, 2024, and April 19, 2024, and will present it to the committee on May 17, 2024. The table below summarizes the public meetings held throughout the development of PAR 1146.2 and provides a summary of the key topics discussed at each of the working group meetings.

Exhibit 2–Page 084
ER-85

# CHAPTER 2: BARCT ASSESSMENT

**INTRODUCTION OF BARCT ASSESSMENT**

**EQUIPMENT CATEGORIES ~~AND PROCESSES~~**

**BARCT ASSESSMENT**

**COST-EFFECTIVENESS AND INCREMENTAL COST-EFFECTIVENESS**

**ADDITIONAL BENEFITS AND CHALLENGES**

Exhibit 2–Page 088
ER-86

(87 of 261), Page 87 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 87 of 261
Case 2:24-cv-10482-PA Document 1-5 Filed 04/24/24 Page 63 of 64 Page
ID #:1137

## INTRODUCTION OF BARCT ASSESSMENT

The purpose of a BARCT assessment is to assess available pollution controls to establish emission limits for specific equipment categories consistent with state law. Under Health and Safety Code Section 40406, BARCT is defined as:

> "an emission limitation that is based on the maximum degree of reduction achievable, taking into account environmental, energy, and economic impacts by each class or category of source."

The BARCT assessment follows a framework through the rule development process and includes public participation. The figure below illustrates the overall BARCT assessment approach.



**Figure 2-1. BARCT Assessment Approach**

For PAR 1146.2, staff conducted a thorough technology assessment to evaluate the NOx control technologies that will achieve the BARCT level equipment subject to PAR 1146.2. The technology assessment consists of four steps including the assessment of South Coast AQMD requirements, a complete assessment of emission limits of existing units, review of other regulatory requirements, and assessment of available pollution control technologies. Cost-effectiveness was estimated for each control technology which staff has referenced for the proposed BARCT emission limit.

## EQUIPMENT CATEGORIES

One of the first steps in the BARCT assessment is to establish the category of equipment. Staff collaborated with the stakeholders to establish the categories by accounting for the type of equipment and other unique features of the units. Compared with the current Rule 1146.2, PAR 1146.2 defines Type 1 and Type 2 units by the same heat input capacities, except that additional categories are defined for Type 1 and Type 2 units for different implementation schedules. Staff categorized the equipment subject to PAR 1146.2 as presented in Table 2-1:

Exhibit 2–Page 089
ER-87

### Electric Resistance Technology

Another common zero-emission water heating technology is electric resistance water heating with storage. Generally, this consists of an insulated steel tank with two electric resistance elements that heat the water. These units are available in a large range of sizes for the commercial market. For a commercial electric boiler, no air intake or exhaust venting is required. There are also instantaneous/mini-tank (point-of-use) electric water heaters which provide hot water at the consumption point and only heat water when necessary. For pool heating, electric resistance swimming pool heaters are a more efficient option than gas-fired pool heaters.

There are also commercial hybrid electric water heaters which utilize heat pump heating and electric resistance heating. These units pull heat from the surrounding air to heat water and use less energy than a standard electric water heater. A commercial heat pump boiler would consist of an all-electric heat pump with an optional built-in backup electric boiler for very cold days.

### Solar Water Heating Technology

Solar water heating is another option, where solar thermal hot water systems range in size from conventional-sized systems to large industrial applications and consist of flat plate collectors, a controller, pump, storage. There are also swimming pool solar heaters which consist of solar collectors, filters, pumps, and control valves. They can be standalone units, with collectors mounted on roofs or anywhere near the pool.

### Fuel Cell Technology

Fuel cells have a broad range of applications from multi-megawatt systems to small units and continue to expand with emerging technologies.[11] Cost and durability are still critical challenges, and studies have indicated price ranges between $4,000 to $20,000 per kW. Natural gas fuel cells produce some NOx emissions. Staff recognizes the applications of zero-emission fuel cells and that this is an emerging technology. Over 100,000 fuel cells have been deployed in Europe and over 300,000 units in Japan primarily for residential applications.[12] Fuel cell adoption in California currently is limited. However, fuel cell technology has the potential to replace existing units to meet the zero-emission limits, and it is especially promising for future high temperature applications.

## COST-EFFECTIVENESS AND INCREMENTAL COST-EFFECTIVENESS

### Initial BARCT Emission Limit and Other Considerations

After completing the technology assessment, staff recommends an initial BARCT NOx emission limit established using information gathered from the technology assessment. All provided emission concentration values (i.e., initial and final) in this report refer to concentration in terms of parts per million by volume (ppmv) based on a dry basis. Additionally, staff evaluates other considerations that could affect the emission limits that represent BARCT, including limits for those units operating close to the BARCT NOx limits. Heat pump technologies are still the main technologies that can achieve in the nearer-term the NOx concentration limits proposed in PAR

---

[11] U.S. Department of Energy, Multi-Year Research, Development, and Demonstration Plan, https://www.energy.gov/sites/default/files/2017/05/f34/fcto_myrdd_fuel_cells.pdf

[12] PACE, Fuel Cell micro-Cogeneration reaches another milestone in Japan, https://pace-energy.eu/fuel-cell-micro-cogeneration-reaches-another-milestone-in-japan/

Exhibit 2–Page 099
ER-88

1146.2. Summary of the BARCT assessment and staff's recommendations based on feasibility is shown below.

**Method for Cost-Effectiveness and Incremental Cost Effectiveness Analysis**

The South Coast AQMD routinely conducts cost-effectiveness analyses for proposed rules and proposed amended rules and regulations that result in the reduction of criteria pollutants (NOx, SOx, VOC, PM, and CO). The analysis is used as a measure of the relative effectiveness of a proposal. It is generally used to compare and rank rules, control measures, or alternative means of emissions control relating to the cost of purchasing, installing, and operating control equipment to achieve the projected emission reductions. The major components of the cost-effectiveness analysis are capital costs, emission reductions, discount rate, and equipment useful life. The cost-effectiveness for PAR 1146.2 was completed using the discounted cash flow method, explained below:

> *Discounted Cash Flow (DCF)*

The DCF method converts all costs, including initial capital investments and costs expected in the present and all future years of equipment useful life, to present value. Conceptually, it is as if calculating the number of funds that would be needed at the beginning of the initial year to finance the initial capital investments and to set aside to pay off the annual costs as they occur in the future. The fund that is set aside is assumed to be invested and generates a rate of return at the discount rate chosen. The final cost-effective measure is derived by dividing the present value of total costs by the total emissions reduced over the equipment useful life. The equation below is used for calculating cost-effectiveness with DCF. The equation was presented in the 2022 AQMP Socioeconomic Report Appendix 2-B (p. 2-B-3):

$$Cost-effectiveness = \frac{Initial\ Capital\ Investments\ +\ (Annual\ O\&M\ Costs \times PVF)}{Annual\ Emission\ Reductions \times Years\ of\ Equipment\ Life}$$

Where       O&M  = Operation and Maintenance; and
                  PVF  = Present Value Factor.

**Equation 2-1. Discounted Cash Flow Cost Effectiveness Equation**

And the PVF is calculated as follows:

$$PVF = \frac{(1+r)^N - 1}{r * (1+r)}$$

Where       r  = real interest rate (discount rate); and
              N = years of equipment life.

**Equation 2-2. PVF Equation**

Finally, Health and Safety Code Section 40920.6 (a)(3) states that an incremental cost-effectiveness assessment should be performed on identified potential control options that meet air quality objectives. To determine the incremental cost-effectiveness under this paragraph, South Coast AQMD calculates the difference in the dollar costs divided by the difference in the emission

(90 of 261), Page 90 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 90 of 261
Case 2:24-cv-10482-PA Document Filed 04/01/25 Page 576 Page ID #:1149

Chapter 2                                                                BARCT Assessment

reduction potentials between each progressively more stringent potential control option as compared to the next less expensive control option. Once the BARCT assessment is complete and NOx limits are established, staff considers incrementally more stringent options to demonstrate that the NOx limit represents the "maximum degree of reduction achievable by each class or category." The equation for incremental cost-effectiveness is below:

$$I\text{-}CE\left(\$/_{tons\ NOx\ reduced}\right) = \frac{Incremental\ Difference\ in\ Cost\ (Present\ Worth\ Value)}{Incremental\ Difference\ in\ Emission\ Reductions\ (Lifetime\ Reductions)}$$

Where          I-CE = Incremental Cost-Effectiveness

**Equation 2-3. Incremental Cost Effectiveness Equation**

For PAR 1146.2, staff did not identify multiple control options that would meet the air quality objectives. The 2022 AQMP's objective is to transition to zero-emission technologies wherever feasible and staff identified technically feasible zero-emission control options for each category of equipment subject to Rule 1146.2; therefore, staff did not conduct an incremental cost-effectiveness assessment.

**Summary of Cost-Effectiveness Analysis and Incremental Cost-Effectiveness Analysis**

In order to determine cost-effectiveness for the proposed BARCT limits, cost information and estimates for the control equipment were obtained. Staff met with multiple manufacturers and stakeholders to gather cost data and estimates for various types of units. In addition, staff also sent out a survey to the facilities to gather equipment data and cost information for recent NOx control projects. After cost information was obtained, a bottom-up approach evaluated each unit category subject to PAR 1146.2 and cost-effectiveness analysis was conducted on a per equipment basis. Baseline emissions for each equipment were calculated using the assumption methodology outlined in Chapter 4.

*Natural Gas-Fired Unit Efficiency*

A major manufacturer recommended utilizing 95 percent efficiency for gas-fired units in cost effectiveness calculations. Currently products in the market range from 80 to 95 percent, with older units being less efficient. Some products in the market can reach a 95 percent efficiency, and manufacturers suggested that future U.S. Department of Energy (U.S. DOE) or CEC standards may be raised to require 95 percent efficiency. As not all units currently achieve 95 percent efficiency, this assumption results in an overestimate of the cost to switch to zero-emission technologies; however, the cost-effectiveness assessment is for future available technologies, so staff agreed to use the 95 percent efficiency assumption. For Type 1 pool heaters, staff utilized 84 percent efficiency to align with the U.S. DOE standard.

*Capacity Factors*

The capacity factor is the proportion of time the unit is expected to operate. Consistent with the rule development process for the Rule 1146.2 amendments in 2006, the analysis assumed the capacity factor for Type 1 and Type 2 natural gas-fired water heaters and boilers to be 21.5 percent, meaning the unit is estimated to operate 21.5 percent of time at maximum heat input capacity. This assumption was taken from a manufacturer survey conducted during the previous Rule 1146.2 rule development.

(91 of 261), Page 91 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 91 of 261
Case 2:24-cv-10482-PA-DFM Document 36-12 Filed 04/24/25 Page 577 of 800 Page
ID #:1150

Chapter 2                                                                                           BARCT Assessment

Instantaneous on-demand units operate at high heat for less time than tank-type units operate. The Energy Star's estimated annual usage for the natural gas-fired instantaneous water heater example is 178 therms or 17.8 MMBtu. The analysis divided 17.8 MMBtu by 8,760 hours in a year which resulted in approximately 2,032 Btu/hr. This number is used to estimate the capacity factor for a typical instantaneous water heater rated at 150,000 Btu/hr: 2,032 Btu/hr ÷ 150,000 Btu/hr = 0.0135.

### Incremental Installation, Maintenance, and Labor Cost

The PAR 1146.2 analysis previously considered negligible incremental maintenance and labor costs, since the requirement for zero-emission units is at the end of natural gas-fired unit age, when similar costs will be required for another natural gas-fired unit. Stakeholders commented that installation costs for heat pumps are higher than for gas units, not including equipment costs, and staff increased the unit capital cost of the zero-emission units in the cost-effectiveness analysis by 20 percent to represent additional installation and other costs. For some units this may be an overestimate, for some it may be an underestimate so applying the additional costs to all units is a conservative assumption. As heat pump installations become more commercially available and common, installation costs are anticipated to be comparable to installation costs for conventional units.

### Electrical Panel Upgrade Cost

In some instances, the transition to zero-emission units will require the electrical panel to be upgraded, which will add costs for the owner or operator of the units. For the cost-effectiveness analysis, the analysis relied on the panel upgrade cost estimate of $5,000 from the 2022 AQMP and considered a useful life of 30 years for the panel. However, the cost of an electrical panel upgrade was adjusted to account for this longer useful life of the electrical panel versus the unit. For panel upgrade cost in the PAR 1146.2 cost-effectiveness calculation, $2,500 was utilized for pool heaters (considering the 15-year useful life) and $4,200 was utilized for other categories (considering the 25-year useful life). For some categories involving residential units, the panel cost was split in half to account for use by multiple residential appliances. Additionally, staff assumed that 50% of residential buildings would require a panel upgrade. Data from TECH Clean California, the state-wide heat pump rebate program, showed that 9% of residential buildings required a panel upgrade. Staff expects 50% to be an overestimate but is utilizing the more conservative estimate in the analysis. Electrical panel upgrades will not be required for all instances where conventional units are replaced with zero-emission units, so staff assessed the cost-effectiveness with and without the estimated cost of the upgrades.

### Applicable Units Recategorization

PAR 1146.2 defines additional categories for Type 1 and Type 2 units, shown in the figure below.

Exhibit 2–Page 102
ER-91

Chapter 2                                                                                    BARCT Assessment



**Figure 2-3-4. PAR 1146.2 Applicable Units Recategorization**

### Type 1 Water Heaters

For storage water heaters, U.S. DOE estimates a useful life of 10 to 15 years.[13] For the 2022 AQMP Control Measure C-CMB-01 development, the analysis assumed a 15 year useful life for commercial water heaters.[14] For this reason, the analysis for Type 1 water heaters assumes a 15-year useful life and four percent discount rate and thus a PVF of 11.118, as calculated per Equation 2-2, and the estimated cost of an electrical panel upgrade of $2,500.

### Type 2 Water Heaters

Meetings and site visits with manufacturers during the rulemaking process indicated a useful life of under and over 25 years for gas-fired water heaters. For Type 2 water heaters, the analysis assumes a 25-year useful life and four percent discount rate thus a PVF of 15.622, as calculated per Equation 2-2, and the estimated cost an electrical panel upgrade of $4,200.

### Type 1 Pool Heaters

According to U.S. DOE, heat pump swimming pool heaters work efficiently as long as the outside temperature remains above the range of 45 to 50 degrees Fahrenheit. The cooler the outside air that a heat pump draws in, the less efficient it is. However, as outdoor pools are more frequently used during warm and mild weather, this reduced efficiency is generally not an issue. Heat pump pool heaters may cost more than natural gas-fired pool heaters, but they typically have much lower annual operating costs due to their higher efficiency. With proper maintenance, heat pump pool heaters typically last longer than gas pool heaters. U.S. DOE estimates that with proper installation and maintenance, heat pump pool heaters can last 10 or more years.[15] For Type 1 pool heaters, the analysis assumes a 15-year useful life and four percent discount rate and thus a PVF of 11.118, as calculated per Equation 2-2, and the estimated cost for an electrical panel upgrade of $2,500. If splitting the panel cost between pool heating and other residential appliances, the panel cost is

---

[13] U.S. Department of Energy, Tankless or Demand-Type Water Heaters,
https://www.energy.gov/energysaver/tankless-or-demand-type-water-heaters
[14] South Coast AQMD, 2022 AQMP, https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/appendix-iv-a.pdf?sfvrsn=18
[15] U.S. Department of Energy, Heat Pump Swimming Pool Heaters, https://www.energy.gov/energysaver/heat-pump-swimming-pool-heaters

---

PAR 1146.2 Final Staff Report                    2-15                                      June 2024
**Exhibit 2–Page 103**
**ER-92**

(93 of 261), Page 93 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 93 of 261
Case 2:24-cv-10482-PA-Doc-Document-see 42/0x4 04/Page578 Dag857 Page 80 D #:154
ID #:1152

$2,500 \div 4 = \$625$. The analysis also utilizes the residential utility rate forecast for Type 1 pool heaters.

### Type 1 and Type 2 High Temperature Units

Meetings and site visits with manufacturers during the rulemaking process indicated a useful life of under and over 25 years for gas-fired boilers, or high temperature units. For Type 1 and Type 2 high temperature units, the analysis assumes a 25-year useful life and four percent discount rate and thus a PVF of 15.622, as calculated per Equation 2-2, and the estimated cost for an electrical panel upgrade of $4,200.

### Instantaneous Water Heaters

U.S. DOE estimates a useful life of more than 20 years for instantaneous water heaters.[16] For instantaneous water heaters, the analysis assumes a 25-year useful life and four percent discount rate and thus a PVF of 15.622, as calculated per Equation 2-2, and the estimated cost of an electrical panel upgrade of $4,200. If splitting the panel cost between pool heating and other residential appliances, the panel cost is $4,200 \div 4 = \$1,050$.

#### Estimating Fuel Switching Cost

The analysis considered the cost impacts of transitions from conventional combustion heating that uses natural gas to zero-emission technologies that use electricity as part of the cost-effectiveness assessment. For this assessment, the analysis relied upon the fuel price estimates which are based on a combination of CEC's 2023 Integrated Energy Policy Report and Energy Information Administration (EIA) national level forecasts. The current CEC forecast extends to 2050. Electricity forecasts are based on the Los Angeles Department of Water and Power (LADWP) and Southern California Edison (SCE) planning areas. Natural gas forecasts are only based on Southern California Gas company forecasts, as Southern California Gas company is the primary gas utility in the region. Forecasted prices will not match observed electric and natural gas prices in any given year and may differ materially. Current prices are affected by demand and supply shocks, geopolitical factors, and other considerations which are all unforecastable. However, the CEC forecasts are created through a rigorous modeling process and reflect the best available expectation for future prices in the region. CEC forecasts are released every two years.

The analysis utilizes the residential utility rate forecast for Type 1 pool heaters and instantaneous water heaters, and commercial utility rate forecast for other units.

Since the forecasted prices for LADWP and SCE differ, staff calculated a weighted average price based on the population served by each utility as follows:

- LADWP: 4 million $\div$ 17.2 million (Population served by LADWP $\div$ regional population) = 0.23
- SCE: 13.2 million $\div$ 17.2 million = 0.77

To estimate the fuel switching cost by category for replacement of natural gas-fired units with zero-emission technology, the analysis:

---

[16] U.S. Department of Energy, Tankless or Demand-Type Water Heaters,
https://www.energy.gov/energysaver/tankless-or-demand-type-water-heaters

Exhibit 2–Page 104
ER-93

1. Estimated the daily electricity demand (in kWh) of the electric unit which will be replacing the existing natural gas fired unit;

2. Estimated the daily natural gas demand (in therms) of the existing natural gas fired unit;

3. Multiplied the daily demand for each fuel type by the number of operating days in a year to estimate the annual energy demand of each unit;

4. Multiplied the annual energy demand in each year and for each fuel type by the forecasted price of each fuel in that year to estimate the annual fuel cost for each unit;

5. Netted the difference between the total electricity cost and total natural gas cost to estimate incremental fuel switching cost in each year.

The list of steps explains the process to estimate switching costs of a single unit. The analysis also utilized a bottom-up calculation with individual units that fill similar roles from different categories. The daily electricity and natural gas demand values were estimated by the following approaches, where applicable.

***Energy Input Estimate Method***

With this method, the fuel switching costs for electric replacement units were estimated based on electric input values (kWh) provided by the unit manufacturer.

***Energy Input Calculation Method***

For situations where the energy input was not provided by a unit manufacturer, an alternate, more conservative method than the Energy Input Estimate Method was relied upon to calculate fuel switching cost, which is referred to here as the "Energy Input Calculation Method." There are certain factors that this alternate method does not take into account. For example, while the Energy Input Calculation Method assumes the same amount of energy output for the gas unit and electric replacement unit via hot water, the oversizing of heat pumps replacing gas-fired units and cycling losses may not be represented. To calculate daily kWh input:

Gas Unit Rating in Btu/hr × 24 hours × Gas Unit Capacity Factor ÷ 3,412.14 Btu/kWh × Gas Unit Efficiency ÷ COP Heat Pump Efficiency

**Equation 2-4. Energy Input Calculation Method Equation**

Note that 1 kWh = 3,412.14 Btu.

*Cost and Cost-Effectiveness*

***Cost-Effectiveness Screening Threshold***

The 2022 AQMP established a cost-effectiveness screening threshold of $325,000 per ton of NOx reduced based on 2021 dollars. The 2022 AQMP stated that this screening threshold will be adjusted based on the annual California Consumer Price Index (CPI). PAR 1146.2 currently considers a $349,000 per ton of NOx reduced cost-effectiveness screening threshold using 2022 dollars. The 2022 AQMP threshold is neither considered a starting point for control costs, nor an absolute cap.

***Type 1 Water Heater***

The analysis considered the potential replacement of a 76,000 Btu/hr natural gas-fired Type 1 water heater with a zero-emission heat pump water heater. The capital cost for a natural gas-fired

Exhibit 2–Page 105
ER-94

(95 of 261), Page 95 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 95 of 261
Case 2:24-cv-10482-PA-DFM Document 104-1 Filed 04/09/24 Page 96 of 261 Page
ID #:1154

unit is estimated at \$7,000, which was derived from the Rule 1146.2 May 2006 final staff report which estimated the cost for a unit with a heat rating ranging from 100,000 to 300,000 Btu/hr and adjusted to present value by the CPI Inflation Calculator. A manufacturer provided the capital cost of \$11,000 for a zero-emission indoor packaged commercial heat pump unit with a COP of 4.2. The annual energy input of 5,841 kWh was provided by the manufacturer for the unit. The unit water use is 350 gallons per day.[17] Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in \$13,200 for the zero-emission unit.

By applying the Energy Input Estimate Method, the calculation for kWh of daily energy input is 5,841 kWh ÷ 365 days = 16 kWh daily input. Fuel switching cost savings are \$11,000. In terms of cost-effectiveness, without a panel upgrade, there are cost savings of \$190,000 per ton of NOx reduced; with a panel upgrade, cost savings are \$93,000 per ton of NOx reduced.

For contrast, by applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 76,000 Btu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 4.2 heat pump COP = 26 kWh daily input. Fuel switching cost savings is \$1,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of \$201,000 per ton of NOx reduced; with a panel upgrade, the cost is \$298,000 per ton of NOx reduced.

### Type 2 Water Heater

#### Type 2 Water Heater Scenario 1: Replacement with Six Integrated Heat Pumps

The analysis considered the potential replacement of a 500,000 Btu/hr natural gas-fired Type 2 water heater with six 76,000 Btu/hr zero-emission integrated heat pump water heaters. The capital cost for a natural gas-fired commercial tank type high efficiency unit is estimated at \$14,000, which was derived from the Rule 1146.2 May 2006 final staff report which estimated the cost for a unit with a heat rating ranging from 400,000 to 500,000 Btu/hr and adjusted to present value by the CPI Inflation Calculator. The analysis also considered a case presented by an installer where two 500,000 Btu/hr units were replaced with seven integrated heat pumps. In this case, the second 500,000 Btu/hr unit and the seventh heat pump were for redundancy purposes, so the analysis considered the replacement of one 500,000 Btu/hr natural gas-fired unit with six zero-emission heat pumps. A manufacturer provided the capital cost of \$11,000 for one zero-emission indoor packaged commercial integrated heat pump unit with a COP of 4.2; the capital cost for the six zero-emission heat pumps is \$66,000, which is the cost of the individual heat pump multiplied by six. The annual energy input of 5,841 kWh was provided by the manufacturer for one unit. Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in \$79,200 for the zero-emission units.

By applying the Energy Input Estimate Method, the calculation for kWh of daily energy input is 5,841 kWh ÷ 365 days × 6 units = 96 kWh daily input. Fuel switching cost savings are \$116,000. In terms of cost-effectiveness, without a panel upgrade, the cost savings will be \$178,000 per ton of NOx reduced; with a panel upgrade, the cost savings will be \$164,000 per ton of NOx reduced.

By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 500,000 Btu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 4.2 heat pump COP = 171.03 kWh daily input. Fuel switching cost savings

---

[17] AO Smith, https://assets.hotwater.com/damroot/Original/10003/AOSZE55000.pdf

are $9,000. In terms of cost-effectiveness, without a panel upgrade, the cost is $197,000 per ton of NOx reduced; with a panel upgrade, the cost is $212,000 per ton of NOx reduced.

### *Type 2 Water Heater Scenario 2: Replacement with Two Split Heat Pumps*

A major manufacturer recommended a different replacement case for Type 2 water heaters and recommended replacing one 500,000 Btu/hr natural gas-fired unit with two large split heat pumps with a COP of 4.38 paired with a 400-gallon tank for an anticipated capital cost of $70,000.[18] Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $84,000 for the zero-emission unit. Capital cost for the natural gas-fired commercial tank type high efficiency unit is estimated at $14,000, taken from the Rule 1146.2 May 2006 staff report estimated cost for the 400,000-500,000 Btu/hr unit range and adjusted to present value by the CPI Inflation Calculator.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 500,000 Btu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 4.38 heat pump COP = 164 kWh daily input. Fuel switching cost savings are $19,000. In terms of cost-effectiveness, without a panel upgrade, the cost is $179,000 per ton of NOx reduced; with a panel upgrade, the cost is $194,000 per ton of NOx reduced.

Scenario 2 provides a cost-effectiveness value estimate less than the 2022 AQMP cost-effectiveness screening threshold of $349,000 per ton of NOx reduced. Scenario 2 has a slightly higher capital cost of $4,800 greater than Scenario 1.

### *Type 1 Pool Heater*

The analysis considered the potential replacement of a 125,000 Btu/hr natural gas-fired pool heater with a 90,000 Btu/hr zero-emission heat pump pool heater. As of December 2023, an internet search for a 125,000 Btu/hr natural gas-fired unit indicated that the capital cost is $1,800.[19] The table below presents other natural gas water heater cost examples obtained via an internet search. For example, as of December 2023, an internet search for a 90,000 Btu/hr zero-emission heat pump indicated that the capital cost is $4,100.[20] The heat pump has a COP of 5.7. Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $4,920 for the zero-emission unit.

---

[18] Lochinvar, https://www.lochinvar.com/products/commercial-heat-pump-water-heaters/veritus-air-source-commercial-heat-pump-water-heater/

[19] In the Swim, https://intheswim.com/p/ec-462024-mastertemp-low-nox-125k-btu-natural-gas-pool-spa-heater-with-cord---limited-warranty/387225.html

[20] In the Swim, https://intheswim.com/p/w3hp21004t-heatpro-90k-btu-230v-titanium-digital-electric-pool-heat-pump/340101.html

(97 of 261), Page 97 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 97 of 261
Case 2:24-cv-10482-PA Document 104-2 Filed 04/14/25 Page 33 of 400 Page
ID #:1156

**Table 2-4. Natural gas water heater cost examples from internet search**

| Heat Output Btu/hr | Price ($) | Heat Output Btu/hr | Price ($) | Heat Output Btu/hr | Price ($) |
|---|---|---|---|---|---|
| 105,000 | 2,000 | 206,000 | 2,000 | 300,000 | 4,000 |
| 125,000 | 2,000 | 240,000 | 3,000 | 333,000 | 4,000 |
| 156,000 | 2,000 | 264,000 | 3,000 | 360,000 | 4,000 |
| 180,000 | 3,000 | 266,000 | 3,000 | 404,000 | 4,000 |

By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 125,000 Btu/hr × 24 hours × 0.024 capacity factor × 0.84 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 5.7 heat pump COP = 3.11 kWh daily input. Fuel switching cost savings are $3,000. In terms of cost-effectiveness, without a panel upgrade, the cost is $11,000 per ton of NOx reduced; with a panel upgrade, the cost is $58,000 per ton of NOx reduced. When splitting the panel cost between residential appliances, with a quarter of the panel cost for pool heating, the cost-effectiveness estimate is cost savings of $4,000 per ton of NOx reduced.

*Type 1 High Temperature Unit*

*Type 1 High Temperature Unit Scenario 1: Replacement with Heat Pump Unit*

The analysis considered the potential replacement of a 399,000 Btu/hr natural gas-fired Type 1 boiler with a 365,000 Btu/hr heat pump. A manufacturer provided a capital cost of $24,000 for a 399,000 Btu/hr natural gas-fired Type 1 boiler. A manufacturer provided a capital cost to consumer of $185,000 for a 365,000 Btu/hr heat pump using waste heat with a COP of 6.3.[21] Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $222,000 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 399,000 Btu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 6.3 heat pump COP = 90.99 kWh daily input. Fuel switching cost savings are $72,000. In terms of cost-effectiveness, without a panel upgrade, the cost is $559,000 per ton of NOx reduced; with a panel upgrade, there is a cost of $578,000 per ton of NOx reduced.

*Type 1 High Temperature Unit Scenario 2: Replacement with Electric Resistance Unit*

The analysis considered replacement of a 399,000 Btu/hr natural gas-fired Type 1 boiler with a 358,000 Btu/hr electric boiler. A manufacturer provided a capital cost of $24,000 for a 399,000 Btu/hr natural gas-fired Type 1 boiler. As of December 2023, an internet search for a 358,000 Btu/hr electric resistance boiler indicated that the capital cost is $25,000.[22] The analysis also assumed a 100 percent efficiency for electric resistance units. Adding an additional 20 percent to

---

[21] Armstrong International, Inc., https://armstronginternational.com/products/armstrongcombitherm-heat-pumps/
[22] ecomfort, https://www.ecomfort.com/Electro-Industries-EB-NB-105-208/p18338.html

Exhibit 2–Page 108
ER-97

Case 2:24-cv-10482-PA-DFM Document 56-12 Filed 04/24/25 Page 3 of 4 Page ID #:1157

Chapter 2                                                                    BARCT Assessment

the zero-emission unit cost to address installation cost results in $30,000 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 399,000 Btu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh = 573.22 kWh daily input. Fuel switching cost is $610,000. In terms of cost-effectiveness, without a panel upgrade, the cost is $2,734,000 per ton of NOx reduced; with a panel upgrade, the cost is $2,753,000 per ton of NOx reduced.

### Type 2 High Temperature Unit

#### Type 2 High Temperature Unit Scenario 1: Replacement of 1 MMBtu Unit with Heat Pump

The analysis considered the potential replacement of a 1 MMBtu/hr natural gas-fired Type 2 boiler with a 1,709,000 Btu/hr heat pump. A manufacturer provided a capital cost of $32,500 for a 1 MMBtu/hr natural gas-fired Type 2 boiler. A manufacturer provided a capital cost to consumer of $280,000 for a 1,709,000 Btu/hr heat pump using waste heat with a COP of 5.9. Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $336,000 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 1 MMBtu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 5.9 heat pump COP = 243.5 kWh daily input. Fuel switching cost savings are $158,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of $257,000 per ton of NOx reduced; with a panel upgrade, the cost is $264,000 per ton of NOx reduced.

#### Type 2 High Temperature Unit Scenario 2: Replacement of 1 MMBtu Unit with Electric Resistance

The analysis considered replacement of a 1 MMBtu/hr natural gas-fired Type 2 boiler with a 1 MMBtu/hr electric boiler. A manufacturer provided a capital cost of $32,500 for a 1 MMBtu/hr natural gas-fired Type 2 boiler. As of December 2023, an internet search for a 1 MMBtu/hr electric resistance boiler indicated that the capital cost is $34,000.[23] Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $40,800 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 1 MMBtu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh = 1,436.64 kWh daily input. Fuel switching cost is $1,530,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of $2,722,000 per ton of NOx reduced; with a panel upgrade, there is a cost of $2,812,000 per ton of NOx reduced.

---

[23] ecomfort, https://www.ecomfort.com/Electro-Industries-EB-NB-300-480/p18335.html

Exhibit 2–Page 109
ER-98

(99 of 261), Page 99 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 99 of 261
Case 2:24-cv-10482-PA Document 60-12 Filed 04/04/25 Page 584 of 635 Page ID
ID #:1158

### *Type 2 Boiler Scenario 3: Replacement of 2 MMBtu Unit with Heat Pump*

The analysis considered the replacement of a 2 MMBtu/hr natural gas-fired Type 2 boiler with a 2,286,000 Btu/hr heat pump. A manufacturer provided a capital cost of $43,500 for a 2 MMBtu/hr natural gas-fired Type 2 boiler. A manufacturer provided a capital cost to consumer of $462,000 for a 2,286,000 Btu/hr heat pump using waste heat with a COP of 6.1. Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $554,400 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 2 MMBtu/hr × 24 hours × 0.215 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 6.1 heat pump COP = 471.03 kWh daily input. Fuel switching cost savings are $339,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of $152,000 per ton of NOx reduced; with a panel upgrade, there is a cost of $156,000 per ton of NOx reduced.

### *Instantaneous Water Heater*

### *Instantaneous Water Heater Scenario 1: Replacement with Electric Resistance Tank Type Unit*

The analysis assumed that a 150,000 Btu/hr natural gas-fired instantaneous water heater could be replaced with a 75-gallon electric resistance tank type unit. The analysis also assumed that the installation cost would be approximately 25 percent of the project cost. Drawing from an E3 study, the natural gas-fired unit capital cost is $3,700 × 0.75 = $2,775 for a 150,000 Btu/hr instantaneous water heater.[24] As of December 2023, an internet search for a 75-gallon electric resistance tank type unit indicated that the capital cost is $2,100.[25] Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $2,520 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 150,000 Btu/hr × 24 hours × 0.0135 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh= 13.53 kWh daily input. Fuel switching cost is $17,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of $3,078,000 per ton of NOx reduced; with a panel upgrade, there is a cost of $3,275,000 per ton of NOx reduced.

### *Instantaneous Water Heater Scenario 2: Replacement with Electric Resistance Instantaneous Unit*

The analysis assumed that a 150,000 Btu/hr natural gas-fired instantaneous water heater could be replaced by an electric resistance instantaneous unit. The analysis assumed that installation cost is approximately 25 percent of the project cost. Drawing from the E3 study, the natural gas-fired unit capital cost is $3,700 × 0.75 = $2,775 for a 150,000 Btu/hr instantaneous water heater. As of December 2023, an internet search for an electric resistance instantaneous unit indicated that the

---

[24] E3, Residential Building Electrification in California, Page 32, Figure 2-7, https://www.ethree.com/wp-content/uploads/2019/04/E3_Residential_Building_Electrification_in_California_April_2019.pdf

[25] The Home Depot, https://www.homedepot.com/p/Rheem-Marathon-Eclipse-Light-Duty-75-gal-Commercial-277-Volt-12kW-Field-Convertible-Non-Metallic-Electric-Water-Heater-MELD75-TB-277-Volt-12-kW/305422236

higher end capital cost is $2,300.[26] Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $2,760 for the zero-emission unit.

