No. 25-5129

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RINNAI AMERICA CORP., ET AL.,

*Plaintiffs–Appellants,*

v.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, ET AL.,

*Defendants–Appellees,*

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, ET AL.,

*Intervenors–Defendants–Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:24-cv-10482-PA-PD
Hon. Percy Anderson, District Judge

## BRIEF *AMICUS CURIAE* OF AMERICAN GAS ASSOCIATION
## IN SUPPORT OF PLAINTIFFS–APPELLANTS AND REVERSAL

Daniel Rankin (admission application
forthcoming)
BAKER BOTTS L.L.P.
401 S. 1st St., Ste 1300
Austin, Texas 98101
(512) 322-2673
daniel.rankin@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
(713) 229-1234
mark.little@bakerbotts.com

Michael Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
mmurray@aga.org

*Counsel for American Gas Association*

# TABLE OF CONTENTS

Table of Authorities .................................................................................. iii

Identity and Interest of *Amicus Curiae* ....................................................1

Summary of Argument ...............................................................................2

Argument.....................................................................................................3

      I.     The history and purpose of EPCA make clear that the District's zero-nitrogen oxide standard must fall to preemption. .........................3

      II.    The Court need not delimit the outer bounds of EPCA preemption in this case....................................................11

Conclusion ................................................................................................13

Form 8. Certificate of Compliance for Briefs..........................................15

Certificate of Service ...............................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*California Restaurant Ass'n v. City of Berkeley*,
    89 F.4th 1094 (9th Cir. 2024) .......................................................................9, 12

*Champion v. Ames*,
    188 U.S. 321 (1903) ...................................................................................12

*Delgado-Hernandez v. Holder*,
    697 F.3d 1125 (9th Cir. 2012) ................................................................2

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ..................................................................................3

*Nat. Res. Def. Council, Inc. v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985) ..............................................................3

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................13

STATUTES AND RULES

42 U.S.C. § 6297 ...............................................................................2, 7, 10, 11

Pub. L. No. 94-163, 89 Stat. 871 (1975) ...............................................................4, 9

Pub. L. No. 95-619, 92 Stat. 3206 (1978) .........................................................5, 6, 9

Pub. L. No. 100-12, 101 Stat. 103 (1987) ...........................................................6, 9

Pub. L. No. 102-486, 106 Stat. 2776 (1992) ............................................................8

Fed. R. App. P. 29 ...........................................................................................1

LEGISLATIVE AUTHORITIES

H.R. Rep. No. 94-340 (1975) ...........................................................................4

H.R. Rep. No. 100-11 (1987) ........................................................................7, 8

S. Rep. No. 94-516 (1975) .............................................................................3

S. Rep. No. 100-6 (1987) ...........................................................6, 7, 10, 11

**OTHER AUTHORITIES**

American Gas Association, *2025 Playbook* .............................................1

Julia Richardson & Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat.
 Res. & Env't 62 (1995)........................................................................5

U.S. Energy Info. Admin., *Annual Energy Outlook* ................................1

U.S. Energy Info. Admin., *What is U.S. electricity generation by energy source?* ..1

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* American Gas Association ("AGA") represents the natural gas local distribution companies that deliver natural gas to homes and businesses. The gas they move heats millions of American homes and generates over 30 percent of the nation's electricity.[2] More than 189 million Americans and 5.8 million businesses use natural gas,[3] and the demand for natural gas continues to increase because it is abundant, safe, and cost-effective.[4]

AGA advocates on its members' behalf on many issues, including legal issues that affect the distribution and use of natural gas. AGA therefore has a substantial interest in this case, in which the district court's mistaken view of the Energy Policy and Conservation Act ("EPCA") threatens to disrupt the lawful use of natural-gas appliances. AGA accordingly files this brief to underscore why, based on the purpose and history of EPCA, the zero-nitrogen oxide emission standard at issue in

---

[1] All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] *See* U.S. Energy Info. Admin., *What is U.S. electricity generation by energy source?*, https://www.eia.gov/tools/faqs/faq.php?id=427&t=3 (last visited September 29, 2025).

[3] *See* AGA, *2025 Playbook*, https://playbook.aga.org/ (last visited September 29, 2025).

[4] *See* U.S. Energy Info. Admin., *Annual Energy Outlook 2023*, https://www.eia.gov/outlooks/aeo/ (last visited September 29, 2025).

1

this case is preempted by federal law.

