Docket No. 25-5129

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

RINNAI AMERICA CORPORATION et al.
Plaintiffs-Appellants,

vs.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
Defendant-Appellee,

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE et al.
Intervenor-Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of California
Case No. 2:24-cv-10482-PA-PD

---

## DEFENDANT-APPELLEE'S ANSWERING BRIEF

---

Bayron T. Gilchrist
General Counsel
Barbara Baird
Chief Deputy District Counsel
South Coast Air Quality Management District
21865 Copley Drive
Diamond Bar, California 91765
Telephone: (909) 396-3400
Facsimile: (909) 396-2961

Matthew D. Zinn
Lauren M. Tarpey
Ryan K. Gallagher
Shute, Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Defendant-Appellee
South Coast Air Quality Management District

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. 4

INTRODUCTION ........................................................................... 10

ISSUES PRESENTED ..................................................................... 12

JURISDICTIONAL STATEMENT ...................................................... 13

STATEMENT OF THE CASE ............................................................ 13

    A.   The Clean Air Act establishes a cooperative
federalism regime that relies on states to exercise
primary authority over air pollution control. .............. 13

    B.   The District has regulated NOx emissions from
appliances for nearly 50 years. .................................. 15

    C.   After a lengthy decision-making process, the
District adopted the current Rule to achieve
federal ozone standards. ............................................ 17

    D.   Plaintiffs sued to enjoin enforcement of the Rule,
and the district court rejected their claim.................. 20

STANDARD OF REVIEW................................................................ 22

SUMMARY OF ARGUMENT ............................................................ 22

ARGUMENT ................................................................................ 24

    I.   The district court correctly held that EPCA does not
preempt the Rule........................................................ 24

    A.   The court recognized that the Rule is unlike the
ordinance in *CRA* because it regulates the
pollutant byproducts of appliances, not their
energy use. ............................................................... 26

        1.   Unlike the Berkeley ordinance, the Rule
does not regulate the quantity of natural
gas used by appliances....................................... 26

        2.   *CRA* did not adopt a broad holding that
EPCA preempts any regulation that

effectively prevents the use of covered products. ........................................................ 29

B.     Plaintiffs cannot distinguish NOx emission standards set at levels above zero. .............................. 39

C.     The district court correctly concluded that EPCA's preemption provision must be applied with an eye to the Clean Air Act's heavy reliance on state emission regulation. ........................................ 43

  1.     The District adopted the Rule to satisfy its obligations under the Clean Air Act, which deputizes the states to achieve federal air quality standards. ................................. 43

  2.     The district court correctly concluded that Congress did not intend to preempt air pollution standards for appliances. .................... 46

  3.     EPCA's legislative history confirm that Congress did not intend to preempt air pollution regulation. ............................................ 49

D.     Plaintiffs' remaining arguments fail to show that the district court erred. ................................. 51

II.     Alternatively, this Court should affirm the district court's decision because Plaintiffs cannot satisfy the standard for their facial challenge to the Rule. .................... 55

III.     The district court did not make any findings of fact about the potential for gas appliances to comply with the Rule. ................................................. 57

IV.     The District reserves its right to argue that *CRA* was wrongly decided. ................................................ 57

CONCLUSION ...................................................... 58

# TABLE OF AUTHORITIES

## CASES

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) ........................................................51

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
107 F.4th 934 (9th Cir. 2024)............................................22, 55, 56

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) ........................................................24

*Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (appeal pending) ....................................................58

*Beentjes v. Placer Cnty. Air Pollution Control Dist.*,
397 F.3d 775 (9th Cir. 2005) ........................................................15

*Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A., Inc.*,
519 U.S. 316 (1997) ..............................................................36, 50

*California Restaurant Ass'n v. City of Berkeley*,
65 F.4th 1045 (2023) ..............................................................30, 31

*California Restaurant Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024)..............................................*passim*

*CDK Glob. LLC v. Brnovich*,
16 F.4th 1266 (9th Cir. 2021)........................................................55

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
529 F. Supp. 2d 1151 (E.D. Cal. 2007)..........................................39

*Comm. for a Better Arvin v. EPA*,
786 F.3d 1169 (9th Cir. 2015) ................................................14, 44

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) ..............................................................35, 48

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt Dist.*,
    541 U.S. 246 (2004) ...................................................................28

*Exxon Mobil Corp. v. EPA*,
    217 F.3d 1246 (9th Cir. 2000) .................................................. 13, 14

*Green Mtn. Chrysler Plymouth Dodge Jeep v. Crombie*,
    508 F. Supp. 2d 295 (D. Vt. 2007)............................................38, 39

*Huron Portland Cement Co. v. City of Detroit*,
    362 U.S. 440 (1960) ...................................................................14

*Independent Towers of Wash. v. Wash.*,
    350 F.3d 925 (9th Cir. 2003) ......................................................52

*Mont. Med. Ass'n v. Knudsen*,
    119 F.4th 618 (9th Cir. 2024).....................................................55

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................................55

*Mulhern Gas. Co. v. Mosley*,
    No. 1:23-CV-1267 (GTS/PJE), 2025 WL 2062194 (N.D.N.Y.
    July 23, 2025) (appeal pending)....................................................57

*Obduskey v. McCarthy & Holthus LLP*,
    586 U.S. 466 (2019) ...................................................................48

*Pac. Merch. Shipping Ass'n v. Goldstene*,
    639 F.3d 1154 (9th Cir. 2011) ....................................................13

*Regents of Univ. of Cal. v. Shalala*,
    82 F.3d 291 (9th Cir. 1996) .......................................................32

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ...................................................................28

*Sprint Telephony PCS, L.P. v. County of San Diego*,
    543 F.3d 571 (9th Cir. 2008) ......................................................55

*Train v. Nat. Res. Def. Council, Inc.*,
  421 U.S. 60 (1975) ........................................................ 13

*Turnacliff v. Westly*,
  546 F.3d 1113 (9th Cir. 2008) ................................... 24

*Union Elec. Co. v. EPA*,
  427 U.S. 246 (1976) .................................................... 15

*United States v. Duarte*,
  137 F.4th 743 (9th Cir. 2025) .................................... 32

*United States v. Hernandez-Estrada*,
  749 F.3d 1154 (9th Cir. 2014) .................................... 57

*United States v. Salerno*,
  481 U.S. 739 (1987) .............................................. 55, 56

## FEDERAL STATUTES

15 U.S.C. § 1261 ................................................................ 55

15 U.S.C. § 2075 ................................................................ 55

42 U.S.C. § 6291 ......................................................... 16, 18

42 U.S.C. § 6292 ................................................................ 56

42 U.S.C. § 6295 ................................................................ 24

42 U.S.C. § 6297 ........................... 25, 30, 33, 35, 47, 53

42 U.S.C. § 6311 ................................................. 16, 18, 56

42 U.S.C. § 7401 ................................................................ 13

42 U.S.C. § 7408 ......................................................... 14, 15

42 U.S.C. § 7410 ......................................................... 14, 44

42 U.S.C. § 7413 ................................................................ 44

42 U.S.C. § 7416 ...................................................................15

42 U.S.C. § 7509 ...................................................................44

42 U.S.C. § 7543 ...................................................................15

49 U.S.C. § 32919 .................................................................38

Clean Air Act, Pub. L. No. 91- 604, 84 Stat. 1676 (1970), Pub. L.
    No. 95-95, 91 Stat. 685 (1977), Pub. L. No. 101-549, 104 Stat.
    2399 (1990) ............................................................... *passim*

Energy Policy and Conservation Act, Pub. L. No. 94-163, 89
    Stat. 871 (1975) ...................................................... *passim*

## CONGRESSIONAL COMMITTEE REPORTS

H.R. Rep. No. 94-700 (1975)...................................................50

H.R. Rep. No. 100-11 (1987)...................................................50

S. Rep. No. 94-516 (1975) ......................................................50

S. Rep. No. 100-6 (1987) ........................................................50

## FEDERAL REGULATIONS

10 C.F.R. Part 430.................................................................56

10 C.F.R. Part 431.................................................................56

10 C.F.R. § 431.87 .................................................................42

40 C.F.R. Part 50...................................................................14

40 C.F.R. § 50.10 ...................................................................15

40 C.F.R. § 50.9 .....................................................................15

40 C.F.R. § 81.305 .................................................................16

## CALIFORNIA STATUTES

1947 Cal. Stat. ch. 632 ...................................................................... 14

1976 Cal. Stat. ch. 324, § 5 ............................................................... 14

Cal. Health & Safety Code § 39002 .................................................. 15

Cal. Health & Safety Code § 40000 .................................................. 15

Cal. Health & Safety Code § 40001 ..................................... 15, 44, 52, 53

Cal. Health & Safety Code § 40440 ........................................ 15, 52, 53

Cal. Health & Safety Code § 40460 ............................................. 15, 44

Cal. Health & Safety Code § 40702 ........................................ 15, 52, 53

Cal. Health & Safety Code § 40716 ........................................ 15, 52, 53

## SOUTH COAST AQMD RULES & REGULATIONS

Rule 1109.1 ....................................................................................... 16

Rule 1111 .................................................................................. 16, 17, 44

Rule 1112 ........................................................................................... 16

Rule 1121 .................................................................................. 16, 17, 44

Rule 1134 ........................................................................................... 16

Rule 1146 ................................................................................... 17, 45

Rule 1146.1 ................................................................................ 17, 45

Rule 1146.2 ..................................... 10, 17, 18, 19, 20, 22, 24, 41, 45, 56

Rule 1153.1 ....................................................................................... 16

**MUNICIPAL CODES**

Los Angeles Muni. Code § 57.605.10.2 ................................................34

**OTHER AUTHORITIES**

Jonathan L. Ramseur & Jane A. Leggett, Cong. Research Serv.,
R45625, *Attaching a Price to Greenhouse Gas Emissions with
a Carbon Tax or Emissions Fee: Considerations and
Potential Impacts* 2-3 (2019) .........................................................37

## INTRODUCTION

For nearly 50 years, the South Coast Air Quality Management District has regulated harmful nitrogen oxide ("NOx") pollution from appliances to protect public health in the nation's most polluted air basin. The District's latest amendment to this longstanding regulatory program—adopted to help achieve ambient air quality standards mandated by Congress—reduced the allowable concentration of NOx emissions to zero for specified appliances. Plaintiffs sued to invalidate Rule 1146.2 on its face, claiming the Energy Policy and Conservation Act ("EPCA") preempts it.

