Docket No. 25-5129

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RINNAI AMERICA CORPORATION et al.
Plaintiffs-Appellants,

vs.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
Defendant-Appellee,

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE et al.,
Intervenor-Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of California
Case No. 2:24-cv-10482-PA-PD

## APPELLEE'S AND INTERVENOR-APPELLEES' JOINT
## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 1

Bayron T. Gilchrist
General Counsel
Barbara Baird
Chief Deputy District Counsel
South Coast Air Quality
Management District
21865 Copley Drive
Diamond Bar, California 91765
Telephone: (909) 396-3400
Facsimile: (909) 396-2961

Matthew D. Zinn
Lauren M. Tarpey
Ryan K. Gallagher
Shute, Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Defendant-Appellee
South Coast Air Quality Management District

| INDEX | | | |
|---|---|---|---|
| **Document** | **Dkt. No.** | **Filed Date** | **SER Pages** |
| Plaintiffs' Reply in support of Motion for Summary Judgment (excerpt) | 66 | 06/02/25 | 5-8 |
| Declaration of Xian-Liang Tian, Ph.D, in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross-motion for Summary Judgment ("Tian Decl.") | 56 | 05/12/25 | 9-15 |
| Tian Declaration, Ex. 1 (Health Benefits Analysis for Rule 1146.2) | 56-1 | 05/12/25 | 16-21 |
| Declaration of Sarah Rees In Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Rees Declaration") | 55 | 05/12/25 | 22-34 |
| Rees Declaration, Ex. 1 (2022 Air Quality Management Plan, Main Volume) (excerpts) | 55-1 | 05/12/25 | 35-50 |
| Rees Declaration, Ex. 2 (2022 Air Quality Management Plan, Appendix II, "Current Air Quality,") (excerpts) | 55-2 | 05/12/25 | 51-53 |

| | | | |
|---|---|---|---|
| Rees Declaration, Ex. 3 (Draft Staff Report for Proposed Amended Rule 1111 – Reduction of NOx Emissions from Natural Gas-Fired Furnaces and Proposed Amended Rule 1121 – Reduction of NOx Emissions from Residential Type, Natural Gas-Fired Water Heaters) (excerpts) | 55-3 | 05/12/25 | 54-60 |
| Rees Declaration, Ex. 4 (District Rule 1146) (excerpts) | 55-4 | 05/12/25 | 61-65 |
| Rees Declaration, Ex. 5 (District Rule 1146.1) (excerpts) | 55-5 | 05/12/25 | 66-69 |
| Declaration of Michael Krause In Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment (excerpts) | 54 | 05/12/25 | 70-79 |
| District's Memorandum of Points and Authorities in Support of Cross-Motion for Summary Judgment (excerpt) | 53 | 05/12/25 | 80-83 |
| Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment (excerpts) | 50-1 | 04/14/25 | 84-88 |
| Declaration of Brian C. Baran in Support of Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction ("Baran Declaration"), Ex. 1 (District Rule 1146.2) (excerpts) | 50-3 | 04/14/25 | 89-91 |

**SER-3**

| | | | |
|---|---|---|---|
| Baran Declaration, Ex. 2 (District's Final Staff Report: Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters) (excerpts) | 50-4 | 04/14/25 | 92-120 |
| Declaration of Adriano L. Martinez in Support of [NGOs] Motion to Intervene | 27-2 | 02/12/25 | 121-151 |

Courtland L. Reichman (SBN 268873)
   creichman@reichmanjorgensen.com
Brian C. Baran (SBN 325939)
   bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz
America Corp., National Association of Home
Builders, California Manufacturers & Technology
Association, California Restaurant Association,
California Hotel & Lodging Association, California
Apartment Association, and Plumbing-Heating-
Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al.<br><br>       Plaintiffs,<br><br>       v.<br><br>SOUTH COAST AIR QUALITY<br>MANAGEMENT DISTRICT,<br><br>       Defendant,<br><br> and<br><br>PEOPLE'S COLLECTIVE FOR<br>ENVIRONMENTAL JUSTICE, SIERRA<br>CLUB, and INDUSTRIOUS LABS,<br><br>       Defendant-Intervenors. | Civil Action No.<br><br>2:24-cv-10482 PA(PDx)<br><br>**REPLY MEMORANDUM IN<br>SUPPORT OF PLAINTIFFS'<br>MOTION FOR SUMMARY<br>JUDGMENT, DECLARATORY<br>RELIEF, AND PERMANENT<br>INJUNCTION**<br><br>Date:  Monday, July 14, 2025<br>Time: 1:30 p.m.<br>Courtroom: 9A<br><br>Honorable Percy Anderson<br>United States District Judge |

(6 of 151), Page 6 of 151    Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 6 of 151
Case 2:24-cv-10482-PA-PD    Document 66    Filed 06/02/25    Page 2 of 31    Page ID
#:1983

ADDITIONAL COUNSEL

Sarah O. Jorgensen (*pro hac vice*)
    sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403; Fax: (650) 560-3501

Sean Kneafsey (SBN 180863)
    skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200; Fax: 213-892-1208

*Attorneys for Plaintiffs Rinnai America
Corp., Noritz America Corp., National
Association of Home Builders, California
Manufacturers & Technology Association,
California Restaurant Association,
California Hotel & Lodging Association,
California Apartment Association, and
Plumbing-Heating-Cooling Contractors of
California*

John J. Davis, Jr. (SBN 65594)
    jjdavis@msh.law
MCCRACKEN, STEMERMAN
    & HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200; Fax: (415) 597-7201

*Attorneys for Plaintiff California State
Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
    matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-7724

*Attorney for Plaintiff Californians for
Homeownership, Inc.*

Angelo I. Amador (*pro hac vice*)
    aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913 Fax: (202) 331-2429

*Attorney for Plaintiff Restaurant Law Center*

(7 of 151), Page 7 of 151    Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 7 of 151
Case 2:24-cv-10482-PA-PD    Document 66    Filed 06/02/25    Page 24 of 31    Page ID
#:2005

1  plain-text reading of § 6297(c).  *Supra* pp. 14-16.  Nor will preempting the District's

2  ban gut air quality regulation.  *Supra* pp. 11-13.  The only lawful way to "harmonize"

3  the District's zero-$NO_x$ limits with EPCA is to enforce EPCA's preemption provision.

## III.    Plaintiffs Have Satisfied the Standard for a Facial Preemption Challenge.

5      Next, the District tries to dodge the merits by quibbling with whether Plaintiffs

6  have satisfied the standard for a facial challenge.  According to the District, Plaintiffs'

7  facial challenge fails because process heaters are not covered appliances under EPCA,

8  and fuel cell technology might in the future provide a zero-$NO_x$ option for complying

9  with its rule.  Dkt. 53 at 28-29.  This argument misapplies the legal standard and goes

10  at most to the proper remedy, not the merits.

11      **1.**    To be sure, as a general matter, a facial challenge requires showing that

12  the challenged law is "unconstitutional in all of its applications."  *Wash. State*

13  *Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  But the District

14  misunderstands the standard, which is tethered to the "plaintiffs' claim and the relief

15  that would follow."  *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).  "The label is

16  not what matters"; "[w]here, as here, the claim and accompanying relief reach beyond

17  the particular circumstances of the[] plaintiffs," facial standards apply, but only "to the

18  extent of that reach."  *Id.*; *accord Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th

19  Cir. 2025) (same).  Or as the Tenth Circuit summed it up, "facial standards are

20  applied . . . to the universe of applications contemplated by plaintiffs' claim, not to all

21  conceivable applications contemplated by the challenged provision."  *United States v.*

22  *Sup. Ct. of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016) (applying *Reed*).

23      The scope of EPCA's preemption provision confirms the point.  Congress

24  directed that state regulations are preempted only to the extent they operate on covered

(8 of 151), Page 8 of 151    Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 8 of 151
Case 2:24-cv-10482-PA-PD    Document 66    Filed 06/02/25    Page 25 of 31    Page ID
#:2006

appliances. § 6297(c) ("no State regulation concerning the energy efficiency, energy use, or water use of such covered product *shall be effective with respect to such product*" (emphasis added)). It was well within Congress's power to limit the scope of preemption in this way. Defendants contend, however, that Plaintiffs must show that the zero-$NO_x$ rule "applies only to 'covered products'" as "a precondition to success on their facial challenge." Dkt. 63 at 23 n.3. By that logic, EPCA's preemption provision would practically never support a facial challenge; a state could easily flout EPCA by simply tacking on a regulation of a non-covered appliance to an otherwise preempted regulation. That result is contrary to Supreme Court and Ninth Circuit precedent—including the Ninth Circuit's decision in *California Restaurant Ass'n*. *See Reed*, 561 U.S. at 194; *Cal. Rest.*, 89 F.4th at 1107.

Here, "the universe of applications contemplated by [P]laintiffs' claim" is the zero-$NO_x$ rule's effect on covered products as defined by EPCA, *Sup. Ct. of N.M.*, 839 F.3d at 914. *See, e.g.*, Dkt. 1 at ¶¶ 89-90 (requesting a "declaratory judgment . . . that the District's Rule 1146.2 is preempted by federal law because it concerns the energy use of appliances covered by" EPCA). Thus, contrary to the District's suggestion, it is irrelevant that the rule is not preempted to the extent it has an effect on products not covered by EPCA—a point no one is disputing. *See Sup. Ct. of N.M.*, 839 F.3d at 915 (facial analysis "focuses on only the constitutional validity of the subset of applications targeted by the plaintiffs' substantive claim"). The District's reliance on *American Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934 (9th Cir. 2024), is thus misplaced; the plaintiffs there were unable to show that all the applications contemplated by their claim were preempted. As a practical matter, however, EPCA covers most gas appliances. *See, e.g.*, §§ 6291(1)-(2), 6292(a), 6311(1)-(2) (listing a wide range of

**SER-8**

(9 of 151), Page 9 of 151    Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 9 of 151
Case 2:24-cv-10482-PA-PD    Document 56    Filed 05/12/25    Page 1 of 7    Page ID
#:1673

1  MATTHEW D. ZINN (CA Bar No. 214587)
   Zinn@smwlaw.com
2  LAUREN M. TARPEY (CA Bar No. 321775)
   Ltarpey@smwlaw.com
3  RYAN K, GALLAGHER (CA Bar No. 344349)
   Rgallagher@smwlaw.com
4  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
5  San Francisco, California 94102
   Telephone: (415) 552-7272
6  Facsimile:  (415) 552-5816

7  Attorneys for Defendant South Coast Air
   Quality Management District

8  (additional counsel on following page)

9

10            **UNITED STATES DISTRICT COURT**

11   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

| 13 | RINNAI AMERICA CORP., et al, | Case No. 2:24-cv-10482 PA (PDx) |
|----|------------------------------|--------------------------------|
| 14 | Plaintiffs, | **DECLARATION OF XIAN-** |
| 15 | | **LIANG TIAN, PH.D, IN** |
| 16 | v. | **SUPPORT OF DEFENDANT'S** |
| 17 | SOUTH COAST AIR QUALITY | **OPPOSITION TO PLAINTIFFS'** |
| 18 | MANAGEMENT DISTRICT, | **MOTION FOR SUMMARY** |
| 19 | Defendant. | **JUDGMENT AND IN SUPPORT** |
| 20 | | **OF DEFENDANT'S CROSS-** |
| 21 | and | **MOTION FOR SUMMARY** |
| 22 | PEOPLE'S COLLECTIVE FOR | **JUDGMENT** |
| 23 | ENVIRONMENTAL JUSTICE, | Date:        July 14, 2025 |
| 24 | SIERRA CLUB, and | Time:       1:30 p.m. |
| 25 | INDUSTRIOUS LABS, | Courtroom:  9A |
| 26 | Defendant-Intervenors. | The Hon. Percy Anderson |
| 27 | | Trial Date:   September 30, 2025 |

28

BAYRON T. GILCHRIST (CA Bar No. 212393)
General Counsel
BARBARA BAIRD (CA Bar No. 81507)
Chief Deputy District Counsel
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
21865 Copley Drive
Diamond Bar, California 91765
Telephone: (909) 396-3400
Facsimile:  (909) 396-2961
bghilchrist@aqmd.gov

Attorneys for Defendant South Coast Air
Quality Management District

DEC. OF XIAN-LIANG TIAN, PH.D., ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

(11 of 151), Page 11 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 11 of 151
Case 2:24-cv-10482-PA-PD    Document 56    Filed 05/12/25    Page 3 of 7    Page ID
#:1675

I, XIAN-LIANG TIAN, declare as follows:

1.    I am employed as a Program Supervisor in the Socioeconomic Analysis unit of the South Coast Air Quality Management District ("District"). I make this declaration based upon my personal knowledge of the facts and expertise in the matters set forth herein, my review of the relevant documents discussed below, and (where indicated) information provided by my colleagues at the District. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Defendant's opposition to the motion for summary judgment filed by Plaintiffs, and in support of Defendant's cross-motion for summary judgment.

2.    My education and training include a Bachelor of Science degree in Finance from Hubei University, as well as a Master of Science and Ph.D. in Economics from Louisiana State University.

3.    Prior to joining the District, I was previously employed as an associate professor in Wenlan School of Business at Zhongnan University of Economics and Law from July 17 to February 2023. My research papers were published in several academic journals, including Global Environmental Change, Energy Economics, and the Journal of Environmental Economics and Management, among others.

4.    My job responsibilities as a Program Supervisor for the District include overseeing the projects assigned to the Socioeconomic Analysis unit, leading socioeconomic impact assessments, as well as assisting other units in rule development. I have held this position since March 2023.

5.    As a Program Supervisor in the Socioeconomic Analysis unit, I have led and overseen approximately 26 socioeconomic impact assessments for proposed rules or rule amendments. These analyses are required by California Health and Safety Code Sections 40728.5 and 40440.8.

**Health-Benefit Analysis for Proposed Amended Rule 1146.2**

3

(12 of 151), Page 12 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 12 of 151
Case 2:24-cv-10482-PA-PD    Document 56    Filed 05/12/25    Page 4 of 7    Page ID
#:1676

6.    I was jointly responsible with Chris Yu, an assistant air quality specialist, for the preparation of the health-benefit analysis for Proposed Amended Rule 1146.2.

7.    Under my direction and control, and with my active participation, District socioeconomic staff prepared an analysis of the health benefits to be derived from implementation of Rule 1146.2, both at the attainment date for the most recent ozone standard of 2037 and upon full implementation in 2057. I am familiar with the methods and inputs used and can testify to how the analysis was done.

8.    A detailed description of the health-benefit analysis work done is attached to this declaration as **Exhibit 1**.

9.    To calculate the health benefits of the emission reductions to be obtained by the rule, we used the emissions reductions calculated by District staff for each type of equipment by full implementation in 2057, which were calculated as 5.61 tpd. *See* Ex. 1, Table 1; District's Final Staff Report: Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters ("Final Staff Report"), available at Dkt. 50-2, Ex. 2 at 144 (p. 4-1). Based on the 2057 estimates, we used linear interpolation to calculate that emissions reductions by the attainment date of 2037 would be 2.44 tons per day ("tpd"). *See* Ex. 1, Table 1.

10.    We then used a reduced-form approach to estimate the health benefits of the rule using estimates of incidence-per-ton ("IPT") and benefits-per-ton ("BPT") derived from the health assessment in the Final Socioeconomic Report for the District's 2022 Air Quality Management Plan ("AQMP"). *See id.* at 1. The reduced-form approach relies upon an estimate of the average health impacts resulting from each ton of pollutant emissions reduced. *See id.* at 2.

11.    The IPT methodology was developed and is used by the U.S. Environmental Protection Agency ("EPA") and is consistent with methods used

(13 of 151), Page 13 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 13 of 151
Case 2:24-cv-10482-PA-PD    Document 56    Filed 05/12/25    Page 5 of 7    Page ID
#:1677

by the California Air Resources Board. *Id.* at 1 & nn. 2-4. We relied on the Final Socioeconomic Report for the 2022 AQMP to develop the IPT for both ozone and fine particulate matter ("PM2.5") reductions resulting from implementation of Rule 1146.2. *Id.* at 1-2. We divided the total 2022 AQMP health benefits results by the total AQMP emissions reductions of oxides of nitrogen ("NOx"), which are a precursor of both ozone and PM2.5. *Id.* at 2.

12.     The Final Socioeconomic Report for the 2022 AQMP estimated the health benefits for the years 2032 and 2037 based on (1) the modeled reductions in ozone and PM2.5 concentrations across the South Coast Air Basin and (2) EPA's Environmental Benefits Mapping and Analysis Program-Community Edition ("BenMAP-CE") model. *Id.* at 1-2. This analysis uses the NOx emissions reductions and associated health benefits attributed to the 2022 AQMP to generate average incidence per ton and benefits per ton estimates. *Id.*

13.     The average estimates are based upon the benefits derived from the 2022 AQMP, which accounts for potential nonlinearities between NOx emissions and ozone concentrations in the South Coast Air Basin. *Id.* at 2. The analysis assesses the public health benefits for which epidemiological studies have demonstrated an association between increases in ambient air pollution exposure and increases in illness and other health effects or increases in death rates from various causes. *Id.*

14.     The IPT factors were used in conjunction with projected annual NOx emission reductions presented in Table 1 of Exhibit 1 to estimate the health benefits presented in Table 2 of Exhibit 1. *Id.* at 3-4.

15.     By 2037, the year the District must attain the most recent ozone standard, Rule 1146.2 is estimated to prevent approximately 374 premature deaths, 23,629 lost school days, 16,549 work loss days, 1,519 cases of newly onset asthma, and other health consequences. *See id.* at 4, Table 2 (factors for ozone and PM2.5 added together).

16.    By the time Rule 1146.2 is fully implemented in 2057 (meaning all equipment that is required to be replaced by zero-emissions equipment has done so), it is estimated to prevent approximately 2,828 premature deaths, 192,754 lost school days, 120,986 work loss days, 11,864 cases of newly-onset asthma, and other health consequences. *See id.* (factors for ozone and PM2.5 added together).

17.    The IPT and BPT factors were used to generate estimates of the quantity and monetized value of the health benefits resulting from anticipated NOx reductions from Rule 1146.2. *See id.* at 5. Approximately 97%-98% of the monetized value of these health benefits are attributable to avoidance of premature death. *Id.* The estimates are based on a value of statistical life of $12.74 million, increased by 1.1% with each increase in per capita income of 1%, which is consistent with the analytical methods used by the U.S. Department of Health and Human Services ("HHS"). *See id.*; *see* also Aaron Kearsley, HHS, *HHS Standard Values for Regulatory Analysis, 2024* (2024), available at https://aspe.hhs.gov/sites/default/files/documents/2889414079ff2f3c3965dc5330626408/Standard-RIA-Values-2024.pdf; HHS, *Updating Value per Statistical Life (VSL) Estimates for Inflation and Changes in Real Income* (2021), available at https://aspe.hhs.gov/sites/default/files/2021-07/hhs-guidelines-appendix-d-vsl-update.pdf.

18.    The total monetary value of health benefits from emission reductions due to Rule 1146.2 by 2037 is $5.48 billion. *See* Exhibit 1 at 5, Table 3.

19.    The total monetary value of health benefits from emission reductions due to Rule 1146.2 by full implementation in 2057 is $95.19 billion. *See id.*

/ / /

/ / /

/ / /

/ / /

/ / /

DEC. OF XIAN-LIANG TIAN, PH.D., ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

SER-14

1        I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3        Executed on this 9 th day of May, 2025, at Diamond Bar, California.

4

5                                          _____

6                                          XIAN-LIANG TIAN

7

8   1914956.4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEC. OF XIAN-LIANG TIAN, PH.D., ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ    **SER-15**
Case No. 2:24-cv-10482 PA (PDx)

(16 of 151), Page 16 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 16 of 151
Case 2:24-cv-10482-PA-PD   Document 56-1   Filed 05/12/25   Page 1 of 6   Page ID
#:1680

# EXHIBIT 1

*April 22, 2025: This exercise was conducted for the purpose of quantifying the health benefits from the June 2024 amendments to Rule 1146.2.*

## Background

Rule 1146.2 – Control of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters, as amended on June 7, 2024, was developed to achieve further emission reductions of nitrogen oxides (NOx) from natural gas-fired equipment within the South Coast AQMD's jurisdiction and implement the 2022 Air Quality Management Plan (AQMP) Control Measure C-CMB-01: Emission Reductions from Replacement with Zero-emission or Low NOx Appliances – Commercial Water Heating. Upon full implementation by 2058, Rule 1146.2 is expected to reduce NOx emissions from large water heaters, small boilers and process heaters by 5.6 tons per day (tpd), which would have substantial public health benefits.

## Health Benefits of Rule 1146.2

This analysis relies upon a reduced-form approach to estimate human health benefits of projects using estimates of incidence-per-ton (IPT) and benefits-per-ton (BPT) of emissions reduced derived from the health assessment in the Final Socioeconomic Report for the 2022 AQMP.[1] The projected AQMP emission reductions and associated health benefits were utilized to generate average IPT and BPT estimates per ton of pollutant emissions reduced. The method of estimating the health benefits by using the IPT and BPT values provides robust, reasonable estimates of the magnitude of health benefits and is consistent with previously employed approaches by South Coast AQMD, as well as by the United States Environmental Protection Agency (U.S. EPA) and the California Air Resources Board (CARB).[2,3,4] Although not a substitute for the application of traditional air quality and health benefits models, the IPT and BPT method can provide useful estimates of the magnitude of health benefits.

IPT and BPT estimates were developed for both PM2.5-specific and ozone-specific benefits by dividing the 2022 AQMP health benefits results by the total AQMP emissions reductions of NOx, a key PM2.5 and ozone precursor.[5] The PM2.5-related health benefits associated with the 2022 AQMP reflect reductions in NOx and, to a lesser degree, directly emitted fine particles. For this analysis, all PM2.5-related benefits from the 2022 AQMP are attributed to reductions in NOx as NOx reductions are the primary focus of the AQMP pollution reduction strategies.

The Final Socioeconomic Impact Report for the 2022 AQMP estimated the health benefits for year 2032 and 2037 based on: 1) modeled reductions in ambient ozone and PM2.5 concentrations across the South Coast Air Basin (Basin); and 2) U.S. EPA's Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP-CE) model. This analysis utilizes the projected

---

[1]   South Coast AQMD, Final Socioeconomic Report for the 2022 AQMP, https://www.aqmd.gov/docs/default-source/clean-air-plans/socioeconomic-analysis/final/aqmp-2022-socioeconomic-report-main-final.pdf accessed March 2025.

[2]   IPT and BPT estimates were used in the health benefits analysis of the South Coast AQMD August 2024 amendment process for Rule 2306 – Freight Rail Yards, http://www.aqmd.gov/docs/default-source/Agendas/Governing-Board/2024/2024-aug2-026.pdf, accessed March 2025.

[3]   U.S. EPA, Technical Support Document: Estimating the Benefit per Ton of Reducing PM2.5 Precursors from 17 Sectors, https://www.epa.gov/sites/default/files/2018-02/documents/sourceapportionmentbpttsd_2018.pdf, accessed March 2025.

[4]   CARB, Estimating the Community Level Health Benefits from Air Pollution Control Programs, https://ww2.arb.ca.gov/resources/documents/estimating-community-level-health-benefits-air-pollution-control-programs#:~:text=CARB%20uses%20a%20California%20specific,available%20on%20the%20CARB%20website, accessed March 2025.

[5]   The IPT and BPT methods have been used to assess health benefits of South Coast Air Basin Attainment Plan for the 2012 Annual PM2.5 Standard. For more detail, please refer to the following link: https://www.aqmd.gov/home/air-quality/air-quality-management-plans/other-state-implementation-plan-(sip)-revisions/2012-annual-pm2-5-plan

**SER-17**

(18 of 151), Page 18 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 18 of 151
Case 2:24-cv-10482-PA-PD   Document 56-1   Filed 05/12/25   Page 3 of 6   Page ID
#:1682

*April 22, 2025:  This exercise was conducted for the purpose of quantifying the health benefits from the June 2024 amendments to Rule 1146.2.*

NOx emissions reductions and associated health benefits attributed to the 2022 AQMP to generate average IPT and BPT estimates. These estimated IPT and BPT factors were then used to generate estimates of the quantity and monetized value of health benefits resulting from anticipated NOx emission reductions from Rule 1146.2 (e.g., 5.6 tpd). Since NOx is a key precursor to the formation of PM2.5 and ozone, the IPT and BPT estimates for both PM2.5-specific and ozone-specific benefits were developed by dividing the results of the health benefits from Rule 1146.2 by the total NOx emission reductions from the 2022 AQMP.

When conducting a socioeconomic analysis, the application of a reduced-form approach relies upon an estimate of the average health impact for each ton of pollutant emissions (and/or its precursors) reduced.

This average estimate is based on the benefits derived from the 2022 AQMP air quality modeling, which accounts for potential nonlinearities between NOx emissions and ozone concentrations in the Basin. The average IPT and BPT of the 2022 AQMP implementation implicitly reflects the impacts of nonlinear air quality chemistry on the overall expected health benefits. Additional methodological assumptions include:

- Changes in incidence are proportional to ambient PM2.5 or ozone concentrations.

- Changes in primary pollutant concentrations are proportional to changes in directly emitted NOx.

- The IPT and BPT values are specific to the year or years being evaluated (e.g., 2032 and 2037).

- For years prior to 2032, IPT and BPT values are not calculated. Instead, health benefits grow linearly from zero benefits in 2026 to the estimated 2032 total benefits (based upon 2032 IPT and BPT values).

- For intermediate years between 2032 and 2037, IPT and BPT values grow linearly.

- For years beyond 2037, 2037 IPT and BPT values are projected through 2057 based on either future population growth (IPT and cost-of-illness based BPT estimates), or both future population growth and income growth (willingness-to-pay based BPT estimates).

This analysis assesses the public health benefits for which epidemiological studies have demonstrated an association between increases in ambient air pollution exposure and increases in illness and other health effects (morbidity endpoints) or increases in death rates from various causes (mortality endpoints) and are the same health endpoints quantified in the Final Socioeconomic Report for the 2022 AQMP. Additional details concerning the selection of quantified health effects, and the generation of health benefits results, are available in Chapter 3 and Appendices 3-A and 3-B of the Final Socioeconomic Report for the 2022 AQMP.[6]

Table 1 presents the estimated NOx emissions inventory for the June 7, 2024 amendments to Rule

---

[6]  South Coast AQMD, Appendices to the Final Socioeconomic Report for the 2022 AQMP, https://www.aqmd.gov/docs/default-source/clean-air-plans/socioeconomic-analysis/final/aqmp-2022-socioeconomic-report-appendices-final.pdf, accessed March 2025.

*April 22, 2025: This exercise was conducted for the purpose of quantifying the health benefits from the June 2024 amendments to Rule 1146.2.*

1146.2. In this analysis, NOx emission reductions are assumed to be zero in the year before implementation for each category; and then grow linearly to the year of full implementation, which is 2058. Rule 1146.2 is expected to reduce NOx emissions by 2.44 tpd in 2037 and by 5.61 tpd in 2057.[7]

### Table 1: NOx Emission Reductions for Rule 1146.2

| PAR 1146.2 Units | NOx Emission Reductions in 2037 (tpd) | NOx Emissions Reductions in 2057 (tpd) |
|---|---|---|
| Type 1 unit- New | 0.04 | 0.05 |
| Type 1 unit - Existing | 0.27 | 0.45 |
| Type 1 high temperature units - New | 0.01 | 0.02 |
| Type 1 high temperature units - Existing | 0.03 | 0.17 |
| Type 1 pool heater - New | 0.22 | 0.33 |
| Type 1 pool heater - Existing | 1.37 | 2.93 |
| Water Heater - New | 0.01 | 0.03 |
| Water Heater - Existing | 0.09 | 0.25 |
| Type 2 unit - New | 0.05 | 0.13 |
| Type 2 unit - Existing | 0.33 | 1.19 |
| Type 2 unit high temperature units - New | 0.00 | 0.01 |
| Type 2 unit high temperature units - Existing | 0.01 | 0.06 |
| **Total** | **2.44** | **5.61** |

The estimated IPT factors were used in conjunction with projected annual NOx emission reductions to estimate the health benefits presented in Table 2. In total, implementation of Rule 1146.2 is estimated to prevent approximately 374 premature deaths, 1,519 cases of newly onset asthma, 176,106 minor restricted activity days, and other outcomes from 2026 to 2037. Additionally, Rule 1146.2 is estimated to prevent approximately 2,828 premature deaths, 11,865 cases of newly onset asthma, 1,362,957 minor restricted activity days, and other outcomes from 2026 to 2057. Table 2 provides the estimated health benefits for the implementation of Rule 1146.2 from 2026 to 2037, and from 2026 to 2057.

---

[7] Full implementation will be achieved by 2058. However, the analysis is up to the end of 2057 based on the useful life of relevant equipment.

*April 22, 2025:  This exercise was conducted for the purpose of quantifying the health benefits from the June 2024 amendments to Rule 1146.2.*

## Table 2: Health Effect Estimates of Rule 1146.2

| Health Effects | 2026-2037 | | 2026-2057 | |
|---|---|---|---|---|
| | Annual Average | Total | Annual Average | Total |
| **Premature Deaths Avoided, All Cause** | | | | |
| Long-Term Ozone Exposure | 7 | 84 | 21 | 686 |
| Long-Term PM2.5 Exposure | 24 | 290 | 67 | 2,142 |
| **Reduced Morbidity Incidence** | | | | |
| **Long-Term Ozone Exposure** | | | | |
| Asthma, New Onset | 91 | 1,093 | 274 | 8,783 |
| **Short-Term Ozone Exposure** | | | | |
| Asthma Symptoms (Chest Tightness, Cough, Shortness of Breath, Wheeze) | 16,337 | 196,048 | 50,182 | 1,605,831 |
| Emergency Room Visits (ED), Asthma | 6 | 72 | 19 | 597 |
| ED Visits, All Respiratory | 14 | 165 | 43 | 1380 |
| HA, Asthma | 170 | 2,044 | 527 | 16,851 |
| Minor Restricted Activity Days | 6,590 | 79,078 | 20,441 | 654,122 |
| School Loss Days, All Cause | 1,969 | 23,629 | 6024 | 192,754 |
| **Long-Term PM2.5 Exposure** | | | | |
| Asthma, New Onset | 36 | 426 | 96 | 3,081 |
| HA, Alzheimer's Disease | 2 | 30 | 7 | 223 |
| HA, Parkinson's Disease | 1 | 12 | 3 | 93 |
| Incidence, Hay Fever/Rhinitis | 169 | 2,029 | 461 | 14,758 |
| Incidence, Lung Cancer (non-fatal) | 2 | 24 | 6 | 179 |
| **Short-Term PM2.5 Exposure** | | | | |
| Acute Myocardial Infarction, Nonfatal | 0 | 4 | 1 | 33 |
| Asthma Symptoms, Albuterol use | 5,942 | 71,307 | 16,266 | 520,527 |
| ED Visits, Asthma | 1 | 15 | 3 | 109 |
| ED Visits, All Cardiac Outcomes | 3 | 32 | 7 | 238 |
| ED Visits, All Respiratory | 6 | 74 | 17 | 545 |
| Emergency Hospitalizations (EHA), Asthma | 0 | 1 | 0 | 6 |
| HA, All Cardiac Outcomes | 1 | 11 | 3 | 81 |
| HA, All Respiratory | 3 | 30 | 7 | 229 |
| Incidence, Ischemic Stroke | 1 | 17 | 4 | 129 |
| Incidence, Out-of-Hospital Cardiac Arrest | 0 | 3 | 1 | 21 |
| Minor Restricted Activity Days | 8,086 | 97,028 | 22,151 | 708,835 |
| Work Loss Days | 1,379 | 16,549 | 3,781 | 120,986 |

[1] Health effects of ozone are quantified for the summer planning period only (i.e., May 1 to September 30). There are potentially more premature mortalities and morbidity conditions avoided outside the ozone peak season.

[2] Expressed in person-days. Minor Restricted Activity Days refer to days when some normal activities are avoided due to illness.

*April 22, 2025: This exercise was conducted for the purpose of quantifying the health benefits from the June 2024 amendments to Rule 1146.2.*

In addition, Table 3 presents the monetized value of the anticipated health benefits for the 2026-2037 and 2026-2057 periods, respectively. Roughly 97%-98% of the monetized value of these health benefits are attributable to avoided premature mortalities in each period. The estimates are based on a value of statistical life (VSL) of $12.74 million[8] and the assumption that the willingness-to-pay for mortality risk reductions will increase as per-capita income grows. Specifically, a one percent increase in income is assumed to raise the VSL by 1.1%.

