Docket No. 25-5129

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RINNAI AMERICA CORPORATION et al.,
Plaintiffs-Appellants,

v.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,
Defendant-Appellee,

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE et al.,
Intervenor-Defendants-Appellees.

On Appeal from the United States District Court
for the Central District of California
Case No. 2:24-cv-10482-PA-PD

## INTERVENOR-DEFENDANTS-APPELLEES' ANSWERING BRIEF

Candice L. Youngblood
Adriano L. Martinez
Earthjustice
707 Wilshire Blvd.,
Suite 4300
Los Angeles, CA 90017
Tel: (415) 217-2000

*Counsel for Intervenor-Defendants-
Appellees People's Collective for
Environmental Justice, Sierra Club,
and Industrious Labs*

James A. Dennison
Sierra Club
1650 38th St., Suite 103W
Boulder, CO 80301
Tel: (435) 232-5784

*Counsel for Intervenor-Defendant-
Appellee Sierra Club*

Sean H. Donahue
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (202) 277-7085

*Counsel for Intervenor-Defendant-
Appellee Industrious Labs*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF THE ISSUE..............................................................................3

STATEMENT OF THE CASE.................................................................................4

I.     LEGAL BACKGROUND.................................................................................4

        A.     Air Pollution Control Powers...............................................................4

        B.     Energy Policy and Conservation Act ..................................................6

II.     FACTUAL BACKGROUND..........................................................................10

        A.     The South Coast's Air Quality Problem ...........................................10

        B.     Development of the Boiler Rule.........................................................12

III.     PROCEDURAL BACKGROUND .................................................................15

STANDARD OF REVIEW ...................................................................................17

SUMMARY OF THE ARGUMENT ....................................................................18

ARGUMENT ........................................................................................................20

I.     CONGRESS DID NOT INTEND EPCA STANDARD-SETTING TO PREEMPT EMISSION LIMITS THAT, LIKE THE BOILER RULE, ARE CRITICAL TO MEET FEDERAL AIR QUALITY STANDARDS. ..............................................................................................22

        A.     EPCA's text and framework demonstrate that Congress intended to preempt state regulations concerning the quantity of energy equipment consumes. ..........................................................23

        B.     The district court correctly held that EPCA does not preempt the Boiler Rule because it does not concern energy use, but rather sets an emission standard. ........................................................26

        C.     The distinction between regulations concerning energy use and emission standards flows from EPCA's text and framework. ............28

        D.     The distinction between regulations concerning energy use and emission standards is ubiquitous and long recognized. ......................31

II.    CONGRESS DID NOT INTEND TO REQUIRE THE STATES TO
       EXERCISE POLLUTION CONTROL RESPONSIBILITIES
       UNDER THE CAA WHILE ALSO PREVENTING THEM FROM
       MEETING THOSE OBLIGATIONS THROUGH EPCA'S
       PREEMPTION PROVISION. ............................................................34

       A.    Plaintiffs' interpretation of EPCA would dismantle the CAA's
             health-based protections. .......................................................35

       B.    Plaintiffs' preemption claim would disable longstanding state
             police powers that Congress requires the District to exercise. ..........41

III.   PLAINTIFFS' OTHER ARGUMENTS IN FAVOR OF
       PREEMPTION FAIL. ..................................................................43

       A.    *California Restaurant Association* does not support, and indeed
             substantially refutes, Plaintiffs' position here. ....................................44

       B.    Plaintiffs fail to articulate a stable or coherent interpretation of
             EPCA's statutory text. ..........................................................51

       C.    Plaintiffs' fears of "patchwork" policies are misplaced. ....................52

       D.    *Morales* and *Association of American Railroads* cannot save
             Plaintiffs' faulty interpretation. ...........................................53

CONCLUSION ..................................................................................57

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
   410 F.3d 492 (9th Cir. 2005) .................................. 6, 7, 8, 24, 25, 27, 28, 39, 42

*Altria Grp. v. Good*,
   555 U.S. 70 (2008)........................................................................18

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
   107 F.4th 934 (9th Cir. 2024) ...........................................................17

*Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*,
   622 F.3d 1094 (9th Cir. 2010) ...................................................53, 54, 55, 56, 57

*Bankhurst v. Wolf Appliance, Inc.*,
   No. 23-cv-253-jdp, 2024 WL 3273322 (W.D. Wis. July 2, 2024).....................32

*Beentjes v. Placer Cnty. Air Pollution Control Dist.*,
   397 F.3d 775 (9th Cir. 2005) .......................................................12, 36

*Cal. Rest. Ass'n v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ...................................................*passim*

*CDK Glob. LLC v. Brnovich*,
   16 F.4th 1266 (9th Cir. 2021) ...........................................................17

*Comm. for a Better Arvin v. EPA*,
   786 F.3d 1169 (9th Cir. 2015) ...........................................................35

*CSX Transp., Inc. v. Easterwood*,
   507 U.S. 658 (1993)........................................................................22

*Drake v. Haier U.S. Appliance Sols. Inc.*,
   2024 WL 590597 (N.D. Cal. Feb. 13, 2024) (unpublished)...........................32

*Exxon Mobil Corp. v. EPA*,
   217 F.3d 1246 (9th Cir. 2000) .......................................................4, 36, 41

*FDA v Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..............................................................26

*Fields v. Palmdale School Dist.*,
    447 F.3d 1187 (9th Cir. 2006) ...........................................51

*Floyd v. Am. Honda Motor Co., Inc.*,
    966 F.3d 1027 (9th Cir. 2020) ............................................40

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..............................................................31

*Hall v. USDA*,
    984 F.3d 825 (9th Cir. 2020) .........................................38, 40

*Hendrick v. BSH Home Appliances Corp.*,
    No. 8:23-cv-00358, 2024 WL 2190984 (C.D. Cal. May 14, 2024) ...................32

*Huron Portland Cement Co. v. City of Detroit*,
    362 U.S. 440 (1960)..........................................................4, 41

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..............................................................31

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)........................................................17, 22

*MetroPCS Cal., LLC v. Picker*,
    970 F.3d 1106 (9th Cir. 2020) .......................................17, 47

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)........................................................53, 54

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
    413 U.S. 405 (1973)........................................................18, 34

*Nat. Res. Def. Council, Inc. v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985)..............................................8

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air
    Pollution Control Dist.*,
    627 F.3d 730 (9th Cir. 2010) ................................................5

*Pac. Merch. Shipping Ass'n v. Goldstene*,
  639 F.3d 1154 (9th Cir. 2011) ...........................................................36

*Pit River Tribe v. BLM*,
  939 F.3d 962 (9th Cir. 2019) .............................................................37

*Puente Ariz. v. Arpaio*,
  821 F.3d 1098 (9th Cir. 2016) ...........................................................17

*Sackett v. EPA*,
  598 U.S. 651 (2023)..................................................................42, 43

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
  472 F.3d 882 (D.C. Cir. 2006)............................................................5

*Sturgeon v. Frost*,
  577 U.S. 424 (2016)...........................................................................53

*Train v. Nat. Res. Def. Council, Inc.*,
  421 U.S. 60 (1975).............................................................................4

*Union Elec. Co. v. EPA*,
  427 U.S. 246 (1976)...........................................................................4

*United States v. Salerno*,
  481 U.S. 739 (1987)..........................................................................47

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  959 F.3d 1201 (9th Cir. 2020) ....................................................34, 365

*West Virginia v. EPA*,
  597 U.S. 697 (2022)..........................................................................18

**Federal Statutes**

15 U.S.C. § 717 ....................................................................................49

42 U.S.C. §§ 6201–6422 ........................................................................7

42 U.S.C. § 6291 ............................................................................23, 24

42 U.S.C. § 6293 ............................................................................23, 25

42 U.S.C. § 6294 .................................................................................25

42 U.S.C. § 6294a ..............................................................................30

42 U.S.C. § 6295 .................................................................................24

42 U.S.C. § 6297 ................................................ 2, 9, 10, 23, 25, 28, 53

42 U.S.C. § 6311 .................................................................................52

42 U.S.C. § 6314 .................................................................................25

42 U.S.C. § 6315 .................................................................................25

42 U.S.C. § 7401 .............................................................................36, 49

42 U.S.C. § 7407 ...............................................................................5, 36

42 U.S.C. § 7410 ...............................................................................5, 36

42 U.S.C. § 7413 ...................................................................................5

42 U.S.C. § 7416 ...............................................................................5, 36

42 U.S.C. §§ 7501–7515 .......................................................................5

42 U.S.C. § 7502 ...................................................................................5

42 U.S.C. § 7509 ............................................................................5, 6, 37

42 U.S.C. § 7511 ...................................................................................6

42 U.S.C. §§ 7511a–7511f ....................................................................6

49 U.S.C. § 10501 ...............................................................................54

Pub. L. No. 91-604, 84 Stat. 1676 (1970) ..............................................4

Pub. L. No. 94-163, 89 Stat. 871 (1975) .............................................7, 8

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ...........................................8, 9

Pub. L. No. 100-12, 101 Stat. 103 (1987) ...........................................8, 9

Pub. L. No. 101-549, 104 Stat. 2399 (1990) ..........................................6

**State Statutes**

Ca. Health & Safety Code § 40406....................................................13

Cal. Health & Safety Code §§ 40460–40462 ........................................13

Cal. Stat. 893 ....................................................................12

Cal. Stat. 1640–41 ................................................................4

**Rules**

Fed. R. Civ. P. 56 ................................................................17

**Regulations**

10 C.F.R. pts. 430–31 ............................................................25

10 C.F.R. § 429.12 ...............................................................25

16 C.F.R. § 305.17 ...............................................................25

40 C.F.R. § 81.305 (2025) ...............................................10, 11, 37

47 Fed. Reg. 29,231 (Jan. 7, 1986) ...............................................38

69 Fed. Reg. 23,858 (Apr. 30, 2004) ..............................................11

70 Fed. Reg. 65,984 (Nov. 1, 2005)................................................12

73 Fed. Reg. 73,562 (Dec. 3, 2008)................................................39

75 Fed. Reg. 20,112 (Apr. 16, 2010) ..............................................33

82 Fed. Reg. 17,136 (Apr. 10, 2017) ..............................................39

85 Fed. Reg. 57,733 (Sep. 16, 2020) ..............................................11

89 Fed. Reg. 40,198 (May 9, 2024) ................................................27

89 Fed. Reg. 54,358 (July 1, 2024)................................................39

89 Fed. Reg. 55,684 (July 5, 2024)................................................27

**Other Authorities**

H.R. Rep. No. 94-340 (1975)......................................................................7

S. Rep. No. 100-6 (1987) ....................................................................9, 52

# INTRODUCTION

This case is about air pollution. Despite significant progress over the last half century, the South Coast Air Basin remains the most smog-filled region in the country. This has led the Environmental Protection Agency to designate the South Coast as in "extreme" nonattainment for ozone federal air quality standards that the states are required to satisfy under the Clean Air Act, or CAA. By Congress's design, the CAA not only expressly affirms states' and subdivisions' historic authority to limit harmful emissions but *requires* Defendant-Appellee South Coast Air Quality Management District—as the regulator for a region with extreme pollution issues—to do so.

