Docket No. 25-5129

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RINNAI AMERICA CORPORATION et al.,
Plaintiffs-Appellants,

v.

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,
Defendant-Appellee,

PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE et al.,
Intervenor-Defendants-Appellees.

On Appeal from the United States District Court
for the Central District of California
Case No. 2:24-cv-10482-PA-PD

### INTERVENOR-DEFENDANTS-APPELLEES' OPPOSITION TO
### PLAINTIFFS-APPELLANTS' MOTION FOR INJUNCTION PENDING
### APPEAL

Candice L. Youngblood
Adriano L. Martinez
Earthjustice
707 Wilshire Blvd.,
Suite 4300
Los Angeles, CA 90017
Tel: (415) 217-2000

*Counsel for Intervenor-Defendants-Appellees People's Collective for Environmental Justice, Sierra Club, and Industrious Labs*

James A. Dennison
Sierra Club
1650 38th St.,
Suite 103W
Boulder, CO 80301
Tel: (435) 232-5784

*Counsel for Intervenor-Defendant-Appellee Sierra Club*

Sean H. Donahue
Donahue, Goldberg &
Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (202) 277-7085

*Counsel for Intervenor-Defendant-Appellee Industrious Labs*

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................2

II.     THE DISTRICT EXERCISES TRADITIONAL POLICE POWERS UNDER THE CLEAN AIR ACT TO ISSUE THE CHALLENGED RULE. ............................................................................................3

III.   THE ENERGY POLICY CONSERVATION ACT. ...................................6

IV.   PLAINTIFFS EVENTUALLY CHALLENGE THE RULE.........................8

ARGUMENT ......................................................................................10

I.      PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS OF THEIR APPEAL. .......................................................................11

II.     THE BALANCE OF HARDSHIPS TIPS SHARPLY AGAINST PLAINTIFFS. ..................................................................................16

     A.    Plaintiffs Fail To Establish Irreparable Harm. ....................................17

     B.    Plaintiffs Fail To Rebut Serious Harm To The Public And The District. ......................................................................................21

CONCLUSION ....................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) ...............................................................7, 8

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ..........................................................17, 18

*Beentjes v. Placer Cnty. Air Pollution Control Dist.*,
397 F.3d 775 (9th Cir. 2005) ....................................................................5

*Brown v. Gilmore*,
533 U.S. 1301 (2001) (Rehnquist, J., in chambers)................................11

*California Restaurant Association v. Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ..........................................................*passim*

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021) ...................................................11, 12, 22

*Edmo v. Corazon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ..................................................................17

*Exxon Mobil Corp. v. U.S. EPA*,
217 F.3d 1246 (9th Cir. 2000) ..................................................................4

*Flores v. Barr*,
977 F.3d 742 (9th Cir. 2020) ..................................................................12

*Garcia v. County of Alameda*,
150 F.4th 1224 (9th Cir. 2025) ...............................................................23

*Garcia v. Google*,
786 F.3d 733 (9th Cir. 2015) ..................................................................20

*Maslenjak v. United States*,
582 U.S. 335 (2017)................................................................................15

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................. 13

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
    413 U.S. 405 (1973) ................................................................. 16

*NRDC, v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985) ................................................. 8

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air*
    *Pollution Control Dist.*,
    627 F.3d 730 (9th Cir. 2010) .................................................... 4

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................. 11

*Oakland Trib., Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ................................................. 20

*Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regulatory*
    *Comm'n*,
    479 U.S. 1312 (1986) (Scalia, J., in chambers) .......................... 11, 17

*Roe v. Critchfield*,
    137 F.4th 912 (9th Cir. 2025) .................................................. 12

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) (per curiam) .............................................. 18

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ................................................................. 4

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................... 11

*Wisconsin Right to Life, Inc. v. FEC*,
    542 U.S. 1305 (2004) ............................................................... 11

**Federal Statutes**

42 U.S.C. § 6297(c) ................................................................. 9, 13

42 U.S.C. § 7407(a) ................................................................. 4

iv

42 U.S.C. § 7416 ................................................................................................15

42 U.S.C. § 7502(c)(1) .......................................................................................4

42 U.S.C. § 7511(a)(1) .......................................................................................4

42 U.S.C. § 7511a(e) .......................................................................................4, 5

42 U.S.C. §§ 7511d(a)-(b) ..................................................................................5

Pub. L. No. 94-163, 89 Stat. 871 (1975) ........................................................7, 8

