25-5129

IN THE UNITED STATES COURT OF APPEAL
FOR THE NINTH CIRCUIT

Rinnai America Corp., et al.,

*Plaintiffs-Appellants*,

*v.*

South Coast Air Quality Management District,

*Defendant-Appellee*,

People's Collective for Environmental Justice, et al.,

*Intervenors-Defendants-Appellees*.

On Appeal from the United States District Court for the
Central District of California

**BRIEF OF THE PUBLIC HEALTH LAW CENTER AS *AMICUS CURIAE*
IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

Esther Agbaje
Daniel Carpenter-Gold
Mia Montoya Hammersley
Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105
(651) 290-6329

*Attorneys for* Amicus Curiae *Public Health Law Center*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.2, *amicus curiae* Public Health Law Center states that it has no parent corporation and that no publicly held corporation holds ten per cent or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT OF IDENTIFICATION ................................................................. 1

SUMMARY OF ARGUMENT ............................................................................ 1

ARGUMENT ...................................................................................................... 4

    I.    Rule 1146.2 Will Protect Public Health ................................................... 4

        A.    The South Coast Air Basin's Ozone Pollution Seriously Harms Public Health ............. 4

        B.    $NO_x$ Reductions Are Necessary to Address These Harms ............................................ 7

        C.    Rule 1146.2 Will Protect Against Other Pollutants ........................................... 9

        D.    Rule 1146.2 Ensures that All Communities Have Access to Clean Air ....................... 12

    II.    Congress Did Not Intend EPCA to Preempt Crucial Public-Health Measures Such as Rule 1146.2 .................................................................................................... 16

        A.    EPCA Amendments Have Not Uniformly Moved the Statute Toward Greater Preemption .............................................................................................. 16

        B.    The Legislative Record Indicates Congressional Intent to Maintain, not Preempt, State and Local Health Regulations ......................................................... 21

        C.    By Comparison, the Vehicle-Efficiency Side of EPCA Explicitly Acknowledges and Addresses Overlap with Health-Protective Regulations ....................................... 25

CONCLUSION .................................................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005)..........................................................................21, 22, 23, 28

*U.S. v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999)......................................26

## Statutes

42 U.S.C. § 32902...........................................................................................................26

42 U.S.C. § 6295.............................................................................................................23

42 U.S.C. § 6297.............................................................................................................22

42 U.S.C. § 7511...............................................................................................................6

42 U.S.C. § 7521.............................................................................................................26

## Regulations

40 C.F.R. § 50.19..............................................................................................................5

40 C.F.R. pt. 58, appx. G...................................................................................................6

## Session Laws and Legislative Materials

153 Cong. Rec. 35,927 (2007).........................................................................................32

Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685 ..........................32

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 ..............26

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776...................................25

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594.......................................26

Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 ..................22, 32

H.R. Rep. No. 94-340 (1975)...........................................................................................31

H.R. Rep. No. 95-1294 (1978).........................................................................................23

National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101 Stat. 103 .. 24, 25

*National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat. Res.*, 99th Cong. (Sept. 16, 1986) ...................................................................................................... 24, 27, 28

National Appliance Energy Conservation Amendments of 1988, Pub. L. 100-357, 102 Stat. 671............................................................................................................................... 25

National Energy Conservation Policy Act of 1978, Pub. L. No. 95-619, 92 Stat. 3206 ........ 22, 23

S. Rep. No. 100-6 (1987)........................................................................................................ 24

S. Rep. No. 101-228, 1990 U.S.C.C.A.N. 3385, 3421 (1989)................................................. 29

## Administrative Materials

*Approval and Promulgation of State Implementation Plans and Redesignation of the South Coast Air Basin in California for Attainment for Nitrogen Dioxide*, 63 Fed. Reg. 39,747 (July 24, 1998) ........................................................................................................................... 13

*National Ambient Air Quality Standards for Ozone*, 80 Fed. Reg. 65,292 (Oct. 26, 2015) ........... 6

## Other Authorities

Am. Lung Ass'n, *State of the Air: 2025 Report* (2025)....................................................... 7, 14, 15

Brady A. Seals & Andee Krasner, RMI, *Health Effects from Gas Stove Pollution* (2020).......... 15

Clean Air Scientific Advisory Committee, *CASAC Review of the EPA's Policy Assessment for the Review of the Primary National Ambient Air Quality Standards for Nitrogen Dioxide* (Mar. 7, 2017) ............................................................................................................................... 12

*County Detail Report for 8-Hour (2015), 8-Hour (2008), 8-Hour Ozone (1997-Revoked) and 1-Hour (1979-Revoked)*, U.S. Env't Prot. Agency (Sept. 30, 2025).......................................... 2, 6

Cynthia A. Pate et al., *Asthma Surveillance—United States, 2006-2018*, Surveillance Summaries, Summer 2021, at 1 ....................................................................................................... 15

Env't Prot. Agency, *AP-42*, c.1.4 (5th ed., rev.1998).................................................................. 10

Env't Prot. Agency, *Integrated Science Assessment for Oxides of Nitrogen – Health Criteria* (2016)................................................................................................................................... 11

Env't Prot. Agency, *Integrated Science Assessment for Particulate Matter (December 2019)* (2019)..................................................................................................................................... 9

Eva Morales, et al., *Association of Early-Life Exposure to Household Gas Appliances and Indoor Nitrogen Dioxide with Cognition and Attention Behavior in Preschoolers*, 169 Am. J. Epidemiology 1327 (2009) ................................................................................................... 15