The energy input (kWh) for this scenario was not provided by the manufacturer, so the analysis did not apply the Energy Input Estimate Method. By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 150,000 Btu/hr × 24 hours × 0.0135 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh= 13.53 kWh daily input. Fuel switching cost is $17,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of $3,123,000 per ton of NOx reduced; with a panel upgrade, there is a cost of $3,320,000 per ton of NOx reduced.

### Instantaneous Water Heater Scenario 3: Replacement with Heat Pump Tank Type Unit

The analysis assumed that a 150,000 Btu/hr natural gas-fired instantaneous water heater could be replaced with a residential 65-gallon storage volume heat pump with a COP of 3.0. The analysis also assumed that the installation cost is approximately 25 percent of the project cost. Drawing from an E3 study, the natural gas-fired unit capital cost is $3,700 × 0.75 = $2,775 for a 150,000 Btu/hr instantaneous water heater. Energy Star by U.S. EPA provided information on a 64-gallon storage volume heat pump with a Uniform Energy Factor of 3.64, which has a capital cost of around $2,000 from internet search.[27] Energy Star provides 178 therms per year for instantaneous and 1,233 kwh for an equivalent heat pump. Adding an additional 20 percent to the zero-emission unit cost to address installation cost results in $2,400 for the zero-emission unit.

By applying the Energy Input Estimate Method, the calculation for kWh of daily energy input is 1,233 kWh ÷ 365 days = 3.4 kWh daily input. Fuel switching cost is cost savings of $600. In terms of cost-effectiveness, without a panel upgrade, cost savings are $185,000 per ton of NOx reduced; with a panel upgrade, the cost is $12,000 per ton of NOx reduced.

When splitting the panel cost between residential appliances, with a quarter of the panel cost for pool heating, the cost-effectiveness estimate is cost savings of $63,000.

By applying the Energy Input Calculation Method, the calculation for kWh of daily energy input is 150,000 Btu/hr × 24 hours × 0.0135 capacity factor × 0.95 natural gas-fired unit efficiency ÷ 3412.14 Btu/kWh ÷ 3.0 heat pump COP = 4.51 kWh daily input. Fuel switching cost is $1,000. In terms of cost-effectiveness, without a panel upgrade, there is a cost of $101,000 per ton of NOx reduced; with a panel upgrade, there is a cost of $298,000 per ton of NOx reduced.

When splitting the panel cost between residential appliances, with a quarter of the panel cost for pool heating, the cost-effectiveness estimate is cost of $223,000 per ton of NOx reduced.

When applying the Energy Input Calculation Method for gas-fired instantaneous units replaced by heat pumps, there is a higher energy input (kWh) and higher fuel switching cost which may result from oversizing. The energy input (kWh) may be overestimated.

---

[26] Carbon Switch, Tankless Water Heater Buyer's Guide, https://carbonswitch.com/tankless-water-heater-buyers-guide/

[27] Energy Star, https://www.energystar.gov/productfinder/product/certified-water-heaters/details/2408601

Exhibit 2–Page 111
ER-100

### Summary of Cost-Effectiveness

The following table summarizes the cost-effectiveness estimates for each category.

**Table 2-5. Cost-Effectiveness for PAR 1146.2 Categories**

| Category | Replace with | Cost-Effectiveness ($/Ton), No Panel Upgrade | | Cost-Effectiveness ($/Ton), With Panel Upgrade | |
| --- | --- | --- | --- | --- | --- |
| | | Energy Input Estimate Method | Energy Input Calculation Method | Energy Input Estimate Method | Energy Input Calculation Method |
| **Type 1 Water Heater** | Heat Pump | (190,000) | 201,000 | (93,000) | 298,000 |
| **Type 2 Water Heater** | Six Heat Pumps (Integrated) | (178,000) | 197,000 | (164,000) | 212,000 |
| | Two Heat Pumps (Split) | - | 179,000 | - | 194,000 |
| **Type 1 Pool Heater** | Heat Pump | - | 11,000 | - | 58,000 |
| | Heat Pump and Split Panel Cost | - | | - | (4,000) |
| **Type 1 High Temperature Unit** | Heat Pump | - | 559,000 | - | 578,000 |
| | Electric Resistance | - | 2,734,000 | - | 2,753,000 |
| **Type 2 High Temperature Unit (1 MMBtu/hr)** | Heat Pump | - | 257,000 | - | 264,000 |
| | Electric Resistance | - | 2,722,000 | - | 2,812,000 |
| **Type 2 High Temperature Unit (2 MMBtu/hr)** | Heat Pump | - | 152,000 | - | 156,000 |

Exhibit 2–Page 112
ER-101

(102 of 261), Page 102 of 261

Case 2:24-cv-10482-PA Document 54-2 Filed 04/04/25 Page 587 of 658 Page ID #:1161

| Category | Replace with | Cost-Effectiveness ($/Ton), No Panel Upgrade | | Cost-Effectiveness ($/Ton), With Panel Upgrade | |
|---|---|---|---|---|---|
| | | Energy Input Estimate Method | Energy Input Calculation Method | Energy Input Estimate Method | Energy Input Calculation Method |
| **Instantaneous Water Heater** | Heat Pump | (185,000) | 101,000 | 12,000 | 298,000 |
| | Heat Pump and Split Panel Cost | - | - | (63,000) | 223,000 |
| | Electric Resistance Tank Type | - | 3,078,000 | - | 3,275,000 |
| | Electric Resistance Instantaneous | - | 3,123,000 | - | 3,320,000 |

The cost-effectiveness values for most categories in PAR 1146.2 were less than the $349,000 per ton of NOx screening threshold; thus, zero-emission (0 ppmv) technologies are considered cost-effective. While some cost-effectiveness values are greater than the 2022 AQMP screening threshold of $349,000 per ton of NOx reduced, future effective compliance dates will allow for market growth in the next 10 years. Market growth for emerging technologies typically includes a price decrease. Currently, the market supply is limited and some of the zero-emission units staff evaluated require preplanning and adjustment prior to installation, which will involve a considerably higher cost. Once more units are commercialized and sold as off-the-shelf units, staff expect costs to drop. Staff is proposing to conduct a technology assessment prior to the implementation of the zero-emission units that had a high cost-effectiveness and will reassess costs at that time.

**Proposed BARCT Emission Limit**



Health and Safety Code Section Sections 40920.6(a)(1) and 40920.6(a)(2) require that prior to adopting rules to meet the requirement of BARCT, one or more potential control options which achieve the emission reduction objectives of the rule must be identified and the cost-effectiveness assessment of the potential control option(s) must be conducted. The final proposed BARCT emission limit for each class and category is the emission limit that achieves the maximum degree of emission reductions and is determined to be cost-effective. The following table summarizes the proposed NOx limits that represent BARCT and the applicable CO limits for each class and category. The zero-emission technologies staff evaluated operate on electricity and have zero CO emissions in addition to zero NOx emissions; hence, staff is proposing zero-emission limits for both pollutants.

**Exhibit 2–Page 113**
**ER-102**

ATTACHMENT H

<div style="border:1px solid black; padding:10px">

# SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT

</div>

**Final Socioeconomic Impact Assessment For
Proposed Amended Rule 1146.2 – Control of Oxides of Nitrogen from
Large Water Heaters, Small Boilers and Process Heaters**

**June 2024**

**Deputy Executive Officer**
Planning, Rule Development, and Implementation
Sarah L. Rees, Ph.D.

**Assistant Deputy Executive Officer**
Planning, Rule Development, and Implementation
Michael Krause

**Planning and Rules Manager**
Planning, Rule Development, and Implementation
Barbara Radlein

| | |
|---|---|
| **Authors:** | Xian-Liang (Tony) Tian, Ph.D. – Program Supervisor<br>Shah Dabirian, Ph.D. – Consultant<br>Daniel Penoyer – Air Quality Specialist<br>Chris Yu – Assistant Air Quality Specialist |
| **Contributors:** | Yanrong Zhu – Program Supervisor<br>Peter Campbell – Air Quality Specialist<br>Emily Yen – Assistant Air Quality Specialist<br>Valerie Rivera – Assistant Air Quality Specialist |
| **Reviewed By:** | Barbara Radlein – Planning and Rules Manager<br>Ruby Laity – Principal Deputy District Counsel<br>Josephine Lee – Senior Deputy District Counsel |

**Exhibit 2–Page 287**
**ER-103**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................ES-1

INTRODUCTION ......................................................................................................... 1

LEGISLATIVE MANDATES ...................................................................................... 1

    South Coast AQMD Governing Board Resolutions.................................................. 1

    Health and Safety Code Requirements...................................................................... 2

AFFECTED FACILITIES AND INDUSTRIES........................................................... 2

    Affected Industries and Small Business .................................................................... 3

COMPLIANCE COSTS................................................................................................. 6

    Water Heaters ............................................................................................................ 6

    High Temperature Units ............................................................................................ 7

    Instantaneous Water Heater and Pool Heater Replaced with Heat Pump ................. 7

    Fuel Switching Cost................................................................................................... 8

    Total Compliance Cost of PAR 1146.2 .................................................................. 10

MACROECONOMIC IMPACTS ON THE REGIONAL ECONOMY........................ 15

    Impact of Proposed Amendments............................................................................ 15

    Regional Job Impacts............................................................................................... 17

    Competitiveness....................................................................................................... 20

REFERENCES............................................................................................................. 21

**Exhibit 2–Page 289**
**ER-104**

(105 of 261)
Page 105 of 26Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 105 of 261
Case 2:24-cv-10482-FMO-AGR Document 188-12 Filed 04/22/25 Page 265 of 270 Page
ID #:1338

# EXECUTIVE SUMMARY

On March 17, 1989, the South Coast Air Quality Management District (South Coast AQMD) Governing Board adopted a resolution which requires an analysis of the economic impacts associated with adopting and amending rules and regulations. In addition, Health and Safety Code Section 40440.8 requires a socioeconomic impact assessment for any proposed rule, rule amendment, or rule repeal which "will significantly affect air quality or emissions limitations." Lastly, Health and Safety Code Section 40920.6 requires an incremental cost-effectiveness analysis for a proposed rule or amendment which imposes Best Available Retrofit Control Technology (BARCT) or "all feasible measures" requirements relating to emissions of ozone, carbon monoxide (CO), sulfur oxides (SOx), nitrogen oxides (NOx), volatile organic compounds (VOC), and their precursors.

Proposed Amended Rule (PAR) 1146.2– Control of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters was developed to seek further emission reductions of NOx from natural gas-fired equipment within the South Coast AQMD's jurisdiction and implement the 2022 Air Quality Management Plan (AQMP) Control Measure C-CMB-01: Emission Reductions from Replacement with Zero-emission or Low NOx Appliances – Commercial Water Heating. Upon full implementation, PAR 1146.2 is expected to reduce NOx emissions by 5.6 tons per day (tpd).

A socioeconomic impact assessment has been conducted to assess the cost impacts of PAR 1146.2 and the following presents a summary of the analysis and findings.

| | |
|---|---|
| **Key Elements of PAR 1146.2** | PAR 1146.2 requires zero-emission technologies at future effective dates for natural gas-fired large water heaters, small boilers, and process heaters with a heat input greater than 75,000 British thermal units per hour (Btu/hr) and less than or equal to 2 million Btu per hour (MMBtu/hr). |
| **Affected Facilities and Industries** | PAR 1146.2 is applicable to manufacturers, distributors, retailers, resellers, installers, owners, and operators of natural gas-fired large water heaters, small boilers, and process heaters with a heat input rating between 75,000 Btu/hr and 2 MMBtu/hr. PAR 1146.2 does not regulate residential gas-fired tank type water heaters rated less than 75,000 Btu/hr heat input. However, residential instantaneous water heaters and pool heaters are regulated by Rule 1146.2 due to higher Btu ratings of those type of units. The PAR 1146.2 universe is comprised of approximately 1,070,000 units of water heaters, high temperature units and pool heaters, which are used in residential, commercial, or light industrial settings. Nearly all industries will be affected by PAR 1146.2. Specifically, the warehousing and storage sector (NAICS 493) will be most affected by PAR 1146.2, followed by sectors of nursing and residential care facilities (NAICS 623) and museums, historical sites, and similar institutions (NAICS 712). Prior analyses in South Coast AQMD indicate that most of the facilities in these sectors do not qualify as a small business pursuant to South Coast AQMD Rule 102 – Definition of Terms. Due to insufficient data on the universe of the facilities affected by PAR 1146.2, a full-blown small business impact analysis is not feasible for this socioeconomic impact assessment. |

**Exhibit 2–Page 290**
**ER-105**

(106 of 261) Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 106 of 261
Case 2:24-cv-10482-PA-BFM Document 64-12 Filed 04/14/25 Page 266 of 360 Page
ID #:1339

| | |
|---|---|
| **Assumptions for the Analysis** | Most of the compliance costs of PAR 1146.2 are related to the transition from gas-fired to zero-emission water heating equipment. Cost estimation involves an estimated universe of 1,070,000 units of Type 1 and Type 2 units, tank type or instantaneous water heaters, high temperature units and pool heaters, 90 percent (%) of which are assumed to be replacement of old gas-fired units in existing commercial, residential, or light industrial buildings, while the remaining 10% are first-time installations in new buildings for the applicable category pursuant to PAR 1146.2 paragraph (d)(2) on and after the applicable PAR 1146.2 compliance dates. |

The analysis assumed the unit age of all existing units is uniformly distributed over a period of their full useful life, implying that implementing PAR 1146.2 at the existing buildings will be a linear, phased-in process. After the phase-in is completed, all of the old gas-fired units will have been replaced by zero-emission units. In addition, PAR 1146.2 provides an implementation grace period for existing buildings, that is, the first year of implementation is allowed to occur three or four years later than what is required for new buildings. Equipment replacement occurring in existing buildings may involve an electric panel upgrade cost, while installing zero-emission units in new buildings has no such upgrade cost.

To estimate the fuel switching cost/saving of transitioning from natural gas to zero-emission water heating technologies that use electricity, this analysis considered the anticipated energy demand and forecasted prices in the future for both natural gas and electricity. The source of the forecasted energy prices is the 2023 California Energy Commission (CEC) Integrated Energy Policy Report (IEPR). For Type 1 pool heaters and instantaneous water heaters, residential utility rates are applied, while commercial utility rates are applied for all the other categories of units. In addition, the CEC IEPR considers three different scenarios: a baseline scenario, a high energy demand scenario and a low energy demand scenario. The analysis in this report applied the electricity price forecast from the baseline scenario.

| | |
|---|---|
| **Compliance Costs** | The average annual compliance costs of PAR 1146.2 are estimated to range from $48.99 million to $96.77 million, depending on the real interest rate assumed (1% to 4%). The estimated annual costs are expected to be incurred by nearly all the industries in the South Coast AQMD region. |

The following table presents the summary of the average annual cost of PAR 1146.2 by equipment category. Except for instantaneous water heaters, all the equipment categories exhibit a cost savings in their recurring fuel-switching cost. With one-time and recurring costs combined, about 32% of the total annual compliance cost is attributed to

Type 2 water heaters being replaced with two split heat pumps, followed by instantaneous water heaters which would be about 21% of the total annual cost.

### Average Annual Compliance Costs (2026-2057)

| Cost Categories | 1% Real Interest Rate | 4% Real Interest Rate |
|---|---|---|
| **One-Time Cost** | | |
| Type 1 Water Heater replaced by heat pump | $16,289,888 | $19,728,126 |
| Type 1 High Temperature Unit replaced by heat pump | $8,260,714 | $11,309,575 |
| Type 2 Water Heater - Scenario with replacement by two split heat pumps | $32,344,304 | $44,281,929 |
| Type 2 High Temperature Unit replaced by heat pump | $6,294,343 | $8,617,457 |
| Type 1 Pool Heater replaced by heat pump | $121,291,936 | $146,892,519 |
| Instantaneous Water Heater replaced by heat pump | $3,847,000 | $5,266,850 |
| **Recurring Costs** | | |
| Type 1 Water Heater replaced by heat pump | ($2,671,829) | ($2,671,829) |
| Type 1 High Temperature Unit replaced by heat pump | ($4,376,038) | ($4,376,038) |
| Type 2 Water Heater - Scenario with replacement by two split heat pumps | ($12,786,700) | ($12,786,700) |
| Type 2 High Temperature Unit replaced by heat pump | ($4,819,582) | ($4,819,582) |
| Type 1 Pool Heater replaced by heat pump | ($129,540,284) | ($129,540,284) |
| Instantaneous Water Heater replaced by heat pump | $14,865,970 | $14,865,970 |
| **Total** | **$48,999,721** | **$96,767,993** |

| | |
|---|---|
| **Job Impacts** | Direct effects of the proposed project are used as inputs to the REMI model in order for the model to assess secondary/induced impacts for all the industries in the four-county economy on an annual basis and across a user-defined horizon. |
| | When the compliance cost is annualized using a 4% real interest rate, it is projected that an annual average of 1,074 net jobs will be foregone from 2026 to 2057. The 1,074 annual jobs foregone represents approximately 0.0084% of total annual jobs in the four-county area. |
| | In 2031, about 600 additional jobs are projected to be added to the economy due to the compliance expenditures and additional spending associated with the installation of zero-emission water heaters. These additional jobs are expected to come from sectors such as retail (NAICS 44-45), fabricated metal product manufacturing (NAICS 332), and wholesale trade (NAICS 42). |
| | However, as affected facilities continue to bear the amortized capital expenditures of zero-emission water heaters, a gradual reduction in the positive job impacts from earlier years is expected to occur. Consequently, this reduction would lead to jobs foregone in the subsequent years following the initial implementation. |
| | The construction sector (NAICS 23) is anticipated to bear the largest share of average annual jobs foregone, with an estimated 173 jobs foregone. |
| **Competitiveness** | The overall impacts of the PAR 1146.2 on the production costs and delivered prices in the region is not expected to be significant. According to the REMI Model, PAR 1146.2 is projected to increase the cost of production of all the industries in South Coast AQMD's jurisdiction by 0.002% and increase the relative delivered price of the goods provided by those industries by 0.002% in 2032, when PAR 1146.2 has the greatest impacts upon cost of production and relative delivered price in affected industries. |

(109 of 261), Page 109 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 109 of 261
Case 2:24-cv-10482-PA-PD   Document 50-6   Filed 04/14/25   Page 1 of 5   Page ID
#:1396

1    Courtland L. Reichman (SBN: 268873)
     creichman@reichmanjorgensen.com
2    Brian C. Baran (SBN: 325939)
     bbaran@reichmanjorgensen.com
3    REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
     100 Marine Parkway, Suite 300
4    Redwood Shores, CA 94065
     Tel.: (650) 623-1401; Fax: (650) 560-3501

5

6    *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
*America Corp., National Association of Home*
*Builders, California Manufacturers & Technology*
7    *Association, California Restaurant Association,*
*California Hotel & Lodging Association, California*
8    *Apartment Association, and Plumbing-Heating-*
*Cooling Contractors of California*

9

10    ADDITIONAL COUNSEL ON FOLLOWING PAGE

11            **UNITED STATES DISTRICT COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**

12

13    RINNAI AMERICA CORP., et al.

14           Plaintiffs,              Civil Action No.

15             v.                  2:24-cv-10482 PA(PDx)

16    SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT,       **DECLARATION OF FRANK**
**WINDSOR IN SUPPORT OF**
17           Defendant,            **PLAINTIFFS' MOTION FOR**
**SUMMARY JUDGMENT,**
18    And                      **DECLARATORY RELIEF, AND**
**PERMANENT INJUNCTION**
19    PEOPLE'S COLLECTIVE FOR
ENVIRONMENTAL JUSTICE, SIERRA
20    CLUB, and INDUSTRIOUS LABS,

21          Defendant-Intervenors.

22

23

24

I, Frank Windsor, hereby declare as follows:

1.      I am President of Rinnai America Corporation. I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.      Rinnai is one of the leading manufacturers and sellers of gas instantaneous (tankless) water heaters in the United States. Rinnai has its headquarters in Peachtree City, Georgia, and in 2022, it opened the first gas tankless water heater manufacturing facility in the United States. Gas tankless water heaters provide greater efficiency and have longer life spans than traditional gas tank water heaters and therefore result in substantial energy savings and emissions reductions across the water heater market. Since their introduction in 2005, gas tankless water heaters have been increasing their share of the water heater market and represent about 10% of all water heater sales in 2022. Rinnai sells roughly 35% of gas tankless water heaters in the United States, and it has significant sales of gas tankless water heaters in California, with approximately $14 million in sales in the jurisdiction of the South Coast Air Quality Management District. Rinnai also sells commercial hybrid tank/tankless water heaters, residential and commercial condensing tankless boilers, residential condensing combination water heaters/boilers, and electric heat pump water heaters. It sells all these products in California and in the District.

3.      Rinnai is a member of Plaintiff National Association of Home Builders, a nonprofit corporation that represents the U.S. residential building construction industry. Rinnai is also a member of Plaintiff California Manufacturers & Technology Association, a nonprofit organization that represents the businesses from the manufacturing community.

4.      Rinnai is experiencing, or will imminently experience, harm in the form of economic injuries, lost sales, and altered business practices because of the impending ban on its appliances under the District's rule imposing zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero- $NO_x$ rule").

5.      Already in the homebuilding market, where gas heaters and boilers have traditionally been installed in up to 80% of new construction, the industry is moving exclusively to electric heat pumps, in anticipation of the District's zero-$NO_x$ rule.

6.      After the relevant effective dates of the zero-$NO_x$ rule, Rinnai's wholesale distributors and sales personnel will no longer be able to sell, offer for sale, or install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; installation contractors in Rinnai's service contract network will no longer be able to install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; and the hiring of gas appliance servicing contractors through Rinnai's service contract network will increasingly diminish as existing gas water heaters and boilers are replaced with electric appliances.

7.      Because of the size of the California market for the banned products, the business disruption caused by the zero-$NO_x$ rule is, or will be, significant.

8.      These consequences of the zero-$NO_x$ rule will also affect Rinnai's long-term investment, manufacturing, marketing, and distribution plans. If Rinnai continues to manufacture appliances for the California market, this would be limited to Rinnai's electric heat pump water heaters. Because of the size and configuration of electric heat pump water heaters, Rinnai would have to secure significantly larger storage facilities, and its transportation and distribution costs would increase. Rinnai's wholesale distributors would also incur these increased storage, transportation, and distribution

2

1    costs.

2         I declare under penalty of perjury under the laws of the United States of America

3    that the above facts are true and correct.

4         Executed on April 14, 2025, at Peachtree City, Georgia.

5

6

7    _____

8    Frank Windsor

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

**ER-112**

1  Courtland L. Reichman (SBN: 268873)
      creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN: 325939)
      bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
   100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
   Tel.: (650) 623-1401; Fax: (650) 560-3501
5
   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6  *America Corp., National Association of Home*
   *Builders, California Manufacturers & Technology*
7  *Association, California Restaurant Association,*
   *California Hotel & Lodging Association, California*
8  *Apartment Association, and Plumbing-Heating-*
   *Cooling Contractors of California*
9
   ADDITIONAL COUNSEL ON FOLLOWING PAGE
10
11            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
12
13 RINNAI AMERICA CORP., et al.

14            Plaintiffs,                    Civil Action No.

               v.                            2:24-cv-10482 PA(PDx)
15
   SOUTH COAST AIR QUALITY              **DECLARATION OF JAY**
16 MANAGEMENT DISTRICT,                 **HASSEL IN SUPPORT OF**
                                        **PLAINTIFFS' MOTION FOR**
               Defendant,               **SUMMARY JUDGMENT,**
17                                      **DECLARATORY RELIEF, AND**
   And                                  **PERMANENT INJUNCTION**
18
   PEOPLE'S COLLECTIVE FOR
19 ENVIRONMENTAL JUSTICE, SIERRA
   CLUB, and INDUSTRIOUS LABS,
20
               Defendant-Intervenors.
21
22
23
24
                         **ER-113**

(114 of 261), Page 114 of 261
Case 2:24-cv-10482-PA-PD    Document 50-7    Filed 04/14/25    Page 3 of 5    Page ID
#:1403

I, Jay Hassel, hereby declare as follows:

1.     I am President at Noritz America Corporation ("Noritz").  Having been in that role since 2017, and in the previous years from 2005 to 2017 having been a Vice President at Noritz, I am personally aware of the specific detail of the finances, management, and operations at Noritz. As such, I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.     Noritz is a leading manufacturer and seller of gas instantaneous (tankless) water heaters in the United States. Noritz has its headquarters in the District, specifically, Fountain Valley in Orange County, California, and is a wholly owned subsidiary of Noritz Corporation (Japan). Noritz's product line incorporates condensing and non-condensing instantaneous water heaters and condensing combination gas boilers.  We have also recently sold a small number of integrated hybrid electric heat pump water heaters.  Noritz started doing business in the United States selling gas tankless water heaters in 2002.  Although the market share varies from year to year, Noritz currently sells about 10% of gas tankless water heaters in the United States, and it has significant sales of gas tankless water heaters in California, approximately $35 million.  A majority of those sales are made to customers in the jurisdiction of the South Coast Air Quality Management District.

3.     Noritz is experiencing, or will imminently experience, harm in the form of economic injuries, lost sales, and altered business practices because of the impending ban on its appliances under the District's rule imposing zero-$NO_x$ emission limits on gas fired boilers, water heaters, and process heaters (the "zero-$NO_x$ rule").

1

(115 of 261), Page 115 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 115 of 261
Case 2:24-cv-10482-PA-PD    Document 50-7    Filed 04/14/25    Page 4 of 5    Page ID
#:1404

4.    Already in the homebuilding market, where gas heaters and boilers have traditionally been installed in up to 80% of new construction, the industry is moving exclusively to electric heat pumps, in anticipation of the District's zero-$NO_x$ rule.

5.    After the relevant effective dates of the zero-$NO_x$ rule, Noritz's wholesale distributors and sales personnel will no longer be able to sell, offer for sale, or install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; installation contractors in Noritz's service contract network will no longer be able to install gas water heaters or boilers in the District in new buildings or in replacement scenarios in existing buildings; and the hiring of gas appliance servicing contractors through Noritz's service contract network will increasingly diminish as existing gas water heaters and boilers are replaced with electric appliances.

6.    Because of the size of the California market for the banned products, the business disruption caused by the zero-$NO_x$ rule is, or will be, significant.

7.    Additionally, as Noritz has its headquarters in California, Noritz may be forced to consider leaving the state if its primary business is not allowed to be conducted in the largest existing market for its products. Noritz, headquartered in the very District banning its gas products, must consider closing its facilities and eliminating or moving its approximately 120 employee positions out of the District or out of California all together.

8.    The consequences of the zero-$NO_x$ rule are affecting Noritz's long-term investment, manufacturing, marketing, and distribution plans. If Noritz Corporation (Japan) does not pull out of the U.S. market altogether and Noritz continues to supply appliances for the California market, this would be limited to Noritz's integrated hybrid electric heat pump water heaters. Because of the size and configuration of heat pump

2

(116 of 261), Page 116 of 261
Case 2:24-cv-10482-PA-PD    Document 50-7    Filed 04/14/25    Page 5 of 5    Page ID
#:1405
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 116 of 261

water heaters, Noritz would have to secure new storage facilities that are substantially larger than its current storage facilities, and its transportation and distribution costs would substantially increase. Noritz's wholesale distributors would also incur these increased storage, transportation, and distribution costs. For these reasons and others, there is a significant likelihood that the zero-NO$_x$ rule could make Noritz's operations in the District and in California commercially unviable such that they would have to cease.

9.     The consequences of the zero-NO$_x$ rule ultimately extend to California consumers, who will face fewer appliance choices, impacts to their expectations and experience of comfort in their homes, and significant building reconfiguration costs.

I declare under penalty of perjury under the laws of the United States of America that the above facts are true and correct.

Executed on April  14  , 2025, in Trabuco Canyon, California.

_____

Jay Hassel

(117 of 261), Page 117 of 261
Case 2:24-cv-10482-PA-PD    Document 50-8    Filed 04/14/25    Page 1 of 4    Page ID
#:1406

Courtland L. Reichman (SBN: 268873)
    creichman@reichmanjorgensen.com
Brian C. Baran (SBN: 325939)
    bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al.<br><br>      Plaintiffs,<br><br>      v.<br><br>SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,<br><br>      Defendant,<br><br>And<br><br>PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS,<br><br>      Defendant-Intervenors. | Civil Action No.<br><br>2:24-cv-10482 PA(PDx)<br><br>**DECLARATION OF THOMAS J. WARD IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION** |

(118 of 261), Page 118 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 118 of 261
Case 2:24-cv-10482-PA-PD   Document 50-8   Filed 04/14/25   Page 3 of 4   Page ID
#:1408

I, Thomas J. Ward, hereby declare as follows:

1.      I am the Vice President of Legal Advocacy at the National Association of Home Builders.  I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.      The National Association of Home Builders is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C.  It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states.  About one-third of our members are home builders and remodelers, both single family and multifamily.  The rest work in closely related specialties such as sales and marketing, housing finance, manufacturing, and building materials supply.

3.      The National Association of Home Builders is affiliated with eleven local organizations in California, including the California Building Industry Association.  Both the National Association of Home Builders and its local organizations have members, including Plaintiff Rinnai America Corporation, that are located in or conduct business and operations in the jurisdiction of the South Coast Air Quality Management District.

4.      Our mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members.

5.      The National Association of Home Builders has one or more members that do business in the District and are suffering, or will imminently suffer, harm to their revenues, business operations, and compliance burdens as a result of the South Coast Air Quality Management District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero $NO_x$ rule").

(119 of 261), Page 119 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 119 of 261
Case 2:24-cv-10482-PA-PD    Document 50-8    Filed 04/14/25    Page 4 of 4    Page ID
#:1409

6.     Because of the zero-$NO_x$ rule, some members in the District will lose the option of selling or installing certain gas appliances.  Members report that the zero-$NO_x$ rule limits their amenity offerings--electrically heated spas are not feasible, and if gas piping is not installed as a result of the rule, gas fireplaces, BBQs, and open fire pits will no longer be part of these communities. Additionally, members are now incurring thousands of dollars in additional costs per home as they are required to pre-wire for future "all-electric" configurations (even though in many cases, the existing electrical infrastructure is inadequate to support this transition). Some members that own multifamily buildings, for example, will be forced to replace certain gas equipment with electric equipment, which will require intrusive and enormously expensive remodeling to incorporate electric service.  Moreover, manufacturer members will lose sales and will be forced to alter their sales, distribution, and servicing networks and business practices because of the rule.

I declare under penalty of perjury under the laws of the United States of America that the above facts are true and correct.

Executed on April 11, 2025, in Sterling, VA.

_____
Thomas J. Ward

(120 of 261), Page 120 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 120 of 261
Case 2:24-cv-10482-PA-PD    Document 50-9    Filed 04/14/25    Page 1 of 4    Page ID
#:1410

1   Courtland L. Reichman (SBN: 268873)
      creichman@reichmanjorgensen.com
2   Brian C. Baran (SBN: 325939)
      bbaran@reichmanjorgensen.com
3   REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
4   100 Marine Parkway, Suite 300
    Redwood Shores, CA 94065
5   Tel.: (650) 623-1401; Fax: (650) 560-3501

6

7   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
    *America Corp., National Association of Home*
8   *Builders, California Manufacturers & Technology*
    *Association, California Restaurant Association,*
9   *California Hotel & Lodging Association, California*
    *Apartment Association, and Plumbing-Heating-*
10  *Cooling Contractors of California*

11
    ADDITIONAL COUNSEL ON FOLLOWING PAGE
12

13            **UNITED STATES DISTRICT COURT**
14            **CENTRAL DISTRICT OF CALIFORNIA**

15  RINNAI AMERICA CORP. et al,            Case No. 2:24-cv-10482 PA(PDx)
16
             Plaintiffs,                   Hon. Percy Anderson
17
18       v.                               **DECLARATION OF MIKE**
                                          **HARTLEY IN SUPPORT OF**
19                                        **PLAINTIFFS' MOTION FOR**
    SOUTH COAST AIR QUALITY               **SUMMARY JUDGMENT,**
20  MANAGEMENT DISTRICT,                  **DECLARATORY RELIEF, AND**
                                          **PERMANENT INJUNCTION**
21
             Defendant,
22                                        Hearing date:  July 14, 2025
23       And                              Hearing time:  1:30 p.m.
                                          Hearing place: 350 West First Street
24  PEOPLE'S COLLECTIVE FOR               Courtroom:     9A
    ENVIRONMENTAL JUSTICE,
25  SIERRA CLUB, and INDUSTRIOUS
26  LABS,

27           Defendant-Intervenors.

28

                                          **1**
    **Decl. of Mike Hartley ISO Pltffs' Mot. for Summary Judgment, Case No. 2:24-cv-10482 PA(PDx)**

I, Mike Hartley, declare:

1.      I am the Executive Director of the California State Pipe Trades Council.

2.      The California State Pipe Trades Council is a statewide labor organization comprised of District Councils and Local Unions representing 38,000 plumbers, pipefitters, steamfitters, welders, refrigeration fitters, HVAC technicians, and sprinkler fitters throughout California.  The Council is a chartered affiliate of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO CLC.  The Council's principal office is in Sacramento, California.  The workers represented by the Council help build California's homes, schools, hospitals, wastewater and water treatment plants, and industrial facilities to the highest standards of safety and efficiency.

3.      The Council's affiliates include Pipe Trades District Council No. 16, which includes thirteen Local Unions that represent more than 10,000 Union members who work throughout the jurisdiction of the South Coast Air Quality Management District. Their members install sophisticated piping systems, including natural-gas piping and gas-fired equipment, in every setting: underground installations, industrial facilities, hospitals and education buildings, commercial buildings, and single- and multi-family residential buildings.