## SUMMARY OF ARGUMENT

Because nitrogen oxide is an inevitable byproduct of gas combustion, the South Coast Air Quality Management District's ("District") zero-nitrogen oxide emission standard effectively bans the use of natural-gas appliances. Thus, by its plain text, EPCA preempts the standard, for it is a local regulation "concerning" the "energy use" of EPCA-covered gas appliances. 42 U.S.C. § 6297(c). This Court could, based on that straightforward, text-based approach to the statute, simply end the analysis there and reverse the district court's judgment. *See Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1127 (9th Cir. 2012) ("Our analysis on this point begins and ends with the plain text of the statute."). But in the event this Court desires to go beyond the text to ascertain EPCA's history and purpose, it will readily find that both illuminate how the district court erred below.

The history and purpose of EPCA reinforce what its text already makes clear. If gas-appliance bans like the District's are allowed to stand and proliferate, appliance manufacturers would be subjected to a patchwork of regulatory regimes across the nation. The sale, marketing, and servicing of gas appliances would, in turn, also be severely affected, prompting appliance manufacturers to pull out of markets entirely. If anything is evident from the statutory and legislative history of EPCA, it is that Congress intended none of that and instead wanted to ensure federal

2

uniformity in this area.

Thus, the history and purpose of EPCA, coupled with this Court's on-point precedent, make this an easy case. The Court can accordingly decide this appeal without having to confront any hard questions about EPCA's preemptive scope. To be sure, those hard questions may arise in future cases that present closer preemption questions. But the proper place to address such questions and demarcate the outer bounds of EPCA preemption would be in those edge cases, not in this easy one.

The district court's judgment should be reversed.

## ARGUMENT

### I.   The history and purpose of EPCA make clear that the District's zero-nitrogen oxide standard must fall to preemption.

The "basic purpose of the legislation as well as its history" can inform the preemptive scope of a statute. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 490 (1996). Here, EPCA's history and purpose confirm what the statute's plain text already makes clear: EPCA preempts the District's zero-nitrogen oxide emission standard.

In response to the 1970s oil crises, "President Ford called for 'the strongest and most far-reaching energy conservation program we have ever had.'" *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985) (quoting 11 Weekly Comp. Pres. Doc. 40, 41 (Jan. 20, 1975)). Hearing the call, Congress enacted what it regarded as a "comprehensive national energy policy." S. Rep. No. 94-516, at 116-17 (1975). Since then, Congress has amended EPCA several times to

3

strengthen the federal government's role in regulating appliance energy use and efficiency and limit states' ability to act in those areas.

The original 1975 EPCA provisions regarding consumer appliances focused on appliance labeling, with the expectation that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Pub. L. No. 94-163, 89 Stat. 871 (1975). The statute accordingly required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should issue energy-efficiency standards if the labeling program proved ineffective. Pub. L. No. 94-163, §§ 324-325, 89 Stat. at 920-24. Contemporaneous legislative materials make that vision clear: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

In addition to this consumer-empowering approach, the original EPCA also permitted significant state involvement in appliance regulation. Specifically, it allowed state regulations that differed from federal regulations, but only if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard. Pub. L. No. 94-163, § 327, 89 Stat. at 926-27. Thus, as originally enacted in 1975, EPCA's

4

provisions regarding energy efficiency took a laissez faire approach to appliance use and efficiency and permitted state regulation, assuming there was a showing of local need.

Since 1975, however, Congress has amended EPCA several times, progressively moving away from this laissez faire approach and toward binding federal appliance standards. Each one of these amendments further strengthened the federal government's role in regulating appliance energy use and efficiency and restricted states' abilities to set their own standards.

First, in 1978, Congress passed a range of statutes that gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy to sustain economic growth. *See* Julia Richardson & Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the Department of Energy ("DOE") in 1977 to coordinate a federal response to the nation's energy problems.

One of those 1978 statutes was the National Energy Conservation Policy Act ("NECPA"), Pub. L. No. 95-619, 92 Stat. 3206 (1978), which amended the 1975 EPCA. Rather than rely exclusively on labeling, as EPCA had done, NECPA required DOE to prescribe minimum energy-efficiency standards for certain

products. Pub. L. No. 95-619, sec. 422, § 325, 92 Stat. at 3259-62. NECPA also strengthened EPCA's preemption provisions, allowing state regulations that were more stringent than federal regulations, only if the Secretary found that there was a significant state or local interest to justify the regulation and that the regulation would not unduly burden interstate commerce. Pub. L. No. 95-619, sec. 424, § 327(b), 92 Stat. at 3263-64.