The district court properly rejected the challenge. Plaintiffs' sweeping theory of preemption finds no support in this Court's explicitly limited decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) ("*CRA*"). There, this Court held that EPCA preempted Berkeley's building code because it directly regulated the quantity of natural gas appliances could use—setting that quantity at zero by prohibiting gas infrastructure. The Court took pains to emphasize the "very narrow" scope of its holding. As the district court here recognized, the District's emission standard is fundamentally different: it regulates the harmful pollutant byproducts that appliances emit, not the quantity of energy they consume.

This distinction is critical. As relevant here, EPCA preempts only regulations "concerning . . . energy use" of covered appliances. The District's Rule does no such thing. It sets limits on harmful air pollution—

10

the byproducts of combustion—without dictating how much gas an appliance may burn or how efficiently it must operate. Just as *CRA* recognized that EPCA would likely not preempt regulations of utility distribution or carbon taxes despite their effect on gas appliance use, the Rule's incidental impact on appliance energy use does not trigger preemption.

Plaintiffs' contrary interpretation threatens to invalidate not just the District's Rule but countless non-zero emission limits that states and air districts have imposed for decades. Plaintiffs can draw no principled distinction between these supposedly "ordinary" emission standards and the District's zero-NOx limit. By Plaintiffs' logic, all these "ordinary" emission standards would be equally vulnerable to preemption challenges whenever they prove stringent enough to prevent the use of appliances. Moreover, *any* emission standard precludes the use of those appliances that cannot satisfy it. The district court was right to reject this untenable result.

The district court also properly recognized that Congress could not have intended Plaintiffs' proposed outcome. When Congress enacted and amended EPCA against the backdrop of the Clean Air Act's unique cooperative federalism regime—which explicitly relies on state and local governments to regulate to achieve federal air quality standards—it said nothing about preempting air pollution regulations. EPCA extensively addresses building codes, but it is silent on emission standards. To hold that EPCA preempts the very regulations Congress depends upon states to adopt would undermine the architecture of federal air quality law.

11

The District faces a stark reality. The South Coast Air Basin ("Basin"), which comprises much of Los Angeles, Orange, Riverside, and San Bernardino counties, remains in "extreme" nonattainment of federal ozone standards, with the worst air quality in the nation. To meet these congressionally mandated standards, the District must reduce NOx emissions by a staggering *67 percent* beyond the reductions that will be achieved under current regulations. After exhaustive analysis, the District concluded that these massive reductions must include eliminating emissions from all stationary sources where feasible, including appliances, which collectively account for 20 percent of stationary source pollution in the Basin. The Rule does not represent not a departure from ordinary air quality regulation, but rather its natural evolution in response to the extraordinary air quality challenges that face the Basin.

The district court properly distinguished this Court's narrow holding in *CRA*. It recognized the fundamental difference between regulating pollutant emissions and regulating energy use and preserved the states' ability to regulate air pollution as Congress intended. This Court should affirm.

## ISSUES PRESENTED

1.    Did the district court correctly hold that EPCA does not preempt the District's latest amendment to its long-standing regulation of harmful air pollutants emitted by appliances, which it adopted in an effort to achieve federal air quality standards in the country's most polluted air basin?

12

2. Regardless of whether the district court erred in its application of EPCA, was summary judgment for the District nevertheless proper because Plaintiffs failed to carry the burden for their facial challenge that the Rule is preempted in every application?

## JURISDICTIONAL STATEMENT

The District agrees with Plaintiffs' statement of jurisdiction.

## STATEMENT OF THE CASE

### A. The Clean Air Act establishes a cooperative federalism regime that relies on states to exercise primary authority over air pollution control.

The federal government first began to address the problem of air pollution in the 1960s. *Train v. Nat. Res. Def. Council, Inc*., 421 U.S. 60, 63 (1975). Congress then established the modern federal air pollution control program in the Clean Air Act of 1970, Pub. L. No. 91- 604, 84 Stat. 1676 (1970), with major amendments in 1977, Pub. L. No. 95-95, 91 Stat. 685 (1977), and 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990) (collectively "CAA").

As "[e]nvironmental regulation traditionally has been a matter of state authority," *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000), "Congress itself contemplated that the states would retain leading roles in regulating air quality when it passed the Clean Air Act," *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011). Indeed, Congress concluded that "air pollution control at its source is the *primary responsibility* of States and local governments." 42 U.S.C. § 7401(a)(3) (emphasis added).

13

Under the CAA's "cooperative federalism regime," *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015), EPA must set national ambient air quality standards for "criteria" pollutants: six specified pollutants known to endanger public health and welfare. 42 U.S.C. § 7408(a)(1); 40 C.F.R. Part 50. States must then develop State Implementation Plans detailing the measures to reduce pollutant emissions to bring regions such as the Basin into attainment of the national standards by statutory deadlines. 42 U.S.C. § 7410.

The CAA thus explicitly relies on states exercising their police powers to enact laws to protect and govern their citizens. This police power encompasses "the power to protect the health of citizens in the state," including "[a]ir pollution prevention." *Exxon Mobil*, 217 F.3d at 1255. Indeed, "[l]egislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of . . . the police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960).

In response to the Basin's notorious smog, in 1947 the California Legislature authorized the Los Angeles County Air Pollution Control District, the first air pollution regulatory agency in the nation and predecessor to the District. 1947 Cal. Stat. ch. 632; Plaintiffs-Appellants' Excerpts of Record, Dkt. 15.1 ("ER") 16 n.8. When it created the District in 1976, the Legislature recognized that the Basin had "the most critical air pollution problem in the nation." 1976 Cal. Stat. ch. 324, § 5 at 893.

California law assigns the District "the primary responsibility for control of air pollution from all sources[,] other than vehicular sources,"

14

in the Basin. *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th Cir. 2005) (quoting Cal. Health & Safety Code ("HSC") §§ 39002, 40000). To allow the District to fulfill this responsibility, the Legislature delegated to the District broad authority to adopt and enforce rules to reduce pollutant emissions to attain state and federal air quality standards. HSC §§ 40001, 40440, 40702, 40716. It also required the District to develop a plan to attain those standards for the Basin, *id.* § 40460(a), and adopt regulations to implement the plan, *id.* § 40001(a). The District thus has primary responsibility to ensure that the Basin attains the federal air quality standards.

Reflecting the states' primary role in air pollution control, the CAA gives states "virtually absolute power in allocating emission limitations so long as the national standards are met." *Union Elec. Co. v. EPA*, 427 U.S. 246, 267 (1976). Thus, except for specific mobile emission sources not at issue here, the CAA directs that "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416; *see also id.* § 7543(a), (e) (narrowly preempting state regulation of vehicle emissions).

## B.  The District has regulated NOx emissions from appliances for nearly 50 years.

Ozone is a criteria pollutant for which the EPA sets national ambient standards. *See* 42 U.S.C. § 7408(a); 40 C.F.R. §§ 50.9, 50.10. Ozone forms in the atmosphere from a reaction of NOx with volatile organic

15

compounds in the presence of sunlight. Appellee's and Intervenor-Appel-lees' Joint Supplemental Excerpts of Record ("SER") 26, 40. NOx are toxic, reactive gases that also directly endanger human health and the environment. *Id.*; ER-9. For decades the District has worked to bring the Basin into compliance with federal standards. However, the Basin continues to suffer from some of the worst air quality in the nation. ER-9; SER-26, 53. In fact, the Basin is in "extreme" nonattainment for all federal ozone standards and has the highest ozone levels nationwide. 40 C.F.R. § 81.305. SER-26, 28-29, 43-46. Accordingly, the District for decades has regulated NOx emissions from a panoply of sources, from petroleum refineries (Rule 1109.1) to cement kilns (Rule 1112), stationary gas turbines (Rule 1134) to commercial food ovens (Rule 1153.1). *See* Request for Judicial Notice in Support of Appellee's Answering Brief ("RJN") Exs. A-D.

The District began regulating NOx emissions from appliances in the 1970s and has progressively tightened those standards and applied them to new appliances. The appliances subject to District emissions standards include both residential devices and industrial equipment that consume energy, such as water heaters, furnaces, boilers, and the like. *See, e.g.*, 42 U.S.C. §§ 6291, 6311. In 1978, it adopted Rules 1111 and 1121, which apply to small central furnaces and water heaters. SER-30. The rules' original NOx emission limit of 40 nanograms per joule ("ng/J") was later lowered to 14 ng/J for furnaces, and to 10 ng/J for water

heaters.[1] ER-83-84; SER-57-60. Ten years after adopting Rules 1111 and 1121, the District adopted Rule 1146, which limits NOx emissions from large boilers, steam generators, and process heaters with rated heat input capacities between 5 million Btu per hour ("MMBtu/hr") and 75 MMBtu/hr.[2] SER-30-31, 62-65. In 1990, the District adopted Rule 1146.1, which limits NOx emissions from industrial, institutional, and commercial boilers, steam generators, and process heaters with rated heat input between 2 and 5 MMBtu/hr. SER-31, 67-69. Emissions limits for the equipment types governed by Rules 1146 and 1146.1 vary depending on their size and type. *Id.*

The District adopted the first iteration of Rule 1146.2 in 1998, imposing a NOx limit of 30 ppm on most covered appliances. ER-83. The Rule was amended in 2005, 2006, and 2018 to expand the equipment subject to the NOx limit and to tighten the limit for most appliances to 20 ppm. ER-84.