### Table 3:  Monetized Value of Health Benefits from Rule 1146.2
### (Billions of 2024 Dollars)

| Type of Health Benefit | 2026 to 2037 | | | 2026 to 2057 | | |
|---|---|---|---|---|---|---|
| | Annual Average | Present Value - 4% Discount Rate | Total | Annual Average | Present Value - 4% Discount Rate | Total |
| **Mortality-related benefits** | **$0.44** | **$3.65** | **$5.29** | **$2.92** | **$34.29** | **$93.52** |
| Long-Term Ozone Exposure | $0.10 | $0.81 | $1.19 | $0.71 | $8.34 | $22.85 |
| Long-Term PM2.5 Exposure | $0.34 | $2.84 | $4.11 | $2.21 | $25.95 | $70.67 |
| **Morbidity-related benefits** | **$0.02** | **$0.13** | **$0.19** | **$0.05** | **$0.69** | **$1.67** |
| **Total** | **$0.46** | **$3.78** | **$5.48** | **$2.97** | **$34.98** | **$95.19** |

1914990.1

---

[8]  Industrial Economics Inc. and Lisa Robinson, Review of Mortality Risk Reduction Valuation Estimates for 2016 Socioeconomic Assessment, https://www.aqmd.gov/docs/default-source/clean-air-plans/socioeconomic-analysis/iecmemos_november2016/scmortalityvaluation_112816.pdf, accessed March 2025.

**SER-21**

MATTHEW D. ZINN (CA Bar No. 214587)
Zinn@smwlaw.com
LAUREN M. TARPEY (CA Bar No. 321775)
Ltarpey@smwlaw.com
RYAN K. GALLAGHER (CA Bar No. 344349)
Rgallagher@smwlaw.com
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Defendant South Coast Air
Quality Management District

(additional counsel on following page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| RINNAI AMERICA CORP., et al, <br><br> Plaintiffs, <br><br> v. <br><br> SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, <br><br> Defendant. <br><br> and <br><br> PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE, SIERRA CLUB, and INDUSTRIOUS LABS, <br><br> Defendant-Intervenors. | Case No. 2:24-cv-10482 PA (PDx) <br><br> **DECLARATION OF SARAH L. REES, PH.D., IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> Date:       July 14, 2025 <br> Time:       1:30 p.m. <br> Courtroom:  9A <br><br> The Hon. Percy Anderson <br><br> Trial Date:  September 30, 2025 |

1   BAYRON T. GILCHRIST (CA Bar No. 212393)
    General Counsel
2   BARBARA BAIRD (CA Bar No. 81507)
    Chief Deputy District Counsel
3   SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
    21865 Copley Drive
4   Diamond Bar, California 91765
    Telephone: (909) 396-3400
5   Facsimile: (909) 396-2961
    bghilchrist@aqmd.gov
6
    Attorneys for Defendant South Coast Air
7   Quality Management District

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

I, Sarah L. Rees, declare as follows:

1. I am Deputy Executive Officer for Planning, Rule Development, and Implementation at South Coast Air Quality Management District ("District"). I make this declaration based upon my personal knowledge of the facts and expertise in the matters set forth herein, my review of the relevant documents discussed below, and (where indicated) information provided by my colleagues at the District. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Defendant's opposition to the motion for summary judgment filed by Plaintiffs, and in support of Defendant's cross-motion for summary judgment. I have carefully reviewed the Motions and opposition and am familiar with the arguments they advance.

2. I have been employed at the District since 2017, beginning as Assistant Deputy Executive Officer for Planning and Rules. I have more than 25 years of management experience in air quality and climate change matters at state and federal levels, including working for the U.S. Environmental Protection Agency ("EPA") for seven years as Regulatory Impact Analyst, Director of the Policy and Regulatory Analysis Division, and Director of Office of Regulatory Policy and Management, all within the Office of Policy. I have a Ph.D. in Engineering and Public Policy from Carnegie Mellon University. I also have a law degree from Rutgers University and have practiced environmental law as part of my professional career.

3. As part of my work at EPA and the District, including as Deputy Executive Officer, as well as during my work as an environmental attorney, I have become familiar with the federal Clean Air Act requirements for air quality planning and attainment of the national ambient air quality standards.

DEC. OF SARAH L. REES, PH.D ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

SER-24

4.    As Deputy Executive Officer, I am responsible for planning and rule development related to stationary, area, and mobile sources, including development of the Air Quality Management Plan (attainment plan) for areas under the District's jurisdiction.

5.    As Deputy Executive Officer, I was also responsible for and oversaw the development of the 2022 Air Quality Management Plan ("2022 Plan"), which is the District's most recent comprehensive plan for attaining the national ambient air quality standards for ozone in the South Coast Air Basin ("Basin"). A true and correct copy of excerpts of the Main Volume of the 2022 Plan is attached hereto as **Exhibit 1**. A true and correct copy of excerpts of Appendix II of the 2022 Plan is attached hereto as **Exhibit 2.**

## The District and the Air Pollution Problem
## in the South Coast Air Basin

6.    The District is the regional air pollution control district responsible for air pollution control in the Basin, which consists of the non-desert portions of Los Angeles, Orange, Riverside, and San Bernardino Counties, as described in Cal. Code of Regulations, Title 17, Section 60104. Cal. Health & Safety Code ("HSC") § 40410.

7.    The District is also responsible for air quality in the Riverside County portion of the Salton Sea Air Basin, which is primarily the Coachella Valley Planning Area. Ex. 1 at 13 (2022 Plan, Main Volume, p. 1-3).

8.    The Basin has an area of approximately 6,800 square miles, and had approximately 17 million residents in 2020. Ex. 2 at 5 (2022 Plan, Appendix II, "Current Air Quality," II-1-2). The Los Angeles urban area (the nation's second largest), the Anaheim-Fullerton urban area, and the Riverside-San Bernardino urban area are part of the Basin. *Id.* at 5, 18 (pp. II-1-2, II-S-1).

9.      In the Basin, the "combination of poor air dispersion and abundant sunshine provides conditions especially favorable to the formation of photochemical smog and the trapping of particulates and other pollutants. The Basin is bounded to the north and east by mountains with maximum elevations exceeding 10,000 feet. The unfavorable combination of meteorology, topography, and emissions from the nation's second largest urban area results in the Basin having some of the worst air quality in the U.S." Ex. 2 at 8 (2022 Plan, Appendix II, "Current Air Quality," p. II-1-5).  In fact, the Basin has the worst air quality in the nation for ozone (smog), and the third worst (behind areas in central California) for fine particulate matter, which is also referred to as PM2.5. Ex. 1 at 16-17 (2022 Plan, Main Volume, pp. 2-59 – 2-60).

10.      Ozone is a colorless gas formed by a complicated series of chemical and photochemical reactions in the atmosphere among volatile organic compounds (VOCs), nitrogen oxides ($NO_x$), oxygen in the air, and sunlight. Ex. 1 at 9 (2022 Plan, Main Volume, p. ES-4).

11.      Ozone causes harm to pulmonary function and localized lung injury, increased mortality risk, increased respiratory-related hospital admissions and emergency room visits, as well as damage to vegetation and property, among other effects. Ex. 2 at 9 (2022 Plan, Appendix II, "Current Air Quality," p. II-1-6). Children, older adults, people with asthma, and people who work outdoors are among the most severely affected. *See* EPA, *Health Effects of Ozone Pollution* (Mar. 13, 2025), https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution.

12.      Fine particulate matter, or PM2.5, comprises particles less than 2.5 micrograms in diameter; particles small enough to penetrate the defenses of the human respiratory system and lodge in the deepest recesses of the lungs, causing health effects including acute and chronic respiratory disease, heart

attacks and strokes, as well as premature death. Ex. 2 at 10 (2022 Plan, Appendix II, "Current Air Quality," p. II-1-7). Particulate pollution can be directly emitted or formed in the atmosphere from reactions among pollutants such as sulfur oxides (SOx), NOx, ammonia (NH3), and VOCs. *Id.* at 17 (2022 Plan, Appendix II, "Current Air Quality," p. II-1-14).

13.   Fine particulate matter may exacerbate symptoms in sensitive patients with respiratory or cardiovascular disease, decrease pulmonary function or growth in children, increase risk of premature death, increase risk of lung cancer, increase asthma-related hospital admissions, increase school absences and lost work days, and decrease visibility. Ex. 2 at 10 (2022 Plan, Appendix II, "Current Air Quality," p. II-1-7).

14.   Chemicals that interact with others to form ozone and particulate pollution are known as "precursors." Ex. 1 at 11 (2022 Plan, Main Volume, p. 1-1). Because $NO_x$ is a precursor to ozone and PM2.5, reducing $NO_x$ emissions contributes to reductions in concentrations of ozone and PM2.5 in the atmosphere. Ex. 2 at 15 (2022 Plan, Appendix II, "Current Air Quality," p. II-1-12).

15.   NOx is measured in terms of nitrogen dioxide, which is a toxic and highly reactive gas that itself endangers human health and the environment. *See* EPA, *Basic Information about NO2* (Jul. 16, 2024), https://www.epa.gov/no2-pollution/basic-information-about-no2.

16.   Reducing NOx is the key to attaining the ozone standard in the South Coast Air Basin. Ex. 1 at 9 (2022 Plan, Main Volume, p. ES-4).

### The 2022 Air Quality Control Plan

17.   Under the federal Clean Air Act ("CAA"), EPA identifies pollutants that may reasonably be anticipated to endanger public health or welfare, and which are present in the ambient air as a result of numerous or diverse mobile

6

or stationary sources of pollution. 42 U.S.C. § 7408. EPA establishes levels of the identified pollutants to be allowed in the ambient air that, allowing an adequate margin of safety, are requisite to protect the public health. These levels are called the national primary ambient air quality standards. Secondary standards may also be established if needed to protect public welfare. These standards are intended to be updated and revised every five years. 42 U.S.C. § 7409.

18.    EPA's most recent national primary ambient air quality standard for ozone was established in 2015 as 70 parts per billion. Ex. 1 at 6 (2022 Plan, Main Volume, p. ES-1).

19.    Once EPA establishes a primary standard, it designates areas in the country which exceed those levels. States are divided into "air quality control regions," which are called "nonattainment areas" if they exceed the ambient standards. *See* EPA, *Process to Determine Whether Areas Meet the NAAQS (Designation Process)* (Nov. 12, 2024), https://www.epa.gov/criteria-air-pollutants/process-determine-whether-areas-meet-naaqs-designations-process.

20.    The CAA requires states to adopt plans that provide for the attainment, maintenance, and enforcement of the national ambient air quality standards set by EPA for a variety of pollutants, including ozone and fine particulate matter. 42 U.S.C. § 7410(a). The District adopted the 2022 Plan, which seeks to achieve and maintain U.S. EPA's 2015 ozone standard, on December 2, 2022.

21.    Despite the District's efforts to bring the Basin into compliance with the federal standards for ozone and other criteria pollutants, the Basin continues to exhibit some of the worst air quality in the nation. Ex. 1 at 14, 15 (2022 Plan, Main Volume, pp. 2-16, 2-58). Specifically, the Basin is in

"extreme" nonattainment for several federal ozone standards and experiences the highest ozone levels nationwide. *Id.* at 6, 14-15 (pp. ES-1, 2-16, 2-58); 42 U.S.C. §§ 7511, 7511a.

22.    The District's 2022 Plan sets forth, among other things, the reductions in emissions of criteria pollutants the District must attain to achieve the EPA's ambient air quality standards and the means by which the District may achieve those reductions. District's Final Staff Report: Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters ("Final Staff Report"), available at Dkt. 50-2, Ex. 2 at 029 (p. 2); Ex. 1 at 6 (2022 Plan, Main Volume, p. ES-1).

23.    As set forth in the 2022 Plan, the District must bring the Basin into attainment of the 2015 8-hour ozone standard by 2038. Ex. 1 at 6 (2022 Plan, Main Volume, p. ES-1). This means the regulations and control measures to attain the standard must be in place by 2037. *Id.* at 7 n. 2 (p. ES-2 at n. 2).

24.    To meet that deadline, NOx emissions in the Basin must decline by 124 tons per day from the 2037 baseline level of 184 tons per day, or about 67 percent beyond the reductions to be achieved by previously adopted rules. Ex. 1 at 33 (2022 Plan, Main Volume, p. 5-16). This required reduction in NOx amounts to about 83 percent below 2018 levels. *Id.* at 9 (p. ES-4).

25.    The 2022 Plan found that "there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technology across all . . . stationary sources, large and small." Ex. 1 at 10 (2022 Plan, Main Volume, p. ES-5).

26.    Accordingly, the 2022 Plan calls for the District to achieve significant further reductions in NOx emissions by requiring zero emission commercial water heaters. Ex. 1 at 32 (2022 Plan, Main Volume, p. 4-15).

## The Persistent Issue of Appliance and Combustion Emissions
## in the District

27.    Appliances and other combustion equipment emit NOx when they burn fossil fuels, primarily when molecules of nitrogen and oxygen react in a high temperature flame zone near an appliance's burners. *See* EPA, *Natural Gas Combustion* 1.43, *available at* https://www3.epa.gov/ttnchie1/ap42/ch01/final/c01s04.pdf.

28.    Emissions limits are expressed in nanograms of a pollutant per Joule of heat, in parts per million ("ppm"), or in parts per million by volume ("ppmv"). The terms ppm and ppmv are essentially interchangeable.

29.    An appliance's rated heat input capacity represents the  maximum amount of heat it can generate, in British thermal units per hour ("Btu/hr").

30.    The District has regulated NOx emissions under Rule 1146.2 from commercial and residential facilities since 1998, and it has regulated NOx from similar but smaller residential sources of space heating and water heating since 1978.

31.    In 1978, the District adopted Rules 1111 and 1121, which apply NOx emission limits to small central furnaces and water heaters. Draft Staff Report for Proposed Amended Rule 1111 – Reduction of NOx Emissions from Natural Gas-Fired Furnaces and Proposed Amended Rule 1121 – Reduction of NOx Emissions from Residential Type, Natural Gas-Fired Water Heaters ("Draft Staff Report") p. 1-1 – 1-4, a true copy of excerpts of which is attached hereto as **Exhibit 3**, at pages 9-12. The rules' original NOx emission limit of 40 ng/J for furnaces and water heaters was later dropped down to 14 ng/J for furnaces, and to 10 ng/J for water heaters. *Id.*

32.    In 1988, the District adopted Rule 1146, which limits NOx emissions from large boilers, steam generators, and process heaters with rated

9

(31 of 151), Page 31 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 31 of 151
Case 2:24-cv-10482-PA-PD   Document 55   Filed 05/12/25   Page 10 of 13   Page ID
#:1557

heat input capacities between 5 million Btu per hour ("MMBtu/hr") and 75 MMBtu/hr. A true and correct copy of Rule 1146 is attached hereto as **Exhibit 4**. Emissions limits for the equipment types governed by Rule 1146 vary depending on their size and type. Ex. 4 at 5, 6 (Rule 1146(c)(1), Table 1146-1).

33.     In 1990, the District adopted Rule 1146.1, which limits NOx emissions from industrial, institutional, and commercial boilers, steam generators, and process heaters with rated heat input between 2 and 5 MMBtu/hr. A true and correct copy of Rule 1146.1 is attached hereto as **Exhibit 5**. Like Rule 1146, emissions limits for the equipment types governed by Rule 1146.1 vary depending on their size and type. Ex. 5 at 4, 5 (Rule 1146.1(c)(1), Table 1146.1-1).

34.     Despite the District's prior efforts to limit NOx emissions from appliances, it must reduce them further to achieve the stringent 2015 8-hour ozone standard. Ex. 1 at 18 (2022 Plan, Main Volume, p. 4-1).

35.     Although individually small, fossil fuel appliances collectively generate enormous emissions. During rule development, District staff calculated the NOx emissions from Rule 1146.2 sources to be approximately 5.6 tons per day. Final Staff Report, Dkt. 50-2, Ex. 2 at 144 (p. 4-1).

36.     Other residential and commercial combustion sources generate about 24 tons per day of emissions. *Id*. Accordingly, appliance emissions account for nearly 20 percent of the residential and commercial combustion stationary sources regulated by the District. (5.6 tons per day / 29.6 tons per day = 18.9 %)

37.     By way of comparison, in 2025 the District estimates that average daily NOx emissions from light duty automobiles account for about 11.01 tons per day. 2022 Plan, Appendix III, "Base and Future Year Emissions Inventory," Attachment A, "2025 Annual Average Emissions by Source

10

1  Category in South Coast Air Basin (tons/day)," a true and correct copy of

2  excerpts of which is attached hereto as **Exhibit 6** at 5.

3      38.     Thus, Rule 1146.2 covers about half the amount of NOx emissions

4  as all the light duty automobiles in the Basin.

**District Rules Requiring Fuel-Switching**

5

6      39.     Some of the District's emission standards cannot be met using fuel

7  oil.

8      40.     These rules include Rule 1146, which imposes a NOx limit of 30

9  parts per million ("ppm") for gaseous-fueled equipment (with specific limits for

10 natural gas) and 40 ppm for non-gaseous fueled equipment covered by the rule.

11 Ex. 4 at 5, 6 (Rule 1146(c)(1), Table 1146-1). According to District staff

12 research, it may not be possible for an oil-fired unit to comply with these limits.

13     41.     Some of the units subject to Rule 1146 may be covered by energy

14 conservation standards issued pursuant to the Energy Policy and Conservation

15 Act ("EPCA"). *See* 10 C.F.R. Section 431.87(a) (energy conservation standards

16 for oil-fired Hot Water Commercial Packaged Boilers and oil-fired Steam

17 Commercial Packaged Boilers with rated input greater than 2.5 MMBtu/hr).

18     42.     Similarly, Rule 1146.1 imposes a NOx limit of 9 ppm for natural

19 gas-fired units and 30 ppm for other units covered by the rule, with some

20 specific limits. Ex. 5 at 4, 5 (Rule 1146.1 (c), Table 1146.1-1). According to

21 District staff research, it is not possible for oil-fired units to comply with these

22 limits.

23     43.     Some of the units subject to Rule 1146.1 may be covered by energy

24 conservation standards issued pursuant to EPCA. *See* 10 C.F.R. § 431.87(a)

25 (energy conservation standards for oil-fired Hot Water Commercial Packaged

26 Boilers and oil-fired Steam Commercial Packaged Boilers with rated input

27 between 300,000 and 2.5 MMBtu/hr, and greater than 2.5 MMBtu/hr).

28

11

DEC. OF SARAH L. REES, PH.D ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

1      44.    The District also has adopted a variety of rules for equipment types

2  that do not appear to be covered by federal efficiency standards issued

3  pursuant to EPCA. Some of these rules are likely to affect the use of a

4  particular fuel and result in fuel switching because there is currently no known

5  technology that could comply using liquid fuels.

6      45.    Examples of such rules include (1) Rule 1110.2, Emissions from

7  Gaseous-and-Liquid Fueled Engines, which sets a limit of 11 ppm NOx, Cal.

8  Air  Dist.  Regs.,  Reg.  XI, Rule 1110.2(d) (South Coast), *available at*

9  https://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1110-2.pdf;

10  (2) Rule 1135, Emissions of NOx from Electric Generating Facilities, which

11  sets emissions limits from 2 ppm to 5 ppm, with a special exception for units

12  on Catalina Island where natural gas is not available, *id.* at Rule 1135(d)(1)(B),

13  (d)(1)(E),   *available   at*   https://www.aqmd.gov/docs/default-source/rule-

14  book/reg-xi/rule-1135.pdf; (3)  Rule 1147, NOx Reductions from Miscellaneous

15  Sources, which sets a limit of 9 to60 ppm for gaseous fueled units and 40 to60

16  ppm  for  liquid  fueled  units,  *id.*  at  Rule  1147(d)(9),  *available  at*

17  https://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1147.pdf; and

18  (4)  Rule 1147.2, NOx Reductions from Metal Melting and Heating Furnaces,

19  whose applicability is not limited to gaseous-fueled sources, and that sets a

20  NOx limit of 15 to 60 ppm depending on type of equipment. *Id.* at Rule

21  1147.2(a), (d)(8)(B), Table 1, *available at* https://www.aqmd.gov/docs/default-

22  source/rule-book/reg-xi/rule-1147-

23  2.pdf?sfvrsn=8#:~:text=(a)%20Purpose%20The%20purpose%20of,Furnaces%2

24  C%20and%20Metal%20Forging%20Furnaces.

25  / / /

26  / / /

27  / / /

28

DEC. OF SARAH L. REES, PH.D ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

(34 of 151), Page 34 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 34 of 151
Case 2:24-cv-10482-PA-PD   Document 55   Filed 05/12/25   Page 13 of 13   Page ID
#:1560

1   I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct.

3    Executed on this 9th day of May, 2025, at Diamond Bar, California.

4

5           _____

6           Sarah L. Rees, Ph.D.

7   1912907.7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

DEC. OF SARAH L. REES, PH.D ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

(35 of 151), Page 35 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 35 of 151
Case 2:24-cv-10482-PA-PD    Document 55-1    Filed 05/12/25    Page 1 of 33   Page ID
#:1561

# EXHIBIT 1

SER-35

# EXHIBIT 1

# 2022 AIR QUALITY
# MANAGEMENT PLAN

## SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT

**ADOPTED DECEMBER 2, 2022**

(38 of 151), Page 38 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 38 of 151
Case 2:24-cv-10482-PA-PD    Document 55-1    Filed 05/12/25    Page 6 of 33    Page ID #:1566

Executive Summary

# Overview

The 17 million residents of the greater Los Angeles area have historically suffered from some of the worst air quality in the nation. While air pollution has reduced greatly, more needs to be done. The region has the worst levels of ground-level ozone (smog) and among the highest levels of fine particulate matter (PM2.5). The air pollution levels in the region exceed both National and California Ambient Air Quality Standards for both these air pollutants. The health impacts associated with the high levels of air pollution cause respiratory and cardiovascular disease, exacerbate asthma, and can lead to premature death. We also know that our Environmental Justice (EJ) communities experience the brunt of the health effects from air pollution. In this document, EJ communities are defined as census tracts in the top 25 percent in the California Office of Environmental Health Hazard Assessment's California Communities Environmental Health Screening Tool (CalEnviroScreen).[1]  Approximately 42 percent of the South Coast Air Basin (Basin) residents and 11 percent of Coachella Valley residents live in EJ communities.

The U.S. Environmental Protection Agency (U.S. EPA) requires areas that do not meet a National Ambient Air Quality Standard (NAAQS or standard) to develop and submit a State Implementation Plan (SIP) for approval. SIPs are used to show how the region will meet the standard. Regions must attain NAAQS by specific dates or face the possibility of sanctions by the federal government and other consequences under the Clean Air Act (CAA). This can result in increased permitting fees, stricter restrictions for permitting new projects, and the loss of federal highway funds.

The South Coast AQMD SIPs are developed within the agency's Air Quality Management Plans (AQMPs). The most recent AQMP was developed in 2016 and addressed the 1997 8-hour and 2008 8-hour ozone standards, as well as PM2.5 standards. This document is the 2022 AQMP and is focused on attaining the 2015 8-hour ozone standard of 70 parts per billion (ppb).

In August 2018, the U.S. EPA designated the Basin as "extreme" nonattainment and the Coachella Valley as "severe-15" nonattainment for the 2015 8-hour ozone standard. The South Coast Air Basin includes large areas of Los Angeles, Orange, Riverside, and San Bernardino counties. The Coachella Valley is the desert portion of Riverside County in the Salton Sea Air Basin. "Extreme" nonattainment areas must attain this standard by August 2038 and "severe" nonattainment areas must attain by August 2033 (Table ES-1).

---

[1]  Full details of the CalEnviroScreen methodology and data sources can be found in the CalEnviroScreen 4.0 report released in October 2021. Available online at: https://oehha.ca.gov/calenviroscreen/report/calenviroscreen-40.

(39 of 151), Page 39 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 39 of 151
Case 2:24-cv-10482-PA-PD    Document 55-1    Filed 05/12/25    Page 7 of 33    Page ID
#:1567

Final 2022 AQMP

**TABLE ES-1**

**NONATTAINMENT STATUS OF 2015 8-HOUR OZONE NAAQS**

| Standard | Nonattainment Area | Classification | Attainment Year |
|---|---|---|---|
| 2015 8-Hour Ozone | South Coast Air Basin | Extreme | 2037[2] |
| | Coachella Valley | Severe-15 | 2032[3] |

The 2022 AQMP builds upon measures already in place from previous AQMPs. It also includes a variety of additional strategies such as regulation, accelerated deployment of available cleaner technologies (e.g., zero emissions technologies, when cost-effective and feasible, and low NOx technologies in other applications), best management practices, co-benefits from existing programs (e.g., climate and energy efficiency), incentives, and other CAA measures to achieve the 2015 8-hour ozone standard.

The 2015 8-hour ozone standard is the most stringent standard to date. Because current ozone levels in the Basin are so high, meeting the standard will require substantial emissions reductions above and beyond current programs. We project that emissions of NOx – the key pollutant controlling formation of ozone – must be reduced by 67 percent beyond what we would achieve through current programs by 2037 to meet the standard. The magnitude of such an emission reduction means that all sources of emissions must be controlled as stringently as possible. This also means that we will have to rely on flexibilities provided by Section 182(e)(5) of the CAA, known as "black box" measures, to show that we are able to meet the standard. These "black box" measures can include the development and deployment of future technologies to reduce emissions as well as the reduction of NOx from sources regulated by the federal government. As depicted in Figure ES-1, 46 percent of NOx emissions in 2037 will come from federal sources, while 34 percent will come from State regulated sources, and only 20 percent will come from South Coast AQMD regulated sources.

---

[2]  Attainment date is August 3, 2038, which is 20 years from the designation as "extreme" nonattainment areas. The U.S. EPA requires that all control measures in the attainment demonstration must be implemented no later than the beginning of the attainment year ozone season. The U.S. EPA also defines the attainment year ozone season as the ozone season immediately preceding a nonattainment area's maximum attainment date, which is August 3, 2038, therefore, 2037 is the attainment year for the Basin.

[3]  Attainment date is August 3, 2033, which is 15 years from the designation as "severe" nonattainment area. The attainment year is the ozone season preceding August 3, 2033, which leads to 2032 as attainment year.

ES-2

SER-39

lead, but does not meet federal ozone and PM2.5 standards. The Coachella Valley does not meet federal ozone and PM10 standards, but attains federal PM2.5, $NO_2$, and CO standards.[4]

# Emissions in the Basin and Reductions Needed for Attainment

Unlike most other air pollutants, ozone is not directly emitted, but instead is formed in the atmosphere. Ozone is formed when NOx and volatile organic compounds (VOCs) react in the presence of sunlight.[5] While both NOx and VOCs contribute to ozone, the key to attaining the ozone standard is to reduce NOx.

In the Basin, mobile sources – heavy-duty trucks, ships, airplanes, locomotives, and construction equipment – account for 80 percent of NOx emissions. Meanwhile, stationary sources – such as power plants, refineries, and factories – will be responsible for the remaining 20 percent in 2037. This is an important point as the majority of South Coast AQMD's regulatory authority is for stationary sources with only limited authority to control mobile sources.

In 2037, we project that 184 tons per day of NOx will be emitted. This is known as the "baseline" and includes the implementation of existing regulations and programs, but does not include the actions proposed in this AQMP. This level is 48 percent lower than NOx emissions in 2018. In order to meet the ozone standard, the amount of NOx that can be emitted into the atmosphere is 60 tons per day and is known as the "carrying capacity." This means that NOx needs to be reduced about 67 percent beyond the current 2037 baseline and about 83 percent below current levels (Figure ES-2).

---

[4]  Lead and $SO_2$ concentrations were not measured in the Coachella Valley. In 2020, however, historic analyses have shown concentrations to be less than the federal standards and no major sources of these pollutants are located in the Coachella Valley.

[5]  Ozone formation is complex and is described in greater detail in Chapter 2.



**FIGURE ES-2**
**BASELINE NOX EMISSIONS INVENTORIES AND ADDITIONAL REDUCTIONS REQUIRED TO ATTAIN THE 2015 OZONE STANDARD**

## Control Strategy

Reducing significant amounts of NOx emissions poses a serious challenge. Previous AQMPs have relied on increasingly stringent regulations targeting tailpipe and exhaust stack emissions, new engine technologies, or fuel mix improvements. However, these approaches rely on additional reductions from already strictly regulated sources and cannot achieve an additional 67 percent reduction beyond the 2037 baseline. Therefore, there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technologies across all mobile sectors and stationary sources, large and small.

An overview of the control strategy by category is shown in Figure ES-3. Low NOx technologies will also need to play a significant role for some areas where ZE technology is not ready or commercially available. These lower emissions technologies will also assist with attainment of other air quality standards with earlier deadlines.

(42 of 151), Page 42 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 42 of 151
Case 2:24-cv-10482-PA-PD    Document 55-1    Filed 05/12/25    Page 11 of 33    Page ID
#:1571

# Purpose

The greater Los Angeles area experiences some of the worst air pollution in the nation. The region has the highest levels of ozone, and among the highest levels of fine particulate matter (PM2.5). These air pollutants cause substantial health impacts, including respiratory and cardiovascular disease, worsening asthma symptoms, and premature death.

The federal Clean Air Act (CAA or Act) requires areas that do not meet the health-based National Ambient Air Quality Standards (NAAQS or federal standards) to develop and implement an emission reduction strategy to attain healthy levels of air quality in a timely manner. The State of California also requires areas that do not meet the California ambient air quality standards (CAAQS or State standards) to take all feasible measures towards achieving the CAAQS at the earliest practicable date. Air Quality Management Plans (AQMPs or Plans) provide the strategy and the underlying technical analysis for how the region will meet federal standards by the required dates and continue progress to achieve the state standards. The South Coast Air Quality Management District (South Coast AQMD), with contributions from and collaborations with the California Air Resources Board (CARB) and Southern California Association of Governments (SCAG), has developed six comprehensive AQMPs since the late 1990s to address updates to air quality standards and attainment deadlines. The primary purpose of the 2022 AQMP is to identify, develop, and implement strategies and control measures to meet the 2015 8-hour ozone NAAQS - 70 parts per billion (ppb) as expeditiously as practicable, but no later than the statutory attainment deadline of August 3, 2038 for South Coast Air Basin (Basin)[1]  and August 3, 2033 for the Riverside County portion of the Salton Sea Air Basin (referred as Coachella Valley Planning Area or Coachella Valley).[2]

# Historical Perspective

Photochemical smog is air pollution containing ozone and other chemicals that is formed with sunlight in the atmosphere. Nitrogen oxides (NOx) and Volatile Organic Compounds (VOCs) are the building blocks that form smog and are referred to as "ozone precursors." The abundant sunlight and presence of mountain ranges surrounding the greater Los Angeles area provide favorable conditions for smog formation within the Basin. As population in the region grew, the air pollution worsened from the increased number of motor vehicles and industrial facilities. With this worsening of air pollution, the Los

---

[1]  The Basin's ozone attainment date is August 3, 2038, which is 20 years from the designation as an "extreme" nonattainment area. The U.S. EPA requires all control measures in the attainment demonstration must be implemented no later than the beginning of the attainment year ozone season. The U.S. EPA also defines the attainment year ozone season is the ozone season immediately preceding a nonattainment area's maximum attainment date, which is August 3, 2038, therefore, 2037 is the attainment year for the Basin.

[2]  The Coachella Valley's ozone attainment date is August 3, 2033, which is 15 years from the designation as a "severe-15" nonattainment area. The U.S. EPA requires all control measures in the attainment demonstration must be implemented no later than the beginning of the attainment year ozone season. The U.S. EPA also defines the attainment year ozone season is the ozone season immediately preceding a nonattainment area's maximum attainment date, which is August 3, 2033, therefore, 2032 is the attainment year for Coachella Valley.