Those obligations led the District to amend Rule 1146.2 ("Boiler Rule" or "Rule") to further reduce nitrogen oxides ("NOx") emissions from certain types of water heaters, boilers, and process heaters. NOx emissions form ozone pollution, commonly known as smog. The District has regulated emissions from these types of equipment since 1998 and has amended the Boiler Rule on three prior occasions. Like its precursors, this amendment gradually phases in more stringent emission limits, which the District has determined are cost-effective, technically feasible, and necessary to attain federal air quality standards and protect public health. The benefits of doing so are substantial: When fully implemented, the Rule is projected to reduce NOx emissions by 5.6 tons per day—the equivalent of nearly

half the combined NOx emissions from every car in the region. The District *cannot* attain federal air quality standards for ozone pollution without the emission reductions it projects the Boiler Rule will accomplish.

Plaintiffs-Appellants Rinnai America Corporation and associated manufacturers and trade associations claim that Congress has overridden that authority. Their argument turns on the Energy Policy Conservation Act, or EPCA—a statute authorizing the Department of Energy to set uniform federal energy conservation standards for various appliances. In their view, when the Department of Energy prescribes an energy conservation standard for a product, it thereby disables local air quality regulators from enforcing public-health-based limits on the product's pollution. But as the district court correctly held, Plaintiffs' reading of EPCA's preemption provision is incompatible with the statute's text, structure, and purpose. EPCA preempts state regulations "concerning the energy efficiency [or] energy use" of equipment covered by federal energy conservation standards, 42 U.S.C. § 6297(c)—not state *emission* regulations to achieve federal air quality standards.

The Boiler Rule does not concern energy use at all. It regulates emissions, without respect to how much energy equipment may consume, just as previous iterations of the District's Boiler Rule have done for decades. It thus falls outside the reach of EPCA preemption. In arguing otherwise, Plaintiffs suggest that

2

Congress intended for a process with no safeguards for pollution control or public health to impair the very responsibilities it had assigned to states under the CAA. Nothing in EPCA's text or framework supports that conclusion. And Plaintiffs' expansive reading of this Court's avowedly "narrow" decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094, 1106 (9th Cir. 2024), cannot patch up their theory's fatal deficiencies. As the opinion emphasized, the Court's holding in that case was "limited" to local building codes that concern energy use and has no bearing on state and local emission regulations exercised pursuant to and in compliance with other federal statutes. *Id.* at 1101.

Because EPCA provides no legal basis for impeding the District's lawful and urgently important air quality standards, the district court's grant of summary judgment should be affirmed.

## STATEMENT OF THE ISSUE

Whether EPCA preempts the District's recent amendment to the Boiler Rule to further reduce ozone-forming NOx emissions from certain types of water heaters, boilers, and process heaters.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    Air Pollution Control Powers

California's police powers include "the power to protect the health of citizens in the state," including "air pollution prevention." *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000); *see also Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of . . . the police power."). Indeed, the nation's first air regulator—the District's predecessor—was created in 1947 in response to Southern California's severe smog problem. 1947 Cal. Stat. 1640–41.

But because air pollution is also a matter of national concern, Congress started enacting laws to clean up air pollution in the 1960s. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63 (1975). Congress then created the modern structure of pollution controls in the Clean Air Act of 1970, which served as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976); *see also* Pub. L. No. 91-604, 84 Stat. 1676 (1970). Under the new regime, Congress directed the U.S. Environmental Protection Agency to set national air quality standards at levels requisite to protect public health and then turned back to the states,

obligating them to deploy their traditional authority to adopt regulations to meet those standards. *See* 42 U.S.C. § 7407(a) (affirming states' "primary responsibility" for assuring air quality and developing state implementation plans to meet national standards); *id.* §§ 7410(a), 7501–7515 (outlining requirements for state implementation plans).

In doing so, the CAA specifically affirms the states' authority over stationary sources of air pollution such as water heaters, boilers, and process heaters. *See, e.g.*, 42 U.S.C. § 7416 (expressly recognizing and preserving states' authority to adopt or enforce "any standard or limitation respecting emissions of air pollutants" from stationary sources); *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 733 (9th Cir. 2010). But at the same time, the Act requires areas that have failed to attain air quality standards to implement emission control measures for stationary sources "as expeditiously as practicable," or face significant penalties. 42 U.S.C. §§ 7413, 7502(c)(1), 7509(b).

Following insufficient progress, Congress overhauled the CAA in 1990 to mandate increasingly prescriptive requirements for nonattainment areas. *See S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886–87 (D.C. Cir. 2006). The 1990 Amendments added new, detailed requirements for ozone reduction measures, along with a new classification scheme that established different

5

regulatory regimes depending on an area's progress toward attainment. *See* 42 U.S.C. § 7511(a)(1) (ranking areas from least to most polluted as "marginal," "moderate," "serious," "severe" and "extreme"); *id.* § 7511a (prescribing escalating control requirements according to classification). For extreme ozone nonattainment areas—a classification that, at the time, applied exclusively to the South Coast region—Congress mandated the most stringent controls. *See generally id.* §§ 7511a–7511f; Pub. L. No. 101-549, §§ 102(b), 103, 104 Stat. 2399, 2412–15, 2423–52 (1990). The 1990 Amendments also strengthened enforcement; if a "severe" or "extreme" ozone nonattainment area cannot meet an applicable standard by the prescribed deadline, its air quality regulator must compel all major stationary sources—like large industrial polluters—either to curtail their emissions drastically or face sanctions and pay a substantial annual fee for every ton of pollution emitted over a specified baseline. 42 U.S.C. §§ 7509(b), 7511d(a)–(b), 7511a(f)(1).

### B. Energy Policy and Conservation Act

Five years after enacting the CAA, in direct response to the 1973 oil crisis, Congress passed EPCA "to reduce the United States' 'domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005) (citation

omitted); *see also* 42 U.S.C. §§ 6201–6422. Because residential energy consumption represented about 17 percent of the nation's energy use, Congress took aim at new consumer appliances, hoping to "reduc[e] the[ir] energy usage . . . relative to their output." H.R. Rep. No. 94-340, at 94–95 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1856–57.

EPCA initially focused primarily on energy labeling requirements for manufacturers. *Air Conditioning*, 410 F.3d at 499; H.R. Rep. No. 94-340, at 17, 95 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1779, 1857. Because Congress believed that "better informed consumers" would make mandatory standards "unnecessary," EPCA required manufacturers to affix labels attesting to an appliance's "energy use" or "energy efficiency," as measured under federally prescribed methods. *See Air Conditioning*, 410 U.S. at 499. By "energy use," Congress meant "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with" prescribed "test procedures." Pub. L. No. 94-163, § 321(a)(4), 89 Stat. 871, 917 (1975). And it defined "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product, determined [by similar means]." *Id.* § 321(a)(5). To guide these standards, Congress called for what would later become the Department of Energy to set "energy efficiency improvement target[s]" for the covered products. *Id.* § 325(a)(1)(A). At the time, "EPCA's express preemption

7

provisions dealt primarily with the possibility that states would adopt different test procedures or consumer labeling requirements." *Air Conditioning*, 410 F.3d at 499; Pub. L. No. 94-163, § 327(a)–(b).

Then, hoping to make more "expeditious[]" progress, Congress discarded the labeling-focused approach in 1978. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985) (citation modified); *see* National Energy Conservation and Policy Act, Pub. L. No. 95-619, § 325, 92 Stat. 3206, 3259 (1978). The 1978 Amendment "created a nationwide conservation program for appliances and required the [Department of Energy] to [initially] prescribe minimum energy efficiency standards for thirteen covered products," for which state and local efficiency regulations would be preempted. *Air Conditioning*, 410 F.3d at 499. Nonetheless, for years the Department of Energy refused to promulgate any federal standards, opting instead to routinely grant "waivers" of preemption for every state regulation for which one was sought. *Id.* (quoting S. Rep. No. 100-6, at 4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52, 54). That "general policy" resulted in a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing" of appliances. *Id.* at 499–500 (quoting S. Rep. No. 100-6, at 4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52, 54).

Congress's efforts to fix these twin deficiencies gave rise to EPCA as it stands today. *See* National Appliance Energy Conservation Act of 1987, Pub. L.

No. 100-12 § 5, 101 Stat. 103, 107–17 (1987). The amended statute itself established a set of uniform national standards and required the Department of Energy to keep them updated. *See id.* To counteract the problems caused by "separate State appliance standards," S. Rep. No. 100-6, at 4, Congress made it considerably more difficult for states to obtain a preemption waiver. *See* 42 U.S.C. § 6297(d) (requiring that petitions should be granted only if "needed to meet unusual and compelling State or local energy . . . interests," and without "significantly burden[ing] manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis"). But it made only modest changes to the preemption provision itself. The text of the clause—titled "General rule of preemption for energy conservation standards when Federal standard becomes effective"—now states that "no State regulation concerning the energy efficiency, energy use, or water use of [a] covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c).[1] The statute also enumerated several exemptions to preemption, such as for "building codes" that use certain means of promoting energy efficiency, a list of specific preexisting state standards, and other

---

[1] The most recent previous iteration of the clause said that "any State regulation which established an energy efficiency standard or other requirement respecting energy use or energy efficiency" of a covered product "is superseded." Pub. L. No. 95-619, § 424(b)(1)–(3).