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ......................................................8, 9

Pub. L. No. 100-12, Stat. 103 (1987) ................................................................8

**State Statutes**

Ca. Health & Safety Code § 40406 ....................................................................5

Cal. Health & Safety Code §§ 40460–40462 .....................................................5

Cal. Stat. Chapter 324 .........................................................................................5

**Regulations**

40 C.F.R. § 81.305 (2025) ..................................................................................2

47 Fed. Reg. 29,231 (Jan. 7, 1986) ..................................................................15

69 Fed. Reg. 23,858 (April 30, 2004) ...............................................................3

70 Fed. Reg. 65,984, 65,988 (Nov. 1, 2005) ....................................................3

85 Fed. Reg. 57,733, 57,733 (Sep. 16, 2020) ...................................................2

**Other Authorities**

S. Rep. No. 100-6 (1987) ...................................................................................8

## INTRODUCTION

Plaintiffs seek an extraordinary remedy, one that forces this Court to act with more haste than Plaintiffs ever have. Having failed to persuade the district court that the Energy Policy and Conservation Act preempts the South Coast Air Quality Management District's zero nitrogen oxides emissions rule for boilers and other appliances, or Rule, they now ask this Court to enjoin that rule pending appeal. But Plaintiffs have not behaved as if they face any of the circumstances that could justify that intervention. They waited more than six months to challenge the Rule, several more to seek summary judgment, and did not seek interim relief until just two months ago, a good eight months into this litigation.

As their leisurely pace signals, there is no urgency here. Plaintiffs claim that they will face a litany of harms on January 1, 2026, when the first deadlines under the Rule's gradually phased-in compliance process kick in. But the harms they claim are unrelated to the Rule, unlikely to befall them while the appeal is pending, or, by their own admission, will occur regardless of whether this Court grants an injunction. By contrast, the costs of delay are significant. The appliances the Rule regulates may be small, but they make sizable contributions to the South Coast's persistent smog problems. It will take three decades to get their emissions under control. Shelving the Rule's deadlines now will delay that progress, subjecting South Coast residents

1

to health risks, interfering with the District's carefully planned rollout of the Rule's implementation, and impeding its attainment of federal air quality standards.

Nor have Plaintiffs shown a strong likelihood that their claims will ultimately succeed. As we explain below, and detail further in our answering brief, *see* ECF No. 32, EPCA preempts regulations concerning covered products' *energy use*—not their emissions. The Court should deny their motion.

## BACKGROUND

### I.      Boilers And Water Heaters Contribute To The South Coast Air Basin's Poor Air Quality.

The South Coast Air Basin's more than 17 million residents suffer from the worst smog, or ground-level ozone, in the country. Appellee's and Intervenor-Appellees' Joint Suppl. Excerpts of R., ECF No. 30 ("SER") SER-128, 131–33, 139. It is such a large problem that the Environmental Protection Agency has classified the South Coast as an "extreme" nonattainment area for federal ozone pollution standards. 40 C.F.R. § 81.305 (2025). This year alone, the South Coast has already had pollution levels above EPA's 8-hour ozone standard more than 100 days—far more than any other region. D.Ct.ECF No. 87-1 at ¶3. That is to say nothing of the Region's perennial nonattainment of state ozone standards, SER-144, or its excessive quantities of fine particulate matter, or PM2.5, *see, e.g.*, 85 Fed. Reg. 57,733, 57,733 (Sep. 16, 2020).

The equipment at issue in this appeal is a significant part of the problem. *See* SER-114–17. Ground-level ozone forms when volatile organic compounds interact with nitrogen oxide, or NOx, in the atmosphere. 69 Fed. Reg. 23,858, 23,859 (April 30, 2004). And when these products combust natural gas, they emit large quantities of NOx—by the District's estimates, nearly 10 percent of the NOx emissions generated by stationary sources. SER-114, 120. They contribute to unhealthy PM2.5 levels as well. SER-117, 119.

Short- and long-term exposure to ozone has significant health consequences, especially for children and those with respiratory diseases—forcing hospital visits and missed school and work days. 69 Fed. Reg. at 23,859. And PM2.5 can be inhaled into the lungs and even pass into the bloodstream, SER-123 ¶5, aggravating respiratory and cardiovascular disease and causing lung disease, asthma attacks, heart attacks, and premature death, *see* 70 Fed. Reg. 65,984, 65,988 (Nov. 1, 2005).