*Health Effects of Ozone in the General Population*, Env't Prot. Agency (Mar. 27, 2025) ........ 4, 5

*Health Effects of Ozone Pollution*, Env't Prot. Agency, (Mar. 13, 2025) ..................................... 5

*Ozone*, Am. Lung Ass'n (June 9, 2025)................................................................................. 2

*PM-2.5 (2006) Designated Area Design Values,* Env't Prot. Agency (Sept. 30, 2025)............... 10

*PM-2.5 (2012) Designated Area Design Values*, Env't Prot. Agency (Sept. 30, 2025),.............. 10

Rachel Morello-Frosch et al., *Understanding the Cumulative Impacts of Inequalities in Environmental Health: Implications for Policy,* 30 Health Affairs 879 (2011) ....................... 12

S. Coast Air Quality Mgmt. Dist., *Map of Jurisdiction*, AQMD................................................ 1, 2

S. Coast Air Quality Mgmt. Dist., *2022 Air Quality Management Plan* (2022).......... 3, 8, 9, 23, 24

Sarawut Sangkham et al., *An Update on Adverse Health Effects from Exposure to PM$_{2.5}$*, Env't Advances, Dec. 2024, art. 100603 ...................................................................................... 9

*Small Industrial Pollution and Ozone Pollution across the United States*, Am. Council for an Energy Efficient Econ. (Feb. 6, 2025) ...................................................................................... 14

Sverre Vedal et al., *Air Pollution and Daily Mortality in a City with Low Levels of Pollution*, Env't Health Perspectives, Jan. 2003, at 45 (2003) ................................................................. 11

*Trends Summary: National Ozone Statistics in the South Coast Air Basin*, Cal. Air Res. Bd. ...... 6

*Trends Summary: PM2.5 Statistics in the South Coast Air Basin*, Cal. Air Res. Bd.................... 10

Wael Kanj et al., Rewiring America, *Breathe Easy: Household Electrification as a Public Health Intervention to Improve Outdoor Air Quality* (2024) ............................................................... 11

Yifang Zhu, et al., UCLA, *Effects of Residential Gas Appliances on Indoor and Outdoor Air Quality and Public Health in California* (2020)................................................................. 12, 14

## STATEMENT OF IDENTIFICATION

The Public Health Law Center (Center) is a public interest legal resource center dedicated to improving health through the power of law and policy. The Center helps local, state, national, Tribal, and global leaders promote health by strengthening public policies. These policies include regulations, such as the rule challenged in this case, that reduce the indoor and outdoor pollution caused by gas combustion. The Center is also concerned with preserving the power of state and local governments to protect their constituents by regulating public health.

The Center files this brief with the consent of all parties. No party's counsel authored this brief in whole or in part. No party's counsel, or any person other than the Center, contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The South Coast Air Basin (Basin), home to over 14 million people, has some of the most polluted air in the country.[1] As one of only two nonattainment areas in the country to be in "extreme" noncompliance with federal ozone-pollution standards under the Clean Air Act, millions of people within the Basin

---

[1] S. Coast Air Quality Mgmt. Dist. (District), *Map of Jurisdiction*, AQMD, https://www.aqmd.gov/docs/default-source/default-document-library/map-of-jurisdiction.pdf (last visited Oct. 28, 2025).

1

are regularly being exposed to harmful levels of ozone.[2] Also known as "smog," ozone is created when nitrogen oxides ($NO_x$) and volatile organic compounds (VOC's) released through polluting sources, such as tailpipes and smokestacks, come into contact with sunlight.[3] Breathing ozone can cause both immediate and long-term health problems, particularly when inhaled in conjunction with other pollutants and particularly for higher risk populations.[4] These health problems include asthma attacks, increased risk of respiratory infections, and even reproductive issues and increased cardiovascular mortality.[5]

The South Coast Air Quality Management District (District) has regulated air quality in the Basin since 1977, well before the passage of the Energy Policy and Conservation Act (EPCA).[6] Under the District's management, and due to the implementation of local regulations such as Rule 1146.2, $NO_x$ emissions have been in decline. Suppl. Excerpts of R. (SER) 134. However, there is more work to be

---

[2] *County Detail Report for 8-Hour (2015), 8-Hour (2008), 8-Hour Ozone (1997-Revoked) and 1-Hour (1979-Revoked)*, U.S. Env't Prot. Agency (EPA) (Sept. 30, 2025), https://www3.epa.gov/airquality/greenbook/gncl.html.

[3] *Ozone*, Am. Lung Ass'n (June 9, 2025), https://www.lung.org/clean-air/outdoors/what-makes-air-unhealthy/ozone#how.

[4] *Id.*

[5] *Id.*

[6] District, *Map of Jurisdiction*, *supra* note 1.

done in the Basin to protect public health and come into compliance with state and federal law. The suite of air pollution measures that includes Rule 1146.2 will save thousands of lives every year and improve the quality of life for residents, once fully implemented.[7]

There is no indication in the text, structure, or history of EPCA that suggests Congress intended to preempt authority for lifesaving measures like Rule 1146.2. This silence is particularly notable because Congress took steps to resolve conflicts between EPCA's preemption provisions and air-pollution reduction where they occurred, namely, for regulations of motor vehicles. Interpreting EPCA to preempt Rule 1146.2 thus requires the Court to assume that Congress intended to, *sub silentio*, undercut crucial elements of its own approach to protecting public health. This runs afoul of established principles of statutory interpretation, to the detriment of public health, and should therefore be rejected.