4.      District Council 16, its Local Unions, their signatory contractors, and their Joint Apprenticeship and Training Committees spend tens of millions of dollars annually in training apprentices and educating their members in work skills, plumbing codes, jobsite hazards, safety practices, theory, and certification of all installations. Their mission is to educate, train, and represent highly skilled journey workers and apprentices;

**3**

**Decl. of Mike Hartley ISO Pltffs' Mot. for Summary Judgment, Case No. 2:24-cv-10482 PA(PDx)**

to support the working conditions and environment of their members; and to protect the health of California residents by providing quality plumbing and pipe fitting services.

5.      The South Coast Air Quality Management District's rule imposing impending zero-NO$_x$ emission limits on natural gas boilers, water heaters, and process heaters is causing and will cause substantial harm to the State Pipe Trades Council, District Council 16, its Local Union affiliates, and the workers we represent.  The accompanying declaration of Joe Raymond, the Business Manager of Plumbers and Pipefitters Local Union No. 364, describes that harm in further detail.

I declare under penalty of perjury that the above facts are true and correct.

Executed on April 7, 2025, at Sacramento, California.

Mike Hartley

_____

Mike Hartley

**Decl. of Mike Hartley ISO Pltffs' Mot. for Summary Judgment, Case No. 2:24-cv-10482 PA(PDx)**

Courtland L. Reichman (SBN: 268873)
  creichman@reichmanjorgensen.com
Brian C. Baran (SBN: 325939)
  bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz
America Corp., National Association of Home
Builders, California Manufacturers & Technology
Association, California Restaurant Association,
California Hotel & Lodging Association, California
Apartment Association, and Plumbing-Heating-
Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al. | Case No. 2:24-cv-10482 PA(PDx) |
| Plaintiffs, | Hon. Percy Anderson |
| v. | **DECLARATION OF JOE RAYMOND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION** |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
| Defendant, | |
| And | Hearing date: July 14, 2025 |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS, | Hearing time: 1:30 p.m. Hearing place: 350 West First Street Courtroom: 9A |
| Defendant-Intervenors. | |

**1**
Decl. of Joe Raymond ISO Pltffs' Mot. for Summary Judgment   Case No. 2:24-cv-10482 PA(PDx)

I, Joe Raymond, declare:

1.     I am the Business Manager of Plumbers and Pipefitters Local Union No. 364. Local 364 represents plumbers, pipefitters, refrigeration fitters and HVAC technicians in San Bernardino and Riverside Counties of California.

2.     Local 364 is a chartered affiliate of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO CLC. Local 364 is also an affiliate of the California State Pipe Trades Council, a statewide organization, and Pipe Trades District Council No. 16, which includes thirteen Local Unions that represent more than 10,000 Union members in southern California who work throughout the jurisdiction of the South Coast Air Quality Management District.

3.     Local 364 represents approximately 800 plumbers, pipefitters, steamfitters, welders, refrigeration fitters, and HVAC technicians working in Riverside and San Bernardino counties, which lie within the territory of the South Coast AQMD. Local 364's principal office is in Colton, California.

4.     Our District Council, Local Unions, signatory contractors, and Joint Apprenticeship and Training Committees spend tens of millions of dollars annually in training apprentices and educating our members in work skills, plumbing codes, jobsite hazards, safety practices, theory, and certification of all installations. Our mission is to educate, train, and represent highly skilled journey workers and apprentices; to support the working conditions and environment of our members; and to protect the health of California residents by providing quality plumbing and pipe fitting services.

5.     The South Coast Air Quality Management District's rule imposing zero-$NO_x$

emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule") is causing and will continue to cause serious harm to the Council, our District Council, our Local Unions, and the workers we represent.

6.      Union plumbers and pipefitters are losing work and wages as a result of the zero-$NO_x$ rule.  Members have already lost work and wages because residential construction projects traditionally built with natural gas service for gas-fired heating and appliances are now being designed and built without gas service or appliances, and often without gas infrastructure at all, in preparation for compliance with the District's zero-$NO_x$ rule.  With the gas plumbing work reduced or eliminated from many building projects, the projects will involve substantially less plumbing work and will employ fewer plumbers. The loss of work on gas infrastructure will cost many of our members their jobs, reduce the need for their services, result in lower hours worked and wages earned by members, and impair our training programs.  These harms will only be exacerbated once the zero-$NO_x$ rule goes into effect.

7.      For example, one of our members is a superintendent for a signatory contractor that does plumbing work on new single- and multi-family home construction. He tells me that because of the new AQMD zero-$NO_x$ rule, over the past year or so developers have started specifying electric heat pumps for the HVAC systems instead of the traditional gas-fired units they have specified in the past.  The cost of heat pumps is higher and the efficiency is lower than with gas-fired units, and the change is a huge blow to our members in lost work and wages.

8.      For another example, one of our signatory plumbing contractors has a subcontract on the construction of student housing with 600-plus apartments for U.C.

Decl. of Joe Raymond ISO Pltffs' Mot. for Summary Judgment   Case No. 2:24-cv-10482 PA(PDx)

1   Riverside.  Traditionally, such apartments have been built with gas service for gas-fired

2   kitchen stoves.  Our contractors and members have traditionally installed the gas-service

3   piping and gas-fired stoves, and this work on a job like the U.C. Riverside apartments

4   would have provided about 25,000 hours of work for our members.  But the U.C.

5   Riverside project calls for electric stoves, so our members have lost that work and the

6   wages it would have produced.

7

8          9.      Moreover, gas service would have provided a greater benefit to U.C. and its

9   student-housing residents, because gas is much cheaper to use than electricity.

10

11         I declare under penalty of perjury that the above facts are true and correct.

12         Executed on April 7, 2025, at _Colton, California._

13

14

15         _____

16                    Joe Raymond

17

18

19

20

21

22

23

24

25

26

27

28

(127 of 261), Page 127 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 127 of 261
Case 2:24-cv-10482-PA-PD   Document 50-11   Filed 04/14/25   Page 1 of 4   Page ID
#:1419

1 | Courtland L. Reichman (SBN: 268873)
creichman@reichmanjorgensen.com
2 | Brian C. Baran (SBN: 325939)
bbaran@reichmanjorgensen.com
3 | REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
4 | Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

5

6 | *Attorneys for Plaintiffs Rinnai America Corp., Noritz
America Corp., National Association of Home
Builders, California Manufacturers & Technology*
7 | *Association, California Restaurant Association,
California Hotel & Lodging Association, California*
8 | *Apartment Association, and Plumbing-Heating-
Cooling Contractors of California*

9
ADDITIONAL COUNSEL ON FOLLOWING PAGE
10

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al. | |
| Plaintiffs, | Civil Action No. |
| v. | 2:24-cv-10482 PA(PDx) |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | **DECLARATION OF LANCE HASTINGS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION** |
| Defendant, | |
| And | |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS, | |
| Defendant-Intervenors. | |

(128 of 261), Page 128 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 128 of 261
Case 2:24-cv-10482-PA-PD   Document 50-11   Filed 04/14/25   Page 3 of 4   Page ID
#:1421

I, Lance Hastings, hereby declare as follows:

1.    I am President and CEO at the California Manufacturers & Technology Association. I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.    California Manufacturers & Technology Association is a nonprofit organization organized under California law and headquartered in Sacramento, California. Its members comprise 400 businesses from the manufacturing community, including Plaintiff Rinnai America Corporation. We work to improve and enhance a strong business climate for California's 30,000 manufacturing, processing, and technology-based companies, and we have worked with the California state government since 1918 to develop balanced laws, effective regulations, and sound public policies to stimulate economic growth and create new jobs while safeguarding the state's environmental resources. We advocate for California policies that assist manufacturers and their employees. As the leading voice for California manufacturers, we promote industry interests that allow the sector to remain competitive.

3.    The South Coast Air Quality Management District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule") is causing current and imminent harm to our members in the District's jurisdiction. One or more members are suffering, or are imminently facing, increased costs, disruption to business, compliance burdens or costs, and harm to profits and operations from the zero-$NO_x$ rule. At least one member has expressed concern about the negative financial effects of the rule, which would result in significant business disruption because of the size of the California market for the banned products.

1    I declare under penalty of perjury under the laws of the United States of America

2    that the above facts are true and correct.

3    Executed on April 14, 2025, in Sacramento, CA.

4

5    [signature]

6    [NAME]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(130 of 261), Page 130 of 261
Case 2:24-cv-10482-PA-PD Document 50-12 Filed 04/14/25 Page 1 of 4 Page ID
#:1423

1    Courtland L. Reichman (SBN: 268873)
       creichman@reichmanjorgensen.com
2    Brian C. Baran (SBN: 325939)
       bbaran@reichmanjorgensen.com
3    REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
     100 Marine Parkway, Suite 300
4    Redwood Shores, CA 94065
     Tel.: (650) 623-1401; Fax: (650) 560-3501
5
     *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6    *America Corp., National Association of Home*
     *Builders, California Manufacturers & Technology*
7    *Association, California Restaurant Association,*
     *California Hotel & Lodging Association, California*
8    *Apartment Association, and Plumbing-Heating-*
     *Cooling Contractors of California*
9
     ADDITIONAL COUNSEL ON FOLLOWING PAGE
10
11              **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
12
     RINNAI AMERICA CORP., et al.
13
                Plaintiffs,
14                                              Civil Action No.
                v.
15                                              2:24-cv-10482 PA(PDx)
     SOUTH COAST AIR QUALITY
16   MANAGEMENT DISTRICT,                       **DECLARATION OF JOT**
                                                **CONDIE IN SUPPORT OF**
17              Defendant,                       **PLAINTIFFS' MOTION FOR**
                                                **SUMMARY JUDGMENT,**
     And                                        **DECLARATORY RELIEF, AND**
18                                              **PERMANENT INJUNCTION**
     PEOPLE'S COLLECTIVE FOR
19   ENVIRONMENTAL JUSTICE, SIERRA
     CLUB, and INDUSTRIOUS LABS,
20
                Defendant-Intervenors.
21
22
23
24
                              **ER-130**

I, Jot Condie, hereby declare as follows:

1. I am President and Chief Executive Officer at the California Restaurant Association. I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2. The California Restaurant Association is a nonprofit mutual benefit corporation organized under California law with its principal office in the County of Sacramento, California. The California Restaurant Association serves as a leading force for the restaurant industry in California, providing support, resources, and advocacy for restaurant owners and operators, while also promoting industry growth and networking. We engage with policy and legislative processes to advocate on behalf of our members to promote and protect restaurant industry interests. All members in good standing with the California Restaurant Association are also members of the Restaurant Law Center, an independent public policy organization supporting the restaurant and food-service industry across the United States.

3. The California Restaurant Association has over 18,000 members across California, including both restaurant owners and chefs. We have members that own or operate restaurants or work as chefs in the jurisdiction of the South Coast Air Quality Management District whose interests will be directly affected by the District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule"), which acts as a *de facto* ban on those gas appliances.

4. One or more of the association's members that do business in the District are suffering, or will imminently suffer, harm to their revenues and business operations along with having compliance burdens as a result of the District's zero-$NO_x$ rule.

(132 of 261), Page 132 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 132 of 261
Case 2:24-cv-10482-PA-PD   Document 50-12   Filed 04/14/25   Page 4 of 4   Page ID
#:1426

Under the zero-NO$_x$ rule, members who want to open a restaurant in a new building may pay higher costs to own, lease, or operate a building for which the regulated appliances must be electric.  And it may also result in more buildings being all electric, removing the option for restaurants to use gas for any appliances including stoves and ovens.  Restaurant owners and chefs will also be denied the use of gas appliances subject to the rule in existing restaurants and may be either subject to scheduled replacements or to forced retrofits to electric appliances, along with the associated reporting and compliance burdens.  Such scheduled or forced retrofits to electric appliances are expensive and disruptive to business operations; they may require electric panel upgrades, space reconfigurations, and new venting or condensate management.  And it will deprive restaurants of affordable and reliable energy.  This will impose significant costs and disruption on members who own or lease buildings and thereby affect chefs who work in these restaurants.

5.    Many members run on thin margins, making any increase in costs significant.  And many members in the District are already struggling due to a variety of unfavorable economic conditions.  California restaurant owners still have not fully recovered from the pandemic, and the rule will further exacerbate these unfavorable economic conditions.

I declare under penalty of perjury under the laws of the United States of America that the above facts are true and correct.

Executed on April 14, 2025, in Sacramento, California.



_____

Jot Condie

2

(133 of 261), Page 133 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 133 of 261
Case 2:24-cv-10482-PA-PD   Document 50-13   Filed 04/14/25   Page 1 of 4   Page ID
#:1427

1  Courtland L. Reichman (SBN: 268873)
     creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN: 325939)
     bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
   100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
   Tel.: (650) 623-1401; Fax: (650) 560-3501
5
   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6  *America Corp., National Association of Home*
   *Builders, California Manufacturers & Technology*
7  *Association, California Restaurant Association,*
   *California Hotel & Lodging Association, California*
8  *Apartment Association, and Plumbing-Heating-*
   *Cooling Contractors of California*
9
   ADDITIONAL COUNSEL ON FOLLOWING PAGE
10

11             **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
12

13  RINNAI AMERICA CORP., et al.

14             Plaintiffs,                    Civil Action No.

15             v.                             2:24-cv-10482 PA(PDx)

16  SOUTH COAST AIR QUALITY
    MANAGEMENT DISTRICT,                      **DECLARATION OF ANGELO**
                                              **AMADOR IN SUPPORT OF**
17             Defendant,                     **PLAINTIFFS' MOTION FOR**
                                              **SUMMARY JUDGMENT,**
18  And                                       **DECLARATORY RELIEF, AND**
                                              **PERMANENT INJUNCTION**
19  PEOPLE'S COLLECTIVE FOR
    ENVIRONMENTAL JUSTICE, SIERRA
20  CLUB, and INDUSTRIOUS LABS,

21             Defendant-Intervenors.

22

23

24

I, Angelo Amador hereby declare as follows:

1. I am Executive Director at the Restaurant Law Center. I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2. The Restaurant Law Center is a nonprofit, tax-exempt organization incorporated in Washington, D.C. and with its principal office also in Washington, D.C. It was established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States. While the Restaurant Law Center is an independent organization with its own board of directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the Restaurant Law Center. As such, the Restaurant Law Center represents the interests of members in an industry that includes over one million restaurant and food-service outlets employing about 15 million employees, or approximately 10% of the U.S. workforce.

3. The Restaurant Law Center's members include the 18,000 members of the California Restaurant Association. In California, the industry is the largest private employer in the state, with approximately 85,000 restaurant locations and $152.1 billion in sales. Despite the industry's size, 96% of restaurants in California have fewer than 50 employees. The California Restaurant Association is submitting its own declaration in this matter explaining that it has members who own or operate restaurants or who work as chefs in the jurisdiction of the South Coast Air Quality Management District whose interests will be directly affected by the District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule"). *See* Declaration of Jot Condie.

(135 of 261), Page 135 of 261
Case 2:24-cv-10482-PA-PD    Document 50-13    Filed 04/14/25    Page 4 of 4    Page ID
#:1430
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 135 of 261

1        4.     The Restaurant Law Center has one or more members that do business or

2    plan to do business in the District and are suffering, or will imminently suffer, harm to

3    their revenues and business operations along with compliance burdens as a result of the

4    District's zero-$NO_x$ rule. Under the rule, members will be deprived of affordable and

5    reliable energy; may pay higher costs to own and operate restaurants in new buildings;

6    and in existing restaurants, will be denied the use of gas appliances subject the rule. In

7    addition to the costs and other requirements of forced conversions, members will bear

8    associated rule compliance burdens such as reporting. With many members running on

9    thin margins, every increase in cost, business disruption, and compliance burdens

10   caused by the rule is significant, further exacerbating the unfavorable economic

11   conditions, including lingering effects from the pandemic, with which many members

12   in the District have already been struggling.

13         I declare under penalty of perjury under the laws of the United States of America

14   that the above facts are true and correct.

15         Executed on April 13, 2025, in Stafford, VA.

16

17                                      _____

18         Angelo Amador

19

20

21

22

23

24

(136 of 261), Page 136 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 136 of 261
Case 2:24-cv-10482-PA-PD   Document 50-14   Filed 04/14/25   Page 1 of 7   Page ID
#:1431

1   Courtland L. Reichman (SBN: 268873)
      creichman@reichmanjorgensen.com
2   Brian C. Baran (SBN: 325939)
      bbaran@reichmanjorgensen.com
3   REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
    100 Marine Parkway, Suite 300
4   Redwood Shores, CA 94065
    Tel.: (650) 623-1401; Fax: (650) 560-3501
5
    *Attorneys for Plaintiffs Rinnai America Corp.  Norit*
6   *America Corp.  National Association of   ome*
     *uilders  California Manufacturers    Tec nology*
7   *Association  California Restaurant Association*
    *California   otel    odging Association  California*
8   *Apartment Association  and Plumbing-  eating-*
    *Cooling Contractors of California*
9
    ADDITIONAL COUNSEL ON FOLLOWING PAGE
10
                    UNITED STATES DISTRICT COURT
11                  CENTRAL DISTRICT OF CALIFORNIA
12
    RINNAI AMERICA CORP., et al.
13
              Plaintiffs,
14                                              Civil Action No.
              v.
15                                              2:24-cv-10482 PA(PDx)
    SOUTH COAST AIR QUALITY
16  MANAGEMENT DISTRICT,                        **DECLARATION OF MATT P.
                                                GELFAND IN SUPPORT OF
17            Defendant,                        PLAINTIFFS' MOTION FOR
                                                SUMMARY JUDGMENT,
18  And                                         DECLARATORY RELIEF, AND
                                                PERMANENT INJUNCTION**
19  PEOPLE'S COLLECTIVE FOR
    ENVIRONMENTAL JUSTICE, SIERRA
20  CLUB, and INDUSTRIOUS LABS,

              Defendant-Intervenors.
21

22

23

24

(137 of 261), Page 137 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 137 of 261
Case 2:24-cv-10482-PA-PD    Document 50-14    Filed 04/14/25    Page 3 of 7    Page ID
#:1433

1    I, Matthew P. Gelfand, hereby declare as follows:

2    1.    I am Counsel at Californians for Homeownership, Inc. I have personal

3    knowledge of the following facts and, if called to testify, I could and would testify

4    competently to their truth and accuracy.

5    2.    Californians for Homeownership, Inc. ("Californians") is a California

6    nonprofit public benefit corporation and a § 501(c)(3) public charity. Our mission is to

7    address California's housing crisis through litigation in support of the production of

8    housing affordable to families at all income levels.

9    3.    Californians was formed in response to a call from the California

10    Legislature for increased nonprofit public interest litigation against local agencies

11    whose actions exacerbate the housing crisis. The Legislature has been engaged in a

12    period of intense focus on California's housing crisis—a period that continues to this

13    day.  The Legislature has made findings, codified in the state's landmark Housing

14    Accountability Act, that "[t]he lack of housing . . . is a critical problem that threatens

15    the economic, environmental, and social quality of life in California;" that "California

16    housing has become the most expensive in the nation;" that "[t]he excessive cost of the

17    state's housing supply is partially caused by activities and policies of many local

18    governments that . . . require that high fees and exactions be paid by producers of

19    housing;" that "[m]any local governments do not give adequate attention to the

20    economic, environmental, and social costs of decisions that result in . . . excessive

21    standards for housing development projects;" and that "[t]he consequences of failing

22    to effectively and aggressively confront this crisis are hurting millions of Californians,

23    robbing future generations of the chance to call California home, stifling economic

24    opportunities for workers and businesses, worsening poverty and homelessness, and

1   undermining the state's environmental and climate objectives."   Cal. Gov. Code

2   §§ 65589.5(a)(1)(A), (a)(1)(B), (a)(1)(D), (a)(2)(A).

3        4.    Californians' purpose includes representing the interests of the future

4   residents of residential units. Because *potential* residents do not reside in the potential

5   residential units whose affordability or creation is affected by a governmental decision,

6   these individuals do not receive advance notice of the decision-making process, and

7   they lack political recourse against the government actors responsible for the decision.

8   Accordingly, California has statutorily provided for standing for nonprofit

9   organizations to represent potential residents in certain land use disputes.  Californians

10  represents the interests of potential residents under California's statutory standing and

11  through more general public interest or representational standing principles.  These

12  individuals are and will be harmed by the District's zero-$NO_x$ rule in at least two ways.

13       5.    First, for some potential new residential developments, the added expense

14  for compliant appliances will cause the developments to no longer "pencil out" (attain

15  financial feasibility given market rents or sales prices), meaning that the developments

16  will not be built or will be built with fewer units.  The unbuilt units will not be available

17  to potential residents, and the increased competition for fewer units will result in

18  increases in rents and sales prices for existing units.  Additionally, for mixed-income

19  projects that include a fixed percentage of purpose-built deed-restricted affordable

20  units to take advantage of zoning or other benefits, as is common in California, fewer

21  of those purpose-built affordable units will be created.

22       6.    Second, to the extent that development of new units remains financially

23  feasible, the rents and sales prices for these units will increase because the developers

24  will pass along the increased appliance costs to the eventual renters or buyers.

2

(139 of 261), Page 139 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 139 of 261
Case 2:24-cv-10482-PA-PD   Document 50-14   Filed 04/14/25   Page 5 of 7   Page ID
#:1435

7.     Californians' purpose also includes representing the interests of current low- and moderate-income tenants and homeowners, who are particularly impacted by policies that increase the barriers to or costs of maintaining a home or adding capacity to an existing home, such as through an addition or the construction of an accessory dwelling unit.  These individuals are and will be harmed by the District's zero-$NO_x$ rule in several ways.

8.     First, homeowners will face increased total costs of ownership associated with replacing appliances.  Some lower-income homeowners who are unable to bear this cost will resort to taking out home equity lines of credit, reducing their equity in their homes.  Others may choose to live without important appliances due to the financial burden of obtaining appliances that comply with the District's zero-$NO_x$ rule.

9.     Second, when landlords face costly appliance replacement expenses due to the District's zero-$NO_x$ rule, they will pass these expenses along to their tenants.  In some cases, this kind of pass-through is expressly permitted, even for rent-controlled or rent-restricted units.  In other cases, it will be accomplished through rent increases at lease renewal.

10.     Third, homeowners seeking to add much-needed capacity to an existing home, such as through an addition or the construction of an accessory dwelling unit, will face increased appliance costs.

11.     Californians' purpose is also to support the California Association of REALTORS ("C.A.R.").  Californians is an I.R.C. § 509(a)(3) supporting organization, it is organized for the benefit of C.A.R. and its members, and it receives the majority of its organizational and financial support from C.A.R. C.A.R. is a voluntary trade association whose membership consists of approximately 200,000 persons licensed by

the State of California as real estate brokers and salespersons and the local Associations of REALTORS to which those members belong. Members of C.A.R. assist the public in buying, selling, leasing, financing, and managing residential and commercial real estate throughout California, including in the jurisdiction of the South Coast Air Quality Management District.

12.    C.A.R.'s members are and will be harmed by the District's zero-$NO_x$ rule in several ways.

13.    First, the zero-$NO_x$ rule will increase the cost to construct, own, and operate residential developments, reducing the development of new residential dwellings and reducing the financial viability of for-sale developments and conversions, thereby limiting residential transactions.

14.    Second, concerns about the future need for appliance replacement will disrupt some real estate transactions.  When buyers become aware that an appliance will need to be replaced with a costly alternative in the future, potentially requiring building upgrades or modifications, they may refuse to remove contingencies or attempt not to close on a transaction.

15.    Third, many of C.A.R.'s members own and operate multifamily residential properties and, under the District's zero-$NO_x$ rule, unnecessarily will bear increased costs and experience disruptions associated with the replacement of

//

//

//

//

//

4

**ER-140**

1    appliances.

2           I declare under penalty of perjury under the laws of the United States of America

3    that the above facts are true and correct.

4           Executed on April 10, 2025, in Los Angeles, CA.

5

6    _____

7                    Matthew P. Gelfand

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(142 of 261), Page 142 of 261
Case 2:24-cv-10482-PA-PD   Document 50-15   Filed 04/14/25   Page 1 of 8   Page ID
#:1438

1   Courtland L. Reichman (SBN: 268873)
      creichman@reichmanjorgensen.com
2   Brian C. Baran (SBN: 325939)
      bbaran@reichmanjorgensen.com
3   REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
    100 Marine Parkway, Suite 300
4   Redwood Shores, CA 94065
    Tel.: (650) 623-1401; Fax: (650) 560-3501
5
    *Attorneys for Plaintiffs Rinnai America Corp., Noritz
6   America Corp., National Association of Home
    Builders, California Manufacturers & Technology
7   Association, California Restaurant Association,
    California Hotel & Lodging Association, California
8   Apartment Association, and Plumbing-Heating-
    Cooling Contractors of California*
9
    ADDITIONAL COUNSEL ON FOLLOWING PAGE
10

11              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
12

13   RINNAI AMERICA CORP., et al.

14            Plaintiffs,                     | Civil Action No.

15            v.                              | 2:24-cv-10482 PA(PDx)

     SOUTH COAST AIR QUALITY
16   MANAGEMENT DISTRICT,                     | **DECLARATION OF THOMAS
                                                K. BANNON IN SUPPORT OF
17            Defendant,                        PLAINTIFFS' MOTION FOR
                                                SUMMARY JUDGMENT,
18   And                                        DECLARATORY RELIEF, AND
                                                PERMANENT INJUNCTION**
     PEOPLE'S COLLECTIVE FOR
19   ENVIRONMENTAL JUSTICE, SIERRA
     CLUB, and INDUSTRIOUS LABS,
20
              Defendant-Intervenors.
21

22

23

24

(143 of 261), Page 143 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 143 of 261
Case 2:24-cv-10482-PA-PD    Document 50-15    Filed 04/14/25    Page 3 of 8    Page ID
#:1440

I, Thomas K. Bannon, hereby declare as follows:

1.     I am the Chief Executive Officer of the California Apartment Association. I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.     The California Apartment Association is a § 501(c)(6) nonprofit California corporation with its headquarters in Sacramento, California. We are the largest state-wide rental housing trade association in the country, representing more than 50,000 property owners and housing operators who are responsible for nearly two million rental housing units throughout California, including approximately 1,460 members within the jurisdiction of the South Coast Air Quality Management District. We provide our membership with support, information, and educational resources relevant to all aspects of California's rental housing industry. Our members are businesspeople, employers, and landlords who are subject to strict business, employment, and housing legal standards in California.

3.     The California Apartment Association has one or more members that do business in the District and are suffering, or will imminently suffer, harm to their revenues and business operations as a result of the District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule").

4.     The impending zero-$NO_x$ rule is causing, or will imminently cause, at least one member unnecessarily to bear increased costs associated with residential construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances subject to the rule.

5.     The zero-$NO_x$ rule will impose serious disruption, as forced replacements

1

(144 of 261), Page 144 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 144 of 261
Case 2:24-cv-10482-PA-PD    Document 50-15    Filed 04/14/25    Page 4 of 8    Page ID
#:1441

1    may require electric panel upgrades, new transformers, space reconfigurations, new

2    supporting infrastructure, new venting or condensate management, and potential tenant

3    relocations while compliance is achieved.

4        6.    For example, individual water heaters are often located in rental units

5    occupied by tenants. Replacing these appliances with compliant appliances can require

6    significant structural changes to the premises, such as installation of additional ducting

7    and venting necessary for heat pump systems to operate properly and the addition of

8    sound suppression materials to compensate for the increased noise created by such

9    systems. In older rental properties, this type of construction activity carries with it the

10   additional requirement to follow specific work practices to prevent danger posed by

11   hazardous materials such as lead-based paint and asbestos. In addition to being costly,

12   this type of construction activity is disruptive to tenants, who may be unable to access

13   significant portions of their home or may need to vacate the premises temporarily.

14   Accordingly, our members are experiencing or will imminently experience harm in the

15   form of economic injuries, altered business practices, and compliance burdens because

16   of the zero-$NO_x$ rule.

17       7.    Further, rental housing providers in California are required by law to

18   maintain dwelling units in a habitable condition, which includes providing heat and hot

19   water. See Cal. Civ. Code § 1941.1(a) and Cal. Health & Saf. Code § 17920.3. In many

20   cases, provision of these required services depends on the use of appliances that are

21   soon to be prohibited by the zero-$NO_x$ rule, such as natural gas-powered water heaters

22   and boilers. This means rental housing providers must be proactive in planning for

23   replacement of covered appliances – even in advance of compliance deadlines specified

24   in the zero-$NO_x$ rule – as they cannot allow any period of down time while necessary

(145 of 261), Page 145 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 145 of 261
Case 2:24-cv-10482-PA-PD   Document 50-15   Filed 04/14/25   Page 5 of 8   Page ID
#:1442

conversion to electric appliances is achieved, without being at risk of violating California law.

8.      Rental housing providers in the District operate in a particularly complex regulatory environment that both results in increased complexity of complying with the zero-$NO_x$ rule and also limits the ability to recover the costs associated with said compliance.

9.      Specifically, rental housing providers in the District are subject to a variety of rent control, just cause eviction, and tenant relocation policies. Rent control policies – which exist both at the state and local level – limit the ability of rental housing providers to increase rents, even as operational costs like those associated with compliance with the zero-$NO_x$ rule rise. For example, the largest city within the District, the City of Los Angeles, has a rent control ordinance known as the Rent Stabilization Ordinance ("RSO") that limits rent increases to the rate of inflation. L.A. Mun. Code §§ 151.06(D) and 151.07(A)(6).[1] The RSO allows rental housing providers to petition and be granted permission for a higher rent increase to compensate for major improvement projects like those necessitated by the zero-$NO_x$ rule; however, the process for doing so is itself complex and subject to numerous limitations.[2] Among these limitations is a provision capping the maximum permissible increase at 10%,

---

[1] The Los Angeles City Council is considering lowering this ceiling to 5 percent, *see* https://laist.com/news/housing-homelessness/los-angeles-rent-control-increases-limits-stabilization-ordinance-economic-roundtable-housing-department-report-tenant-landlord (last visited April 10, 2025).

[2] The Primary Renovation Cost Recovery Regulations published by the City's Rent Adjustment Commission span 17 pages. *See* https://housing.lacity.gov/wp-content/uploads/2024/04/RAC-220-–-Primary-Renovation.pdf (last visited April 10, 2025).

3

1  even if the per-unit amortized cost of the improvements exceeds this amount. L.A.

2  Mun. Code § 151.07(a)(1)(C).

3      10.    The City of Los Angeles is not alone in limiting rent increases. The

4  County of Los Angeles similarly limits rent increases for rental housing located within

5  the unincorporated areas of the county, as do many other cities within the District,

6  including Baldwin Park, Bell Gardens, Beverly Hills, Commerce, Cudahy, Culver City,

7  Inglewood, Maywood, Pasadena, Pomona, Santa Ana, Santa Monica, and West

8  Hollywood. Further, most rental units not subject to a local rent control law are subject

9  to the state's rent control law, the Tenant Protection Act, which limits annual rent

10  increases to the rate of inflation plus five percent. Cal. Civ. Code § 1947.12.

11      11.    State and local landlord-tenant laws regulating evictions also impose

12  obstacles that make performing the work necessitated by the zero-$NO_x$ rule more

13  challenging by limiting the circumstances under which the tenant can be required to

14  vacate. Most rental units in California are subject to some form of "just cause" eviction

15  law. These laws provide that a tenancy may be terminated only if one of the reasons

16  enumerated in the law exists. While most such laws do allow the rental housing

17  provider to either temporarily or permanently regain possession of a rental unit for the

18  purpose of performing substantial renovations, they may do so only upon 60 days'

19  written notice in most cases,[3] and often, these laws require the rental housing provider

20  to make relocation assistance payments to tenants as a condition of regaining

21  possession. For rental units subject to the state's just cause eviction law, this amount is

22  equivalent to one month's rent. Cal. Civ. Code § 1946.2(d). However, local just cause

23

24

---

[3] Cal. Civ. Code § 1946.1(b).

4

**ER-146**

(147 of 261), Page 147 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 147 of 261
Case 2:24-cv-10482-PA-PD   Document 50-15   Filed 04/14/25   Page 7 of 8   Page ID
#:1444

eviction laws often require much larger payments. For example, the City of Pasadena mandates landlords who require a tenant to vacate for the purpose of performing substantial renovation work to pay both: (1) a relocation assistance payment of between $6,411 and $12,771, with the precise amount dependent on the size of the rental unit, length of time the tenants have resided in the unit, and whether the tenants have "special circumstances" such as having children in the home or one or more household members having a disability; and (2) a moving expense allowance of either $1,573 or $4,748, with the larger sum being owed to the "special circumstance" households. The City of Los Angeles' RSO imposes an even more onerous requirement mandating that, prior to performing any renovation work, rental housing providers must prepare for city approval a "Tenant Habitability Plan" that provides information about all of the following: (1) the contractor(s) that will perform the work; (2) a description of the scope, estimated timeline, and cost of the work, including the specific work to be undertaken on each affected unit; (3) a discussion of impact severity and duration with regard to noise, utility interruption, exposure to hazardous materials, interruption of fire safety systems, inaccessibility of all or portions of each affected rental unit, and disruption of other tenant services; (4) identification of the mitigation measures to ensure that rental units remain habitable; and (5) discussion of the impact on the personal property of affected tenants, including the exposure of tenant property to theft or damage from hazards related to work or storage and plans to mitigate said risk. L.A. Mun. Code § 152.03(B). The Los Angeles RSO further mandates that if the renovation work will impact the tenantability of a rental unit for 30 days or more, the tenant must be given the option of terminating their lease and being paid relocation assistance by the landlord. L.A. Mun. Code § 152.05. In most cases, the amount of relocation

(148 of 261), Page 148 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 148 of 261
Case 2:24-cv-10482-PA-PD    Document 50-15    Filed 04/14/25    Page 8 of 8    Page ID
#:1445

1  assistance required by the RSO depends on a number of factors including how long the

2  tenant has resided in the unit, whether the tenant is considered to be a "qualified tenant"

3  (applicable to households with elderly, disabled, or child occupants), and whether the

4  tenant's household income is equal to or less than 80% of the area median income –

5  based on these factors the amount of relocation assistance ranges from $10,330 to

6  $25,700.[4]

7       12.    In short, the District's zero-$NO_x$ rule will impose significant cost,

8  disruption, and regulatory compliance risks and burdens on the California Apartment

9  Association's members who own or operate rental properties in the District, some of

10 whom are submitting separate declarations in this matter.