Despite NECPA's new requirements, DOE did not act to adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption." S. Rep. No. 100-6, at 4 (1987). "As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." *Id.*

So, in 1987, Congress responded to this trend by passing the National Appliance Energy Conservation Act ("NAECA"). Pub. L. No. 100-12, 101 Stat. 103 (1987). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance-manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 2. As the Senate at the time recognized, DOE's abdication of its standard-setting responsibility and its freewheeling policy of granting preemption waivers had created "the problem of a growing patchwork of differing State regulations which would increasingly complicate [appliance

6

manufacturers'] design, production and marketing plans." *Id.* at 4. Similarly, reports about NAECA in the House make clear that Congress sought to "end the era of confusion and uncertainty" for the appliance industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

NAECA thus contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2. "In general, these national standards would preempt all State standards." *Id.* To that end, EPCA's current preemption provision regarding consumer appliances reads:

> [E]ffective on the effective date of an energy conservation standard established or prescribed under [42 U.S.C. § 6295] for any covered product, *no State regulation concerning the energy efficiency, energy use*, or water use *of such covered product shall be effective with respect to such product*.

42 U.S.C. § 6297(c) (emphases added).

After NAECA, federal law provided two routes for a state or local jurisdiction to avoid preemption. First, DOE can grant a waiver of preemption in certain limited circumstances. *Id.* § 6297(d). Second, performance-based building codes for new construction can qualify for an exception from preemption if they meet a strict, seven-part test. *Id.* § 6297(f). As the House Report regarding NAECA explains, this exception is intended to "prevent[] State building codes from being used as a means of setting mandatory State appliance standards in excess of Federal standards." H.R.

7

Rep. No. 100-11, at 26. Flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard." *Id.*

Congress then amended EPCA once more through the Energy Policy Act of 1992. Pub. L. No. 102-486, 106 Stat. 2776 (1992). That amendment expanded the federal appliance program to include energy-efficiency standards for industrial appliances as well as consumer appliances. EPCA's current preemption provision regarding industrial appliances reads:

> A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, *supersede any State or local regulation concerning the energy efficiency or energy use of a product* for which a standard is prescribed or established pursuant to such section.

42 U.S.C. § 6316(b)(2)(A) (emphasis added). Likewise, a pathway was added for a state building code for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i).[5] Thus, in its present

---

[5] The ASHRAE/IES Standard 90.1 is a joint standard developed by the American Society of Heating, Refrigeration and Air-Conditioning Engineers and Illuminating Engineering Society that sets minimum energy efficiency requirements for commercial buildings. Products subject to the ASHRAE/IES Standard 90.1 include various kinds of gas boilers and water heaters—exactly the type of products that would be banned under the District's zero-nitrogen oxide emission standard.

form, EPCA covers both consumer and industrial appliances, sets federal standards for the energy use and efficiency of those products, and preempts state and local regulations concerning those matters.

Notably, as Congress amended EPCA throughout the years, it expanded the statute's preemption clause. *See* Pub. L. No. 94-163, 89 Stat. 871, 926-27 (1975) (preempting local regulations that "provide for . . . any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product"); Pub. L. No. 95-619, 92 Stat. 3206, 3263-64 (1978) (preempting local regulation "which establishes an energy efficiency standard or other requirement respecting energy use or energy efficiency"); Pub. L. No. 100-12, 101 Stat. 103, 118 (1987) (preempting local regulations "concerning the energy efficiency or energy use of such covered product"). Each time Congress revisited EPCA, it broadened its reach, ultimately opting for the most expansive wording in the current preemption clause.

The upshot of these several amendments is that EPCA became a muscular federal regulatory regime that protects consumer choice from local regulatory deviations. Or, in this Court's words, "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094, 1103 (9th Cir. 2024). Hence, EPCA's broadly phrased

9

preemption clause preempting "any State regulation concerning [covered appliances'] energy efficiency or energy use," 42 U.S.C. § 6297(c); *see also id.* § 6316(b)(2)(A), along with the stringent requirements for a waiver or exception, *id.* §§ 6297(d), (f), 6316(b)(2)(D).

The purpose and history of EPCA reinforce Congress's intent to preempt state and local regulations concerning appliances' energy use and energy efficiency. More specifically, it demonstrates that the District's zero-nitrogen oxide emission standard is exactly the sort of local law that Congress sought to prevent because the standard renders gas appliances effectively "unavailab[le]" in that jurisdiction. S. Rep. No. 100-6, at 8. If such local laws are allowed to stand and proliferate, appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation, with gas appliances effectively prohibited in some states and localities while being permitted in others. *Id.* at 4.