### C. After a lengthy decision-making process, the District adopted the current Rule to achieve federal ozone standards.

Despite the District's prior efforts to limit NOx emissions from appliances and numerous other sources, the Basin cannot achieve the

---

[1] Emissions limits are stated in nanograms of a pollutant per joule of heat ("ng/J") or in parts per million ("ppm") or parts per million by volume ("ppmv"). SER-30. The terms ppm and ppmv are interchangeable. *Id.* We will use ppm here.

[2] An appliance's rated heat input capacity represents the maximum amount of heat it can generate, in British thermal units per hour. SER-30.

current federal ozone standard without enormous additional emission reductions. SER-29, 41. The District must bring the Basin into attainment of the 2015 8-hour ozone standard by 2038. SER-29, 38, 42 n.1. To meet that deadline, NOx emissions must decline by 124 tons per day from the 2037 baseline level of 184 tons per day, or about 67 percent beyond the reductions that will be achieved by previously adopted rules. SER-29, 50.

The District adopted the 2022 Air Quality Management Plan ("2022 Plan") to target those additional reductions. ER-10, 85. The 2022 Plan found that "there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technology across all . . . stationary sources, large and small." SER-29, 41. In other words, to realize the sharp decline in ozone pollution that federal law demands, the District must reduce emissions from a panoply of emission sources that include individually small but collectively significant sources.

Those small-but-significant sources include appliances, which are residential devices or commercial or industrial equipment that consume energy, such as water heaters, furnaces, boilers, and the like. *See, e.g.*, 42 U.S.C. §§ 6291, 6311. Appliances collectively emit massive amounts of NOx from burning fossil fuels. SER-30, 31, 114. The large water heaters, small boilers, and process heaters covered by Rule 1146.2 alone generate approximately 5.6 tons of NOx per day in the Basin. *See* SER-31; ER-105. In fact, appliances account for almost 20 percent of all emissions from the stationary sources the District regulates. SER-31, 114.

To implement the 2022 Plan, the District developed the 2024 amendments to Rule 1146.2 in a 14-month-long process. ER-105; SER-

17,73. This process included five Working Group Meetings, involving representatives from manufacturers, trade organizations, businesses, environmental groups, and other interested parties. SER-73. The District held multiple public meetings, and the Stationary Source Committee of the District's Governing Board reviewed the Rule on three occasions. SER-74. The District then held a public hearing and adopted the Rule on June 7, 2024. ER-10. In adopting the Rule, the Governing Board found there were no "control options that meet . . . the air quality objectives," other than those in the proposed amended rule. SER-102.

Rule 1146.2 applies to large water heaters, small boilers, and process heaters with a rated heat input capacity of up to 2 MMBtu/hr.[3] ER-81, 214 (Rule 1146.2(a)). Before the 2024 amendments, the Rule generally required these appliances to achieve a NOx emission limit of 20 ppm. ER-81. As amended, the Rule prohibits the manufacture, sale, or installation of large water heaters, small boilers, and process heaters that emit more than zero NOx, subject to staggered future compliance deadlines. ER-214, 217-18 (Rule 1146.2(b), (d)(2)). Until the zero-emission limits go into effect, the current 20 ppm emission limits apply. ER-217 (Rule 1146.2(d)(1)).

---

[3] The Rule defines "water heaters" as equipment used solely to heat water for use external to the equipment, including pool heaters and instantaneous water heaters; "boilers" as equipment used to produce steam or to heat water, but not used exclusively to produce electricity; and "process heaters" as equipment that transfers heat from combustion gases to water or process streams. ER-215-17 (Rule 1146.2(c)(1), (12), (17), (18), (31)).

19

The Rule establishes future compliance deadlines that differ by the type and capacity of the appliance and whether it will be installed in a new or existing building. Many appliances installed in newly constructed buildings must comply with the Rule starting in 2026, but those installed in existing buildings need not comply until 2029 at the earliest and in many cases not until a decade or more thereafter. The Rule's rolling compliance deadlines allow time for additional compliant technologies to be developed. SER-91, 109. The Rule also exempts residential structures and small businesses from replacing appliances at a defined unit age; they may instead replace appliances at the end of their lives. ER-234-35 (Rule 1146.2(k)(4), (5)).

### D. Plaintiffs sued to enjoin enforcement of the Rule, and the district court rejected their claim.

On December 5, 2024, about six months after the District adopted the Rule, Plaintiffs filed a facial challenge, contending that EPCA preempts the Rule. ER-8-9, 249. On February 26, 2025, the district court granted a motion to intervene filed by People's Collective for Environmental Justice, Sierra Club, and Industrious Labs (collectively, "Intervenors"). ER-8-9.

Plaintiffs then moved for summary judgment, seeking a declaratory judgment that the Rule is preempted by EPCA and therefore unenforceable, and a permanent injunction preventing the District from enforcing the Rule. *See* SER-84; ER-8. The District also cross-moved for summary judgment. ER-8.

20

On July 18, 2025, the district court granted the District's cross-motion. ER-6-7, 17. Noting that EPCA preemption turns on whether a rule regulates the "energy efficiency" or "energy use" of a covered product, ER-14, the court distinguished this case from *CRA*. That case held that Berkeley's ban on natural gas piping in new buildings was preempted because it inevitably set at zero the quantity of gas that covered appliances could use. 89 F.4th at 1101-02; ER-14-15. As the district court emphasized, *CRA* was expressly "narrow" and addressed only building codes controlling the quantity of energy that covered appliances may use. ER-15.

The court concluded that the Rule, in contrast, does not regulate the quantity of natural gas an appliance consumes. ER-15. Rather, it regulates air pollution emissions to address public health concerns and implement the District's responsibilities under the CAA, and says nothing about energy consumption or efficiency. ER-15-16. The court further concluded there was no reason to believe that Congress intended EPCA to preempt air pollution regulations like the Rule. The CAA had been in place for years when EPCA was enacted and amended, yet Congress never mentioned air pollution regulations—unlike building codes—in EPCA's preemption provisions. ER-16. Finally, the court reasoned that adopting Plaintiffs' reading—that any zero-*emission* requirement equates to setting energy *use* at zero—would undermine states' ability to regulate air pollution. *Id.*

Plaintiffs appealed.

21

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment and its preemption analysis. *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024).

## SUMMARY OF ARGUMENT

1.   The district court correctly held that EPCA does not preempt Rule 1146.2.

A.   Unlike Berkeley's building code in *CRA*, which directly regulated the quantity of natural gas that all appliances could use by prohibiting gas infrastructure, the Rule regulates harmful NOx emissions—a byproduct of appliances' operation. The Rule says nothing about how much gas an appliance may use or how efficiently it must operate.

B.   This distinction is critical under EPCA's preemption provision. EPCA preempts only regulations "concerning . . . energy use" of covered products. Because the Rule targets air pollution emissions rather than energy consumption, any impact on appliance energy use is merely incidental. As *CRA* recognized, regulations with only incidental impacts on energy use—such as utility distribution regulations or carbon taxes—would likely not be preempted, even if they effectively discourage gas appliance use. Plaintiffs' argument to the contrary ignores this Court's repeated insistence that its decision in *CRA* was "very narrow."

C.   Plaintiffs cannot distinguish the Rule from other "ordinary" non-zero emission standards that states and air districts have imposed on EPCA-covered appliances for decades. The Rule represents a change in degree, not kind, from the District's prior regulatory efforts.

22

Like other numerical emission limits—whether set at 100, 20, or zero parts per million—the Rule sets a NOx emissions standard without regulating the quantity of energy appliances use. Because Plaintiffs theory offers no coherent limiting principle, it could also imperil non-zero emission limits that have the effect of precluding gas appliances in some circumstances. Nothing in EPCA's text supports this result.

D.  The district court recognized that EPCA's preemption provision must be interpreted against the backdrop of the Clean Air Act's cooperative federalism regime, which explicitly relies on states to regulate emissions and achieve federal air quality standards. The District adopted the Rule—only its latest in nearly 50 years of regulating NOx emissions from appliances—to fulfill its obligations under the CAA and California law to bring the South Coast Air Basin into attainment of federal ozone standards by 2038. This task requires massive emission reductions that cannot be achieved without eliminating emissions from all stationary sources where feasible, including appliances.

E.  Congress did not intend to preempt the very air pollution regulations it depends on states to adopt under the CAA. EPCA's legislative history demonstrates that Congress intended to regulate energy consumption and energy efficiency of covered products, with no mention of preempting air pollution regulations. The CAA had been in place for years when Congress enacted and amended EPCA, yet Congress never mentioned preempting emission regulations—unlike building codes, which EPCA expressly addresses. The statute's silence on emission regulations counsels against preemption.

23

2.   Even if the Court accepts Plaintiffs' theory of EPCA preemption, Plaintiffs cannot succeed on their facial challenge to the Rule. They concede that the Rule applies to process heaters, which are not federally regulated "covered products" under EPCA and therefore cannot be preempted. Because the Rule is not preempted in every application, Plaintiffs' facial challenge fails.