Final 2022 AQMP

*Ozone*

Despite substantial improvements in air quality over the past few decades, some air monitoring stations in the Basin still exceed the NAAQS and frequently record the highest ozone levels in the United States. In 2020, one or more stations in the Basin exceeded the most current federal standards on a total of 181 days (49 percent of the year), including: 8-hour ozone (157 days over the 2015 ozone NAAQS), 24-hour PM2.5 (39 days),[10] PM10 (3 days), and NO$_2$ (1 day). Nine of the top 10 stations in the nation most frequently exceeding the 2015 8-hour ozone NAAQS in 2020 were located within the Basin,[11] including stations in San Bernardino, Riverside, and Los Angeles Counties. Regarding the former ozone NAAQS,[12] 142 days exceeded the revised 2008 8-hour ozone NAAQS, 97 days exceeded the revoked 1997 8-hour ozone NAAQS, and 27 days exceeded the revoked 1-hour ozone NAAQS at one or more stations in the Basin in 2020. Table 2-6 summarizes the number of days exceeding current and former federal and State 1-hour and 8-hour ozone standard levels by county in the Basin and the Coachella Valley in 2020.

---

[10] Data includes both FRM filter-based and continuous measurements.

[11] The only station outside the Basin in the top 10 most 8-hour ozone exceedances is located on Ash Mountain in Sequoia and Kings Canyon National Park.

[12] While the former federal 8-hour and 1-hour ozone NAAQS have been revised or revoked by the U.S. EPA, nonattainment areas, including the Basin, still have continuing obligations under each standard until it is attained.

# Air Quality Compared to Other U.S. Metropolitan Areas

Despite significant improvements, the Basin continues to experience some of the worst air quality in the nation. In 2020, nine of the country's top ten locations most frequently exceeding the 2015 8-hour ozone NAAQS were located within the Basin, including stations in San Bernardino, Riverside and Los Angeles Counties.[39]  The location with the highest number of days over the 2015 8-hour ozone NAAQS was in the Basin's Eastern San Bernardino Valley (141 days at the Redlands station). The Basin exceeded the 2008 8-hour ozone NAAQS on 142 days, more days than any other areas in the country. The Basin exceeded the 2015 ozone NAAQS on 157 days. The Basin also recorded the highest 8-hour average ozone concentrations of any area in the nation, with stations in the Basin making up all of the country's top ten locations with the highest fourth maximum 8-hour average ozone concentrations (0.105-0.125 ppm). The single highest maximum 8-hour average ozone concentration recorded in 2020 was also measured at a Basin station (0.139 ppm in the Central San Bernardino Mountains area, almost 200 percent of the 2015 ozone NAAQS).

Figures 2-11 and 2-12 show the number of days exceeding federal standards by Air Quality Index (AQI) category for ozone, PM2.5, and PM10 in the Basin compared to other major metropolitan areas in the U.S. and California air basins, respectively. These totals include days influenced by exceptional events, such as wildfires and high wind dust events, which may be excluded with the U.S. EPA concurrence when calculating regulatory design values. All areas recorded at least one exceedance of the 2015 8-hour ozone NAAQS, with the Basin, San Joaquin Valley, and South Central Coast all recording at least one Very Unhealthy AQI (8-hour average concentration ≥ 0.106 ppm) day. Similarly, all areas recorded at least one exceedance of the 24-hour PM2.5 standard, with much higher exceedance totals in California air basins and Phoenix metro area compared to other areas. Some of the days with the highest recorded PM2.5 concentrations in these areas were influenced by the particularly severe wildfire season throughout the western U.S. in 2020. In California, the 2020 wildfire season was the largest in modern history to date, with a total burn area of more than 4 million acres, or 4 percent of California's total land area. The 24-hour PM10 standard was exceeded in the Basin, Phoenix, and Chicago, as well as in all California air basins shown. As for PM2.5, wildfire smoke likely contributed to PM10 exceedances throughout California. High wind dust events may have also impacted PM10 levels, particularly in the Phoenix metro area.

Exceedances of CO, NO2, and SO2 federal standards are generally rare in California and other major metropolitan areas in the U.S. Of the areas shown in Figures 2-11 and 2-12, the only exceedance of the 1-hour NO2 NAAQS in 2020 was recorded in the Basin at the Ontario near-road station, and the only exceedances of the 1-hour SO2 standard were recorded in Chicago (five exceedances) and San Francisco Bay Area (one). Federal CO standards were not exceeded at any station in the U.S. in 2020. Nationwide,

---

[39]  The top ten stations in the nation for number of exceedances of the 2015 8-hour ozone NAAQS in 2020 include Basin stations in the areas of East San Bernardino Valley (Redlands), Central San Bernardino Mountains (in the Crestline-Lake Gregory community), Central San Bernardino Valley (San Bernardino and Fontana), Northwest San Bernardino Valley (Upland), Pomona/Walnut Valley (Pomona), East San Gabriel Valley (Glendora) and Metropolitan Riverside County (Riverside-Rubidoux and Mira Loma), as well as one station in the San Joaquin Valley Air Basin (Sequoia and Kings Canyon National Park).

(45 of 151), Page 45 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 45 of 151
Case 2:24-cv-10482-PA-PD    Document 55-1    Filed 05/12/25    Page 16 of 33    Page ID
#:1576

Chapter 2: Air Quality and Health Effects

the federal lead standard (not shown) was exceeded at two locations in 2020 at source-oriented monitoring stations in Missouri.



**FIGURE 2-11**

**2020 SOUTH COAST AIR BASIN AIR QUALITY COMPARED TO OTHER U.S. METRO AREAS**

*(DAYS EXCEEDING FEDERAL STANDARD BY MAXIMUM POLLUTANT-BASED AQI RECORDED IN AREA. AIR QUALITY DATA FOR METRO AREAS WAS COLLECTED FROM ALL STATIONS WITHIN CORE-BASED STATISTICAL AREAS AS DEFINED BY THE U.S. CENSUS BUREAU. ASTERISKS INDICATE AREAS WHERE DAILY MEASUREMENTS ARE NOT AVAILABLE AND ANNUAL EXCEEDANCES HAVE BEEN ESTIMATED FROM 1-IN-3 DAY OR LESS FREQUENT SAMPLING.)*

Final 2022 AQMP



**FIGURE 2-12**

**2020 SOUTH COAST AIR BASIN AIR QUALITY COMPARED TO OTHER CALIFORNIA AIR BASINS**

*(Days exceeding federal standard by maximum AQI recorded in area. Asterisks indicate areas where daily measurements are not available and annual exceedances have been estimated from 1-in-3 day or less frequent sampling. **Coachella Valley is defined as the Riverside County portion of the Salton Sea Air Basin.)*

As noted previously, federal standard exceedances do not necessarily indicate NAAQS violations and subsequent attainment/nonattainment designation changes, which is determined by the design value form of the NAAQS. Figures 2-13 and 2-14 show the 2018-2020 3-year design values for the Basin compared to other urban areas in the U.S. and California, respectively. These design values reflect monitoring data as of May 2021, but values may be updated as the U.S. EPA concurs on exceptional event demonstrations submitted by local air agencies.

For the 2018-2020 period, 8-hour ozone design values in most urban areas and California air basins exceeded the 2015 8-hour federal standard. Design values in the San Francisco Bay Area basin and Atlanta were at or just below the standard, with values of 0.069 and 0.07 ppm, respectively. For the revoked 1979 1-hour ozone NAAQS, only the Basin had a design value over the federal standard for the 2018-2020 period. The design values for annual averaged PM2.5 were over the 2012 annual PM2.5 NAAQS for the Basin, Phoenix metro area, San Joaquin Valley, and Sacramento Valley. The 24-hour PM2.5 design values exceeded the 24-hour NAAQS in the Basin, San Joaquin Valley, San Francisco Bay Area, and Sacramento Valley. However, after removing PM2.5 exceedances caused by the Bobcat and El Dorado Fires in September 2020, the Basin meets the 24-hour federal standard. PM2.5 design values in other California air basins affected by wildfires may also decrease after the exceptional event process is completed. PM10 design values exceeded the 24-hour federal standard in the Basin and all other California air basins shown in Figure 2-14, as well as in the Phoenix metro area. These values will likely decrease as the exceptional

Chapter 4: Control Strategy and Implementation

# Introduction

The control strategy in the 2022 Air Quality Management Plan (AQMP) provides the path to achieving emission reductions needed to meet the 2015 8-hour ozone NAAQS. Implementation of the 2022 AQMP will be based on a series of control measures and strategies that vary by source type (i.e., stationary or mobile) as well as by pollutant (i.e., NOx or VOC). This chapter outlines the proposed control strategy and the adoption and implementation schedule for the 2022 AQMP to achieve the 2015 8-hour ozone standard in the Basin and the Coachella Valley.

To meet the 2015 ozone standard, NOx emissions must be reduced by 124 tons per day, or about 67 percent over baseline levels by 2037, and about 83 percent below current levels. The preliminary baseline NOx emissions inventory is 184 tons per day in 2037. This baseline reflects already adopted regulations and other controls currently in place. Meanwhile, the carrying capacity – the maximum amount of NOx in the atmosphere that results in attaining the standard – is approximately 60 tons per day. The vast amount of NOx emission reductions needed to attain the standard poses a significant challenge. Traditional combustion controls and after controls will not be sufficient to achieve the level of NOx emission reduction needed for attainment. Instead, meeting the standard requires widespread adoption of zero emissions technologies where feasible, and the lowest emitting technologies where zero emission technologies are not feasible, across all emission sectors. Close collaboration with federal, State, and regional governments, businesses, and the public will be critical to tackling this challenge. Meeting the standard will also require that the federal government act to address sources that are subject to federal regulation and beyond the regulatory authority of the South Coast AQMD and California Air Resources Board (CARB).

The 2022 AQMP control strategy includes a variety of implementation approaches such as regulation, accelerated deployment of available cleaner technologies, best management practices, co-benefits from existing programs (e.g., climate, energy efficiency), incentives, and CAA section 182(e)(5) "black box" measures. Additional demonstration and commercialization projects will be crucial to help deploy and reduce costs for zero emission and low NOx technologies. A key element of AQMP implementation will be private and public funding from several sources to help further the development and deployment of these advanced technologies. Many of the same technologies will address both air quality and climate goals, such as increased energy efficiency and a transition to cleaner fuels. The total required emission reductions, technology readiness, cost-effectiveness, and economic impacts are critical considerations in developing a comprehensive and integrated control strategy.

# Overall Strategy

The most significant air quality challenge in the Basin, and the primary driver for the control strategy, is the significant amount of NOx emission reductions required to meet the standard by the required attainment date, August 3 2038 – which requires the needed emission reductions to be in effect in 2037.

The challenge associated with the amount of emission reductions to reach attainment is depicted in Figure 4-1. The figure demonstrates the baseline reductions and strategy reductions required to reach


4-1

(48 of 151), Page 48 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 48 of 151
Case 2:24-cv-10482-PA-PD   Document 55-1   Filed 05/12/25   Page 24 of 33   Page ID #:1584

Chapter 4: Control Strategy and Implementation

sources in the Basin are projected to be 41 tons per day in 2037, which is approximately two-thirds of the carrying capacity. While stationary sources within the South Coast AQMD are already subject to some of the most stringent regulations in the country, additional reductions will still be needed in this sector to get down to the 60 tons per day NOx carrying capacity.

The South Coast AQMD's proposed ozone control measures are comprised of stationary and mobile source measures. Stationary source categories include: residential, commercial and large equipment. Each group accounts for approximately one third of the entire stationary source inventory (see Figure 4-3). The control measures that cover stationary sources include traditional NOx controls, recognizing co-benefits from climate programs, incentives, limited, strategic VOC measures, and others. Stationary combustion sources can be replaced with new, lower or zero emission technologies, including low NOx or ultra-low NOx equipment and fuel cells for, but not limited to, combined heat and power (CHP). Electrification of equipment is another way to achieve substantial NOx emission reductions, especially when combined with renewable, non-combustion power generation. For residential and commercial water and space heating equipment, zero emission technologies are currently available as discussed in control measures R-CMB-01, R-CMB-02, C-CMB-01, and C-CMB-02.



Total NOx: 41.3 tons/day

FIGURE 4-3

STATIONARY SOURCE NOX EMISSIONS IN 2037

Substantial emission reductions will also be required from mobile sources to meet the standard. Mobile sources will account for about 80 percent of regional NOx emissions in 2037, or around 240 percent of the carrying capacity. Therefore, mobile source controls must be a significant part of the control strategy.

the rulemaking, staff will assess the universe of equipment. Incentive funds will be considered to facilitate adoption of zero emission technologies that would promote further emission reductions earlier than required. Commercial Combustion Source Measures

There are five stationary source measures aiming to reduce NOx emissions from commercial combustion equipment:

- C-CMB-01: Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Commercial Water Heating;
- C-CMB-02: Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Commercial Space Heating;
- C-CMB-03: Emission Reductions from Commercial Cooking Devices;
- C-CMB-04: Emission Reductions from Small Internal Combustion Engines; and
- C-CMB-05: NOx Reductions from Small Miscellaneous Commercial Combustion Equipment (Non-Permitted).

**C-CMB-01: EMISSION REDUCTIONS FROM REPLACEMENT WITH ZERO EMISSION OR LOW NOX APPLIANCES – COMMERCIAL WATER HEATING:** This control measure seeks to reduce NOx emissions from commercial building water heating sources that are subject to Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters. The measure proposes to: (1) develop a rule to require zero emission commercial water heating units for installations in both new and existing buildings; and (2) allow low NOx technologies as a transitional alternative when installing a zero emission unit is determined to be infeasible. This control measure would also provide incentive funds to facilitate adoption of zero emission technologies that would promote further emission reductions earlier than required.

**C-CMB-02: EMISSION REDUCTIONS FROM REPLACEMENT WITH ZERO EMISSION OR LOW NOX APPLIANCES – COMMERCIAL SPACE HEATING:** This control measure seeks to reduce NOx emissions from commercial building space heating sources. (i.e., forced air furnaces) with a rated heat input capacity between 175,000 and 2,000,000 BTU per hour. Those sources are currently not subject to the South Coast AQMD NOx rules. The measure proposes to: (1) develop rules to require zero emission commercial space heating units for installations in both new and existing buildings; and (2) allow low NOx technologies as a transitional alternative when installing a zero emission unit is determined to be infeasible. This control measure would also provide incentive funds to facilitate adoption of zero emission technologies that would promote further emission reductions earlier than required. Heat pumps have been broadly applied in commercial applications as the primary zero emission technology.

**C-CMB-03: EMISSION REDUCTIONS FROM COMMERCIAL COOKING DEVICES:** This control measure seeks to reduce NOx emissions from commercial cooking devices including stoves, ovens, griddles, broilers, and others in new and existing buildings. Replacing gas burners with electric cooking devices, induction cooktops, or low NOx gas burner technologies will reduce NOx emissions. NOx reductions will be pursued through a combination of regulatory approaches and incentive programs. Proposed method of control consists of two steps: step one includes a technology assessment of emissions testing of various cooking devices to establish emissions rates. Once emissions rates are defined, step two supports future rule development and incentive programs. The rule will apply to manufacturers, distributors, and installers


4-15



**FIGURE 5-7**
**INTERPOLATED 2037 CONTROLLED 8-HOUR OZONE CONCENTRATIONS (PPB)**
**(VALUES ARE COLOR-CODED TO CORRESPOND TO THE 2015 70 PPB AIR QUALITY INDEX)**

## Summary and Conclusions

Figure 5-8 shows the Basin-wide maximum 5-year weighted ozone base design value along with the projected design value for the attainment deadline of the 2015 8-hour federal standard (2037). Approximately 124 tons per day of NOx reductions from the 2037 baseline are needed to meet the 8-hour ozone standard in 2037 (see Figure 5-9). This equates to an approximately 67 percent reduction from the 2037 baseline (see Figure 5-10). With the controls proposed in this AQMP, future ozone concentrations are expected to meet the federal 2015 8-hour ozone standard by 2037.

California Ambient Air Quality Standards (CAAQS) are distinct from NAAQS. The current 8-hour and 1-hour ozone CAAQS are 70 ppb and 90 ppb, respectively. CAAQS are based on designation values, while NAAQS are based on design values. Due to the stringency of the CAAQS designation values, attainment is not anticipated in 2037 for either the 8-hour or 1-hour standard. Further emission reductions and additional time will be required to attain the CAAQS. A detailed analysis is presented in Appendix V.

# EXHIBIT 2

(52 of 151), Page 52 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30-1, Page 52 of 151
Case 2:24-cv-10482-PA-PD    Document 55-2    Filed 05/12/25    Page 2 of 18    Page ID
#:1595

# 2022 AQMP
# APPENDIX II

## CURRENT AIR QUALITY

**ADOPTED DECEMBER 2, 2022**

## Weather Factors

The climate of the South Coast AQMD jurisdiction varies considerably between the coastal zone, inland valleys, mountain areas, and deserts. Most of the Basin is relatively arid, with very little rainfall and abundant sunshine during the summer months. It has light winds and poor vertical mixing compared to most other large urban areas in the U.S. The combination of poor air dispersion and abundant sunshine provides conditions especially favorable to the formation of photochemical smog and the trapping of particulates and other pollutants. The Basin is bounded to the north and east by mountains with maximum elevations exceeding 10,000 feet. The unfavorable combination of meteorology, topography, and emissions from the nation's second largest urban area results in the Basin having some of the worst air quality in the U.S.

The prevailing daytime sea breeze tends to transport pollutants and precursor emissions from coastal areas into the Basin's inland valleys, and from there, even further inland into neighboring areas of the SSAB (especially the Coachella Valley) and the MDAB. Concentrations of primary pollutants (those emitted directly into the air) are typically highest close to the sources which emit them. However, secondary pollutants (those formed in the air by chemical reactions, such as ozone and the majority of PM2.5) reach maximum concentrations some distance downwind of the sources that emit the precursors as winds transport polluted air masses inland. As pollutants are transported beyond these areas into regions without significant emissions, dilution of the air mass results in a reduction in concentrations.

# Ambient Air Quality Standards

Both the federal government and the State of California have adopted ambient air quality standards, which define the concentration below which long-term or short-term exposure to a pollutant is not expected to cause adverse effects to public health and welfare. The criteria pollutants, those that have federal health-based National Ambient Air Quality Standards (NAAQS or federal standards), are: ozone ($O_3$), carbon monoxide (CO), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), coarse and fine particulate matter (PM10 and PM2.5, respectively), and lead (Pb). The State of California also has California Ambient Air Quality Standards (CAAQS or State standards) for these criteria pollutants, plus standards for sulfates, hydrogen sulfide ($H_2S$), and vinyl chloride ($C_2H_3Cl$), as well as a welfare-based standard for visibility-reducing particles.

For several of the NAAQS, there are both primary and secondary standards. Primary standards provide public health protection, including protecting the health of "sensitive" populations such as people with asthma, children, and the elderly. Secondary standards provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings. This document focuses mainly on the primary federal and State standards. The federal and State primary standards are summarized in Table 1-2, along with a brief summary of health and welfare effects. Further discussion of the health effects of air pollutants is presented in Chapter 2, and more detailed health information is presented in Appendix I: Health Effects.

(54 of 151), Page 54 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 54 of 151
Case 2:24-cv-10482-PA-PD    Document 55-3    Filed 05/12/25    Page 1 of 12    Page ID
#:1612

# EXHIBIT 3

---

# SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT

---

**Draft Staff Report for:**

**Proposed Amended Rule 1111 – Reduction of NOx Emissions From Natural Gas-Fired Furnaces**
**Proposed Amended Rule 1121 – Reduction of NOx Emissions From Residential Type, Natural Gas-Fired Water Heaters**

April 2025

**Deputy Executive Officer**
Planning, Rule Development and Implementation
Sarah L. Rees, Ph.D.

**Assistant Deputy Executive Officer**
Planning, Rule Development and Implementation
Michael Krause

**Planning and Rules Manager**
Planning, Rule Development and Implementation
Heather Farr

---

Authors:              Peter Campbell – Air Quality Specialist
                      Jennifer Vinh – Air Quality Specialist

Contributors:         Emily Yen – Air Quality Specialist
                      Marissa Poon – Administration Assistant
                      Jivar Afshar – Air Quality Specialist
                      Daniel Penoyer – Former Air Quality Specialist
                      Valerie Rivera – Air Quality Specialist
                      Joshua Ewell – Assistant Air Quality Specialist
                      Areio Soltani – Air Quality Specialist
                      James McCreary – Air Quality Specialist
                      Isabelle Shine – Program Supervisor
                      Michael Morris – Planning & Rules Manager

Reviewed by:        Yanrong Zhu – Program Supervisor
                    Barbara Baird – Chief Deputy Counsel
                    Ruby Laity – Former Principal Deputy District Counsel
                    Josephine Lee – Senior Deputy District Counsel
                    Xian-Liang (Tony) Tian, Ph.D. – Program Supervisor
                    Kevin Ni – Program Supervisor, CEQA
                    Barbara Radlein – Planning and Rules Manager

## INTRODUCTION

Rule 1111 – Reduction of NOx Emissions from Natural Gas-Fired Furnaces reduces nitrogen oxide emissions from gas-fired fan-type space heating furnaces with a rated heat input capacity of less than 175,000 Btu/hr or, for combination heating and cooling units, with a cooling rate of less than 65,000 Btu per hour. The rule applies to manufacturers, distributors, and installers of such furnaces. Most single-family homes, many multifamily residences, and some light commercial buildings in the South Coast AQMD use this type of space heating equipment.

Rule 1121 – Control of Nitrogen Oxides from Residential Type, Natural Gas-Fired Water Heaters aims to reduce NOx emissions from natural gas-fired residential water heaters with a rated heat input capacity less than 75,000 Btu/hr. This rule applies to manufacturers, distributors, retailers, and installers of natural gas-fired units and requires water heaters to meet a 10 ng/J emission limit and mobile home water heaters to meet a 40 ng/J emission limit. This rule does not apply to water heaters used in recreational vehicles or large water heaters subject to Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters (Rule 1146.2).

Rule 1111 and Rule 1121 require manufacturers to certify that each natural gas unit model offered for sale in the South Coast AQMD complies with the emission limit using the test methods approved by the South Coast AQMD and U.S. EPA.

## RULE 1111 REGULATORY HISTORY

Rule 1111 was adopted by the South Coast AQMD Governing Board in December 1978. The original rule required the applicable space heating furnaces to meet a NOx emission limit of 40 ng/J of heat output, which equivalent to a concentration of 61 parts per million by volume (ppmv) at a reference level of 3 percent oxygen and 80 percent Annual Fuel Utilization Efficiency (AFUE), beginning January 1, 1984.

### NOx Emission Limit of 14 ng/J Established

Rule 1111 was amended in November 2009 to implement the 2007 AQMP Control Measure CMB-03. The 2009 amendment established a new lower NOx emission limit of 14 ng/J (equivalent to 22 ppmv at a reference level of 3 percent oxygen and 80 percent AFUE) and required the three major categories of residential furnaces, condensing (high efficiency), non-condensing (standard), and weatherized furnaces to meet the new limit by October 1, 2014, October 1, 2015, and October 1, 2016, respectively. Furthermore, new mobile home heating units, which were unregulated prior to the 2009 amendment, were required to meet a NOx limit of 40 ng/J by October 1, 2012, and 14 ng/J by October 1, 2018. To facilitate the depletion of existing inventories and to ensure a smooth transition to the new limits, Rule 1111 also provided a temporary 10-month exemption (e.g., a sell-through period) for units manufactured and delivered into the South Coast AQMD prior to the compliance date.

### Mitigation Fee to Delay Compliance of 14 ng/J Furnaces

Rule 1111 was amended in September 2014 to provide an alternative compliance option. The alternative compliance option allowed original equipment manufacturers (OEM) to pay a per-unit mitigation fee for each furnace with NOx emissions certificated at 40 ng/J distributed or sold in South Coast AQMD, in lieu of meeting the 14 ng/J NOx emission limit.

(58 of 151), Page 58 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 58 of 151
Case 2:24-cv-10482-PA-PD   Document 55-3   Filed 05/12/25   Page 10 of 12   Page ID
#:1621

Chapter 1                                                              Background

Rule 1111 was amended six times from 2018 to 2023 to extend the mitigation fee end dates, increase mitigation fees, and allow limited exemptions for furnaces at high-altitude.

The mitigation fee end date for each type of furnaces is listed in the following table. All furnace types have transitioned to 14 ng/J, except for mobile home furnaces, which constitute about four percent residential furnace market share of the region. The mitigation fee alternative compliance option for mobile home furnaces will end by September 30, 2025, according to the current rule language.

**Table 1-1: Mitigation Fee Option End Dates**

| Furnace Category | Mitigation Fee Option End Date |
|------------------|-------------------------------|
| Condensing | September 30, 2019 |
| Non-condensing | September 30, 2019 |
| Weatherized | September 30, 2021 |
| Mobile Home | September 30, 2025 |

**Clean Air Furnace Rebate Program**

In March 2018, the South Coast AQMD developed a rebate program for consumers who purchased and installed future compliant 14 ng/J furnaces in the South Coast AQMD. The purpose of the rebate program was to help commercialize future compliant furnaces and incentivize consumers to purchase and install them. On May 4, 2018, the South Coast AQMD executed the contract with Electric & Gas Industries Association (EGIA) to administer the Clean Air Furnace Rebate Program. On June 28, 2018, the rebate website was launched. The South Coast AQMD Governing Board initially approved funding of $3 million for the furnace rebate program, specifying a $500 rebate for each compliant furnace. In September 2020, the Governing Board approved additional funding of $3.5 million, modifying the program to specify a $500 rebate for up to 600 compliant weatherized furnaces, a $500 rebate for up to 200 high-altitude compliant condensing or non-condensing furnace installations, and a $1,500 rebate for each all-electric heat pump for central ducted space heating. Rebates for weatherized and high-altitude condensing and non-condensing furnaces ended on September 30, 2021, when remaining funds for those categories were reallocated for all-electric heat pump systems. Rebates for all-electric heat pump systems concluded in April of 2023 when funds were exhausted. The Clean Air Furnace Rebate Program incentivized the installation of over 5,300 ultra-low NOx furnaces for early implementation of 14 ng/J limit and over 2,400 all-electric heat pump installations after the implementation of 14 ng/J limit, with 25 percent of all-electric heat pump funds allocated to disadvantaged communities.

**2022 AQMP Control Measure**

In the 2022 AQMP, the Governing Board adopted control measure R-CMB-02: Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Residential Space Heating which proposed the development of zero-emission NOx limits for residential space heating when feasible. The 2022 AQMP Policy Brief for Residential and Commercial Building

(59 of 151), Page 59 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 59 of 151
Case 2:24-cv-10482-PA-PD    Document 55-3    Filed 05/12/25    Page 11 of 12    Page ID
#:1622

Chapter 1                                                                    Background

Appliances[1] cited heat pumps as an energy-efficient, zero-NOx emission alternative to NOx-emitting natural gas furnaces.

## PAR 1111 AFFECTED INDUSTRIES

PAR 1111 affects manufacturers, distributors, retailers, resellers, and installers of natural gas-fired furnaces for space heating with a rated heat input capacity less than 175,000 Btu/hr, or for combination heating and cooling units, a cooling rate of less than 65,000 Btu per hour. There are no OEMs of gas-fired furnaces located in the South Coast AQMD; however, these companies maintain regional sales offices and distribution centers in the South Coast AQMD with supply chains to support their products. The units affected by the proposed rule are mostly used in residential buildings for space heating.

The following table shows the North American Industry Classification System (NAICS) for the industries affected by PAR 1111. Staff estimated approximately 5,200,000 units in the South Coast AQMD are regulated by PAR 1111.

### Table 1-2: PAR 1111 Affected Industries

| Affected Industry | NAICS |
|---|---|
| Heating Equipment (except Warm Air Furnaces) Manufacturing | 333414 |
| Air-Conditioning and Warm Air Heating Equipment and Commercial and Industrial Refrigeration Equipment Manufacturing | 333415 |
| Motor and Generator Manufacturing | 335312 |
| Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | 423610 |
| Heating, Ventilation, and Air Conditioning (HVAC) Equipment Merchant Wholesalers | 423730 |
| Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | 423620 |
| Installers | 238 |

## RULE 1121 REGULATORY HISTORY

Rule 1121 was adopted by the South Coast AQMD's Governing Board on December 1, 1978. The objective of the rule is to reduce NOx emissions from natural gas-fired residential water heaters.

---

[1] The South Coast AQMD, Residential and Commercial Building Appliances, http://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/buildings_final.pdf

(60 of 151), Page 60 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 60 of 151
Case 2:24-cv-10482-PA-PD   Document 55-3   Filed 05/12/25   Page 12 of 12   Page ID
#:1623

Chapter 1                                                                    Background

Rule 1121 applies to manufacturers, distributors, retailers, and installers of residential natural gas-fired water heaters less than 75,000 Btu per hour.

Starting in 1982, Rule 1121 required that gas-fired water heaters meet a NOx emission limit of 40 ng/J of heat output, except gas-fired mobile home water heaters, which were required to meet a NOx emission limit of 50 ng/J of heat output.

**NOx Emission Limit of 10 ng/J Established**

In December 1999, Rule 1121 was amended to reduce the NOx emission limit. The amendment reduced the NOx limit in two steps from 40 ng/J to 20 ng/J on July 1, 2002, and 10 ng/J on January 1, 2005. The mobile home water heater emission limit was reduced from 50 ng/J to 40 ng/J, effective on and after January 1, 2000. Alternate equivalent emission limits expressed in part per million were also added. The rule also required manufacturers to provide a report by July 1, 2003, on their progress toward meeting the final emission limit in the rule.

Rule 1121 was included in the Settlement Agreement for the 1999 AQMP amendment. The Settlement Agreement included a commitment to begin the lower emissions limits implementation by 2005, allowing up to a 1-year extension to the implementation, or additional extensions if the Governing Board makes a finding of infeasibility.

**Request a Delay in the Compliance Date**

Manufacturers reported their progress towards meeting the emission limits by July 2003 and requested a delay in the compliance date and exemptions for power vented and direct vented water heaters. In addition, manufacturers requested to delay residential water heaters less than 50 gallons for one year and residential water heaters greater than 50 gallons for an additional two years.

Staff submitted a report to the Governing Board in January 2004, where the January 2005 compliance date was found to be infeasible, and the Governing Board directed staff to proceed with the rule development.

**Extension of Compliance Date and Mitigation Fee**

The most recent amendment to Rule 1121 in September 2004 extended the emission limit of 10 ng/J by one year for conventional water heaters less than or equal to 50 gallons, two years for conventional water heaters greater than 50 gallons, and three years for direct-vent, power-vent, and power direct-vent water heaters. The mitigation fee program for the interim rule limit was extended for three years and changed from $1.80 per water heater to $3.00 per water heater. The rule also required manufacturers to provide a report on progress towards meeting the interim and final rule limits for direct-vent, power-vent, and power direct-vent water heaters. The mitigation fee period ended when the 10 ng/J emissions limit was implemented from 2006-2008, depending on water heater type.

**2022 AQMP Control Measure**

In the 2022 AQMP, the Governing Board adopted control measure R-CMB-01: Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Residential Water Heating. The control measure proposed the development zero-NOx emission standards for water heating appliances installed in new and existing buildings, when feasible. All-electric heat pumps were mentioned as an option for zero-emission water heating.

# EXHIBIT 4

SER-61

(62 of 151), Page 62 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 62 of 151
Case 2:24-cv-10482-PA-PD    Document 55-4    Filed 05/12/25    Page 2 of 24    Page ID
#:1625

(Adopted September 9, 1988)(Amended January 6, 1989)(Amended May 13, 1994)
(Amended June 16, 2000)(Amended November 17, 2000)(Amended September 5, 2008)
(Amended November 1, 2013)(Amended December 7, 2018)
(Amended December 4, 2020)

## RULE 1146.  EMISSIONS OF OXIDES OF NITROGEN FROM INDUSTRIAL, INSTITUTIONAL, AND COMMERCIAL BOILERS, STEAM GENERATORS, AND PROCESS HEATERS

(a)    Applicability

This rule applies to boilers, steam generators, and process heaters of equal to or greater than 5 million Btu per hour rated heat input capacity used in all industrial, institutional, and commercial operations.

(b)    Definitions

(1)    ADSORPTION CHILLER UNIT means any natural gas fired unit that captures and uses waste heat to provide cold water for air conditioning and other process requirements.

(2)    ANNUAL HEAT INPUT means the total heat input to a unit during a calendar year.

(3)    ATMOSPHERIC UNIT means any natural gas fired unit with a heat input less than or equal to 10 million Btu per hour with a non-sealed combustion chamber in which natural draft is used to exhaust combustion gases.