"regulation[s] concerning the water efficiency" and/or "water use" of particular appliances. *See id.* § 6297(c)(4)–(6), (e), and (f).[2]

Notably, two years after passing these amendments, Congress began overhauling the CAA as described above—considerably strengthening its protections and imposing stricter requirements on states to control emissions and achieve federal air quality standards.

## II.    Factual Background

### A.    The South Coast's Air Quality Problem

More than 17 million people—roughly half of California's population—live within the South Coast, which consists of all of Orange County and the urban portions of Los Angeles, Riverside, and San Bernardino Counties. Appellee's and Intervenor-Appellees' Joint Suppl. Excerpts of R., ECF No. 30.1 ("SER") SER-131–33. South Coast residents suffer from the worst smog, or ground-level ozone, in the country. SER-128, 139. It is such a significant problem that the South Coast has been classified by EPA as an extreme nonattainment area for all federal ozone pollution standards—the highest level that federal law provides. 40 C.F.R. § 81.305 (2025). The region is also in nonattainment of California's state-level

---

[2] These water-focused exemptions exist because EPCA provides for water conservation standards for covered appliances like washing machines in parallel to its energy conservation standards, and preempts competing state standards, in parallel fashion to its energy conservation provisions. Those provisions are not at issue here.

ozone standards. SER-144. It violates federal and state air quality standards for fine particulate matter, or PM2.5, as well. 40 CFR § 81.305 (2025); 85 Fed. Reg. 57,733, 57,733 (Sep. 16, 2020).

Gas-fired boilers, water heaters, and process heaters are a significant part of the problem. *See* SER-114–17. Ground-level ozone forms when volatile organic compounds interact with nitrogen oxides, or NOx, in the atmosphere in the presence of sunlight. 69 Fed. Reg. 23,858, 23,859 (Apr. 30, 2004). When boilers, water heaters, and process heaters combust natural gas, they emit large quantities of NOx—by the District's estimate, nearly 10 percent of the NOx emissions generated by South Coast stationary sources each day. SER-114, 120. Emissions from this equipment also create PM2.5 pollution. SER-117, 119 (noting health benefits from PM2.5 reductions occurring in the South Coast).

Those emissions significantly affect the health and livelihood of people across the region. Short- and long-term exposure to ozone is a significant health concern, particularly for children and people with asthma and other respiratory diseases, and it is associated with school and work absences, decreased productivity, and increased hospital and emergency room visits. SER-129, 136–38. And fine particulate matter can be inhaled into the lungs and even pass into the bloodstream, SER-123 ¶ 5, aggravating respiratory and cardiovascular disease and

causing lung disease, asthma attacks, heart attacks, and premature death, *see* 70 Fed. Reg. 65,984, 65,988 (Nov. 1, 2005).

But some South Coast residents have it worse than others. People living near industrial facilities that operate boilers, large water heaters, and process heaters are subject to particularly acute health risks. *See* SER-136–38, 145, 148–49, 150. And wind patterns distribute high concentrations of ozone to low-income inland communities already heavily impacted by industrial overuse, such as San Bernardino and Riverside Counties. SER-135, 150. In all, the health harms from South Coast air pollution disproportionately fall on disadvantaged communities. *See* SER-134, 145, 146–47, 150.

### B.    Development of the Boiler Rule

Six years after Congress enacted the CAA, the California legislature established the District, recognizing that the South Coast Air Basin had "the most critical air pollution problem in the nation." 1976 Cal. Stat. 893. California law grants the District "the primary responsibility for control of air pollution from all sources[,] other than vehicular sources." *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th Cir. 2005) (emphasis in original) (quoting Cal. Health & Safety Code §§ 39002, 40000).

By law, the District's air quality management plan and subsequent revisions serve as the federally required state implementation plan for the South Coast to

improve air quality and meet federal and state standards. Cal. Health & Safety Code §§ 40460–40462; *id.* § 40406 (California Clean Air Act provision enhancing stringency requirements in plans for nonattainment areas). Intervenors and thousands of other stakeholders engaged in the three-year administrative process that culminated in the District adopting the most recent amendment to its air quality management plan in December 2022. SER-127, 151. The 2022 Plan determined that the South Coast must reduce to zero emissions from many types of stationary sources to meet federal and state clean air standards. SER-140–42. To that end, the 2022 Plan included a control measure—which serves as a commitment to adopt a rule—to reduce NOx emissions from the equipment covered by the Rule at issue here. SER-143.

Soon after, the District initiated a rulemaking proceeding to amend the Boiler Rule. SER-94–95. The District originally adopted the Boiler Rule in 1998 "to reduce NOx emissions," SER-94, 113, from large water heaters, small boilers, process heaters, residential instantaneous water heaters, and pool heaters, SER-94. At that time, the Rule required equipment like large water heaters and smaller process heaters to meet a NOx emission limit of 55 parts per million by volume (ppmv), and small boilers and larger process heaters to meet a 30 ppmv limit. SER-105. The District strengthened the Rule three times before the amendment challenged here, to reflect changes in both the South Coast's air pollution problems

13

and major advances in technology. *See* SER-106. The NOx limit in effect before the amendment challenged in this case was 20 ppmv for most covered equipment, except for pool heaters, which remained at 55 ppmv. SER-106.

But these limits were insufficient: The South Coast's air quality continued to fall short of federal standards. Thus, after over a year of thorough deliberation, the District adopted the Boiler Rule amendment challenged in this case,[3] finding that stricter emission limits were technologically feasible and "needed . . . in order to meet the National Ambient Air Quality Standards for ozone." SER-118. The Rule will gradually phase in zero-emission requirements over nearly a decade, with compliance deadlines differing by equipment type and capacity and whether the installation site is a new or existing building. SER-96–99. The first deadline, January 1, 2026, covers certain equipment installed in new buildings. SER-97. Equipment in existing buildings need not comply until 2029 at the earliest, when it is due to be replaced—and even then, may qualify for extensions and alternative compliance options. Plaintiffs-Appellants' Excerpts of R., ECF No. 15.1 ("ER") ER-218, ER-222–30; SER-97–98.

When fully implemented, the Rule is projected to reduce NOx emissions by 5.6 tons per day—the equivalent of nearly half the combined NOx emissions from

---

[3] Hereinafter, the term "Boiler Rule" is used to refer to the amended Rule adopted in 2024.

every car in the region. SER-114–15; SER-31–32 ¶¶ 37–38. The Boiler Rule alone

will eliminate nearly 10 percent of the emissions within the District's jurisdiction

and move the region closer to ozone attainment. SER-114, 120. These reductions

translate to significant public health benefits for South Coast communities,

including preventing "approximately 2,828 premature deaths, 192,754 lost school

days, 120,986 work loss days, [and] 11,864 cases of newly-onset asthmas." SER-

14 ¶ 16. The estimated monetary value of those health benefits is over $95 billion.

SER-14 ¶ 19. Although the Boiler Rule's gradual phase-in means that its full

benefits will not be realized right away, its health benefits will begin to accrue

immediately, and each application of the Rule will relieve residents of pollution

burdens that new equipment would have emitted for the entirety of its useful life.

## III. Procedural Background

Nearly six months after the District amended the Boiler Rule, Plaintiffs—a

group of appliance manufacturers and trade associations, including the California

Restaurant Association—sued. In what they termed a facial challenge, they argued

that the Boiler Rule was preempted under EPCA and sought to enjoin it in its

entirety. ER-183–86. Plaintiffs filed a motion for summary judgment on April 14,

2025. ER-255. The District filed a cross-motion for summary judgment on May 12,

2025, which Intervenors joined. ER-256–57.

The district court issued an order and entered judgment for the District on July 18, 2025, ER-259, making modest clarifying and typographical amendments to the order the following week, ER-259–60. The court held that "the SCAQMD Rule does not concern the energy use of appliances under the EPCA and is not preempted." ER-16–17. Examining EPCA's plain text, purpose, and structure, the court concluded that "there is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emission regulations designed to combat air pollution." ER-16. "Indeed," it observed, while EPCA "specifically preempts building codes concerning energy use unless certain exemptions are met, it fails to mention air pollution regulations, despite the fact that the CAA had been in place for many years at the time the EPCA was enacted and amended." ER-16.

The court further noted that EPCA's statutory framework and "legislative history confirms its focus on establishing national standards for energy efficiency and not on upsetting states' and local governments' longstanding practice of regulating appliance emissions to achieve air pollution goals." ER-16. Plaintiffs' interpretation of EPCA, "if taken to its logical conclusion . . . would upset the historic and recognized powers of states and local governments to set emission standards and implement other regulations designed to protect the health and safety of their citizens." ER-16. And, the court explained, this Court's "narrow holding [in *California Restaurant Association*]—expressly limited to building codes that

16

concern an appliance's actual energy use"—did not extend preemption to "state regulation of toxic emissions from appliances in order to comply with federal air pollution standards." ER-16–17.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's order granting summary judgment on preemption grounds." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024). Summary judgment may be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Facial challenges like Plaintiffs' face "unique burdens," *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016), and are "the most difficult [] to mount successfully," since the challenger must establish that "no set of circumstances exist[s] under which the [state law] [is] valid," *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1122 (9th Cir. 2020) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Puente Ariz.*, 821 F.3d at 1104). In other words, the challenger "must establish that every possible application of the [state law] would conflict with the [federal statute]." *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021) (citing *Puente Ariz.*, 821 F.3d at 1104).