## II.    The District Exercises Traditional Police Powers Under The Clean Air Act To Issue The Challenged Rule.

State governments (and their local agents) have long regulated local air pollution under their traditional police powers to protect their citizens' health and safety. *See Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000). Congress enacted the Clean Air Act (CAA) as a backstop to those powers. Under the Act, EPA sets national air quality standards and leaves states with "primary

responsibility" for attaining them, 42 U.S.C. § 7407(a), largely by regulating stationary pollution sources, *see Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified APCD*, 627 F.3d 730, 733 (9th Cir. 2010). So "long as the national standards are met," states have "virtually absolute power in allocating emission limitations." *Union Elec. Co. v. EPA*, 427 U.S. 246, 267 (1976). But when they fall short, the CAA requires them to adopt control measures "as expeditiously as practicable." 42 U.S.C. § 7502(c)(1).

Areas in nonattainment for ozone face particularly stringent obligations. For *any* nonattainment area, states must establish detailed state implementation plans to address the problem. 42 U.S.C. § 7511(a)(1). And for "extreme" nonattainment areas, states must adopt even more stringent controls, *see id.* § 7511a(e), and new enforcement rules apply: If a jurisdiction cannot meet an applicable standard by the prescribed deadline, all major stationary sources must curtail emissions or pay fees, 42 U.S.C. §§ 7511d(a)–(b), 7511a(f)(1).

The District is responsible for implementing these requirements in the South Coast. To address what has long been "the most critical air pollution problem in the nation," 1976 Cal. Stat. ch. 324, § 5 at 893, California law grants the District "the primary responsibility for control of air pollution from all sources[,] other than vehicular sources." *Beentjes v. Placer Cnty. APCD*, 397 F.3d 775, 782 (9th Cir. 2005). The District adopts and periodically revises an air quality management plan,

4

or AQMP, that explains how it will attempt to meet state and federal air quality standards. Cal. Health & Safety Code §§ 40460–40462; *id.* § 40406 (California provision enhancing stringency requirements). It then issues rules to implement that plan for sources. SER-140.

Since 1978, the District has regulated emissions from appliances that combust natural gas. The District first adopted the Rule in 1998, which sets NOx emission limits on boilers, hot water heaters, and process heaters. Updates to the Rule in 2005, 2006, and 2018 tightened the emission limits. Plaintiffs-Appellants' Excerpts of R., ECF No. 15.1 ("ER") ER-83.

But despite its efforts, the District continues to fall far short of federal and state standards—and this equipment continues to contribute to the problem. In light of these shortfalls, the District has already been forced to pass a rule to assess fees from major polluters. D.Ct.ECF No. 63-1 at Exh. 1. As its latest AQMP update explains, if the District is to meet the current federal ozone standards, it must reduce current NOx emissions by *67 percent* beyond what it could achieve through current programs. SER-130. And the only way to do so is to reduce sources' NOx emissions to zero where technologically feasible. *Id*. Under the AQMP, that includes the equipment covered by the Rule, for which the AQMP includes a specific control measure. SER-143.

Recognizing that the current Rule fell short of these requirements, the District spent over a year designing an update, SER-118. It issued its new rule on June 7, 2024. ER-214. To minimize the burdens of its new requirements, the District opted to gradually phase in zero-emission requirements over the next decade. The first compliance deadline, for a subset of equipment installed in new buildings, will fall on January 1, 2026. ER-218. Other equipment faces its first deadline a few years later. Equipment installed in existing buildings need not comply until 2029 at the earliest, when it is due to be replaced—and even then, has the option of extensions or alternative compliance options. ER-218, 222–30; SER-97–98.

While it will take time to fully implement the Rule, once the District has done so, the Rule will dramatically reduce NOx emissions—the equivalent of eliminating pollution from nearly half the region's cars. SER-114–15, 31–32 ¶¶37–38. That amounts to a reduction of nearly 10 percent of the emissions under the District's authority, preventing thousands of premature deaths and newly-onset asthma cases. SER-114, 120.

## III.  The Energy Policy Conservation Act.

Congress enacted EPCA in the wake of the 1973 oil crisis to reduce how much energy the country's appliances consume. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498-99 (9th Cir.