---

[7] District, *2022 Air Quality Management Plan* Appx. I, at I-116-17 (2022), https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/appendix-i.pdf.

**ARGUMENT**

## I. Rule 1146.2 Will Protect Public Health

### A. The South Coast Air Basin's Ozone Pollution Seriously Harms Public Health

Take a deep breath. Amid the flood of life-giving oxygen and inert nitrogen, a small fraction of the air you have inhaled is ozone, also called "smog." Unlike some other pollutants, ozone does not easily dissolve in water—so it is not always stopped by your nose, sinuses, and throat.[8] Instead, it travels into the airways of your lungs, where several things happen: The ozone dissolves into your lungs' protective fluid, damaging the lining between the airways and the blood vessels that carry oxygen to the rest of your body. These leak enzymes, and even elements from the blood vessel, back into your lungs' airways, while the damage triggers inflammation in the lung lining. At the same time, the ozone stimulates neural receptors in your lungs that restrict the depth of your breathing, limiting further exposure to the threat, but also reducing your lung capacity.[9]

The combined effect of this damage varies widely from one person to the next. You may be fine, even on high-ozone days. However, your neighbor,

---

[8] *Health Effects of Ozone in the General Population*, EPA (Mar. 27, 2025), https://www.epa.gov/ozone-pollution-and-your-patients-health/health-effects-ozone-general-population.

[9] *Id.*

particularly if they spend the day outdoors and physically active, may experience lung inflammation, damage, and reduced lung function by the end of the day.[10] If they have asthma, the effect is even worse. The damage done by ozone exposure weakens the lungs, leading to increased asthma symptoms and likelihood of asthma attacks.[11]

How much damage is done depends, in large part, on how much ozone enters your lungs. The U.S. Environmental Protection Agency (EPA) has set the regulatory limit for ozone at 70 parts per billion (ppb), measured as an average over an 8-hour period. 40 C.F.R. § 50.19. There is strong evidence for health impacts in at least some people at any level higher than 70 ppb. *See generally National Ambient Air Quality Standards for Ozone*, 80 Fed. Reg. 65,292, 65,352-65 (Oct. 26, 2015) (describing basis for 70 ppb standard and collecting supporting research). When ozone concentrations exceed 85 ppb, the EPA considers the air "unhealthy" for the general population. 40 C.F.R. pt. 58, appx. G, tbl. 2; *see also* 80 Fed. Reg. at 65,366 (noting studies that show impacts on lung function in one out of every four people when ozone concentrations reach 85 ppb).

---

[10] *Id.*; *see also, e.g.*, *Health Effects of Ozone Pollution*, EPA, (Mar. 13, 2025), https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution.

[11] *Health Effects of Ozone in the General Population*, *supra* note 8.

And, of course, where you live, work, and play determines how much ozone you inhale. The South Coast Air Basin, which makes up the bulk of the South Coast Air District's jurisdiction, has the worst ozone pollution in the country. Sites in the Basin exceeded the 70 ppb regulatory limit on 140 days last year, and exceeded the 85 ppb threshold on 90 days.[12] In other words, there is a universally harmful level of ozone somewhere in the Basin once every four days.

No other place in the country has this level of ozone pollution. The region is one of only two nonattainment areas in the country to be designated as having an "extreme" level of noncompliance with federal ozone-pollution standards—and the Basin has had that "extreme" rating under every ozone standard the EPA has issued.[13] The Basin's ozone pollution far exceeds that of its closest rival, the San Joaquin Valley: The Basin's "design value"—a measure of the highest-ozone days, used to determine compliance with federal ozone standards—is 108 ppb, while the

---

[12] *Trends Summary: National Ozone Statistics in the South Coast Air Basin*, Cal. Air Res. Bd. (CARB), https://www.arb.ca.gov/adam/trends/trends1.php (select "Ozone (national)," "Summarize by Air Basin," and "South Coast") (last visited Oct. 28, 2025).

[13] *See* 42 U.S.C. § 7511(a)(1) (setting out classification of ozone nonattainment areas); *County Detail Report*, *supra* note 2. In addition to the Basin, the Coachella Valley, which abuts the Basin and is also within the District's jurisdiction, has been designated as "severe" for ozone pollution under standards issued by the EPA in 1997 and 2008, but not for the most recent standard. *Id.*

6

San Joaquin Valley has a design value of only 88 ppb.[14] The Los Angeles-Long Beach metropolitan area, within the Basin, is the most ozone-polluted urban area in the country according to the American Lung Association.[15] In fact, metro Los Angeles has a "pollution index" for ozone nearly twice as high as that of the second-highest city, and nearly fifty times the level at which the American Lung Association assigns a grade of "F" for air pollution.[16]

### B. $NO_x$ Reductions Are Necessary to Address These Harms

Ozone primarily forms as the result of $NO_x$ interacting with VOC's in the atmosphere. *E.g.*, SER 42. The Basin's extreme ozone pollution stems from a unique combination of a large number of man-made sources of "precursor" chemicals and a geography and climate that encourage ozone-producing reactions. *See, e.g.*, SER 53 ("The unfavorable combination of meteorology, topography, and emissions from the nation's second largest urban area results in the Basin having some of the worst air quality in the U.S."); SER 131-33 (describing effects on

---

[14] *Trends Summary: National Ozone Statistics*, *supra* n.12.

[15] Am. Lung Ass'n, *State of the Air: 2025 Report* 15 (2025), https://www.lung.org/getmedia/5d8035e5-4e86-4205-b408-865550860783/State-of-the-Air-2025.pdf.