11      I declare under penalty of perjury under the laws of the United States of America

12 that the above facts are true and correct.

13      Executed on April _10___, 2025, in  Sacramento, CA  .

14

15                                   _Thomas K. Bannon_

16                                   THOMAS K. BANNON

17

18

19

20

21

22

23
[4] *See* L.A. Housing Department Relocation Assistance Bulletin, available at
24 https://housing.lacity.gov/wp-content/uploads/2020/06/Relocation-Assistance-
English-6.26.24.pdf (last visited April 10, 2025).

1  Courtland L. Reichman (SBN: 268873)
      creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN: 325939)
      bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
   100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
   Tel.: (650) 623-1401; Fax: (650) 560-3501
5
   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6  *America Corp., National Association of Home*
   *Builders, California Manufacturers & Technology*
7  *Association, California Restaurant Association,*
   *California Hotel & Lodging Association, California*
8  *Apartment Association, and Plumbing-Heating-*
   *Cooling Contractors of California*
9
   ADDITIONAL COUNSEL ON FOLLOWING PAGE
10
11            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
12
13 RINNAI AMERICA CORP., et al.

              Plaintiffs,                    Civil Action No.
14
              v.                             2:24-cv-10482 PA(PDx)
15
   SOUTH COAST AIR QUALITY
   MANAGEMENT DISTRICT,                      **DECLARATION OF BRIAN**
16                                           **ABERNATHY IN SUPPORT OF**
              Defendant,                     **PLAINTIFFS' MOTION FOR**
17                                           **SUMMARY JUDGMENT,**
   And                                       **DECLARATORY RELIEF, AND**
18                                           **PERMANENT INJUNCTION**
   PEOPLE'S COLLECTIVE FOR
19 ENVIRONMENTAL JUSTICE, SIERRA
   CLUB, and INDUSTRIOUS LABS,
20
              Defendant-Intervenors.
21

22

23

24

(150 of 261), Page 150 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 150 of 261
Case 2:24-cv-10482-PA-PD    Document 50-16    Filed 04/14/25    Page 3 of 9    Page ID
#:1448

I, Brian Abernathy, hereby declare as follows:

1.    I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.    I am the owner of SGV Management, LLC, a limited liability company formed under the laws of California with its principal office in Arcadia, California. SGV Management, LLC is a member of the California Apartment Association, a nonprofit state-wide rental housing trade association.

3.    SGV Management, LLC has been our family business for over 30 years. We manage approximately 800 rental units under family ownership. These units are primarily located in foothill communities of the San Gabriel Valley, including the cities of Pasadena, Arcadia, Sierra Madre, Monrovia, Duarte, Covina, Azusa and Glendora, all of which are within the jurisdiction of the South Coast Air Quality Management District.

4.    Approximately, 86 rental units at 11 properties that the family owns and manages are serviced by 68 tankless natural gas-powered water heaters (with Rated Heat Input Capacity of 199,000 Btu per hour); 92 rental units at 2 other properties are serviced by gas boilers (with Rated Heat Input Capacities of 400,000 Btu per hour and 500,000 Btu per hour, respectively); and many other locations have 30- to 40-gallon tank individual or 100-gallon tank central gas water heaters. I understand that the tankless gas water heaters and gas boilers are subject to the District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule"). Moreover, I understand that the District is in the process of considering similar amendments to the rule applying to gas tank water heaters.

5.    Because we have more than 10 employees, I further understand we do not

1

(151 of 261), Page 151 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 151 of 261
Case 2:24-cv-10482-PA-PD   Document 50-16   Filed 04/14/25   Page 4 of 9   Page ID
#:1449

1   qualify as a "Small Business" under the District's zero-NO$_x$ rule.

2      6.     When we are forced to replace the tankless gas water heaters subject to

3 the zero-NO$_x$ rule's scheduled replacement deadlines, this will require, depending on

4 the property: structural engineering, electrical upgrades including service panel work,

5 new electrical feeds, concrete cutting, running long conduits, and new venting. For

6 most of our properties, the space dedicated for water heaters will need to be relocated.

7 In almost all cases, we will have to construct exterior closets (with the required venting)

8 to house the replacement electric heat pump water heaters (which are significantly

9 larger than tankless gas water heaters). For at least two properties, meeting minimum

10 setback requirements may require locating the new exterior closets in the properties'

11 patio areas, thereby removing this space from tenants' enjoyment. For one property,

12 first-floor installation is not a viable option because that would block tuck-under

13 parking areas; but the alternative of installing the new exterior closet on the balcony

14 may cause difficulty in meeting applicable city building code requirements, in addition

15 to removing that space from tenants' enjoyment. For another property, there is no good

16 location to accommodate the new cabinet required for the replacement water heaters

17 for the front house; and for the back house, the only feasible location is in the garage,

18 which would become too small to accommodate a vehicle.

19      7.     The reason we would need to replace existing tankless gas water heaters

20 with electric heat pump water heaters, despite the problems caused by heat pumps'

21 size, is that on-demand (tankless) electric water heaters require a tremendously higher

22 amount of electricity to generate the same heat as on-demand gas water heaters,

23 resulting in increased electric demand and substantially higher utility bills for tenants.

24 Even with the relatively lower amperage of heat pumps, however, either electrical

2

1  upgrades or new electrical panel work will still be necessary.

2    8.    With respect to our properties with gas boilers subject to the District's
3  zero-$NO_x$ rule, these are large boilers that service large 39- and 53-unit complexes (at
4  400,000 to 500,000 Btu per hour). We have never before had to purchase electrical
5  units of that size, but their power needs will undoubtedly be very large, and will require
6  both new electrical feeds and either electrical upgrades or panel work, as well as
7  potentially requiring other building modifications. For example, please see the attached
8  **Exhibit A**, which is a true and correct copy of a photograph I received from my
9  plumber depicting a stage in a project to convert a third party's 10-unit apartment
10 building's boiler room to heat pumps. This photograph depicts the utility room in that
11 building. Because of the size of service required, it was necessary to install, in addition
12 to the heat pumps themselves, four (4) condensers (to transfer heat extracted from the
13 refrigerant cycle into the water system), a buffer tank (to store thermal energy to
14 prevent frequent cycling of the heat pump), a 90-gallon swing tank (a specialized
15 storage tank to store excess hot water to ensure the heat pump receives cool inlet water
16 for more efficient operation of the system), and two (2) 360-gallon storage tanks.
17 However, due to the small size of the utility room, the heat pumps cooled that room to
18 such low temperatures that ice formed on the floor. Consequently, the ventilation
19 system needed to be upgraded to provide more ambient temperature airflow into the
20 room. Further complications with the installation occurred because the room was too
21 small to accommodate the 90-gallon swing tank and two (2) 360-gallon storage tanks.
22 Those needed to be located on the roof of the building. At 8.3 pounds per gallon of
23 water, given the amount of water stored in the various components, the load totaled
24 6,723 pounds of water alone—not including the weight of the equipment. Because of

3

(153 of 261), Page 153 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 153 of 261
Case 2:24-cv-10482-PA-PD   Document 50-16   Filed 04/14/25   Page 6 of 9   Page ID
#:1451

this weight, engineering was required to add additional roof load. In comparison, our properties' utility rooms are smaller than the one shown in Exhibit A, and our water heating systems need to service four to five times the number of units than the building associated with Exhibit A. (This predicament would also apply to our properties with 100-gallon central tank gas water heaters. Most of these are located in closets that are just large enough to accommodate the size of the 100-gallon water heaters themselves, with no additional room to house multiple condensers and tanks totaling several hundred gallons of water.) At this point in time, we do not know what a viable solution looks like for the increased space and engineering needs for our levels of service.

9.     Moreover, many of our properties are older constructions, built many decades ago. The costs and difficulties associated with retrofitting older properties such as ours are myriad and truly significant.

10.     In addition, in order to accomplish the retrofitting as and when required by the District's zero-$NO_x$ rule, we will in many if not most cases be performing this work while the units are still occupied, rather than asking the tenants to vacate, meaning we will have to ensure tenants' access to hot water for at least 8 hours a day. This is a difficult feat to accomplish, particularly when the work required for the forced replacements involves the coordination of multiple hired trades: for example, not only electricians and plumbers, but also a separate insulating company to insulate the pipes, as well as licensed lead and asbestos testing professionals when drilling into walls for new electrical lines and plumbing line work, in addition to roofers for venting. This level of work is very intrusive to tenants.

11.     In the rental housing provider business, margins are rather thin, and housing regulations limit our ability to recover regulatory compliance costs from

4

1  tenants. Though we are a family business, we have grown to be a good-sized family

2  business, which gives us more experience in communicating with tenants in difficult

3  situations and greater capacity for large capital expenditures than smaller "mom and

4  pop" businesses and sole proprietorships. There are many businesses smaller than ours

5  in this industry in this District, and they may not have the ability to weather or survive

6  the impositions of the District's zero-$NO_x$ rule.

7      12.    The threats to business operation and viability increase exponentially

8  when you must consider the prospect of the District imposing zero-$NO_x$ emissions

9  limits on more, and eventually all, residential gas appliances—in other words, the

10  prospect of an across-the-board gas ban. In this legal and economic climate, we are for

11  the first time in our family business's history redirecting future business and investment

12  decisions outside of the state of California.

13      13.    For these reasons, the District's zero-$NO_x$ rule imposes or imminently will

14  impose significant harm to our business, by increasing our costs, impacting our

15  business operations and revenues, disrupting our tenants, and raising our regulatory

16  compliance risks and burdens.

17      I declare under penalty of perjury under the laws of the United States of America

18  that the above facts are true and correct.

19      Executed on April __12th__, 2025, in __Arcadia, CA_____.

20

21

22  BRIAN ABERNATHY

23

24

5

# Exhibit A



1  Courtland L. Reichman (SBN: 268873)
     creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN: 325939)
     bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
   100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
   Tel.: (650) 623-1401; Fax: (650) 560-3501
5
   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6  *America Corp., National Association of Home*
   *Builders, California Manufacturers & Technology*
7  *Association, California Restaurant Association,*
   *California Hotel & Lodging Association, California*
8  *Apartment Association, and Plumbing-Heating-*
   *Cooling Contractors of California*
9
   ADDITIONAL COUNSEL ON FOLLOWING PAGE
10
11            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
12
13  RINNAI AMERICA CORP., et al.

14            Plaintiffs,                    Civil Action No.

              v.                            2:24-cv-10482 PA(PDx)
15
    SOUTH COAST AIR QUALITY
16  MANAGEMENT DISTRICT,                    **DECLARATION OF JESSICA**
                                            **BOHN IN SUPPORT OF**
              Defendant,                    **PLAINTIFFS' MOTION FOR**
17                                          **SUMMARY JUDGMENT,**
    And                                     **DECLARATORY RELIEF, AND**
18                                          **PERMANENT INJUNCTION**
    PEOPLE'S COLLECTIVE FOR
19  ENVIRONMENTAL JUSTICE, SIERRA
    CLUB, and INDUSTRIOUS LABS,
20
              Defendant-Intervenors.
21
22
23
24

(158 of 261), Page 158 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 158 of 261
Case 2:24-cv-10482-PA-PD   Document 50-17   Filed 04/14/25   Page 3 of 5   Page ID
#:1457

I, Jessica Bohn, hereby declare as follows:

1.      I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.      I am responsible for operations and compliance at 7240 Corbin Investment Co., LP, a rental property organized under the laws of California with its principal office in Woodland Hills, California. I am a member of the California Apartment Association, a nonprofit state-wide rental housing trade association.

3.      7240 Corbin Investment Co., LP has been family-managed for over 30 years and we manage other rental properties under family ownership. 7240 Corbin Investment Co., LP is a property with a natural gas-powered spa heater, which I understand is a type of process heater subject to the South Coast Air Quality Management District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule"). Because we have more than 10 employees, I understand we do not qualify as a "Small Business" under the District's zero-$NO_x$ rule.

4.      When we are forced to replace the spa heater subject to the zero-$NO_x$ rule's scheduled replacement deadline, we must be able to secure a replacement electric appliance that will operate to the satisfaction of our tenants. This may be difficult to achieve, because we must consider our tenants' amenities expectations and usage against the fact that, as between the options of electric resistance pool/spa heaters versus electric heat pump pool/spa heaters: on the one hand, electric resistance heaters are smaller appliances, have relatively lower appliance and installation costs, and are capable of heating water more rapidly than electric heat pumps, but also consume correspondingly higher energy amounts than heat pumps, likely making it prohibitively

1

expensive to keep a spa constantly heated; and on the other hand, electric heat pumps are larger appliances with relatively higher appliance and installation costs, are capable of retaining water temperature more efficiently than electric resistance heaters, but are significantly slower than resistance heaters in heating the water to the desired temperature in the first place. It is by no means certain that we will be able to find a satisfactory solution.

5.     Assuming we can secure an appropriate replacement electric spa heating appliance and avoid removing an important amenity from our tenants, because of the amount of power consumption involved, the work likely will entail installing a sub-grade power vault to house the electrical utility component equipment, as well as purchasing, encasing in conduit, laying, and burying lines to run between the vault and the heater. For this property, the ultimate location of a power vault will depend on the determination of the Los Angeles Department of Water and Power. Based on my past experience, depending on the setback requirement, the location will likely force a loss of community amenity space (such as the garden) or even a loss of parking space.

6.     Equally if not more importantly, and also based on my past experience, there is no guarantee that we will be able to secure the necessary input and permissions from the Los Angeles Department of Water and Power to conduct the required work in time to meet our individual compliance deadline under the District's zero-NO$_x$ rule. This is due to the city agency's capacity and resource constraints. We likely will be in a position where we must weigh competing compliance risks: those incurred under the District's zero-NO$_x$ rule (in the case of untimely replacement) against those incurred under landlord-tenant law (in the case of removing amenities).

1       7.   For these reasons, the District's zero-$NO_x$ rule imposes or imminently will

2  impose significant harm to our business, by increasing our costs, impacting our

3  business operations and revenues, disrupting our tenants, and raising our regulatory

4  compliance risks and burdens.

5       I declare under penalty of perjury under the laws of the United States of America

6  that the above facts are true and correct.

7       Executed on April ___13___, 2025, in ___WOODLAND HILLS, CALIFORNIA___.

8

9                                _____

10                               JES BOHN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

**ER-160**

(161 of 261), Page 161 of 261
Case 2:24-cv-10482-PA-PD   Document 50-18   Filed 04/14/25   Page 1 of 5   Page ID
#:1460

1   Courtland L. Reichman (SBN: 268873)
      creichman@reichmanjorgensen.com
2   Brian C. Baran (SBN: 325939)
      bbaran@reichmanjorgensen.com
3   REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
    100 Marine Parkway, Suite 300
4   Redwood Shores, CA 94065
    Tel.: (650) 623-1401; Fax: (650) 560-3501
5
    *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6   *America Corp., National Association of Home*
    *Builders, California Manufacturers & Technology*
7   *Association, California Restaurant Association,*
    *California Hotel & Lodging Association, California*
8   *Apartment Association, and Plumbing-Heating-*
    *Cooling Contractors of California*
9
    ADDITIONAL COUNSEL ON FOLLOWING PAGE
10

11              **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
12

13   RINNAI AMERICA CORP., et al.

14          Plaintiffs,                          Civil Action No.

              v.                                 2:24-cv-10482 PA(PDx)
15
     SOUTH COAST AIR QUALITY
16   MANAGEMENT DISTRICT,                        **DECLARATION OF BLAKE**
                                                 **BOYD IN SUPPORT OF**
17          Defendant,                           **PLAINTIFFS' MOTION FOR**
                                                 **SUMMARY JUDGMENT,**
18   And                                         **DECLARATORY RELIEF, AND**
                                                 **PERMANENT INJUNCTION**
19   PEOPLE'S COLLECTIVE FOR
     ENVIRONMENTAL JUSTICE, SIERRA
20   CLUB, and INDUSTRIOUS LABS,

21          Defendant-Intervenors.

22

23

24

I, Blake Boyd, hereby declare as follows:

1. I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2. I am the sole member of my rental property management companies, Lone Star Properties I, LLC and Lone Star Properties II, LLC, which are organized under the laws of California, with their principal office in Pasadena, California. I am also a member of the California Apartment Association, a nonprofit state-wide rental housing trade association.

3. Through my companies, I manage two properties in Pasadena, California purchased in 2019 and 2021. I have one (1) tankless natural gas-powered water heater at the first property, and eight (8) tankless natural gas-powered water heaters at the second property. I also have gas-powered laundry driers at both properties and gas stoves at the second property. For the gas stoves that are owned by tenants, I am responsible for infrastructure changes.

4. I understand that my properties' tankless gas water heaters are subject to the South Coast Air Quality Management District's rule imposing impending zero-$NO_x$ emission limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule"). I also understand that after the rule's effective date, when the tankless gas water heaters at my properties need to be replaced, the District's zero-$NO_x$ rule will obligate me to replace them with electric appliances.

5. First, this will force me to forego the benefit of the significant plumbing investments I made in my properties only three (3) years ago when I replaced the original tank gas water heaters with the current tankless gas water heaters and installed additional gas meters. These investments installed more efficient appliances that

(163 of 261), Page 163 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 163 of 261
Case 2:24-cv-10482-PA-PD   Document 50-18   Filed 04/14/25   Page 4 of 5   Page ID
#:1463

1   reduce emissions and benefit the environment.

2        6.    Second, the necessary electrical and plumbing work associated with

3   replacing the tankless gas water heaters with electric water heaters will be significant

4   investments. At the very least, I will need to convert electrical panels from 110 to 220

5   volts and run new wires between the panels and the units, despite recent electrical

6   upgrades that I had done in 2020 and 2022.

7        7.    Third, I will have to make a choice between electric tank/tankless water

8   heaters on the one hand, and electric heat pump water heaters on the other hand.  I

9   understand that the former are smaller and cheaper to purchase/install, but consume

10  tremendously higher amounts of energy; and that the latter are more energy efficient,

11  but larger and more expensive to purchase/install.  Because of their larger size, the heat

12  pump option may entail having to enlarge the exterior closets where the tankless gas

13  water heaters are currently housed.  Also, because heat pumps operate by extracting

14  heat from the surrounding air, this process can produce moisture that can build up if

15  the air isn't properly ventilated, meaning it may be necessary to install new venting and

16  condensate management in the exterior closets.

17       8.    Fourth, the rent control and other landlord-tenant laws and regulations that

18  my properties are subject to will limit or otherwise affect my ability to pass through

19  these regulatory compliance and capital improvement costs to tenants.  And in the event

20  I must require tenants to vacate for purposes of performing substantial renovation work,

21  I understand I will be mandated to pay relocation assistance payments and moving

22  expense allowances, with higher amounts due to tenants in defined special

23  circumstances.

24

9.      The baseline reality is that margins in the rental housing provider industry are tight to begin with.  In my case, the increased costs imposed under the District's zero-$NO_x$ rule will be significant relative to the small size of my business, which is extremely important to my livelihood.  I have strong ties to this area and am not in a position to move outside the state to find a more hospitable and survivable legal and economic climate.

10.     For these reasons, the District's zero-$NO_x$ rule imposes or imminently will impose significant harm to my business, by increasing my costs, impacting my operations and revenues, disrupting my tenants, and raising my regulatory compliance risks and burdens.

I declare under penalty of perjury under the laws of the United States of America that the above facts are true and correct.

Executed on April _13_, 2025, in _Los Angeles, California_.

BLAKE BOYD

[3]

(165 of 261), Page 165 of Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 165 of 261
Case 2:24-cv-10482-PA-PD    Document 50-19    Filed 04/14/25    Page 1 of 4    Page ID
#:1465

1 | Courtland L. Reichman (SBN: 268873)
    creichman@reichmanjorgensen.com
2 | Brian C. Baran (SBN: 325939)
    bbaran@reichmanjorgensen.com
3 | REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
    100 Marine Parkway, Suite 300
4 | Redwood Shores, CA 94065
    Tel.: (650) 623-1401; Fax: (650) 560-3501
5 |
6 | *Attorneys for Plaintiffs Rinnai America Corp., Noritz
    America Corp., National Association of Home
    Builders, California Manufacturers & Technology*
7 | *Association, California Restaurant Association,
    California Hotel & Lodging Association, California*
8 | *Apartment Association, and Plumbing-Heating-
    Cooling Contractors of California*
9 |
    ADDITIONAL COUNSEL ON FOLLOWING PAGE
10 |
11 |             **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
12 |

13 | RINNAI AMERICA CORP., et al.

              Plaintiffs,
14 |
                   v.                          Civil Action No.
15 | SOUTH COAST AIR QUALITY                    2:24-cv-10482 PA(PDx)
      MANAGEMENT DISTRICT,
16 |                                            **DECLARATION OF LYNN
              Defendant,                        MOHRFELD IN SUPPORT OF
17 | And                                         PLAINTIFFS' MOTION FOR
                                                SUMMARY JUDGMENT,
18 | PEOPLE'S COLLECTIVE FOR                     DECLARATORY RELIEF, AND
      ENVIRONMENTAL JUSTICE, SIERRA             PERMANENT INJUNCTION**
19 | CLUB, and INDUSTRIOUS LABS,

20 |          Defendant-Intervenors.

21 |

22 |

23 |

24 |

                              **ER-165**

ADDITIONAL COUNSEL

Sarah O. Jorgensen (*pro hac vice*)
  sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
  FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403; Fax: (650) 560-
  3501

Sean Kneafsey
  skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200; Fax: 213-892-1208

*Attorneys for Plaintiffs Rinnai America
Corp., Noritz America Corp., National
Association of Home Builders, California
Manufacturers & Technology Association,
California Restaurant Association,
California Hotel & Lodging Association,
California Apartment Association, and
Plumbing-Heating-Cooling Contractors of
California*

John J. Davis, Jr. (SBN 65594)
  jjdavis@msh.law
MCCRACKEN, STEMERMAN & HOLSBERRY
LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200; Fax: (415) 597-
7201

*Attorneys for Plaintiff California State
Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
  matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP,
INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-
7724

*Attorney for Plaintiff Californians for
Homeownership, Inc.*

Angelo I. Amador (*pro hac vice*)
  aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913 Fax: (202) 331-
2429

*Attorney for Plaintiff Restaurant Law
Center*

1     I, Lynn Mohrfeld, hereby declare as follows:

2     1.    I am President and Chief Executive Officer at the California Hotel &

3     Lodging Association. I have personal knowledge of the following facts and, if called

4     to testify, I could and would testify competently to their truth and accuracy.

5     2.    The California Hotel & Lodging Association is a § 501(c)(6) nonprofit

6     California corporation with its headquarters in Sacramento, California. We are the

7     largest state lodging industry association in the country, representing the interests of

8     more than 5,000 hotel owners and operators who directly and indirectly facilitate more

9     than $150.4 billion in travel-related spending across the state annually. California's

10     hospitality industry is a diverse cross-section of the state and includes independent

11     owner-operators, family businesspeople, first- and second-generation immigrant

12     entrepreneurs, large-scale operators, and many more. We regularly represent our

13     members' interests in governmental advocacy as well as legal affairs, and provide our

14     membership with educational and operational resources relevant to all aspects of

15     California's hotel and lodging industry.

16     3.    The California Hotel & Lodging Association has one or more members

17     that do business in the jurisdiction of the South Coast Air Quality Management District

18     and are suffering or will imminently suffer harm to their revenues and business

19     operations as a result of the District's rule imposing impending zero-$NO_x$ emission

20     limits on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule").

21     4.    The impending zero-$NO_x$ rule is causing or will imminently cause at least

22     one member of the California Hotel & Lodging Association unnecessarily to bear

23     increased costs associated with hotel construction, ownership, and maintenance arising

24     from the prohibition of effective, available, and affordable fuel gas appliances subject

1    to the District's rule.

2          5.    Due to the size and use cases of the affected equipment, the zero-$NO_x$ rule

3    will significantly affect essential parts of hotel operations and may necessitate

4    meaningful reductions in or absolute cancellations of guest stays to provide space and

5    time to retrofit electric panel upgrades, install new transformers, reconfigure spaces,

6    obtain and install new supporting infrastructure and appliances, design and construct

7    new venting or condensate management, implement other ancillary modifications, and

8    demolish existing infrastructure. Within the District, hotels dating to the 1920s are still

9    in operation and were constructed with materials and structural plans that never

10    contemplated such significant modifications. In some cases, retrofitting new systems

11    to comply with the District's rule may not be readily feasible and, particularly in

12    currently depreciated markets, could force complete overhaul or abandonment of the

13    existing structure.

14          6.    These cost pressures, revenue impacts, and compliance burdens come

15    during a period of economic vulnerability resulting from latent and persistent effects

16    of COVID-19 travel restrictions, digital telecommuting technologies, and the evolution

17    of localized travel demands.

18          I declare under penalty of perjury under the laws of the United States of America

19    that the above facts are true and correct.

20          Executed on April 10, 2025, in Sacramento, California.

21

22

23    Lynn Mohrfeld

24

2

(169 of 261), Page 169 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 169 of 261
Case 2:24-cv-10482-PA-PD Document 50-20 Filed 04/14/25 Page 1 of 5 Page ID
#:1469

1 | Courtland L. Reichman (SBN: 268873)
creichman@reichmanjorgensen.com
2 | Brian C. Baran (SBN: 325939)
bbaran@reichmanjorgensen.com
3 | REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
4 | Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501
5 |
*Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6 | *America Corp., National Association of Home*
*Builders, California Manufacturers & Technology*
7 | *Association, California Restaurant Association,*
*California Hotel & Lodging Association, California*
8 | *Apartment Association, and Plumbing-Heating-*
*Cooling Contractors of California*
9 |
ADDITIONAL COUNSEL ON FOLLOWING PAGE
10 |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al. | |
| Plaintiffs, | Civil Action No. |
| v. | 2:24-cv-10482 PA(PDx) |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | **DECLARATION OF WHITNEY SQUIRE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION** |
| Defendant, | |
| And | |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS, | |
| Defendant-Intervenors. | |

(170 of 261), Page 170 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 170 of 261
Case 2:24-cv-10482-PA-PD    Document 50-20    Filed 04/14/25    Page 3 of 5    Page ID
#:1471

I, Whitney Squire, hereby declare as follows:

1.    I am Chief Executive Officer of the Plumbing-Heating-Cooling Contractors Association of California.  I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to their truth and accuracy.

2.    The Plumbing-Heating-Cooling Contractors Association is the nation's oldest trade association, founded in 1883 by plumbing craftsmen seeking to distinguish themselves as experts and share best practices to improve the industry and protect the health and safety of the public. The Plumbing-Heating-Cooling Contractors of California chapter was founded in 1900, and for the past 125 years has been instrumental in training the workforce, elevating the industry, and connecting plumbing-heating-cooling professionals.

3.    Plumbing-Heating-Cooling Contractors of California is a 501(c)(6) nonprofit California corporation with its headquarters in Sacramento, California.  Our motto is "Best People. Best Practices", and we represent contractors ranging from single truck owner / operators to large commercial contractors, all committed to furthering our mission statement: The Plumbing-Heating-Cooling Contractors Association is dedicated to the advancement and education of the plumbing and HVACR industry for the health, safety, and comfort of society and the protection of the environment.  Plumbing-Heating-Cooling Contractors of California's members include The Family Plumber, which is submitting its separate declaration in this matter.

4.    One or more or our members that conducts business within the jurisdiction of the South Coast Air Quality Management District are currently experiencing or will imminently experience financial harm to their revenues and business operations due to

(171 of 261), Page 171 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 171 of 261
Case 2:24-cv-10482-PA-PD   Document 50-20   Filed 04/14/25   Page 4 of 5   Page ID
#:1472

1    the implementation of the District's rule imposing impending zero-$NO_x$ emission limits

2    on natural gas boilers, water heaters, and process heaters (the "zero-$NO_x$ rule"). The

3    zero-$NO_x$ rule will require one or more members operating their businesses within the

4    District to incur otherwise unnecessary increased expenses related to residential and

5    commercial construction, ownership, and maintenance, and will also impact members'

6    work opportunities, investments in long-term assets, and hiring and training programs.

7         5.    As explained in the declaration of The Family Plumber, the zero-$NO_x$ rule

8    will significantly decrease the company's plumbing business revenue associated with

9    the banned gas appliances and eventually eliminate the service and repair side of such

10    business. In addition to this substantial impact on sales, service, and revenue, this will

11    also impact the company's decisions on what equipment to buy and how many

12    employees to hire or train. Further, this will require the company to incur costs to train

13    its technicians for alternative non-gas products, something that is a significant capital

14    expense. The gas appliance ban will also increase appliance and installation costs for

15    customers while taking away customer choice—putting customers in difficult positions

16    and perhaps delaying needed appliance replacements.

17         6.    Other member companies are affected similarly, whether small family

18    businesses or larger contractors. Given the significant size of the District, such loss of

19    work and revenue, business disruption, and compliance costs will be felt tremendously,

20    particularly for smaller companies.

21         I declare under penalty of perjury under the laws of the United States of America

22    that the above facts are true and correct.

23         Executed on April 11, 2025, in Sacramento County.

24

2

**ER-171**

1

Whitney Squire

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(173 of 261), Page 173 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 173 of 261
Case 2:24-cv-10482-PA-PD   Document 50-21   Filed 04/14/25   Page 1 of 5   Page ID
#:1474

1  Courtland L. Reichman (SBN: 268873)
     creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN: 325939)
     bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
   100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
   Tel.: (650) 623-1401; Fax: (650) 560-3501
5
   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6  *America Corp., National Association of Home*
   *Builders, California Manufacturers & Technology*
7  *Association, California Restaurant Association,*
   *California Hotel & Lodging Association, California*
8  *Apartment Association, and Plumbing-Heating-*
   *Cooling Contractors of California*
9
10 ADDITIONAL COUNSEL ON FOLLOWING PAGE

11                **UNITED STATES DISTRICT COURT**
                  **CENTRAL DISTRICT OF CALIFORNIA**
12

13 RINNAI AMERICA CORP., et al.

14         Plaintiffs,                        Civil Action No.

            v.                               2:24-cv-10482 PA(PDx)
15
   SOUTH COAST AIR QUALITY               **DECLARATION OF MIKE**
16 MANAGEMENT DISTRICT,                  **PRENCAVAGE JR. IN**
                                         **SUPPORT OF PLAINTIFFS'**
17         Defendant,                    **MOTION FOR SUMMARY**
                                         **JUDGMENT, DECLARATORY**
   And                                   **RELIEF, AND PERMANENT**
18                                       **INJUNCTION**
   PEOPLE'S COLLECTIVE FOR
19 ENVIRONMENTAL JUSTICE, SIERRA
   CLUB, and INDUSTRIOUS LABS,
20
           Defendant-Intervenors.
21

22

23

24

(174 of 261), Page 174 of 261
Case 2:24-cv-10482-PA-PD    Document 50-21    Filed 04/14/25    Page 3 of 5    Page ID
#:1476
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 174 of 261

1    I, Mike Prencavage Jr., hereby declare as follows:

2    1.    I am the owner of The Family Plumber, a member of the California

3    chapter of the Plumbing-Heating-Cooling Contractors Association, and we operate in

4    the jurisdiction of the South Coast Air Quality Management District. I have personal

5    knowledge of the following facts and, if called to testify, I could and would testify

6    competently to their truth and accuracy.

7    2.    I submit this declaration in support of Plaintiffs' Motion for Summary

8    Judgment in this action. I explain the harms caused to my company and clients by the

9    District's zero-$NO_x$ rule in my attached letter (Exhibit A).

10    I declare under penalty of perjury under the laws of the United States of America

11    that the above facts are true and correct.

12    Executed on April __9__, 2025, in Los Alamitos, California.

13

14    _____

15    Mike Prencavage Jr.

16

17

18

19

20

21

22

23

24

1
**ER-174**

# EXHIBIT A

(176 of 261), Page 176 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 176 of 261
Case 2:24-cv-10482-PA-PD    Document 50-21    Filed 04/14/25    Page 5 of 5    Page ID
#:1478



**Statement to AQMD regarding zero-Nox rule:**

As a multi-generational family-owned company for over 39 years, our company has always specialized in providing top quality plumbing services for residential clients in and throughout Los Angeles and Orange County. Roughly 70% of the total company revenue derives from services we provide in the residential gas appliance repair/replace category.

In an already volatile industry of competing companies who are primarily un-licensed we see this zero-Nox rule as an avenue for these types of companies to ignore this ruling regardless and take advantage of becoming an "only option" alternative for clients who don't want to switch to all electric appliances or otherwise. Consumers have choices in any other home service space to pick and choose the products they want (roofing, lumber, agriculture etc.). This rule takes away that opportunity for a free and fair market.

After this rule takes effect, we would in essence be losing roughly 60-70% of our overall business revenue. Moreover, we would lose the repair side of our business altogether. Our business, as it has been for over 39 years, provides installation and repair options for our clients to ensure they control what goes into their home. This rule is a forceful removal of a free market in the gas appliance sector. Because of this rule our clients will have fewer appliance options, impacting on the affordability of installation and disruption to overall household ownership costs.

Not only would revenue generation be severely impacted by this rule for our company, but also the training cost incurred for alternative non-gas products that haven't been fully tested in the residential space. We would need to spend large sums of capital to send our technicians to formalize training on non-gas products which furthermore depletes our working capital further. The expectations from AQMD that this rule can move forward without any ramifications to small plumbing businesses is absurd. Because of the overall size of the district and the plan for complete zero-NOx products, the business disruption will be felt tremendously.

We do not support this rule and would hope that the free market would prevail. Our clients are looking for our company to provide options, not forcefully demand they spend more in order to switch to zero-NOx.