Appliance manufacturers, in turn, would be forced to radically shift or add production lines—for example, by redesigning and retooling them for electric appliances rather than gas ones—in an attempt to accommodate discrete jurisdictions all over the nation. The sale and marketing of gas appliances would also become increasingly complex and economically burdensome, with no-go zones scattered across the country. *Cf.* 42 U.S.C. § 6295(o)(2)(B)(i)(I) (directing the Secretary to evaluate, among other things, the "economic impact of the standards on the

10

manufacturers" to determine whether the standards are "economically justified"). So too would the servicing of gas appliances, as consumers could find themselves hours away from a business that could repair their gas appliances. *Cf.* 42 U.S.C. § 6297(d)(3) (DOE cannot grant a preemption waiver if, *inter alia*, the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis"). All of this, in effect, would prompt manufacturers to pull out of certain markets and result in the very "patchwork" economy that Congress sought to avoid. S. Rep. No. 100-6, at 4.

It is clear from EPCA's history and purpose that Congress intended to avoid this outcome. Congress's manifest intention bolsters Plaintiffs-Appellants' plain-text analysis and confirms that EPCA preempts the District's zero-nitrogen oxide emission standard.

## II. The Court need not delimit the outer bounds of EPCA preemption in this case.

As the text, history, and purpose all show, EPCA's preemptive scope extends at least far enough to encompass regulations like the District's that broadly ban the use of EPCA-covered products. Yet the intervenors below—Sierra Club, People's Collective for Environmental Justice, and Industrious Labs—have claimed that such a conclusion will open the floodgates to a limitless version of EPCA preemption that will swallow up the police powers of states and localities. Intervenors' argument is unavailing, and it should give the Court no pause in confirming the plain reach of

11

EPCA's preemptive scope in this case.

To be sure, while "EPCA's preemption provision is broad, it is not unlimited." *California Restaurant Association*, 89 F.4th at 1103. Difficult cases down the road may test the precise bounds of EPCA preemption, but this case does not. None of the hard questions about EPCA's preemptive scope are at issue here. The District's zero-nitrogen oxide emission standard is a rather conspicuous attack on EPCA-covered products because it effectively bans their use. Far from being subtle or nuanced, it is a heavy-handed way of eliminating appliances that Congress has expressly permitted for use. *See Champion v. Ames*, 188 U.S. 321, 359 (1903) (recognizing that a "regulation may take the form of prohibition"). That makes this an easy case, especially in light of *California Restaurant Association*.

This Court finds itself in the same position as it did in *California Restaurant Association*: evaluating a regulation that falls within the heartland of EPCA preemption, rather than on its frontiers. The Court should take the same approach here as it did there. It need not indulge the intervenors' sky-is-falling arguments and instead should merely resolve the straightforward case in front of it, which pertains to the blatant regulation of EPCA-covered products. *Cf. California Restaurant Ass'n*, 89 F.4th at 1103, 1106 (noting that "[t]his is a narrow opinion about Berkeley's building codes" and its holding had "nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where

covered products might be used"). In other words, "[i]t is enough for today that wherever [EPCA's] line may be, the [zero-nitrogen oxide emission standard] is surely beyond it." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012).

If some future litigant pushes the envelope and starts the parade of horribles that the intervenors fear, that would be the proper time to tackle the line-drawing problems that EPCA preemption may present in edge cases. Notably, those harrowing developments have not materialized in the nearly two years since this Court decided *California Restaurant Association*. And unless and until they do arise, this Court has no occasion to chart the perimeter of EPCA preemption.

## CONCLUSION

The text, history, and purpose of EPCA—as well as this Court's decision in *California Restaurant Association*—are all at odds with the district court's reasoning. Accordingly, this Court should reverse the judgment below.

Dated:  September 29, 2025          Respectfully submitted,

  */s/ J. Mark Little*
J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
(713) 229-1234
mark.little@bakerbotts.com

Daniel Rankin (admission application
forthcoming)
Baker Botts L.L.P.
401 S. 1st St., Ste 1300
Austin, TX 78704
(512) 322-2673
daniel.rankin@bakerbotts.com

Michael Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
mmurray@aga.org

*Counsel for American Gas Association*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-5129

I am the attorney or self-represented party.

**This brief contains 2,968 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ J. Mark Little        **Date** September 29, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

15

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system, which will send notice of such filing to all registered users.

Dated:  September 29, 2025                    */s/ J. Mark Little*
                                              J. Mark Little
                                              BAKER BOTTS L.L.P.
                                              910 Louisiana St.
                                              Houston, TX 77002
                                              (713) 229-1489
                                              mark.little@bakerbotts.com

                                              *Counsel for Amicus Curiae*
                                              *American Gas Association*