3.   Should the Court reverse on the preemption issue, it should remand for the district court to consider whether gas appliances can comply with the Rule's zero-NOx standard. The District presented evidence that natural gas fuel cell technology could potentially achieve compliance, but the district court made no factual findings on this question.[4]

## ARGUMENT

## I.   The district court correctly held that EPCA does not preempt the Rule.

EPCA authorizes the Department of Energy to promulgate energy conservation standards for specified appliances, referred to as "covered products." 42 U.S.C. § 6295(a). Once a federal standard is in place for a

---

[4] Plaintiffs' amicus curiae Navien, Inc. raises new arguments that Rule 1146.2 is preempted because it allegedly creates "inconsistent state efficiency standards" for water heaters and that the Court should find the Rule preempted under field preemption. Brief of Navien, Inc. as Amicus Curiae Supporting Plaintiffs-Appellants, Dkt. 22.1 at 11, 27. The Court should decline to consider these issues raised for the first time on appeal and only by an amicus. *See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003). Navien's claims are also based on alleged facts outside the record (*e.g.*, Dkt. 22.1 at 10) and thus are inappropriate for resolution in the first instance on appeal. *See Turnacliff v. Westly*, 546 F.3d 1113, 1120 (9th Cir. 2008).

24

covered product, EPCA provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product" unless one of several exceptions applies. *Id.* § 6297(c). Because EPCA defines "energy use" as "the quantity of energy" an appliance uses, and "energy" is defined to include fossil fuels, such as natural gas, this Court explained that EPCA "preempts regulations . . . that relate to 'the quantity of [natural gas] directly consumed by'" covered products at the point of use. *CRA,* 89 F.4th at 1101 (quoting 42 U.S.C. § 6297(f)).

In *CRA*, this Court held that EPCA preempted Berkeley's building code ordinance prohibiting the installation of gas infrastructure because that ordinance "necessarily regulate[d] the 'quantity of energy'" used by appliances. *Id.* at 1102. The Court took pains to emphasize how "very narrow" its decision was, *id.* at 1106, warning that "[w]e only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available," *id.* at 1103.

The district court here took the *CRA* court at its word. Explaining that the Rule "concerns the pollution appliances emit, and not how much energy an appliance uses," the district court concluded that the Rule is unlike the Berkeley ordinance in *CRA*. ER-13. As the district court correctly noted, the Berkeley ordinance set at zero the quantity of gas that appliances could use. ER-15. By contrast, the court explained, the Rule "says nothing about the quantity of gas an appliance may use." ER-16. Because the Clean Air Act had been in place "for many years" when

25

EPCA was enacted and amended, the district court found "no reason to believe" that Congress intended EPCA to "preempt emission regulations designed to combat air pollution." *Id.* The district court's straightforward distinction of Berkeley's ordinance was right.

## A. The court recognized that the Rule is unlike the ordinance in *CRA* because it regulates the pollutant byproducts of appliances, not their energy use.

Plaintiffs gloss over the basic differences between the Rule and Berkeley's ordinance. *E.g.,* Plaintiffs-Appellants' Opening Brief ("AOB") 40. Unlike Berkeley's ordinance, the Rule regulates the pollutant byproducts that appliances generate, not the quantity of gas they use. *CRA* does not apply here.

### 1. Unlike the Berkeley ordinance, the Rule does not regulate the quantity of natural gas used by appliances.

According to this Court in *CRA*, EPCA preempted Berkeley's ordinance because it "necessarily regulate[d] the 'quantity of energy'" consumed by gas appliances by prohibiting the use of gas piping. 89 F.4th at 1101-02. Berkeley conceded that its ordinance "reduce[d] the energy consumed by natural gas appliances in new buildings to 'zero.'" *Id.* at 1102. By contrast, as the district court recognized, the Rule regulates only the emissions of harmful pollutants from appliances and not the quantity of gas that they may use. ER-15-16.

Nevertheless, Plaintiffs try to analogize the Rule to Berkeley's ordinance based on their contention that both regulations indirectly affect the gas use of appliances. *See* AOB 46. According to Plaintiffs, the "whole

26

point" of *CRA* was that Berkeley's ordinance did not "say anything about the quantity of gas they could use." *Id.* They therefore dispute the district court's description of Berkeley's ordinance as "regulat[ing] 'the quantity of gas an appliance may use.'" *Id.* But according to this Court in *CRA*, that is precisely what Berkeley's ordinance did.

The issue in *CRA* was whether Berkeley's ordinance was preempted because it regulated the quantity of gas appliances could use even though it did not regulate the design or manufacture of *appliances* themselves. *See* 89 F.4th at 1099 ("[T]he ordinance does 'not facially regulate or mandate any particular type of product or appliance."). "Berkeley concede[d] that a prohibition on natural gas infrastructure reduce[d] the energy consumed by natural gas appliances in new buildings to 'zero.'" *Id.* at 1102.

The *CRA* Court held that a building code that regulates the quantity of energy available for use by appliances was preempted as surely as a regulation of the design of appliances to limit the quantity of energy they use. *Id.* at 1104 (rejecting a reading of EPCA's preemption provision that would "end[] with the design or manufacture of the product"). Thus, contrary to Plaintiffs' contention, the dispositive fact in *CRA* was that the Berkeley ordinance directly controlled the quantity of gas that appliances could use, even though it did not directly regulate the appliances themselves as they were designed and manufactured. By contrast, the Rule sets a limit only on the quantity of NOx emissions an appliance may emit, not the quantity of gas the appliance may use. ER-15-16 ("[The Rule] says nothing about the quantity of gas an appliance may use.").

27

In this respect, Berkeley's ordinance—unlike the Rule here—was similar to the regulations held to be preempted in *Engine Manufacturers Association v. South Coast Air Quality Management District,* 541 U.S. 246, 253-55 (2004), and *Rowe v. New Hampshire Motor Transportation Association*, 552 U.S. 364, 372 (2008). *See* AOB 49, 56. In those cases, the Supreme Court held that states could not evade preemption of regulation of supply of a product or service by regulating its demand. In *Engine Manufacturers*, the Court held that a requirement that fleet operators purchase only vehicles meeting certain pollution standards was preempted by the CAA's prohibition on standards "relating to the control of emissions" from new vehicles. 541 U.S. at 248, 252. The Court held that the "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 255; *see also Rowe*, 552 U.S. at 371-72 (Maine's requirement that tobacco *shippers* use qualifying delivery services was preempted by a federal statute prohibiting laws "related to a price, route, or service of any motor carrier" because it affected the *delivery services'* provision of services).

Berkeley's ordinance attempted a similar inversion: it regulated the *supply* of gas (energy) to appliances in lieu of regulating appliances' *demand* for it. The *CRA* Court rejected it accordingly. 89 F.4th at 1106-07 (discussing *Engine Mfrs.* and *Rowe*). The Rule here does not regulate either the supply of gas *or* appliances' demand for it, but rather the appliance' emissions—a harmful byproduct of their operation.

### 2. *CRA* did not adopt a broad holding that EPCA preempts any regulation that effectively prevents the use of covered products.

Plaintiffs attempt to broaden this Court's "narrow" *CRA* decision to reach any regulation effectively precluding use of a natural gas appliance. That reading ignores the Court's express limitations on its holding and misunderstands its reasoning. Under *CRA*, since the Rule has only an incidental impact on natural gas appliances, it is not preempted.

### a. Plaintiffs ignore this Court's repeated insistence that its decision in *CRA* was "very narrow."

Plaintiffs' description of *CRA* as preempting any regulation that has the effect of banning gas appliances is irreconcilable with this Court's efforts to limit the scope of its decision. The Court *repeatedly* emphasized that its decision is a "very narrow" one about building codes that regulate energy use. 89 F.4th at 1106; *id.* at 1101 ("Our holding here is limited."); *id.* at 1103 ("We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances . . . ."); *id.* at 1106 ("This is a narrow opinion about Berkeley's building codes."); *id.* (referring to "our limited decision today" in which the court "only hold[s] that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings").

That emphasis is particularly evident in the changes the Court made in amending its decision in response to Berkeley's petition for rehearing en banc. The panel amended its opinion to repeatedly highlight its limited scope, adding five new references to the narrowness of its

opinion. *Compare* 65 F.4th 1045 (2023) *with* 89 F.4th 1094 (2024). Plaintiffs completely ignore these changes. *See* AOB 20-23.

The Court also extensively amended the decision to emphasize its focus on building codes. The amended opinion added 10 new references to "building code(s)"—a choice that Plaintiffs cannot explain:

**Table 1**

| Original *CRA* Opinion | Amended *CRA* Opinion |
|---|---|
| "And we know that EPCA preemption reaches building codes." 65 F.4th at 1052. | "**Of critical importance here** is that the structure of the statute indicates that 'a regulation concerning the . . . energy use' **can include 'building code requirements.'**" 89 F.4th at 1101 (quoting 42 U.S.C. § 6297(f)) (emphasis added). |
| "Based on its text, structure, and context, we conclude EPCA preempts Berkeley's Ordinance banning natural gas piping within new buildings." 65 F.4th at 1050. | "Based on its text, structure, and context, we conclude that EPCA preempts **building codes like** Berkeley's Ordinance that ban natural gas piping within new buildings. **Our holding here is limited. We conclude only that EPCA applies to building codes and that Berkeley's Ordinance falls within the Act's preemptive scope.**" 89 F.4th at 1101 (emphases added). |
| "After all, a regulation that prohibits consumers from using | "After all, a **building code** that prohibits consumers from using |

| | |
|---|---|
| appliances necessarily impacts the 'quantity of energy directly consumed by [the appliances] at point of use." 65 F.4th at 1051. | natural gas-powered appliances in newly constructed buildings necessarily **regulates** the 'quantity of energy directly consumed by [the appliances] at point of use." 89 F.4th at 1102 (emphases added). |
| "Thus, a regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'" 65 F.4th at 1051. | "Thus, a **building code** regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'" 89 F.4th at 1102 (emphasis added). |
| "So EPCA preemption extends to regulations that address the products themselves *and* the onsite infrastructure for their *use* of natural gas." 65 F.4th at 1052. | "So EPCA preemption extends to regulations that address the products themselves *and* **building codes that concern** their *use* of natural gas." 89 F.4th at 1103 (emphasis added). |
| "We only hold that EPCA prevents Berkeley from banning new-building owners from 'extending' fuel gas piping within their buildings …." 65 F.4th at 1055. | "We only hold that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings … **by way of a building code**." 89 F.4th at 1106 (emphasis added). |

That the Court repeatedly emphasized the opinion's narrow scope and used the term "building code[s]" 30 times demonstrates the clear

31

limits of the Court's holding. *See United States v. Duarte*, 137 F.4th 743, 751 (9th Cir. 2025) (en banc) (holding that court had limited the scope of its opinion to "law-abiding citizens" as evidenced by the court's use of that term 14 times in its opinion). Indeed, in similar circumstances, this Court has held that a court's statement emphasizing the limited scope of its opinion should be read to "expressly limit[]" the holding to the facts of that case. *Regents of Univ. of Cal. v. Shalala*, 82 F.3d 291, 295 (9th Cir. 1996).