(4)    BOILER or STEAM GENERATOR means any combustion equipment fired with liquid and/or gaseous (including landfill and digester gas) and/or solid fossil fuel and used to produce steam or to heat water, and that is not used exclusively to produce electricity for sale. Boiler or Steam Generator does not include any open heated tank, adsorption chiller unit, or waste heat recovery boiler that is used to recover sensible heat from the exhaust of a combustion turbine or any unfired waste heat recovery boiler that is used to recover sensible heat from the exhaust of any combustion equipment.

(5)    BTU means British thermal unit(s).

(6)    COMMERCIAL OPERATION means any office building, lodging place, or similar location designed for tenancy by one or more business entities or residential occupants.

(7)    FIRE-TUBE BOILER means any boiler that passes hot gases from a fire box through one or more tubes running through a sealed container of water.  The

(63 of 151), Page 63 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 63 of 151
Case 2:24-cv-10482-PA-PD    Document 55-4    Filed 05/12/25    Page 4 of 24    Page ID
#:1627

**Rule 1146 (Cont.)**                                        **(Amended December 4, 2020)**

(18)     NON-RECLAIM FACILITY means a facility, or any of its successors, that was not in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX.

(19)     NOx EMISSIONS means the sum of nitric oxides and nitrogen dioxides emitted, calculated as nitrogen dioxide.

(20)     OPEN HEATED TANK means a non-pressurized self-heated tank that may include a cover or doors that can be opened or detached to put in or remove parts, components or other material for processing in the tank. Tanks heated solely by an electric heater, boiler, thermal fluid heater or heat recovered from another process using heat exchangers are excluded from this definition.

(21)     PROCESS HEATER means any combustion equipment fired with liquid and/or gaseous (including landfill and digester gas) and/or solid fossil fuel and which transfers heat from combustion gases to water or process streams. Process Heater does not include any kiln or oven used for drying, curing, baking, cooking, calcining, or vitrifying; or any unfired waste heat recovery heater that is used to recover sensible heat from the exhaust of any combustion equipment.

(22)     RATED HEAT INPUT CAPACITY means the heat input capacity as specified by the permit issued by the Executive Officer, or if not specified on the permit, as specified on the nameplate of the combustion unit. If the combustion unit has been altered or modified such that its maximum heat input is different than the heat input capacity specified on the nameplate, the new maximum heat input shall be considered as the rated heat input capacity.

(23)     RECLAIM FACILITY means a facility, or any of its successors, that was in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX.

(24)     SCHOOL means any public or private school, including juvenile detention facilities with classrooms, used for purposes of the education of more than 12 children at the school, including in kindergarten and grades 1 to 12, inclusive, but does not include any private school in which education is primarily conducted in private homes. The term includes any building or structure, playground, athletic field, or other area of school property, but does not include unimproved school property.

(25)     THERM means 100,000 Btu.

(64 of 151), Page 64 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 64 of 151
Case 2:24-cv-10482-PA-PD    Document 55-4    Filed 05/12/25    Page 5 of 24   Page ID
#:1628

**Rule 1146 (Cont.)**                    **(Amended December 4, 2020)**

(26)    THERMAL FLUID HEATER means a natural gas fired process heater in which a process stream is heated indirectly by a heated fluid other than water.

(27)    UNIT means any boiler, steam generator, or process heater as defined in paragraph (b)(4) or (b)(21) of this subdivision.

(c)    Requirements

Notwithstanding the exemptions contained in Rule 2001 – Applicability, Table 1 – Rules Not Applicable to RECLAIM Facilities for Requirements Pertaining to NOx Emissions If Rule Was Adopted or Amended Prior to October 5, 2018, the owner or operator of any unit(s) subject to this rule shall not operate the unit in a manner that exceeds the applicable emission limits specified in paragraphs (c)(1), (c)(2), and (c)(3), and shall comply with the applicable requirements in paragraphs (c)(4) to (c)(10).

(1)    The owner or operator shall subject all of the units within the facility to comply with the applicable NOx emission limits specified in Table 1146-1:

Rule 1146 (Cont.)                                         (Amended December 4, 2020)

Table 1146-1 – NOx Emission Limits and Compliance Schedule

| Rule Reference | Category | Limit[1] | Compliance Schedule for Non-RECLAIM Facilities | Compliance Schedule for RECLAIM and Former RECLAIM Facilities |
|---|---|---|---|---|
| (c)(1)(A) | All Units Fired on Gaseous Fuels | 30 ppm or for natural gas fired units 0.036 lbs/$10^6$ Btu | September 5, 2008 | See Rule 1100 – Implementation Schedule for NOx Facilities |
| (c)(1)(B) | Any Units Fired on Non-gaseous Fuels | 40 ppm | September 5, 2008 | |
| (c)(1)(C) | Any Units Fired on Landfill Gas | 25 ppm | January 1, 2015 | |
| (c)(1)(D) | Any Units Fired on Digester Gas | 15 ppm | January 1, 2015 | |
| (c)(1)(E) | Atmospheric Units | 12 ppm or 0.015 lbs/$10^6$ Btu | January 1, 2014 | |
| (c)(1)(F) | Group I Units | 5 ppm or 0.0062 lbs/$10^6$ Btu | January 1, 2013 | |
| (c)(1)(G) | Group II Units (Fire-tube boilers with a previous NOx limit less than or equal to 9 ppm and greater than 5 ppm prior to December 7, 2018) | 7 ppm or 0.0085 lbs/$10^6$ Btu | See (c)(6)(A) | |
| (c)(1)(H) | Group II Units (All others with a previous NOx limit less than or equal to12 ppm and greater than 5 ppm prior to December 7, 2018) | 9 ppm or 0.011 lbs/$10^6$ Btu | January 1, 2014 | |
| (c)(1)(I) | Group II Units (All others) | 5 ppm or 0.0062 lbs/$10^6$ Btu | December 7, 2018 | |
| (c)(1)(J) | Group III Units (Fire-tube boilers, excluding units with a previous NOx limit less than or equal to 12 ppm and greater than 9 ppm prior to December 7, 2018) | 7 ppm or 0.0085 lbs/$10^6$ Btu | December 7, 2018 or See (c)(6)(B) for units with a previous NOx limit less than or equal to 9 ppm prior to December 7, 2018 | |
| (c)(1)(K) | Group III Units (All others) | 9 ppm or 0.011 lbs/$10^6$ Btu | January 1, 2015 or See (c)(7) for units with a previous NOx limit less than or equal to 12 ppm prior to September 5, 2008 | |
| (c)(1)(L) | Thermal Fluid Heaters | 12 ppm or 0.015 lbs/$10^6$ Btu | December 7, 2018 or See (c)(6)(C) for units with a previous NOx limit less than or equal to 20 ppm prior to December 7, 2018 or See (e)(2) for units with a previous NOx limit greater than 20 ppm prior to December 7, 2018 | |

[1]All parts per million (ppm) emission limits are referenced at 3 percent volume stack gas oxygen ($O_2$) on a dry basis averaged over a period of 15 consecutive minutes or pounds per million Btu (lbs/$10^6$ Btu).

# EXHIBIT 5

SER-66

(67 of 151), Page 67 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 67 of 151
Case 2:24-cv-10482-PA-PD    Document 55-5    Filed 05/12/25    Page 2 of 20    Page ID
#:1649

(Adopted October 5, 1990)(Amended July 10, 1992)(Amended May 13, 1994)
(Amended September 5, 2008)(Amended November 1, 2013)
(Amended December 7, 2018)

## RULE 1146.1.    EMISSIONS OF OXIDES OF NITROGEN FROM SMALL INDUSTRIAL, INSTITUTIONAL, AND COMMERCIAL BOILERS, STEAM GENERATORS, AND PROCESS HEATERS

(a)    Applicability

This rule applies to boilers, steam generators, and process heaters that are greater than 2 million Btu per hour and less than 5 million Btu per hour rated heat input capacity used in any industrial, institutional, or commercial operation.

(b)    Definitions

(1)    ADSORPTION CHILLER UNIT means any natural gas fired unit that captures and uses waste heat to provide cold water for air conditioning and other process requirements.

(2)    ANNUAL HEAT INPUT means the total heat input to a unit during a calendar year, based on the fuel's higher heating value.

(3)    ATMOSPHERIC UNIT means any natural gas fired unit with a non-sealed combustion chamber in which natural draft is used to exhaust combustion gases.

(4)    BOILER OR STEAM GENERATOR means any combustion equipment fired with liquid and/or gaseous (including landfill and digester gas) and/or solid fossil fuel and used to produce steam or to heat water, and that is not used exclusively to produce electricity for sale.  Boiler or Steam Generator does not include any open heated tank, adsorption chiller unit, or waste heat recovery boiler that is used to recover sensible heat from the exhaust of a combustion turbine or any unfired waste heat recovery boiler that is used to recover sensible heat from the exhaust of any combustion equipment.

(5)    BTU means British thermal unit(s).

(6)    COMMERCIAL OPERATION means any office building, lodging place, or similar location designed for tenancy by one or more business entities or residential occupants.

(7)    FIRE-TUBE BOILER means any boiler that passes hot gases from a fire box through one or more tubes running through a sealed container of water.  The

SER-67

(68 of 151), Page 68 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 68 of 151
Case 2:24-cv-10482-PA-PD   Document 55-5   Filed 05/12/25   Page 4 of 20   Page ID
#:1651

**Rule 1146.1 (Cont.)**                                          **(Amended December 7, 2018)**

Process Heater does not include any kiln or oven used for drying, curing, baking, cooking, calcining, or vitrifying; or any unfired waste heat recovery heater that is used to recover sensible heat from the exhaust of any combustion equipment.

(19)  RATED HEAT INPUT CAPACITY means the heat input capacity as specified by the permit issued by the Executive Officer, or if not specified on the permit, as specified on the nameplate of the combustion unit. If the combustion unit has been altered or modified such that its maximum heat input is different than the heat input capacity specified on the nameplate, the new maximum heat input shall be considered as the rated heat input capacity.

(20)  RECLAIM FACILITY means a facility, or any of its successors, that was in the Regional Clean Air Incentives Market as of January 5, 2018, as established in Regulation XX.

(21)  THERM means 100,000 Btu.

(22)  THERMAL FLUID HEATER means a natural gas fired process heater in which a process stream is heated indirectly by a heated fluid other than water.

(23)  UNIT means any boiler, steam generator, or process heater as defined in paragraph (b)(4) or (b)(18).

(c)  Requirements

Notwithstanding the exemptions contained in Rule 2001 – Applicability, Table 1 – Rules Not Applicable to RECLAIM Facilities for Requirements Pertaining to NOx Emissions If Rule Was Adopted or Amended Prior to October 5, 2018, the owner or operator of any unit(s) subject to this rule shall not operate the unit in a manner that exceeds the applicable emission limits specified in paragraphs (c)(1), (c)(2), and (c)(3).

(1)  An owner or operator of any unit subject to subdivision (a) must comply with the applicable NOx emission limits specified in Table 1146.1-1:

**SER-68**

(69 of 151), Page 69 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 69 of 151
Case 2:24-cv-10482-PA-PD   Document 55-5   Filed 05/12/25   Page 5 of 20   Page ID
#:1652

**Rule 1146.1 (Cont.)**          **(Amended December 7, 2018)**

## Table 1146.1-1 – NOx Emission Limits and Compliance Schedule

| Rule Reference | Category | Limit[1] | Compliance Schedule for Non-RECLAIM Facilities | Compliance Schedule for RECLAIM and Former RECLAIM Facilities |
|---|---|---|---|---|
| (c)(1)(A) | All Other Units | 30 ppm or for natural gas fired units 0.036 lbs/$10^6$ Btu | September 5, 2008 | See Rule 1100 – Implementation Schedule for NOx Facilities |
| (c)(1)(B) | Any Units Fired on Landfill Gas | 25 ppm | January 1, 2015 | |
| (c)(1)(C) | Any Units Fired on Digester Gas | 15 ppm | January 1, 2015 | |
| (c)(1)(D) | Atmospheric Units | 12 ppm or 0.015 lbs/$10^6$ Btu | January 1, 2014 | |
| (c)(1)(E) | Any Units Fired on Natural Gas, excluding Fire-tube Boilers subject to (c)(1)(F), Atmospheric Units, and Thermal Fluid Heaters | 9 ppm or 0.011 lbs/$10^6$ Btu | January 1, 2014 or<br><br>See (c)(6) for units with a previous NOx limit less than or equal to 12 ppm and greater than 9 ppm prior to September 5, 2008 | |
| (c)(1)(F) | Any Fire-tube Boilers Fired on Natural Gas, excluding units with less than or equal to 12 ppm and greater than 9 ppm prior to December 7, 2018 | 7 ppm or 0.0085 lbs/$10^6$ Btu | December 7, 2018 or<br><br>See (c)(5)(A) for units complying with a previous NOx emission limit that is less than or equal to 9 ppm prior to December 7, 2018 | |
| (c)(1)(G) | Thermal Fluid Heaters | 12 ppm or 0.015 lbs/$10^6$ Btu | December 7, 2018 or<br><br>See (c)(5)(B) for units with a previous NOx limit less than or equal to 20 ppm prior to December 7, 2018 or<br><br>See (e)(2) for units with a previous NOx limit greater than 20 ppm prior to December 7, 2018 | |

[1] All parts per million (ppm) emission limits are referenced at 3 percent volume stack gas oxygen on a dry basis averaged over a period of 15 consecutive minutes.

    (2)    For dual fuel co-fired combustion units a weighted average emission limit calculated by Equation 1146.1-1 may be used in lieu of the emission limits of Table 1146.1-1 provided a totalizing fuel flow meter is installed pursuant to paragraph (c)(7), for units burning a combination of both fuels.

(70 of 151), Page 70 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 70 of 151
Case 2:24-cv-10482-PA-PD   Document 54   Filed 05/12/25   Page 1 of 10   Page ID
#:1528

1  MATTHEW D. ZINN (CA Bar No. 214587)
   Zinn@smwlaw.com
2  LAUREN M. TARPEY (CA Bar No. 321775)
   Ltarpey@smwlaw.com
3  RYAN K, GALLAGHER (CA Bar No. 344349)
   Rgallagher@smwlaw.com
4  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
5  San Francisco, California 94102
   Telephone: (415) 552-7272
6  Facsimile:  (415) 552-5816

7  Attorneys for Defendant South Coast Air
   Quality Management District
8
   (additional counsel on following page)
9

10              UNITED STATES DISTRICT COURT

11     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  RINNAI AMERICA CORP., et al,          Case No. 2:24-cv-10482 PA (PDx)

14           Plaintiffs,                   **DECLARATION OF MICHAEL
                                           KRAUSE IN SUPPORT OF
15                                         DEFENDANT'S OPPOSITION
                                           TO PLAINTIFFS' MOTION FOR
16       v.                                SUMMARY JUDGMENT AND IN
                                           SUPPORT OF DEFENDANT'S
17  SOUTH COAST AIR QUALITY               CROSS-MOTION FOR
    MANAGEMENT DISTRICT,                  SUMMARY JUDGMENT**
18
19           Defendant.                    Date:       July 14, 2025
                                           Time:       1:30 p.m.
20  and                                    Courtroom:  9A
21
    PEOPLE'S COLLECTIVE FOR               The Hon. Percy Anderson
22  ENVIRONMENTAL JUSTICE,
    SIERRA CLUB, and                      Trial Date:  September 30, 2025
23  INDUSTRIOUS LABS,
24
25           Defendant-Intervenors.
26
27
28

---

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

BAYRON T. GILCHRIST (CA Bar No. 212393)
General Counsel
BARBARA BAIRD (CA Bar No. 81507)
Chief Deputy District Counsel
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
21865 Copley Drive
Diamond Bar, California 91765
Telephone: (909) 396-3400
Facsimile:  (909) 396-2961
bghilchrist@aqmd.gov

Attorneys for Defendant South Coast Air
Quality Management District

2

(72 of 151), Page 72 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 72 of 151
Case 2:24-cv-10482-PA-PD    Document 54    Filed 05/12/25    Page 3 of 10    Page ID
#:1530

1      I, MICHAEL KRAUSE, declare as follows:

2      1.    I am Assistant Deputy Executive Officer for the South Coast Air
3 Quality Management District ("District"), reporting to Dr. Sarah Rees. I make
4 this declaration based upon my personal knowledge of the facts and expertise in
5 the matters set forth herein, my review of the relevant documents discussed
6 below, and (where indicated) information provided by my colleagues at the
7 District. If called as a witness, I could and would competently testify to the
8 matters stated herein. I make this declaration in support of Defendants'
9 opposition to the motion for summary judgment filed by Plaintiffs and in support
10 of Defendant's cross-motion for summary judgment. I have carefully reviewed the
11 Motions and opposition and am familiar with the arguments they advance.

12      2.    I earned my Bachelors of Science degree in Petroleum Engineering
13 from the Colorado School of Mines in Golden, Colorado. I have worked for the
14 District for 34 years, starting as an Air Quality Engineer for five years. As an Air
15 Quality Engineer, I processed permit applications for boilers, heaters, engines,
16 gas station equipment, and coatings. Thereafter I worked in and subsequently
17 supervised the California Environmental Quality Act ("CEQA") section of the
18 Planning and Rules Division. In that role, I analyzed and supervised staff in the
19 preparation of CEQA documents analyzing the environmental impacts of permits
20 (e.g. refineries), rules, and air quality management plans. I was promoted to
21 Planning & Rules Manager in June 2016 and to Assistant Deputy Executive
22 Officer in February 2021.

23      3.    For the last ten years, I have managed rule development in the areas
24 of ozone and particulate matter emission reductions; air monitoring; reducing air
25 toxics; regulating emissions from coatings and solvents; and zero-emission rules.
26 As Assistant Deputy Executive Officer I manage almost all rule development
27 efforts at the District, as well as the CEQA and socioeconomic impact analysis

28

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

1   functions. Staff works closely under my direction and control to develop rules that

2   will obtain the greatest feasible amount of emission reductions, taking into

3   consideration economic and other impacts.

4        4.      As part of my duties as Assistant Deputy Executive Officer, I managed

5   the development of Rule 1146.2, Emissions of Oxides of Nitrogen from Large

6   Water Heaters and Small Boilers and Process Heaters, which was adopted on

7   June 7, 2024. I was closely involved in every aspect of rule development, including

8   working groups; public workshops; meetings with manufacturers, users, and

9   other stakeholders; Board Committee presentations; and development of the rule

10  structure.

11                          **Rule Development Process**

12       5.      As explained in the Declaration of Dr. Sarah Rees, the District's 2022

13  Air Quality Management Plan ("2022 Plan") sets out a path to achieve and

14  maintain U.S. EPA's 2015 ozone standard.

15       6.      Staff researched zero-emission technologies as part of the

16  development of the 2022 Plan, and continued to investigate the applicability of

17  such technology to sources covered by Rule 1146.2 in the subsequent months.

18       7.      Formal development of Rule 1146.2 began with a working group

19  meeting on April 26, 2023. Staff conducted four more working group meetings

20  throughout 2023, on June 7, August 30, October 19, and December 13.

21       8.      The purpose of the working group meetings is for the public to learn

22  about the current rule proposals, provide comments and data for staff to consider,

23  ask questions, and share any concerns they may have. The working groups were

24  attended by affected industries and users, as well as environmental groups.

25       9.      As part of the rule development process, District staff is required to

26  conduct various analyses of the proposed rule, including a cost-effectiveness

27  analysis, a CEQA analysis, a comparative analysis (comparing to other rules for

28

                                         4

---

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

(74 of 151), Page 74 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 74 of 151
Case 2:24-cv-10482-PA-PD    Document 54    Filed 05/12/25    Page 5 of 10    Page ID
#:1532

1   the same sources), and a socioeconomic analysis. Cost-effectiveness refers to the

2   cost per ton of emission reductions that the rule will obtain.

3       10.    During the course of rule development, staff met with a wide variety

4   of interested parties, including equipment manufacturers; installers; government

5   agencies including the U.S. Environmental Protection Agency (EPA), the

6   California Air Resources Board, and the California Public Utilities Commission;

7   utilities including Southern California Gas Company, Southern California

8   Edison, and Los Angeles Department of Water and Power; various air agencies;

9   organizations representing the building industry, apartment owners, drycleaners,

10  and industry groups; and environmental groups. Staff conducted over 50

11  stakeholder meetings throughout the rule development process. We also made 26

12  site visits to observe both zero-emission equipment and equipment that would

13  need to be replaced under the proposed rule, learning about any difficulties that

14  might be presented at that site.

15      11.    The District held a public workshop on the proposed rule on February

16  7, 2024. The public workshop is very similar to a working group meeting. It is

17  required by state law for most rules (*see* Cal. Health & Safety Code § 40440.7),

18  and staff must make available to the public the proposed rule, a preliminary draft

19  staff report, and any other materials relevant to the subject of the workshop.

20      12.    The District also held a public consultation meeting on the proposed

21  rule on February 12, 2024.

22      13.    District staff also presented the proposed rule and sought input at

23  three meetings of the Stationary Source Committee on March 14, April 19, and

24  May 17, 2024. The Stationary Source Committee is a standing committee of less

25  than a quorum of the Governing Board, which reviews rules applicable to

26  stationary sources of air pollution. At these meetings, Governing Board Members

27  and members of the public learned about the rule proposals and were able to ask

28

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

1  questions and provide input.

2      14.    Throughout the public process, staff was sensitive to the concerns

3  raised by manufacturers, installers, users, and industry associations regarding

4  the availability of zero-emission technology, the costs of implementation, and

5  possible hurdles to implementation. As a result, the final rule includes a number

6  of provisions to alleviate these concerns.

7      15.    District staff also developed alternative compliance options and other

8  provisions to address stakeholders' concerns. Our goal was to minimize any

9  burden on equipment users while still obtaining significant emissions reductions.

10          **Compliance with Rule 1146.2 Using Natural Gas Equipment**

11      16.    As part of the 2022 Plan and the rule development process, staff

12  investigated various technologies that could reach a zero-NOx emissions limit,

13  including heat pump technology, electric resistance technology, solar water

14  heater technology, and fuel cell technology. District's Final Staff Report: Proposed

15  Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water

16  Heaters, Small Boilers and Process Heaters ("Final Staff Report"), available at

17  Dkt. 50-2, Ex. 2 at 096-099 (p. 2-8 – 2-11). While recognizing that natural gas fuel

18  cells produce some emissions, the staff report concluded that fuel cells have the

19  potential to replace existing units to meet zero-emission limits. *Id.* at 099 (p. 2-

20  11). The Staff Report also mentions the University of California at Irvine project

21  that will integrate fuel cells into an all-electric project. *Id.* at 120 (p. 2-32).

22      17.    As described by the United States Department of Energy ("DOE"), fuel

23  cells use an electrochemical process to convert the chemical energy in a fuel to

24  electricity. A true and correct copy of the DOE's 2016 Fact Sheet on Combined

25  Heat and Power Technology ("DOE Fact Sheet") is attached hereto as **Exhibit 1**.

26      18.    According to the DOE, a fuel cell converts a fuel, such as natural gas

27  or biogas, into electricity, without combusting the fuel. Ex. 1 at 2 (DOE Fact

28

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)                                                    **SER-75**

1  Sheet, p. 1). The fuel cell converts the fuel into hydrogen, which is then reacted to

2  generate electricity. *See id.*

3      19.    The component parts of commercially available fuel cells typically are

4  a fuel cell stack, a fuel processor (also known as a reformer), and a power

5  conditioner. *Id.* The fuel processor converts the fuel, such as natural gas or biogas,

6  into a hydrogen-rich feed stream for the fuel cell stack. *Id.* Some NOx emissions

7  may result from the fuel cell reformer. *Id.* at 5 (p. 4).

8      20.    A fuel cell stack then uses an electrochemical process to convert the

9  hydrogen  into electricity, which does not result in NOx emissions. *Id.* at 5 (p. 4).

10 A fuel cell element (one part of a fuel cell stack) consists of a cathode (a positively

11 charged electrode), an anode (a negatively charged electrode), and an electrolyte.

12 *Id.* Hydrogen and oxygen are fed to the anode and cathode respectively, and

13 chemical reactions occur in the presence of catalysts at the anode and cathode. *Id.*

14 The chemical reactions generate ions and electrons that produce direct current

15 ("DC") electricity and water. *Id.* Individual fuel cell elements create low voltage,

16 so usually a hundred or more single cells are combined to generate voltage in the

17 range of 200 to 400 volts DC. *Id.* The fuel cell stack is typically packaged with a

18 power conditioner that converts the DC electricity to alternating current ("AC").

19 *Id.*

20     21.    Fuel cells generate excess heat as a byproduct of producing electricity.

21 *See id.* at 2, 4 (p. 1, 3). This waste heat can be captured and used for heating

22 purposes, making fuel cells attractive for combined heat and power ("CHP")

23 applications. *Id.* at 2 (p. 1). A natural gas fuel cell CHP can provide electricity to

24 a building as well as use waste heat for water heating. *See id.* at 2 (p. 1).

25     22.    In a CHP system, the equipment that is heated by the waste heat

26 generated from the natural gas fuel cell is a zero-emission unit.

27

28

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

23.   A fuel cell CHP system could be used to generate zero-NOx emission waste heat that is used to heat water, even if the fuel cell reformer generates minimal amounts of NOx. Because the fuel cell stack has no emissions itself, a natural gas fuel cell used in a CHP configuration would be considered compliant with Rule 1146.2.

24.   The District has previously considered commercial food ovens to meet a zero-NOx emissions standard when the oven itself has zero emissions, even when the oven is heated by associated equipment that does have emissions. *See* Cal. Air Dist. Regs., Reg. XI, Rule 1153.1 (South Coast), *available at* https://www.aqmd.gov/docs/          default-source/rule-book/reg-xi/rule-1153-1-emissions-of-oxides-of-nitrogen-from-commercial-food-ovens.pdf?sfvrsn=8346f861_8.

25.   Rule 1153.1 regulates emissions from commercial food ovens. A true and correct copy of an excerpt of the District's Final Staff Report for Proposed Amended Rule 1153.1 (Aug. 2023), which discusses these types of units, is attached hereto as **Exhibit 2**. Ex. 2 at 4 (Staff Report at Executive Summary). The rule requires that certain categories of ovens achieve a zero-NOx emission limit. Ex. 2 at 4 (Staff Report at Executive Summary). In the Staff Report for the rule, District staff explained  that indirect-fired units, including ovens, use heat generated from another unit's combustion process, which is transferred via a heat exchanger to heat the air that enters the oven. Ex. 2 at 5 (Staff Report at 2-9). Indirect fired units result in no NOx emissions from the commercial food oven itself, because the NOx emissions are generated from the combustion processes of other units. Ex. 2 at 5 (Staff Report at 2-9).  There are several examples of these types of units in bakery ovens, dryers, and smokehouses. Ex. 2 at 5 (Staff Report at 2-9).

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)

26.    Therefore, the District has precedent for considering a unit to qualify as Zero-NOx equipment, where it has no NOx emissions itself, even if it is heated by equipment that does have NOx emissions.

27.    Fuel cells can be used for a wide variety of applications and size units. Over 300,000 fuel cell units have been deployed in Japan, and over 100,000 units were expected to be deployed in Europe by 2022, primarily for residential applications. *See* Final Staff Report, Dkt. 50-2, Ex. 2 at 099 (p. 2-11) (citing PACE, Fuel Cell micro-Cogeneration reaches another milestone in Japan (May 2, 2019) *available at* https://pace-energy.eu/fuel-cell-micro-cogeneration-reaches-another-milestone-in-japan/).

28.    Fuel cells for CHP are currently commercially available with capacities from 5 to 2,800 kilowatts (kW). Ex. 1 at 1 (DOE Fact Sheet, p. 1). Based on Bloom Energy data, District staff converted the rated heat input capacity of the appliances subject to Rule 1146.2 (between 75,000 Btu/hr and 2 million Btu/hr) into kilowatts (kW). *See* Bloom Energy Server, *available at* https://www.bloomenergy.com/resource/bloom-energy-server/. Based on this conversion, District staff determined that fuel cells between 32 kW and 861 kW would be equivalent in size to water heaters between 76,000 and 2 million Btu.

29.    Staff examined the DOE CHP Installation Database and discovered 87 CHP installations in this size range in the U.S. *See* U.S. Dept. of Energy Combined Heat and Power and Microgrid Installation Databases, CHP Installations, *available at* https://doe.icfwebservices.com/chp (last updated Dec. 18, 2024). Accordingly, fuel cell CHP systems in the size range regulated by the Rule are currently in use in the U.S.

30.    Information regarding natural gas fuel cell CHP technology was presented to the Rule 1146.2 working group on April 26, 2023.

///

9

1    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3    Executed on this __8th day of May, 2025, at Diamond Bar, California.

4

5                                                     MICHAEL KRAUSE

6

7

8  1915735.1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

DEC. OF MICHAEL KRAUSE ISO DEFENDANT'S OPP. TO PLAINTIFFS' MSJ & ISO CROSS-MSJ
Case No. 2:24-cv-10482 PA (PDx)                                    **SER-79**

(80 of 151), Page 80 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 80 of 151
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 1 of 31    Page ID
#:1494

1  MATTHEW D. ZINN (CA Bar No. 214587)
   Zinn@smwlaw.com
2  LAUREN M. TARPEY (CA Bar No. 321775)
   Ltarpey@smwlaw.com
3  RYAN K, GALLAGHER (CA Bar No. 344349)
   Rgallagher@smwlaw.com
4  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
5  San Francisco, California 94102
   Telephone:  (415) 552-7272
6  Facsimile:   (415) 552-5816

7  Attorneys for Defendant South Coast Air
   Quality Management District
8
   (additional counsel on following page)
9

10            UNITED STATES DISTRICT COURT

11      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  RINNAI AMERICA CORP., et al,          Case No. 2:24-cv-10482 PA (PDx)

14            Plaintiffs,                 **DEFENDANT'S OPPOSITION TO**
                                          **PLAINTIFFS' MOTION FOR**
15                                        **SUMMARY JUDGMENT**
          v.
16                                        Date:        July 14, 2025
17  SOUTH COAST AIR QUALITY               Time:        1:30 p.m.
    MANAGEMENT DISTRICT,                  Courtroom:   9A
18
19            Defendant.                  The Hon. Percy Anderson

20  and                                   Trial Date:  September 30, 2025
21
    PEOPLE'S COLLECTIVE FOR
22  ENVIRONMENTAL JUSTICE,
    SIERRA CLUB, and INDUSTRIOUS
23  LABS,
24
              Defendant-Intervenors.
25
26
27
28

---

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT    **SER-80**
Case No. 2:24-cv-10482 PA (PDx)

(81 of 151), Page 81 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 81 of 151
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 2 of 31    Page ID
#:1495

1   BAYRON T. GILCHRIST (CA Bar No. 212393)
    General Counsel
2   BARBARA BAIRD (CA Bar No. 81507)
    Chief Deputy District Counsel
3   SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT
    21865 Copley Drive
4   Diamond Bar, California 91765
    Telephone: (909) 396-3400
5   Facsimile:    (909) 396-2961
    bghilchrist@aqmd.gov
6
7   Attorneys for Defendant South Coast Air
    Quality Management District
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(82 of 151), Page 82 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 82 of 151
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 28 of 31    Page ID
#:1521

1  overruled as wrongly decided. *See United States v. Hernandez-Estrada*, 749 F.3d 1154,

2  1160 (9th Cir. 2014). The District adopts the explanation provided in the dissent from de-

3  nial of rehearing en banc in *CRA*. *See* 89 F.4th at 1119-26 (Friedland, J., dissenting from

4  denial of reh'g en banc). A New York district court recently refused to follow *CRA* for the

5  same reasons. *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No.

6  23-CV-11292 (RA), 2025 WL 843619, at *1 (S.D.N.Y. Mar. 18, 2025).

7  **III.    Even if *CRA* applied to the Rule, Plaintiffs could not satisfy the facial
8          challenge standard because they cannot show the Rule is preempted as to all
          regulated categories of appliances.**

9       Plaintiffs have failed to meet the burden to show that the Rule is preempted in every

10  application. Like the plaintiffs in *American Apparel*, they have not shown that the Rule is

11  preempted as to every appliance it regulates. *See Am. Apparel*, 107 F.4th at 938.