Preemption analysis "is guided by" the rule that "'[t]he purpose of Congress is the ultimate touchstone.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)

17

(quoting *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103 (1963)). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Grp. v. Good*, 555 U.S. 70, 76 (2008) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). While this Court applies no presumption against preemption, it is, like all courts, cautious to be "certain of Congress's intent" before finding that Congress has legislated "in areas traditionally regulated by the States." *West Virginia v. EPA*, 597 U.S. 697, 744 (2022) (Gorsuch, J., concurring) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 459–60 (1991)). And "the case for federal preemption" is "less persuasive" when "coordinate state and federal efforts exist within a complementary administrative framework," *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973), to say nothing of circumstances where states act under federal direction.

## SUMMARY OF THE ARGUMENT

The district court correctly recognized that regulating emissions and regulating appliances' energy use are two fundamentally different projects, which are accomplished through different means and addressed by different federal statutes. Because Plaintiffs have not and cannot show that Congress intended federal energy conservation standards to preempt the Boiler Rule's health-based emission standards, this Court should affirm the district court's grant of summary judgment for the District.

**I.** First, Plaintiffs' construction of EPCA's preemption provision runs contrary to EPCA's text, structure, and purpose. In enacting EPCA, Congress was clear that it intended to preempt energy conservation standards, which concern the quantity of energy that goes *into* a piece of equipment. By contrast, nothing indicates that Congress intended to preempt emission standards, which concern the concentration of emissions that come *out of* the equipment. This distinction between energy conservation standards and emission standards flows from EPCA's text and framework. Courts, federal agencies, and even one of the Plaintiffs here have also long embraced it. And as applied to the Boiler Rule, it shows that the Rule is not preempted. As a technology- and fuel-neutral emission standard, the Boiler Rule does not concern energy use.

**II.** Second, Plaintiffs' preemption theory leads to an unlikely conclusion: that Congress intended to disable air regulators from pursuing measures necessary to attain federal standards and then to penalize them for that failure. The district court recognized that this theory, followed to its logical ends, would inhibit the District and other regulators from adopting emission standards that are essential to achieve federal air quality standards under the CAA—of which the Boiler Rule is one. But there is no reason to draw that inference. Given that Congress was well-aware of states' obligations under the CAA when it enacted EPCA, the best interpretation of EPCA's preemption provision is one that allows the statute to co-

exist with the framework established by the CAA. And Plaintiffs' construction of EPCA is even more implausible because the pollution-control responsibilities that Congress requires the District to exercise are rooted in longstanding state police powers. Plaintiffs have not pointed to any evidence in EPCA of Congressional intent to narrow states' powers to limit air pollution.

**III.** Finally, neither this Court's precedent nor any of Plaintiffs' remaining arguments support their interpretation of EPCA. Plaintiffs claim that *California Restaurant Association* compels the conclusion that the Boiler Rule is preempted. But as this Court explained at the time, that decision was a narrow one explicitly confined to building code regulations concerning the quantity of energy EPCA-covered equipment may use. The district court correctly held that *California Restaurant Association* has no bearing on state emission limits regulating what emissions they may produce. Beyond misapplying precedent, Plaintiffs fail to supply a stable or coherent interpretation of EPCA's statutory text, resort to ineffective policy arguments, and ask the Court to apply irrelevant caselaw. The Court should reject each of their arguments and affirm the district court.

## ARGUMENT

States and local governments have long exercised their police powers to protect their residents from the health and safety consequences of excessive pollution. Under the CAA, Congress not only preserved those powers but in fact

20

required states to discharge them to take actions such as what the District has done here: adopt control measures, and rules implementing them, to reduce the ozone-forming pollutants that give the South Coast the worst air quality in the nation.

But as Plaintiffs see it, at the same time Congress was creating—and expanding—these obligations, it was tying states' hands under a different enactment that arose from the 1970s oil crisis. EPCA authorizes the Department of Energy to set uniform national energy conservation standards. And to implement that regime and assure that federal standards govern as intended, it preempts state and local regulations concerning those same appliances' energy use. But according to Plaintiffs, EPCA preemption stretches much further. They say that it *also* forecloses states from issuing regulations that do not concern energy use at all, but rather, like the District's Boiler Rule, set health-based emission standards with wholly incidental impacts on a covered appliance's energy consumption.

The district court properly rejected that theory, and this Court should too. It is at odds with EPCA's text, structure, and purpose; inexplicably undercuts the force of a different federal enactment; and is not supported by this Court's precedent or any of Plaintiffs' remaining arguments. The Court should affirm.

21

## I.  Congress did not intend EPCA standard-setting to preempt emission limits that, like the Boiler Rule, are critical to meet federal air quality standards.

As with any question of statutory interpretation, the express preemption inquiry starts with EPCA's "text and structure." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (citation modified). For Congress to preempt state or local law, its intent to do so must be discernible "from the language of the preemption statute and the statutory framework surrounding it." *Medtronic*, 518 U.S. at 486 (citation modified). Here, every indicator of statutory meaning forecloses Plaintiffs' theory. In enacting EPCA, Congress deliberately distinguished energy conservation standards, which concern the quantity of energy that goes *into* a piece of equipment, from emission standards, which concern the concentration of emissions that come *out of* the equipment. EPCA's text and structure make clear that Congress intended to preempt the former. But it did not in so doing also intend to interfere with emission standards that states must implement to satisfy their federal mandate to attain health-based air quality standards under the CAA. Since that is all the Boiler Rule does, it is not preempted.

22

A. **EPCA's text and framework demonstrate that Congress intended to preempt state regulations concerning the quantity of energy equipment consumes.**

Beginning with the statutory text, EPCA's preemption provision states that, "effective on the effective date of an energy conservation standard," "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product . . . ." 42 U.S.C. § 6297(c). In other words, a state law is preempted if it directly or indirectly regulates the "energy efficiency" or "energy use" of a covered product. *Id.*; *see also Cal. Rest. Ass'n*, 89 F.4th at 1102.

EPCA supplies precise definitions of both terms. It defines "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product" and "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. §§ 6291(4)–(5). Section 6293, in turn, provides for test procedures that "measure . . . energy use . . . of a covered product during a representative average use cycle or period of use, as determined by" the Department of Energy. *Id.* § 6293(b)(3). In sum, then, each definition focuses on the quantity of energy equipment consumes.

23

These concepts are an essential component of EPCA's statutory framework. As the district court explained, that framework establishes an energy conservation program centered on energy conservation standards for a set of covered appliances. ER-14. In reaction to the 1970s energy supply crisis, Congress aimed to reduce U.S. energy consumption "through the operation of specific voluntary and mandatory energy conservation programs"—i.e., requiring appliances to operate more efficiently and thereby use less fuel, in the interest of conserving those resources. *Air Conditioning*, 410 F.3d at 498–99 (quoting S. Rep. No. 94–516, at 117 (1975)).

To that end, EPCA establishes (or requires the Department of Energy to establish) "energy conservation standards" that restrict how manufacturers may design covered products by "prescrib[ing] a minimum level of energy efficiency" or a "maximum quantity of energy [or water] use" before those products may be "distributed in commerce." 42 U.S.C. §§ 6291(6), 6295. In other words, depending on the type of product, the Department of Energy must either restrict how much energy it may consume in absolute terms (an "energy use" standard) or bar it from producing too little usable output relative to that energy consumption (an "energy efficiency" standard). Energy use standards are common for products' use energy only some of the time, like clothes dryers, while efficiency standards are common for products that use energy continuously, like refrigerators. Once such a standard

24

is set, before a manufacturer may distribute a product, it must test it under prescribed procedures to determine its energy efficiency or energy use, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. pts. 430–31; certify to the Department of Energy that the product meets the standard, 10 C.F.R. § 429.12; and affix labels that accurately present its federally-determined energy efficiency or energy use, *see* 42 U.S.C. §§ 6294, 6315; 16 C.F.R. § 305.17.

EPCA's preemption clause fits neatly into this framework. When a federal energy conservation standard has been established for a particular covered product, the preemption clause ensures that no state or local regulation that likewise "concern[s]" the "energy use" or "efficiency" "of such covered product" may "be effective with respect to such product." 42 U.S.C. § 6297(c). And by doing this, EPCA ensures that, when manufacturers design and produce their products, they need not juggle competing state and federal energy conservation standards and are subject to a single set of rules, governed by a single set of familiar test procedures. *Air Conditioning*, 410 F.3d at 499.

Reading EPCA in this straightforward manner leads to a straightforward rule: Once the Department of Energy establishes, for example, a maximum amount of energy that gas-burning boilers may use to output a particular level of heat, the District may not, directly or indirectly, set its own limits on how much energy boilers can consume. But EPCA says nothing about state or local regulations that

25

regulate other aspects of those appliances—such as the amount of pollution they may emit into the atmosphere.

**B.  The district court correctly held that EPCA does not preempt the Boiler Rule because it does not concern energy use, but rather sets an emission standard.**

EPCA's definitions of "energy use" and "energy efficiency," and those terms' roles in EPCA's "coherent regulatory scheme," *FDA v Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)), together foreclose Plaintiffs' theory that the statute preempts the Boiler Rule. Under those definitions, as the district court correctly held, the Boiler Rule is not a regulation concerning energy use at all. ER-16–17. It is a technology- and fuel-neutral emission standard. SER-108–12. EPCA has no application to such a limit, and little wonder, because Congress specifically intended state and local agencies to pursue regulations of this nature. *See* ER-16.

Start with what the Boiler Rule does. By design, the Boiler Rule "addresses the pollution appliances emit." ER-28. But it says nothing at all about how equipment may consume energy, as long as any NOx produced during its operation is fully captured or eliminated. *See* ER-217–20. A zero-emission standard like this one presents no such physical or technical obstacle to an appliance's consumption of gas; indeed, it is not uncommon for emission sources to comply with a zero-emission standard while still consuming the same fuel or producing the same

useful output as the uncontrolled emitting process. *See, e.g.*, 89 Fed. Reg. 55,684, 55,696 (July 5, 2024) (requiring zero emission leaks from certain coke oven doors, without requiring changes to the fuel used or coke produced); 89 Fed. Reg. 40,198, 40,199–200 (May 9, 2024) (setting a zero-discharge effluent limitation at coal-fired and other power plants, without requiring changes to the fuel used).