2005). At first, Congress sought these savings through labeling. Believing that "better informed consumers" would make mandatory energy conservation standards "unnecessary," Congress required manufacturers to label appliances with measures of their "energy use" and "energy efficiency." *See id.* at 499. By "energy use," Congress meant "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with" prescribed "test procedures." Pub. L. No. 94-163, § 321(a)(4) (1975). And it defined "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product, determined" by similar means. *Id.* § 321(a)(5). To guide these standards, Congress called for what would later become the Department of Energy to set "energy efficiency improvement target[s]" for the covered products. *Id.* § 325(a)(1)(A). It also preempted state laws that imposed different testing or labeling obligations or differed from any federal efficiency standards. *Id.* § 327(a)–(b).

When that approach proved too slow, Congress in 1978 jettisoned the labeling-focused regime and instead required the Department of Energy to set mandatory energy use and efficiency standards. *NRDC v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985) (citation modified); *see* Pub. L. No. 95-619, § 325, 92 Stat. 3206, 3259 (1978). But for years the Department refused. Instead, it granted waivers to states that allowed them to set their own efficiency requirements,

7

fueling a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing" of appliances. *See Air Conditioning*, 410 F.3d at 500.

Congress's efforts to fix that problem gave rise to EPCA as we know it today. *See* Pub. L. No. 100-12 § 5 (1987). The amended statute adopted a set of uniform standards and required the Department of Energy to keep them updated. *See id.* And, to address the problem of "separate State appliance standards," S. Rep. No. 100-6, at 4 (1987), Congress revised EPCA's preemption regime. It made only modest changes to the preemption clause itself. While the clause previously said that "any State regulation which established an energy efficiency standard or other requirement respecting energy use or energy efficiency" of a covered product "is superseded," *see* Pub. L. No. 95-619, § 424(b)(1)–(3), it now says instead that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c). But to ensure that states could no longer sidestep these provisions, Congress made it much more difficult for states to obtain a waiver. *Compare id.* § 6297(d), *with* Pub L. No. 95-619 § 424(b)(1)–(3).

## IV. Plaintiffs Eventually Challenge The Rule.

About six months after the District issued the Rule, Plaintiffs sued and claimed that EPCA preempts it. ER-183–86. As they see it, the Rule is a "State

8

regulation concerning" the "energy use" of appliances within the meaning of EPCA's preemption clause. That is so, Plaintiffs say, because even though the Rule does not on its face have anything to do with energy use—indeed, it concerns only how much pollution those products may emit—the Rule "*effectively*" restricts how much gas they may consume. ER-209 (emphasis added).

The district court did not hesitate to reject Plaintiffs' theory. On July 18, 2025, a month after the parties finished briefing cross-motions for summary judgment, the court denied Plaintiffs' motion and granted the District's. ER-18–30. As it explained, EPCA's plain text, structure, and purpose provide "no reason to believe" that when Congress preempted state regulations on how much energy an appliance may consume, it also displaced local governments' powers to regulate what pollution those appliances may emit. ER-16.

On August 8, 2025, Plaintiffs appealed, ER-236, and on August 27, 2025, they asked the district court for an injunction pending appeal, D.Ct.ECF. No. 85. Although they had not previously asked to preliminarily enjoin the rule, they contended in August that its pending January 1, 2026 compliance deadline will inflict serious harm. The district court denied that motion a month later. D.Ct.ECF. No. 92. It reasoned that the "extraordinary and drastic remedy" of an injunction was not warranted because Plaintiffs failed to demonstrate the irreparable harm that remedy requires. *Id.* at 4 (citation omitted). Plaintiffs' "alleged harms" were

9

too "vague and speculative" to show that "irreparable harm is likely, and not just possible," and they showed no "causal link" between the harms they claimed and their requested relief. *Id.* at 5. Their claims of harm were further "undercut" by their significant delays in seeking injunctive relief. *Id.* at 6. Plaintiffs now seek an injunction here.