[16] *Id.* (finding Los Angeles-Long Beach has ozone pollution index of 153.7; the next-closest metropolitan area has an index of 88.7); *id.* at 10 (assigning a grade of "F" to any area where the ozone index exceeds 3.3).

ozone concentrations). Reducing $NO_x$ and VOC emissions is, therefore, the primary means available to protect the public from ozone exposure. Thanks to the actions of the District, as well as state and federal regulations, ozone emissions have been in decline for decades. *See* SER 134. At the beginning of the process, VOC emissions far outweighed $NO_x$ emissions.[17] Today, VOC and $NO_x$ emissions are more closely balanced.[18] $NO_x$ emissions are therefore key to reducing the Basin's extreme ozone pollution.[19] While already-adopted regulations are predicted to reduce $NO_x$ emissions to about 184 tons per day by 2037, an additional reduction of about 124 tons per day will be needed to meet the federal 70 ppb standard. SER 40-41. In other words, under current regulations, $NO_x$ emissions will be three times what they need to be in order to bring the Basin's ozone to a safe level.

---

[17] *E.g.*, District, *2022 Air Quality Management Plan* at 1-1 to 1-2 (2022), https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/final-2022-aqmp.pdf (VOC emissions estimated at 2,000 tons per day in 1952, compared to 250 tons per day of $NO_x$ emissions).

[18] *Id.* at 1-15 (in 2018, VOC emissions were approximately 406 tons per day in the basin, compared to 351 tons per day of $NO_x$).

[19] *See, e.g., id.* at 5-8, fig. 5-4 (predicted ozone levels at one sample site for varying $NO_x$ and VOC emissions rates, showing that VOC reductions alone could not achieve federal standard, while $NO_x$ reductions could); SER 40 (noting that $NO_x$ reductions are "key" in reducing ozone in the Basin).

*C. Rule 1146.2 Will Protect Against Other Pollutants*

Beyond lowering ozone concentrations, Rule 1146.2 will provide a number of additional health benefits. First, the Rule will reduce $PM_{2.5}$—airborne, inhalable particles 2.5 micrometers or less in diameter—because $NO_x$ contributes to $PM_{2.5}$ formation, as well as that of $NO_x$.[20] Because of these particles' miniscule size, $PM_{2.5}$ bypasses the filtration ordinarily provided by the upper respiratory system and, like ozone, enters the microscopic airways where oxygen is transferred to our bloodstream.[21] There, $PM_{2.5}$ can damage the lungs, trigger immune responses, and even enter the bloodstream itself, eventually reaching and damaging other organs.[22] $PM_{2.5}$ exposure causes cardiovascular impacts, particularly coronary artery disease and heart failure, and ultimately, death.[23] $PM_{2.5}$ also likely damages the lungs and nervous system and increases cancer risk.[24]

---

[20] District, *2022 Air Quality Management Plan*, *supra* note 17, at 2-1, 2-31.

[21] *See generally*, *e.g.*, Sarawut Sangkham et al., *An Update on Adverse Health Effects from Exposure to $PM_{2.5}$*, Env't Advances, Dec. 2024, art. 100603, at 1-6, https://www.sciencedirect.com/science/article/pii/S2666765724001212.

[22] *Id.* at 4-8.

[23] *E.g.*, EPA, *Integrated Science Assessment for Particulate Matter (December 2019)* ES-13 to ES-14, ES-16 to ES-17 (2019), https://assessments.epa.gov/isa/document/&deid=347534.

[24] *E.g.*, *id.* at ES-12 to ES-13, ES-15 to ES-16.

The Basin is one of a handful of areas in the country where the $PM_{2.5}$ concentrations exceed the latest federal standard.[25] The Basin also exceeds state $PM_{2.5}$ standards.[26] This is primarily due to emissions of $NO_x$ and other gases that are converted into $PM_{2.5}$ in the atmosphere. SER 138. Thus, Rule 1146.2's reduction in $NO_x$ emissions is an important step toward checking $PM_{2.5}$ levels in the Basin. *E.g.*, SER 18, 117.

Eliminating $NO_x$ emissions from appliances subject to Rule 1146.2 will also reduce the emissions of harmful co-pollutants. The source of $NO_x$ emissions addressed by Rule 1146.2—gas combustion—directly produces particulate matter, as well as carbon monoxide and various hazardous air pollutants such as benzene and formaldehyde.[27] Transitioning to zero-$NO_x$ equipment, such as heat pumps,

---

[25] *PM-2.5 (2012) Designated Area Design Values*, EPA, (Sept. 30, 2025), https://www3.epa.gov/airquality/greenbook/kdtc.html. The Basin is also in "serious" nonattainment status for the 2006 $PM_{2.5}$ standards, which are based on 24-hour averages rather than annual averages. *PM-2.5 (2006) Designated Area Design Values,* EPA (Sept. 30, 2025), https://www3.epa.gov/airquality/greenbook/rdtc.html.

[26] *Trends Summary: PM2.5 Statistics in the South Coast Air Basin*, CARB, https://www.arb.ca.gov/adam/trends/trends1.php (select "PM2.5" "Summarize by Air Basin," and "South Coast") (last visited Oct. 28, 2025).