_____                    04/09/25

Mike Prencavage Jr. (Owner – The Family Plumber)            Date

3613 Briggeman Dr. Los Alamitos CA 90720

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 24-10482 PA (PDx) | Date | February 26, 2025 |
|---|---|---|---|

| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District |
|---|---|

**Present: The Honorable**  PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**     IN CHAMBERS – COURT ORDER

Before the Court is a Motion to Intervene as Defendants ("Motion") filed by proposed defendant-intervenors People's Collective for Environmental Justice, Sierra Club and Industrious Labs ("Proposed Intervenors").  (Docket No. 27.)  Plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association, and California Apartment Association ("Plaintiffs") have represented to counsel for Interveners that they do not oppose the Motion as long as it is granted with certain conditions (as set forth in the proposed order granting the Motion).  (Docket No. 27 at pp. 3-4.)[1] Proposed Intervenors also represent that defendant South Coast Air Quality Management District ("SCAQMD" or "Defendant") supports the Motion.  (Docket No. 27 at p. 3.)  Pursuant to Federal Rule of Civil Procedure 78 and Local Rule 7-15, the Court finds this matter appropriate for

---

[1]     Specifically the agreed upon conditions are set forth as follows:

> Proposed Intervenors may not expand the scope of this action.  In particular, Proposed Intervenors may not move for relief in District Court separately from the South Coast AQMD, but Proposed Intervenors are not limited in the arguments they may make within the scope of this action.  Proposed Intervenors may submit their own brief in support of any motion filed by the South Coast AQMD.  All filings must be in accordance with the Court's Standing Order and may not be duplicative.  Proposed Intervenors and Plaintiffs agree not to pursue discovery between themselves.  This agreement does not place any conditions on Proposed Intervenors' participation or submissions at any appellate stage.

(Docket No. 27-8 at p. 3.)

(178 of 261), Page 178 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 178 of 261
Case 2:24-cv-10482-PA-PD    Document 35    Filed 02/26/25    Page 2 of 4    Page ID
#:899

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | | Date | February 26, 2025 |
|---|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District | | | |

decision without oral argument. The hearing on the Motion, calendared for March 17, 2025 is vacated, and the matter taken off calendar.

## I.    **Factual Background**

In this action, Plaintiffs, manufacturers of gas appliances, affordable housing groups, labor union associations and associations of manufacturers, builders, commercial and residential building owners, hotel owners and operators, and restaurant chefs and owners, seek declaratory and injunctive relief against enforcement of the SCAQMD's rule imposing a zero-nitrogen oxide standard on certain categories of natural gas appliances covered by the federal Energy Policy and Conservation Act, 42 U.S.C. §§ 6201-6422 ("EPCA"). (Complaint ¶1.) Plaintiffs allege that implementation of this rule will effectively prohibit the manufacture, sale, purchase and installation of natural gas appliances after certain dates, and that this "de facto ban" on gas appliances violates the EPCA, which preempts this type of ban on gas appliances. (Id.)

Proposed Intervenors are environmental groups whose missions include protecting the health of their members by reducing air pollution in California. (Docket No. 27-1 at pp. 15-16.) These groups represent the public interest, and also the members who live near facilities that operate gas boilers and water heaters covered by the rule. (Id.) People's Collective for Environmental Justice is a non profit association dedicated to activating the community to fight against pollution and environmental racism. (Id.) Sierra Club is a national environmental organization dedicated to its members enjoyment of the outdoors, preserving the planet, and the responsible use of the earth's ecosystems and resources. (Id.) Industrious Labs is an environmental organization focused on advocacy through research and communication campaigns to combat industrial air pollution. (Id.)[2]

Proposed Intervenors seeks intervention as of right or permissively. (Docket No. 27.) The Court addresses permissive intervention first.

## II.    **Permissive Intervention**

A district court may grant intervention under Rule 24(b) where the proposed intervenor shows that: (1) the motion is timely; (2) independent grounds for jurisdiction exist; and (3) the

---

[2]    "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." Sw. Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 820 (9th Cir. 2001).

(179 of 261), Page 179 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 179 of 261
Case 2:24-cv-10482-PA-PD    Document 35    Filed 02/26/25    Page 3 of 4    Page ID
#:900

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | | Date | February 26, 2025 |
|---|---|---|---|---|
| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District | | | |

intervenor's claim or defense and the main action share a common question of law or fact. <u>Perry v. Proposition 8 Official Proponents</u>, 587 F.3d 947, 955 (9th Cir. 2009). Even if each of these requirements is satisfied, the court has discretion "to determine the fairest and most efficient method of handling a case . . . ." <u>Venegas v. Skaggs</u>, 867 F.2d 527, 530 (9th Cir. 1989), aff'd sub nom, <u>Venegas v. Mitchell</u>, 495 U.S. 82, 110 S. Ct. 1679, 109 L. Ed. 2d 74 (1990) (internal citation and quotation marks omitted). "[A] court must consider whether intervention will 'unduly delay or prejudice the adjudication of the rights of the original parties." <u>Id.</u> (quoting Rule 24(b)). Additionally, a court should "evaluate whether the movant's 'interests are adequately represented by existing parties'" and whether judicial economy favors intervention. <u>Id.</u> at 530–31. "Rule 24 traditionally receives liberal construction in favor of applicants for intervention." <u>Arakaki v. Cayetano</u>, 324 F.3d 1078, 1083 (9th Cir. 2003).

The Court has considered each these factors, and in its discretion, finds that permissive intervention is appropriate in this case because each factor weighs in favor of intervention. The Motion is timely, made at an early stage in the proceedings and will not cause any delay or prejudice the existing parties. Indeed, Proposed Intervenors represent that they will work within the existing schedule set by the Court and will not delay resolution of any matters. In addition, Proposed Intervenors intend to defend the SCAQMD nitrous oxide rule against the claims raised in Plaintiffs' Complaint; thus their defenses share common questions of fact and law with the main action. Moreover, Proposed Intervenors have agreed to certain conditions that will prevent any delay or prejudice to the parties, and the presentation of duplicative motions and arguments.

### <u>Conclusion</u>

For the foregoing reasons and the reasons set forth in Proposed Intervenors' moving papers, the Court grants Proposed Intervenors' Motion subject to the following conditions:

(1)   Proposed Intervenors may not expand the scope of this action, raise new issues or make any motion independent of Defendant;

(2)   Proposed Intervenors may submit their own brief in support of any motion filed by Defendant, or to oppose a Motion filed by Plaintiffs, but their arguments may not be duplicative;

(3)   All filings must be in accordance with the Court's Standing Order and the Local Rules; and

(4)   Proposed Intervenors and Plaintiffs will not pursue discovery between themselves.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 24-10482 PA (PDx) | Date | February 26, 2025 |
|----------|----------------------|------|-------------------|

| Title | Rinnai America Corp., et al. v. South Coast Air Quality Management District |
|-------|------------------------------------------------------------------------------|

Because the Court grants the Motion for permissive intervention under Fed. R. Civ. P. 24(b), it does not reach the issue of whether Proposed Intervenors have a right to intervene under Fed. R. Civ. P. 24(a). Proposed Intervenors are ordered to file the proposed answer lodged with their Motion (Docket No. 27-9) by no later than March 5, 2025.

IT IS SO ORDERED.

Courtland L. Reichman (SBN: 268873)
  creichman@reichmanjorgensen.com
Brian C. Baran (SBN: 325939)
  bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz
America Corp., National Association of Home
Builders, California Manufacturers & Technology
Association, California Restaurant Association,
California Hotel & Lodging Association, California
Apartment Association, and Plumbing-Heating-
Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., NORITZ AMERICA CORP., NATIONAL ASSOCIATION OF HOME BUILDERS, CALIFORNIA STATE PIPE TRADES COUNCIL, CALIFORNIA MANUFACTURERS & TECHNOLOGY ASSOCIATION, CALIFORNIA RESTAURANT ASSOCIATION, RESTAURANT LAW CENTER, CALIFORNIANS FOR HOMEOWNERSHIP, INC., CALIFORNIA HOTEL & LODGING ASSOCIATION, CALIFORNIA APARTMENT ASSOCIATION, and PLUMBING-HEATING-COOLING CONTRACTORS OF CALIFORNIA | Civil Action No.<br><br>2:24-cv-10482 PA(PDx)<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
|            Plaintiffs, | |
|    v. | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
|            Defendant. | |

(182 of 261), Page 182 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 182 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 2 of 33    Page ID
#:394

ADDITIONAL COUNSEL:

Sarah O. Jorgensen (*pro hac vice*
  forthcoming)
  sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403; Fax: (650) 560-3501

Sean Kneafsey
  skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200; Fax: 213-892-1208

*Attorneys for Plaintiffs Rinnai America
Corp., Noritz America Corp., National
Association of Home Builders, California
Manufacturers & Technology Association,
California Restaurant Association,
California Hotel & Lodging Association,
California Apartment Association, and
Plumbing-Heating-Cooling Contractors of
California*

John J. Davis, Jr. (SBN 65594)
  jjdavis@msh.law
MCCRACKEN, STEMERMAN &
  HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200; Fax: (415) 597-7201

*Attorneys for Plaintiff California State
Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
  matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP,
  INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-
7724

*Attorney for Plaintiff Californians for
Homeownership, Inc.*

Angelo I. Amador (*pro hac vice*
forthcoming)
  aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913; Fax: (202) 331-
2429

*Attorney for Plaintiff Restaurant Law
Center*

## INTRODUCTION

1.     Plaintiffs seek declaratory and injunctive relief against enforcement of the South Coast Air Quality Management District's rule imposing a zero-$NO_x$ standard on certain categories of natural gas appliances covered by the federal Energy Policy and Conservation Act, 42 U.S.C. §§ 6201-6422 ("EPCA"). By design, the District's zero-$NO_x$ rule will effectively prohibit the manufacture, sale, purchase, or installation of certain natural gas appliances after set dates. Because $NO_x$ is a byproduct of combustion, banning $NO_x$ emissions bans gas appliances, which operate by combustion. But such *de facto* bans on gas appliances run afoul of EPCA. The Ninth Circuit recently held that EPCA would undoubtedly preempt a ban on gas appliances, and it therefore preempts a ban on gas piping that has the effect of banning gas appliances. So too here: The District cannot do indirectly by banning combustion emissions what it cannot do directly by banning gas appliances. This Court has federal question jurisdiction under 28 U.S.C. § 1331 to resolve this dispute.

2.     The District's zero-$NO_x$ rule is already harming and will harm many residents and businesses that use natural gas for furnaces and boilers, cooking appliances, water heaters, and other equipment. Prohibiting the end use of natural gas is at odds with the needs of individuals and businesses in the District for reliable, resilient, and affordable energy. Banning gas-fired instantaneous (tankless) water heaters, boilers, pool and spa heaters, or other appliances is fundamentally inconsistent with the public interest and consumer choice, will exacerbate California's problem of housing affordability, and will shift energy demand onto already overburdened electric grids. Plaintiffs support working to improve efficiency and reduce emissions, but banning these natural gas appliances does little to advance those goals—and in all

1

(184 of 261), Page 184 of 261  Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 184 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 4 of 33    Page ID
#:396

1    events, the District must comply with federal law and binding Ninth Circuit precedent.

2        3.    Plaintiffs Rinnai America Corporation, Noritz America Corporation,

3    National Association of Home Builders, California State Pipe Trades Council,

4    California Manufacturers & Technology Association, California Restaurant

5    Association, Restaurant Law Center, Californians For Homeownership, Inc.,

6    California Hotel & Lodging Association, California Apartment Association, and

7    Plumbing-Heating-Cooling Contractors of California are manufacturers of gas

8    appliances; affordable housing groups; labor union associations; and associations of

9    manufacturers, builders, owners of commercial and residential buildings, hotel owners

10   and operators, and restaurant chefs and owners.   Plaintiffs and their members are

11   harmed by the District's effective ban on certain gas appliances.   Plaintiffs face

12   significant costs in having to replace gas appliances with electric appliances in existing

13   buildings, which may also necessitate building modifications, disrupt business

14   operations, or require the temporary relocation of tenants.   The increased cost of

15   retrofitting or building for electric appliances will raise the cost of housing and limit

16   supply.  Plaintiffs also have members that include plumbers and pipefitters who will

17   see a decrease in the amount of gas plumbing work, affecting their hours, job

18   opportunities, and hiring and training in the industry.  In short, the District's rule will

19   impose enormous financial costs and disruption on businesses and individuals,

20   including Plaintiffs.

21       4.    The federal energy policy reflected in EPCA was born out of the oil crisis

22   of the 1970s and reflects concerns with energy independence, domestic supply, and

23   national security.   The federal regulatory scheme requires a practical approach to

24   energy regulation that maintains neutrality on energy sources and recognizes the need

for a diverse energy supply.  This is for good reason: A patchwork approach is unworkable, undercuts a coordinated national energy policy, overlooks the public's need for reliable and resilient energy, and denies consumers choice.

5.    EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances.  The thrust of EPCA's appliance provisions is that nationally uniform energy use and energy efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply, and that those standards should use consumption objectives that do not favor one type of energy or appliance over another.  To that end, EPCA's preemption provision for consumer appliances states:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product unless the regulation [falls within certain enumerated exceptions not applicable here].

42 U.S.C. § 6297(c) (emphasis added).  EPCA thus expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which EPCA sets energy conservation standards, leaving only narrow room for concurrent state and local regulations that meet certain stringent statutory conditions.  EPCA's default rule is federal preemption; Congress intended for national policy to control.

6.    Indeed, the Ninth Circuit recently held that EPCA preempted Berkeley's prohibition on gas piping in new buildings because it effectively banned covered gas appliances.  *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).  The Ninth Circuit decision emphasizes that "EPCA would no doubt preempt an

ordinance that directly prohibits the use of covered natural gas appliances in new buildings," and that "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly.*" *Id.* at 1107. Just as EPCA prohibited Berkeley from banning gas appliances indirectly by banning gas piping, so too does it prohibit the District from banning those appliances indirectly by prohibiting their $NO_x$ emissions. Controlling precedent therefore resolves this case.

7. In short, the District's zero-$NO_x$ rule will cause substantial adverse consequences for Plaintiffs and the public. The District's effort to bypass federal law to implement its own energy policy violates EPCA, is contrary to the public interest, and causes irreparable harm to Plaintiffs and their members. Plaintiffs accordingly bring this action seeking a declaration that the District's zero-$NO_x$ rule is preempted by EPCA, as well as an injunction preventing its enforcement.

## JURISDICTION

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

## VENUE

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant South Coast Air Quality Management District is the sole defendant and resides in the Central District of California within the meaning of § 1391(c)(2). Venue is also proper under § 1391(b)(2) because a substantial part of the acts and events giving rise to the claim occurred in the Central District of California, including because the rule at issue will be enforced here.

## PARTIES

10. Plaintiff Rinnai America Corporation is one of the leading manufacturers

4

(187 of 261), Page 187 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 187 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 7 of 33    Page ID
#:399

and sellers of gas instantaneous (tankless) water heaters in the United States. Rinnai has its headquarters in Peachtree City, Georgia, and in 2022, it opened the first gas tankless water heater manufacturing facility in the United States. Gas tankless water heaters provide greater efficiency and have longer life spans than traditional gas tank water heaters and therefore result in substantial energy savings and emissions reductions across the water heater market. Since their introduction in 2005, gas tankless water heaters have been increasing their share of the water heater market and represent about 10% of all water heater sales in 2022. Rinnai sells roughly 35% of gas tankless water heaters in the United States, and it has significant sales of gas tankless water heaters in California and in the District. Rinnai also sells commercial hybrid tank/tankless water heaters, residential and commercial condensing tankless boilers, residential condensing combination water heaters/boilers, and electric heat pump water heaters. It sells all these products in California and in the District.

11.    Rinnai is experiencing or will imminently experience harm in the form of economic injuries, lost sales, and altered business practices because of the impending ban on its appliances. Its distributors and sales personnel will no longer be able to sell, offer for sale, or install gas tankless water heaters in new buildings in the District or in replacement scenarios in existing buildings after the relevant effective dates. This will also affect Rinnai's long-term investment, manufacturing, marketing, and distribution plans.

12.    Plaintiff Noritz America Corporation is a leading manufacturer and seller of gas instantaneous (tankless) water heaters in the United States. Noritz has its headquarters in Fountain Valley, California, and is a wholly owned subsidiary of Noritz Corporation (Japan). Noritz's product line incorporates condensing and non-

condensing instantaneous water heaters, condensing combination gas boilers, and integrated hybrid electric heat pump water heaters.  It started doing business in the United States selling gas tankless water heaters in 2002.  Noritz sells roughly 10% of gas tankless water heaters in the United States, and it has significant sales of gas tankless water heaters in California and in the District.

13.    Noritz is experiencing or will imminently experience harm in the form of economic injuries, lost sales, and altered business practices because of the impending ban on its appliances.  Its distributors and sales personnel will no longer be able to sell, offer for sale, or install gas water heaters or boilers in new buildings in the District or in replacement scenarios in existing buildings after the relevant effective dates.  This will also affect Noritz's long-term investment, manufacturing, marketing, and distribution plans.  Additionally, as Noritz has its headquarters in California, Noritz may be forced to consider leaving the state if its primary business is not allowed to be conducted in the largest existing market for its products.

14.    Plaintiff National Association of Home Builders ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C.  It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states, including Plaintiff Rinnai.  About one-third of NAHB's members are home builders and remodelers, both single family and multifamily.  The rest work in closely related specialties such as sales and marketing, housing finance, manufacturing, and building materials supply.  The NAHB is affiliated with 11 local organizations in California, and NAHB and its local organizations have members in the District or who conduct business and operations in the District (including Rinnai).  The NAHB's mission is to protect and provide housing

6
ER-188

(189 of 261), Page 189 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 189 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 9 of 33    Page ID
#:401

opportunities for the American public while promoting the business interests of its members.

15.    The NAHB has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues, business operations, and compliance burdens as a result of the zero-$NO_x$ rule.  Because of the zero-$NO_x$ rule, some NAHB members in the District will lose the option of installing certain gas appliances, and some members that own multifamily buildings will be forced to replace certain gas equipment with electric equipment, which will require enormously extensive remodeling to incorporate electric service.    Moverover, NAHB's manufacturer members will lose sales and be forced to alter their business practices because of the rule.  Members of NAHB accordingly are experiencing or imminently will experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the District's zero-$NO_x$ rule.

16.    Plaintiff California State Pipe Trades Council ("Council") is a statewide labor organization comprised of District Councils and Local Unions representing 35,000 plumbers, pipefitters, steamfitters, welders, refrigeration fitters, HVAC technicians, and sprinkler fitters throughout California.  The Council is a chartered affiliate of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO CLC.  The Council's principal office is in Sacramento, California.  The workers represented by the Council help build California's homes, schools, hospitals, wastewater and water treatment plants, and industrial facilities to the highest standards of safety and efficiency.

17.    The Council's affiliates include Pipe Trades District Council No. 36, which includes six Local Unions that represent more than 10,000 Union members who

(190 of 261), Page 190 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 190 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 10 of 33   Page ID
#:402

work throughout the District. Their members provide sophisticated piping systems, and their work spans from underground installations to final connections of fixtures and equipment. District Council 36, the Local Unions, their signatory contractors, and their Joint Apprenticeship and Training Committees spend tens of millions of dollars annually in training apprentices and educating their members in work skills, plumbing codes, jobsite hazards, safety practices, theory, and certification of all installations. Their mission is to educate, train, and represent highly skilled journey workers and apprentices; to support the working conditions and environment of their members; and to protect the health of California residents by providing quality plumbing and pipe fitting services.

18.     The impending zero-$NO_x$ rule is causing current and imminent harm to the Council, District Council 16, its Local Union affiliates, and the workers they represent. Union plumbers and pipefitters are losing work and wages as a result of the gas ban. Members have already lost work and wages because residential construction projects traditionally built with gas service for gas heating and appliances are now being designed and built without gas service or appliances, and often without gas infrastructure at all, in preparation for compliance with the District's rule. With the gas plumbing work reduced or eliminated from many building projects, the projects will involve substantially less plumbing work overall and therefore will employ fewer plumbers. The loss of work on gas infrastructure will cost some of the Council's members their jobs, reduce the need for their services, result in lower hours worked and wages earned by members, or lead to hiring freezes.

19.     Plaintiff California Manufacturers & Technology Association ("CMTA") is a nonprofit organization organized under California law and headquartered in

(191 of 261), Page 191 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 191 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 11 of 33   Page ID
#:403

Sacramento, California. Its members comprise 400 businesses from the manufacturing community. The CMTA works to improve and enhance a strong business climate for California's 30,000 manufacturing, processing, and technology-based companies, and it has worked with the California state government since 1918 to develop balanced laws, effective regulations, and sound public policies to stimulate economic growth and create new jobs while safeguarding the state's environmental resources. It advocates for California policies that assist manufacturers and their employees. As the leading voice for California manufacturers, the CMTA promotes industry interests that allow the sector to remain competitive.

20. The District's zero-$NO_x$ rule is causing current and imminent harm to the CMTA's members. One or more members are suffering, or are imminently facing, increased costs, disruption to business, compliance burdens, and harm to profits and operations from the zero-$NO_x$ rule. At least one member has expressed concern about the negative financial effects of the rule, which would result in significant business disruption because of the size of the California market for the banned products.

21. Plaintiff California Restaurant Association ("CRA") is a nonprofit mutual benefit corporation organized under California law with its principal office in the County of Sacramento, California. It has over 18,000 members across California, including both restaurant owners and chefs. It has members that own or operate restaurants or work as chefs in the District whose interests will be directly affected by the District's zero-$NO_x$ rule.

22. The California Restaurant Association has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations along with compliance burdens as a result of the

(192 of 261), Page 192 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 192 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 12 of 33    Page ID
#:404

District's zero-$NO_x$ rule.  Under the rule, CRA members who want to open a restaurant in a new building may pay higher costs to own or lease a building for which certain appliances must be electric.  Restaurant owners and chefs will also be denied the use of gas appliances subject to the rule in existing restaurants that require appliance replacements, which may require electric panel upgrades, space reconfigurations, and new venting or condensate management.  This will impose significant costs on members who own or lease buildings and will also disrupt business operations and deprive restaurants of affordable and reliable energy.

23.    Plaintiff the Restaurant Law Center ("RLC"), is a nonprofit, tax-exempt organization incorporated in Washington, D.C. and with its principal office also in Washington, D.C.  The RLC was established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States.  While the RLC is an independent organization with its own board of directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC.  As such, the RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 15.7 million employees, or approximately 10% of the workforce in the United States.  In California, the industry is the largest private employer in the state, with approximately 85,000 restaurant locations and $152.1 billion in sales.  Despite the industry's size, 96% of restaurants in California have fewer than 50 employees.  The RLC's member restaurants include thousands located across the District whose interests will be directly affected by the District's zero-$NO_x$ rule.

24.    The RLC has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations

(193 of 261), Page 193 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 13 of 33   Page ID
#:405

along with compliance burdens as a result of the District's zero-$NO_x$ rule.  Under the rule, RLC members who want to open a restaurant in a new building may pay higher costs to own or lease a building for which certain appliances must be electric. Restaurant owners and chefs will also be denied the use of gas appliances subject to the rule in existing restaurants that require appliance replacements, which may require electric panel upgrades, space reconfigurations, and new venting or condensate management.  This will impose significant costs on members who own or lease buildings and will also disrupt business operations and deprive restaurants of affordable and reliable energy.  Many RLC members run on thin margins, making any increase in costs significant.  And many RLC members in the District are already struggling due to a variety of unfavorable economic conditions.  California restaurant owners still have not fully recovered from the pandemic, and the rule will further exacerbate these unfavorable economic conditions.

25.     Plaintiff Californians For Homeownership, Inc. ("CFH") is a California nonprofit public benefit corporation and a § 501(c)(3) public charity.  Its mission is to address California's housing crisis through litigation in support of the production of housing affordable to families at all income levels.

26.     CFH is an I.R.C. § 509(a)(3) supporting organization of the California Association of REALTORS ("C.A.R."), is organized for the benefit of C.A.R. and its members, and receives the majority of its organizational and financial support from C.A.R.  C.A.R. is a voluntary trade association whose membership consists of approximately 200,000 persons licensed by the State of California as real estate brokers and salespersons and the local Associations of REALTORS to which those members belong.  Members of C.A.R. assist the public in buying, selling, leasing, financing, and

(194 of 261), Page 194 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 194 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 14 of 33   Page ID
#:406

managing residential and commercial real estate. C.A.R.'s members are and will be harmed by the District's zero-$NO_x$ rule in several ways. First, the rule will increase the cost to construct, own, and operate residential developments, reducing the development of new residential dwellings and reducing the financial viability of for-sale developments and conversions in particular, limiting residential transactions. Second, concerns about appliance replacement are likely to disrupt real estate transactions. Third, many of C.A.R.'s members own and operate multifamily residential properties and under the District's rule will unnecessarily bear increased costs and experience disruptions associated with the replacement of appliances.

27. CFH's purpose includes representing the interests of the future residents of residential units in litigation. Because these individuals do not reside in the residential units or potential residential units whose affordability or creation is affected by a governmental decision, these individuals often do not receive advance notice of the decisionmaking process, and they lack political recourse against the government actors responsible for the decision. These individuals are and will be harmed by the District's zero-$NO_x$ rule because it will increase construction and renovation costs, reducing the likelihood of development and availability of homes they can afford.

28. Plaintiff California Apartment Association ("CAA") is a § 501(c)(6) nonprofit California corporation with its headquarters in Sacramento, California. CAA is the largest statewide rental housing trade association in the country, representing more than 50,000 property owners and housing operators who are responsible for nearly two million rental housing units throughout California, including approximately 1,460 members within the District. It provides its membership with support, information, and educational resources relevant to all aspects of California's rental

(195 of 261), Page 195 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 195 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 15 of 33   Page ID
#:407

housing industry. CAA members are businesspeople, employers and landlords who are subject to strict business, employment, and housing legal standards in California.

29. The CAA has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations as a result of the zero-$NO_x$ rule. The impending zero-$NO_x$ rule is causing or will imminently cause at least one member of CAA to unnecessarily bear increased costs associated with residential construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances subject to the rule. The rule will impose serious disruption, as forced replacements may require electric panel upgrades, new transformers, space reconfigurations, new supporting infrastructure, new venting or condensate management, and potential tenant relocations while compliance is achieved. For example, individual water heaters are often located in rental units occupied by tenants. Replacing these appliances with compliant appliances can require significant structural changes to the premises, such as installation of additional ducting and venting necessary for heat pump systems to operate properly and the addition of sound suppression materials to compensate for the increased noise created by such systems. In older rental properties, this type of construction activity carries with it the additional requirement to follow specific work practices to prevent danger posed by hazardous materials such as lead-based paint and asbestos. In addition to being costly, this type of construction activity is disruptive to tenants, who may be unable to access significant portions of their home or may need to vacate the premises temporarily. Accordingly, members of the CAA are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the zero-$NO_x$ rule.

30.     Plaintiff California Hotel & Lodging Association ("CHLA") is a § 501(c)(6) nonprofit California corporation with its headquarters in Sacramento, California. CHLA is the largest state lodging industry association in the country, representing more than 3,000 hotel owners and operators who directly and indirectly facilitate more than $150.4 billion in travel-related spending across the state annually. California's hospitality industry is a diverse cross-section of the state and includes independent owner-operators, family businesspeople, first- and second-generation immigrant entrepreneurs, large-scale operators, and many more. CHLA regularly represents its members' interests in governmental advocacy as well as legal affairs and provides its membership with educational and operational resources relevant to all aspects of California's hotel industry.

31.     CHLA has one or more members that do business in the District and are suffering or will imminently suffer harm to their revenues and business operations as a result of the zero-$NO_x$ rule. The impending zero-$NO_x$ rule is causing or will imminently cause at least one member of CHLA to unnecessarily bear increased costs associated with hotel construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances subject to the District's rule. Within the District, hotels dating to the 1920s are still in operation and were constructed with materials and structural plans that never contemplated such significant modifications. Due to the size and use cases of the affected equipment, the rule will significantly affect essential parts of hotel operations and may necessitate meaningful reductions in or absolute cancellations of guest stays to provide space and time to retrofit electric panel upgrades, install new transformers, reconfigure spaces, obtain and install new supporting infrastructure, design and construct new venting or

(197 of 261), Page 197 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 197 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 17 of 33   Page ID
#:409

condensate management, implement other ancillary modifications, and demolish existing infrastructure.  In some cases, retrofitting new systems to comply with the District's rule may not be readily feasible and, particularly in currently depreciated markets, could force complete overhaul or abandonment of the existing structure. These cost pressures and revenue impacts come during a period of economic vulnerability resulting from latent and persistent effects of COVID-19 travel restrictions, digital telecommuting technologies, and the materializing evolution of localized travel demands.  Accordingly, CHLA members are experiencing or will imminently experience harm in the form of significant economic injuries, altered business practices, and compliance burdens because of the zero-$NO_x$ rule.

32.    The Plumbing-Heating-Cooling Contractors Association is the nation's oldest trade association, founded in 1883 by plumbing craftsmen seeking to distinguish themselves as experts and share best practices to improve the industry and protect the health and safety of the public. The Plumbing-Heating-Cooling Contractors of California ("PHCC of California") chapter was founded in 1900, and for the past 124 years has been instrumental in training the workforce, elevating the industry, and connecting plumbing-heating-cooling professionals. PHCC of California is a 501 (c)(6) nonprofit California corporation with its headquarters in Sacramento, California. Our motto is 'Best People. Best Practices', representing contractors ranging from single truck owner / operators to large commercial contractors, all committed to furthering PHCC's mission statement: The Plumbing-Heating-Cooling Contractors Association is dedicated to the advancement and education of the plumbing and HVACR industry for the health, safety, and comfort of society and the protection of the environment.

33.    The PHCC of California has one or more members conducting business

(198 of 261), Page 198 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 198 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 18 of 33   Page ID
#:410

within the District who are currently experiencing or will imminently experience financial harm to their revenues and business operations due to the implementation of the zero-NOx regulation. This impending zero-NOx rule will obligate at least one member operating its business within the District to incur unnecessary increased expenses related to residential construction, ownership, and maintenance. The impending rule will also impact the work opportunities of one or more members operating in the District.

34.     Plaintiff associations each have standing to bring this action because the interests they seek to address are germane to their fundamental purposes; each Plaintiff association has one or more members that are being injured as a result of the rule and would independently have standing; and the claims asserted seek only declaratory and injunctive relief and therefore do not require individual members' participation.

35.     Defendant South Coast Air Quality Management District is a public entity existing under the laws of the State of California with the capacity to sue and be sued. Cal. Health & Safety Code §§ 40410, 40412, 40700, 40701(b); *see Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 777-86 (9th Cir. 2005).

36.     An actual and substantial controversy has arisen and now exists between Plaintiffs and the District concerning the validity of the District's zero-$NO_x$ rule. Plaintiffs contend that the rule's effective ban on certain gas appliances is preempted by EPCA.  Plaintiffs are informed and believe, and on that basis allege, that the District disagrees with Plaintiffs' contentions and asserts that its rule is lawful and enforceable.

37.     Enforcement of the rule will injure Plaintiffs or their members.  Those injuries will likely be redressed by a favorable ruling from this Court.

38.     Plaintiffs challenge the facial validity of the District's zero-$NO_x$ rule.

(199 of 261), Page 199 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 199 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 19 of 33   Page ID
#:411

1    There is no set of circumstances under which the rule can be valid under federal law.

2                                           **ALLEGATIONS**

3            **The District's Zero-NO$_x$ Rule**

4            39.    This case involves the District's Rule 1146.2, titled "Emissions of Oxides

5    of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters."  In

6    June 2024, the District amended the rule to phase in zero-NO$_x$ emission limits for

7    appliances within the rule's scope.  The amended rule is attached as Exhibit 1.

8            40.    As amended, the rule applies to "manufacturers, distributors, retailers,

9    Resellers, Installers, owners, and operators of Units fired with, or designed to be fired

10   with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000

11   British Thermal Units (Btu) per hour."  S. Coast AQMD R. 1146.2(b).  A "Unit" is

12   defined as "any Boiler, Water Heater, or Process Heater," except "Water Heaters

13   subject to the limits of Rule 1121," which governs some residential storage (tank) water

14   heaters.  *See* S. Coast AQMD R. 1146.2(c)(28), (c)(30), (k)(1)(B); *see also* S. Coast

15   AQMD R. 1146.2(c)(1), (18), (31) (defining "Boiler," "Process Heater," and "Water

16   Heater").

17           41.    Rule 1121 applies to tank-type natural gas water heaters with heat input

18   rates below 75,000 Btu per hour.  S. Coast AQMD R. 1121(a), (b)(14); *see* Ex. 2 at 2.

19   Residential tankless water heaters are not covered by Rule 1121 and thus are covered

20   by Rule 1146.2.

21           42.    According to the District, "Rule 1146.2 applies to more than one million

22   units."  Ex. 2 at 2.

23           43.    The amendments to Rule 1146.2, which set limits on NO$_x$ emissions for

24   regulated appliances, set a schedule for phasing in zero-NO$_x$ limits depending on the

(200 of 261), Page 200 of 261
Case 2:24-cv-10482-PA-PD  Document 12  Filed 12/17/24  Page 20 of 33  Page ID
#:412

1   type of appliance and whether it is in a new or existing building.  S. Coast AQMD
2   R. 1146.2(d)(1)-(2); *see* Ex. 2 attach. G at 1-1.

3       44.    The first zero-$NO_x$ limits for appliances in new buildings will take effect
4   January 1, 2026.  Those limits cover natural gas tankless water heaters with a rated heat
5   input capacity of 200,000 Btu per hour or less, along with all other "Type 1 Units"
6   (those with a rated heat input capacity less than or equal to 400,000 Btu per hour)
7   except pool heaters and "High Temperature Unit(s)."    S. Coast AQMD
8   R. 1146.2(d)(1)-(2); *see id.* 1146.2(c)(8) (defining "High Temperature Unit" as "any
9   Unit that is designed and used to produce steam or to heat water above 180 degrees
10  Fahrenheit"); *id.* 1146.2(c)(12) (defining "Instantaneous Water Heater" as "a tankless
11  Water Heater with a Rated Heat Input Capacity less than or equal to 2,000,000 Btu per
12  hour that heats water only on-demand when it flows through a heat exchanger, which
13  is a device used to transfer heat between two or more mediums of different
14  temperatures").  These limits will be applied to existing buildings in 2029.

15      45.    The second phase of appliances subject to zero-$NO_x$ limits are pool heaters
16  (whether Type 1 or Type 2) and all other Type 2 units (those with a rated heat input
17  capacity greater than 400,000 Btu per hour) except Type 2 High Temperature Units.
18  S. Coast AQMD R. 1146.2(d)(2); *see id.* 1146.2(c)(29) (defining "Type 2 Unit").  The
19  Phase II limits take effect in 2028 for new buildings and 2031 for existing buildings.
20  *Id.* 1146.2(d)(2) tbl.3.