      **b.**    **The flaw in Berkeley's ordinance was that it attempted to control the quantity of energy used, not that the quantity it chose was zero.**

Plaintiffs' argument that EPCA preempts any regulation that "effectively bans" the use of a covered appliance is belied by the Court's reasoning and holding in *CRA*. Plaintiffs focus exclusively on the effect of a regulation, with no regard for the mechanism by which it operates. *See, e.g.*, AOB 34 (asserting that after the district court concluded that the Rule "effectively bans" gas appliances, there was "nothing left for it to do"). *CRA* does not support Plaintiffs' argument.

*CRA* did not turn on the fact that Berkeley prevented all gas use, but instead on the fact that Berkeley's ordinance regulated the quantity of energy a covered appliance may use.[5] 89 F.4th at 1101. This Court

---

[5] Plaintiffs object to the district court's description of Berkeley's ordinance as "impos[ing] a complete physical impediment to the use of gas" for covered products. AOB 31, 42. But the court was simply noting that

explained that because "energy use" is defined as "the quantity of energy" an appliance uses, and "energy" is defined to include fossil fuels, such as natural gas, EPCA "preempts regulations . . . that relate to 'the quantity of [natural gas] directly consumed by'" covered products at the point of use. *Id.* (quoting 42 U.S.C. § 6297(f)). Because Berkeley's building code required appliances to use a quantity of "zero" natural gas, it fit within EPCA's preemption provision. *Id.* at 1102.

If instead of prohibiting gas pipes, Berkeley had required installing a device at the gas connection that restricted the flow of gas into the building and thereby reduced gas consumed by an appliance, the result could hardly be different. Such a regulation would not prohibit the use of gas appliances, but would still "necessarily regulate[] the 'quantity of energy directly consumed.'" *Id.* Indeed, the Court rejected Berkeley's argument that a required quantity of zero was different from any other quantity. *Id.* Plaintiffs now ask this Court to treat zero as qualitatively different from other quantities—the same argument Berkeley made in *CRA*.

In fact, this Court held that some regulations that may "effectively ban" gas appliances, such as regulations of gas utility distribution, would likely not be preempted under EPCA. *CRA*, 89 F.4th at 1103 ("our holding here has nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used"); *see also id.* at 1117 (Baker, J., concurring) ("If a state or

---

Berkeley had directly set the *gas usage* of appliances at zero by barring all gas infrastructure. ER-15; ER-28.

local government terminates existing gas utility service or declines to extend such service, EPCA likely has no application."). Such regulations have the effect of precluding the use of gas appliances, but because they do so only incidentally, and do not "necessarily regulate[]" the quantity of gas that such appliances use, they do not fall within EPCA's preemptive scope. *See* Section I.A.2.c, *infra*.

Similarly, as the district court noted, many health and safety regulations may have the effect of precluding gas appliances in certain locations, but EPCA does not preempt them because they do not regulate the quantity of gas used. ER-16; *see, e.g.*, HSC § 19881(a) (prohibiting "unvented heaters" for use in "any dwelling house or unit"); Los Angeles Muni. Code § 57.605.10.2 (prohibiting certain heating and lighting products in industrial buildings containing flammable materials)[6]. Plaintiffs' theory would similarly undermine these effective prohibitions despite the fact that they do not regulate the quantity of energy appliances may use. *See* 89 F.4th at 1102.

Finally, Plaintiffs' characterization of *CRA* as preempting any regulation that effectively precludes the use of natural gas appliances cannot be squared with this Court's repeated characterization of its decision as "a narrow opinion about Berkeley's building codes." 89 F.4th at 1106; *see* Section I.A.2.a, *supra*. The district court correctly interpreted "CRA's narrow holding" as "expressly limited to building codes that concern an appliance's actual energy use." ER-16. Plaintiffs have never explained

---

[6] Available at https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-363335.

how the sweeping holding they see in *CRA* is consistent with this Court's determined effort to limit the scope of its opinion.[7] *See* AOB 31.

### c. Any impact on appliance energy use is only incidental and therefore not preempted.

Because the Rule regulates appliance emissions—a byproduct of appliance use—any impact on appliance energy use is only incidental. "EPCA preemption is unlikely to reach a host of state and local regulations that incidentally impact 'the quantity of natural gas'" used by appliances. 89 F.4th at 1117 (Baker, J., concurring); *see also id.* at 1103 (confirming that the opinion "has nothing to say" about regulations with such incidental impacts). Thus, the Rule cannot be preempted even if it has an incidental effect of preventing the use of gas appliances.[8]

In *CRA*, this Court emphasized that "the breadth of EPCA's preemption provision 'does not mean the sky is the limit.'" *Id.* (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). Indeed,

---

[7] The Court's observation that EPCA would ordinarily preempt an ordinance directly prohibiting the use of all covered gas appliances poses no problem for the Rule. *See* 89 F.4th at 1107. By directly targeting the type and quantity of energy that covered appliances may use, such an ordinance would fall squarely within EPCA's preemptive scope as "relat[ing] to 'the quantity of [natural gas]'" appliances could consume. *Id.* at 1101 (quoting 42 U.S.C. § 6297(f)). The Rule does not do so.

[8] The District has assumed for the sake of argument that the district court was correct in concluding that the Rule effectively bans gas appliances. However, the District pointed out below that some natural gas appliances can comply with the zero-NOx standard. SER-82-83. If this Court reverses, it should remand the case to the district court to consider the factual question of whether some gas appliances can comply with the zero-NOx rule.

35

taking phrases like "concerning" or "related to" literally is "a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A., Inc*., 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("*Dillingham*"), *quoted in CRA*, 89 F.4th at 1117 (Baker, J., concurring).[9] Concluding that EPCA preempts the District's zero-NOx emission standard based solely on its incidental impact on gas appliances' energy use would reach far beyond *CRA*'s holding.

Plaintiffs concede that "[i]ncidental impacts do not trigger preemption." AOB 37. Instead, they assert, "[c]ategorical bans do." *Id.* This facile dichotomy between an incidental impact and a categorical ban ignores the fact that some regulations might incidentally preclude the use of gas appliances.

*CRA* explained that EPCA would likely *not* preempt a regulation that incidentally discourages or precludes the use of gas appliances. 89 F.4th at 1103 (majority), 1117 (Baker, J., concurring). In particular, the Court explained that its holding had "nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used." *Id.* at 1103. Judge Baker's concurring opinion explained that while a state or local regulation might "terminate[]" gas utility service, thereby precluding the use of gas appliances, the regulation would not be preempted because its impact on appliance energy use would be only "incidental[]." *Id.* at 1117 (Baker, J.,

---

[9] In *CRA*, the Ninth Circuit interpreted the phrases "relate to" and "concerning" interchangeably. 89 F.4th at 1103.

concurring). The same is true of a "carbon tax designed to discourage . . . consumption [of natural gas]." *Id.* A carbon tax imposes a charge on carbon emissions, thereby making fuel more expensive, and making more carbon-intensive fuels more expensive than others. Jonathan L. Ramseur & Jane A. Leggett, Cong. Research Serv., R45625, *Attaching a Price to Greenhouse Gas Emissions with a Carbon Tax or Emissions Fee: Considerations and Potential Impacts* 2-3 (2019).[10] Such a tax thus aims to decrease the quantity of certain fossil fuels used in order to reduce carbon emissions. Nevertheless, because the impact of such a tax on energy use would be only incidental, the tax would not be preempted. 89 F.4th at 1117 (Baker, J., concurring).

The same is true here. Any impact on the use of gas appliances from the Rule's limitation of NOx emissions is incidental. The Rule's operation on emissions rather than on the quantity of gas that appliances use means that its impact on energy use is as incidental as the impact of a carbon tax or a decision not to extend gas distribution. *See* 89 F.4th at 1103 (majority); *id.* at 1117 (Baker, J., concurring).

Ignoring the difference between incidental and direct impacts, Plaintiffs assert that whereas Berkeley's ordinance was "one step up in the energy chain" from the regulation of gas appliances, the Rule is merely "one step down the energy chain." AOB 40, 36. On the contrary, the Rule does not regulate the "energy chain" at all. As explained above, Berkeley sought to control the supply of energy to appliances, and *CRA*

---

[10] Available at https://www.congress.gov/crs-product/R45625.

held that was no different, for preemption purposes, from regulating appliances' demand for it. The Rule regulates neither. Indeed, the Rule is even more attenuated from that "chain" than the distribution of gas—i.e., energy—that *CRA* held could be curtailed without triggering preemption. 89 F.4th at 1103 (majority), *id.* at 1117 (Baker, J., concurring).