12      **A.    The Rule does not preclude the use of natural gas appliances in every
13              application.**

14      Plaintiffs' assertion that the Rule's emission standard acts as a de facto ban on every

15  type of gas appliance ignores gas appliances that operate without combustion. According

16  to Plaintiffs, because the Rule prohibits NOx emissions, which are an inevitable byproduct

17  of combustion, the Rule prohibits combustion, "and thus prohibits gas appliances from

18  consuming any energy." Mot. 12. But not all gas appliances operate through combustion.
   AMF 92.

19      In the Staff Report, the District discussed the potential for compliant natural gas fuel

20  cell technology. AMF 93. Fuel cells use but do not combust natural gas, so their operation

21  results in negligible NOx emissions. AMF 94. Such technology is already in use in Japan

22  and Europe. AMF 95 (over 100,000 fuel cells are in use in Europe, and over 300,000 units

23  have been deployed in Japan).

24      A specific type of natural gas fuel cell called a Combined Heat and Power system

25  generates both electricity and waste heat, which can be used to heat water. AMF 96. The

26  District has previously found that analogous equipment satisfies a zero-NOx emission

27  standard when the regulated equipment heated by the waste heat generates no NOx. AMF

28

(83 of 151), Page 83 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 83 of 151
Case 2:24-cv-10482-PA-PD    Document 53    Filed 05/12/25    Page 29 of 31    Page ID
#:1522

97. Because it can be reasonably anticipated that compliant natural gas fuel cell technology could be developed by most of the Rule's compliance deadlines, Plaintiffs have not shown that the Rule bans natural gas appliances in all its applications.

Furthermore, the Rule's rolling compliance deadlines are designed to provide the additional time to develop compliant technology for some equipment categories. AMF 76. This structure is common for the District, which promulgates "technology-forcing" stand-ards based on technologies that do not yet exist, but which are reasonably anticipated to exist by the compliance deadline. *Am. Coatings Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 54 Cal.4th 446, 452 (2012). In this case, the District projected that manufacturers will con-tinue to improve and expand zero-emission products. AMF 98. These products may include additional compliant natural gas products.

Ignoring the potential for compliant gas technology, Plaintiffs focus solely on the District's cost-effectiveness analysis. Mot. 8. That analysis estimated the cost of electric appliances as replacements for natural gas appliances covered by the Rule. *Id.* (citing Dkt. 50-2, Ex. 2 at 102-105, 291). They claim this analysis showed the Rule required gas appli-ances to be replaced with electric appliances. *Id.* But this analysis was just an estimate of the relative cost effectiveness of the Rule using assumptions about how most regulated entities might choose to comply. Dkt. 50-2, Ex. 2 at 100. The cost-effectiveness analysis neither replaces the Rule's requirements nor demonstrates that compliant gas appliances are unavailable. Dkt. 50-2, Ex. 2 at 099. Because the Rule does not dictate that only electric appliances may comply with its emissions standard, Plaintiffs' attempt to turn the emis-sions limit into a gas appliance ban fails.

### B. The Rule regulates some appliances not subject to federal standards and thus not subject to preemption under EPCA.

To prevail in their facial challenge, Plaintiffs must show the Rule is invalid in "all of its applications"—that EPCA preempts each appliance emission standard in the Rule. *Am. Apparel*, 107 F.4th at 938-39. But EPCA only preempts state regulation of covered products for which DOE has promulgated a federal efficiency standard. 42 U.S.C. §§

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT    **SER-83**
Case No. 2:24-cv-10482 PA (PDx)

(84 of 151), Page 84 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 84 of 151
Case 2:24-cv-10482-PA-PD    Document 50-1    Filed 04/14/25    Page 1 of 34    Page ID
#:1013

Courtland L. Reichman (SBN: 268873)
  creichman@reichmanjorgensen.com
Brian C. Baran (SBN: 325939)
  bbaran@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel.: (650) 623-1401; Fax: (650) 560-3501

*Attorneys for Plaintiffs Rinnai America Corp., Noritz
America Corp., National Association of Home
Builders, California Manufacturers & Technology
Association, California Restaurant Association,
California Hotel & Lodging Association, California
Apartment Association, and Plumbing-Heating-
Cooling Contractors of California*

ADDITIONAL COUNSEL ON FOLLOWING PAGE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINNAI AMERICA CORP., et al.<br><br>      Plaintiffs,<br><br>      v.<br><br>SOUTH COAST AIR QUALITY<br>MANAGEMENT DISTRICT,<br><br>      Defendant,<br><br> and<br><br>PEOPLE'S COLLECTIVE FOR<br>ENVIRONMENTAL JUSTICE, SIERRA<br>CLUB, and INDUSTRIOUS LABS,<br><br>      Defendant-Intervenors. | Civil Action No.<br><br>2:24-cv-10482 PA(PDx)<br><br>**MEMORANDUM IN SUPPORT<br>OF PLAINTIFFS' MOTION<br>FOR SUMMARY JUDGMENT,<br>DECLARATORY RELIEF, AND<br>PERMANENT INJUNCTION**<br><br>Date:  Monday, July 14, 2025<br>Time: 1:30 p.m.<br>Courtroom: 9A<br><br>Honorable Percy Anderson<br>United States District Judge |

(85 of 151), Page 85 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 85 of 151
Case 2:24-cv-10482-PA-PD    Document 50-1    Filed 04/14/25    Page 2 of 34    Page ID
#:1014

ADDITIONAL COUNSEL

Sarah O. Jorgensen (*pro hac vice*)
  sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Tel.: (650) 623-1403; Fax: (650) 560-3501

Sean Kneafsey
  skneafsey@kneafseyfirm.com
THE KNEAFSEY FIRM, INC.
707 Wilshire Blvd., Suite 3700
Los Angeles, CA 90017
Tel.: (213) 892-1200; Fax: 213-892-1208

*Attorneys for Plaintiffs Rinnai America
Corp., Noritz America Corp., National
Association of Home Builders, California
Manufacturers & Technology Association,
California Restaurant Association,
California Hotel & Lodging Association,
California Apartment Association, and
Plumbing-Heating-Cooling Contractors of
California*

John J. Davis, Jr. (SBN 65594)
  jjdavis@msh.law
MCCRACKEN, STEMERMAN
  & HOLSBERRY LLP
475 – 14th Street, Suite 1200
Oakland, CA 94612
Tel.: (415) 597-7200; Fax: (415) 597-7201

*Attorneys for Plaintiff California State
Pipe Trades Council*

Matthew P. Gelfand (SBN 297910)
  matt@caforhomes.org
CALIFORNIANS FOR HOMEOWNERSHIP, INC.
525 S. Virgil Ave.
Los Angeles, California 90020
Tel.: (213) 739-8206; Fax: (213) 480-7724

*Attorney for Plaintiff Californians for
Homeownership, Inc.*

Angelo I. Amador (*pro hac vice*)
  aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Tel.: (202) 331-5913 Fax: (202) 331-2429

*Attorney for Plaintiff Restaurant Law Center*

(86 of 151), Page 86 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 86 of 151
Case 2:24-cv-10482-PA-PD    Document 50-1    Filed 04/14/25    Page 9 of 34    Page ID
#:1021

## INTRODUCTION

The federal Energy Policy and Conservation Act ("EPCA") expressly preempts state and local "regulations concerning" certain covered appliances' "energy use." Under the statute's plain text, banning an appliance from using any energy—and thus setting its maximum energy use to zero—concerns that appliance's energy use and is therefore preempted. Last year, the Ninth Circuit held just that. It ruled that EPCA preempted Berkeley, California's ordinance banning gas piping because it effectively prohibited covered appliances from using gas as an energy source. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). That Berkeley "took a more circuitous route" rather than directly banning the appliances made no difference; "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Id.* at 1098, 1107.

Plaintiffs in this case challenge the South Coast Air Quality Management District's effective ban on several types of gas appliances, implemented via its zero-$NO_x$ rule, as preempted by EPCA. The Ninth Circuit's decision controls the outcome here. The District wanted to require consumers to use electric appliances, so it promulgated a rule prohibiting the manufacture, sale, or installation of certain types of natural gas appliances whenever their $NO_x$ emissions exceed zero. Because $NO_x$ emissions are an inevitable byproduct of combustion, the District's zero-$NO_x$ rule effectively bans the covered gas appliances, which cannot operate without combustion. The District's Final Staff Report acknowledges as much. As a result, the District's rule is functionally indistinguishable from Berkeley's preempted ban on gas piping. That the rule prohibits gas appliances that produce $NO_x$ emissions as opposed to banning gas appliances outright does not allow it to escape preemption; by effectively banning

**SER-86**

(87 of 151), Page 87 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 87 of 151
Case 2:24-cv-10482-PA-PD   Document 50-1   Filed 04/14/25   Page 16 of 34   Page ID
#:1028

Similarly, the report's cost-effectiveness analysis assumes that the rule would require gas appliances to be replaced with electric appliances. *See, e.g.*, *id.* at 2-14 (considering the increased installation costs for heat pumps relative to gas appliances); *id.* at 2-15 (comparing "[h]eat pump pool heaters" with "natural gas-fired pool heaters"). In particular, the report "considered the cost impacts of transitions from conventional combustion heating that uses natural gas to zero-emission technologies that use electricity." *Id.* at 2-16 ("Estimating Fuel Switching Cost"); *id.* at 2-17 (determining utility costs for "existing" gas unit compared to "the electric unit which will be replacing" it). Likewise, the Final Socioeconomic Impact Assessment acknowledges that the rule will force a "transition[] from natural gas to zero-emission water heating technologies that use electricity." Ex. 2 attach. H at ES-2.

In sum, Rule 1146.2's zero-$NO_x$ limit effectively bans the regulated gas appliances, including by forcing replacement of gas with electric appliances.

### D. Plaintiffs' Facial Challenge to the Zero-$NO_x$ Rule

Plaintiffs are manufacturers and sellers of gas appliances, trade associations, affordable housing groups, and labor union groups that collectively represent or employ thousands of residents, business owners, employers, and employees who live or work in the District. Plaintiffs' and their members' livelihoods rely on the availability of natural gas appliances and systems. *See* SUF ¶¶ 6-39. The District's zero-$NO_x$ rule is already harming Plaintiffs and their members. It is causing them to lose sales, business opportunities, customer and business relationships, work hours, wages, and jobs; to suffer disruption to their business practices, planning, infrastructure investments, hiring and training decisions, and job opportunities; and to face compliance costs. *Id.* And once the zero-$NO_x$ rule's effective date arrives, it will

(88 of 151), Page 88 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 88 of 151
Case 2:24-cv-10482-PA-PD    Document 50-1    Filed 04/14/25    Page 19 of 34    Page ID
#:1031

regulation, or other requirement of a State or its political subdivisions"). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." § 6291(4). "[E]nergy" includes "fossil fuels," such as natural gas. § 6291(3). And "covered products" include water heaters, boilers, and process heaters such as pool heaters. § 6292(a)(4), (11); § 6313(a)(4)-(5).[2]

But perhaps the most important statutory term is "concerning," which carries a well-established meaning in preemption provisions. "[B]y using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Cal. Rest.*, 89 F.4th at 1103. "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (cleaned up). And such terms "express[] a broad pre-emptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (attribution omitted); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (describing "relating to" as "broad," "deliberately expansive" language, "conspicuous for its breadth"). Congress could have preempted regulation of appliances' energy use, but instead it preempted regulation "concerning" appliances' energy use.

---

[2] EPCA's industrial appliance provisions work the same way. The industrial provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which" there is a federal standard. § 6316(b)(2)(A). "[E]nergy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314." § 6311(4). And "energy" is defined in the same way as for consumer products. §§ 6311(7), 6291(3). Because there is no relevant distinction in the consumer and industrial provisions' application to this case, this brief cites only the consumer provisions.

**SER-88**

(89 of 151), Page 89 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 89 of 151
Case 2:24-cv-10482-PA-PD Document 50-3 Filed 04/14/25 Page 1 of 24 Page ID
#:1050

# Exhibit 1

Exhibit 1–Page 002 SER-89

(Adopted January 9, 1998)(Amended January 7, 2005)(Amended May 5, 2006)
(Amended December 7, 2018)(Amended June 7, 2024*)

## RULE 1146.2.  EMISSIONS OF OXIDES OF NITROGEN FROM LARGE WATER HEATERS AND SMALL BOILERS AND PROCESS HEATERS

(a)     Purpose

The purpose of this rule is to reduce Oxides of Nitrogen (NOx) emissions from Water Heaters, Boilers, and Process Heaters fired with, or designed to be fired with, natural gas as defined in this rule.

(b)     Applicability

The provisions of this rule are applicable to manufacturers, distributors, retailers, Resellers, Installers, owners, and operators of Units fired with, or designed to be fired with, natural gas that have a Rated Heat Input Capacity less than or equal to 2,000,000 British Thermal Units (Btu) per hour.

(c)     Definitions

(1)     BOILER means any equipment that is fired with, or is designed to be fired with, natural gas, used to produce steam or to heat water, and that is not used exclusively to produce electricity for sale. Boiler does not include any waste heat recovery boiler that is used to recover sensible heat from the exhaust of a combustion turbine or any unfired waste heat recovery boiler that is used to recover sensible heat from the exhaust of any combustion equipment.

(2)     CERTIFIED RETROFIT KIT means any burner and ancillary controls or blowers that have been demonstrated to comply with the provisions of this rule, on a retrofit basis, on a particular model of Unit.

(3)     COMPLIANCE PORTAL means the dedicated webpage on the South Coast AQMD website for submitting reports, notifications, or any documents to comply with South Coast AQMD rule(s).

(4)     EXISTING BUILDING means a building that is not a New Building as defined in this rule. Existing Building includes any structures on the property including, but not limited to, sheds, detached garages, pools, and spas.

Exhibit 1–Page 004                                    SER-90

**Rule 1146.2 (Cont.)**                          **(Amended June 7, 2024)**

applicable Table 2 emission limits by the applicable Table 3 compliance dates.

Table 2 – Zero-Emission Limits, Compliance Schedule, and Unit Age

| Equipment Category | NOx and CO Emission Limits (ppmv) | Compliance Schedule | Unit Age (years) |
|---|---|---|---|
| Type 1 Unit* | 0 | Phase I | 15 |
| Instantaneous Water Heater ≤ 200,000 Btu/hr | 0 | | 25 |
| Instantaneous Water Heater > 200,000 Btu/hr | 0 | Phase II | 25 |
| Type 1 Pool Heater | 0 | | 15 |
| Type 2 Unit** | 0 | | 25 |
| Type 1 High Temperature Unit | 0 | Phase III | 25 |
| Type 2 High Temperature Unit | 0 | | 25 |

\*  Referring to a Type 1 Unit that is not a High Temperature Unit, Pool Heater, or Instantaneous Water Heater.
\*\*  Referring to a Type 2 Unit that is not a High Temperature Unit or Instantaneous Water Heater.

Table 3 – Compliance Dates for Zero-Emission Limits

| Phase | Building Type | Compliance Date |
|---|---|---|
| Phase I | New Buildings | January 1, 2026 |
| | Existing Buildings | January 1, 2029 |
| Phase II | New Buildings | January 1, 2028 |
| | Existing Buildings | January 1, 2031 |
| Phase III | New Buildings | January 1, 2029 |
| | Existing Buildings | January 1, 2033 |

**1146.2 - 5**

**Exhibit 1–Page 008**                          **SER-91**

# Exhibit 2

Exhibit 2–Page 026

(93 of 151), Page 93 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 93 of 151
Case 2:24-cv-10835-PA-RAO Document 30-10 Filed 12/05/24 Page 2 Page 05 of Page ID
#:1076

BOARD MEETING DATE: June 7, 2024          AGENDA NO. 26

| | |
|---|---|
| PROPOSAL: | Determine That Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters does not require a new environmental document; and Amend Rule 1146.2 |
| SYNOPSIS: | Rule 1146.2 applies to units that are between 75,000 and 2,000,000 Btu/hour that are exempt from permitting. Proposed Amended Rule 1146.2 (PAR 1146.2) proposes to require a zero- NOx emission limit for new installations of applicable large water heaters, small boilers, and process heaters based on future effective dates, implementing a 2022 AQMP Control Measure necessary to meet the NAAQS ozone standards. PAR 1146.2 proposes zero-emission limits for existing units after the unit reaches a specific age, with an allowance for units installed at residential structures and small businesses to comply with the zero-emission limits upon natural replacement, and provides alternative compliance options and a low-use exemption to address challenges transitioning to zero-emission technologies. In addition, PAR 1146.2 clarifies existing rule language, removes obsolete provisions, and is a later activity within scope of Final Program Environmental Impact Report for 2022 AQMP such that no new environmental document will be required. |
| COMMITTEE: | Stationary Source, March 15, April 19 and May 17, 2024 |

RECOMMENDED ACTIONS:
Adopt the attached Resolution:
1. Determining that Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters, is a later activity within the scope of the Final Program Environmental Impact Report for the 2022 AQMP such that no new environmental document will be required; and
2. Amending Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters.


                        Wayne Nastri
                        Executive Officer

SR:MK:HF:YZ:EY

**Background**

Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters (Rule 1146.2) was adopted in January 1998 to regulate NOx emissions from natural gas-fired large water heaters, small boilers, and process heaters that have a rated heat input capacity of less than or equal to two million British thermal units (Btu) per hour. This rule does not regulate residential gas-fired tank type water heaters rated less than 75,000 Btu/hr heat input, which are regulated under Rule 1121 – Control of Nitrogen Oxides from Residential-Type, Natural Gas-Fired Water Heaters; however, residential instantaneous water heaters and pool heaters are regulated by Rule 1146.2 due to the higher Btu ratings of those type of units. The provisions of Rule 1146.2 are applicable to manufacturers, distributors, retailers, installers, refurbishers, and operators. Rule 1146.2 applies to more than one million units and the current NOx limits were established based on a BARCT assessment conducted in 2006 that established the current NOx emission limits of 20 parts per million by volume (ppmv), except for pool heaters, which remained at 55 ppmv.

South Coast Air Basin has been classified as in "extreme" nonattainment for the 2015 federal 8-hour ozone standard and is subject to requirements of the federal Clean Air Act (CAA). The 2022 AQMP adopted on December 2, 2022, set forth a path for improving air quality and meeting federal air pollution standards by striving for zero-emission technologies across all sectors. The 2022 AQMP included Control Measure C-CMB-01, which seeks 70 to 75 percent NOx emission reductions by 2037 from commercial building water heating sources; PAR 1146.2 will implement that control measure.

**Proposed Amendments**

PAR 1146.2 requires applicable large water heaters, small boilers, and process heaters to meet a zero-emission NOx standard for new equipment installations. The implementation approach and compliance schedule vary by the different categories of equipment and end-user. Earlier zero-emission implementation dates will be required for smaller units, beginning January 1, 2026 for installations in new buildings and January 1, 2029 for units installed in existing buildings; larger units and pool heaters will be required to transition to zero-emission units beginning January 1, 2028 for new buildings and January 1, 2031 for existing buildings, and the latest zero-emission limits will be required for high temperature units, beginning January 1, 2029 for new buildings and January 1, 2033 for existing buildings. The future effective dates will allow time for the technology to further mature, with longer timelines provided for the technologies that are not widely commercially available at time of rule adoption.

PAR 1146.2 allows existing units to reach the end of their unit age, as defined in the rule, before requiring operators to transition to zero-emission technologies. The proposed rule allows units used at residential structures and small businesses to comply with the zero-emission limits upon natural replacement as compared to replacing units at a defined unit age.

(95 of 151), Page 95 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 95 of 151
Case 2:24-cv-04632-PA Document 30-1 Filed 12/04/14 Page 95 of 151 Page ID
#:1078

To address the challenges and costs associated with PAR 1146.2, several alternative compliance options are included to provide more time to transition to zero-emission technologies if: 1) utility upgrades are required; 2) multiple units are required to be replaced within two consecutive years; 3) an emergency replacement is required; 4) an instantaneous water heater in a mobile home is required to be replaced; 5) a new unit is required in a property under lease relying on landlords for electrical upgrades; and 6) construction is required to expand spacing or relocate a unit. During the extensions provided by the alternative compliance options, if a unit is not operational, or an emergency replacement is needed, PAR 1146.2 allows the use of a temporary unit that is certified to meet the specified low-NOx limit.

**Public Process**

PAR 1146.2 was developed through a public process that began in the second quarter of 2023 and included five Working Group Meetings on April 26, 2023, June 7, 2023, August 30, 2023, October 19, 2023, and December 13, 2023. The working group is composed of representatives from manufacturers, trade organizations, permit stakeholders, businesses, environmental groups, public agencies, consultants, and other interested parties. A public workshop was held on February 7, 2024, and a public consultation was held on February 23, 2024. Throughout the rulemaking, staff also met with individual stakeholders and conducted site visits to a wide variety of affected facilities.

**Emission Reductions**

PAR 1146.2 will affect approximately 1,070,000 units in the South Coast AQMD. The rule approach requires the transition to zero-emission units based on unit age and natural replacement; therefore, the emission reductions will occur gradually. At full implementation, PAR 1146.2 is estimated to be 5.6 tons per day (tpd) by 2058.

**Key Issues**

Throughout the rule development process, staff worked with stakeholders and revised PAR 1146.2 to address key issues. There are three remaining issues: impact on small businesses; limited market availability of zero-emission technologies for high temperature units; and high upfront costs for installing zero-emission equipment.

*Impact on Small Businesses*

PAR 1146.2 will affect many industries in the South Coast AQMD jurisdiction, including small businesses such as dry cleaning operations. In the case of dry cleaning operations, they operate high temperature units which have later compliance dates (e.g., 2029 for units installed in a new building and 2033 for units installed in an existing building). In addition, several proposed rule provisions will address impacts on small businesses, including a provision that allows small businesses to transition to zero-emission technologies at natural unit replacement instead of replacing units at the defined unit age. The rule also includes a low-use exemption that allows units installed before rule adoption to continue to operate and several alternative compliance options to

# ATTACHMENT A
# SUMMARY OF PROPOSAL

| Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters |
|---|

Purpose

Reduce NOx emissions from water heaters, boilers, and process heaters as defined

Applicability

- Applicable to manufacturers, distributors, retailers, resellers, installers, owners, and operators of units that have a rated heat input capacity less than or equal to 2 MMBtu/hr

Requirements

- Emission limits prior to zero-emission requirements summarized in Table 1

Table 1 – Emission Limits

| Equipment Category | NOx Emission Limit* | Carbon Monoxide (CO) Emission Limit* |
|---|---|---|
| Type 1 Units, excluding Pool Heaters | 14 ng/J or 20 ppmv | N/A** |
| Type 1 Pool Heaters | 40 ng/J or 55 ppmv | N/A** |
| Type 2 Units | 14 ng/J or 20 ppmv | 400 ppmv |

\* Nanograms per Joule (ng/J) of NOx (calculated as $NO_2$) of Heat Output or the specified ppmv of NOx or CO corrected at 3 percent volume stack gas oxygen ($O_2$) on a dry basis.

\*\* Type 1 Units are not subject to a CO limit in Rule 1146.2 but may be subject to CO limits by other South Coast AQMD rules.

- Zero-emission requirements by equipment categories with future effective dates summarized in Table 2 and Table 3
    - o Units divided into seven equipment categories
    - o Zero-emission requirements by three phases, each applicable to specified equipment categories
    - o For each phase, earlier compliance dates for new buildings vs. existing buildings

Table 2 – Zero-Emission Limits, Compliance Schedule, and Unit Age

| Equipment Category | NOx and CO Emission Limits (ppmv) | Compliance Schedule | Unit Age (years) |
|---|---|---|---|
| Type 1 Unit* | 0 | Phase I | 15 |

-1-

Exhibit 2–Page 034

(97 of 151), Page 97 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 97 of 151
Case 2:24-cv-04442-PA Document 50-4 Filed 12/04/24 Page 9 of 51 Page ID #:65
Case 2:24-cv-04442-PA Document 51-4 Filed 12/04/24 Page 9 of 51 Page ID #:1083

| | Instantaneous Water Heater ≤ 200,000 Btu/hr | 0 | | 25 |
|---|---|---|---|---|
| | Instantaneous Water Heater > 200,000 Btu/hr | 0 | Phase II | 25 |
| | Type 1 Pool Heater | 0 | | 15 |
| | Type 2 Unit** | 0 | | 25 |
| | Type 1 High Temperature Unit | 0 | Phase III | 25 |
| | Type 2 High Temperature Unit | 0 | | 25 |

\*    Referring to a Type 1 Unit that is not a High Temperature Unit, Pool Heater, or Instantaneous Water Heater.

\*\*   Referring to a Type 2 Unit that is not a High Temperature Unit or Instantaneous Water Heater.

Table 3 – Compliance Dates for Zero-Emission Limits

| Phase | Building Type | Compliance Date |
|---|---|---|
| Phase I | New Buildings | January 1, 2026 |
| | Existing Buildings | January 1, 2029 |
| Phase II | New Buildings | January 1, 2028 |
| | Existing Buildings | January 1, 2031 |
| Phase III | New Buildings | January 1, 2029 |
| | Existing Buildings | January 1, 2033 |

- Units reaching their unit age specified in Table 2 after Table 3 compliance dates of their applicable categories are subject to zero-emission standards, except for units for residential buildings and small businesses as defined by Rule 102

  o Except for residential buildings or small businesses, units reaching rule defined "unit age" after zero-emission compliance dates shall not operate if not meeting zero-emission standards

Unit Age

- Added subdivision on unit age determination

Alternative Compliance Options

- Alternative compliance options are provided for:

(98 of 151), Page 98 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 98 of 151
Case 2:24-cv-10482-PA Document 54-12 Filed 04/14/25 Page 10 of 11 Page ID Page
ID #:1084

| Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters |
|---|

- o Up to a five-year extension if a utility upgrade is required and the applicable utility company is unable to provide the necessary power to operate the unit;
- o Up to a three-year extension if an owner or operator has five or more units that are required to meet the Table 2 emission limits within two consecutive calendar years pursuant to paragraph (d)(3) with an option to include several extensions if utility upgrades are required beyond the control of the facility;
- o Up to six-months for using a temporary gas unit meeting specified emission limits, if an owner or operator of a unit requires a short-term replacement due to sudden unit failure after the applicable Table 3 compliance date and an electrical upgrade to increase the power supply capacity to operate a unit that complies with Table 2 emission limits;
- o Up to a four-year extension if an owner or operator has an instantaneous water heater installed prior to the date of rule adoption in a mobile home;
- o Up to a two-year extension if an owner or operator of a unit operates the unit in a property under lease; and
- o Up to an eighteen-month extension if construction is required to expand the space designed to house the unit, and associated equipment necessary for operating the unit

Labeling, Reporting, and Recordkeeping Requirements

- Labeling is required for:
  - o Units supplied or offered for sale in the period between the new building compliance date and the existing building compliance date of the unit equipment category; and
  - o Instantaneous water heater with rated heat input capacity of less than or equal to 200,000 Btu/hr supplied or offered for sale for use in a mobile home in the extended period for instantaneous water heaters being installed in mobile homes
- Manufacturers of natural gas-fired units shall submit an annual report for the gas units sold into or within the South Coast AQMD after the zero-emission compliance dates
- Recordkeeping requirements include:
  - o General recordkeeping for manufacturer and/or distributor's written instruction, maintenance activities, building permits, and fuel use if under low-use exemption;
  - o Rated heat input capacity documentation;
  - o Required documents if utilizing alternative compliance options for utility upgrade
  - o Required documents if utilizing alternative compliance options for units at a property under lease
  - o Required documents if utilizing alternative compliance options for construction
- Small businesses shall register their qualification of small business
- Alternative reporting method is provided for when a report cannot be submitted though the compliance portal

Exemptions

- Units subject to Rule 1121 - Control of Nitrogen Oxides from Residential Type, Natural Gas-fired Water Heaters

| Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters |
|---|
| • Units subject to Rule 1179.1 – Emission Reductions from Combustion Equipment at Publicly Owned Treatment Works Facilities |
| • Low-use exemption for 9,000 therms per calendar year with an end date on the applicable zero-emission compliance date |
| • Low-use exemption for 3,000 therms and 2,000 therms per calendar year |
| • Owners and operators of units installed or used in residential structures need not adhere to the unit age and recordkeeping requirements |
| • Small businesses need not adhere to the unit age requirement |
| • Zero-emission units exempted from the certification requirements |

**Exhibit 2–Page 037**                                    **SER-99**

## ATTACHMENT C

## RULE DEVELOPMENT PROCESS

**Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters**

| |
|---|
| **Initiated Rule Development**<br>April 2023 |



| |
|---|
| **Working Group Meetings (5)**<br>April 26, June 7, August 30, October 19, and December 13, 2023 |



| |
|---|
| **Public Workshop**<br>February 7, 2024 |



| |
|---|
| **Public Consultation**<br>February 12, 2024 |



| |
|---|
| **Stationary Source Committee (3)**<br>March 15, April 19, and May 17, 2024 |



| |
|---|
| **Set Hearing**<br>April 5, 2024 |



| |
|---|
| **Notice of Public Hearing**<br>May 7, 2024 |



| |
|---|
| **Public Hearing**<br>June 7, 2024 |

**Fourteen (14) months spent in rule development**
**One (1) Public Workshop Meeting**
**One (1) Public Consultation Meeting**
**Three (3) Stationary Source Committee Meetings**

Exhibit 2–Page 040                    SER-100

regulated by the rule, (c) the changes are consistent with the information contained in the notice of public hearing, and (d) the consideration of the range of CEQA alternatives was conducted in the Final Program EIR for the 2022 AQMP, which evaluated Control Measure C-CMB-01 upon which Proposed Amended Rule 1146.2 relies; and

**WHEREAS**, Proposed Amended Rule 1146.2 will be submitted for inclusion in the State Implementation Plan; and

**WHEREAS**, Health and Safety Code Section 40727 requires that prior to adopting, amending, or repealing a rule or regulation, the South Coast AQMD Governing Board shall make findings of necessity, authority, clarity, consistency, non-duplication, and reference based on relevant information presented at the public hearing and in the Final Staff Report; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that a need exists to amend Rule 1146.2 to establish appropriate Best Available Retrofit Control Technology (BARCT) emission limits and implement the 2022 AQMP Control Measure C-CMB-01; and

**WHEREAS**, the South Coast AQMD Governing Board obtains its authority to adopt, amend or repeal rules and regulations from Health and Safety Code Sections 39002, 40000, 40001, 40440, 40702, 40725 through 40728.5, 40920.6, and 41508 as well as the federal Clean Air Act; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that Proposed Amended Rule 1146.2 is written or displayed so that its meaning can be easily understood by the persons directly affected by it; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that Proposed Amended Rule 1146.2 is in harmony with, and not in conflict with or contradictory to, existing statutes, court decision, or state or federal regulations; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that Proposed Amended Rule 1146.2 does not impose the same requirements as any existing state or federal regulations, and the proposed amended rule is necessary and proper to execute the powers and duties granted to, and imposed upon, the South Coast AQMD; and

**WHEREAS**, the South Coast AQMD Governing Board, in amending Rule 1146.2, references the following statutes which the South Coast AQMD hereby implements, interprets or makes specific: Health and Safety Code Sections 39002, 40000, 40001, 40406, 40702, 40440(a), 40725 through 40728.5, 40920.6, 41508 and Clean Air Act Sections 110, 172, and 182(e); and

**WHEREAS**, Health and Safety Code Section 40727.2 requires the South Coast AQMD to prepare a written analysis of existing federal air pollution control

**Exhibit 2—Page 045** **SER-101**

(102 of 151), Page 102 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 102 of 151
Case 2:24-cv-10482-PAD Document 56-4 12/05/24 Page 20 of 31 Page ID Page
ID #:1094

requirements applicable to the same source type being regulated whenever it adopts, or amends a rule, and that the South Coast AQMD's comparative analysis of Proposed Amended Rule 1146.2 is included in the Final Staff Report; and

**WHEREAS**, the South Coast AQMD Governing Board finds that staff's proposed control options for Proposed Amended Rule 1146.2 are being adopted because they constitute BARCT, and that there is no other control options that meet BARCT and the air quality objectives; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that the Final Socioeconomic Impact Assessment for the proposed project is consistent with the March 17, 1989, Governing Board Socioeconomic Resolution for rule adoption; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that the Final Socioeconomic Impact Assessment is consistent with the provisions of Health and Safety Code Sections 40440.8, 40728.5, and 40920.6; and

**WHEREAS**, the South Coast AQMD Governing Board has determined that the Final Socioeconomic Impact Assessment concludes that Proposed Amended Rule 1146.2 will result in increased costs to nearly all affected industries in the South Coast AQMD jurisdiction, yet such costs are considered to be reasonable; and

**WHEREAS**, the South Coast AQMD Governing Board has considered the Final Socioeconomic Impact Assessment, and has made a good faith effort to minimize such impacts; and

**WHEREAS**, the South Coast AQMD staff conducted a Public Workshop regarding Proposed Amended Rule 1146.2 on February 7, 2024; and

**WHEREAS**, the Public Hearing has been properly noticed in accordance with the provisions of Health and Safety Code Sections 40725 and 40440.5; and

**WHEREAS**, the South Coast AQMD Governing Board has held a Public Hearing in accordance with all provisions of state and federal law; and

**WHEREAS**, the South Coast AQMD Governing Board specifies the Planning, Rule Development and Implementation Manager overseeing the rule development for Proposed Amended Rule 1146.2 as the custodian of the documents or other materials which constitute the record of proceedings upon which the adoption of this proposed project is based, which are located at the South Coast Air Quality Management District, 21865 Copley Drive, Diamond Bar, California; and

**NOW, THEREFORE, BE IT RESOLVED**, that the South Coast AQMD Governing Board does hereby determine, pursuant to the authority granted by law, that Proposed Amended Rule 1146.2 qualifies as a later activity within the scope of the program

Exhibit 24 Page 046                                    SER-102

approved earlier for the 2022 AQMP per CEQA Guidelines 15168 (c), and the Final Program EIR for the 2022 AQMP adequately describes the activity for the purposes of CEQA such that no new environmental document will be required. This information was presented to the South Coast AQMD Governing Board, whose members exercised their independent judgement and reviewed, considered, and approved the information therein prior to acting on the proposed project; and

**BE IT FURTHER RESOLVED**, that the South Coast AQMD Governing Board directs staff to conduct a status update/technology check-in and report to the Stationary Source Committee by June 1, 2027, if the zero-emission limits established in Proposed Amended Rule 1146.2 are technically feasible, cost effective, and represent BARCT as defined in the Health and Safety Code Section 40406; and

**BE IT FURTHER RESOLVED**, that the South Coast AQMD Governing Board does hereby adopt, pursuant to the authority granted by law, Proposed Amended Rule 1146.2 as set forth in the attached, and incorporated herein by reference; and

**BE IT FURTHER RESOLVED,** that the South Coast AQMD Governing Board requests that Proposed Amended Rule 1146.2 be submitted for inclusion in the State Implementation Plan; and

**BE IT FURTHER RESOLVED**, that the Executive Officer is hereby directed to forward a copy of this Resolution and Proposed Amended Rule 1146.2 to CARB for approval and subsequent submittal to U.S. EPA for inclusion into the State Implementation Plan.