And the District welcomes that outcome here. It expressly contemplated compliance with the Boiler Rule by multiple equipment types using a range of fuels and zero-emission technologies, including heat pumps, electric resistance, solar water heating, and gas fuel cell technologies. SER-108–12. The Rule also commits the District's staff to performing a technology assessment in 2027 to assess market availability before the Rule's later compliance dates go into effect. SER-103.

The fact that the Boiler Rule operates independently of an appliance's energy use places it far outside the scope of EPCA preemption. As the district court explained, there is a fundamental textual distinction between a regulation concerning energy use—that is, the quantity of *energy* that goes *into* a piece of equipment—and an emission standard, which concerns the concentration of *emissions* that come *out of* the equipment. *See* ER-16–17. EPCA's text plainly preempts the former. But it does not reach the latter, which instead fits into the CAA's comprehensive, cooperative federalism system of pollution regulation.

27

### C. The distinction between regulations concerning energy use and emission standards flows from EPCA's text and framework.

This distinction between energy use regulations and emission standards is evident in EPCA's text and framework. EPCA's preemption provision says nothing about emission standards, but rather repeatedly concerns itself with how much energy equipment could consume. And the rest of the statute gets no closer. Time and again, it focuses its attention on how much *energy* an appliance will consume: EPCA directs the federal Department of Energy to set energy conservation standards for individual appliances, expressed in terms of "energy efficiency" and "energy use," to advance Congress's goal of using less energy overall.

EPCA's exemption provisions illustrate the same focus. For instance, EPCA expressly exempts from preemption certain state regulations and types of regulation. Those exemptions apply to building codes, 42 U.S.C. § 6297(f); procurement standards that are more stringent than federal energy conservation standards, *id.* § 6297(e); and state regulations that are granted a waiver from the Department of Energy to help "meet unusual and compelling State or local energy or water interests," *id.* § 6297(d). And for each one, when Congress granted an exception to preemption, it directed that exception at the amount of energy that appliances consume—not the quantity of emissions they produce, nor any other metric.

28

Plaintiffs concede that emission standards are not mentioned at all in EPCA, but insist that this silence is "dispositive evidence that Congress did not create any such exception." Pls.' Br. at 25. As they see it, "if Congress had wanted to include an exception for state and local emission standards, it could have—and presumably would have—said so." Pls.' Br. at 46 (internal citation and quotation marks omitted).

This misses the point. Emission standards are not included in EPCA's list of exceptions—or anywhere else in the statutory framework—because emission standards do not concern energy conservation standards in a way that might warrant an exception to EPCA's preemption provision. The provision simply does not apply. Instead, the common feature of all EPCA's exceptions—a focus on the efficiency of appliances or the quantity of energy used—illustrates that Congress had only this context in mind when crafting the preemption provision. If, by including building codes, the exceptions indicate that EPCA's preemptive scope extends beyond *direct* state energy conservation standards, they indicate just as strongly that it does not reach beyond the broader energy-use context to which they all, in one way or another, apply. *Cal. Rest. Ass'n*, 89 F.4th at 1101 (finding the building code exception to EPCA preemption to be "[o]f critical importance" to the court's "limited" holding "that EPCA applies to building codes and that Berkeley's Ordinance falls within the Act's preemptive scope").

29

Indeed, if Plaintiffs' logic were correct, this Court's reservation in *California Restaurant Association* of whether a bona fide exercise of Natural Gas Act authority to restrict local gas distribution would suffer the same preemption fate as Berkeley's no-piping connection ordinance would be inexplicable: If "Congress wrote in all the exceptions it wanted," Pls.' Br. at 2, "silence" as to gas distribution rules that prevent gas-appliance use should have been "dispositive." Pls.' Br. at 24–25; *see also* Pls.' Br. at 2 (A "[local gas distribution] exception is nowhere to be found."). And as we explain below, *see infra* Section III.A, Judge Baker's concurrence would make even less sense.

In addition, the distinction between regulations concerning energy use and regulations limiting pollution is evident from the text of one of the preemption provision's immediate neighbors, 42 U.S.C. § 6294a. That section establishes the Energy Star program—a voluntary labeling program aimed at promoting products that will both "reduce energy consumption . . . and reduce pollution"—and vests the EPA Administrator and the Secretary of Energy with joint responsibility for those distinct goals. *Id.* § 6294a(a), (c). It is hard to believe that Congress would have carefully preserved a role for the EPA in this voluntary labeling program, based on that agency's pollution reduction expertise, but left it to the Energy Secretary to sweepingly divest air pollution regulators of authority unilaterally, through exercise of authority to set appliance-specific conservation standards. *Cf.*

*Gonzales v. Oregon*, 546 U.S. 243, 265 (2006) (rejecting as "inconsistent with the design of the statute" Attorney General's claimed authority to regulate medical practice under the Controlled Substances Act, because he "share[d authority] with the [HHS] Secretary," with the "medical judgments . . . placed in the [latter's] hands"). It is especially unlikely that, having explicitly mentioned air pollution in the Energy Star context, Congress would have intended energy conservation standards to apply to laws designed to reduce air pollution without ever saying so. Congress knew how to direct its focus to air pollution if it wanted to, and it did not do so in the preemption clause.

In each instance, the best interpretation is the one the district court settled on: EPCA preempts regulations concerning energy use, not regulations concerning pollution.

### D. The distinction between regulations concerning energy use and emission standards is ubiquitous and long recognized.

Consistent with the district court's interpretation, courts, federal agencies, and even one of the Plaintiffs here have long recognized the distinction under EPCA between regulations limiting emissions and regulations concerning energy use.

Notably, the Supreme Court concluded in *Massachusetts v. EPA* that regulations concerning emissions and efficiency are "wholly independent." 549 U.S. 497, 532 (2007) (observing that federal agencies' obligations under EPCA

and the CAA "may overlap, but there is no reason to think the two agencies [responsible for regulating vehicles' fuel economy and greenhouse gas emissions] cannot both administer their obligations and yet avoid inconsistency").

Other courts likewise have affirmed that EPCA does not preempt state limits on harmful pollution from EPCA-covered equipment. *See, e.g.*, *Bankhurst v. Wolf Appliance, Inc.*, No. 23-cv-253-jdp, 2024 WL 3273322, at *(W.D. Wis. July 2, 2024) (finding that EPCA preemption did not apply where plaintiffs' claims did not concern energy consumption, but instead "the unsafe levels of hazardous *pollutants*—particularly nitrogen dioxide—that the products allegedly emit"); *Hendrick v. BSH Home Appliances Corp.*, No. 8:23-cv-00358, 2024 WL 2190984, at *8 (C.D. Cal. May 14, 2024) (concluding that allegations relating to emissions and health impacts of gas stoves "do not concern the EPCA and the effect that Plaintiffs' claims would have on energy use, if any, is merely tangential and remote"); *see also Drake v. Haier U.S. Appliance Sols. Inc.*, 2024 WL 590597, at *6 (N.D. Cal. Feb. 13, 2024) (unpublished) (finding that fraud claims relating to failure to disclose emissions risks of gas appliances "do not regulate the amount of gas accessible to appliances, nor do they necessarily impact the quantity of gas consumed by gas appliances at the point of use").

The Department of Energy also has long recognized that its charge to enact efficiency standards under EPCA is unaltered by local emission standards for

covered appliances, even if they tangentially affect equipment efficiency. *See, e.g.*, 75 Fed. Reg. 20,112, 20,132–33 (Apr. 16, 2010) (recognizing that local emission standards for water heaters can affect their efficiency, but declining to adjust efficiency standards in response).

And the *California Restaurant Association* challengers—before they brought this case—made much the same point. As they saw it, construing EPCA to preempt Berkeley's building law *would not* affect "all sorts of ordinary local regulations" of covered products—including "regulations of nitrogen oxide emissions." ECF No. 31.2 at 244–45. Those were not at risk of displacement, they explained, because "[t]he express preemption clause . . . does not bar *all* local regulations that affect EPCA-covered appliances . . . only local regulations that 'concern[] energy use.'" *Id.* at 24. (emphasis added). "Local regulations . . . limiting the emissions of nitro[gen] oxide[s], they told the court, might affect EPCA-covered appliances, but they do not 'concern energy use.'" *Id.* That is a crisp statement of the district court's conclusion here.

Thus, Plaintiffs have failed to show that Congress intended EPCA to preempt the Boiler Rule's health-based emission standards. The Court should affirm the district court's finding that EPCA does not preempt the Boiler Rule.

**II.    Congress did not intend to require the states to exercise pollution control responsibilities under the CAA while also preventing them from meeting those obligations through EPCA's preemption provision.**

It is little surprise that EPCA does not preempt emission standards, because Congress in fact requires states to set them. Under the CAA—which Congress enacted prior to EPCA, and continued to strengthen after EPCA was enacted—states are not just permitted to use their police powers to set emission standards for equipment like what is covered under the Boiler Rule but required to do so. As the district court recognized, if Plaintiffs were correct, Congress in enacting EPCA somehow also extinguished those requirements. *See* ER-16. That would mean that Congress intended to disable air regulators from pursuing measures necessary to attain federal standards and *then* to penalize them for that failure.

"[T]he case for federal preemption" is already "less persuasive" when "coordinate state and federal efforts exist within a complementary administrative framework," *Dublino*, 413 U.S. at 421, such as the cooperative federalism scheme the CAA adopts here, *see In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1225 (9th Cir. 2020). But when, as here, the preemption theory stands in tension with another *federal* enactment, it makes no sense at all. Plaintiffs offer no support for their claim that Congress sought to erode the CAA and traditional state police powers to control air pollution, and as explained below, the evidence is to the contrary.