## ARGUMENT

Injunctions pending appeal are warranted "only in the most critical and exigent circumstances," *Wisconsin Right to Life, Inc. v. FEC*, 542 U.S. 1305, 1306 (2004) (Rehnquist, C.J., in chambers) (citation omitted), and this is not one of them. To be entitled to such an "extraordinary remedy," Plaintiffs must show (1) a "strong" likelihood that their appeal will succeed, *Nken v. Holder*, 556 U.S. 418, 426 (2009); (2) that they are "likely to suffer irreparable harm" absent injunctive relief; (3) that the "balance of equities" tips in their favor, and (4) that "an injunction is in the public interest," *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 (9th Cir. 2021). This is a particularly high bar when, as here, Plaintiffs are "not merely seeking a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid" local rule. *Brown v. Gilmore*, 533 U.S. 1301, 1302 (2001) (Rehnquist, J., in chambers). The bar is higher still here because the requested relief "has been withheld by" the district court. *Ohio Citizens for*

10

*Responsible Energy, Inc. v. Nuclear Regulatory Comm'n*, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers).

Plaintiffs come nowhere close to making the "clear showing" this relief requires. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs are unlikely to prevail on the merits because their reading of EPCA is fundamentally wrong as a matter of statutory text and structure. EPCA preempts state regulations concerning covered appliances' energy use, not state regulations that limit the air pollution they emit pursuant to a federal statute—the CAA—that specifically directs states to discharge their police powers for this purpose. Plaintiffs' arguments otherwise fundamentally misunderstand this Court's decision in *California Restaurant Association v. Berkeley*, 89 F.4th 1094 (9th Cir. 2024). The balance of the equities, meanwhile, "tips sharply" in the District's favor. *Doe*, 19 F.4th at 1176. The harms to the public of disturbing the District's carefully calibrated Rule compliance deadlines easily outweigh Plaintiffs' claimed harms, which are disconnected from the deadlines they seek to suspend and undermined by Plaintiffs' own delays in seeking injunctive relief.

## I. Plaintiffs Are Unlikely To Prevail On The Merits Of Their Appeal.

Plaintiffs have not made a "strong showing that [they are] likely to succeed on the merits of [their] appeal." *Flores v. Barr*, 977 F.3d 742, 746 (9th Cir. 2020). To the extent Plaintiffs suggest that this is a modest burden, they are mistaken. To

enjoin the District from enforcing its validly enacted rule, Plaintiffs must "establish a "*strong* likelihood of success on the merits," *id.* (emphasis added), and they must carry that burden "by a clear showing," *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025). Plaintiffs cannot do this. For Congress to preempt state or local laws, its intent to do so must be discernible "from the language of the preemption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (citation modified). EPCA flatly forecloses Plaintiffs' theory.

For starters, as our Answering Brief details, *see* ECF No. 32 at Argument Part I, Plaintiffs' theory is at odds with EPCA's text. EPCA's preemption provision provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c). As the district court explained, the Rule does none of these things. It "says nothing about the quantity of gas an appliance may use" or how efficiently it must do so. ER-16. It addresses how much pollution a source may emit. And it is agnostic on how an appliance gets to that result—or what fuel it consumes or what technology it employs to do so. SER-108–12 (contemplating compliance by various fuel types and technologies, including electric resistance and gas fuel cells); *see also* ECF No. 32 at 26–28. Simply put, the Rule operates independently of an appliance's energy use. It thus is far outside of EPCA's preemptive domain.

12

That makes the Rule fundamentally different from the ordinance this Court held preempted in *California Restaurant Association*, 89 F.4th at 1094. That case concerned an ordinance amending Berkeley's building code banning "natural gas piping within new buildings." *Id.* at 1101. By virtue of that ban, covered appliances were directly prohibited from accessing (and therefore consuming) natural gas energy, and no set of technological advances could restore their ability to access the natural gas delivered from the utility at the meter. So while Berkeley's ordinance did not "directly" regulate appliances as designed or manufactured, it nevertheless controlled the quantity of natural gas they could use by "effectively eliminat[ing] the 'use' of an energy source" altogether. *Id.* at 1102, 1107. The Rule has no equivalent effect. *See* ECF No. 32 at 47.

What is more, the Court's preemption conclusion turned on two case-specific reasons that do not apply here. *First*, the Court grounded its holding in EPCA's definition of "energy use" as "the quantity of energy directly consumed by a consumer product at point of use." *Cal. Rest. Ass'n*, 89 F.4th at 1101. Because "zero" is a "quantity," and "fossil fuels" are "energy," the Court reasoned, a regulation that sets at zero the quantity of gas appliances may use is a regulation that "concern[s]" the quantity of energy appliances may consume and is therefore preempted. *Id.* at 1101–02 (quoting 42 U.S.C. § 6291(4)). But as we have just

13

explained, by focusing instead on emissions, the Rule does not "concern[]" *any* quantity of energy consumption.