[27] *E.g.*, EPA, *AP-42*, c.1.4, tbls. 1.4-2, 1.4-3 (5th ed., rev.1998), https://www.epa.gov/sites/default/files/2020-09/documents/1.4_natural_gas_combustion.pdf.

will largely eliminate the onsite emissions of these co-pollutants and drastically reduce overall emissions.[28]

Finally, $NO_x$ is a harmful pollutant in its own right and reducing it will further protect public health. $NO_x$ is an irritant that causes asthma attacks and can make asthma worse; there is also evidence connecting $NO_x$ to other respiratory illnesses, allergy exacerbation, diabetes, heart disease, lung cancer, and negative birth outcomes.[29] While the Basin meets federal standards for nitrogen dioxide, it was the only region in the country to have been designated as a "nonattainment area" for the modern standards when they were adopted in 1990. *Approval and Promulgation of State Implementation Plans and Redesignation of the South Coast Air Basin in California for Attainment for Nitrogen Dioxide*, 63 Fed. Reg. 39,747, 39,747-48 & n.3 (July 24, 1998). Even now, $NO_x$ emissions are a subject of

---

[28] *See generally, e.g.*, Wael Kanj et al., Rewiring America, *Breathe Easy: Household Electrification as a Public Health Intervention to Improve Outdoor Air Quality* (2024), https://a-us.storyblok.com/f/1021068/x/3c121cf7ec/breathe-easy-health-benefits-from-electrification.pdf (finding $40 billion in net quantified health benefits from converting existing residential space and water heating to heat pumps).

[29] *See generally* EPA, *Integrated Science Assessment for Oxides of Nitrogen – Health Criteria* 1-17 to 1-30 (2016), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=526855.

11

concern, as some research suggests that even small $NO_x$ concentrations can increase mortality rates.[30]

> D. *Rule 1146.2 Ensures that All Communities Have Access to Clean Air*

Vulnerable communities cannot breathe. On the frontlines of environmental injustice, low-income communities, communities of color, children, elders, and those with preexisting health conditions suffer the most from poor air quality. In California, ethnic or racial minorities are overrepresented in communities that are situated in unhealthy environments. These neighborhoods have limited access to green spaces, healthy food, and clean air.[31] These communities are also disproportionately more likely to have polluting industries like power plants and other industrial facilities that expose them to more chemicals and pollutants than people who live in more affluent neighborhoods.[32] Notably, 40 percent of

---

[30] *See, e.g.*, Sverre Vedal et al., *Air Pollution and Daily Mortality in a City with Low Levels of Pollution*, Env't Health Perspectives, Jan. 2003, at 45, 45 (2003), https://pmc.ncbi.nlm.nih.gov/articles/instance/1241305/pdf/ehp0111-000045.pdf (concluding, with caveats, "that increases in low concentrations of air pollution are associated with increased daily mortality"); Clean Air Scientific Advisory Committee, *CASAC Review of the EPA's Policy Assessment for the Review of the Primary National Ambient Air Quality Standards for Nitrogen Dioxide* 8-9 (Mar. 7, 2017), https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100X9A8.txt.

[31] *See* Rachel Morello-Frosch et al., *Understanding the Cumulative Impacts of Inequalities in Environmental Health: Implications for Policy,* 30 Health Affairs 879. 879-81 (2011), https://escholarship.org/uc/item/1kq0196d.

[32] *Id*.

California's power plants, which produce $NO_x$, are located in vulnerable communities like the Los Angeles South Bay area.[33]

The concentration of poor air quality across the state corresponds with poverty and racial segregation. At least 42 percent of the District lives in an area defined as an environmental justice community that has high levels of air pollution. SER 146. While this definition does not include the racial and ethnic make-up of an area in the scoring of what qualifies as an environmental justice community, the District's environmental justice communities do have large amounts of ethnic and racial minorities in their populations. SER 146-147. And the number of people at risk from the hazards of smog caused by $NO_x$ will disproportionately be those who are low-income and of a racial minority.[34]

Rule 1146.2 will help curb the harm that these pollutants pose to all inhabitants in Southern California. The stationary fuel combustion targeted by the rule accounts for a significant portion of nitrogen oxide emissions across the country. These emissions are usually concentrated in low-income communities

---

[33] Yifang Zhu, et al., UCLA, *Effects of Residential Gas Appliances on Indoor and Outdoor Air Quality and Public Health in California* 35 (2020), https://coeh.ph.ucla.edu/wp-content/uploads/2023/01/Effects-of-Residential-Gas-Appliances-on-Indoor-and-Outdoor-Air-Quality-and-Public-Health-in-California.pdf.

[34] Am. Lung Ass'n, *Disparities in the Impact of Air Pollution* (Nov. 2, 2023), https://www.lung.org/clean-air/outdoors/who-is-at-risk/disparities.

posing risks for greater exposure to ozone, smog, and other poor air quality indicators.[35] Specifically, mapping shows that southern California has moderate to extreme levels of ozone, measured over an eight-hour period, from small industrial boilers.[36] These emissions are disproportionately concentrated in communities of color and low-income communities, who often bear the burden of pollution and suffer the health consequences. Industrial emissions are aggregated with resident emissions, often where people do not have a choice about the appliances they use, especially if they rent or live in public housing. By limiting nitrogen oxide emissions to zero, the District is working to create a healthier environment for everyone.

In addition, poor air quality, both indoor and outdoor, has negative effects on different segments of the community. Children and older adults are at high levels of risk of developing asthma, cardiovascular issues, and general breathing trouble.[37] For example, children under four who are exposed to nitrogen dioxide indoors are also more likely to experience impaired cognitive function and are at

---

[35] *See generally* Yifang Zhu et al., UCLA, *Effects of Residential Gas Appliances*, *supra* note 33.