21      46.    The third phase covers Type 1 and Type 2 High Temperature Units.  S.
22  Coast AQMD R. 1146.2(d)(2).  Zero-$NO_x$ limits for those appliances take effect in
23  2029 for new buildings and 2033 for existing buildings.  *Id.*

24      47.    Once a zero-$NO_x$ limit takes effect, Rule 1146.2(d)(2) provides that "[n]o

18

(201 of 261), Page 201 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 201 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 21 of 33    Page ID
#:413

person shall manufacture, supply, sell, offer for sale, or Install, for use in the South Coast AQMD" any appliance exceeding that limit.

48.    The rule is not limited to new appliances; it also mandates the eventual scheduled replacement of existing appliances with new ones that satisfy the zero-$NO_x$ limit.  In general, once a zero-$NO_x$ limit takes effect, appliances in existing buildings must be replaced with zero-$NO_x$ appliances after the appliances are 15 years old (for Type 1 appliances except tankless water heaters and High Temperature Units) or 25 years old (for all other appliances).    S. Coast AQMD R. 1146.2(d)(3); *see id.* 1146.2(d)(2) tbl.2 (listing maximum unit ages); *id.* 1146.2(e)(1) (unit age calculation).

49.    Appliances installed in "Residential Structures" or "Small Business[es]" are exempt from these scheduled replacements, but owners and operators must still comply with the zero-$NO_x$ limits whenever they choose (or are forced by a breakdown) to replace their appliances.    *Id.* 1146.2(k)(4)-(5); *see also id.* 1146.2(j)(9) (recordkeeping and reporting requirements for the small business exemption).  A "Residential Structure" is "any structure which is designed exclusively as a dwelling for not more than four families, and where [the covered] equipment is used by the owner or occupant of such a dwelling." *Id.* 1146.2(c)(24).  A "Small Business" is "a business which is independently owned and operated" that has 10 or fewer employees and either is a "not-for-profit training center" or has "total gross annual receipts [of] $500,000 or less."    S. Coast AQMD R. 102 at 10; *see* S. Coast AQMD R. 1146.2(c)(25).

50.    In certain limited circumstances, the rule allows appliance owners or operators to apply for extended compliance deadlines.  For example, appliance owners or operators may receive an extension if they "will encounter delays beyond [their]

reasonable control" in meeting zero-$NO_x$ limits "because a utility upgrade is required and the applicable utility company is unable to provide the necessary power to operate the Unit." *See* S. Coast AQMD R. 1146.2(i)(1), (i)(2)(C); *see also id.* 1146.2(i)(2) (extension for owners or operators of five or more appliances that must all meet zero-$NO_x$ limits within a two-year period); *id.* 1146.2(i)(4) (extension for certain "short-term replacement[s] due to sudden Unit failure" where "an electrical upgrade is required to increase the power supply capacity to operate a" zero-$NO_x$ replacement); *id.* 1146.2(i)(5) (alternative compliance date for certain tankless water heaters in mobile homes); *id.* 1146.2(i)(6) (extension for tenants of leased property facing installation delays beyond their reasonable control); *id.* 1146.2(i)(7) (extension for delays caused by the need for construction to accommodate a zero-$NO_x$ unit).

51. The District's Final Staff Report regarding the zero-$NO_x$ rule, Ex. 2 attach. G, repeatedly acknowledges that the effect of zero-$NO_x$ limits is to prohibit gas appliances subject to the rule and that the rule will require the replacement of existing gas appliances with electric appliances. For example, the report contends "that there is a range of heat pump and electric resistance units available to replace gas units subject to this rule" and predicts that "manufacturers will continue development to improve and expand zero-emission products." Ex. 2 attach. G at 2-8; *see also id.* at 2-11 (suggesting that "fuel cell technology has the potential to replace existing units to meet the zero-emission limits" while recognizing that "[n]atural gas fuel cells produce some NOx emissions"). Similarly, its cost-effectiveness analysis assumes that the rule would require natural gas appliances to be replaced with electric appliances. *See, e.g.*, *id.* at 2-14 (considering the increased installation costs for heat pumps relative to the gas appliances that could be installed absent the rule); *id.* (considering the costs of

(203 of 261), Page 203 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 23 of 33    Page ID
#:415

upgrading electrical panels); *id.* at 2-15 (comparing "[h]eat pump pool heaters" with "natural gas-fired pool heaters"). In particular, the report "considered the cost impacts of transitions from conventional combustion heating that uses natural gas to zero-emission technologies that use electricity as part of the cost-effectiveness assessment." *Id.* at 2-16; *see id.* at 2-16 to -17 ("Estimating Fuel Switching Cost"); *id.* at 2-17 (describing a methodology that involves determining the gas costs for "the existing natural gas fired unit" compared to the electricity costs for "the electric unit which will be replacing" it).

52.    Similarly, the Final Socioeconomic Impact Assessment for the zero-$NO_x$ rule acknowledges that the rule will force a "transition[] from natural gas to zero-emission water heating technologies that use electricity." Ex. 2 attach. H at ES-2.

53.    In sum, the intent and effect of Rule 1146.2's zero-$NO_x$ limit is to ban natural gas appliances in the covered categories, including by forcing their replacement with electric appliances in existing buildings.

54.    The District is considering similar rules for other appliances. The District has proposed amendments to Rule 1111 covering gas residential and commercial furnaces and to Rule 1121 covering gas tank water heaters that, if approved, would phase in similar zero-$NO_x$ emission limits. *See Proposed Amended Rules (PAR) 1111 and 1121*, S. Coast AQMD, https://www.aqmd.gov/home/rules-compliance/rules/scaqmd-rule-book/proposed-rules/rule-1111-and-rule-1121.

### Federal Energy Policy and Regulation

55.    Born out of the oil crisis the United States faced in the early 1970s, the Energy Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422, establishes a "comprehensive energy policy" designed to address "the serious economic and national

(204 of 261), Page 204 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 204 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 24 of 33   Page ID
#:416

security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016). Among other topics, EPCA regulates the energy efficiency and energy use of covered appliances and equipment.

56.     Congress has amended EPCA several times since it was first enacted in 1975, progressively moving away from a laissez-faire approach to appliance efficiency, which relied on consumers to choose more efficient appliances, and toward binding federal standards. Each amendment to EPCA further emphasized the government's intent to regulate appliance energy use and energy efficiency at the federal level and to limit further state and local government authority in this area.

57.     EPCA's original provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499. The legislative history memorializes Congress's intent at the time: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H. Rep. No. 94-340, at 95 (1975).

58.     In that early form, EPCA permitted significant state involvement,

(205 of 261), Page 205 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 205 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 25 of 33   Page ID
#:417

allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

59.   In 1977, President Carter created the federal Department of Energy to coordinate a federal response to the nation's energy problems.  And the next year, Congress passed a range of statutes known as the National Energy Act, which gave the federal government broader authority over energy policy and sought to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth.

60.   As part of that 1978 effort, Congress amended EPCA.  Rather than relying exclusively on labeling, the new approach "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain products.  *Air Conditioning*, 410 F.3d at 499.  The amendment also strengthened EPCA's preemption, allowing state regulations "*only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Id.* at 499.

61.   Despite these new requirements, the Department of Energy did not adopt federal minimum energy standards.  Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption.  As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

62.   Congress responded in 1987 by again amending EPCA.  Among other

(206 of 261), Page 206 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 26 of 33    Page ID
#:418

changes, Congress added the preemption provision at issue here.  *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 7, 101 Stat. 103, 117-22.

63.    The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances."  S. Rep. No. 100-6, at 2.  As Congress recognized, varying state standards created "the problem of a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans."  *Id*. at 4; *see also* H.R. Rep. No. 100-11, at 24 (1987) ("Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements.").

64.    EPCA now broadly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, while allowing narrow exceptions for state and local governments to regulate.  States can still seek permission to establish their own standards, but "achieving the waiver is difficult."  S. Rep. No. 100-6 at 2.  The statute requires showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators."  *Id.*; *see* 42 U.S.C. § 6297(d)(4).

65.    In 1992, Congress again amended EPCA, expanding its federal appliance program to include commercial and industrial appliances.

66.    Congress has made a handful of minor amendments to EPCA's preemption provisions since 1987, none of which are relevant here.

(207 of 261), Page 207 of 261
Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 207 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 27 of 33    Page ID
#:419

**EPCA's Express Preemption Provisions**

67.   EPCA expressly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, subject to a few narrow exceptions.  State and local regulations that do not satisfy the exceptions' detailed conditions are preempted.

68.   EPCA regulates the energy efficiency and energy use of a variety of consumer and industrial products, which the statute calls "covered product[s]."  Its standards for "consumer product[s]" cover a range of appliances, including water heaters, furnaces, dishwashers, pool and spa equipment, and stoves.   42 U.S.C. §§ 6291(1)-(2), 6292(a).   It also contains standards for "industrial equipment," including furnaces and water heaters.  *Id.* § 6311(2)(A).  Those definitions are not tied to who is using the product.  A product qualifying as a "consumer product" but used in a commercial enterprise is still a "consumer product."  *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).

69.   The express preemption provision in EPCA's consumer product regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

70.   "State regulation" is defined to include "a law, regulation, or other requirement of a State or its political subdivisions." 42 U.S.C. § 6297(a)(2)(A).

71.   "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use."  42 U.S.C. § 6291(4).  "Energy" is defined as

(208 of 261), Page 208 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 208 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 28 of 33    Page ID
#:420

"electricity, or fossil fuels." *Id.* § 6291(3).

72.    Putting these definitions together, EPCA preempts regulations relating to "the quantity of [fossil fuel] directly consumed by" covered consumer appliances at the point of use. *Cal. Rest.*, 89 F.4th at 1101.

73.    Similarly, EPCA's industrial equipment provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. 42 U.S.C. § 6316(b)(2)(A). In the industrial product standards, "energy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use." *Id.* § 6311(4). And "energy" is defined in the same way as for the consumer product standards. *Id.* §§ 6311(7), 6291(3).

74.    EPCA thus preempts regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the point of use.

**The District's Zero-NO$_x$ Rule Is Preempted by EPCA**

75.    The District's zero-NO$_x$ rule is preempted by EPCA's express preemption provisions. The rule concerns the energy use of appliances covered by EPCA in that it "prevent[s] the operation of natural gas appliances" by prohibiting them from using any gas. *Cal. Rest.*, 89 F.4th at 1106.

76.    As the Ninth Circuit recently held, EPCA's "plain text and structure" preempted Berkeley's ordinance that, instead of banning covered gas appliances outright, "prohibit[ed] natural gas *piping* in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless." *Cal. Rest.*, 89 F.4th at 1098. The Ninth Circuit recognized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Id.* at

1107.  "And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* at 1103.

77.    As the Ninth Circuit explained, "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'"  *Cal. Rest.*, 89 F.4th at 1102 (alteration in original) (quoting 42 U.S.C. § 6297(c)).  Berkeley's gas ban thus was preempted by EPCA "because it prohibit[ed] the installation of necessary natural gas infrastructure on premises where covered appliances are used."  *Id.*  That Berkeley's ban regulated gas piping instead of gas appliances themselves was of no matter; "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly.*" *Id.* at 1107.

78.    The District's zero-$NO_x$ rule is functionally indistinguishable from Berkeley's preempted ordinance.  Instead of banning gas piping as an indirect route to banning gas appliances, the District banned gas appliances from emitting any $NO_x$—a byproduct of the combustion needed to run those appliances—which has the intent and effect of prohibiting their use.  On information and belief, no existing gas appliance can satisfy the District's rule.  And while the Final Staff Report gestures at the possibility that in the future such gas appliances theoretically could be developed (which would then potentially make the rule fuel neutral), the District's own analysis acknowledges that complying with the rule involves replacing natural gas appliances with electric alternatives.  By effectively banning gas appliances covered by EPCA,

27

the zero-NO$_x$ rule does exactly what the Ninth Circuit held that EPCA preempts.

79.    The rule does not qualify for any of EPCA's narrow exceptions to preemption.

80.    On information and belief, neither the District nor the State of California has applied for a waiver from the Secretary of Energy, as would be required for § 6297(d)'s exception.  Nor could it lawfully obtain such a waiver.  The Secretary is authorized to grant waivers only where the "regulation is needed to meet unusual and compelling State or local energy . . . interests."  42 U.S.C. § 6297(d)(1)(B); *see id.* § 6297(d)(1)(C)(i) (interests must be "substantially different in nature or magnitude than those prevailing in the United States generally").  Even then, EPCA prohibits the Secretary from granting waivers that would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," *id.* § 6297(d)(3), or where "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver, *id.* § 6297(d)(4).

81.    Nor can the rule satisfy the exception for certain building code requirements for new construction.  The rule is not "contained in a State or local building code" and, in any event, could not meet the exception's seven narrow requirements.  42 U.S.C. § 6297(f)(3).

82.    Similar to the consumer product provisions, EPCA contains only limited exceptions to the default rule of preemption of state regulations concerning the energy use of industrial appliances.  42 U.S.C. § 6316(b)(2).  The District's gas ban does not

(211 of 261), Page 211 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 31 of 33    Page ID
#:423

qualify for any exception because it is not in a building code (and, in any event, could not meet the building code exception's requirements), *id.* § 6316(b)(2)(B); is not enumerated in § 6316(b)(2)(C); and has not received and is ineligible for a waiver, *id.* § 6316(b)(2)(D).

**CAUSE OF ACTION:**
**FEDERAL PREEMPTION BY THE**
**ENERGY POLICY AND CONSERVATION ACT**

83. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

84. The District's zero-$NO_x$ rule is preempted by EPCA.

85. The zero-$NO_x$ rule concerns the energy use of EPCA-covered gas appliances by subjecting some of those appliances to zero-$NO_x$ emission limits and thus preventing them from using any energy.

86. The rule does not qualify for any of EPCA's exemptions from preemption because:

   a. The rule has not received—and is not eligible for—a waiver of preemption;

   b. It is not in a building code for new construction and would not qualify for the building code exception even if it were;

   c. It bans gas appliances even when those appliances meet federal standards.

87. Plaintiffs and their members will be irreparably harmed if the zero-$NO_x$ rule is enforced. Plaintiffs and their members are already experiencing and will continue to face economic injuries, including lost sales, lost work hours or jobs, the cost to replace appliances and make associated building upgrades and modifications,

(212 of 261), Page 212 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 212 of 261
Case 2:24-cv-10482-PA-PD    Document 12    Filed 12/17/24    Page 32 of 33    Page ID
#:424

and the cost of business disruptions or interruptions; their business planning, infrastructure investments, and hiring decisions and job opportunities are and will be affected; and they face compliance burdens associated with the rule.

88. Plaintiffs and their members have no adequate remedy at law for these irreparable harms. Unless the District is enjoined from enforcing the zero-NO$_x$ rule, Plaintiffs and their members will continue to be denied their legal rights.

89. There will be no significant harm to the District from an injunction because it has no legitimate interest in enforcing invalid regulations. The balance of harms thus favors injunctive relief.

90. An injunction is also in the public interest. The public interest is not served by enforcing invalid regulations. Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, ensuring energy security, and protecting consumer choice, all of which is undermined by conflicting local regulations of appliances, including the District's rule.

91. Plaintiffs therefore request that the Court (i) declare that the zero-NO$_x$ rule is preempted by EPCA and (ii) enjoin the District from enforcing the rule.

## REQUESTED RELIEF

92. Plaintiffs therefore request that the Court award the following relief:

    a. a declaratory judgment under 28 U.S.C. § 2201(a) that the District's Rule 1146.2 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

    b. a permanent injunction enjoining the District from enforcing or

(213 of 261), Page 213 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 213 of 261
Case 2:24-cv-10482-PA-PD   Document 12   Filed 12/17/24   Page 33 of 33   Page ID
#:425

1    attempting to enforce Rule 1146.2's zero-$NO_x$ emissions limits;

2    c.  costs of this suit, including reasonable attorneys' fees; and

3    d.  such other and further relief as the Court may deem just and proper.

4    Dated: December 17, 2024                Respectfully submitted,

5                                            */s/ Courtland L. Reichman*

6    John J. Davis, Jr. (SBN 65594)          Courtland L. Reichman (SBN 268873)
       jjdavis@msh.law                         creichman@reichmanjorgensen.com
7    MCCRACKEN, STEMERMAN &                  Brian C. Baran (SBN 325939)
       HOLSBERRY LLP                           bbaran@reichmanjorgensen.com
8    475 – 14th Street, Suite 1200           REICHMAN JORGENSEN
     Oakland, CA 94612                         LEHMAN & FELDBERG LLP
9    Tel.: (415) 597-7200; Fax: (415) 597-7201   100 Marine Parkway, Suite 300
                                             Redwood Shores, CA 94065
10   *Attorneys for Plaintiff California State*   Tel.: (650) 623-1401; Fax: (650) 560-3501
     *Pipe Trades Council*

11                                           Sarah O. Jorgensen (*pro hac vice*
     Matthew P. Gelfand (SBN 297910)           forthcoming*)*
12     matt@caforhomes.org                     sjorgensen@reichmanjorgensen.com
     CALIFORNIANS FOR HOMEOWNERSHIP, INC.    REICHMAN JORGENSEN
13   525 S. Virgil Ave.                        LEHMAN & FELDBERG LLP
     Los Angeles, California 90020           1201 West Peachtree St., Suite 2300
14   Tel.: (213) 739-8206; Fax: (213) 480-7724   Atlanta, GA 30309
                                             Tel.: (404) 609-1040; Fax: (650) 560-3501
15
     *Attorney for Plaintiff Californians for*   Sean M. Kneafsey (SBN 180863)
16   *Homeownership, Inc.*                      skneafsey@kneafseyfirm.com
                                             THE KNEAFSEY FIRM, INC.
17   Angelo I. Amador (*pro hac vice*        707 Wilshire Blvd., Suite 3700
       forthcoming)                          Los Angeles, CA 90017
18     aamador@restaurant.org                Tel.: (213) 892-1200; Fax: (213) 892-1208
19   RESTAURANT LAW CENTER
     2055 L Street, NW, Suite 700            *Attorneys for Plaintiffs Rinnai America*
20   Washington, DC 20036                    *Corp., Noritz America Corp., National*
     Tel.: (202) 331-5913 Fax: (202) 331-2429   *Association of Home Builders, California*
21                                           *Manufacturers & Technology Association,*
                                             *California Restaurant Association,*
22   *Attorney for Plaintiff Restaurant Law*    *California Hotel & Lodging Association,*
     *Center*                                   *California Apartment Association, and*
                                             *Plumbing-Heating-Cooling Contractors of*
23                                           *California*

24

(Adopted January 9, 1998)(Amended January 7, 2005)(Amended May 5, 2006)
(Amended December 7, 2018)(Amended June 7, 2024*)

**RULE 1146.2.**      **EMISSIONS OF OXIDES OF NITROGEN FROM LARGE WATER HEATERS AND SMALL BOILERS AND PROCESS HEATERS**

(a)      Purpose

The purpose of this rule is to reduce Oxides of Nitrogen (NOx) emissions from Water Heaters, Boilers, and Process Heaters fired with, or designed to be fired with, natural gas as defined in this rule.

(b)      Applicability

The provisions of this rule are applicable to manufacturers, distributors, retailers, Resellers, Installers, owners, and operators of Units fired with, or designed to be fired with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000 British Thermal Units (Btu) per hour.

(c)      Definitions

     (1)      BOILER means any equipment that is fired with, or is designed to be fired with, natural gas, used to produce steam or to heat water, and that is not used exclusively to produce electricity for sale. Boiler does not include any waste heat recovery boiler that is used to recover sensible heat from the exhaust of a combustion turbine or any unfired waste heat recovery boiler that is used to recover sensible heat from the exhaust of any combustion equipment.

     (2)      CERTIFIED RETROFIT KIT means any burner and ancillary controls or blowers that have been demonstrated to comply with the provisions of this rule, on a retrofit basis, on a particular model of Unit.

     (3)      COMPLIANCE PORTAL means the dedicated webpage on the South Coast AQMD website for submitting reports, notifications, or any documents to comply with South Coast AQMD rule(s).

     (4)      EXISTING BUILDING means a building that is not a New Building as defined in this rule. Existing Building includes any structures on the property including, but not limited to, sheds, detached garages, pools, and spas.

**1146.2 - 1**

**Rule 1146.2 (Cont.)**                                        **(Amended June 7, 2024)**

(c)     (5)     FORMER RECLAIM FACILITY means a facility, or any of its successors, that was in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX, that has received a final determination notification, and is no longer in the RECLAIM program.

        (6)     HEAT INPUT means the chemical heat released due to assumed complete combustion of fuel to a Unit, using the higher heating value of the fuel. This does not include the sensible heat of incoming combustion air.

        (7)     HEAT OUTPUT means the enthalpy of the working fluid output of the Unit.

        (8)     HIGH TEMPERATURE UNIT means any Unit that is designed and used to produce steam or to heat water above 180 degrees Fahrenheit.

        (9)     INDEPENDENT TESTING LABORATORY means a testing laboratory that meets the requirements of Rule 304 – Equipment, Materials, And Ambient Air Analyses, subdivision (k) and is approved by the Executive Officer to conduct certification testing under the Protocol: Nitrogen Oxides Emissions Compliance Testing for Natural Gas-Fired Water Heaters and Small Boilers (Protocol).

        (10)    INSTALL means the action of an Installer to place a Unit in a position ready for use.

        (11)    INSTALLER means a person who Installs a Unit and is required to obtain a license issued by the Department of Consumer Affairs Contractors State License Board for a classification related to buildings and appliances.

        (12)    INSTANTANEOUS WATER HEATER means a tankless Water Heater with a Rated Heat Input Capacity less than or equal to 2,000,000 Btu per hour that heats water only on-demand when it flows through a heat exchanger, which is a device used to transfer heat between two or more mediums of different temperatures.

        (13)    MOBILE HOME means a prefabricated structure on a permanently attached chassis.

        (14)    NEW BUILDING means a building that is newly constructed or a building with a major alteration which changes the occupancy classification of a building, which means a change in the formal designation of the primary purpose of the building pursuant to 2022 Title 24 California Building Code Part 2 Chapter 3 for occupancy classification and use, and that does not have a Unit installed prior to the applicable Table 3 compliance dates. New

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

Building comprises any structures on the property including, but not limited to sheds, detached garages, pools, and spas.

(c)    (15)    OXIDES OF NITROGEN (NOx) EMISSIONS means the sum of nitric oxide and nitrogen dioxide emitted, calculated, and expressed as nitrogen dioxide.

(16)    PARTS PER MILLION BY VOLUME (ppmv) means, for the purpose of this rule, Parts Per Million by Volume of a pollutant at a three percent oxygen correction on a dry basis at Standard Conditions.

(17)    POOL HEATER means a Water Heater designed and used to heat a pool, hot tub, or spa.

(18)    PROCESS HEATER means any equipment that is fired with, or is designed to be fired with, natural gas and which transfers heat from combustion gases to water or process streams. A Process Heater does not include any kiln or oven used for annealing, drying, curing, baking, cooking, calcining, or vitrifying; or any unfired waste heat recovery heater that is used to recover sensible heat from the exhaust of any combustion equipment.

(19)    PROTOCOL means the South Coast AQMD Protocol to ensure standardization of compliance certification test procedures, titled: Nitrogen Oxides Emissions Compliance Testing for Natural Gas-Fired Water Heaters and Small Boilers.

(20)    RECLAIM FACILITY means a facility, or any of its successors, that was in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX.

(21)    RATED HEAT INPUT CAPACITY means the gross Heat Input of the combustion device, as supported by required documentation.

(22)    RECREATIONAL VEHICLE means any vehicle used for recreational purposes designed to include a Water Heater and licensed to be driven or moved on the highways of California.

(23)    RESELLER means anyone who sells either retail, wholesale, or on an individual basis any Unit.

(24)    RESIDENTIAL STRUCTURE means any structure which is designed exclusively as a dwelling for not more than four families, and where such equipment is used by the owner or occupant of such a dwelling. Residential Structures includes any structures on the property including, but not limited to, sheds, detached garages, pools, and spas.

**1146.2 - 3**

**Rule 1146.2 (Cont.)**                    **(Amended June 7, 2024)**

(c)    (25)    SMALL BUSINESS is as defined by Rule 102 – Definition of Terms (Rule 102).

(26)    STANDARD CONDITIONS are as defined by Rule 102.

(27)    THERM means 100,000 Btu.

(28)    TYPE 1 UNIT means any Unit with a Rated Heat Input Capacity less than or equal to 400,000 Btu per hour, excluding Water Heaters subject to the limits of Rule 1121 – Control of Nitrogen Oxides from Residential Type, Natural Gas-fired Water Heaters (Rule 1121).

(29)    TYPE 2 UNIT means any Unit with a Rated Heat Input Capacity greater than 400,000 Btu per hour up to and including 2,000,000 Btu per hour.

(30)    UNIT means any Boiler, Water Heater, or Process Heater as defined in this rule.

(31)    WATER HEATER means any equipment that is fired with, or designed to be fired with, natural gas and that is used solely to heat water for use external to the equipment.

(d)    Requirements

(1)    Prior to the applicable Table 3 compliance dates, no person shall manufacture, supply, sell, offer for sale, or Install, for use within the South Coast AQMD, any Unit unless the Unit is certified pursuant to subdivision (f) not to exceed the applicable Table 1 emission limits.

Table 1 – Emission Limits

| Equipment Category | NOx Emission Limit* | Carbon Monoxide (CO) Emission Limit* |
|---|---|---|
| Type 1 Units, excluding Pool Heaters | 14 ng/J or 20 ppmv | N/A** |
| Type 1 Pool Heaters | 40 ng/J or 55 ppmv | N/A** |
| Type 2 Units | 14 ng/J or 20 ppmv | 400 ppmv |

\*      Nanograms per Joule (ng/J) of NOx (calculated as $NO_2$) of Heat Output or the specified ppmv of NOx or CO corrected at 3 percent volume stack gas oxygen ($O_2$) on a dry basis.

\*\*    Type 1 Units are not subject to a CO limit in Rule 1146.2 but may be subject to CO limits by other South Coast AQMD rules.

(2)    No person shall manufacture, supply, sell, offer for sale, or Install, for use in the South Coast AQMD, any Unit, unless such Unit complies with the

**1146.2 - 4**

**Rule 1146.2 (Cont.)**                                      **(Amended June 7, 2024)**

applicable Table 2 emission limits by the applicable Table 3 compliance dates.

Table 2 – Zero-Emission Limits, Compliance Schedule, and Unit Age

| Equipment Category | NOx and CO Emission Limits (ppmv) | Compliance Schedule | Unit Age (years) |
|---|---|---|---|
| Type 1 Unit* | 0 | Phase I | 15 |
| Instantaneous Water Heater ≤ 200,000 Btu/hr | 0 | | 25 |
| Instantaneous Water Heater > 200,000 Btu/hr | 0 | Phase II | 25 |
| Type 1 Pool Heater | 0 | | 15 |
| Type 2 Unit** | 0 | | 25 |
| Type 1 High Temperature Unit | 0 | Phase III | 25 |
| Type 2 High Temperature Unit | 0 | | 25 |

\*   Referring to a Type 1 Unit that is not a High Temperature Unit, Pool Heater, or Instantaneous Water Heater.

\*\*  Referring to a Type 2 Unit that is not a High Temperature Unit or Instantaneous Water Heater.

Table 3 – Compliance Dates for Zero-Emission Limits

| Phase | Building Type | Compliance Date |
|---|---|---|
| Phase I | New Buildings | January 1, 2026 |
| | Existing Buildings | January 1, 2029 |
| Phase II | New Buildings | January 1, 2028 |
| | Existing Buildings | January 1, 2031 |
| Phase III | New Buildings | January 1, 2029 |
| | Existing Buildings | January 1, 2033 |

**1146.2 - 5**

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

(d)    (3)    On and after the Table 3 compliance dates, an owner or operator of a Unit shall not operate a Unit which exceeds Table 2 emission limits once the Unit age determined pursuant to subdivision (e) is greater than or equal to the applicable Table 2 Unit age.

(4)    The owner or operator of a Unit may modify a Unit and demonstrate it meets the emission limits in subdivision (d) by:

(A)    Modifying the Unit with a Certified Retrofit Kit; or

(B)    Causing an Independent Testing Laboratory to conduct a source test according to the South Coast AQMD Source Test Method 100.1 - Instrumental Analyzer Procedures for Continuous Gaseous Emission Sampling.

(5)    An owner or operator of a Unit that modifies or replaces a burner in the Unit shall comply with the following applicable emission limits:

(A)    Table 1 emission limits if the modification or replacement occurs:

(i)    Prior to the applicable Table 3 compliance dates; or

(ii)    Before the Unit reaches its Table 2 Unit age; or

(B)    Table 2 emission limits if the modification or replacement occurs:

(i)    On and after the applicable Table 3 compliance dates; and

(ii)    When the Unit has reached its Table 2 Unit age.

(6)    Except for units at a RECLAIM or former RECLAIM facility, an owner or operator shall not operate any Type 2 Unit manufactured prior to January 1, 2000, in the South Coast AQMD which does not meet the NOx emission limit of 30 ppmv, or 0.037 pound NOx per million Btu of heat input, and the CO emission limit of 400 ppmv.

**Rule 1146.2 (Cont.)**                          **(Amended June 7, 2024)**

(d)    (7)    An owner or operator of a Unit that elects to comply with the exemption in:

        (A)    Paragraph (k)(2) shall not operate a Unit that exceeds the applicable Table 1 emission limits on and after 180 days of failing to demonstrate compliance with paragraph (k)(2) pursuant to paragraph (g)(2);

        (B)    Paragraph (k)(3) shall not operate a Unit that exceeds the applicable Table 2 emission limits on and after 180 days of failing to demonstrate compliance with paragraph (k)(3) pursuant to paragraph (g)(2); or

        (C)    Paragraph (k)(5) shall not operate a Unit that does not comply with paragraph (d)(3) on and after 180 days of failing to meet the definition of a Small Business.

(e)    Unit Age

    (1)    For all Unit age determinations in this rule, an owner or operator of a Unit shall determine the Unit age as follows:

        (A)    Unit age shall be based on the original date of manufacture determined by:

            (i)    Invoice from purchase of Unit provided by manufacturer;

            (ii)    Original Unit manufacturer's identification or rating plate permanently affixed to the Unit; or

            (iii)    Any other method of determining Unit age that can be substantiated through written information as approved by the Executive Officer.

        (B)    The Unit shall be deemed at the end of its Unit age as of January 1, 2025, for any Unit where the Unit age cannot be determined pursuant to subparagraph (e)(1)(A).

(f)    Certification

    (1)    The manufacturer shall obtain confirmation from an Independent Testing Laboratory prior to applying for certification for a natural gas Unit that each Unit model or retrofit kit complies with the Table 1 emission limits when fired with natural gas. This confirmation shall be based upon emission source tests of a randomly selected Unit of each model, and the Protocol shall be adhered to during the confirmation testing of all Units subject to this rule.

**Rule 1146.2 (Cont.)**                          **(Amended June 7, 2024)**

(f)    (2)    When applying for Unit(s) certification, the manufacturer shall submit to the Executive Officer the following:

(A)    A statement that the model is in compliance with subdivision (d). The statement shall be signed and dated, and shall attest to the accuracy of all statements;

(B)    General Information including:

(i)    Name and address of manufacturer;

(ii)    Brand name; and

(iii)    Model number, as it appears on the Unit rating plate;

(C)    A description of each model being certified; and

(D)    A source test report verifying compliance with the emission limits in subdivision (d) for each model to be certified. The source test report shall be prepared by the confirming Independent Testing Laboratory and shall contain all of the elements identified in the Protocol for each Unit tested.

(3)    When applying for Unit certification, the manufacturer shall submit the items identified in paragraph (f)(2) no more than 180 days after the date of the source test identified in subparagraph (f)(2)(D).

(4)    The Executive Officer shall certify a Unit model which complies with the provisions of subdivision (d) and of paragraphs (f)(1), (f)(2), and (f)(3).

(g)    Demonstration of Compliance with Emission Limits

(1)    The owner or operator of a Unit shall demonstrate compliance pursuant to subparagraph (d)(4)(B) by maintaining a copy of the South Coast AQMD approved source test report and making it available to the Executive Officer upon request. The source test report shall, at a minimum, include:

(A)    The applicable NOx and CO emissions of the Unit;

(B)    The South Coast AQMD approved test method and Independent Testing Laboratory that conducted the source test;

(C)    The model and serial numbers of the Unit; and

(D)    The Rated Heat Input Capacity of the Unit.

(2)    The owner or operator of a Unit electing to comply with the exemptions in paragraph (k)(2) or (k)(3) shall:

(A)    Demonstrate compliance with the annual Therm limit for each calendar year, determined using one of the following methods:

Rule 1146.2 (Cont.)                                                      (Amended June 7, 2024)

(g)    (2)    (A)    (i)    Fuel usage recorded by a non-resettable totalizing fuel meter, corrected to Standard Conditions;

(ii)   Fuel usage calculated by multiplying the number of hours recorded by a non-resettable totalizing time meter and the Rated Heat Input Capacity of the Unit, as calculated using Equation 1 (Eq. 1):

Fuel Usage (Therms) = H × R × 1,000,000 (Btu per MMBtu) ÷ 100,000 (Btu per Therm)                              (Eq. 1)

Where:

H = Number of Hours Recorded

R = Rated Heat Input Capacity of the Unit (MMBtu/hr); or

(iii)  Monthly fuel billing statement or equivalent documentation;

(B)    Calibrate the non-resettable totalizing fuel meter or non-resettable time meter according to the manufacturer's recommendation; and

(C)    Use the higher heating value of 1,050 million Btu per million standard cubic feet for converting natural gas measured in volume to Therm.

(h)    Identification of Compliant Units

(1)    Newly Manufactured Units

The manufacturer shall display the model number of the Unit complying with subdivision (d) on the shipping carton and permanent rating plate. The manufacturer shall also display the certification status on the shipping carton and on the Unit.