In an analogous context, courts have held that EPCA does not preempt states' regulation of pollutant emissions from vehicles, even if those regulations have a "substantial" incidental impact on the fuel economy of covered vehicles. Section 32919(a) of EPCA forbids states from "adopt[ing] or enforc[ing] a law or regulation related to fuel economy standards or average fuel economy standards" for those automobiles for which the federal government has set a national standard. 49 U.S.C. § 32919(a).

In *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007) ("*Green Mountain*"), the court held that EPCA did not preempt Vermont regulations limiting greenhouse gas ("GHG") emissions from new vehicles. *Id.* at 339, 351-54. The court held the regulations were concerned primarily with reducing GHG emissions and only *incidentally* prompted manufacturers to improve fuel economy. *Id.* at 352. The court also concluded that the regulations did not "relate to" a fuel economy standard under section 32919(a). *Id.* at 353. It held that Vermont's rules could only be interpreted as "'relat[ing] to' fuel economy within the meaning intended by Congress" if the court were to disregard "decades of EPA-issued and approved [state] regulations that also can be said to 'relate to' fuel economy" to a similar extent. *Id.* at 354;

*see also Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1175 (E.D. Cal. 2007) ("*Central Valley*") (rejecting manufacturers' argument that California vehicle emissions regulations "related to" a fuel efficiency standard simply because they would need to improve their vehicles' fuel economy to comply).

These cases provide the only viable reading of EPCA's preemption provisions: a regulation that directly targets pollutant emissions cannot "relate to" or "concern[]" energy use simply because it may incidentally affect the type or amount of energy a product consumes. *See Green Mtn.*, 508 F. Supp. 2d at 353; *Cent. Valley*, 529 F. Supp. 2d at 1176. As in *Green Mountain* and *Central Valley*, reading EPCA to preempt the Rule's emissions limits would ignore the CAA and jeopardize dozens of longstanding public health regulations across the country. *See* 508 F. Supp. 2d at 354; 529 F. Supp. 2d at 1175-76; Section I.B, , *infra*. EPCA does not dictate that result.

### B. Plaintiffs cannot distinguish NOx emission standards set at levels above zero.

In trial court briefing in *CRA*, Plaintiff California Restaurant Association conceded that EPCA would not preempt NOx emission limits. The Association—also a plaintiff in this case—reassured the court that finding Berkeley's building code to be preempted would not affect "all sorts of ordinary local regulations" of covered products. RJN, Ex. U at 23-24. It insisted that "regulations of nitrogen oxide emissions" were not at risk because "[t]he express preemption clause in the EPCA does not bar *all* local regulations that affect EPCA-covered appliances. It bars only local

regulations that 'concern[] energy use.' Local regulations . . . limiting the emissions of nitro[gen] oxide may affect EPCA-covered appliances, but they do not 'concern energy use.'" *Id.* at 23. As shown above, the Association was right the first time.

Plaintiffs try to evade this concession by distinguishing "ordinary limits" on emissions from the District's zero-NOx Rule, on the theory that such rules only "incidental[ly]" affect energy use. AOB 62-63 (suggesting the District regulations that had been in effect before the Rule was adopted were "ordinary" emission limits and thus would not be preempted). They thus try to wave off the district court's conclusion that their argument would imperil just these "ordinary" emission limits in place across the country. ER-16.

The challenged Rule is no less "ordinary" than the District's prior emission limits or the numerous other NOx rules in effect elsewhere. Like other states and air districts, the District has imposed NOx limits on EPCA-covered appliances for decades. *See* Statement of the Case Section B, *supra*; RJN, Exs. A-T. Over time, those limits grew more stringent as it became clear that the earlier, laxer standards would not meet the District's goals—and legal obligations—to improve regional air quality. *See* Statement of the Case Section B, *supra*. Ultimately, the District concluded that it could fulfill those goals and obligations only by incrementally lowering its NOx emission limits again, this time to the lowest level of zero ppm. *See id.*. This was a change in *degree*—not in *kind*—from the District's own prior regulatory efforts. The Rule was no departure from the "ordinary."

40

The district court was therefore right to worry that Plaintiffs' claim would jeopardize far more than the District's Rule. ER-16. At least four other states and 10 other California air districts have adopted numerical limits on the emissions of NOx from EPCA-covered appliances. *See* RJN, Exs. A-T. For example, the Ventura County Air Pollution Control District caps NOx emissions at 20 ppm, while Texas restricts emissions to 55 ppm or less. RJN, Ex. O at 2, Ex. Q at 2. Like the challenged Rule, these standards expressly limit the quantity of pollutants that EPCA-covered appliances emit. These regulations are not qualitatively different from Rule 1146.2; they are simply less stringent.

Indeed, Plaintiffs' attempt to differentiate a NOx limit of zero ppm from greater NOx concentrations is incoherent. First, it is at odds with *CRA*'s reasoning. The Court held that "'zero' is a 'quantity'" like any other because it is "'a property or attribute that can be expressed in numerical terms.'" 89 F.4th at 1102. Second, it would contort the meaning of EPCA's text. It would mean that an emission standard does not "concern[] . . . energy use" at 100 or 1 or 0.001 ppm, but at 0 ppm it suddenly begins to "concern[] . . . energy use." But each of those standards sets a NOx emissions limit at a specified quantity, and none of them sets a limit on energy use. Nothing in the ordinary meaning of "concerning . . . energy use" supports a distinction between zero-NOx emissions and any other number— because the phrase refers to quantities of *energy*, not quantities of emissions.

Plaintiffs also vaguely suggest that the District's zero-NOx Rule differs from existing non-zero emission regulations because it effectively

prevents the use of some gas-fired appliances. *See* AOB 62. This distinction is illusory. Many *non-zero* emission limits may also be stringent enough to prevent the use of some energy-intensive appliances. For example, many older gas-fired appliances are unlikely to meet the District's existing 14 ng/J NOx emission limit—an emission standard that Plaintiffs nonetheless argue is sufficiently "ordinary" to avoid preemption. *See id*. Similarly, the District has long imposed non-zero emissions standards on industrial equipment that may effectively prohibit the use of fuel oil. *See* SER-32 (District Rules 1146 and 1146.1 apply to industrial, institutional, and commercial boilers, steam generators, and process heaters); 10 C.F.R. § 431.87(a) (contemplating the use of oil-fired hot water and steam commercial packaged boilers). Under Plaintiffs' theory, these long-standing "ordinary" emissions standards would also be preempted. *See* AOB 60. As these examples highlight, Plaintiffs have not grappled with implications of their theory. Indeed, *any* emission standard—or any regulation applicable to appliances, for that matter—bans *all* the covered appliances that are unable to satisfy it. Plaintiffs' theory does not provide any limiting principle that could save such standards from preemption.

Plaintiffs end by insisting that this Court should kick the can down the road and ignore the implications of its decision for "other regulations that are not yet and may never be before it."[11] AOB 63. If the Court

---

[11] This echoes the Association's insistence in *CRA* that the court did not need to worry about the fate of appliance emission standards. RJN, Ex. U at 23-24. Yet here we are, only one year after the Court's decision in *CRA*.

invalidates the District's Rule by endorsing Plaintiffs' boundless theory of EPCA preemption, those other regulations are at risk. The same widespread health and safety rules that Plaintiffs acknowledge "have long coexisted with EPCA" (AOB 60) could be imperiled, as the district court recognized. ER-16. Nothing in EPCA or *CRA* requires that extreme result.

### C. The district court correctly concluded that EPCA's preemption provision must be applied with an eye to the Clean Air Act's heavy reliance on state emission regulation.

#### 1. The District adopted the Rule to satisfy its obligations under the Clean Air Act, which deputizes the states to achieve federal air quality standards.

Plaintiffs dismiss the role of the federal CAA in this case. They assert that the complex regime Congress adopted to control NOx and other harmful pollution "has no bearing" on this challenge to the District's NOx rule. AOB 63. The district court properly declined to take this blinkered view. That the District adopted the Rule to satisfy its obligations under the federal CAA is a further basis for distinguishing *CRA,* as the district court concluded. ER-16. Berkeley had no similar basis for adopting the building code this Court struck down in *CRA.*

The District adopted the Rule to implement Congress's directive to California in the CAA to achieve the federal air quality standards under the CAA's "cooperative federalism" framework. *See* Statement of the Case Section A, *supra*. The CAA directs EPA to set national air quality standards for six pollutants, including ozone, and the CAA and state law

give the District primary responsibility for regulating emissions from stationary sources, including appliances. *See Comm. for a Better Arvin*, 786 F.3d at 1173 (the CAA creates a "cooperative federalism regime in which the federal agency sets required air quality standards but the state is a primary actor in creating plans to achieve them"). They also task the District with adopting all measures necessary to attain the federal air quality standards within the Basin by EPA's deadlines. *See* 42 U.S.C. § 7410(a); HSC §§ 40001(a), 40460. If the District fails to achieve the national standards, it risks federal enforcement actions and severe sanctions, including the loss of federal transportation funding and restrictions on new development in the Basin. *See* 42 U.S.C. §§ 7410(k)(5), 7413, 7509(b).

Plaintiffs assert that the District's obligation to achieve federal air quality standards "does not come with a specific federal directive to regulate appliance emissions." AOB 64. But given the Basin's status in extreme nonattainment of federal air quality standards, the District has no practical choice. It must wield its authority to achieve the federal standards, or suffer severe sanctions. SER-38, 123. That the CAA does not dictate each of the District's specific regulatory actions does not diminish the District's obligation to achieve the federal air quality standards, and the air quality predicament facing the District means it must use every conceivable means.

The District adopted its first NOx regulations of appliances, Rules 1111 and 1121, in 1978. Statement of the Case Section B, *supra*; SER-30, 57-60. Over the next two decades, the District lowered the NOx emission

limits for the covered appliances and adopted Rules 1146 and 1146.1 to regulate NOx emissions from larger appliances and industrial equipment. SER-30-31, 61-69. The District adopted Rule 1146.2 in 1998. SER-30, 94. It amended the Rule three times before 2024 to expand the equipment subject to the Rule and to lower the NOx emissions limit for most appliances. ER-84.