DATE: _____          _____

                                         CLERK OF THE BOARDS

Exhibit 2 – Page 047                          SER-103

(104 of 151), Page 104 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 104 of 151
Case 2:24-cv-10482-PA Document 56-12 Filed 04/22/25 Page 55 of 100 Page
ID #:1128

Executive Summary

# EXECUTIVE SUMMARY

South Coast AQMD Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters (Rule 1146.2), regulates oxides of nitrogen (NOx) emissions from natural gas-fired large water heaters, small boilers, and process heaters that have a rated heat input capacity of less than or equal to two million British thermal units (Btu) per hour. This rule does not regulate residential gas-fired tank type water heaters rated ~~at~~ less than 75,000 Btu/hr heat input, which are regulated under Rule 1121 – Control of Nitrogen Oxides from Residential-Type, Natural Gas-Fired Water Heaters (Rule 1121); however, instantaneous water heaters and pool heaters used in residential structures are regulated by Rule 1146.2 due to the higher Btu ratings of those type of units. The provisions of Rule 1146.2 are applicable to manufacturers, distributors, retailers, installers, refurbishers, and operators.

Rule 1146.2 was initially adopted in January 1998. A Best Available Retrofit Control Technology (BARCT) assessment was conducted for the 2006 amendment where the NOx emission limits were lowered from 30 parts per million by volume (ppmv) to 20 ppmv, except for pool heaters, which remained at 55 ppmv. The rule was last amended in 2018 to remove the exemption for facilities in the REgional CLean Air Incentives Market (RECLAIM) and to require applicable new installations in RECLAIM facilities to meet the 20 ppmv NOx emission limits.

Proposed Amended Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters, Small Boilers and Process Heaters (PAR 1146.2), seeks further NOx emission reductions and implements the 2022 Air Quality Management Plan (AQMP) Control Measure C-CMB-01- Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Commercial Water Heating (Control Measure C-CMB-01).

For PAR 1146.2, staff conducted a comprehensive BARCT assessment which included an analysis of the technical feasibility and cost-effectiveness of zero-emission NOx technologies. PAR 1146.2 proposes to divide the applicable large water heaters, small boilers, and process heaters into different categories and require zero-emission (0 ppmv) limits for new installations based on future effective dates ~~depending on the commercial availability of zero-emission technologies~~. The zero-emission compliance dates are further differentiated for units installed in new or existing buildings. The future effective dates will allow time for the technology to mature, with longer timelines provided for the technologies that are not widely commercially available at this time. PAR 1146.2 also proposes zero-emission limits for existing units that will reach the end of unit age after the zero-emission compliance dates, with an exemption for units used for residential structures and small businesses and provides alternative compliance options and a low-use exemption to address challenges transitioning to zero-emission technologies. In addition, PAR 1146.2 clarifies and updates rule language, restructures the rule, and removes obsolete language.

PAR 1146.2 will affect approximately 1,070,000 units in the South Coast AQMD. Staff estimates that upon full implementation, PAR 1146.2 will reduce NOx emissions by 5.6 tons per day (tpd). The public process for PAR 1146.2 consisted of five working group meetings, a public workshop, a public consultation, and multiple meetings with industry stakeholders and technology vendors to obtain feedback.

Exhibit 2–Page 080                                        SER-104

Chapter 1                                                                                     Background

## INTRODUCTION

Rule 1146.2 limits NOx and carbon monoxide (CO) emissions from natural gas-fired large water heaters, small boilers, and process heaters that have a rated heat input capacity less than or equal to two million Btu per hour (MMBtu/hr). The rule was initially adopted in January 1998, and beginning on January 1, 2000, the provisions of the rule were applicable to manufacturers, distributors, retailers, refurbishers, installers, and operators of new units. Beginning July 1, 2002, the provisions of the rule were also applicable to operators of existing Type 2 units.

In Rule 1146.2, units are split into two categories based on rated heat input capacity: Type 1 units for units rated ~~at~~ less than or equal to 400,000 Btu per hour (kBtu/hr) and Type 2 units for units rated ~~at~~ greater than 400 kBtu/hr and less than or equal to 2 MMBtu/hr. Rule 1146.2 does not regulate residential gas-fired tank type water heaters rated less than 75,000 Btu/hr heat input, which are regulated under South Coast AQMD Rule 1121. However, instantaneous water heaters, also known as tankless water heaters, and pool heaters used in residential structures are regulated by Rule 1146.2 due to the higher Btu ratings of those type of units. Units used in recreational vehicles are exempt from the requirements of Rule 1146.2.

## REGULATORY BACKGROUND

Rule 1146.2 was initially adopted in 1998 and has been amended three times: in 2005, 2006, and 2018. The table below summarizes the current NOx and CO emission limits required in Rule 1146.2.

### Table 1-1. Current Rule 1146.2 NOx and CO Emission Limits

| Equipment Category | NOx Emission Limit* | CO Emission Limit* |
|---|---|---|
| **Type 1 Units, excluding Pool Heaters** | 14 ng/J or 20 ppmv | N/A** |
| **Type 1 Pool Heaters** | 40 ng/J or 55 ppmv | N/A** |
| **Type 2 Units** | 14 ng/J or 20 ppmv | 400 ppmv |

\*   Nanograms per Joule (ng/J) of NOx (calculated as $NO_2$) of heat output or the specified ppmv of NOx or CO at three percent oxygen ($O_2$) correction, on a dry basis

\*\*  Type 1 units are not subject to a CO limit by Rule 1146.2 but may be subject to CO limits by other South Coast AQMD rules.

South Coast AQMD developed the Rule 1146.2 Certification Program in 1998 which requires manufacturers to submit documentation for new unit models, including source test reports, to South Coast AQMD to demonstrate compliance with Rule 1146.2 emission limits.

Rule 1146.2, as adopted in January 1998, required new Type 2 water heaters or boilers to meet an emission limit of 30 ppmv of NOx or 0.037 pound NOx per million Btu of heat input and 400 ppmv of CO. New Type 1 units were required to meet a NOx emission limit of 55 ppmv of NOx or 40 ng/J of heat output. Compliance dates for the emission limits were based on the date of unit manufacture. Following rule adoption, staff prepared three implementation studies as required by

Exhibit 2–Page 082                                                          SER-105

the rule. A working group comprised of manufacturers, end-users, utilities, and other interested parties was convened to provide input and guidance to staff during each of the three implementation studies. The purpose of the third and final implementation study, Phase III Implementation Study, was to evaluate the requirement for retrofit of units greater than 400 kBtu/hr and less than or equal to 1 MMBtu/hr (smaller Type 2 units). The findings of the Phase III Implementation Study were presented at the July 2004 Governing Board meeting. The Phase III Implementation Study recommended modifying retrofit requirements and evaluating whether lower NOx emission limits were feasible for new equipment.

Based on the findings of the Phase III Implementation Study, Rule 1146.2 was amended on January 7, 2005, to require existing in-use equipment to comply with the emission limit once the unit reached 15 years of unit age, and to address technical and cost issues for the retrofit of existing units. The rule was amended to require smaller Type 2 units up to 1 MMBtu/hr manufactured prior to January 1, 2000 with unit age over 15 years to be retrofitted to meet 30 ppmv NOx limit and 400 ppmv CO limit; and require larger Type 2 units up to 2 MMBtu/hr manufactured on and after 1992 with unit age over 15 years to be retrofitted to meet 30 ppmv NOx limit and 400 ppmv CO limit. Lower emission limits for new equipment were not considered for the January 7, 2005, rule amendment because additional time was needed to evaluate low NOx technologies and their cost-effectiveness.

Rule 1146.2 was amended again in May 2006 to establish lower NOx emission limits for new equipment. Staff noted that the technology to reduce NOx emissions was available, that many of the new Rule 1146.2 boilers and heaters sold met the proposed 20 ppmv limit, and that the proposed amended rule allowed manufacturers four to six years to design equipment which would meet the proposed limit. New manufactured units rated greater than 400 kBtu/hr were required to meet a NOx emission limit of 20 ppmv effective January 1, 2010, and new manufactured units rated less than or equal to 400 kBtu/hr, with the exception for pool heaters, had to meet a 20 ppmv (less than 14 ng/J heat output) NOx limit effective January 1, 2012. The NOx limit for pool heaters rated less than or equal to 400 kBtu/hr remained at 55 ppmv (or 40 ng/J heat output) because it was deemed not cost-effective for this category to meet a 20 ppmv NOx limit at the time of the rulemaking, primarily due to the small number of hours these units operate each year.

Rule 1146.2 was amended in 2018 along with Rule 1146 – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam Generators, and Process Heaters, and Rule 1146.1 – Emissions of Oxides of Nitrogen from Small Industrial, Institutional, and Commercial Boilers, Steam Generators, and Process Heaters. The 2018 rule amendments were to create landing rules in anticipation of the sunset of the RECLAIM program when facilities would be transitioned to a command-and-control regulatory structure. The amendment for Rule 1146.2 extended the applicability to the RECLAIM facilities and required the RECLAIM facilities to meet applicable NOx emission limits by December 31, 2023, for new installations. The 2018 amendment also committed staff to conduct a BARCT technology assessment by January 2022 to determine if a more stringent BARCT requirement should be applied to existing Type 2 units operated in RECLAIM facilities. About 80 RECLAIM facilities have been identified to operate one or more Rule 1146.2 units.

A technology assessment for Rule 1146.2 was completed by January 1, 2022, determining that the NOx emission limits should be lowered in order to satisfy BARCT requirements. Staff evaluated water heaters and boilers rated less than or equal to 2 MMBtu/hr in both non-RECLAIM and RECLAIM facilities and reviewed certification test reports submitted in recent years to understand

heating is available. The Energy Code is contained in Title 24, Part 6 of the California Code of Regulations and is updated every three years. The 2025 Energy Code will apply to newly constructed buildings, additions, and alterations, with proposed standards to be adopted in 2024 and an effective date of January 1, 2026.

Bay Area Air Quality Management District (BAAQMD) adopted Rule 9-6 – Nitrogen Oxides Emissions from Natural Gas-Fired Boilers and Water Heaters in March 2023 with zero-emission limits for 2031 implementation. The BAAQMD analysis found that zero-NOx 240-volt heat pump water heaters are widely commercially available at sizes equivalent to existing natural gas systems on market for commercial spaces; technology development and field testing is still needed to bring compliant appliances of larger water heaters and boilers up to 2 MMBtu/hr to market; and BAAQMD staff expects that the availability of zero-NOx units will increase, and costs will decrease over time. BAAQMD committed to an Implementation Working Group and reporting back to their Board on technology developments and availability. Staff presented the assessment of other regulatory requirements in Working Group Meetings #1 and #2, detailed in the tables below.

**Table 2-3. Other Regulatory Requirements**

| Regulatory Entity | Regulation/Rule | Relevant Emission Limits |
|---|---|---|
| **San Joaquin Valley Air Pollution Control District (Valley Air District)[4]** | Rule 4308 – Boilers, Steam Generators, and Process Heaters (units with a total rated heat input capacity of greater than or equal to 75 kBtu/hr and less than 2 MMBtu/hr) – Exempts units installed in manufactured homes, units installed in recreational vehicles, and hot water pressure washers | 20 ppmv (except for pool heaters greater than or equal to 75 kBtu/hr and less than or equal to 400 kBtu/hr, which are at 55 ppmv) |
| **Bay Area Air Quality Management District (BAAQMD)[5]** | Rule 9-6 – Nitrogen Oxides Emissions from Natural Gas-Fired Boilers and Water Heaters (units with total rated heat input capacity of 75 kBtu/hr – 2 MMBtu/hr) adopted in March 2023 | Zero-emission limits with implementation in 2031 – Exempts units installed in manufactured homes (40 ng/J limit), units installed in recreational vehicles, and pool/spa heaters with less than 400 kBtu/hr rated heat input capacity used exclusively to heat swimming pools, hot tubs, or spas |

---

[4] San Joaquin Valley Air Pollution Control District, Rule 4308, https://ww2.valleyair.org/media/o5pdu0oe/rule-4308.pdf

[5] Bay Area Air Quality Management District, Rule 9-6, https://www.baaqmd.gov/~/media/dotgov/files/rules/reg-9-rule-4-nitrogen-oxides-from-fan-type-residential-central-furnaces/2021-amendments/documents/20230315_rg0906-pdf.pdf?rev=436fcdb037324b0b8f0c981d869e684d&sc_lang=en

(108 of 151), Page 108 of 151

| Regulatory Entity | Regulation/Rule | Relevant Emission Limits |
|---|---|---|
| **California Air Resources Board (CARB)[6]** | 2022 State Strategy for the State Implementation Plan (adopted September 22, 2022) proposed measures for residential and commercial buildings; Anticipating Board consideration for rule adoption in 2025 | Proposed zero-emission limits (GHG, NOx) for new equipment and appliances sold for use in both residential and commercial buildings, with implementation in 2030 |

On the local level, over 60 cities and counties across California are considering policies to support zero-emission appliances for new construction.

**Assessment of Pollution Control Technologies**

The next step is to research the commercially available emission control technologies and seek information on any emerging emission control technologies. As part of this assessment, staff met with multiple manufacturers. South Coast AQMD Rule 1146.2 is technology and fuel neutral and is focused on achieving the maximum NOx emission reductions possible.

Staff assessed different pollution control technologies as part of the BARCT assessment. Staff presented and discussed the pollution control technology assessment in working group meetings. The objective is to identify and evaluate control technologies, approaches, and potential emission reductions.

**Emerging Technology and Zero-Emission Technology**

Zero-emission technologies such as heat pumps, electric resistance, and fuel cell technologies were explored as part of the BARCT assessment. Staff conducted internet searches, met with stakeholders, and sent a survey to manufacturers to gather more information on emerging and zero-emission technology.

*Manufacturer Survey*

On May 10, 2023, staff sent a survey to space and water heating manufacturers to gather information on zero-emission technologies, after sending an initial draft survey to stakeholders for feedback on April 28, 2023. The survey covered types of zero-emission technology; applications for installation in residential or commercial buildings; available models; energy efficiency ranges; current annual sales in the South Coast AQMD region; incremental manufacturing cost for the technology; concerns for the technology; and focus of current and future development.[7] Staff received eight responses to the manufacturer survey and presented the aggregate and anonymized responses in the working group meeting on August 30, 2023. Manufacturers who responded to the survey reported that they provided air source and water source heat pump water heater units and hybrid heating, cooling, and water heating, including split system units with heating capacity between 60,000 to 250,000 Btu/hr; variable speed; ducted or ductless; indoor or outdoor; and

---

[6] California Air Resources Board, 2022 State SIP Strategy, p. 30, https://ww2.arb.ca.gov/sites/default/files/2022-08/2022_State_SIP_Strategy.pdf

[7] South Coast AQMD, Proposed Amended Rule 1146.2, Manufacturer Survey, http://www.aqmd.gov/docs/default-source/rule-book/Proposed-Rules/rule-1146-1146.1-and-1146.2/manufacturer-survey---may-10.xlsx?sfvrsn=6

modular units (that can dynamically adjust their capacity) up to 2.2 MMBtu/hr. Manufacturers also reported integrated units with up to 2 MMBtu/hr output. Manufacturers reported plans for future heat pump water heater development, including: reduce necessary storage tank capacity; improve capacity and efficiency at lower ambient temperatures; improve efficiency through variable speed compressor and pump control; increase outlet water temperature; utilize alternate refrigerants that allow lower ambient and higher output temperature operation; expand integrated and split-system all-electric heat pumps (air-to-water) to units with larger heating capacities; expand water source in addition to air source technology; and expand efforts in modular design and commercial hydronic heating heat pumps.

Manufacturers who responded to the survey also reported that they provided electric resistance elements for boilers; electric resistance single-stage compressor and fan for pool heating; and all-electric air-to-water heat pumps for pool heating. Manufacturers who responded to the survey reported that they provide electric resistance storage water heater products up to 900 kW input (approximately 3 MMBtu/hr) and electric resistance instantaneous water heater products up to 150 kW (approximately 500,000 Btu/hr).

Based on the feedback from manufacturers, staff understands that there is a range of heat pump and electric resistance units available to replace gas units subject to this rule. However, manufacturers will continue development to improve and expand zero-emission products.

### Heat Pump Technology

Common zero-emission water heating technology includes heat pumps. Heat pumps operate like a refrigerator or air conditioning unit by moving heat from one place (such as air, water, or ground) to another. This technology can be over three times more efficient than conventional appliances and can be used for water heating, space heating, and cooling. For pool heating, heat pump pool heaters are an option and are significantly more efficient than electric resistance pool heating.

An integrated heat pump with a water tank packaged as a single unit, as shown in the image below, can be sized for commercial applications and be located indoors. Another type of heat pump is a split system with a water tank that can be located as far as fifty feet away from the heat pump, as shown in the image below. In split systems the heat pump takes heat from outdoor air rather than indoor air.



**Figure 2-2-3. Examples of Integrated Heat Pump (Left) and Split System Heat Pump (Right)**

Some stakeholders have expressed concerns over how well heat pumps will operate in colder climates, such as the high-altitude locations within the South Coast AQMD. There are heat pump products available in the market that can operate at low temperatures, and the Northwest Energy Efficiency Alliance's Qualified Products List includes heat pump water heater products that are energy efficient in cold climates and products that can produce hot water via heat pump at negative 25 degrees Fahrenheit. Cold climate heat pumps can pull heat from the air even at below-zero temperatures and are utilized in colder climates in the U.S. and abroad. Maine has one of highest per capita heat-pump adoption rates, outpacing Scandinavian countries, with rebates incentivizing installation of approximately 116,000 heat pumps in a state that has fewer than 600,000 occupied housing units. Heat pump technology is also being adopted in states such as Vermont and Alaska, and according to the International Energy Agency, 60 percent of Norway's buildings are fitted with a heat pump.

One concern is whether sufficiently high-water temperatures needed to meet certain commercial applications could be achieved by using a heat pump water heater. One common practice is to use a booster heater, which can be electric, to increase water temperature up to 180 degrees Fahrenheit. This would satisfy the domestic water temperature requirements for dietary, laundry, and dishwashing. There are also products existing and emerging in the market that can meet the high-water temperature demand. For example, an internet search of units sold or installed in U.S. or Southern California with focus on high water temperatures found products providing water temperature between 160- and 248-degrees Fahrenheit, with waste heat recycling systems capable of achieving up to 248 degrees Fahrenheit. This is a type of technology where a heat pump extracts

(111 of 151), Page 111 of 151
Case 2:24-cv-10482-PA Document 30-1 Filed 04/22/25 Page 573 of 800 Page
ID #:1146

wasted heat from a heat source (chilled water, cooling tower water, or any consistent waste heat) and raises the temperature to a useful level. The heat pump allows reuse of low-temperature heat (less than 140 degrees Fahrenheit). Through the refrigeration cycle of the heat pump, hot water temperature can be increased up to 248 degrees Fahrenheit.[8] Applications of waste heat include sterilization; hot and chilled water for hotels, hospitals, schools, and universities; boiling processes for food manufacturing; and other industrial processes. Waste heat application is opted for only when there is an existing source that provides waste heat. It is not intended for large combustion units to be installed with the sole purpose of creating waste heat for a zero-emission unit. The energy efficiency of these products varies, with Coefficient of Performance (COP) between 4.3 and 6.0, or between 4.3 to 6 times more efficient than electric resistance units. For many commercial processes, heat pumps are a viable technology.

Staff recognizes that for steam, heat pump technology may not be viable in the market yet, and for certain industrial processes, heat pump technology is not as mature and electric resistance options are more expensive to operate due to the energy demand. As part of the BARCT assessment, including discussions with manufacturers, staff determined that a temperature threshold was necessary to provide more time for the zero-emission technology market to mature for high temperature applications. As discussed above, zero-emission technologies for providing water temperatures up to 180 degrees Fahrenheit are available. Further discussion in a later section indicates that California plumbing code hot water temperature requirements are also up to 180 degrees Fahrenheit. For PAR 1146.2, staff suggested a temperature threshold of 180 degrees Fahrenheit for special consideration on high temperature applications, to align with the Code of Federal Regulations definition for "residential-duty commercial water heater" for outlet water temperature. PAR 1146.2 provides a definition for high temperature units used to produce steam or heat water above 180 degrees Fahrenheit, and the compliance schedule for zero-emission limits differentiates high temperature units with further implementation dates. Staff intends to conduct a technology assessment prior to the proposed implementation dates for high temperature units to gather information on changes in technology development and availability.

Zero-emission technology for commercial and industrial applications is continuing to develop, with New Belgium Brewing in Colorado partnering with AtmosZero on a pilot study to replace their gas boiler with industrial electric heat pump technology in 2024.[9] The facility is currently operating at 329 degrees Fahrenheit. An air source heat pump water heater can be used to generate steam (greater than 212 degrees Fahrenheit), operate in sub-zero temperatures, with potential applications including breweries, dairies, plastics, pharmaceuticals, food, paper, and more. The pilot study hopes to result in an off-the-shelf product at a comparable price to a combustion unit. The current unit is larger than the size range for 1146.2 units, with some potential for further technology development for smaller units. The International Energy Agency's Technology Collaboration Programme on Heat Pumping Technologies expects high-temperature heat pump technologies to become more commercially available and implemented in coming years.[10]

---

[8] Armstrong International Inc., https://armstronginternational.com/products-landing/heat-pump-packages/
[9] The Colorado Sun, New Belgium Brewing prepares for industrial heat pump that could cut its greenhouse gas emissions, https://coloradosun.com/2023/09/11/new-belgium-greenhouse-gases-atmoszero-heat-pump/
[10] Annex 58, Task 1: Technologies, https://heatpumpingtechnologies.org/annex58/task1/

*Electric Resistance Technology*

Another common zero-emission water heating technology is electric resistance water heating with storage. Generally, this consists of an insulated steel tank with two electric resistance elements that heat the water. These units are available in a large range of sizes for the commercial market. For a commercial electric boiler, no air intake or exhaust venting is required. There are also instantaneous/mini-tank (point-of-use) electric water heaters which provide hot water at the consumption point and only heat water when necessary. For pool heating, electric resistance swimming pool heaters are a more efficient option than gas-fired pool heaters.

There are also commercial hybrid electric water heaters which utilize heat pump heating and electric resistance heating. These units pull heat from the surrounding air to heat water and use less energy than a standard electric water heater. A commercial heat pump boiler would consist of an all-electric heat pump with an optional built-in backup electric boiler for very cold days.

*Solar Water Heating Technology*

Solar water heating is another option, where solar thermal hot water systems range in size from conventional-sized systems to large industrial applications and consist of flat plate collectors, a controller, pump, storage. There are also swimming pool solar heaters which consist of solar collectors, filters, pumps, and control valves. They can be standalone units, with collectors mounted on roofs or anywhere near the pool.

*Fuel Cell Technology*

Fuel cells have a broad range of applications from multi-megawatt systems to small units and continue to expand with emerging technologies.[11] Cost and durability are still critical challenges, and studies have indicated price ranges between $4,000 to $20,000 per kW. Natural gas fuel cells produce some NOx emissions. Staff recognizes the applications of zero-emission fuel cells and that this is an emerging technology. Over 100,000 fuel cells have been deployed in Europe and over 300,000 units in Japan primarily for residential applications.[12] Fuel cell adoption in California currently is limited. However, fuel cell technology has the potential to replace existing units to meet the zero-emission limits, and it is especially promising for future high temperature applications.

**COST-EFFECTIVENESS AND INCREMENTAL COST-EFFECTIVENESS**

**Initial BARCT Emission Limit and Other Considerations**

After completing the technology assessment, staff recommends an initial BARCT NOx emission limit established using information gathered from the technology assessment. All provided emission concentration values (i.e., initial and final) in this report refer to concentration in terms of parts per million by volume (ppmv) based on a dry basis. Additionally, staff evaluates other considerations that could affect the emission limits that represent BARCT, including limits for those units operating close to the BARCT NOx limits. Heat pump technologies are still the main technologies that can achieve in the nearer-term the NOx concentration limits proposed in PAR

---

[11] U.S. Department of Energy, Multi-Year Research, Development, and Demonstration Plan, https://www.energy.gov/sites/default/files/2017/05/f34/fcto_myrdd_fuel_cells.pdf
[12] PACE, Fuel Cell micro-Cogeneration reaches another milestone in Japan, https://pace-energy.eu/fuel-cell-micro-cogeneration-reaches-another-milestone-in-japan/

\* PAR 1146.2 zero-emission requirements for new units installed in new and existing buildings are included in PAR 1146.2 (d)(2).

The table below shows the phase-out/retrofit requirements in the current rule and proposed revisions in PAR 1146.2. Phase-out/retrofit was required in Rule 1146.2 for unregulated old units to phase into the emission limits.

**Table 3-2. Summary of Phase-out/Retrofit Requirements in Rule 1146.2 and New Revisions in PAR 1146.2**

| Rule 1146.2 Current Section | Unit Type and Age | Compliance Date | Emission Limit (ppmv at 3%O$_2$, dry) | PAR 1146.2 Revision* |
|---|---|---|---|---|
| **Rule 1146.2 (c)(3)-(c)(5)** | Type 2; Manufactured prior to 2000 | 2002-2006 | 30 ppmv NOx | Should have met the limits; now included in PAR 1146.2 (d)(6) as a compliance tool if a non-compliant unit is found |
| **Rule 1146.2 (c)(11)** | Type 2; Manufactured and purchased prior to 2000 and sold/installed by December 31, 2010 | Until Dec 31, 2010 | 20 ppmv NOx | Obsolete; section removed |

\* Additionally, PAR 1146.2 will require units reaching their unit age after PAR 1146.2 Table 3 zero-emission compliance dates of their applicable categories to phase into zero-emission requirement as specified in PAR 1146.2 (d)(3).

**PAR 1146.2 Purpose [Subdivision(a)]**

The purpose of this rule is to reduce NOx emissions from water heaters, boilers, and process heaters as defined in this rule.

**PAR 1146.2 Applicability [Subdivision(b)]**

The provisions of this rule are applicable to manufacturers, distributors, retailers, resellers, installers, owners, and operators of units that have a rated heat input capacity less than or equal to 2 MMBtu/hr. Those units could be sold through physical stores or online. An installer installing a noncompliant unit purchased online is in violation of the rule.

The provisions of the rule are primarily enforced through the supply chain (manufacturers, distributors, installers, etc.); however, enforcement staff also enforces the rule at commercial and industrial facilities that own and operate Rule 1146.2 units, especially if those facilities also own and operate other units that require a South Coast AQMD permit to operate.

Refurbishers were also subject to Rule 1146.2 but have been removed from PAR 1146.2 applicability to avoid redundancy. The term reseller has been added to PAR 1146.2 applicability. A refurbisher can be a manufacturer, reseller, or installer; therefore, removing the term refurbisher and adding the term reseller does not change the applicability.

(114 of 151) Page 114 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 114 of 151
Case 2:24-cv-10482-FMO-JDE Document 56-12 Filed 04/25/25 Page 119 of 260 Page ID #:1192

Chapter 4                                                                                       Impact Assessment

## INTRODUCTION

PAR 1146.2 is expected to impact 1,070,000 units located in the South Coast AQMD region.

## EMISSIONS INVENTORY AND EMISSION REDUCTIONS

The total NOx inventory for the RECLAIM and non-RECLAIM units affected by PAR 1146.2 is estimated to be 5.6 tpd. For context, the 2022 AQMP indicated a total of 351 tpd of NOx emitted from all sources in the region in 2018, the base-year of the emissions inventory and modeling analysis in the plan. Appliances used in residential and commercial buildings emit about 22.1 tpd of NOx, which is about 54 percent of 2037 NOx emissions from all stationary and area sources that South Coast AQMD regulates. Those appliances are primarily space and water heaters, cooking devices, and some other appliances combusting natural gas. The estimated baseline emissions for PAR 1146.2 are around nine percent of the total stationary source inventory, as shown in the figure below.



**Figure 4-1. 2018 NOx Emissions from Stationary Sources (tons per day)**

*Baseline Emissions*

PAR 1146.2 will impact 1,070,000 units, the applicable large water heaters, small boilers, and process heaters. To estimate baseline emissions, staff evaluated the following information:

- Estimated universe by category and categories' percentage of universe
- Unit size (MMBtu/hr) of the gas unit being replaced in each category
- Baseline Emission Factor (lb/MMBtu)
- Capacity Factor (or Usage Factor)
- Unit Age (years)

The following table was presented in Working Group Meeting #5 and has since been updated to reflect new data and assumptions:

**Table 4-1. Baseline Emission Estimates**

| Equipment Category | Estimated Universe | Baseline Emissions Estimate (tpd) |
|---|---|---|
| Type 1 Units (not Type 1 Pool Heaters, Instantaneous Water Heaters, or High Temperature Units) | 60,000 | 0.50 |
| Type 1 High Temperature Units | | 0.19 |
| Type 2 Units (not Instantaneous Water Heaters) | | 1.39 |
| Type 1 Pool Heaters | 710,000 | 3.25 |
| Instantaneous Water Heaters | 300,000 | 0.28 |
| **Total** | **1,070,000** | **5.61** |

Staff estimated the Type 1 pool heater universe and updated the baseline emission estimate in Working Group Meeting #5. According to the 2019 CEC Residential Appliance Saturation Study (RASS), seven percent of homes in the SoCalGas region have spas with gas heaters and five percent have pools with gas heaters.[54] There are approximately 5.9 million homes in the region from the U.S. Census' 2021 American Housing Survey. Staff estimated approximately 710,000 Type 1 pool heaters in the region and baseline emissions of 3.25 tpd for this category as 5.9 million homes × 0.12 = 708,000, rounding to 710,000. Based on the U.S. DOE estimate for units in California and the new DOE 84% efficiency requirement for gas pool heaters by 2028, staff calculated 211 annual operating hours for pool and spa heater units in California. Staff had previously used a capacity factor of 7.16% or 627 operating hours based on the previous Rule 1146.2 2004 implementation study, and staff had previously used 95% for gas pool heater efficiency. The updated pool and spa heater universe, annual operating hours of 211, and 84% pool heater efficiency inform the pool heater baseline emission estimate of 3.25 tpd, which is lower than the previous estimate of 5.66. This affects the total baseline emission estimate for PAR 1146.2 which is updated to 5.61 tpd.