34

### A. Plaintiffs' interpretation of EPCA would dismantle the CAA's health-based protections.

Even Plaintiffs do not seriously dispute the undeniable: that the Boiler Rule is the outcome of a serious, bona fide exercise of the District's responsibilities as the air regulator charged with bringing the South Coast into compliance with the CAA. As this Court has explained, the CAA "*requires* states to address nonattainment areas" like the South Coast through plans that limit emissions from stationary sources and demands increasingly stringent regulation for increasingly serious air quality problems. *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1174 (9th Cir. 2015) (emphasis added). The Boiler Rule flows from such a plan. Plaintiffs' brief nonetheless says nothing about the CAA for its first 50 pages, and it breaks the silence only to offer up conclusory assertions that the Act is "irrelevant" to this case, Pls.' Br. at 51–53, and that the District does not have "a specific federal directive to regulate appliance emissions." Pls.' Br. at 52. In fact, the Boiler Rule is exactly the type of rule that Congress intended, and indeed mandated, states to implement to meet their CAA obligations.

Importantly, the powers Plaintiffs would take from the District here are not only central strands of states' historic sovereign authority but also the primary means by which Congress has chosen to pursue the national interest in healthy air. A "defining feature" of the CAA is its "uniquely important system of cooperative federalism" that makes "the States and the Federal Government partners in the

struggle against air pollution." *In re Volkswagen*, 959 F.3d at 1214 (internal quotations and citations omitted). The CAA's cooperative federalism scheme demonstrates Congress's intent for state and local governments to maintain primary control over air pollution. As "[e]nvironmental regulation traditionally has been a matter of state authority," *Exxon*, 217 F.3d at 1255, "Congress itself contemplated that the states would retain leading roles in regulating air quality," *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011).

Thus, while the CAA requires states to attain federal air quality standards, it preserves state and local strategies over how to meet them. *See* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."); *id.* §§ 7407(a), 7410(a)(1). And to ensure that states retain the authority needed to meet these and related obligations, the CAA expressly recognizes and preserves states' authority to adopt or enforce "any standard or limitation respecting emissions of air pollutants" from stationary sources. 42 U.S.C. § 7416.

Here, that power lies with the District, which has "the primary responsibility for control of air pollution" from all stationary sources in its region, including the covered equipment. *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 782 (9th Cir. 2005) (quoting Cal. Health & Safety Code §§ 39002, 40000).

The District cannot meet federal air quality standards without adopting the Boiler Rule, whose pollution reductions will advance Congress's health protection mandates and are essential to the South Coast's attainment of federal air quality standards. SER-130, 140; SER-101–02; SER-118. The District expressly adopted the Rule to meet its obligations under section 110, as it was "needed . . . in order to meet the National Ambient Air Quality Standards for ozone." SER-101–02; SER-118. Indeed, the District confirmed "that staff's proposed control options for [the Boiler Rule] are being adopted because . . . there is [sic] no other control options that meet . . . the air quality objectives." SER-102. As explained above, the South Coast is in extreme nonattainment for all federal ozone pollution standards, posing serious public health concerns in the region. 40 C.F.R. § 81.305. Without reductions, the District will face sanctions, such as loss of federal highway funding and other consequences for failure to achieve attainment. *See* 42 U.S.C. § 7509(b).

If Plaintiffs were correct, then when Congress enacted EPCA, it intended to thereby prohibit the District from fulfilling the very obligations it faced under the CAA. There is no reason to draw that inference. To the contrary, courts "assume Congress is knowledgeable about existing law when it enacts new legislation." *See Pit River Tribe v. BLM*, 939 F.3d 962, 971 (9th Cir. 2019). Congress was well aware of states' obligations under the CAA—a fact that both the district court noted and Plaintiffs themselves points out. *See* ER-16 ("Indeed, while the EPCA

specifically preempts building codes concerning energy use unless certain exemptions are met, it fails to mention air pollution regulations, despite the fact that the CAA had been in place for many years at the time the EPCA was enacted and amended."); Pls.' Br. at 46 (citing ER-16). Despite that, EPCA singles out building codes concerning energy use but entirely "fails to mention air pollution regulations." ER-16. And no wonder: "EPCA's legislative history confirms its focus on establishing national standards for energy efficiency and not on upsetting states and local governments' longstanding practice of regulating appliance emissions to achieve air pollution goals." ER-16.

Indeed, at the time Congress amended EPCA in 1987, adding the preemption provision on which Plaintiffs' theory is based, multiple state agencies had already promulgated NOx emission standards for EPCA-covered appliances, some of which had become federally enforceable when the EPA approved their incorporation into state implementation plans. *See, e.g.*, 47 Fed. Reg. 29,231 (Jan. 7, 1986) (approving a local air district's emission standards for furnaces into California's State Implementation Plan); *see also Hall v. USDA*, 984 F.3d 825, 840 (9th Cir. 2020) ("Congress is presumed to be aware of an agency's interpretation of a statute."). And in 1990, soon after adopting EPCA's preemption provision, Congress continued to strengthen the CAA, including by ratcheting up sanctions for nonattainment of air quality standards—with no suggestion that the recently

38

amended energy conservation statute's preemption measure would or even might drastically constrain local regulators' powers to fulfill their obligations, let alone jeopardize measures that EPA had specifically approved years earlier.

In fact, the natural consequence of the 1990 CAA Amendments' heightened demands was that other jurisdictions followed their peers' federally approved approach. The number of states and air districts adopting emission standards for covered appliances multiplied, creating no apparent conflict with EPCA's preemption provision. *See, e.g.*, 89 Fed. Reg. 54,358, 54,360 (July 1, 2024) (approving Utah's NOx emission standards for water heaters); 82 Fed. Reg. 17,136, 17,142 (Apr. 10, 2017) (approving Washington Southwest Clean Air Agency standards including water heater and boiler emission standards); 73 Fed. Reg. 73,562, 73,570–71 (Dec. 3, 2008) (approving Texas's NOx emission standards for water heaters). That is because state regulation of emissions does not disrupt Congress's goal of "counteract[ing] the systems of separate state appliance standards" under EPCA. *Air Conditioning*, 410 F.3d at 500.

Plaintiffs' broad preemption theory thus would inhibit the Boiler Rule and other local emission standards that are essential for the District and other regulators nationwide to achieve federal air quality standards under the CAA and avoid sweeping, onerous consequences. This repeal by implication is "disfavored"; "when two statutes are capable of co-existence, it is the duty of the courts, absent a

clearly expressed congressional intention to the contrary, to regard each as effective." *Floyd v. Am. Honda Motor Co., Inc.*, 966 F.3d 1027, 1034 (9th Cir. 2020) (internal quotes and citation omitted). Just as federal agencies have done for decades, and the district court did here, this Court should construe EPCA's preemption provision in the way that fits "logically and comfortably into the body of both previously and subsequently enacted law," including amendments to and applications of the CAA from both before and after 1987. *Hall*, 984 F.3d at 838 (internal quotes omitted).

In response, Plaintiffs suggest that the district court has improperly allowed the CAA to override EPCA preemption where it correctly applies by creating a special exception for emission regulations. Pls.' Br. at 45–48, 51–53. But it is *Plaintiffs* that attempt to use one federal enactment to functionally override another. All the district court did was read the CAA and EPCA, correctly, as "capable of co-existence," *see Floyd*, 966 F.3d at 1034 (internal quotes omitted), and as parts of a coherent whole.

The bottom line is that Plaintiffs' interpretation of EPCA would interfere with the District's attaining federal and state air quality standards by preempting traditional state authority that the CAA respects and depends upon to achieve federal air quality goals. It is clear that Congress did not intend for EPCA to undercut the core health and safety powers it not only affirmed but required the

District to exercise under the CAA's cooperative federalism scheme. Because the District cannot meet federal air quality standards without the Boiler Rule's health protections, Plaintiffs' preemption theory cannot stand.

### B. Plaintiffs' preemption claim would disable longstanding state police powers that Congress requires the District to exercise.

Plaintiffs' claims of preemptive intent are even more implausible because the pollution-control responsibilities that Congress requires the District to exercise are rooted in longstanding state police powers. California's traditional police powers include "the power to protect the health of citizens in the state," including "air pollution prevention." *Exxon*, 217 F.3d at 1255; *see also Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of . . . the police power."). As the district court noted, "California has regulated ozone pollution in Los Angeles since the mid-twentieth century." ER-16 n.8.

Here, Plaintiffs' preemption theory would mean that EPCA disables traditional police powers—a result that the district court foresaw. ER-16 ("The District contends – and the Court agrees – that if taken to its logical conclusion, this interpretation would upset the historic and recognized powers of states and local governments to set emission standards and implement other regulations designed to protect the health and safety of their citizens."). In addition to emission

41

standards, Plaintiffs' construction would invalidate any regulation that incidentally affects the quantity of gas consumed by an appliance—eviscerating safety, density, inspection, and other regulations unrelated to energy conservation. Based on Plaintiffs' logic, an ordinance restricting the use of kerosene in fire prone locations might be preempted by EPCA if it reduced the usage of EPCA-covered kerosene appliances.

But courts are not to conclude that Congress meant "to significantly alter the balance between federal and state power" absent "exceedingly clear language" to that effect. *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (internal quotation omitted). Despite their contentions that the district court's reasoning was contrary to EPCA's text, *see* Pls.' Br. at 45–48, Plaintiffs have not pointed to any evidence in EPCA of Congressional intent to narrow states' powers to limit air pollution.

Trying to escape this problem, Plaintiffs mischaracterize the district court's citation to this Court's discussion of EPCA's legislative history in *Air Conditioning*, 410 F.3d at 500, as an application of the presumption against preemption.[4] Pls.' Br. at 47–48 (citing *Medtronic*, 518 U.S. at 485 ). But the district court expressly acknowledged that this Court no longer applies the

---

[4] While this Court no longer applies the presumption against preemption, the discussion of EPCA's legislative history in *Air Conditioning*—on which Plaintiffs themselves heavily rely in their own discussion of EPCA's legislative history, *see* Pls.' Br. at 5–6, 41—still stands.

presumption against preemption. ER-12. And even without that presumption, *Sackett* demands a showing of clear Congressional intent before altering the balance between federal and state power—one Plaintiffs cannot make.