*Second*, the Court explained that the building-code context was "of critical importance" because an exemption elsewhere in the statute expressly clarified that building code requirements can be regulations concerning energy use. *Id.* at 1101. EPCA does nothing similar for emissions restrictions. And that omission is telling. *See* ECF No. 32 at 28–30; *California Restaurant Association*, 89 F.4th at 1119 (Baker, J., concurring). States and localities have regulated air pollution under their police powers since long before EPCA was enacted. The CAA does not just recognize and preserve those powers, *see* 42 U.S.C. § 7416, it *requires* their exercise. And states and localities had responded by specifically adopting NOx emission standards for EPCA-covered appliances. *See, e.g.*, 47 Fed. Reg. 29,231 (Jan. 7, 1986) (approving a local air district's emission standards for furnaces into California's State Implementation Plan). If Plaintiffs' theory were correct, when Congress adopted EPCA's current preemption provision, it was content to silently displace the very rules it was elsewhere encouraging or even requiring. Plaintiffs "would need far stronger textual support to believe Congress intended" that result. *Maslenjak v. United States*, 582 U.S. 335, 346 (2017); *see also* ECF No. 32 at 35–41.

Plaintiffs' only response is to insist that "nothing" in this Court's opinion confined its reach to building codes. Mot. at 9. But the Court was clear that its holding was in fact so "limited." *Cal. Rest. Ass'n*, 89 F.4th at 1101. As it said, it concluded "*only* that EPCA applies to building codes" like Berkeley's. *Id.* (emphasis added). And Plaintiffs' suggestion that the District's Rule is equally a "building code" is nonsensical. Unlike for traditional building codes, EPCA contains no textual signal that Congress meant EPCA's preemptive sweep to encompass emission restrictions like the Rule's. What is more, the Court was not finished: While its reading of the preemption provision was broad, that did "not mean the sky is the limit." *Id.* at 1103. The Court specifically recognized that its conclusion did not restrict "a utility's distribution of natural gas to premises where covered products might be used." *Id.* at 1103; *see also id.* at 1117 (Baker, J., concurring) (explaining that the Court's opinion posed no preemptive threat to "a host of state and local regulations" whose effect is to reduce, in one way or another, "the quantity of [natural gas] directly consumed by a [covered] product"); ECF No. 32 at 45–46.

Further, Plaintiffs' effort to extend *California Restaurant Association* broadly beyond building codes does not account for the backdrop against which EPCA was enacted—the CAA's requirement that states issue pollution limits to bring themselves into attainment of federal ozone standards. ECF No. 32 at 34–43.

"[T]he case for federal preemption" is already "less persuasive" when "coordinate state and federal efforts exist within a complementary administrative framework," *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973), and wholly illogical when, as here, the preemption theory would result in Congress undermining its own enactment.

Thus, Plaintiffs have not shown a strong likelihood of success on their appeal. Indeed, they have not even raised the "serious questions" they suggest might suffice. *See* Plaintiffs-Appellants Motion for Injunction Pending Appeal, ECF No. 27 ("Mot.") at 7. And even if they had, they would face two further problems. When it comes to an injunction *pending appeal*, serious questions are not enough. Because the Court's injunctive power flows from the All Writs Act, it "is to be used only where the legal rights at issue are indisputably clear." *Ohio Citizens*, 479 U.S. at 1312. And in any event, the Court's sliding-scale injunction standard is only applicable if Plaintiffs can also show that the "balance of hardships tips sharply towards them" and that they meet the remaining injunctive-relief standards. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). But as explained next, they cannot.

## II.   The Balance of Hardships Tips Sharply Against Plaintiffs.

Plaintiffs do not establish "that the balance of hardships" justifies the injunction they seek. *Edmo v. Corazon*, 935 F.3d 757, 784 (9th Cir. 2019). They

16

have now repeatedly failed to show that the arrival of the January 1, 2026 deadline is likely to cause them irreparable injury. *See* D.Ct.ECF No. 92 at 5–6. And even if their evidence established that they may face a modicum of harm while this appeal is decided, they have only their own litigation delays to blame. *See id.* at 6. South Coast residents' strong interests in cleaner and safer air, and the District's interest in beginning the long path to securing federally required reductions in NOx emissions, outweigh any minor injuries Plaintiffs may incur.