[36] *Small Industrial Pollution and Ozone Pollution across the United States*, Am. Council for an Energy Efficient Econ. (Feb. 6, 2025), https://www.aceee.org/small-industrial-boilers-and-ozone-pollution-across-united-states.

[37] Am. Lung Ass'n, *State of the Air: 2025 Report*, *supra* note 15, at 21-22, 28-31.

greater risk of developing attention-deficit or hyperactivity disorder symptoms.[38] Children in these settings are more likely to develop asthma than children who live in less polluted areas.[39] The vulnerability of these groups and limited lack of choice, especially for those living in poverty, keep them exposed to high levels of nitrogen oxides that exacerbate and create health issues.

Additionally, people who are already living with a medical condition will see those conditions worsen as indoor and outdoor air quality deteriorates. Nitrogen oxides and other chemicals that the District seeks to limit harm people living with asthma, COPD, or lung cancer. Poor air quality is also known to harm both the person carrying a pregnancy, as well as the development of the fetus. Poor air quality will influence and determine the health of future generations, not just the current one[40]

---

[38] Brady A. Seals & Andee Krasner, RMI, *Health Effects from Gas Stove Pollution* 12-13 (2020), https://rmi.org/insight/gas-stoves-pollution-health (citing Eva Morales, et al., *Association of Early-Life Exposure to Household Gas Appliances and Indoor Nitrogen Dioxide with Cognition and Attention Behavior in Preschoolers*, 169 Am. J. Epidemiology 1327 (2009)).

[39] *See generally* Cynthia A. Pate et al., *Asthma Surveillance—United States, 2006-2018*, Surveillance Summaries, Summer 2021, at 1, https://www.cdc.gov/mmwr/volumes/70/ss/ss7005a1.htm.

[40] *See* Am. Lung Ass'n, *State of the Air: 2025 Report*, *supra* note 15, at 21-22.

While Rule 1146.2 benefits everyone in the district, it will have even more dramatic benefits for children, elders, and communities that have had to bear a disproportionate burden of air pollution for many years. The Rule is therefore crucial to the District's efforts to include the vulnerable communities most at risk for chronic and life-threatening diseases in the benefits of cleaner air.

## II. Congress Did Not Intend EPCA to Preempt Crucial Public-Health Measures Such as Rule 1146.2

Given the crucial importance of air-pollution regulations like Rule 1146.2 in protecting the health and wellbeing of the Basin's residents, it would be surprising if Congress intentionally dismantled them through EPCA's preemption provisions. There is, in fact, no indication in the text, structure, or history of EPCA that Congress intended the energy-policy statute to preempt these sorts of regulations. On the contrary, the legislative history and structure of EPCA point to an intention to subordinate EPCA's provisions to public-health protections.

### A. EPCA Amendments Have Not Uniformly Moved the Statute Toward Greater Preemption

*Amicus curiae* the American Gas Association claims that "Each one of [EPCA's] amendments further…restricted states' abilities to set their own standards." Br. *Amicus Curiae* Am. Gas Assoc. Supp. Pls.-Appellants and Reversal 5. This is incorrect. Congress's amendments to EPCA have taken divergent

16

approaches to preemption, often simultaneously relaxing preemption in one area while making it more stringent in another.

As the Intervenors-Defendants-Appellees (Intervenors) note, EPCA's original approach relied primarily on labeling and voluntary targets to achieve its energy-conservation objectives. Intervenor-Defs.-Appellees' Answering Br. (Intervenors' Br.) 6-7; *see also Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Devt. Comm'n*, 410 F.3d 492, 499 (9th Cir. 2005). This version of EPCA allowed for mandatory appliance standards only as a fallback option if these less coercive measures failed. *Air Conditioning*, 410 F.3d at 499. Preemption under the 1975 EPCA would apply if and when federal mandatory standards took effect. Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, § 327(a)(2), 89 Stat. 871, 927. State and local governments also had the option to request a waiver of federal preemption for a given standard, which would be granted if the government could show "substantial State or local need," that the standard would "not unduly burden interstate commerce," and that the standard was more stringent than the preempting federal standard. *Id.* § 327(b)(2), 89 Stat. at 927.

The National Energy Conservation Policy Act of 1978 (NECPA), Pub. L. No. 95-619, 92 Stat. 3206, shifted away from this voluntary approach, requiring the Department of Energy (DOE) to establish federal regulations for thirteen

17

designated categories of appliances. Intervenors' Br. 8; *Air Conditioning*, 410 F.3d at 499. This shift came with a temporary preemption of state and local conservation standards for those categories until the middle of 1980, when preemption would return to essentially what it was under the original EPCA language. NECPA § 424(a), 92 Stat. at 3264. At the same time, NECPA loosened the requirements for preemption waivers: First, state and local government no longer needed to show "substantial…need," but rather "significant…interest." *Id.* Second, NECPA shifted the burden of demonstrating that the preempted standard would not burden interstate commerce. Now, EPCA required DOE to approve the waiver unless the agency found a burden to interstate commerce, rather than requiring the state or local government to show that there was no burden. *Id.*; *see also* H.R. Rep. No. 95-1294, at 118 (1978).