(2)    Certified Retrofit Kits

The manufacturer shall display the model number of the retrofit kit and manufacturer and model of applicable Units on the shipping carton and in a plainly visible portion of the retrofit kit.

(i)    Alternative Compliance Options

(1)    Alternative Compliance Option for Utility Upgrades

If an owner or operator of a Unit required to meet the Table 2 emission limits will encounter delays beyond the reasonable control of the owner or operator to meet the applicable compliance dates in Table 3 or paragraph (d)(3) because a utility upgrade is required and the applicable utility

1146.2 - 9

ER-222

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

company is unable to provide the necessary power to operate the Unit as demonstrated with documents specified in paragraph (j)(6), the owner or operator of a Unit shall:

(i)     (1)     (A)     Notify the Executive Officer through the Compliance Portal:

(i)     At least 90 days prior to the Unit's applicable compliance date in Table 3 or paragraph (d)(3) to request an extension of no more than 24 months from the applicable compliance date; or

(ii)    If utility upgrades are needed to operate a Unit that is replacing a Unit that failed and is no longer operational, no later than 30 days after the date the Unit became non-operational to request an extension of no more than 24 months from the date of Unit failure;

(B)     Obtain a letter from the Executive Officer through the Compliance Portal approving or disapproving the extension:

(i)     Prior to the Unit's compliance date; or

(ii)    No later than 90 days after the date the notification was submitted pursuant to clause (i)(1)(A)(ii) for a Unit failure;

(C)     If the utility upgrades will not be completed within the 24-month extension approved pursuant to subparagraph (i)(1)(B), the owner or operator may:

(i)     Request an additional extension of no more than 24 months through the Compliance Portal at least 90 days prior to the end of the initial 24-month extension; and

(ii)    Obtain a letter from the Executive Officer through the Compliance Portal prior to the end of the initial extension approving or disapproving the extension;

(D)     If the utility upgrades will not be completed within the additional 24-month extension approved pursuant to subparagraph (i)(1)(C), the owner or operator may:

(i)     Request a further extension of no more than 12 months through the Compliance Portal at least 90 days prior to the end of the additional 24-month extension; and

**1146.2 - 10**

Rule 1146.2 (Cont.)                                    (Amended June 7, 2024)

(i)      (1)      (D)      (ii)      Obtain a letter from the Executive Officer through the Compliance Portal prior to the end of the additional 24-month extension approving or disapproving the extension;

(E)      Provide a progress report to the Executive Officer through the Compliance Portal every six months after the start of the initial extension approved pursuant to subparagraph (i)(1)(B) and for the applicable extension period(s) approved pursuant to subparagraphs (i)(1)(C) and (i)(1)(D), which includes, but is not limited to:

(i)      The status of the utility upgrade;

(ii)      The estimated date the utility provider will complete the utility upgrade; and

(iii)      Documentation which justifies the update to estimated date for completion;

(F)      Provide a follow-up notification to the Executive Officer through the Compliance Portal no later than 72 hours after the Unit complying with the Table 2 emission limits has been installed;

(G)      Maintain records pursuant to paragraph (j)(6);

(H)      For a Unit that is non-operational during the extension(s) approved pursuant to subparagraphs (i)(1)(B), (i)(1)(C), and (i)(1)(D), the owner or operator may elect to operate a temporary Unit during the extension, provided:

(i)      The temporary Unit complies with Table 1 emission limits;

(ii)      No later than 72 hours after the date the temporary Unit was installed, the owner or operator notifies the Executive Officer through the Compliance Portal; and

(iii)      No later than 72 hours after the date the temporary Unit was disconnected, the owner or operator notifies the Executive Officer through the Compliance Portal.

(2)      Alternative Compliance Option for Multiple Units

An owner or operator of five or more Units that are required to meet the Table 2 emission limits within two consecutive calendar years pursuant to paragraph (d)(3) may elect to submit an alternative compliance plan requesting alternative compliance date(s), provided the owner or operator:

1146.2 - 11

ER-224

Rule 1146.2 (Cont.)                                      (Amended June 7, 2024)

(i)    (2)    (A)    Submit the alternative compliance plan at least one year prior to the earliest compliance due date, with a filing fee payment pursuant to Rule 306 – Plan Fees (Rule 306);

(B)    Specify compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(i)    Three or at least 30 percent of the Units by the latest applicable compliance date;

(ii)    At least 30 percent of the Units one year after the latest applicable compliance date; and

(iii)    The remaining Units two years after the latest applicable compliance date;

(C)    In lieu of subparagraph (i)(2)(B), if an owner or operator of five or more Units electing to comply by submitting an alternative compliance plan in subparagraph (i)(2)(A) will encounter delays beyond the reasonable control of the owner or operator to meet the applicable compliance dates because a utility upgrade is required and the applicable utility company is unable to provide the necessary power to operate the Units, as demonstrated with documents specified in paragraph (j)(6), the owner or operator of the Units may elect to:

(i)    Include a request for an extension of no more than 24 months from the earliest compliance due date of the Units included in the alternative compliance plan submitted pursuant to subparagraph (i)(2)(A); and specify alternative compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(A)    Three or at least 50 percent of the Units no later than 24 months after end of the approved extension in clause (i)(2)(C)(i); and

(B)    The remaining Unit(s) no later than 36 months after the end of the approved extension(s) in clause (i)(2)(C)(i);

(ii)    If the utility upgrades will not be completed within the initial 24-month extension period provided in clause (i)(2)(C)(i), the owner or operator may request a second extension of no

1146.2 - 12

ER-225

Rule 1146.2 (Cont.)                                    (Amended June 7, 2024)

more than 24 months by submitting a revised alternative compliance plan at least 180 days prior to the end of the first 24-month extension, with a filing fee payment pursuant to Rule 306 and Executive Officer approval or disapproval; and specify alternative compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(i)   (2)   (C)   (ii)   (A)   Three or at least 50 percent of the Units no later than 24 months after end of the approved extension in clause (i)(2)(C)(ii); and

(B)   The remaining Unit(s) no later than 36 months after the end of the approved extension in clause (i)(2)(C)(ii);

(iii)   If the utility upgrades will not be completed within the second 24-month extension period provided in clause (i)(2)(C)(ii), the owner or operator may request a third extension of no more than 12 months by submitting a revised alternative compliance plan at least 180 days prior to the end of the second 24-month extension, with a filing fee payment pursuant to Rule 306 and Executive Officer approval or disapproval; and specify alternative compliance date(s) in the alternative compliance plan for the number of Units to meet the Table 2 emission limits as below:

(A)   Three or at least 50 percent of the Units no later than 24 months after the end of the approved extension in clause (i)(2)(C)(iii); and

(B)   The remaining Unit(s) no later than 36 months after the end of the approved extension in clause (i)(2)(C)(iii);

(iv)   Include the documentation listed in paragraph (j)(6) with the application for any alternative compliance plan or revised alternative compliance plan;

(v)   Provide a progress report to the Executive Officer through the Compliance Portal every six months after the start of the initial extension approved pursuant to clause (i)(2)(C)(i) for

1146.2 - 13

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

the applicable extension period(s) approved pursuant to clauses (i)(2)(C)(ii) or (i)(2)(C)(iii), which includes, but is not limited to:

(i) (2) (C) (v) (A) The status of the utility upgrade;

(B) The estimated date the utility provider will complete the utility upgrade; and

(C) Documentation which justifies the update to estimated date for completion;

(D) Obtain written approval from the Executive Officer, as specified in paragraph (i)(3):

(i) Prior to the earliest compliance due date of all Units included in the alternative compliance plan; and

(ii) If an additional extension(s) was requested pursuant to clauses (i)(2)(C)(ii) and/or (i)(2)(C)(iii), prior to the end of the previously approved extension.

(3) Approval of Alternative Compliance Option for Multiple Units

The Executive Officer shall review the request for alternative compliance date submitted pursuant to paragraph (i)(2) and provide written approval or disapproval based on whether the following criteria are met:

(A) The owner or operator demonstrated they are operating five or more Units that are required to be replaced based on Unit age pursuant to paragraph (d)(3) to meet Table 2 emission limits within two calendar years;

(B) The request was submitted at least one year prior to the earliest applicable compliance due date; and

(C) The proposed alternative compliance date meets the criteria specified in subparagraph (i)(2)(B) and subparagraph (i)(2)(C), if applicable.

(4) Alternative Compliance Option for Emergency Replacements

If a Unit requires a short-term replacement due to sudden Unit failure after the applicable Table 3 compliance date and an electrical upgrade is required to increase the power supply capacity to operate a Unit that complies with Table 2 emission limits, excluding Units utilizing alternative compliance options specified in paragraphs (i)(1), (i)(6), and (i)(7):

1146.2 - 14

**ER-227**

Rule 1146.2 (Cont.)                                      (Amended June 7, 2024)

(i)  (4)  (A)  For Units used in buildings that are not Residential Structures, the owner or operator of the Unit may elect to Install and operate a temporary Unit that complies with Table 1 emission limits for up to six months prior to installing a Unit that complies with Table 2 emission limits provided the owner or operator of the Unit:

(i)  Report the date the existing Unit failed and the date the temporary Unit was installed through the Compliance Portal no later than 72 hours after the date the temporary Unit was installed;

(ii)  Report the date the temporary Unit was disconnected through the Compliance Portal no later than 72 hours after the date the temporary Unit was disconnected; and

(iii)  Report the date the Unit complying with Table 2 emission limits was installed through the Compliance Portal no later than 72 hours after the date the new Unit was installed;

(B)  For Units sold for use in Residential Structures, a manufacturer, distributor, retailer, or Installer may elect to offer a Unit for rent that complies with Table 1 emission limits for up to six months prior to installing a Unit that complies with Table 2 emission limits provided the manufacturer, distributor, retailer, or Installer report the date the temporary Unit was rented through the Compliance Portal no later than 72 hours after the date the temporary Unit was rented.

(5)  Alternative Compliance Option for Mobile Homes

An owner or operator of an Instantaneous Water Heater manufactured prior to June 7, 2024 that is installed in a Mobile Home may elect to Install an Instantaneous Water Heater with Rated Heat Input Capacity of less than or equal to 200,000 Btu/hr that complies with the Table 1 emission limits before January 1, 2033, in lieu of the applicable compliance date in Table 3 or paragraph (d)(3), provided the labeling requirement in paragraph (j)(2) is met. On and after January 1, 2033, any Instantaneous Water Heater with Rated Heat Input Capacity of less than or equal to 200,000 Btu/hr manufactured, supplied, sold, offered for sale, or installed for use in a mobile home must meet the Table 2 emission limits upon replacement.

1146.2 - 15

Rule 1146.2 (Cont.)                                                    (Amended June 7, 2024)

(i)     (6)     Alternative Compliance Option for Units at a Property Under Lease

An owner or operator of a Unit in a property under lease shall be provided an extension of no more than 24 months from the applicable compliance date to comply with the Table 2 emission limits, if the installation is delayed beyond the reasonable control of the owner or operator of the Unit, excluding Units utilizing the alternative compliance options specified in paragraphs (i)(1), (i)(2), and (i)(7), provided the owner or operator of the Unit:

(A)     Occupies the property under a lease as a tenant before and after the applicable compliance date in Table 3 or paragraph (d)(3);

(B)     Reports the date the existing Unit is required to be replaced to comply with the Table 2 emission limits to the Executive Officer through the Compliance Portal no later than 90 days prior to the applicable compliance date in Table 3 or paragraph (d)(3);

(C)     If a Unit is non-operational during the extension specified in paragraph (i)(6), the owner or operator may elect to operate a temporary Unit during the extension, provided:

(i)     The temporary Unit complies with Table 1 emission limits;

(ii)    No later than 72 hours after the date the temporary Unit was installed, the owner or operator notifies the Executive Officer through the Compliance Portal; and

(iii)   No later than 72 hours after the date the temporary Unit was disconnected, the owner or operator notifies the Executive Officer through the Compliance Portal;

(D)     Report the date the new Unit was installed to comply with the Table 2 emission limits to the Executive Officer through the Compliance Portal no later than 72 hours after the date the new Unit was installed; and

(E)     Maintain records pursuant to paragraph (j)(7).

(7)     Alternative Compliance Option for Construction

An owner or operator of a Unit shall be provided an extension of no more than 18 months from the applicable compliance date to comply with the Table 2 emission limits if the installation is delayed because construction is required to expand the space designed to house or relocate the Unit, and associated equipment necessary for operating the Unit, excluding Units

1146.2 - 16

**Rule 1146.2 (Cont.)**                                        **(Amended June 7, 2024)**

utilizing the alternative compliance options specified in paragraphs (i)(1), (i)(2), (i)(5), and (i)(6), provided the owner or operator of a Unit:

(i) (7) (A) Reports the date the existing Unit is required to be replaced to comply with the Table 2 emission limits to the Executive Officer through the Compliance Portal no later than 90 days prior to the applicable compliance date in Table 3 or paragraph (d)(3);

(B) If a Unit is non-operational during the extension specified in paragraph (i)(7), the owner or operator may elect to operate a temporary Unit during the extension, provided:

(i) The temporary Unit complies with Table 1 emission limits;

(ii) No later than 72 hours after the date the temporary Unit was installed, the owner or operator notifies the Executive Officer through the Compliance Portal; and

(iii) No later than 72 hours after the date the temporary Unit was disconnected, the owner or operator notifies the Executive Officer through the Compliance Portal;

(C) Report the date the new Unit was installed to comply with the Table 2 emission limits through the Compliance Portal no later than 72 hours after the date the new Unit was installed; and

(D) Maintain records pursuant to paragraph (j)(8).

(8) An owner or operator of a Unit electing to use any of the alternative compliance options in this subdivision that fails to comply with the applicable requirements of the alternative compliance options must comply with the applicable requirements in paragraph (d)(2), (d)(3), or subparagraph (d)(5)(B).

(j) Labeling, Reporting, and Recordkeeping Requirements

(1) Pursuant to the labeling schedule in Table 4, any Unit that is supplied or offered for sale for use within the South Coast AQMD prior to the applicable Table 3 compliance dates that complies with the Table 1 emission limits, but not the Table 2 emission limits, shall prominently display the statement "If Installed in South Coast AQMD: For Installation and Use in Existing Buildings Only."

**Rule 1146.2 (Cont.)**                        **(Amended June 7, 2024)**

Table 4 – Labeling Schedule

| Unit's Compliance Schedule | Labeling Requirements | |
|---|---|---|
| | Start Date | End Date |
| Phase I | January 1, 2026 | January 1, 2029 |
| Phase II | January 1, 2028 | January 1, 2031 |
| Phase III | January 1, 2029 | January 1, 2033 |

(j)     (2)     Effective January 1, 2029, to January 1, 2033, an Instantaneous Water Heater with Rated Heat Input Capacity of less than or equal to 200,000 Btu/hr supplied or offered for sale for use in a Mobile Home within the South Coast AQMD and complying with the alternative compliance date in paragraph (i)(5) shall prominently display the statement "If Installed in South Coast AQMD: For Installation and Use in Mobile Homes Only."

         (3)     Annual Reporting Requirement

Effective on and after the Table 3 compliance dates for Existing Buildings, manufacturers of natural gas-fired Unit(s) shall submit a report by March 1st of the following calendar year to the Executive Officer through the Compliance Portal. The report shall include:

            (A)     Name of the product manufacturer;

            (B)     List of product model(s);

            (C)     Number of Units and Rated Heat Input Capacity of each model that was sold into or within the South Coast AQMD; and

            (D)     The applicable equipment category in Table 2.

         (4)     General Recordkeeping Requirements

The owner or operator of a Unit shall maintain on-site, or provide upon the Executive Officer's request, the following records:

            (A)     A copy of the manufacturer's and/or distributor's written instructions;

            (B)     A record of the maintenance activity for a period of not less than three years;

            (C)     A copy of a government-issued document that grants permission to an individual or organization to initiate a construction project which determines the eligibility of New Building or Existing Building for the compliance of the rule; and

**1146.2 - 18**

**Rule 1146.2 (Cont.)**                                    **(Amended June 7, 2024)**

(j)   (4)   (D)   A record demonstrating annual fuel usage pursuant to subparagraph (g)(2)(D) for a period of not less than three years, if the owner or operator of a Unit is electing to comply with the exemptions in paragraph (k)(2) or (k)(3).

      (5)   Rated Heat Input Capacity Documentation

The owner or operator of a Unit shall maintain on-site, or provide upon the Executive Officer's request, a copy of all documents identifying the Unit's Rated Heat Input Capacity including:

          (A)   Manufacturer's or distributor's manual or invoice; and

          (B)   Maintain documentation of the Rated Heat Input Capacity for a Unit modified pursuant to paragraph (d)(5), signed by the licensed person modifying the Unit, including:

             (i)   Description of all Unit modifications;

             (ii)   Dates the Unit was modified; and

             (ii)   Calculation of Rated Heat Input Capacity.

      (6)   Recordkeeping for Alternative Compliance Option for Utility Upgrades

An owner or operator of a Unit that elects to comply with paragraph (i)(1) or subparagraph (i)(2)(C) shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after the end date of the approved extension(s), that demonstrate the utility provider's progress on providing the necessary power, including but not limited to an official document signed by the responsible party of the utility company that services the facility that includes:

          (A)   An explanation of the utility upgrades required by the utility company;

          (B)   Communications with the utility provider when the utility upgrade was requested;

          (C)   Estimated date the utility provider will complete the utility upgrades;

          (D)   Any additional information to substantiate that an additional time is necessary; and

          (E)   Documentation which demonstrates that the delays are outside of the reasonable control of the owner or operator.

**1146.2 - 19**

**Rule 1146.2 (Cont.)**                                          **(Amended June 7, 2024)**

(j)    (7)    Recordkeeping for Alternative Compliance Option for Units at a Property Under Lease

An owner or operator that elects to comply with paragraph (i)(6) shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after reporting through the Compliance Portal pursuant to subparagraph (i)(6)(B), including but not limited to:

(A)    A legally binding contract that explains the terms and duration of the lease under which the owner or operator of the Unit is a tenant renting the property from a landlord; and

(B)    Documentation which demonstrates that the delays are beyond the reasonable control of the owner or operator of the Unit.

(8)    Recordkeeping for Alternative Compliance Option for Construction

An owner or operator that elects to comply with paragraph (i)(7) shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after reporting through the Compliance Portal pursuant to subparagraph (i)(7)(A), including but not limited to:

(A)    Images that show:

(i)    Construction activity;

(ii)    Expansion of the space for the Unit or new location where the Unit will be housed; and

(iii)    Associated equipment by the construction; and

(B)    Documentation which demonstrates the construction, which could be a construction permit or contract.

(9)    Small Business Registration

An owner or operator of a Unit electing to comply with the exemption in paragraph (k)(5) shall register their facility as a Small Business through the Compliance Portal at least 90 days prior to the Unit reaching the Unit age specified in Table 2. The owner or operator of the Unit shall maintain records on-site, or make them available to the Executive Officer upon request, until three years after registering through the Compliance Portal, to demonstrate:

(A)    Business legal owner and contact information;

(B)    Number of current employees;

(C)    The total gross annual receipts; and

(D)    If the business is a not-for-profit training center.

**1146.2 - 20**

Rule 1146.2 (Cont.)                                  (Amended June 7, 2024)

(j)     (10)    The owner or operator of a Unit required to submit information through the Compliance Portal in paragraph (i)(1), (i)(4), (i)(6), (i)(7), (j)(3), or (j)(9) shall provide the required information by calling 1-800-CUT-SMOG® (800-288-7664) if:

        (A)     The Compliance Portal is not available;

        (B)     The functions within the Compliance Portal do not allow the owner or operator of a Unit to enter the necessary information; or

        (C)     The owner or operator of a Unit does not have access to the Compliance Portal.

(k)     Exemptions

        (1)     The provisions of this rule shall not apply to:

                (A)     Units used in Recreational Vehicles;

                (B)     Units subject to a NOx emission limit in Rule 1121; and

                (C)     Units subject to a NOx emission limit in Rule 1179.1 – Emission Reductions From Combustion Equipment at Publicly Owned Treatment Works Facilities.

        (2)     Until the applicable Table 3 compliance dates, the Table 1 emission limits shall not apply to Type 2 Units manufactured prior to January 1, 2000 that are demonstrated to use less than 9,000 Therms during every calendar year.

        (3)     The provisions of paragraphs (d)(2) and (d)(3) and subparagraph (d)(5)(B) shall not apply to the following Units installed prior to June 7, 2024 that meet Table 1 emission limits:

                (A)     Units with a rated heat input capacity greater than 1,000,000 Btu per hour, but less than or equal to 2,000,000 Btu per hour that are demonstrated to use less than 3,000 Therms during every calendar year; or

                (B)     Units with a rated heat input capacity greater than 400,000 Btu per hour, but less than or equal to 1,000,000 Btu per hour that demonstrate to use less than 2,000 Therms during every calendar year.

        (4)     The provisions of paragraphs (d)(3), (d)(4), (d)(5), (d)(6), and (d)(7), and the recordkeeping and reporting provisions in paragraphs (j)(4) through (j)(9) shall not apply to Units installed or used in Residential Structures.

1146.2 - 21

**Rule 1146.2 (Cont.)**                          **(Amended June 7, 2024)**

(k)    (5)    The provisions of paragraph (d)(3) shall not apply to a Unit installed in a Small Business, provided that the owner or operator of the Unit complies with paragraph (j)(9).

    (6)    Certification requirements specified in paragraphs (f)(1) through (f)(4) shall not apply to Units complying with Table 2 emission limits.

(236 of 261), Page 236 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 236 of 261
Case 2:24-cv-10482-PA-PD   Document 83   Filed 08/08/25   Page 1 of 7   Page ID
#:2312

1  Courtland L. Reichman (SBN 268873)
     creichman@reichmanjorgensen.com
2  Brian C. Baran (SBN 325939)
     bbaran@reichmanjorgensen.com
3  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
   100 Marine Parkway, Suite 300
4  Redwood Shores, CA 94065
   Tel.: (650) 623-1401; Fax: (650) 560-3501
5
   *Attorneys for Plaintiffs Rinnai America Corp., Noritz*
6  *America Corp., National Association of Home*
   *Builders, California Manufacturers & Technology*
7  *Association, California Restaurant Association,*
   *California Hotel & Lodging Association, California*
8  *Apartment Association, and Plumbing-Heating-*
   *Cooling Contractors of California*
9
   ADDITIONAL COUNSEL ON FOLLOWING PAGE
10
11            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| RINNAI AMERICA CORP., et al. | Civil Action No. |
| Plaintiffs, | 2:24-cv-10482 PA(PDx) |
| v. | **PLAINTIFFS' NOTICE OF APPEAL** |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, | |
| Defendant, | |
| and | Honorable Percy Anderson United States District Judge |
| PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS, | |
| Defendant-Intervenors. | |

(237 of 261), Page 237 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 237 of 261
Case 2:24-cv-10482-PA-PD    Document 83    Filed 08/08/25    Page 2 of 7    Page ID
#:2313

ADDITIONAL COUNSEL

Sarah O. Jorgensen (*pro hac vice*)
  sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403; Fax: (650) 560-3501

Sean Kneafsey (SBN 180863)
  skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200; Fax: 213-892-1208

*Attorneys for Plaintiffs Rinnai America
Corp., Noritz America Corp., National
Association of Home Builders, California
Manufacturers & Technology Association,
California Restaurant Association,
California Hotel & Lodging Association,
California Apartment Association, and
Plumbing-Heating-Cooling Contractors of
California*

John J. Davis, Jr. (SBN 65594)
  jjdavis@msh.law
Luke Dowling (SBN 328014)
  ldowling@msh.law
MCCRACKEN, STEMERMAN
  & HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200; Fax: (415) 597-7201

*Attorneys for Plaintiff California State
Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
  matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-7724

*Attorney for Plaintiff Californians for
Homeownership, Inc.*

Angelo I. Amador (*pro hac vice*)
  aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913 Fax: (202) 331-2429

*Attorney for Plaintiff Restaurant Law Center*

## PLAINTIFFS' NOTICE OF APPEAL

Plaintiffs Rinnai America Corp.; Noritz America Corp.; National Association of Home Builders; California State Pipe Trades Council; California Manufacturers & Technology Association; California Restaurant Association; Restaurant Law Center; Californians for Homeownership, Inc.; California Hotel & Lodging Association; California Apartment Association; and Plumbing-Heating-Cooling Contractors of California all appeal to the United States Court of Appeals for the Ninth Circuit from the judgment entered July 18, 2025 (Dkt. 80) and the amended judgment entered July 23, 2025 (Dkt. 82).

(239 of 261), Page 239 of 26 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 239 of 261
Case 2:24-cv-10482-PA-PD    Document 83    Filed 08/08/25    Page 4 of 7    Page ID
#:2315

1  Dated: August 8, 2025                    Respectfully submitted,

2  /s/ John J. Davis, Jr.                   /s/ Courtland L. Reichman
   John J. Davis, Jr. (SBN 65594)           Courtland L. Reichman (SBN 268873)
3  jjdavis@msh.law                            creichman@reichmanjorgensen.com
   Luke Dowling (SBN 328014)                Brian C. Baran (SBN 325939)
4  ldowling@msh.law                           bbaran@reichmanjorgensen.com
   McCracken, Stemerman                     Reichman Jorgensen
5    & Holsberry LLP                          Lehman & Feldberg LLP
   475 – 14th Street, Suite 1200            100 Marine Parkway, Suite 300
6  Oakland, CA 94612                        Redwood Shores, CA 94065
   Tel.: (415) 597-7200; Fax: (415) 597-7201   Tel.: (650) 623-1401; Fax: (650) 560-3501
7
   *Attorneys for Plaintiff California State*   Sarah O. Jorgensen (*pro hac vice*)
8  *Pipe Trades Council*                     sjorgensen@reichmanjorgensen.com
                                            Reichman Jorgensen
9  /s/ Matthew P. Gelfand                    Lehman & Feldberg LLP
   Matthew P. Gelfand (SBN 297910)          1201 West Peachtree St., Suite 2300
10   matt@caforhomes.org                    Atlanta, GA 30309
   Californians for Homeownership, Inc.     Tel.: (404) 609-1040; Fax: (650) 560-3501
11 525 S. Virgil Ave.
   Los Angeles, California 90020            /s/ Sean M. Kneafsey
12 Tel.: (213) 739-8206; Fax: (213) 480-7724   Sean M. Kneafsey (SBN 180863)
                                              skneafsey@kneafseyfirm.com
13 *Attorney for Californians for*          The Kneafsey Firm, Inc.
   *Homeownership, Inc.*                    707 Wilshire Blvd., Suite 3700
14                                          Los Angeles, CA 90017
   /s/ Angelo I. Amador                     Tel.: (213) 892-1200; Fax: (213) 892-1208
15 Angelo I. Amador (*pro hac vice*)
     aamador@restaurant.org                 *Attorneys for Plaintiffs Rinnai America*
16 Restaurant Law Center                    *Corp., Noritz America Corp., National*
   2055 L Street, NW, Suite 700             *Association of Home Builders, California*
17 Washington, DC 20036                     *Manufacturers & Technology Association,*
   Tel.: (202) 331-5913 Fax: (202) 331-2429  *California Restaurant Association,*
18                                          *California Hotel & Lodging Association,*
   *Attorneys for Plaintiff Restaurant Law*   *California Apartment Association, and*
19 *Center*                                 *Plumbing-Heating-Cooling Contractors of*
                                            *California*
20                        **ATTESTATION**
21      In accordance with Civil Local Rule 5-4.3.4(a)(2)(i), I attest that each of the
22 signatories have concurred in this filing's content and have authorized its filing.
23 Dated:  August 8, 2025              By:  /s/ Courtland L. Reichman
24                                          Courtland L. Reichman

2

## UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT
#### Form 6.  Representation Statement

**Appellants:**

**Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, California Hotel & Lodging Association, California Apartment Association, and Plumbing-Heating-Cooling Contractors of California**

Courtland L. Reichman
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
(650) 623-1401
creichman@reichmanjorgensen.com
Registered for Electronic Filing:  Yes

Brian C. Baran
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com
Registered for Electronic Filing:  Yes

Sarah O. Jorgensen
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
(650) 623-1403
sjorgensen@reichmanjorgensen.com
Registered for Electronic Filing:  Yes

**California State Pipe Trades Council**
John J. Davis, Jr.
Luke Dowling
MCCRACKEN, STEMERMAN & HOLSBERRY LLP
475 14th Street, Suite 1200
Oakland, CA 94612
(415) 597-7200
jjdavis@msh.law
ldowling@msh.law
Registered for Electronic Filing:  Yes

1

(241 of 261), Page 241 of 261 Case: 25-5129, 09/22/2025, DktEntry: 15.1, Page 241 of 261
Case 2:24-cv-10482-PA-PD   Document 83   Filed 08/08/25   Page 6 of 7   Page ID
#:2317

**Appellants Continued:**

**Californians for Homeownership, Inc.**
Matthew P. Gelfand
CALIFORNIANS FOR HOMEOWNERSHIP, INC.
915 L Street, #1460
Sacramento, CA 95814
(213) 739-8206
matt@caforhomes.org
Registered for Electronic Filing:  No

**Restaurant Law Center**
Angelo I. Amador
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
(202) 331-5913
aamador@restaurant.org
Registered for Electronic Filing:  Yes

**Appellees:**

**South Coast Air Quality Management District**
Matthew D. Zinn
Lauren M. Tarpey
Ryan K. Gallagher
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, CA 94102
(415) 552-7272
zinn@smwlaw.com
Ltarpey@smwlaw.com
Rgallagher@smwlaw.com

Bayron T. Gilchrist, General Counsel
Barbara Baird, Chief Deputy District Counsel
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
21865 Copley Drive
Diamond Bar, CA 91765
(909) 396-3400
bgilcrist@awmd.gov

**Intervenors-Appellees:**

**People's Collective for Environmental Justice**
Adriano L. Martinez
Candice L. Youngblood
EARTHJUSTICE
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(415) 217-2000
amartinez@earthjustice.org
cyoungblood@earthjustice.org

**Sierra Club**
Nihal Shrinath
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5566
nihal.shrinath@sierraclub.org

James A. Dennison
SIERRA CLUB
1650 38th Street, Suite 103W
Boulder, CO 80301
(435) 232-5784
jim.dennison@sierraclub.org

**Industrious Labs**
Sean M. Donahue
DONAHUE, GOLDBERG & HERZOG
1008 Pennsylvania Ave., SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com

3

Query    Reports    Utilities    Help    Log Out

ACCO,(PDx),APPEAL,CLOSED,DISCOVERY,MJDAP_OUT,PROTORD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:24-cv-10482-PA-PD

| | |
|---|---|
| Rinnai America Corp. et al v. South Coast Air Quality Management District | Date Filed: 12/05/2024 |
| Assigned to: Judge Percy Anderson | Date Terminated: 07/18/2025 |
| Referred to: Magistrate Judge Patricia Donahue | Jury Demand: None |
| Case in other court: 9th CCA, 25-05129 | Nature of Suit: 890 Other Statutory Actions |
| Cause: 28:1331 Fed. Question | Jurisdiction: Federal Question |

**Plaintiff**

**Rinnai America Corp.**                     represented by  **Courtland L Reichman**
Reichman Jorgensen Lehman and Feldberg LLP
100 Marine Parkway Suite 300
Redwood Shores, CA 94065
650-623-1401
Fax: 650-623-1449
Email: creichman@reichmanjorgensen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
Reichman Jorgensen Lehman and Feldberg LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
650-623-5070
Fax: 650-560-3501
Email: bbaran@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
Reichman Jorgensen Lehman and Feldberg LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
650-623-1403
Fax: 650-560-3501
Email: sjorgensen@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
Kneafsey Firm Inc
707 Wilshire Boulevard Suite 3700

**ER-243**

Los Angeles, CA 90017
213-892-1200
Fax: 213-892-1208
Email: skneafsey@kneafseyfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Noritz America Corp.**                    represented by **Courtland L Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William J. Brown , Jr.**
Brown Wegner LLP
2010 Main Street Suite 1260
Irvine, CA 92614
949-705-0080
Email: bill@brownwegner.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Association of Home Builders**    represented by **Courtland L Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ER-244**

| | | |
|---|---|---|
| **California State Pipe Trades Council** | represented by | **John J Davis , Jr** |

McCracken, Stemerman and Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612
415-597-7200
Email: jjdavis@msh.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Courtland L Reichman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Luke Noah Dowling**
McCracken, Stemerman and Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612
415-597-7200
Fax: 415-597-7201
Email: ldowling@msh.law
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **California Manufacturers & Technology Association** | represented by | **Courtland L Reichman** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **California Restaurant Association** | represented by | **Courtland L Reichman** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Restaurant Law Center**                      represented by   **Angelo I. Amador**
                                                                Restaurant Law Center
                                                                2055 L Street, NW
                                                                Washington, DC 20036
                                                                202-331-5913
                                                                Email: AAmador@restaurant.org
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Courtland L Reichman**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Sean M. Kneafsey**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Californians for Homeownership, Inc.**       represented by   **Matthew Parker Gelfand**
                                                                416 S SPRING ST APT 1009
                                                                Los Angeles, CA 90013
                                                                3017874706
                                                                Fax: 3017874706
                                                                Email: matthew.p.gelfand@gmail.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Courtland L Reichman**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**California Hotel & Lodging Association**      represented by   **Courtland L Reichman**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brian C. Baran**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Sarah O. Jorgensen**
                                                                (See above for address)
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Sean M. Kneafsey**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**California Apartment Association**          represented by   **Courtland L Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Plumbing-Heating-Cooling Contractors**     represented by   **Sarah O. Jorgensen**
**of California**                                             (See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Kneafsey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtland L Reichman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**South Coast Air Quality Management**       represented by   **Lauren Mary Tarpey**
**District**                                                 Shute Mihaly and Weinberger, LLP
396 Hayes Street
San Francisco, CA 94102
415-552-7272
Fax: 415-552-5816
Email: Ltarpey@smwlaw.com
*ATTORNEY TO BE NOTICED*

**Matthew D Zinn**
Shute Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, CA 94102
415-552-7272

Fax: 415-552-5816
Email: zinn@smwlaw.com
*ATTORNEY TO BE NOTICED*

**V.**

**Intervenor Defendant**

| | | |
|---|---|---|
| **People's Collective for Environmental Justice** | represented by | **Candice Liana Youngblood** |