When the District began developing the Rule amendments in 2023, the Basin was out of attainment of multiple federal standards for ozone. The District could not possibly attain those standards by relying on the regulations in effect at the time. SER-29, 38, 43-44 (describing the Basin's "extreme" nonattainment). Indeed, the District calculated that it would need to reduce NOx emissions by at least an additional *67 percent* by 2037 to meet the federal ozone standards. SER-29. *Id.* To achieve this staggering reduction, the District concluded, the *only* "viable pathway" would be to eliminate NOx emissions from "*all* . . . stationary sources of pollutants, large and small." SER-29, 41 (emphasis added). Fossil-fuel-burning appliances collectively account for 20 percent of all emissions from stationary sources regulated by the District. SER-31, 114.

Thus, as it has many times before, the District amended an existing rule to further reduce the NOx emissions from appliances. In doing so, it expressly found that no other regulatory approach could make the necessary progress toward achieving the Basin's air quality objectives established by Congress and EPA. SER-41, 102.

2.  **The district court correctly concluded that Congress did not intend to preempt air pollution standards for appliances.**

Despite the critical role the CAA played in the District's adoption of the Rule, Plaintiffs deem it irrelevant. They caricature the District as claiming that the CAA immunizes it from preemption under other federal statutes. AOB 64. Similarly, Plaintiffs complain that the district court created an exception to preemption for regulations adopted to comply with the CAA. AOB 57.

Plaintiffs simply assume the conclusion that EPCA preempts appliance-emission regulations in the first instance. *See* AOB 57. To the contrary, the district court correctly concluded that Congress did not intend EPCA to preempt emission standards because the CAA had been in place for many years when EPCA was enacted and amended and EPCA is silent on the topic of air pollution regulations. ER-16. No exception from preemption is necessary.

*CRA* confirms that EPCA's silence on the topic of air pollution regulations shows that Congress did not intend to preempt them. *See* 89 F.4th at 1103 (majority), 1117 (Baker, J., concurring). Because EPCA is silent on regulations with only an incidental impact on energy use, such as utility regulation and carbon taxes, the Court clarified that its opinion does not reach these regulations, *id.* at 1103 (majority), and the concurrence opined that EPCA likely would not preempt these regulations, *id.* at 1117, 1119 (Baker, J., concurring). By contrast, EPCA "has everything to say about 'State or local building code[s]," *id.* at 1119 (Baker, J., concurring). Indeed, EPCA's express exemption from preemption for

46

specified building codes was "of critical importance" to the Court because it demonstrated that building codes were otherwise covered by EPCA's preemption provision. *Id.* at 1101 (citing § 6297(f)).

EPCA's silence on emission standards is similarly significant here. In contrast to EPCA's in-depth treatment of building codes, the statute says nothing about regulation of air pollution from appliances. As *CRA* suggests, Congress did not intend to preempt regulatory fields about which it was silent, like air pollution control, merely because they incidentally affect energy use or efficiency.

The district court faithfully followed *CRA*'s guidance, noting Congress's silence on the topic of "air pollution regulations, despite the fact that the CAA had been in place for many years" when Congress adopted and amended EPCA. ER-16. If Congress had intended for EPCA to preempt state regulations adopted to implement the CAA, it would have mentioned them in the statute specifically. *Id.* The district court's conclusion on this subject is consistent with *CRA*'s discussion of building codes. *See, e.g.*, 89 F.4th at 1101, 1103 (majority); 1117 (Baker, J., concurring) The district court was therefore correct to conclude that "there is no reason to believe that Congress ever intended" to preempt emission regulations. ER-16.

Nor did the district court create an "unwritten exception" to EPCA preemption for emission regulations as Plaintiffs suppose. AOB 36-37, 57, 59; *see also* AOB 64 (asserting that the district court "excuse[d] air quality rules" from EPCA's preemption provision). Instead, the court

47

correctly reasoned that Congress never intended to include air pollution regulations within the class of regulations "concerning . . . energy use" to begin with. ER-16. Because emissions regulations have only an incidental connection with appliance energy use, they fall outside EPCA's preemptive sweep. *See Dan's City Used Cars, Inc.*, 569 U.S. at 264 (where regulations plainly fall outside the preemptive sweep of a statute, the statute need not expressly exempt them).

Inverting the *CRA* court's reliance on EPCA's express treatment of building codes, Plaintiffs argue that EPCA's "*silence* on emissions regulations" instead means that Congress intended to *include* them in EPCA's preemptive scope. AOB 58 (emphasis added). Plaintiffs argue that Congress should have included an express exception for emissions standards if it intended to for them to be non-preempted. AOB 37, 58 (citing *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 477, 1038 (2019)).[12] But EPCA did not need to expressly exempt air pollution regulations because they do not "concern[] . . . energy use." *See Dan's City*, 569 U.S. at 264 (Congress did not need to expressly exempt state law claims with only a tenuous connection to the preemptive scope of the federal statute). *Rowe* does not undermine this conclusion. *See* AOB 50 (citing 552 U.S. at 374). The Court there merely rejected the notion that the statute impliedly

---

[12] *Obduskey* is not a preemption case, nor does it elucidate how courts should interpret statutory exceptions to preemption. 586 U.S. 466. In *Obduskey*, the Court merely rejected the plaintiff's attempt to add a narrowing term onto a statutory definition. *Id.* at 477. The District makes no such attempt here.

48

exempted from preemption all regulations advancing a vague notion of "public health." 552 U.S. at 374. This case does not present that issue.

Plaintiffs point to the building code and waiver exceptions as supporting the breadth of EPCA's preemption provision. *See* AOB at 50-51. But *CRA* held that these exceptions show instead that EPCA preemption extends beyond regulation of appliances as designed and manufactured. 89 F.4th at 1103-04. They do not reveal that Congress intended to preempt regulations like the Rule with only an incidental impact on gas use. *Id.* at 1103.

### 3. EPCA's legislative history confirm that Congress did not intend to preempt air pollution regulation.

As the district court correctly concluded, EPCA's legislative history offers more evidence that Congress never intended to preempt air pollution regulations. ER-16.

Contrary to the assertions of Plaintiffs and their Amicus American Gas Association ("AGA"), EPCA's history shows no intent to undermine decades of air pollution regulations. *See, e.g.*, Brief for American Gas Ass'n as Amicus Curiae Supporting Plaintiffs at 13-14, Dkt. 21.1 ("Amicus Br."). Drafted in the wake of a major oil embargo, EPCA was designed in part to "conserve energy supplies" by regulating energy uses, and to "provide for improved energy efficiency of . . . major appliances." EPCA, Pub. L. No. 94-163, § 2(4)-(5), 89 Stat. 871, 874 (1975). The legislative history of the 1987 amendments, which expanded EPCA's original preemption provisions to resemble their current language, does not support Plaintiffs' and AGA's contentions.

Nothing in EPCA's legislative history indicates that Congress meant to undercut the very state and local pollution regulations that it "sought to foster" in the CAA. *See Dillingham*, 519 U.S. at 331 n.7 (holding that Congress' silence on the preemption of state statutes it previously encouraged "counsels against preemption"). Rather, discussion of EPCA's preemption provisions in the legislative history focused exclusively on state regulation of the "*energy* consumption" and "*energy* efficiency" of covered products. *See* S. Rep. No. 94-516, at 173 (1975); H.R. Rep. No. 94-700, at 173 (1975); H.R. Rep. No. 100-11, at 23-24 (1987); S. Rep. No. 100-6, at 4, 12 (1987) (emphases added). Had Congress intended to reverse course by using EPCA to preempt the state emissions regulations that it had relied on in the CAA, one would have expected Congress to say so. *See Dillingham*, 519 U.S. at 331 n.7. But it was silent.

Plaintiffs and AGA claim Congress was concerned about a patchwork of any "state and local regulations under which appliances would be legal in some places but not others." AOB 54; Amicus Br. at 14 (citing S. Rep. No. 100-6, at 8 (1987)). But this sweeping view of the "patchwork" would invalidate all of the "ordinary" non-zero emission standards that Plaintiffs supposedly would preserve. *See* Section I.B, *supra*. It is surely just as "disruptive," AOB at 55, for Ventura County to cap appliance NOx emissions at 20 ppm and Texas to allow up to 55 ppm, as it is for the District to set a zero-NOx limit. These differing non-zero standards also result in some gas appliances being "effectively prohibited in some states and localities while being permitted in others" and force manufacturers to "accommodate discrete jurisdictions all over the nation." Amicus Br. at

50

14 Here too, Plaintiffs offer no reason to distinguish between zero-NOx limits and non-zero limits that manufacturers have had to meet around the country for decades. Accordingly, the Rule does not cause or worsen any regulatory "patchwork" with which EPCA's drafters may have been concerned.

### D.    Plaintiffs' remaining arguments fail to show that the district court erred.

Plaintiffs' claim that the district court applied a presumption against preemption is flatly contradicted by the court's express statements that it was doing no such thing. The court explicitly followed the Ninth Circuit's directive to examine EPCA's "text, structure and context" without applying any presumption and even explained in depth why such a presumption is inappropriate in interpreting an express preemption clause. ER-12, 14 (quoting *CRA*, 89 F.4th at 1101).

Undeterred, Plaintiffs point to the district court's recognition that their theory would undermine a wide swath of non-zero emission standards. AOB 59-60. But the court was simply noting that Plaintiffs' theory has no rational limiting principle—not putting a thumb on the scale against preemption. The district court also did not err in citing this Court's decision in *Air Conditioning & Refrigeration Institute v. Energy Resources Conservation & Development Commission*, 410 F.3d 492 (9th Cir. 2005), which applied a presumption. The district court cited *Air Conditioning* only for its discussion of EPCA's legislative history—a discussion Plaintiffs themselves invoke. AOB 17-18; ER-16.

Plaintiffs also argue that the district court's decision would authorize cities like Berkeley to adopt emission regulations effectively banning gas appliances. AOB 55-56. But cities do not face any obligation under state or federal law to plan for and regulate to attain federal air quality standards. *See* HSC §§ 40001, 40440, 40702, 40716. By contrast, the District, which has been regulating emissions of air pollutants from appliances for decades under its CAA authority and obligations, is uniquely tasked with adopting stationary source emissions regulations. *See id.* The District's obligation to achieve the federal ozone standards, which necessitated the Rule, distinguishes its actions from those of local governments. *See* SER-29 (The 2022 Plan found that "there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technology across all . . . stationary sources of pollutants, large and small.").

And in a last-ditch effort to analogize the Rule to Berkeley's building code, Plaintiffs include a table purporting to rebut the district court's rationale for distinguishing the two regulations. AOB 44-45. Plaintiffs fail to explain any of these comparisons. For that reason alone, the Court should ignore them. *See Independent Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (the court may not "manufacture arguments for an appellant" and will only review issues that are "argued specifically and distinctly in a party's opening brief").

Regardless, Plaintiffs' isolated phrases from the district court's decision and *CRA*, taken out of context, fail to undermine the district court's reasoning:

52

**1.** Contrary to Plaintiffs' implication, the District's Rule is not a building code. *See* AOB 44. It is a regulation adopted to reduce pollutant emissions to attain state and federal air quality standards. *See* HSC §§ 40001, 40440, 40702, 40716.

**2.** Plaintiffs next compare the district court's holding that the Rule "says nothing about the quantity of gas an appliance may use" to Berkeley's argument that "'zero' is not a 'quantity.'" AOB 44. These are unrelated issues, and contrary to Plaintiffs' contention, AOB 43, Berkeley had no occasion to raise the issue here before the Court in *CRA*, and thus the Court did not address it.

**3.** Plaintiffs compare the district court's conclusion that the Rule addresses appliances' pollution rather than their energy use to the observation in *CRA* that a regulation that effectively eliminates the use of an energy source is a regulation of energy use. AOB 44 (citing 89 F.4th at 1102). These are unrelated statements. Unlike Berkeley's ordinance, the Rule does not require a quantity of "zero" natural gas. 89 F.4th at 1102.

**4.** Plaintiffs compare the district court's observation that the Rule does not depend on appliance efficiency or energy use to the *CRA* dissental. AOB 44 (quoting 89 F.4th at 1126 (Friedland, J., dissenting from denial of reh'g en banc)). But the district court was not adopting the dissental's reasoning. Instead, it was applying EPCA's plain language. 42 U.S.C. § 6297(c); ER-16.

**5.** Plaintiffs compare the district court's explanation of why the Rule regulates NOx emissions with the *CRA* dissental's discussion of the rationale for Berkeley's ordinance. AOB 45 (quoting 89 F.4th at 1126

(Friedland, J., dissenting from denial of reh'g en banc)). Plaintiffs omit the District's obligation to achieve air quality standards. And, in any event, regulations may have some overlapping goals, just as they may have some overlapping effects, without utilizing the same preempted mechanism. *See* 89 F.4th at 1117 (Baker, J., concurring).

**6.** The district court explained that the Rule does not regulate appliance efficiency. ER-16. Plaintiffs compare that conclusion with the observations in *CRA* that Berkeley's ordinance did not require the use of any particular appliance. AOB 45 (quoting 89 F.4th at 1099 (majority), 1126 (Friedland, J., dissenting from denial of reh'g en banc)). This comparison is irrelevant; Berkeley's ordinance was preempted because it regulated the quantity of gas appliances may use. The Rule does not.

**7.** The district court found "no reason to believe that Congress ever intended" for EPCA to preempt emission regulations. ER-16. Plaintiffs compare this finding to *CRA*'s statement that EPCA preempts more than "facial regulations" of appliances. AOB 45 (citing 89 F.4th 1103). But as discussed above, Section I.A.2.b , *supra*, *CRA*'s conclusion that preemption is not limited to appliances as designed does not mean that EPCA guarantees the use of particular appliances in any circumstance.

* * *

In sum, Plaintiffs' table fails to undermine the district court's rationale for distinguishing the Rule from Berkeley's ordinance. The district court was carefully following the *CRA* decision in concluding that, unlike Berkeley's ordinance, the Rule does not regulate the quantity of natural gas appliances may use, and therefore is not preempted.

54

## II. Alternatively, this Court should affirm the district court's decision because Plaintiffs cannot satisfy the standard for their facial challenge to the Rule.

Even if the Court agrees with Plaintiffs' view of EPCA preemption, Plaintiffs cannot succeed in their *facial* challenge to the Rule. Because they have conceded that the Rule applies to process heaters, which are not "covered products" regulated under EPCA, the Rule is not preempted in every application.

Plaintiffs challenge the Rule only on its face. SER-86-87. Their decision to do so "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Under the exacting standard governing such challenges, Plaintiffs must show the Rule is invalid in *all* of its applications. *Am. Apparel*, 107 F.4th at 938-39 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021) (challenged regulation must be preempted in "every possible application"). This standard applies with "full force" in preemption cases. *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 624 (9th Cir. 2024) (quoting *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en banc)).

In *American Apparel*, this Court rejected a similar facial preemption challenge to a state law and regulations that the appellants had not shown to be "invalid in all their applications." 107 F.4th at 936. Two federal statutes expressly preempted state regulation of any harmful substance once a federal regulation of that substance was in effect. *Id.* at 939 (quoting 15 U.S.C. §§ 1261, 2075(a)). The appellants argued that Oregon's regulation of 73 chemicals was facially preempted. *Id.* at 940. The

court rejected this argument, explaining that while federal agencies had regulated some chemicals on Oregon's list, they had not regulated all 73. *Id.* at 941. The appellants accordingly had not met their burden of showing that "all 73" of the State's designated chemicals were preempted, and thus had not shown that "'no set of circumstances exists under which the Act would be valid.'" *Id.* at 939, 943 (quoting *Salerno*, 481 U.S. at 745).

Similarly here, without a federal standard in place for each of the appliance types regulated under the Rule, Plaintiffs' facial preemption challenge fails. *Id.* at 942-43. The Rule regulates emissions from "process heaters" (ER-216 (Rule 1146.2(c)(18))), which are not federal covered products. A "process heater" is any equipment designed to be fired with natural gas that "transfers heat from combustion gases to water or process streams." *Id.* Process heaters are not on the statutory lists of covered products, and DOE has not issued any federal standards for them. *See* 42 U.S.C. §§ 6292, 6311; 10 C.F.R. Parts 430, 431.

Below, Plaintiffs tried to dodge this problem by inaccurately asserting that pool or spa heaters—which are covered products—are a type of process heater, and therefore that process heaters are covered products. SER-88. That is not the case. The Rule defines pool heaters as a type of water heater, not as a type of process heater. ER-216 (Rule 1146.2(c)(17)). Because process heaters are not federally regulated, the Rule's standards for them cannot be preempted, and Plaintiffs' facial challenge must fail.[13] *CRA*, 89 F.4th at 1104; *Am. Apparel*, 107 F.4th at 942-43.

---

[13] Plaintiffs may argue their claim should be construed to apply only to covered products. *See* SER-7-8. But their claim is patently facial and

III.  **The district court did not make any findings of fact about the potential for gas appliances to comply with the Rule.**

The district court concluded that the Rule effectively precludes the use of covered gas fueled appliances. ER-13. However, the District argued below that natural gas fuel cell technology could potentially be developed to comply with the Rule. SER-82-83. The district court did not make any findings of fact on this issue. *See* ER-13. Accordingly, should this Court reverse, it should remand the case to the district court to consider the factual question whether it is possible for gas appliances to comply with the zero-NOx Rule.

IV.  **The District reserves its right to argue that *CRA* was wrongly decided.**

*CRA* is binding precedent. In an abundance of caution, the District reserves its right to argue in a petition for rehearing en banc that the Court should overrule *CRA* as wrongly decided. *See United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014). The District adopts the explanation provided in the dissental in *CRA*. *See* 89 F.4th at 1119-26 (Friedland, J., dissenting from denial of reh'g en banc). Two New York district courts recently refused to follow *CRA* for the same reasons. *Mulhern Gas. Co. v. Mosley*, No. 1:23-CV-1267 (GTS/PJE), 2025 WL 2062194, at *14 (N.D.N.Y. July 23, 2025) (appeal pending); *Ass'n of Contracting*

---

seeks to invalidate the entire Rule. *See, e.g.*, ER-198-199 (challenging the "facial validity of the District's zero-NOX rule" and claiming there is "no set of circumstances under which the rule can be valid").

*Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *1 (S.D.N.Y. Mar. 18, 2025) (appeal pending).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment. However, if the Court reverses, it should remand to the district court to consider the factual question of whether any gas appliances can comply with the zero-NOx rule.

DATED: Oct. 22, 2025          SHUTE, MIHALY & WEINBERGER LLP

By:    s/Matthew D. Zinn
       _____
       MATTHEW D. ZINN
       LAUREN M. TARPEY
       RYAN K. GALLAGHER

       Attorneys for Defendant-Appellee
       South Coast Air Quality Management
       District

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-5129

I am the attorney or self-represented party.

**This brief contains** | 12,368 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
 ☐ it is a joint brief submitted by separately represented parties.
 ☐ a party or parties are filing a single brief in response to multiple briefs.
 ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Matthew D. Zinn | **Date** | 10/22/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*