---

[54] 2019 CEC Residential Appliance Saturation Study, Page 11, Table ES-3: Natural Gas UECs and Appliance Saturation Summaries by Gas Utility, https://www.energy.ca.gov/data-reports/surveys/2019-residential-appliance-saturation-study



**Figure 4-2. Percent of Baseline NOx Emissions Estimate**

Analysis during the 2006 rule amendment estimated around 40,000 Type 1 units and 22,000 Type 2 units in the South Coast AQMD based on data provided by SoCalGas. For PAR 1146.2, staff updated the Type 1 and Type 2 water heater and boiler categories' percentages of universe based on Air-Conditioning, Heating, and Refrigeration Institute (AHRI) certifications data. Staff estimates there are approximately 60,000 Type 1 and Type 2 water heaters and boilers.

In recent years, adoption of residential instantaneous water heaters has increased with state and federal energy efficiency regulations. Staff estimated the instantaneous water heater universe to be approximately 300,000 instantaneous water heaters in the South Coast AQMD region using the 2019 California Residential Appliance Saturation Study (RASS) from the CEC and the Residential Energy Consumption Survey (RECS) from the U.S. Energy Information Administration.[55,56]

The baseline emission was estimated per unit by category as: Lifetime NOx Baseline Emission (tons) = Unit Size (MMBtu/hr) × Baseline Emission Factor (lb/MMBtu) × Capacity Factor (or usage factor) × Annual Hours × Unit Age (years) ÷ 2,000 pounds per ton.

For Type 1 units and instantaneous water heaters, 0.238 MMBtu/hr was the Type 1 mid-range unit size utilized in the calculation. For Type 2 units (not instantaneous water heaters), 1.2 MMBtu/hr was the Type 2 mid-range unit size utilized in the calculation.

The baseline emission factor (pounds per MMBtu) taken from previous Rule 1146.2 rulemaking was 0.067 pound of NOx per MMBtu for 20 ppmv at ~~3%~~three percent oxygen for Type 1 pool

---

[55] California Energy Commission, 2019 California Residential Appliance Saturation Study, https://www.energy.ca.gov/publications/2021/2019-california-residential-appliance-saturation-study-rass
[56] U.S. Energy Information Administration, 2020 Residential Energy Consumption Survey Data, https://www.eia.gov/consumption/residential/data/2020/

heaters and 0.024 pound of NOx per MMBtu for 20 ppmv at ~~3%~~three percent oxygen for other categories.

The analysis also assumed 100 percent emission reduction for zero-emission units. The estimated emission reduction is 5.61 tpd at full implementation. For context, the 2022 AQMP indicated a total of 351 tpd of NOx emitted in 2018, the base-year of the emissions inventory and modeling analysis in the plan.

### Zero-Emission Co-Benefits

South Coast Air Basin has been classified as "extreme" nonattainment for the 2015 ozone standard. Ozone is formed when NOx and VOC react in the presence of sunlight. While both NOx and VOC contribute to ozone, the key to attaining the ozone standard in the Basin is to reduce NOx.[57] While PAR 1146.2 is focused on zero-NOx standards, air quality co-benefits of zero-emission standards include reducing other emissions such as greenhouse gas (GHG) and particulate matter (PM) emissions. CARB's current rulemaking for potential statewide zero-emission appliance standards would be focused on zero-GHG and zero-NOx, while also quantifying the air quality co-benefits of reducing criteria pollutants such as smog-forming NOx, CO, and toxic air contaminant emissions.[58] The PAR 1146.2 zero-emission standard will also be considered as a control strategy for the South Coast AQMD to attain the 2012 annual PM 2.5 national ambient air quality standard by 2030.

## COST-EFFECTIVENESS

Health and Safety Code Section 40920.6 requires a cost-effectiveness analysis when establishing BARCT requirements. The cost-effectiveness of a control technology is measured in terms of the control cost in dollars per ton of air pollutant reduced ~~is measured in terms of the control cost in dollars per ton of air pollutant reduced~~ for each class and category of equipment. The costs for the control technology include purchasing, installation, operating, and maintaining the control technology.

As detailed in ~~c~~Chapter ~~two~~2, the South Coast AQMD typically relies on the DCF method which converts all costs, including initial capital investments and costs expected in the present and all future years of unit age, to a present value. The DCF calculation is detailed in Chapter 2.

The table below summarizes the cost-effectiveness estimates for each category.

---

[57] South Coast AQMD, 2022 AQMP, https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/final-2022-aqmp.pdf?sfvrsn=16

[58] California Air Resources Board, Zero-emission Appliances, https://ww2.arb.ca.gov/our-work/programs/building-decarbonization/zero-emission-appliance-standards/faq

(118 of 151) Page 118 of 151Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 118 of 151
Case 2:24-cv-10482-PA Document Filed 04/28/25 Page 123 of 224 Page ID #:170

Chapter 4                                                                    Impact Assessment

The proposed BARCT emission limits will take effect at the end of the presumed unit age of the equipment that is currently being used; therefore, the majority ~~is~~of the cost impacts are at the natural turnover of the equipment. The facilities will incur some cost to upgrade the equipment, but some of the cost will already be incurred due to end-of-unit-age replacement.

## SOCIOECONOMIC IMPACT ASSESSMENT

Health and Safety Code Section 40440.8 requires a socioeconomic impact assessment for proposed and amended rules resulting in significant impacts to air quality or emission limitations. A Draft Socioeconomic Impact Assessment for PAR 1146.2 has been prepared and released for public review and comment on May 7, 2024. The Final Socioeconomic Impact Assessment is available in Attachment H of the June 7, 2024, Governing Board Package.

## CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA) ANALYSIS SUMMARY

Pursuant to the California Environmental Quality Act (CEQA) and South Coast AQMD's certified regulatory program (Public Resources Code Section 21080.5, CEQA Guidelines Section 15251(l) and South Coast AQMD Rule 110), the South Coast AQMD, as lead agency, reviewed the proposed project (PAR 1146.2) and determined that: 1) PAR 1146.2 implements the 2022 AQMP Control Measure C-CMB-01 – Commercial Water Heating; and 2) the Final Program Environmental Impact Report (EIR) for the 2022 AQMP evaluated Control Measure C-CMB-01 and analyzed its potential environmental impacts. Since PAR 1146.2 does not involve any new or modified impacts when compared to what was previously analyzed in the Final Program EIR for Control Measure C-CMB-01, PAR 1146.2 qualifies as a later activity within the scope of the program approved earlier for the 2022 AQMP per CEQA Guidelines 15168 (c), and the Final Program EIR for the 2022 AQMP adequately describes the activity for the purposes of CEQA such that no new environmental document will be required. The detailed CEQA analysis supporting this conclusion is provided in Appendix A of this staff report.

## DRAFT FINDINGS UNDER HEALTH AND SAFETY CODE SECTION 40727

### Requirements to Make Findings

Health and Safety Code Section 40727 requires that prior to adopting, amending, or repealing a rule or regulation, the South Coast AQMD Governing Board shall make findings of necessity, authority, clarity, consistency, non-duplication, and reference based on relevant information presented at the public hearing, and in the staff report.

### Necessity

PAR 1146.2 is needed to establish BARCT requirements and achieve emission reductions proposed by 2022 AQMP Control Measure C-CMB-01 in order to meet the National Ambient Air Quality Standards for ozone.

### Authority

The South Coast AQMD Governing Board has authority to adopt amendments to Rule 1146.2 pursuant to Health and Safety Code Sections 39002, 40000, 40001, 40440, 40702, 40725 through 40728, and 41508.

### Clarity

**Response to Comment 10-2:**

Staff recognizes the concerns of small businesses and added an exemption for small businesses from the unit age requirement, so that small businesses can operate their equipment beyond the rule defined unit age. Staff gathered cost data for various types of units for the cost-effectiveness analysis described in Chapter 2 of this report. Heat pumps are the primary zero-emission technology. The analysis accounted for higher equipment and installation cost, operational cost of switching from gas to electricity, and electrical upgrade cost for some cases. Although the analysis determined that it is cost-effective for most of the equipment categories to implement zero-emission standards, staff understands the challenge of higher upfront costs. Staff is in the process of developing a rebate program to help lower the cost for some consumers and centralizing information for incentive and financing opportunities offered by other agencies and organizations. Please refer to Response to Comment 6-1 for more detail. Further, as zero-emission technologies become more mature and more widely adopted in the market in the future, there will be less cost impact.

To address further concerns, PAR 1146.2 provides alternative compliance options to address specific concerns including emergency replacement, utility upgrades, replacement of five or more units with the same compliance year, and other cases. PAR 1146.2 is accompanied by a socioeconomic impact assessment which considers potential impacts to job growth forecast, among other metrics.

We should also recognize the health benefit to the communities. BAAQMD evaluated ambient air quality and health impacts from natural gas-fired furnaces and water heaters in commercial and residential buildings in support of the zero-emission standards BAAQMD adopted in March 2023. According to the BAAQMD staff report, the proposed zero emission space and water heaters in residential and commercial buildings will result in reductions in NOx emissions and reductions in secondary PM2.5 across the Bay Area. [73] These reductions in secondary PM2.5 avoid an estimated 23 to 52 deaths per year and about 71 new cases of asthma per year. Reductions in total PM2.5 attributable to the targeted appliances, including reductions in primary PM2.5 from adoption of electric appliances, would avoid an estimated 37 to 85 premature deaths per year and about 110 new cases of asthma each year. The valuations of the health impacts from total PM2.5 were estimated to be between 400 to 890 million U.S. dollars annually. Similar benefits would accrue to communities in the South Coast AQMD.

**Response to Comment 10-3:**

Regarding electric grid supply and reliability, please refer to Response to Comment 4-1.

As the South Coast Air Basin has been classified as "extreme" nonattainment for the 2015 ozone standard, staff is required to consider emission reduction for all categories and set future effective dates to reduce emissions as early as feasible. The current baseline emissions for PAR 1146.2 is around nine percent of the total stationary source inventory. Staff also considers that South Coast AQMD standards cannot be less stringent than state-wide standards. CARB has commenced its rulemaking process for potential state-wide standards to "develop and propose zero-emission standards for space and water heaters

(120 of 151), Page 120 of 151

Case: 25-5125, 10/28/2025, DktEntry: 30.1, Page 120 of 151
Case 2:24-cv-10482 Document 100-4 Filed 04/08/25 Page 227 of 298
ID #:1306

# PAR 1146.2 Will Achieve Significant NOx and Concurrent $CO_2$ Emission Reductions

## ~5.6 tons of NOx emission reductions per day

- Second largest NOx reductions (petroleum refinery rule largest)
- Reduces almost 10 percent of stationary/area source NOx emissions regulated by South Coast AQMD
- Harmonizes with local, state, and federal decarbonization goals
  - $CO_2$ emission reductions equivalent to ~1.2 million vehicles

Exhibit 2–Page 318

SER-120

4

1  ADRIANO L. MARTINEZ (SBN 237152)
   CANDICE L. YOUNGBLOOD (SBN 328843)
2  Earthjustice
   707 Wilshire Blvd., Suite 4300
3  Los Angeles, CA 90017
   amartinez@earthjustice.org
4  cyoungblood@earthjustice.org
   Tel: (415) 217-2000 / Fax: (415) 217-2040
5
6  *Counsel for Proposed Defendant-Intervenors*
   *People's Collective for Environmental Justice,*
7  *Sierra Club, and Industrious Labs*
8
   (List of Counsel continued on next page)
9
10            UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
11                   WESTERN DIVISION
12

13  RINNAI AMERICA CORP., et al.,          Civ. No. 2:24-cv-10482 PA (PDx)
              Plaintiff,
14
       v.                                 **DECLARATION OF ADRIANO
15                                         L. MARTINEZ IN SUPPORT
    SOUTH COAST AIR QUALITY               OF [NGOs] MOTION TO
16  MANAGEMENT DISTRICT,                   INTERVENE**
              Defendants,
17
18  and
19
    PEOPLE'S COLLECTIVE FOR
20  ENVIRONMENTAL JUSTICE, et al.,
              Proposed Defendant-Intervenors.
21
22
23
24
25
26
27
28

───────────────────────────────────────────────
DECLARATION OF ADRIANO L. MARTINEZ ISO [NGOS] MOTION TO INTERVENE
(Civ. No. 2:24-cv-10482 PA(PDx))

1  NIHAL SHRINATH (SBN 327921)
   Sierra Club
2  2101 Webster St., Suite 1300
   Oakland, CA 94612
3  nihal.shrinath@sierraclub.org
4  Tel: (415) 977-5566

5  JAMES A. DENNISON *(Pro Hac Vice forthcoming)*
   Sierra Club
6  1650 38th St., Suite 103W
   Boulder, CO 80301
7  jim.dennison@sierraclub.org
8  Tel: (435) 232-5784

9  *Counsel for Proposed Defendant-Intervenor*
   *Sierra Club*
10

11

12 SEAN H. DONAHUE (SBN 264284)
   Donahue, Goldberg & Herzog
13 1008 Pennsylvania Ave., SE
   Washington, DC 20003
14 sean@donahuegoldberg.com
   Tel: (202) 277-7085
15

16 *Counsel for Proposed Defendant-Intervenor*
   *Industrious Labs*

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF ADRIANO L. MARTINEZ ISO [NGOS] MOTION TO INTERVENE
(Civ. No. 2:24-cv-10482 PA(PDx))

**SER-122**

(123 of 151) Page 123 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 123 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 3 of 293   Page ID
#:527

# DECLARATION OF ADRIANO L. MARTINEZ

I, Adriano L. Martinez, declare as follows:

1. I am an attorney in the Los Angeles office of Earthjustice. I represent Proposed Defendant-Intervenors People's Collective for Environmental Justice, Sierra Club, and Industrious Labs in the above-captioned matter.

2. I submit this declaration in support of Proposed Defendant-Intervenors' Unopposed Motion to Intervene as Defendants. I am personally familiar with the factual bases for the following assertions and have sufficient knowledge to competently attest to them.

3. Exhibit 1 is a true and correct copy of relevant excerpts of the Executive Summary and Chapters 1, 2, 4, 6, and 8 of the District's Final 2022 Air Quality Management Plan, dated December 2, 2022. To obtain this document, on February 12, 2025, I visited the District's website at https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/final-2022-aqmp.pdf?sfvrsn=16.

4. The South Coast has failed to attain the 1997 8-hour ozone national ambient air quality standard. As a region failing to attain national air quality standards, the federal Clean Air Act requires South Coast to achieve attainment for ozone by 2031 and 2038 or potentially face sanctions.

5. When particulate matter—a broad class of chemically and physically diverse substances existing as distinct solid or liquid particles that become suspended in the ambient air—bypasses the body's natural defenses, it can be inhaled into the lungs and even pass into the bloodstream.

6. Once implemented, Rule 1146.2 is projected to reduce daily NOx emissions in Southern California by 5.6 tons—the equivalent of nearly half the NOx emissions from every car in the region combined.

(124 of 151) Page 124 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 124 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 4 of 293   Page ID
#:528

7.     On January 30, 2025, counsel for Defendant South Coast Air Quality Management District indicated that their client supports this intervention motion.

8.     On February 3, 2025, I conferred with lead counsel for Plaintiffs Rinnai America Corporation, Noritz America Corporation, National Association of Home Builders, California State Pipe Trades Council, California Manufacturers & Technology Association, California Restaurant Association, Restaurant Law Center, Californians For Homeownership, Inc., California Hotel & Lodging Association, and California Apartment Association. Counsel conveyed that they would not oppose this intervention motion subject to specified conditions. After consulting with co-counsel in the case, I developed a proposed set of conditions that sought to address counsel for Plaintiffs' concerns about intervention. On February 5, 2025, I sent the proposed conditions via email to all counsel. On February 10, 2025, counsel for Plaintiffs responded that they consent to Proposed Defendant-Intervenors' intervention on the conditions presented in the February 5, 2025 email.

I declare under penalty of perjury pursuant to the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 12th day of February, 2025 in Los Angeles, California.

 /s/ Adriano L. Martinez
Adriano L. Martinez

# EXHIBIT 1



# South Coast AQMD

# 2022
## AIR QUALITY
## MANAGEMENT PLAN



(127 of 151) Page 127 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 127 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 7 of 293   Page ID
#:531

# 2022 AIR QUALITY
# MANAGEMENT PLAN

## SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT

**ADOPTED DECEMBER 2, 2022**

SER-127

(128 of 151), Page 128 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 128 of 151
Case 2:24-cv-10482-PA-PD Document 27-2 Filed 02/12/25 Page 16 of 293 Page ID #:540

Executive Summary

# Overview

The 17 million residents of the greater Los Angeles area have historically suffered from some of the worst air quality in the nation. While air pollution has reduced greatly, more needs to be done. The region has the worst levels of ground-level ozone (smog) and among the highest levels of fine particulate matter (PM2.5). The air pollution levels in the region exceed both National and California Ambient Air Quality Standards for both these air pollutants. The health impacts associated with the high levels of air pollution cause respiratory and cardiovascular disease, exacerbate asthma, and can lead to premature death. We also know that our Environmental Justice (EJ) communities experience the brunt of the health effects from air pollution. In this document, EJ communities are defined as census tracts in the top 25 percent in the California Office of Environmental Health Hazard Assessment's California Communities Environmental Health Screening Tool (CalEnviroScreen).[1]  Approximately 42 percent of the South Coast Air Basin (Basin) residents and 11 percent of Coachella Valley residents live in EJ communities.

The U.S. Environmental Protection Agency (U.S. EPA) requires areas that do not meet a National Ambient Air Quality Standard (NAAQS or standard) to develop and submit a State Implementation Plan (SIP) for approval. SIPs are used to show how the region will meet the standard. Regions must attain NAAQS by specific dates or face the possibility of sanctions by the federal government and other consequences under the Clean Air Act (CAA). This can result in increased permitting fees, stricter restrictions for permitting new projects, and the loss of federal highway funds.

The South Coast AQMD SIPs are developed within the agency's Air Quality Management Plans (AQMPs). The most recent AQMP was developed in 2016 and addressed the 1997 8-hour and 2008 8-hour ozone standards, as well as PM2.5 standards. This document is the 2022 AQMP and is focused on attaining the 2015 8-hour ozone standard of 70 parts per billion (ppb).

In August 2018, the U.S. EPA designated the Basin as "extreme" nonattainment and the Coachella Valley as "severe-15" nonattainment for the 2015 8-hour ozone standard. The South Coast Air Basin includes large areas of Los Angeles, Orange, Riverside, and San Bernardino counties. The Coachella Valley is the desert portion of Riverside County in the Salton Sea Air Basin. "Extreme" nonattainment areas must attain this standard by August 2038 and "severe" nonattainment areas must attain by August 2033 (Table ES-1).

---

[1]  Full details of the CalEnviroScreen methodology and data sources can be found in the CalEnviroScreen 4.0 report released in October 2021. Available online at: https://oehha.ca.gov/calenviroscreen/report/calenviroscreen-40.

(129 of 151), Page 129 of 151   Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 129 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 18 of 293   Page
ID #:542
Executive Summary



**NOx Emissions: 184 tons/day**

**FIGURE ES-1**
**2037 EMISSIONS INVENTORY BY AGENCY RESPONSIBILITY**

# Health Effects and Air Quality Trends

Breathing high levels of ozone can cause a variety of negative health impacts such as asthma, chronic bronchitis, and emphysema; and increased susceptibility to lung infection. Individuals working outdoors, children, older adults, people with preexisting lung disease, and individuals with certain nutritional deficiencies are the most susceptible to these effects. Exposure to high levels of ozone levels can increase school absences, hospital visits, disease, and death.



Improvements in cleaner technology and strict regulations have reduced ozone levels since its peak in the mid-twentieth century. However, ozone levels have remained unacceptably high over the past decade despite significant reductions. This trend is due to the changes in climate and other weather conditions such as the increase in hot, stagnant days that can lead to the formation of ozone that we have experienced in recent years. While this AQMP predominantly addresses ozone, the trends and attainment status of all criteria air pollutants are presented in Chapter 2 and Appendix II. The Basin meets federal standards for particulate matter less than 10 microns in diameter (PM10), nitrogen dioxide ($NO_2$), carbon monoxide (CO), sulfur dioxide ($SO_2$) and

SER-129

(130 of 151), Page 130 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 130 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 20 of 293   Page ID #:544
Executive Summary



**FIGURE ES-2**
**BASELINE NOX EMISSIONS INVENTORIES AND ADDITIONAL REDUCTIONS REQUIRED TO ATTAIN THE 2015 OZONE STANDARD**

# Control Strategy

Reducing significant amounts of NOx emissions poses a serious challenge. Previous AQMPs have relied on increasingly stringent regulations targeting tailpipe and exhaust stack emissions, new engine technologies, or fuel mix improvements. However, these approaches rely on additional reductions from already strictly regulated sources and cannot achieve an additional 67 percent reduction beyond the 2037 baseline. Therefore, there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technologies across all mobile sectors and stationary sources, large and small.

An overview of the control strategy by category is shown in Figure ES-3. Low NOx technologies will also need to play a significant role for some areas where ZE technology is not ready or commercially available. These lower emissions technologies will also assist with attainment of other air quality standards with earlier deadlines.

**SER-130**



**FIGURE 1-1**
**ILLUSTRATION OF LOCAL, STATE, AND FEDERAL AGENCIES AND THEIR AUTHORITY OVER EMISSIONS CONTROL TECHNOLOGY OR EMISSIONS DEMAND MANAGEMENT.[8]**

# Regional Setting

Because air pollution is not contained within city and county jurisdictional boundaries, local programs were not enough to solve regional problems. For air resource management, California was divided into 15 air basins which are characterized as regions having similar geography and terrain, similar weather and climate conditions, and are affected by similar regional air quality problems.[9] The jurisdiction of the South Coast AQMD covers (Figure 1-2) an area of approximately 10,743 square miles, consisting of the Basin, and the Riverside



**FIGURE 1-2**
**BOUNDARIES OF THE SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT AND NEIGHBORING FEDERAL PLANNING AREAS**

County portions of the SSAB and MDAB. The Basin, which is a sub-region of the South Coast AQMD's

---

[8]  The cities displayed in the figure are for illustrative purposes only and South Coast AQMD recognizes that all cities contribute to emission demand management through land use decisions. Reproduced from Comment Letter 89.

[9]  https://www.arb.ca.gov/app/emsinv/maps/2021statemap/abmap.php.

(132 of 151), Page 132 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 132 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 34 of 293   Page
ID #:558

Chapter 1: Introduction

jurisdiction, is bounded by the Pacific Ocean to the west and the San Gabriel, San Bernardino, and San Jacinto mountains to the north and east. It includes all of Orange County and major portions of Los Angeles, Riverside, and San Bernardino counties. The Coachella Valley Planning Area (Riverside County portion of the SSAB) is a federal nonattainment area that is part of a sub-region of Riverside County in the SSAB that is bounded by the San Jacinto Mountains to the west and the eastern boundary of the Coachella Valley. The Riverside County portion of the MDAB within the South Coast AQMD jurisdiction is bounded by the eastern boundary of the Coachella Valley in the west and spans eastward to the Palo Verde Valley. The SSAB and MDAB were previously included in a single large basin called the Southeast Desert Air Basin (SEDAB).

The Coachella Valley Planning Area also experiences high levels of ozone but lacks the large sources of smog-forming emissions. Instead, it is primarily impacted by pollutants that are transported from the Basin. In addition, pollutant transport also impacts the Antelope Valley, Mojave Desert, Ventura County, and San Diego County. As part of this AQMP, the air quality planning requirements for the Coachella Valley ozone nonattainment area are discussed and addressed in Chapter 7.

The topography and climate of Southern California combine to make the Basin an area highly favorable for forming air pollution. A warm air mass frequently descends over the cool, moist marine layer produced by the interaction between the ocean's surface and the lowest layer of the atmosphere. Within the atmosphere, the warm upper layer forms a cap over the cooler surface layer, which traps the pollutants near the ground. Light winds can further limit ventilation. Additionally, the region experiences more days of sunlight than any other major urban area in the nation except Phoenix, Arizona. This abundant sunlight triggers the photochemical reactions which produce ozone and PM2.5.

## Emissions Sources

The Basin's economic base is diverse. Historically, the four counties of the Basin have collectively comprised one of the largest and fastest-growing local economies in the nation. Significant changes have occurred in the composition of the industrial base of the region in the past few decades. As in many areas of the nation, a large segment of heavy manufacturing, including steel and tire manufacturing as well as automobile assembly, has either eliminated or greatly lessened their operations. Although there are still significant manufacturing operations in the region,[10] growth in shipping and trade, service and logistics businesses have replaced some of the heavy industry. The region is home to the largest seaport complex in the nation, and over a third of all cargo imported to the nation comes through the Ports of Los Angeles and Long Beach.[11] The goods movement sector has further grown rapidly in recent years and the emissions from the associated seaports, railyards, warehouse, drayage trucks, and cargo handling equipment accounts for a significant portion of the Basin's emissions. In particular, the COVID-19 pandemic shifted American consumers behavior from service-based economy to goods-based economy, which brought record high congestion in the Ports of Los Angeles and Long Beach and substantially

---

[10] http://blogs.wsj.com/economics/2015/07/15/where-are-the-most-u-s-manufacturing-workers-los-angeles/.

[11] https://www.statista.com/statistics/1265024/leading-us-ports-by-teu/.

Final 2022 AQMP

increased emissions in the region. These goods movement activities posed additional challenges in cleaning air for the 17 million residents in the Basin.

Air pollution forms either directly or indirectly from pollutants emitted from a variety of sources. These sources of air pollution can be natural, such as oil seeps, vegetation, or windblown dust. However, the majority of emissions in the Basin are related to human activity. The air pollution control strategy in the 2022 AQMP is directed at controlling man-made sources of air pollution. Examples of man-made emission sources include industrial and manufacturing facilities, cars and trucks, off-road mobile sources such as locomotives, aircraft and ocean-going vessels, evaporation of organic liquids, such as those used in coating and cleaning processes, and abrasion processes, such as tires on roadways. South Coast Air Basin has a complex mix of emission sources. The Basin has around 28,400 stationary source businesses operating under South Coast AQMD permits, including 31 electricity generating facilities[12] and five major petroleum refineries.[13] The Basin is also a logistics hub with the largest port complex in the nation, five major commercial airports, around 9,500 locomotive fleet operating per year, and around 3,000 warehouses larger than or equal to 100,000 square feet. More details on the emission sources in the Basin are described in Chapter 3. Natural emissions are included in the air quality modeling analysis in Chapter 5.

## Population

Since the end of World War II, the Basin has experienced faster population growth than the rest of the nation. The annual average percent growth has slowed but the overall population of the region is expected to continue to increase through 2037 and beyond. Figure 1-3 shows the estimated population and projections based on the regional growth forecast from the 2020 Regional Transportation Plan/Sustainable Communities Strategy (2020 RTP/SCS).[14]



ᵃ Based on SCAG's 2020 Regional Transportation Plan

**FIGURE 1-3**
**REGIONAL POPULATION GROWTH**

---

[12] http://www.aqmd.gov/docs/default-source/rule-book/Proposed-Rules/1135/par-1135---dsr---final.pdf?sfvrsn=12.

[13] http://www.aqmd.gov/docs/default-source/Agendas/Governing-Board/2021/2021-Nov5-034.pdf?sfvrsn=6.

[14] https://scag.ca.gov/read-plan-adopted-final-plan.

**SER-133**

(134 of 151), Page 134 of 151   Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 134 of 151
Case 2:24-cv-10482-PA-PD    Document 27-2    Filed 02/12/25    Page 36 of 293    Page ID #:560

Chapter 1: Introduction

Despite this population growth, air quality has improved significantly over the years, primarily due to the impacts of air quality control programs at the local, State and federal levels. Figure 1-4 shows the trends since 1995 of the 8-hour ozone levels, the 1-hour ozone levels, and annual PM2.5 levels (since 2001), compared to the regional gross domestic product, total employment, and population. Human activity in the region has an impact on achieving reductions in emissions. However, over the past several decades ozone and PM levels have been reduced significantly as the size of the economy and population increased, demonstrating that it is possible to maintain a healthy economy while improving public health through air quality. While California has seen tremendous regional air quality improvement, many communities known as environmental justice communities are disproportionately impacted due to multiple air pollution sources near residential areas. Details regarding environmental justice communities can be found in Chapter 8.



**FIGURE 1-4**
**PERCENT CHANGE IN AIR QUALITY ALONG WITH DEMOGRAPHIC DATA FOR THE 4-COUNTY REGION (1995–2020)**
*(ECONOMIC SET BACK IN 2019 AND 2020 DUE TO COVID-19 PANDEMIC)*



# Chapter 2
## Air Quality and Health Effects

- The South Coast Air Basin (Basin) experiences high levels of ozone due to the large amount of air emissions combined with ideal weather and topography for ozone formation.
- The Basin does not meet federal ozone standards or the annual PM2.5 standard. It met the 24-hour PM2.5 standard for the first time based on 2018-2020 data but continues to exceed the annual PM2.5 standard.
- The Coachella Valley also fails to meet federal ozone standards due to transport of pollution from the South Coast Air Basin.
- The highest levels of ozone are typically in the Inland Empire; the highest levels of PM2.5 are typically in South Central Los Angeles and metropolitan Riverside County.
- The region experienced unusually high levels of ozone in 2020 due to record-breaking heatwaves and wildfires.



**FIGURE 2-8**
**NUMBER OF DAYS IN 2020 EXCEEDING THE REVOKED 1979 1-HOUR FEDERAL OZONE STANDARD**
*(1-HOUR AVERAGE OZONE > 0.12 PPM)*

# Particulate Matter (PM2.5 and PM10)

## Health Effects, Particulate Matter

A significant body of peer-reviewed scientific research, including studies conducted in Southern California, points to adverse impacts of particulate matter air pollution on both increased illness (morbidity) and increased death rates (mortality). The 2019 U.S. EPA *Integrated Science Assessment for Particulate Matter*[23] as well as the Supplement to the 2019 Integrated Science Assessment for Particulate Matter[24] describe these health effects and discusses the state of the scientific knowledge. As of early 2022, the U.S. EPA is evaluating the need to strengthen the standards for fine particulate matter based on the best available science and recommendations from the Clean Air Scientific Advisory Committee (CASAC).[25] A summary of health effects information and additional references can also be found in Appendix I: Health Effects.

Several studies have found correlations between elevated ambient particulate matter levels and an increase in mortality rates, respiratory infections, number and severity of asthma attacks, chronic

---

[23] U.S. EPA. (2019). Integrated Science Assessment for Particulate Matter (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188.
https://www.epa.gov/isa/integrated-science-assessment-isa-particulate-matter.

[24] U.S. EPA. (2021). Supplement to Integrated Science Assessment for Particulate Matter (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-21/198.
https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=352823.

[25] U.S. EPA. (2021) Policy Assessment Updates for the PM NAAQS Reconsideration.
https://casac.epa.gov/ords/sab/f?p=105:18:7422383326691:::RP,18:P18_ID:2607#report.

(137 of 151), Page 137 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 137 of 151
Case 2:24-cv-10482-PA-PD    Document 27-2    Filed 02/12/25    Page 89 of 293    Page
ID #:613

obstructive pulmonary disease exacerbation, combined respiratory-diseases and the number of hospital admissions in different parts of the United States and in various areas around the world.

Higher levels of PM2.5 have also been related to increased mortality due to cardiovascular or respiratory diseases, hospital admissions for acute respiratory conditions, school absences, lost workdays, a decrease in respiratory function in children, and increased medication use in children and adults with asthma.

Long-term exposure to PM has been found to be associated with reduced lung function growth in children, changes in lung development, development of asthma in children, and increased risk of cardiovascular diseases in adults. In recent years, studies have reported an association between long-term exposure to PM2.5 and increased total mortality (reduction in life-span and increased mortality) from lung cancer.

The U.S. EPA, in its most recent review, has concluded that both short-term and long-term exposure to PM2.5 are causally related to cardiovascular effects and increased mortality risk. In addition, new evidence is suggestive of metabolic, nervous system, and reproductive and developmental effects for short-term and long-term exposure to PM2.5.

Young children and non-white populations appear to be most susceptible to the effects of PM10 and PM2.5. With lesser evidence, people with pre-existing conditions of cardiovascular disease; respiratory illness; and obesity; individuals with certain genetic polymorphisms that control antioxidant response, regulate enzyme activity, or regulate procoagulants; older adults (for cardiovascular effects); individuals with lower socioeconomic status and smokers also appear to be more susceptible to the effects of PM10 and PM2.5.

An expanded discussion of studies relating to PM exposures and mortality, including a brief description of how studies accounted for potential confounding factors, is contained in Appendix I of this document.

### *Air Quality, PM2.5*

The South Coast AQMD began regular monitoring of PM2.5 in 1999 following the U.S. EPA's adoption of the national PM2.5 standards in 1997. In 2020, ambient PM2.5 concentrations were monitored at 27 locations throughout the South Coast AQMD, including two stations in the SSAB in the Coachella Valley and two near-road sites. Filter-based Federal Reference Method (FRM) PM2.5 sampling was employed at 19 of these stations and nine of the FRM measurement stations sampled daily to improve temporal coverage with the FRM measurements beyond the required 1-in-3-day sampling schedule, including the two near-road sites. Seventeen stations,[26] including two near-road sites, employed continuous PM2.5 monitors and nine of these were collocated with FRM measurements. PM2.5 continuous monitors at seven stations are federal equivalent method (FEM) PM2.5 monitors. Data collected at six out of these seven FEM continuous PM2.5 monitors are comparable to the NAAQS. On scheduled sampling days, when FRM measurements are not available at a FEM station, FEM measurements are used to replace missing FRM measurements for regulatory/attainment determination purposes. In the 2018-2020 period, one

---

[26]  The special purpose monitoring of continuous PM2.5 at the North Hollywood station and the Compton station began operation January 1, 2020 and July 1, 2020, respectively.

FEM continuous PM2.5 monitor in the Basin does not meet the U.S. EPA criteria to be used for NAAQS comparison[27]  and the South Coast AQMD has been granted annual waivers by the U.S. EPA precluding the use of FEM monitors that do not pass comparability criteria for NAAQS attainment consideration. The continuous data is used for forecasting, real-time air quality alerts, real-time AQI dissemination, and for evaluating hour-by-hour variations.

The 2018-2020 24-hour PM2.5 design values are summarized in Table 2-9. PM2.5 concentrations were higher in the inland valley areas of metropolitan Riverside County and in south central Los Angeles County. The Basin met the 24-hour PM2.5 NAAQS for the 2018-2020 period after removing exceedances collected during the Bobcat and El Dorado fires as these events meet the criteria for exclusion under the U.S. EPA Exceptional Events Rule. The highest 24-hour design value was measured in Metropolitan Riverside County (Mira Loma), with a design value of 35 μg/m$^3$. If exceptional events are included, the highest 2018-2020 PM2.5 24-hour design value was measured at the Central Los Angeles and South San Gabriel Valley stations (37 μg/m$^3$). The 2018-2020 24-hour design values measured at the Metropolitan Riverside County (Mira Loma) and CA-60 Near Road stations (36 μg/m$^3$) also violate the 24-hour PM2.5 NAAQS (35 μg/m$^3$). There is no State 24-hour PM2.5 standard.

PM2.5 is both directly emitted and also forms in the atmosphere. The higher PM2.5 concentrations in the Basin are mainly due to the secondary formation of smaller particulates resulting from precursor gas emissions (i.e., NOx, SOx, NH3, and VOC) that are converted to PM in the atmosphere. The precursors are from mobile, stationary and area sources, with the largest portion resulting from fuel combustion. Most of the 24-hour PM2.5 exceedances in the Basin occur in the late fall and winter months. Cold and humid weather conditions favor the conversion of inorganic vapors into particles in the atmosphere, resulting in high PM2.5 levels. Other unfavorable weather conditions such as a low and stable boundary layer and the lack of storms and rainfall can also contribute to high PM2.5 concentrations, as the precursors and particles are not dispersed or washed out as frequently. During the winter months, especially the holiday season, residential wood burning is also a major contributor to particulate mass and precursors, leading to high PM2.5 concentrations in the coastal and inland valley areas.

In contrast to PM10, PM2.5 concentrations were relatively low in the Coachella Valley area of the SSAB. PM10 concentrations are normally higher in the desert areas due to windblown and fugitive dust emissions; PM2.5 is relatively low in the desert area due to fewer combustion-related emissions sources and less secondary aerosol formation in the atmosphere. The PM2.5 federal standards were not exceeded in the Coachella Valley in 2020 and the highest 24-hour and annual average 2018-2020 design values (17 and 8.0 μg/m$^3$, respectively, both at the Indio air monitoring station) are well below the PM2.5 NAAQS.

---

[27]  The U.S. EPA waiver from NAAQS compliance for the continuous FEM PM2.5 samplers is re-evaluated annually as part of the South Coast AQMD Annual Air Quality Monitoring Network Plan [http://www.aqmd.gov/home/library/clean-air-plans/monitoring-network-plan].

# Air Quality Compared to Other U.S. Metropolitan Areas

Despite significant improvements, the Basin continues to experience some of the worst air quality in the nation. In 2020, nine of the country's top ten locations most frequently exceeding the 2015 8-hour ozone NAAQS were located within the Basin, including stations in San Bernardino, Riverside and Los Angeles Counties.[39]  The location with the highest number of days over the 2015 8-hour ozone NAAQS was in the Basin's Eastern San Bernardino Valley (141 days at the Redlands station). The Basin exceeded the 2008 8-hour ozone NAAQS on 142 days, more days than any other areas in the country. The Basin exceeded the 2015 ozone NAAQS on 157 days. The Basin also recorded the highest 8-hour average ozone concentrations of any area in the nation, with stations in the Basin making up all of the country's top ten locations with the highest fourth maximum 8-hour average ozone concentrations (0.105-0.125 ppm). The single highest maximum 8-hour average ozone concentration recorded in 2020 was also measured at a Basin station (0.139 ppm in the Central San Bernardino Mountains area, almost 200 percent of the 2015 ozone NAAQS).

Figures 2-11 and 2-12 show the number of days exceeding federal standards by Air Quality Index (AQI) category for ozone, PM2.5, and PM10 in the Basin compared to other major metropolitan areas in the U.S. and California air basins, respectively. These totals include days influenced by exceptional events, such as wildfires and high wind dust events, which may be excluded with the U.S. EPA concurrence when calculating regulatory design values. All areas recorded at least one exceedance of the 2015 8-hour ozone NAAQS, with the Basin, San Joaquin Valley, and South Central Coast all recording at least one Very Unhealthy AQI (8-hour average concentration ≥ 0.106 ppm) day. Similarly, all areas recorded at least one exceedance of the 24-hour PM2.5 standard, with much higher exceedance totals in California air basins and Phoenix metro area compared to other areas. Some of the days with the highest recorded PM2.5 concentrations in these areas were influenced by the particularly severe wildfire season throughout the western U.S. in 2020. In California, the 2020 wildfire season was the largest in modern history to date, with a total burn area of more than 4 million acres, or 4 percent of California's total land area. The 24-hour PM10 standard was exceeded in the Basin, Phoenix, and Chicago, as well as in all California air basins shown. As for PM2.5, wildfire smoke likely contributed to PM10 exceedances throughout California. High wind dust events may have also impacted PM10 levels, particularly in the Phoenix metro area.

Exceedances of CO, NO2, and SO2 federal standards are generally rare in California and other major metropolitan areas in the U.S. Of the areas shown in Figures 2-11 and 2-12, the only exceedance of the 1-hour NO2 NAAQS in 2020 was recorded in the Basin at the Ontario near-road station, and the only exceedances of the 1-hour SO2 standard were recorded in Chicago (five exceedances) and San Francisco Bay Area (one). Federal CO standards were not exceeded at any station in the U.S. in 2020. Nationwide,

---

[39]  The top ten stations in the nation for number of exceedances of the 2015 8-hour ozone NAAQS in 2020 include Basin stations in the areas of East San Bernardino Valley (Redlands), Central San Bernardino Mountains (in the Crestline-Lake Gregory community), Central San Bernardino Valley (San Bernardino and Fontana), Northwest San Bernardino Valley (Upland), Pomona/Walnut Valley (Pomona), East San Gabriel Valley (Glendora) and Metropolitan Riverside County (Riverside-Rubidoux and Mira Loma), as well as one station in the San Joaquin Valley Air Basin (Sequoia and Kings Canyon National Park).

(140 of 151) Page 140 of 151Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 140 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 131 of 293   Page
ID #:655
Chapter 4: Control Strategy and Implementation

# Introduction

The control strategy in the 2022 Air Quality Management Plan (AQMP) provides the path to achieving emission reductions needed to meet the 2015 8-hour ozone NAAQS. Implementation of the 2022 AQMP will be based on a series of control measures and strategies that vary by source type (i.e., stationary or mobile) as well as by pollutant (i.e., NOx or VOC). This chapter outlines the proposed control strategy and the adoption and implementation schedule for the 2022 AQMP to achieve the 2015 8-hour ozone standard in the Basin and the Coachella Valley.

To meet the 2015 ozone standard, NOx emissions must be reduced by 124 tons per day, or about 67 percent over baseline levels by 2037, and about 83 percent below current levels. The preliminary baseline NOx emissions inventory is 184 tons per day in 2037. This baseline reflects already adopted regulations and other controls currently in place. Meanwhile, the carrying capacity – the maximum amount of NOx in the atmosphere that results in attaining the standard – is approximately 60 tons per day. The vast amount of NOx emission reductions needed to attain the standard poses a significant challenge. Traditional combustion controls and after controls will not be sufficient to achieve the level of NOx emission reduction needed for attainment. Instead, meeting the standard requires widespread adoption of zero emissions technologies where feasible, and the lowest emitting technologies where zero emission technologies are not feasible, across all emission sectors. Close collaboration with federal, State, and regional governments, businesses, and the public will be critical to tackling this challenge. Meeting the standard will also require that the federal government act to address sources that are subject to federal regulation and beyond the regulatory authority of the South Coast AQMD and California Air Resources Board (CARB).

The 2022 AQMP control strategy includes a variety of implementation approaches such as regulation, accelerated deployment of available cleaner technologies, best management practices, co-benefits from existing programs (e.g., climate, energy efficiency), incentives, and CAA section 182(e)(5) "black box" measures. Additional demonstration and commercialization projects will be crucial to help deploy and reduce costs for zero emission and low NOx technologies. A key element of AQMP implementation will be private and public funding from several sources to help further the development and deployment of these advanced technologies. Many of the same technologies will address both air quality and climate goals, such as increased energy efficiency and a transition to cleaner fuels. The total required emission reductions, technology readiness, cost-effectiveness, and economic impacts are critical considerations in developing a comprehensive and integrated control strategy.

# Overall Strategy

The most significant air quality challenge in the Basin, and the primary driver for the control strategy, is the significant amount of NOx emission reductions required to meet the standard by the required attainment date, August 3 2038 – which requires the needed emission reductions to be in effect in 2037.

The challenge associated with the amount of emission reductions to reach attainment is depicted in Figure 4-1. The figure demonstrates the baseline reductions and strategy reductions required to reach

(141 of 151) Page 141 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 132 of 293   Page
ID #:656
Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 141 of 151

Final 2022 AQMP

attainment. The former is due to ongoing implementation of already adopted regulations and the latter represents reductions anticipated from the proposed control measures included in this chapter.



**FIGURE 4-1**

**BASELINE NOX EMISSIONS INVENTORIES AND ADDITIONAL REDUCTIONS REQUIRED TO ATTAIN THE 70 PPB STANDARD**

## Control Strategy

South Coast AQMD staff have developed a comprehensive emission control strategy to achieve the necessary NOx emission reductions. The 2022 AQMP integrates a variety of control measures and implementation approaches in a cost-effective, feasible, and strategic fashion. Co-benefits from climate change programs and multi-pollutant management will likely produce concurrent benefits for ozone. Regional air quality modeling analysis indicates that significant NOx reductions with additional strategic, limited VOC reductions will result in the region attaining the 2015 ozone standard. The only viable pathway to achieve the standard requires a transformation to zero emissions technology where feasible across all sectors. Air quality regulatory agencies have traditionally set policies and requirements that are performance-based. Such standards do not prescribe specific technologies or fuel usage provided the required level of emission control is achieved. This is a policy that the South Coast AQMD intends to continue.

The 2022 AQMP relies on the development of new, zero emission and on ultra low NOx technologies where advanced zero emission control technologies are not yet available or feasible. CAA section 182(e)(5) provides for reliance on the emission reductions from developing advanced technologies. These emission reductions are known as "black box" measures because the specific technologies or controls to achieve the emission reductions are not yet known. The rationale for allowing "black box" measures is

SER-141

sources in the Basin are projected to be 41 tons per day in 2037, which is approximately two-thirds of the carrying capacity. While stationary sources within the South Coast AQMD are already subject to some of the most stringent regulations in the country, additional reductions will still be needed in this sector to get down to the 60 tons per day NOx carrying capacity.

The South Coast AQMD's proposed ozone control measures are comprised of stationary and mobile source measures. Stationary source categories include: residential, commercial and large equipment. Each group accounts for approximately one third of the entire stationary source inventory (see Figure 4-3). The control measures that cover stationary sources include traditional NOx controls, recognizing co-benefits from climate programs, incentives, limited, strategic VOC measures, and others. Stationary combustion sources can be replaced with new, lower or zero emission technologies, including low NOx or ultra-low NOx equipment and fuel cells for, but not limited to, combined heat and power (CHP). Electrification of equipment is another way to achieve substantial NOx emission reductions, especially when combined with renewable, non-combustion power generation. For residential and commercial water and space heating equipment, zero emission technologies are currently available as discussed in control measures R-CMB-01, R-CMB-02, C-CMB-01, and C-CMB-02.



**Total NOx: 41.3 tons/day**

**FIGURE 4-3**

**STATIONARY SOURCE NOX EMISSIONS IN 2037**

Substantial emission reductions will also be required from mobile sources to meet the standard. Mobile sources will account for about 80 percent of regional NOx emissions in 2037, or around 240 percent of the carrying capacity. Therefore, mobile source controls must be a significant part of the control strategy.

(143 of 151) Page 143 of 151Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 143 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 145 of 293   Page
ID #:669
Chapter 4: Control Strategy and Implementation

the rulemaking, staff will assess the universe of equipment. Incentive funds will be considered to facilitate adoption of zero emission technologies that would promote further emission reductions earlier than required. Commercial Combustion Source Measures

There are five stationary source measures aiming to reduce NOx emissions from commercial combustion equipment:

- C-CMB-01: Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Commercial Water Heating;
- C-CMB-02: Emission Reductions from Replacement with Zero Emission or Low NOx Appliances – Commercial Space Heating;
- C-CMB-03: Emission Reductions from Commercial Cooking Devices;
- C-CMB-04: Emission Reductions from Small Internal Combustion Engines; and
- C-CMB-05: NOx Reductions from Small Miscellaneous Commercial Combustion Equipment (Non-Permitted).

**C-CMB-01: EMISSION REDUCTIONS FROM REPLACEMENT WITH ZERO EMISSION OR LOW NOX APPLIANCES – COMMERCIAL WATER HEATING:** This control measure seeks to reduce NOx emissions from commercial building water heating sources that are subject to Rule 1146.2 – Emissions of Oxides of Nitrogen from Large Water Heaters and Small Boilers and Process Heaters. The measure proposes to: (1) develop a rule to require zero emission commercial water heating units for installations in both new and existing buildings; and (2) allow low NOx technologies as a transitional alternative when installing a zero emission unit is determined to be infeasible. This control measure would also provide incentive funds to facilitate adoption of zero emission technologies that would promote further emission reductions earlier than required.

**C-CMB-02: EMISSION REDUCTIONS FROM REPLACEMENT WITH ZERO EMISSION OR LOW NOX APPLIANCES – COMMERCIAL SPACE HEATING:** This control measure seeks to reduce NOx emissions from commercial building space heating sources. (i.e., forced air furnaces) with a rated heat input capacity between 175,000 and 2,000,000 BTU per hour. Those sources are currently not subject to the South Coast AQMD NOx rules. The measure proposes to: (1) develop rules to require zero emission commercial space heating units for installations in both new and existing buildings; and (2) allow low NOx technologies as a transitional alternative when installing a zero emission unit is determined to be infeasible. This control measure would also provide incentive funds to facilitate adoption of zero emission technologies that would promote further emission reductions earlier than required. Heat pumps have been broadly applied in commercial applications as the primary zero emission technology.

**C-CMB-03: EMISSION REDUCTIONS FROM COMMERCIAL COOKING DEVICES:** This control measure seeks to reduce NOx emissions from commercial cooking devices including stoves, ovens, griddles, broilers, and others in new and existing buildings. Replacing gas burners with electric cooking devices, induction cooktops, or low NOx gas burner technologies will reduce NOx emissions. NOx reductions will be pursued through a combination of regulatory approaches and incentive programs. Proposed method of control consists of two steps: step one includes a technology assessment of emissions testing of various cooking devices to establish emissions rates. Once emissions rates are defined, step two supports future rule development and incentive programs. The rule will apply to manufacturers, distributors, and installers

(144 of 151) Page 144 of 151Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 144 of 151
Case 2:24-cv-10482-PA-PD    Document 27-2    Filed 02/12/25    Page 243 of 293    Page ID #:767

Final 2022 AQMP

# California Clean Air Act Requirements

The Basin is designated as nonattainment with the State ambient air quality standards for PM10, PM2.5 and ozone, while the Coachella Valley is designated as nonattainment with the State air quality standards for PM10 and ozone. The CCAA requires that a plan for attaining the ozone standard be reviewed, and revised as necessary, every three years (Health & Safety Code § 40925).[26] This triennial update requirement will be satisfied in the 2022 AQMP. The CCAA established a number of legal mandates to facilitate achieving health-based state air quality standards at the earliest practicable date. The following CCAA requirements are directed at ozone as described in the remainder of this chapter:

(1)     Attainment by the earliest practicable date (Health & Safety Code § 40913);

(2)     Reduce each nonattainment pollutant or its precursors at a rate of 5 percent per year, or include all feasible measures and an expeditious adoption schedule (Health & Safety Code § 40914);

(3)     Reduce population exposure to "severe" nonattainment pollutants according to a prescribed schedule (Health & Safety Code § 40920(c)); and

(4)     Rank control measures by cost-effectiveness (Health & Safety Code § 40922).

## Plan Effectiveness

Beginning in 1994 the CCAA requires that South Coast AQMD assess its progress toward attainment of the State Ambient Air Quality Standards [Health & Safety Code § 40924(b)] and that this assessment be incorporated into South Coast AQMD's triennial plan revision. To demonstrate the effectiveness of South Coast AQMD's program, ozone air quality trends since 1991 depicting the California Ambient Air Quality Standards (CAAQS) 1-hour and 8-hour ozone designation values are provided for the South Coast Air Basin and the Coachella Valley in Figures 6-5 and 6-6, respectively. NAAQS attainment strategy assists the Coachella Valley to progress toward meeting the CAAQS as shown in Figure 6-6.

In both the South Coast Air Basin and the Coachella Valley, 8-hour and 1-hour ozone State designation values have decreased significantly from values recorded in the 1990s and 2000s, but have remained relatively constant in the past decade.

---

[26]  https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=40925.&lawCode=HSC.

# Introduction

Environmental Justice (EJ) communities are disproportionately impacted by various types of pollution and experience health, social, and economic inequities. These inequities can also make residents of EJ communities more vulnerable to the effects of environmental pollution. These communities are often located near multiple air pollution sources including both mobile sources and commercial and industrial facilities. For example, communities adjacent to ports, rail yards and warehouses are exposed to higher levels of emissions from the associated ships, trains, and trucks, including diesel particulate matter, a carcinogen. Communities near refineries and other industries can also suffer from higher levels of air pollution.

The California Office of Environmental Health Hazard Assessment (OEHHA) developed the California Communities Environmental Health Screening Tool (CalEnviroScreen) to identify disadvantaged communities across California based on pollution exposure and population characteristics. This information can be used to advise and assist South Coast Air Quality Management District (South Coast AQMD) in protecting and improving public health in the most impacted communities through the reduction and prevention of air pollution. While there is no universal definition for what constitutes an EJ community, one that is commonly used is the Senate Bill (SB) 535 definition of disadvantaged communities (DACs).[1]  These are defined as:

1. Census tracts receiving the highest 25 percent of overall scores in CalEnviroScreen 4.0 (1,984 tracts).
2. Census tracts lacking overall scores in CalEnviroScreen 4.0 due to data gaps, but receiving the highest 5 percent of CalEnviroScreen 4.0 cumulative pollution burden scores (19 tracts).
3. Census tracts identified in the 2017 DAC designation as disadvantaged, regardless of their scores in CalEnviroScreen 4.0 (307 tracts).
4. Lands under the control of federally recognized Tribes.

All calculations and maps in this chapter that refer to EJ communities are consistent with this definition. The map of disadvantaged communities that are within the Basin and the Coachella Valley is presented in Figure 8-1.

---

[1]  https://oehha.ca.gov/calenviroscreen/sb535.



**FIGURE 8-2**

**MODELED MULTI-PATHWAY AIR TOXICS CANCER RISK FROM MATES V (2018 BASE YEAR)[2]**

The purpose of this chapter is to describe air quality impacts experienced in EJ communities and outline some of the steps South Coast AQMD is taking to address localized impacts. While the work described in this chapter will help reduce localized impacts, we know that this work is ongoing, and much more will need to be done to address historic environmental injustice. We are committed to continuing our work with impacted communities, listening to their concerns, and to the greatest extent possible, addressing their concerns.

# Environmental Justice Communities

Environmental Justice, or "EJ" has been defined by South Coast AQMD as "equitable environmental policymaking and enforcement to protect the health of all residents, regardless of age, culture, ethnicity, gender, race, socioeconomic status, or geographic location, from the health effects of air pollution." While there are many approaches for identifying EJ communities, throughout this AQMP, we use the definition of disadvantaged communities defined under SB 535. By that definition, approximately 42 percent of South Coast Air Basin residents and 11 percent of Coachella Valley residents live in EJ communities in South Coast AQMD jurisdiction. Race and ethnicity are not included in the CalEnviroScreen population

---

[2]  http://www.aqmd.gov/docs/default-source/planning/mates-v/mates-v-final-report-9-24-21.pdf?sfvrsn=6.

(147 of 151) Page 147 of 151 Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 147 of 151
Case 2:24-cv-10482-PA-PD   Document 27-2   Filed 02/12/25   Page 256 of 293   Page ID #:780
Final 2022 AQMP

indicators, but as discussed in the OEHHA Analysis of Race/Ethnicity and CalEnviroScreen results,[3] people of color disproportionately reside in highly impacted communities in California. These disparities are also clear in both the South Coast Air Basin and Coachella Valley, reflecting the impact of institutional and structural racism that has created unequal pollution burdens and health impacts for different groups (Figure 8-3).



**FIGURE 8-3**

**RACIAL MAKEUP OF EJ AND NON-EJ COMMUNITIES IN THE SOUTH COAST AIR BASIN AND COACHELLA VALLEY**

*(RACE/ETHNICITY DATA IS FROM CALENVIROSCREEN 4.0 BASED ON 2015-2019 AMERICAN COMMUNITY SURVEY 5-YEAR ESTIMATES FROM THE U.S. CENSUS BUREAU)*

# Assembly Bill 617

The 2022 AQMP is designed to address regional air pollution, however, South Coast AQMD recognizes there is still much work to be done to reduce local exposures within EJ communities. Statewide and South Coast AQMD environmental justice efforts, such as the Assembly Bill 617 (AB 617)[4] program, seek to collaboratively address environmental challenges in communities that are disproportionately impacted

---

[3] Available online at:
https://oehha.ca.gov/media/downloads/calenviroscreen/document/calenviroscreen40raceanalysisf2021.pdf.

[4] California Health and Safety Code, § 44391.2.

# Emissions in Environmental Justice Communities

As part of the AB 617 program, the South Coast AQMD has developed base and future milestone years emission inventories (EIs) of criteria air pollutants (CAPs) and toxic air contaminants (TACs) and provided source attribution reports for each community. The base year for each EI is one year prior to the year that a community was designated for the AB 617 program and future milestone years are five and ten years after expected adoption of the CERP. For more details on EI development and for AB 617 communities refer to the technical report.[6]

EIs are constantly under improvement to incorporate the latest information on emission sources and EIs are developed for each AB 617 community using the most up-to-date information at the time. For instance, EIs developed for the 2018-designated communities relied on data from the 2016 AQMP, whereas EIs developed for 2019-designated communities incorporated new updates that were consistent with revisions to South Coast AQMD PM2.5 Plan for the 2006 PM2.5 standard. The EI developed for the 2020-designated community is consistent with the latest data used in the 2022 AQMP.[7] This section reevaluates the criteria pollutant emissions for all six AB 617 communities using the most recent data from the 2022 AQMP for the base year 2018 and for the future year 2037.

## Baseline 2018 Emissions

Figure 8-5 shows the NOx, VOC (Volatile Organic Compounds) and PM2.5 emissions levels and contributions from stationary, areawide, on-road mobile, and off-road mobile sources in the six AB 617 and EJ communities for the base year 2018. Because each community varies widely in size and makeup of emission sources, total emissions also vary widely. The emissions shown in this section illustrates the relative contribution of different source categories in each community. The overwhelming majority of NOx emissions in 2018 are from mobile sources throughout the Basin and Coachella Valley. In comparison with the basin average, the communities of ELABHWC and SLA have a higher contribution from on-road sources, and in particular, from heavy-duty trucks. This is because both those communities have multiple major freeways crossing their boundaries. Meanwhile, the communities of SBM, WCWLB, ECV and SELA show higher contribution from off-road sources due to large contributions from trains, and industrial and commercial off-road equipment and for WCWLB, ships. SELA and WCWLB include many industrial facilities, and WCWLB also includes large oil and gas, and petrochemical facilities, which leads to a higher contribution from stationary sources in these communities. Disadvantaged communities tend to concentrate along heavy-duty transport corridors, and as a result, the contribution from on-road NOx in EJ communities is larger than the overall contribution in the Basin.

For 2018 VOC emissions, the largest contributor in the basin is area-wide sources, which are largely composed of emissions from consumer products such as hair sprays and cleaning products. Other

---

[6] Source Attribution Methodology Report. Available at: http://www.aqmd.gov/docs/default-source/ab-617-ab-134/technical-advisory-group/source-attribution-methodology.pdf.

[7] Direct comparison of the EIs included in the CERPs for the various AB 617 communities may lead to distorted conclusions due to the different underlying data used in each EI and because baseline and future milestone years vary amongst communities.

**SER-148**

significant sources include gasoline-powered on-road and off-road vehicles, and various industrial processing involving petroleum and solvent products. Most communities have a composition of VOC sources that is similar to the overall distribution in the basin. In WCWLB, there is a significant source of VOCs from ships and commercial harbor craft in the off-road category, and there are also large refineries that contribute a much larger percentage from stationary sources. In SELA there are also petrochemical industries that contribute to an overall higher percentage of VOC emissions from stationary sources compared to the overall breakdown in the Basin.

For 2018 PM2.5 emissions, the largest contributor in the basin is from area-wide sources. In particular, road dust and commercial cooking are the largest contributors. SLA has a similar distribution of sources as in the basin. In the communities of WCWLB and SELA, there are many industrial facilities, which leads to stationary sources contributing a large fraction of total PM2.5 emissions. The community of ELABHWC is crossed by major freeways, which results in a larger contribution from on-road sources. The community of SBM has slightly higher contribution from road dust than the overall basin average, whereas the community of ECV and the whole Coachella Valley have a significant source of PM2.5 from construction and demolition that contributes to a larger fraction of PM2.5 from area-wide sources.

# Air Quality in Environmental Justice Communities

The impacts of air pollution are not distributed equitably throughout South Coast AQMD jurisdiction, with some communities bearing much higher air pollution burdens. In this section, results from the recently released CalEnviroScreen 4.0 are used to show the distribution of air pollution across the South Coast Air Basin and Coachella Valley. Ambient ozone and PM2.5 concentrations make up two of the 13 pollution burden indicators included in CalEnviroScreen 4.0. Figures 8-7 and 8-8 show the distribution of estimated ozone and PM2.5 concentrations in EJ and non-EJ communities in the South Coast Air Basin and Coachella Valley. As described in the CalEnviroScreen 4.0 report, average annual PM2.5 concentrations in each census tract were calculated using 2015-2017 ambient air monitoring data combined with satellite observations. While estimated annual average PM2.5 concentrations span a wide range of concentrations in EJ and non-EJ communities, PM2.5 concentrations are generally higher in EJ communities in the South Coast Air Basin. Overall PM2.5 concentrations are lower in the Coachella Valley, but concentrations are also higher in EJ communities compared to other areas within the Coachella Valley. The observed disparities in both air basins are likely driven by local sources of directly emitted PM2.5 such as freeways and industrial facilities, that tend to be concentrated in disadvantaged communities. These sources also contribute to higher levels of diesel particulate matter, a powerful air toxic, in EJ communities.

Average daily maximum 8-hour ozone concentrations from May to October (i.e., peak ozone season) were estimated using 2017-2019 ambient air monitoring data. As shown in Figures 8-7 and 8-8, ozone concentration distributions are broadly similar between EJ and non-EJ communities in both the South Coast Air Basin and Coachella Valley. Since ozone is a secondary pollutant that forms downwind of precursor emission sources, local variability in ozone concentration is more muted compared to directly emitted pollutants. The lower median summer ozone concentration in EJ communities in the Basin is driven by the geographic distribution of EJ communities. In the Basin, the highest ozone concentrations are observed in the Inland Empire as sea breezes push NOx and VOC emissions inland from major urban source areas. Since EJ communities are highly concentrated in Los Angeles County, the lower median reflects generally lower ozone concentrations in areas closer to the coast.

SER-150

(151 of 151) Page 151 of 151Case: 25-5129, 10/22/2025, DktEntry: 30.1, Page 151 of 151
Case 2:24-cv-10482-PA-PD    Document 27-2    Filed 02/12/25    Page 276 of 293    Page ID #:800

Final 2022 AQMP

reviews the overall aspects of a draft air quality management plan and makes recommendations concerning emissions inventories, modeling, control measures, and socioeconomic impacts, including:

- Review and provide comments on: (a) studies relevant to advancing scientific and technical knowledge in support of AQMP preparation; (b) emissions inventory development and modeling approaches; (c) the development of new and revised control measures, including on-and off-road mobile sources; and (d) socioeconomic data and evaluations;

- Foster coordinated approaches toward overall attainment strategies; and

- Assist in resolving key technical issues.

In addition, a Scientific, Technical, and Modeling Peer Review (STMPR) Advisory Group convened to make recommendations on air quality modeling, emissions inventory, and socioeconomic modeling and analysis. Both Advisory Groups met periodically, sometimes monthly, throughout the AQMP development process and those meetings have been open to the public. Table 9-2 lists the schedule for the Advisory Group Meetings for the 2022 AQMP.

**TABLE 9-2**

**ADVISORY GROUP MEETING SCHEDULE FOR 2022 AQMP**

| Date | Organization |
|------|-------------|
| 10/9/2019 | AQMP Advisory Group Meeting |
| 11/21/2019 | AQMP Advisory Group Meeting |
| 4/16/2020 | AQMP Advisory Group Meeting |
| 9/3/2020 | AQMP Advisory Group Meeting |
| 1/27/2021 | STMPR Advisory Group Meeting |
| 2/3/2021 | AQMP Advisory Group Meeting |
| 5/18/2021 | AQMP Advisory Group Meeting |
| 8/19/2021 | STMPR Advisory Group Meeting |
| 8/27/2021 | AQMP Advisory Group Meeting |
| 11/4/2021 | STMPR Advisory Group Meeting |
| 11/9/2021 | AQMP Advisory Group Meeting |
| 1/28/2022 | AQMP Advisory Group Meeting |
| 3/16/2022 | STMPR Advisory Group Meeting |
| 3/24/2022 | AQMP Advisory Group Meeting |
| 5/31/2022 | STMPR Advisory Group Meeting |
| 10/5/2022 | Joint Meeting of the Advisory Council and STMPR Advisory Group |