## III. Plaintiffs' other arguments in favor of preemption fail.

Unable to find support for their position in the text, structure, and history of EPCA's preemption provision, or to reconcile that position with Congress's parallel enactments under the CAA, Plaintiffs claim that *California Restaurant Association* nevertheless compels the conclusion that the Boiler Rule is preempted. They are wrong. As this Court explained at the time, that decision was a narrow one explicitly confined to building code regulations concerning the quantity of energy EPCA-covered equipment may use. It has no bearing on state emission limits regulating what emissions covered equipment may produce. Plaintiffs' contrary argument fails to grapple with the fundamental difference between the two types of regulations.

And unable to simply cross-apply *California Restaurant Association*, Plaintiffs offer little else. They refuse to supply a stable or coherent interpretation of EPCA's statutory text, resort to policy arguments, and ask to apply irrelevant caselaw. The Court should reject each of these arguments and affirm the district court.

## A. *California Restaurant Association* does not support, and indeed substantially refutes, Plaintiffs' position here.

Much of Plaintiffs' brief is devoted to insisting that this case is "legally indistinguishable" from, "on all fours" with, and therefore "control[led]" by this Court's decision in *California Restaurant Association*. Pls.' Br. at 1–2, 18, 22, 27, 31, 35, 51. They accuse the district court of sidestepping this Court's holding by allegedly focusing on immaterial distinctions between the Berkeley ordinance and Boiler Rule and "mistaking the [*California Restaurant Association*] decision's facts for its reasoning." Pls.' Br. at 23.

Those aspersions are wholly undeserved. In holding that *California Restaurant Association* does not support invalidating the District's recent effort to extricate itself from extreme nonattainment of federal ozone air quality standards, the district court correctly understood and faithfully applied circuit precedent. Indeed, it is *Plaintiffs* who repeatedly—and impermissibly—jettison centrally important strands of this Court's holding and reasoning. *See* Pls.' Br. at 26. This Court was explicit that *California Restaurant Association* should not be read as settling the fate of very different measures: "This is a narrow opinion about Berkeley's building codes," 89 F.4th at 1106, and "[o]f critical importance here is that the structure of the statute indicates that 'a regulation concerning the . . . energy use' can include 'building code requirements.'" *Id.* at 1101.

Notably, these disavowals of breadth first appeared in this Court's amended opinion, issued after rehearing requests noted that its initial decision risked being read as disabling large swaths of longstanding health and safety protections—e.g., fire codes that prevent cooking with barbecues indoors or operating space heaters or hot plates in dorms or nursing homes—on the theory that these limits on EPCA-compliant appliances restricted their energy use.

The Court's affirmations of narrowness echoed the understanding advanced by the California Restaurant Association—the lead plaintiff in that case and one of the Plaintiffs attacking the district court's decision here—that the panel holding was indeed "case-specific," and did not "threaten the wide range" or "endanger[] local health and safety regulations that," unlike Berkeley's ordinance, "have long coexisted with EPCA." Pl.'s Opp. to Pet. for Reh'g En Banc ("E.B. Opp.") at 1–2, 11, 16, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) (No. 21-16278). Indeed, the plaintiffs in *California Restaurant Association* had told the district court that construing EPCA to preempt Berkeley's building law *would not* affect "all sorts of ordinary local regulations" of covered products—including "regulations of nitrogen oxide emissions." ECF No. 31.2 at 244–45. The Association specifically attributed contrary assertions of sweeping significance to the rehearing petitioners' "mistaken" belief that the panel opinion construed the preemption clause to establish an individual right to operate federally approved

appliances free of local regulation, when, on the Association's account, it "did no such thing." E.B. Opp. at 10.

Moreover, far from being "legally indistinguishable," the Berkeley ordinance and the Boiler Rule differ fundamentally with respect to what the *California Restaurant Association* decision treats as most important: the plain meaning of the preemption clause's text. As we explained above, *see supra* Section I, and this Court underscored in *California Restaurant Association*, EPCA's preemption clause is concerned with energy use—that is, the amount of energy a product consumes when it is used in a home or business. The Berkeley ordinance regulated just that: It operated to—not incidentally, but purposefully and unavoidably—prevent natural gas, a particular type of energy, from being used by a broad swath of appliances for which federal conservation standards have been established. It prevented constructing new buildings with natural gas infrastructure and therefore prohibited appliances' use of that energy source in perpetuity, without regard to technological advances or any objective external criterion like achieving federal air quality standards.

The Boiler Rule's concern, by contrast, is with reducing air pollution, *see supra* Section I.B. As the Association told the Court in *California Restaurant Association*, the effect of rules like these on energy use—and the effect of prior longstanding regulations in the District and other jurisdictions setting non-zero

46

emission limits for the same equipment—is incidental. Indeed, the Boiler Rule is even agnostic as to the type of fuel covered equipment consumes. *See supra* Section I.B.

By pronouncing the Berkeley ordinance and the Boiler Rule "legally indistinguishable," Plaintiffs appear to mean that each regulation could be described as having the effect of preventing the use of EPCA-compliant natural gas appliances. Pls.' Br. at 22. To be sure, the district court observed in passing that "by prohibiting NOx emissions, [the Boiler Rule] effectively bans the use of covered gas fueled boilers and water heaters." ER-13. But that imprecise description should not obscure that any "effective ban" here is an incidental and contingent result of the District's legitimate regulation of emissions. The Boiler Rule only "bans" the use of covered gas products insofar as those products emit unhealthy amounts of NOx—and even to that extent, only temporarily. If the state of available zero-NOx gas technology, like fuel cells, continues to develop, the Boiler Rule's "effective ban" will evaporate.[5]

Plaintiffs are similarly mistaken in their insistence that their sweeping construction of EPCA's preemption provision is needed to prevent the District

---

[5] Plaintiffs thus have failed to show that "no set of circumstances exists under which the [Boiler Rule] would be valid"—that is, that no gas equipment could comply with the Boiler Rule—as required to prevail on their facial challenge. *See Salerno*, 481 U.S. at 745; *see also MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1122 (9th Cir. 2020).

from somehow circumventing *California Restaurant Association*. To be clear, the Boiler Rule was not an attempt to skirt this Court's decision. While the Rule was indeed issued "within months" of the *California Restaurant Association* decision, Pls.' Br. at 1, the timing was coincidental. The Rule had been in the works for years; its precursors were in place decades earlier; and the District's role in preventing unhealthful pollution dates back decades further still. *See supra* pp. 12–15. The same goes for Plaintiffs' suggestion that allowing the Boiler Rule to be enforced would provide a loophole for jurisdictions like Berkeley to re-enact preempted gas bans.[6] Berkeley's ordinance was not an emission standard necessary to protect public health and comply with federal air quality standards; it was a law that was designed to and did prevent operation of every gas appliance in newly constructed buildings. If local governments could do what Berkeley did—pass outright bans on gas piping, subject to ad hoc public interest exceptions—it is quite possible that the substantive judgments expressed in EPCA and its preemption provision could be circumvented. But that concern does not extend to the Boiler Rule's duly supported exercise of the District's pollution-control mandate.

---

[6] Notably, in March 2023, the Bay Area air district—whose jurisdiction includes the City of Berkeley—adopted a similar rule setting a zero-emission limit for much of the same covered equipment starting in 2031. SER-107. Many of the same public health benefits will accrue to communities in the Bay Area. SER-119. That rule was issued before this Court had even decided *California Restaurant Association* and to date, no lawsuit has been filed challenging the rule.

Furthermore, *California Restaurant Association* presents a formidable barrier to Plaintiffs' position that the CAA is irrelevant here. In addition to arguing unsuccessfully that zero was not a "quantity of energy," Berkeley's other principal defense was that its ordinance was an exercise of authority, reserved to state and local governments under the Natural Gas Act, to regulate local distribution of natural gas. *See* 15 U.S.C. § 717(b). The Court rejected that argument because Berkeley's ordinance did not restrict distribution, but rather only prevented new buildings from connecting to existing utility service. 89 F.4th at 1106. But the Court emphasized that it was not holding that a bona fide exercise of that authority, such as a municipal decision to not "maintain" existing gas service—which would have the same effect on appliance use as Berkeley's law—would likewise be ECPA-preempted. *Id.* Rather, as Judge Baker explained, EPCA preemption "likely [would] ha[ve] no application" to a local government decision to "terminate[] existing gas utility service." *Id.* at 1117 (Baker, J., concurring). Instead, "as far as EPCA is concerned, states and local governments are likely free" to do so. *Id.*

But if Plaintiffs' test of mere relevance governed, the Natural Gas Act would fail it even more readily than does the CAA here. The Natural Gas Act does not give states a central role in federal regulation of gas distribution, *compare* 15 U.S.C. § 717(b), *with* 42 U.S.C. § 7401(a)(3); indeed, as *California Restaurant Association* noted, even its reservation of local authority is implicit, not express. 84

49

F.3d at 1106. And it emphatically does not encourage states to restrict distribution the way the CAA requires them to control air pollution, let alone sanction local jurisdictions for making insufficient progress in that direction. Rather, what was true of the Natural Gas Act in *California Restaurant Association*, is true of the CAA here: Both show the sheer implausibility that Congress would have meant to drastically revise the allocation of authority established under a milestone federal statute on the specific subject, let alone express that intent through general words of a preemption clause in a federal energy conservation statute.

Finally, Plaintiffs' table comparing the district court's ruling with *California Restaurant Association* adds nothing to their argument. It merely reproduces their cherry-picked reading of *California Restaurant Association* in table form. And even on its own terms, the table gets wrong the stare decisis principles Plaintiffs accuse the district court of disrespecting. The table collects not only points that were argued and rejected by the *California Restaurant Association* panel but also arguments made by the en banc dissent and arguments that *could have been* raised in *California Restaurant Association*. But Judge Friedland's opinion was not a dissent from an opinion on en banc rehearing—it was a dissent from *denial of rehearing* en banc. *Cal. Rest. Ass'n*, 89 F.4th at 1120 (Friedland, J., dissenting from denial of rehearing en banc). Even if those arguments failed to persuade a majority of this Court to rehear this case, that does not mean that the en banc

court—or, indeed, the panel majority—disagreed with each one. And while some of the points listed in Plaintiffs' table were presented in the rehearing petition, the plaintiffs in that case countered that such arguments should be disregarded because they were not properly presented to the panel. *Fields v. Palmdale School Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006). No citation should be needed for the proposition that arguments that were not but could have been raised in a prior case are not deemed resolved for future cases involving different parties.

### B. Plaintiffs fail to articulate a stable or coherent interpretation of EPCA's statutory text.

Without their misunderstanding of *California Restaurant Association*, Plaintiffs have little to say about why EPCA's text, structure, or purpose supports their interpretation of the preemption provision. Perhaps recognizing that problem, it invites the Court to decide the "easy" question that zero-NOx emission standards are preempted, while withholding judgment as to whether EPCA preempts non-zero limits like those in effect in the District since the Clinton Administration. *See* Pls.' Br. at 48–51.

But the Court cannot do so, and Plaintiffs' proposal is a plea for judicial abdication more than an appeal to judicial restraint. The Court's obligation is to say what the preemption provision *means*, and Plaintiffs—for all the heavy play that "text" and "plain meaning" get in their brief—offer no textual basis whatsoever for treating a zero-NOx emission limit for an appliance differently

under EPCA's preemption provision than a non-zero-NOx one. Quite to the contrary, the textual basis for *California Restaurant Association*'s holding was that EPCA's definition of "energy use," 42 U.S.C. § 6311(4)—i.e., "the quantity, of energy used," *id.*—applied to all quantities, including zero. *Cal. Rest. Ass'n*, 89 F.4th at 1102. But no dictionary definition of "quantity" says that *only* zero qualifies.

### C.    Plaintiffs' fears of "patchwork" policies are misplaced.

Next, Plaintiffs invoke the policy worry that the Boiler Rule will contribute to "a growing patchwork of differing State regulations" of the sort Congress intended to avoid when amending EPCA's preemption provision. S. Rep. No. 100-6, at 4 (1987). But they misunderstand Congress's objectives: When Congress enacted EPCA, the patchwork it intended to avoid was a patchwork of differing state *efficiency* regulations contrary to federal policy. The Boiler Rule, on the other hand, arises from an exercise of authority under the CAA, a statute that recognizes that air pollution problems and nonattainment of health-based standards are nationally non-uniform, as must be programs addressing them. And in any event, Plaintiffs' policy concerns cannot override EPCA's plain statutory text. Nor do they make much sense on their own terms, because Plaintiffs' interpretation of EPCA will create a patchwork of its own. It never explains how a regime where appliances are subject to a wide variety of non-zero local emission limits would

meet the supposed uniformity concern that Congress sought to eliminate, but one that allows anything but zero is sufficiently uniform.

### D. *Morales* and *Association of American Railroads* cannot save Plaintiffs' faulty interpretation.

Plaintiffs' strained analogies to preemption clauses in other federal statutes aimed at deregulating entire industries cannot save their faulty interpretation of EPCA, which has a distinct text, structure, and history and comparatively modest purpose.

Plaintiffs incorrectly read the term "concerning" in EPCA's preemption clause—"concerning the energy efficiency, energy use, or water use of such covered product," 42 U.S.C. § 6297(c)—to expand EPCA's coverage of federal conservation standards to any regulation with an incidental effect on the quantity of gas consumed. Pls.' Br. at 36. Plaintiffs root their expansive reading in a single case, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992), which they claim gives sweeping preemptive effect to a different preemption clause that also uses the term "concerning." Pls.' Br. at 36.

But that argument makes the mistake of reading words in isolation, without regard to surrounding text and statutory structure. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016). It is inappropriate to apply the preemption analysis in *Morales*, which involved the Airline Deregulation Act, to EPCA. The Airline Deregulation Act was intended to deregulate an entire industry in order to facilitate "maximum

53

reliance on competitive market forces." *Morales*, 504 U.S. at 379 (quoting 49 U.S.C. App. §§ 1302(a)(4), (a)(9)). In that deregulatory context, a broad range of state-law impacts risk interfering with the core congressional judgment that market forces should operate freely. Furthermore, Plaintiffs' expansion of EPCA's preemptive effect based on a *Morales*-like reading of "concerning" would render EPCA's preemption clause untenably broad, invalidating wide swaths of regulations.

Nor does this Court's decision in *Association of American Railroads v. South Coast Air Quality Management District*, 622 F.3d 1094 (9th Cir. 2010) relegate the CAA to "irrelevan[ce]" here. Pls.' Br. at 53. There, this Court preempted a rule that sought to restrict emissions from idling trains. The preemption provision at issue was part of a statute, the Interstate Commerce Commission Termination Act, whose purpose and operation was deregulation of the rail transportation industry and granting a new federal agency, the Surface Transportation Board, "exclusive" jurisdiction over the "operation" of rail facilities including those "located . . . entirely in one state." *Ass'n of Am. R.Rs.*, 622 F.3d at 1097 (quoting 49 U.S.C. § 10501(b)). To that end, the preemption provision provided that "[e]xcept as otherwise provided . . . the remedies provided under this part with respect to regulation of rail transportation preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

Consistent with that broad text, this Court had already recognized "that Congress intended to preempt a wide range of state and local regulation of rail activity," and it derived specific "guidance on the scope of [Interstate Commerce Commission Termination Act] preemption" from a body of decisions by the newly enshrined federal regulator, which had made "unreasonabl[e] interfere[nce] with interstate commerce" a touchstone of preemption. *Ass'n of Am. R.Rs.*, 622 F.3d at 1097.

EPCA and the Interstate Commerce Commission Termination Act could hardly be more different. EPCA does not grant the Department of Energy "exclusive jurisdiction" over a sweeping subject like rail transportation. It empowers the Secretary of Energy to set energy conservation standards and displaces local rules concerning a particular appliance's energy efficiency or use.

Moreover, the Interstate Commerce Commission Termination Act's preemption provision plays a different role in the statute's regulatory scheme than EPCA's preemption provision does. In the Interstate Commerce Commission Termination Act, the preemption provision implements the statute's predominant purpose: leaving the industry to the interplay of market forces. In EPCA, by contrast, the preemption clause serves a distinct role. The purpose of EPCA is not to deregulate the operation of appliances; it is to promote reduction of those appliances' energy use. EPCA's preemption provision, however, does not serve

55

that purpose. Instead, it plays a subsidiary role: confirming that Congress's dominant purpose of conserving energy should not be pursued to the point where manufacturers would need to make different versions of a product to meet every jurisdiction's particular standards.

And of course, the subject matter of the Interstate Commerce Commission Termination Act, rail transportation, was one where the federal-state balance has historically tipped in the federal direction. Indeed, the trial court had held that the challenged rule was not a proper exercise of state law powers to begin with, though this Court chose not to affirm on that basis. *See id.* at 1096 n.1.

To be sure, as Plaintiffs point out, the Boiler Rule at issue here is not part of an EPA-approved state implementation plan (though numerous other ones are), a fact to which the *Association of American Railroads* decision attached legal significance. But that is of scant help to Plaintiffs here. While *Association of American Railroads* held that "harmoniz[ation]" is only required when two federal statutes govern, 622 F.3d at 1098, it surely *did not* hold that Congress's enactment of another important and elaborate statute on the specific subject is irrelevant per se when ascertaining preemptive intent.[7] It simply strains credulity that Congress

---

[7] To be sure, this Court in *Association of American Railroads* reasoned that there is no conflict between federal laws, and thus no need for a harmonization analysis, when emission limits adopted under the CAA have not been incorporated into a state implementation plan. Here, there is no conflict for an even more basic reason: By its plain text, EPCA preempts state energy conservation standards, not emission

56

would have intended to disrupt state powers critically necessary to achieve federal air quality mandates and avoid federal sanctions when it amended EPCA in 1987—or that any Congress harboring that improbable intent would effectuate such intent by enacting the words "concerning . . . energy use."

***

Simply put, emission limits are not energy conservation standards, EPCA is not a surreptitious assault on the CAA's regulatory regime, and this case is not *California Restaurant Association*. This Court should reject Plaintiffs' invitation to apply EPCA preemption well outside the scope of EPCA's concern, which would undermine states' core police powers and obligations under the CAA without any indication in EPCA's text, structure, or history that Congress intended to do so.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's grant of summary judgment in favor of Defendant-Appellee South Coast Air Quality Management District.

---

limits like the Boiler Rule. The CAA is relevant to that determination because, under the basic principles of statutory interpretation, EPCA must be interpreted in statutory context—including Congress's parallel enactment of a statute that obligates the District to enact control measures like this one. *See supra* Section II.A. *Association of American Railroads* does not say otherwise.

Respectfully submitted,

Dated: October 22, 2025          /s/Candice L. Youngblood

CANDICE L. YOUNGBLOOD (SBN 328843)
ADRIANO L. MARTINEZ (SBN 237152)
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
cyoungblood@earthjustice.org
amartinez@earthjustice.org
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Intervenor-Defendants-Appellees
People's Collective for Environmental Justice,
Sierra Club, and Industrious Labs*

JAMES A. DENNISON (*Pro Hac Vice*)
Sierra Club
1650 38th St., Suite 103W
Boulder, CO 80301
jim.dennison@sierraclub.org
Tel: (435) 232-5784

*Counsel for Intervenor-Defendant-Appellee
Sierra Club*

SEAN H. DONAHUE (SBN 264284)
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
sean@donahuegoldberg.com
Tel: (202) 277-7085

*Counsel for Intervenor-Defendant-Appellee
Industrious Labs*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-5129

I am the attorney or self-represented party.

**This brief contains** 13,043 **words,** including ⬜ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

🔘 complies with the word limit of Cir. R. 32-1.

⚪ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⚪ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

⚪ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⚪ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
⬜ it is a joint brief submitted by separately represented parties.
⬜ a party or parties are filing a single brief in response to multiple briefs.
⬜ a party or parties are filing a single brief in response to a longer joint brief.

⚪ complies with the length limit designated by court order dated ⬜.

⚪ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Candice L. Youngblood **Date** 10/22/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*