## A. Plaintiffs Fail To Establish Irreparable Harm.

Plaintiffs' injunction request requires them to establish that "denying [them] relief would lead to irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020) (per curiam). They have not done so. As explained above, no preempted law is being enforced against them. As to their remaining claims, many of the injuries Plaintiffs assert have no relationship to the Rule at all, or at least not to its approaching deadlines. Many more are, by Plaintiffs' own admission, the result of market forces over which those deadlines exert little control. And the remainder are too vague or speculative to establish that irreparable harm is "likely" to befall anyone. *All. for Wild Rockies*, 632 F.3d at 1131.

*First*, the Rule does not ban "gas infrastructure" or "gas piping," Mot. Ex. 5 ¶6, Ex. 6 ¶6; bar plumbers or pipefitters from performing "gas-related work," Mot. 15 (quoting Ex. 3 ¶10); or compel any building to go "all electric," Mot. Ex. 6 ¶5.

17

Rather, the only portion of the Rule that will be enforced during this appeal concerns just a few covered appliances—and not stoves, pools, spas, fireplaces, or firepits. *See* Mot. Ex. 3 ¶¶7–8; Ex. 7 ¶6. And that deadline applies only to first-time installations in *new* construction that presumably will need little "service, repair, or replacement" in the months this appeal is pending. Mot. Ex. 4 ¶4. In the meantime, the Rule will allow replacements for covered gas-powered appliances in existing home construction for years to come. Indeed, by the District's estimation, only 10 percent of the appliances impacted by the Rule will be first-time installations at all, only a subset of which face the District's upcoming deadline. D.Ct.ECF No. 50-2, Ex. 2 at 291; D.Ct.ECF No. 50-2, Ex. 1 at 8. And only a portion of *those* will be installed while this appeal is pending.

While this appeal is being decided, then, the Rule will not "abruptly" "ban" Noritz or Rinnai appliances, *see* Mot. Ex. 2 ¶14; Ex. 1 ¶4, or require either company to "dismantle" its "ecosystem" for selling, distributing, or marketing those products, *see* Mot. Ex. 2 ¶¶7, 11. Nor will it shutter "the repair side" of any plumber or pipefitter's business, Mot. Ex. 4 ¶4; "bar" the installation of covered appliances, Mot. Ex. 5 ¶5; or require repair workers to "pivot to other lines of business to survive," Mot. Ex. 5 ¶7. Indeed, the Rule's focus and early deadlines are so narrow that, to the extent Plaintiffs have any documented evidence of home

18

construction abandoning gas infrastructure altogether, the Rule is unlikely the cause.

*Second*, by Plaintiffs' own accounts, many of the harms they raise are not attributable to the January 1, 2026 compliance deadline they ask the Court to suspend. Rinnai and Noritz have both claimed since April that the homebuilding market is "moving exclusively to electric heat pumps." D.Ct.ECF No. 50-7 ¶4; D.Ct.ECF No. 50-6 ¶5. By August, Noritz said that sales of its products in that market had been "virtually eliminated." Mot. Ex. 1 ¶6; *see also, e.g.*, Ex. 7 ¶8 (claiming that, as of August, "builders must already comply with the rule's requirements"). If, as they claim, long lead times require purchasing decisions to be made six to twelve months out, enjoining the Rule for the duration of this appeal will not disrupt market forces already well underway. By Plaintiffs' logic, builders would need to account for the prospect that a decision from this Court could spring the Rule back into place.

*Third*, even if Plaintiffs have pointed to the possibility of irreparable harm, they have not established that it is *likely* to befall them—let alone to do so in the relatively brief period while this appeal is pending. Plaintiffs do not attempt to disentangle their sweeping claims from one another, nor supply this Court with any guidance on how to do so. For example, their claims of lost business and an inability to compete in alternative markets are speculative and difficult to follow.

Noritz and Rinnai are major industry players who sell a variety of unaffected products—including products for which demand is rising. *See, e.g.*, Mot. Ex. 1 ¶¶2, 11; Ex. 2 ¶4.

By waiting until only very recently to seek any interim relief, Plaintiffs themselves have not acted like those harms pose much of a threat. That long delay "implies a lack of urgency and irreparable harm." *Oakland Trib. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also, e.g.*, *Garcia v. Google*, 786 F.3d 733, 746 (9th Cir. 2015). All the more so because they had every opportunity to hasten this litigation along. The District gave interested parties like Plaintiffs more than a year's notice that the Rule would be forthcoming. SER-118. And it designed the Rule with long implementation delays and alternative compliance pathways precisely to accommodate any burdens associated with the Rule, including close to 18 months between the Rule's adoption and the compliance deadline that now prompts Plaintiffs' injunction request. SER-94, 97–98. If Plaintiffs were truly concerned about the costs they might face when that deadline arrived, they would not have waited six months to challenge the rule, or nine to begin briefing summary judgment, or fourteen to seek interim injunctive relief.

In response, Plaintiffs suggest (Mot. at 18) that they would not have needed interim relief if they had won their case on the merits. But the public should not be

forced to endure the costs of an emergency that, if it is an emergency at all, is one of Plaintiffs' own making. And while a delay may not always undermine the gravity of the asserted harm, it does when, as here, Plaintiffs claim they have been enduring harms for months but have only recently taken steps to secure relief from them.

### B. Plaintiffs Fail To Rebut Serious Harm To The Public And The District.

By contrast, both the District and the public face harm if the Rule is enjoined. From 2026 to 2037, the Rule is estimated to prevent approximately 374 premature deaths, 23,629 lost school days, 16,549 work loss days, 1,519 cases of newly onset asthma, and other health consequences." SER-13 ¶15. Meanwhile, the District needs the Rule to be enforced as carefully designed to have any hope of attaining federal and state air quality standards. Plaintiffs are certainly correct when they claim (Mot. at 19) that only a fraction of those benefits will accrue while this appeal is pending. But for the South Coast residents whose lungs, paychecks, and lives lie in the balance, that fraction is an important one. And because each polluting element that is installed could lock in emissions for its lifetime, the harms of delayed implementation will be felt for decades to come.

Plaintiffs suggest (Mot. at 20) that if it is true that enjoining the Rule will not halt market restructuring, Plaintiffs' claimed harm may not manifest at all. If true, that is a bigger problem for Plaintiffs than the District, because it is *Plaintiffs*'

burden to show that the balance of equities "tips sharply" in their favor. *Doe*, 19 F.4th at 1176–77. And in any event, Plaintiffs ignore the profoundly disruptive effects of hitting pause on a carefully calibrated compliance schedule years in the making. The District took care to establish an orderly compliance schedule that minimizes the burdens on regulated parties. If the Rule is enjoined, the District faces a difficult choice between those burdens and compromising its statutory air quality responsibilities—and the health of the people that statutory standards exist to protect.

Because Plaintiffs thus have failed to show that the balance of the hardships is in their favor at all—let alone sharply so—their motion should be denied. And because the party opposing Plaintiffs is the government, this factor merges with the question whether granting this injunction is in the public interest. *Garcia v. County of Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025). As just explained, it is not.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' motion to enjoin enforcement of the Rule pending appeal.

Respectfully submitted,

Dated: October 23, 2025     /s/Candice L. Youngblood

CANDICE L. YOUNGBLOOD (SBN 328843)
ADRIANO L. MARTINEZ (SBN 237152)
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
cyoungblood@earthjustice.org
amartinez@earthjustice.org
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Intervenor-Defendants-Appellees*
*People's Collective for Environmental Justice,*
*Sierra Club, and Industrious Labs*

JAMES A. DENNISON (*Pro Hac Vice*)
Sierra Club
1650 38th St., Suite 103W
Boulder, CO 80301
jim.dennison@sierraclub.org
Tel: (435) 232-5784

*Counsel for Intervenor-Defendant-Appellee*
*Sierra Club*

SEAN H. DONAHUE (SBN 264284)
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
sean@donahuegoldberg.com
Tel: (202) 277-7085

*Counsel for Intervenor-Defendant-Appellee*
*Industrious Labs*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-5129

I am the attorney or self-represented party.

**This brief contains** | 5,200 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Candice L. Youngblood | **Date** | 10/23/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*