NECPA's amendments to EPCA were not, therefore, uniformly directed toward reducing state and local authority. The amendments temporarily paused new state and local standards and pushed forward the process of establishing federal standards that would preempt them, but they also made it substantially easier to obtain a waiver of preemption. In practice, NECPA may well have *increased* state and local authority relative to what would have happened if EPCA was not amended, since DOE did not actually issue the required federal standards

18

until 1982,[41] well after NECPA's temporary preemption expired, and never denied a petition for a preemption waiver after it released them. *See* S. Rep. No. 100-6, at 4 (1987); *National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat. Res.*, 99th Cong. 255 (Sept. 16, 1986) (*NAECA Hearing*) (statement of Alan J. Streb, Deputy Assistant Sec'y for Conservation, DOE) ("[I]n all cases where we actually acted [on a waiver petition], the Department did act favorably."). Indeed, as DOE interpreted NECPA, the statute left it "little power to do anything else." *NAECA Hearing* at 255.

The changes to EPCA preemption in the National Appliance Energy Conservation Act of 1987 (NAECA), Pub. L. No. 100-12, 101 Stat. 103, are even more nuanced. Like NECPA, NAECA provided for some level of preemption before federal standards took effect; it also set those standards by statute to avoid further delays. NAECA § 7, 101 Stat. at 118. At the same time, however, NAECA created categorical exemptions for specific state standards. *Id.* Similarly, NAECA tightened the standard for preemption waivers, but simultaneously created a broad and automatic carve-out for efficiency regulations in performance-based energy

---

[41] These were the infamous "'no-standard' standards." *Air Conditioning*, 410 F.3d at 499 (quoting S. Rep. 100-6, at 4).

codes. *Id.*, 101 Stat. at 121. Neither the protections for specific types of regulations nor those for energy codes had existed in EPCA before NAECA. Thus, while some additional state and local regulations were preempted under NAECA, many others received permanent exemptions from preemption which they would not have had under NECPA or EPCA's original formulation.

Congress has continued to add specificity and nuance to EPCA's preemption scheme in the decades since NAECA. The Energy Policy Act of 1992, which extended EPCA to industrial appliances, mostly incorporates NAECA's preemption regime while adding its own twists. The exemption for building codes is much simpler than in NAECA, for example, and a specific California standard for water-source heat pumps is explicitly protected. Pub. L. No. 102-486, § 122(e)(2), 106 Stat. 2776, 2816. Congress has added many additional carveouts through later EPCA amendments. *See* National Appliance Energy Conservation Amendments of 1988, Pub. L. 100-357, § 2(f), 102 Stat. 671, 674 (exempting some state fluorescent-lamp standards from preemption); Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 135(d)(3), 136(h)(3), 119 Stat. 594, 634, 644 (exempting some state standards for pedestrian crossing lights and creating a complex system for preemption of industrial cooling equipment); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, §§ 312(e)(2), 321(d)(3), 324(f)(2), 121

20

Stat. 1492, 1567, 1585, 1594-95 (exempting state standards for walk-in freezers and certain lighting equipment).

It is therefore incorrect to assert that EPCA's amendments have moved uniformly in the direction of increased preemption. Rather, Congress has evinced a high level of care in determining which regulations would be the responsibility of the federal government and which would be left to state and local governments— often down to the individual state and type of appliance preempted. *E.g.*, 42 U.S.C. § 6297(c)(9) (exempting certain California regulations of metal halide lamps from preemption). This detail and nuance indicate that Appellants and the American Gas Association are wrong to interpret EPCA as secretly doing away with broad swathes of state and local authority. *Cf. U.S. v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 412 (1999) ("[W]here precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions…, a statute…that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.").

### B. The Legislative Record Indicates Congressional Intent to Maintain, not Preempt, State and Local Health Regulations

As the district court noted, "there is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emissions regulations designed to combat air pollution." Excerpts of R. at 16. Certainly, EPCA's preemption of health regulations would be news to the Congressmembers

21

that enacted NAECA. Senator Alan Cranston, a co-sponsor of the bill that became

NAECA, believed that it "preserves the ability of states to respond to…adverse

environmental or health and safety conditions that can be alleviated by energy-

saving appliances." *NAECA Hearing* at 65. Similarly, Senator Dan Evans noted

that one important element of NAECA was that it "reduces…negative impact on

the environment." *Id.* at 2.

The fact that emissions regulation would affect EPCA-covered appliances

was clear before NAECA's passage. For example, the District has been regulating

$NO_x$ emissions from residential furnaces and water heaters—which are covered by

EPCA, 42 U.S.C. § 6295(e)-(f)—since 1978.[42] And it is not as though Congress

was unaware of the connection between air pollution and energy use. The Natural

Resources Defense Council, one of NAECA's architects, *Air Conditioning*, 410

F.3d at 499-500, specifically cited the nexus of reducing fuel consumption and

eliminating $NO_x$ emissions in testimony to Congress on the bill language. *NAECA*

*Hearing* at 119-20 (statement of Dr. David B. Goldstein, Sr. Staff Scientist, Nat.

---

[42] District, *Regulation 1111: Reduction of $NO_x$ Emissions from Natural-Gas-Fired, Fan-Type Central Furnaces* (last amended Sept. 1, 2023), https://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1111.pdf; District, *Regulation 1121: Control of Nitrogen Oxides from Residential Type, Natural Gas-Fired Water Heaters* (last amended Sept. 3, 2004), https://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1121.pdf; *see also* SER 57-60 (describing the Rules' history since 1978).

Res. Def. Council) (noting that "reductions in energy use can lead to substantial reductions in air pollution" and specifically that California's conservation standards for refrigerators "would reduce emissions of nitrogen oxides by 5% statewide").

It is therefore incongruous to read the preemption language inserted by NAECA as a restraint on air-pollution regulations. This incongruity is magnified by the clear congressional policy in favor of regulations like Rule 1146.2, embodied in the Clean Air Act—a statute whose history of amendments is closely tied up with EPCA's, as the Intervenors describe. Intervenors' Br. 37-40.

After all, tackling the Basin's ozone problem is an explicit goal of the federal Clean Air Act. *See, e.g.*, S. Rep. No. 101-228, 1990 U.S.C.C.A.N. 3385, 3421 (1989) ("extreme" category of ozone violation designated by Congress in 1990 included only "Los Angeles-Anaheim-Riverside," an area roughly equivalent to the Basin). However, the District only has a narrow window in which to operate because of already established federal preemption. The federal government—and, in some cases, international law—is the primary regulatory authority for emissions from planes, cargo ships, interstate trucking, and trains.[43] These sources alone emit enough pollutants to prevent the Basin from attaining federal ozone standards—

---

[43] *See* District, *2022 Air Quality Management Plan*, *supra* note 17, at 4-5.

23

and the federal government has not been nearly as effective in reducing $NO_x$ emission from the sources it controls as the District has been.[44] As a result, the District needs to eliminate essentially every possible source of $NO_x$ within its jurisdiction to meet federal ozone standards.

Now Appellants argue that another broad area of regulation is forbidden to the District: anything that prevents the use of an appliance regulated under EPCA. *E.g.*, Appellants' Br. 22-23. Adopting this view would effectively mandate a permanent minimum amount of $NO_x$ emissions that the District must allow in the Basin. This is incompatible with the District's obligation under federal law to reduce ozone concentrations in the Basin. SER 29 (District's determination that "there is no viable pathway to achieve the [federally mandated] reductions without widespread adoption of zero emissions (ZE) technology"). Indeed, state and local air-pollution regulations across the country, which are specifically designed to meet federal standards, are under threat from Appellants' reasoning. *See* Def.-Appellee's Answering Br. 40-43 (discussing impacts of holding Rule 1146.2 preempted on air-pollution rules in other states). And it cannot possibly be the intent of Congress, which, as demonstrated above, never indicated an intent to

---

[44] *Id.*

interfere with the Clean Air Act in EPCA's appliance regulations and made specific provisions to avoid doing so with EPCA's vehicle regulations.

### C. By Comparison, the Vehicle-Efficiency Side of EPCA Explicitly Acknowledges and Addresses Overlap with Health-Protective Regulations

Congress's silence on the overlap between emissions and efficiency regulations for appliances contrasts with Congress's clear acknowledgment of tension between EPCA and the Clean Air Act in an area where the two statutes actually do overlap: vehicle regulation. In addition to providing for energy conservation for appliances, EPCA regulates vehicle fuel economy; that is, a vehicle's miles per gallon. 42 U.S.C. § 32902. The Clean Air Act, meanwhile, regulates air pollutants emitted by vehicles. 42 U.S.C. § 7521.

Mileage and emissions interact with each other in various ways: For example, there was concern at the time of EPCA's original passage that emissions controls would reduce vehicles' fuel economy. *See* H.R. Rep. No. 94-340, at 86-87 (1975). Congress addressed this overlap by explicitly recognizing it and cross-referencing the applicable EPCA and Clean Air Act provisions. When it first passed EPCA in 1975, Congress included a provision specifically allowing for less stringent fuel-economy standards for technologies that could be shown to meet "Federal standards," including "Emissions standards under section 202 of the Clean Air Act." Energy Policy and Conservation Act of 1975, Pub. L. 94-163,

25

§ 301, 89 Stat. 871, 904-05. Two years later, Congress incorporated EPCA into the Clean Air Act, allowing manufacturers flexibility on emissions standards for technologies that could meet EPCA fuel-economy standards. Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 201(c), 91 Stat. 685, 753. More recently, Congress protected Clean Air Act standards in the saving clause for the Energy Independence and Security Act of 2007. *See, e.g.*, 153 Cong. Rec. 35,927-28 (2007) (statement of Rep. Edward J. Markey) (noting that, in amending EPCA's fuel-economy provisions through the 2007 Energy Independence and Security Act, "It is the intent of Congress to fully preserve existing federal and State authority under the Clean Air Act").

Congress's careful treatment of the overlap between the Clean Air Act's emissions standards and EPCA's vehicle-efficiency preemption provisions argues for a narrow reading of the appliance-efficiency portion of EPCA. Congress has demonstrated that, when it found that the two statutes could conflict, it explicitly delineated which would prevail. Moreover, Congress ensured that, where emissions and fuel-economy regulations conflicted, the emissions standards would win. It is therefore incongruous to read another efficiency standard in the same statute as implicitly eliminating air-pollution regulations that are crucial for the implementation of the Clean Air Act.

26

**CONCLUSION**

Everyone has the right to breathe clean air, and the District's efforts to implement regulations that will contribute to a more just and healthier society should not be precluded. The Center urges the Court to affirm the District Court's decision upholding Rule 1146.2 in order to protect this important public-health measure.

Dated: October 29, 2025                    Respectfully Submitted,

                                           ___s/Daniel Carpenter-Gold___
                                           Daniel Carpenter-Gold
                                           daniel.carpentergold@mitchellhamline.edu

                                           Esther Agbaje
                                           Mia Montoya Hammersley
                                           Public Health Law Center
                                           875 Summit Ave.
                                           St. Paul, MN 55105

                                           *Counsel for* Amicus Curiae *Public Health Law Center*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** ___25-5129___

I am the attorney or self-represented party.

**This brief contains ___4,735___ words,** including ___0___ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___s/ Daniel Carpenter-Gold___ **Date** ___10/29/2025___
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                      *Rev. 12/01/22*