Earthjustice
707 Wilshire Boulevard Suite 4300
Los Angeles, CA 90017
415-217-2000
Email: cyoungblood@earthjustice.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adriano Martinez**
Earthjustice
707 Wilshire Street, Suite 4300
Los Angeles, CA 90017
415-217-2000
Fax: 415-217-2040
Email: amartinez@earthjustice.org
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **Sierra Club** | represented by | **Candice Liana Youngblood** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adriano Martinez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Dennison**
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
435-232-5784
Email: jim.dennison@sierraclub.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **Industrious Labs** | represented by | **Candice Liana Youngblood** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adriano Martinez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mediator (ADR Panel)**

| | |
|---|---|
| **Philip E Cook** | represented by **Philip Earl Cook**<br>Cook Law Firm PC<br>601 South Figueroa Street Suite 2050<br>Los Angeles, CA 90017<br>213-988-6100<br>Fax: 213-988-6099<br>Email: pcook@jamsadr.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/05/2024 | 1 | COMPLAINT Receipt No: ACACDC-38702220 - Fee: $405, filed by Plaintiffs California Restaurant Association, National Association of Home Builders, Restaurant Law Center, California Hotel & Lodging Association, Noritz America Corp., Californians for Homeownership, Inc., Rinnai America Corp., California State Pipe Trades Council, California Apartment Association, California Manufacturers & Technology Association. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Attorney Courtland L Reichman added to party California Apartment Association(pty:pla), Attorney Courtland L Reichman added to party Rinnai America Corp.(pty:pla), Attorney Courtland L Reichman added to party Noritz America Corp.(pty:pla), Attorney Courtland L Reichman added to party National Association of Home Builders(pty:pla), Attorney Courtland L Reichman added to party California State Pipe Trades Council(pty:pla), Attorney Courtland L Reichman added to party California Manufacturers & Technology Association(pty:pla), Attorney Courtland L Reichman added to party California Restaurant Association(pty:pla), Attorney Courtland L Reichman added to party Restaurant Law Center(pty:pla), Attorney Courtland L Reichman added to party Californians for Homeownership, Inc.(pty:pla), Attorney Courtland L Reichman added to party California Hotel & Lodging Association(pty:pla))(Reichman, Courtland) (Entered: 12/05/2024) |
| 12/05/2024 | 2 | CIVIL COVER SHEET filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association. (Reichman, Courtland) (Entered: 12/05/2024) |
| 12/05/2024 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,,,, 1 filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association. (Reichman, Courtland) (Entered: 12/05/2024) |
| 12/05/2024 | 4 | NOTICE of Interested Parties filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel & Lodging Association, (Reichman, Courtland) (Entered: 12/05/2024) |
| 12/09/2024 | 5 | NOTICE OF ASSIGNMENT to a U.S. Magistrate Judge and Declination of Consent. This case has been randomly assigned to Magistrate Judge Steve Kim. (jtil) (Entered: 12/09/2024) |

| 12/09/2024 | 6 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant South Coast Air Quality Management District. (jtil) (Entered: 12/09/2024) |
|---|---|---|
| 12/11/2024 | 7 | Declination of Consent form received on 12/10/24 was submitted within deadline set forth in L.R. 73-2.1. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (clee) TEXT ONLY ENTRY (Entered: 12/11/2024) |
| 12/12/2024 | 8 | NOTICE OF REASSIGNMENT of MJDAP case from Magistrate Judge Steve Kim to Judge Percy Anderson for all further proceedings. Any discovery matters that may be referred to a Magistrate Judge are assigned to U.S. Magistrate Judge Patricia Donahue. The case number will now reflect the initials of the transferee Judges 2:24-cv-10482 PA(PDx). (rn) (Entered: 12/12/2024) |
| 12/13/2024 | 9 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Angelo I. Amador. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 12/13/2024) |
| 12/13/2024 | 10 | STANDING ORDER by Judge Percy Anderson. READ THIS ORDER CAREFULLY. IT CONTROLS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES. This action has been assigned to the calendar of Judge Percy Anderson. (SEE DOCUMENT FOR FURTHER DETAILS). (aco) (Entered: 12/13/2024) |
| 12/13/2024 | 11 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Sarah O. Jorgensen. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 12/13/2024) |
| 12/17/2024 | 12 | First AMENDED COMPLAINT against Defendant South Coast Air Quality Management District, Plumbing-Heating-Cooling Contractors of California amending Complaint (Attorney Civil Case Opening),,,,, 1 , filed by Plaintiffs California Restaurant Association, National Association of Home Builders, Restaurant Law Center, California Hotel & Lodging Association, Noritz America Corp., Californians for Homeownership, Inc., Rinnai America Corp., California State Pipe Trades Council, California Apartment Association, California Manufacturers & Technology Association, Plumbing-Heating-Cooling Contractors of California(Attorney Courtland L Reichman added to party Plumbing-Heating-Cooling Contractors of California(pty:pla))(Reichman, Courtland) (Entered: 12/17/2024) |
| 12/17/2024 | 13 | Request for Clerk to Issue Summons on Amended Complaint/Petition,, 12 filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., Plumbing-Heating-Cooling |

| | | |
|---|---|---|
| | | Contractors of California, California Hotel & Lodging Association. (Reichman, Courtland) (Entered: 12/17/2024) |
| 12/17/2024 | 14 | *Amended* NOTICE of Interested Parties filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., Plumbing-Heating-Cooling Contractors of California, California Hotel & Lodging Association, (Reichman, Courtland) (Entered: 12/17/2024) |
| 12/17/2024 | 15 | APPLICATION of Non-Resident Attorney Sarah O. Jorgensen to Appear Pro Hac Vice on behalf of Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, Plumbing-Heating-Cooling Contractors of California, California Hotel & Lodging Association (Pro Hac Vice Fee - $500 Previously Paid on 12/17/2024, Receipt No. 38773561) filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers & Technology Association, California Restaurant Association, Plumbing-Heating-Cooling Contractors of California, California Hotel & Lodging Association. (Attachments: # 1 Proposed Order) (Attorney Sean M. Kneafsey added to party Plumbing-Heating-Cooling Contractors of California(pty:pla)) (Kneafsey, Sean) (Entered: 12/17/2024) |
| 12/18/2024 | 16 | 21 DAY Summons Issued re Amended Complaint/Petition,, 12 as to Defendant South Coast Air Quality Management District. (aco) (Entered: 12/18/2024) |
| 12/18/2024 | 17 | ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Percy Anderson. APPLICATION of Attorney Sarah O. Jorgensen to Appear Pro Hac Vice on behalf of Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National Association of Home Builders, California Manufacturers and Technology Association, California Restaurant Association, Plumbing-Heating-Cooling Contractors of California, California Hotel and Lodging Association, designating Sean M. Kneafsey as local counsel is GRANTED.; granting 15 Non-Resident Attorney Sarah O. Jorgensen. (aco) (Entered: 12/18/2024) |
| 12/19/2024 | 18 | APPLICATION of Non-Resident Attorney Angelo I. Amador to Appear Pro Hac Vice on behalf of Plaintiff Restaurant Law Center (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-38786998) filed by Plaintiff Restaurant Law Center. (Attachments: # 1 Proposed Order) (Attorney Sean M. Kneafsey added to party Restaurant Law Center(pty:pla)) (Kneafsey, Sean) (Entered: 12/19/2024) |
| 12/19/2024 | 19 | ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Percy Anderson. APPLICATION of Attorney Angelo I. Amador to Appear Pro Hac Vice on behalf of Plaintiff Restaurant Law Center, designating Sean M. Kneafsey as local counsel is GRANTED.; granting 18 Non-Resident Attorney Angelo I. Amador (aco) (Entered: 12/20/2024) |
| 01/02/2025 | 20 | PROOF OF SERVICE Executed by Plaintiff California Restaurant Association, National Association of Home Builders, Restaurant Law Center, California Hotel & Lodging Association, Noritz America Corp., Californians for Homeownership, Inc., Rinnai America Corp., California State Pipe Trades Council, California Apartment Association, Plumbing-Heating-Cooling Contractors of California, California Manufacturers & Technology Association, upon Defendant South Coast Air Quality Management District served on 12/20/2024, answer due 1/10/2025. Service of the Summons and Complaint were executed upon Faye Thomas - Clerk of the Boards in compliance with California Code of Civil Procedure by personal service (Reichman, Courtland) (Entered: 01/02/2025) |

| 01/03/2025 | 21 | Notice of Appearance or Withdrawal of Counsel: for attorney William J. Brown, Jr counsel for Plaintiff Noritz America Corp.. Adding William J. Brown, Jr. as counsel of record for Noritz America Corporation for the reason indicated in the G-123 Notice. Filed by plaintiff Noritz America Corporation. (Attorney William J. Brown, Jr added to party Noritz America Corp.(pty:pla))(Brown, William) (Entered: 01/03/2025) |
|---|---|---|
| 01/06/2025 | 22 | STIPULATION Extending Time to Answer the complaint as to South Coast Air Quality Management District answer now due 1/24/2025, re Amended Complaint/Petition,, 12 filed by defendant South Coast Air Quality Management District.(Attorney Matthew D Zinn added to party South Coast Air Quality Management District(pty:dft))(Zinn, Matthew) (Entered: 01/06/2025) |
| 01/24/2025 | 23 | ANSWER to Amended Complaint/Petition,, 12 filed by Defendant South Coast Air Quality Management District.(Zinn, Matthew) (Entered: 01/24/2025) |
| 01/24/2025 | 24 | NOTICE of Appearance filed by attorney Lauren Mary Tarpey on behalf of Defendant South Coast Air Quality Management District (Attorney Lauren Mary Tarpey added to party South Coast Air Quality Management District(pty:dft))(Tarpey, Lauren) (Entered: 01/24/2025) |
| 01/27/2025 | 25 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Notice of Appearance 24 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Appearance or Withdrawal of Counsel G-123.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 01/27/2025) |
| 01/27/2025 | 26 | SCHEDULING MEETING OF COUNSEL [FRCP 16, 26(f)] by Judge Percy Anderson. SCHEDULING CONFERENCE set for March 10, 2025, at 10:30 a.m. This action has been assigned to the calendar of Judge Percy Anderson. (SEE DOCUMENT FOR FURTHER DETAILS). (aco) (Entered: 01/28/2025) |
| 02/12/2025 | 27 | NOTICE OF MOTION AND MOTION to Intervene filed by PROPOSED DEFENDANT-INTERVENOR People's Collective for Environmental Justice, Sierra Club, Industrious Labs. Motion set for hearing on 3/17/2025 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Memorandum OF POINTS AND AUTHORITIES IN SUPPORT OF PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, ET AL.'S [NGOs] UNOPPOSED MOTION TO INTERVENE, # 2 Declaration OF ADRIANO L. MARTINEZ IN SUPPORT OF [NGOs] MOTION TO INTERVENE, # 3 Declaration OF ANDREA VIDAURRE IN SUPPORT OF NGOs MOTION TO INTERVENE, # 4 Declaration OF GEM M. MONTES IN SUPPORT OF NGOs MOTION TO INTERVENE, # 5 Declaration OF KIMBERLY R. ORBE IN SUPPORT OF NGOs MOTION TO INTERVENE, # 6 Declaration OF RODNEY P. BOONE IN SUPPORT OF NGOs MOTION TO INTERVENE, # 7 Declaration OF EVAN GILLESPIE IN SUPPORT OF NGOs MOTION TO INTERVENE, # 8 Proposed Order GRANTING [NGOs] UNOPPOSED MOTION TO INTERVENE, # 9 [PROPOSED] ANSWER OF INTERVENORS [NGOs] TO AMENDED COMPLAINT IN INTERVENTION, # 10 NOTICE OF INTERESTED PARTIES; CORPORATE DISCLOSURE STATEMENT) (Attorney Candice Liana Youngblood added to party People's Collective for Environmental Justice(pty:mov), Attorney Candice Liana Youngblood added to party Sierra Club(pty:mov), Attorney Candice Liana Youngblood added to party Industrious Labs(pty:mov)) (Youngblood, Candice) (Entered: 02/12/2025) |
| 02/12/2025 | 28 | Notice of Appearance or Withdrawal of Counsel: for attorney Candice Liana Youngblood counsel for Movants People's Collective for Environmental Justice, Sierra Club, |

| | | |
|---|---|---|
| | | Industrious Labs. Adding Candice L. Youngblood as counsel of record for People's Collective for Environmental Justice, Sierra Club, Industrious Labs for the reason indicated in the G-123 Notice. Filed by PROPOSED DEFENDANT-INTERVENOR People's Collective for Environmental Justice, Sierra Club, Industrious Labs. (Youngblood, Candice) (Entered: 02/12/2025) |
| 02/12/2025 | 29 | APPLICATION of Non-Resident Attorney JAMES A. DENNISON to Appear Pro Hac Vice on behalf of Movants People's Collective for Environmental Justice, Sierra Club, Industrious Labs (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-39097495) filed by PROPOSED DEFENDANT-INTERVENOR People's Collective for Environmental Justice, Sierra Club, Industrious Labs. (Attachments: # 1 [PROPOSED] ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE) (Youngblood, Candice) (Entered: 02/12/2025) |
| 02/12/2025 | 30 | PROOF OF SERVICE filed by PROPOSED DEFENDANT-INTERVENORS People's Collective for Environmental Justice, Sierra Club, Industrious Labs, re NOTICE OF MOTION AND MOTION to Intervene 27 served on 2/12/2025. (Youngblood, Candice) (Entered: 02/12/2025) |
| 02/12/2025 | 31 | Notice of Appearance or Withdrawal of Counsel: for attorney Candice Liana Youngblood counsel for Movants People's Collective for Environmental Justice, Sierra Club, Industrious Labs. Adding ADRIANO L. MARTINEZ as counsel of record for People's Collective for Environmental Justice, Sierra Club, Industrious Labs for the reason indicated in the G-123 Notice. Filed by PROPOSED DEFENDANT-INTERVERNORS People's Collective for Environmental Justice, Sierra Club, Industrious Labs. (Youngblood, Candice) (Entered: 02/12/2025) |
| 02/14/2025 | 32 | First STIPULATION to Continue Scheduling Conference from March 10, 2025 Re: Initial Order Setting R26 Scheduling Conference - form only 26 filed by Defendant South Coast Air Quality Management District. (Attachments: # 1 Proposed Order)(Zinn, Matthew) (Entered: 02/14/2025) |
| 02/14/2025 | 33 | ORDER GRANTING STIPULATION CONTINUING SCHEDULING CONFERENCE AND ASSOCIATED DEADLINES by Judge Percy Anderson. For good cause shown in the Stipulation Continuing Scheduling Conference and Associated Deadlines, filed by Plaintiffs Rinnai America Corp., et al. and Defendant South Coast Air Quality Management District, it is hereby ordered that the Scheduling Conference currently set for March 10, 2025, is rescheduled to March 17, 2025, at 1:30 p.m. All associated deadlines are extended accordingly. RE: First STIPULATION to Continue Scheduling Conference, 32 . (aco) (Entered: 02/18/2025) |
| 02/18/2025 | 34 | Notice of Appearance or Withdrawal of Counsel: for attorney Adriano Martinez counsel for Movants People's Collective for Environmental Justice, Sierra Club, Industrious Labs. Adding ADRIANO L. MARTINEZ as counsel of record for People's Collective for Environmental Justice, Sierra Club, Industrious Labs for the reason indicated in the G-123 Notice. Filed by PROPOSED DEFENDANT-INTERVENOR People's Collective for Environmental Justice, Sierra Club, Industrious Labs. (Attorney Adriano Martinez added to party Sierra Club(pty:mov))(Martinez, Adriano) (Entered: 02/18/2025) |
| 02/26/2025 | 35 | MINUTES IN CHAMBERS-COURT ORDER by Judge Percy Anderson. For the foregoing reasons and the reasons set forth in Proposed Intervenors' moving papers, the Court grants Proposed Intervenors' Motion subject to the following conditions: (See document for further details).; granting 27 MOTION to Intervene. (aco) (Entered: 02/26/2025) |
| 03/03/2025 | 36 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 1, filed by Plaintiffs California Apartment Association, Rinnai America Corp., Noritz America Corp., National |

| | | Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., Plumbing-Heating-Cooling Contractors of California, California Hotel & Lodging Association.. (Reichman, Courtland) (Entered: 03/03/2025) |
|---|---|---|
| 03/04/2025 | 37 | ANSWER to Amended Complaint/Petition,, 12 filed by Defendant-Intervenors People's Collective for Environmental Justice, Sierra Club, Industrious Labs.(Youngblood, Candice) (Entered: 03/04/2025) |
| 03/04/2025 | 38 | ORDER/REFERRAL to ADR Procedure No 2 by Judge Percy Anderson. Case ordered to Court Mediation Panel for mediation. ADR Proceeding to be held no later than August 4, 2025. (aco) (Entered: 03/04/2025) |
| 03/04/2025 | 39 | PROTECTIVE ORDER CONCERNING CONFIDENTIAL INFORMATION by Judge Percy Anderson. The Court enters the following protective order: (See document for further details). (aco) (Entered: 03/04/2025) |
| 03/04/2025 | 40 | MINUTES IN CHAMBERS by Judge Percy Anderson. Dates set by the Court in this action are listed in the Schedule of Trial and Pretrial Dates attached to this order. The scheduling conference currently on calendar for March 17, 2025, at 10:30 a.m. is hereby vacated, and the matter taken off calendar. The Court has entered a Protective Order in this action. This case is referred to the Court's Mediation Panel. Final Pretrial Conference 09/05/2024 at 1:30 p.m. Court Trial 09/30/25 at 9:00 a.m. (See document for additional deadlines and details). (aco) (Entered: 03/04/2025) |
| 03/04/2025 | 42 | CIVIL TRIAL SCHEDULING ORDER [FED. R. CIV. P. 16(b)] by Judge Percy Anderson. 1. Establishing a Discovery Cut-off Date of July 21, 2025; 2. Setting Motion Cut-off date of July 28, 2025; 3. Setting Final Pretrial Conference for September 5, 2025, at 1:30 p.m.; 4. Setting Court Trial Date of September 30, 2025, at 9:00 a.m. (See document for further details). (aco) (Entered: 03/05/2025) |
| 03/05/2025 | 41 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Answer to Complaint (Attorney Civil Case Opening) 37 . The following error(s) was/were found: Local Rule 7.1-1 no notice of interested parties. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (aco) (Entered: 03/05/2025) |
| 03/05/2025 | 43 | ANSWER to Amended Complaint/Petition,, 12 filed by Defendant-Intervenors People's Collective for Environmental Justice, Sierra Club, Industrious Labs. (Attachments: # 1 Notice of Interested Parties-Coporate Disclosure Statement)(Youngblood, Candice) (Entered: 03/05/2025) |
| 03/06/2025 | 44 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Answer to Complaint (Attorney Civil Case Opening), 43 . The following error(s) was/were found: The Notice of Interested parties should be filed as its own docket entry and not as an attachment to the Answer. The correct event to be used for the Notice of Interested Parties is Notices > Certificate/Notice of Interested Parties. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (aco) (Entered: 03/06/2025) |

| 03/07/2025 | 45 | NOTICE of Interested Parties filed by Defendant-Intervenors People's Collective for Environmental Justice, Sierra Club, Industrious Labs, (Youngblood, Candice) (Entered: 03/07/2025) |
|---|---|---|
| 03/19/2025 | 46 | Joint STIPULATION for Order Re: Setting Briefing Schedule and Hearing Date filed by Plaintiff Rinnai America Corp.. (Attachments: # 1 Proposed Order)(Reichman, Courtland) (Entered: 03/19/2025) |
| 03/19/2025 | 47 | ORDER RE: SETTING BRIEFING SCHEDULE AND HEARING DATE by Judge Percy Anderson. The Court, having read and considered the Joint Stipulation and for good cause shown, hereby ORDERS the following schedule for dispositive motions: Dispositive Motions Hearing July 14, 2025, at 1:30 p.m. (See document for additional deadlines). RE: Joint STIPULATION for Order Re: Setting Briefing Schedule and Hearing Date 46 . (aco) (Entered: 03/20/2025) |
| 03/25/2025 | 48 | STIPULATION REGARDING SELECTION of Panel Mediator filed. Parties stipulate that Phillip Cook may serve as Panel Mediator. Plaintiff obtained the Panel Mediators consent to serve. Filed by Plaintiff Rinnai America Corp.(Reichman, Courtland) (Entered: 03/25/2025) |
| 03/27/2025 | 49 | NOTICE OF ASSIGNMENT of Panel Mediator. Mediator (ADR Panel) Philip E Cook has been assigned to serve as Panel Mediator. (lst) (Entered: 03/27/2025) |
| 04/14/2025 | 50 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. Motion set for hearing on 7/14/2025 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Memorandum ISO of Pltfs' Motion for Summary Judgment, # 2 Declaration of Brian C. Baran ISO Pltfs' Motion for Summary Judgment, # 3 Exhibit 1 to Declaration of B. Baran, # 4 Exhibit 2 to Declaration of B. Baran, # 5 Statement of Uncontroverted Facts ISO Motion for Summary Judgment, # 6 Declaration of Frank Windsor ISO Pltfs' Motion for Summary Judgment, # 7 Declaration of Jay Hassel ISO Pltfs' Motion for Summary Judgment, # 8 Declaration of Thomas J. Ward ISO Pltfs' Motion for Summary Judgment, # 9 Declaration of Mike Hartley ISO Pltfs' Motion for Summary Judgment, # 10 Declaration of Joe Raymond ISO Pltfs' Motion for Summary Judgment, # 11 Declaration of Lance Hastings ISO Pltfs' Motion for Summary Judgment, # 12 Declaration of Jot Condie ISO Pltfs' Motion for Summary Judgment, # 13 Declaration of Angelo Amador ISO Pltfs' Motion for Summary Judgment, # 14 Declaration of Matt P. Gelfand ISO Pltfs' Motion for Summary JudgmentISO Pltfs' Motion for Summary Judgment, # 15 Declaration of Thomas K. Bannon ISO Pltfs' Motion for Summary Judgmentment, # 16 Declaration of Brian Abernathy ISO Pltfs' Motion for Summary Judgment, # 17 Declaration of Jessica Bohn ISO Pltfs' Motion for Summary Judgment, # 18 Declaration of Blake Boyd ISO Pltfs' Motion for Summary Judgment, # 19 Declaration of Lynn Mohrfeld ISO Pltfs' Motion for Summary Judgment, # 20 Declaration of Whitney Squire ISO Pltfs' Motion for Summary Judgment, # 21 Declaration of Mike Prencavage Jr. ISO Pltfs' Motion for Summary Judgment, # 22 Proposed Judgment) (Attorney Courtland L Reichman added to party California State Pipe Trades Council(pty:pla), Attorney Courtland L Reichman added to party Californians for Homeownership, Inc.(pty:pla), Attorney Courtland L Reichman added to party Restaurant Law Center(pty:pla)) (Reichman, Courtland) (Entered: 04/14/2025) |
| 04/25/2025 | 51 | Joint STIPULATION for Order to Extend Deadline to Complete Mediation filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, |

**ER-255**

| | | |
|---|---|---|
| | | California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Attachments: # 1 Proposed Order)(Reichman, Courtland) (Entered: 04/25/2025) |
| 04/28/2025 | 52 | ORDER RE: SETTING MEDIATION DATE by Judge Percy Anderson. The Court, having read and considered the Joint Stipulation and for good cause shown, hereby ORDERS that the Parties, with Mr. Phil Cook as mediator, will hold the mediation on August 12, 2025 at 9:00 a.m. RE: Joint STIPULATION for Order to Extend Deadline to Complete Mediation, 51 . (aco) (Entered: 04/28/2025) |
| 05/12/2025 | 53 | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 filed by Defendant South Coast Air Quality Management District. (Attachments: # 1 Proposed Order)(Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 54 | DECLARATION of Michael Krause re Response in Opposition to Motion, 53 filed by Defendant South Coast Air Quality Management District. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 55 | DECLARATION of Sarah L. Rees, Ph.D re Response in Opposition to Motion, 53 filed by Defendant South Coast Air Quality Management District. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 56 | DECLARATION of Xian-Liang Tian, Ph.D re Response in Opposition to Motion, 53 filed by Defendant South Coast Air Quality Management District. (Attachments: # 1 Exhibit 1) (Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 57 | STATEMENT of Genuine Disputes of Material Fact in Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club, Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 58 | Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 filed by Defendant South Coast Air Quality Management District. Motion set for hearing on 7/14/2025 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Memorandum of Points and Authorities in support, # 2 Proposed Judgment) (Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 59 | OBJECTION in opposition to Evidence Filed re: NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 filed by Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 60 | STATEMENT of Consolidated Additional Material Facts and Statement of Uncontroverted Facts re Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 , NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club, Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 05/12/2025) |

| | | |
|---|---|---|
| 05/12/2025 | 61 | REQUEST FOR JUDICIAL NOTICE re Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 *and in support of Opposition to Plaintiff's Motion for Summary Judgment,* filed by Defendant South Coast Air Quality Management District. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(Zinn, Matthew) (Entered: 05/12/2025) |
| 05/12/2025 | 62 | JOINDER in Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club. (Youngblood, Candice) (Entered: 05/12/2025) |
| 05/12/2025 | 63 | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club. (Attachments: # 1 Declaration OF CANDICE L. YOUNGBLOOD, # 2 Proposed Order)(Youngblood, Candice) (Entered: 05/12/2025) |
| 05/28/2025 | 64 | Joint STIPULATION for Order Re: Dispositive Motions Briefing filed by Plaintiff Rinnai America Corp.. (Attachments: # 1 Proposed Order)(Reichman, Courtland) (Entered: 05/28/2025) |
| 05/28/2025 | 65 | ORDER RE: DISPOSITIVE MOTIONS BRIEFING by Judge Percy Anderson. The Court, having read and considered the Joint Stipulation and for good cause shown, hereby ORDERS that Plaintiffs will file a single consolidated reply brief of up to 24 pages by June 2, 2025, the previously set deadline for Plaintiffs' reply briefs. (See document for further details). RE: Joint STIPULATION for Order Re: Dispositive Motions Briefing 64 . (aco) (Entered: 05/29/2025) |
| 06/02/2025 | 66 | REPLY In Support NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Reichman, Courtland) (Entered: 06/02/2025) |
| 06/02/2025 | 67 | STATEMENT of Genuine Disputes of Material Facts NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 50 *and Response to Defendants' Statement of Genuine Disputes of Material Facts* filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Reichman, Courtland) (Entered: 06/02/2025) |
| 06/02/2025 | 68 | OBJECTIONS to Request for Judicial Notice,, 61 filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Reichman, Courtland) (Entered: 06/02/2025) |

**ER-257**

| 06/02/2025 | 69 | RESPONSE filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.to Objection/Opposition (Motion related), 59 *to Defendants' Objections to Evidence Filed ISO Plaintiffs' Motion for Summary Judgment* (Reichman, Courtland) (Entered: 06/02/2025) |
| 06/02/2025 | 70 | OBJECTIONS to Declaration, 55 , Declaration 54 , Response in Opposition to Motion, 63 , Request for Judicial Notice,, 61 , Declaration 56 *Plaintiffs' Evidentiary Objections to Defendants' Evidence* filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Reichman, Courtland) (Entered: 06/02/2025) |
| 06/02/2025 | 71 | OPPOSITION Opposition re: Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Attachments: # 1 Proposed Judgment)(Reichman, Courtland) (Entered: 06/02/2025) |
| 06/02/2025 | 72 | Notice of Incorporation of Dkts. 50-5, 67, 68, 69, and 70 in Support of Plaintiffs' Opposition to Defendant's Cross Motion for Summary Judgment filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Reichman, Courtland) (Entered: 06/02/2025) |
| 06/16/2025 | 73 | REPLY in support of Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 filed by Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 06/16/2025) |
| 06/16/2025 | 74 | DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' EVIDENCE re Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club, Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 06/16/2025) |
| 06/16/2025 | 75 | DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT re Cross NOTICE OF MOTION AND MOTION for Summary Judgment as to Federal preemption of South Coast Air Quality Management District Rule 1146.2 58 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club, Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 06/16/2025) |

| 06/16/2025 | 76 | JOINDER filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club joining in Reply (Motion related), 73 . (Youngblood, Candice) (Entered: 06/16/2025) |
| --- | --- | --- |
| 06/25/2025 | 77 | Notice of Appearance or Withdrawal of Counsel: for attorney Luke Noah Dowling counsel for Plaintiff California State Pipe Trades Council. Adding Luke N. Dowling as counsel of record for California State Pipe Trades Council for the reason indicated in the G-123 Notice. Filed by Plaintiff California State Pipe Trades Council. (Attorney Luke Noah Dowling added to party California State Pipe Trades Council(pty:pla))(Dowling, Luke) (Entered: 06/25/2025) |
| 07/09/2025 | 78 | IN CHAMBERS ORDER TAKING MOTION UNDER ADVISEMENT by Judge Percy Anderson. A hearing on the MOTION for Summary Judgment 50 and CROSS MOTION for Summary Judgment 58 is scheduled for July 14, 2025, at 1:30 p.m. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds this matter appropriate for decision without oral argument. The hearing calendared for July 14, 2025, is vacated and the matter taken off calendar. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kss) TEXT ONLY ENTRY (Entered: 07/09/2025) |
| 07/18/2025 | 79 | MINUTES IN CHAMBERS-COURT ORDER by Judge Percy Anderson. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument and vacates the hearing on the matter. For all of the foregoing reasons, the Court grants Defendant's Cross-Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment, Declaratory Relief and Permanent Injunction. A Judgment consistent with this order will be filed concurrently. (See document for further details).; denying 50 MOTION for Summary Judgment; granting 58 CROSS-MOTION for Summary Judgment. (aco) (Entered: 07/18/2025) |
| 07/18/2025 | 80 | JUDGMENT by Judge Percy Anderson. In accordance with the Court's July 18, 2025 Minute Order granting the Cross-Motion for Summary Judgment filed by defendant South Coast Air Quality Management District ("Defendant"), IT IS HEREBY ORDERED, ADJUDGED, AND DECREED: 1. Defendant is entitled to summary judgment on the claim for declaratory relief filed by plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers and Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel and Lodging Association, and California Apartment Association; 2. Plaintiffs shall take nothing and Defendant shall have its costs of suit; and 3. The Clerk is ordered to enter this Judgment. (MD JS-6, Case Terminated). (aco) (Entered: 07/18/2025) |
| 07/22/2025 | 81 | AMENDED MINUTES IN CHAMBERS-COURT ORDER held before Judge Percy Anderson. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument and vacates the hearing on the matter. For all of the foregoing reasons, the Court grants Defendant's Cross-Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment, Declaratory Relief and Permanent Injunction. A Judgment consistent with this order will be filed concurrently. (See document for further details). RE: MINUTES IN CHAMBERS-COURT ORDER, 79 . (aco) (Entered: 07/23/2025) |
| 07/22/2025 | 82 | AMENDED JUDGMENT by Judge Percy Anderson. In accordance with the Court's July 22, 2025 Amended Minute Order granting the Cross-Motion for Summary Judgment filed by defendant South Coast Air Quality Management District ("Defendant"), IT IS HEREBY ORDERED, ADJUDGED, AND DECREED: 1. Defendant is entitled to summary judgment on the claim for declaratory relief filed by plaintiffs Rinnai America Corp., Noritz America Corporation, National Association of Home Builders, California State Pipe |

| | | |
|---|---|---|
| | | Trades Council, California Manufacturers and Technology Association, California Restaurant Association, Restaurant Law Center, Californians for Homeownership, Inc., California Hotel and Lodging Association, and California Apartment Association; 2. Plaintiffs shall take nothing and Defendant shall have its costs of suit; and 3. The Clerk is ordered to enter this Amended Judgment. (aco) (Entered: 07/23/2025) |
| 08/08/2025 | 83 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. Appeal of Judgment,,, 82 , Judgment,,, 80 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-40270617.) (Reichman, Courtland) (Entered: 08/08/2025) |
| 08/13/2025 | 84 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 25-5129 assigned to Notice of Appeal to 9th Circuit Court of Appeals,, 83 as to Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, National Association of Home Builders, Noritz America Corp., Rinnai America Corp.. (sh) (Entered: 08/14/2025) |
| 08/27/2025 | 85 | NOTICE OF MOTION AND MOTION for Preliminary Injunction re Injunction Pending Appeal filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. Motion set for hearing on 9/29/2025 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Memorandum in Support of Plaintiffs' Motion for Injunction Pending Appeal, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Proposed Order) (Reichman, Courtland) (Entered: 08/27/2025) |
| 09/08/2025 | 86 | OPPOSITION to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Injunction Pending Appeal 85 filed by Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 09/08/2025) |
| 09/08/2025 | 87 | OPPOSITION to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Injunction Pending Appeal 85 filed by Intervenor Defendants Industrious Labs, People's Collective for Environmental Justice, Sierra Club. (Attachments: # 1 Declaration OF ADRIANO L. MARTINEZ)(Youngblood, Candice) (Entered: 09/08/2025) |
| 09/15/2025 | 88 | REPLY In Support of NOTICE OF MOTION AND MOTION for Preliminary Injunction re Injunction Pending Appeal 85 filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.. (Reichman, Courtland) (Entered: 09/15/2025) |
| 09/17/2025 | 89 | NOTICE OF SUPPLEMENTAL AUTHORITY re NOTICE OF MOTION AND MOTION for Preliminary Injunction re Injunction Pending Appeal 85 filed by Defendant South Coast Air Quality Management District. (Zinn, Matthew) (Entered: 09/17/2025) |
| 09/18/2025 | 90 | RESPONSE filed by Plaintiffs California Apartment Association, California Hotel & Lodging Association, California Manufacturers & Technology Association, California Restaurant Association, California State Pipe Trades Council, Californians for |

Homeownership, Inc., National Association of Home Builders, Noritz America Corp., Plumbing-Heating-Cooling Contractors of California, Restaurant Law Center, Rinnai America Corp.to Motion Related Document [89](#) *Notice of Supplemental Authority* (Reichman, Courtland) (Entered: 09/18/2025)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/21/2025 22:05:03 | | | |
| **PACER Login:** | rejolf22 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:24-cv-10482-PA-PD End date: 9/22/2025 |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |